Fulton County Superior Court
***EFILED***LW
Date: 12/23/2019 7:02 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF GEORGIA
## FULTON COUNTY

|  |  |
|---|---|
| MACHELLE JOSEPH, )<br><br>Plaintiff, )<br><br>v. )<br><br>BOARD OF REGENTS OF )<br>THE UNIVERSITY SYSTEM )<br>OF GEORGIA; )<br>GEORGIA TECH ATHLETIC )<br>ASSOCIATION; )<br>GEORGE P. PETERSON, in his individual )<br>capacity; M. TODD STANSBURY, in his )<br>individual capacity; MARVIN LEWIS, in )<br>his individual capacity; and )<br>SHOSHANNA ENGEL, in her individual )<br>capacity. )<br><br>Defendants. )<br>)| Civil Action No.: **2019CV331019**<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

### PRELIMINARY STATEMENT AND INTRODUCTION

1.  For 16 years, Plaintiff MaChelle Joseph ("Coach Joseph") served as Head Coach of the Georgia Institute of Technology's ("GT") Women's Basketball ("WBB") Team, during which time she amassed more wins than any other coach in GT WBB history.

2.  In her first year as Head Coach, Coach Joseph assembled the highest-rated freshman class in school history and tied the records for most overall and conference victories by a first-year head coach at GT.

3.  In the years that followed, she continued to break records and elevate the GT WBB program. In just 10 years, Coach Joseph more than tripled the GT WBB Team's participation in the National Collegiate Athletic Association ("NCAA") tournament, including an

<span style="color:red">Exhibit B</span>

appearance in the Sweet Sixteen.  She also assembled 13 top-25 recruiting classes during her 16 years as Head Coach, including a top-15 class in 2017, a top-10 class in 2018 that included two McDonald's All-Americans, and a top-25 class in 2019.  In 2018, she led the GT WBB Team to its 300th win under her leadership.

4.      While Coach Joseph's accomplishments standing alone are outstanding, they are made even more impressive when viewed within the context in which she achieved them.

5.      Throughout her career at GT, Coach Joseph worked in an Athletic Department that afforded her and her team significantly fewer benefits and resources than it provided to the GT Men's Basketball ("MBB") Team, including but not limited to funding, facilities, publicity, marketing, and travel.

6.      GT's failure to provide Coach Joseph and her team equal benefits and resources in turn, denied her and her team equal opportunity and required her to devote a substantial portion of her time opposing GT's discriminatory treatment.

7.      Although Coach Joseph's advocacy initially helped better ensure GT's equal treatment of Coach Joseph and the WBB Team, it started to provoke animus from GT beginning in or around 2015, after GT hired new leadership in the Athletic Department.

8.      After this time, GT not only attempted to stymie Coach Joseph's advocacy efforts, but it embarked on a campaign of retaliation and harassment against her for her opposition to GT's discriminatory treatment of her and the WBB Team.

9.      On February 8, 2019, in an effort to stop GT's escalating discriminatory and retaliatory treatment of her, Coach Joseph filed an internal complaint with GT outlining her concerns of discrimination and retaliation.

10.     Approximately two weeks later, on or around February 25, 2019, GT opened a spurious investigation into Coach Joseph's coaching practices, abruptly suspended her employment with two games left in the season and when she was one win away from leading the GT WBB Team to the NCAA berth, and launched a freewheeling investigation that probed into nearly every aspect of her program.

11.     Using this retaliatory investigation as a pretext, GT then ended Coach Joseph's 16-year career as Head Coach by terminating her employment on March 26, 2019, for her allegedly unacceptable and extreme coaching practices.

12.     The reason GT has put forward to justify its termination of Coach Joseph's employment is not worthy of credence.  Instead, it is merely pretext for the discriminatory and retaliatory bias that infused the GT culture during Coach Joseph's employment and led GT to unlawfully terminate Coach Joseph's employment.  Indeed, the explanation itself – which justifies the punishment of a female coach for employing demanding coaching practices regularly used by male coaches without consequence – reflects the sex biases that Coach Joseph spent her career fighting against.

13.     Coach Joseph files this Complaint for declaratory, injunctive, and monetary relief against Defendants Board of Regents of the University System of Georgia ("BOR") and Georgia Tech Athletic Association ("GTAA"), collectively "the Institutional Defendants," for sex discrimination in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a) ("Title IX") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII");  against the Institutional Defendants for retaliation in violation of Title IX, Title VII, and the Georgia Whistleblower Act, O.C.G.A. § 45-1-4 ("GWA"); against former President George P. Peterson, Athletic Director Todd Stansbury, Associate Athletic Director of

Administration and Finance Marvin Lewis, and Associate Athletic Director of Compliance Shoshanna Engel, in their individual capacities (collectively, the "Individual Defendants") for sex discrimination in violation of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983; against the Institutional Defendants for breach of contract in violation of Georgia law; against BOR for violation of the Georgia Open Records Act, O.C.G.A. § 50-18-17 ("ORA"); and against the Institutional Defendants and Individual Defendants (collectively, "the Defendants") for litigation expenses under O.C.G.A. § 13-6-11.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this Complaint pursuant to O.C.G.A. § 15-6-8.

15.     Venue is proper in this Court as to Counts 1-16 pursuant to GA CONST Art. 6, § 2, ¶ VI as all Defendants reside in Fulton County.  Venue is also proper in this Court as to Count 12 pursuant to O.C.G.A. § 45-1-4(e)(1).  Venue is also proper in this Court as to Count 15 pursuant to O.C.G.A. § 50-21-1(b).  Venue is also proper in this Court as to Count 16 pursuant to O.C.G.A. § 50-18-73(a).

## PARTIES

16.     Coach Joseph is a citizen of the United States and an adult resident of the State of Florida.  She was employed by GT and GTAA from approximately June 2001 to March 26, 2019, serving most recently as the Head Coach of the GT WBB Team.

17.     GT is a member institution of the University System of Georgia. Pursuant to O.C.G.A. § 20-3-51, Defendant Board of Regents of the University System of Georgia ("BOR") is vested with the government, control, and management of the University System of Georgia

4

and all of its institutions, including GT.[1]   Defendant BOR's headquarters is located at 270 Washington Street, S.W., in Atlanta, Georgia, 30334, in Fulton County.  Defendant BOR is an employer subject to suit under Title VII as it has 15 or more employees and is engaged in interstate commerce.

18.     Defendant Georgia Tech Athletic Association, Inc. ("GTAA") is a non-profit corporation organized and existing under Georgia law that administers the intercollegiate athletic programs of GT.  Its principal place of business is located at 151 Bobby Dodd Way, N.W., Atlanta, Georgia 30332, in Fulton County.  GTAA is an employer subject to suit under Title VII as it has 15 or more employees and is engaged in interstate commerce or acted with BOR as a single and/or joint employer and/or acted as agent of BOR.

19.     Defendant George P. Peterson ("Defendant Peterson") is the former President of GT, who served in this capacity from 2009 to approximately August 2019.   In this role, Defendant Peterson had ultimate responsibility and authority for the operation, fiscal integrity, and personnel of GT's athletic programs.  Defendant Peterson is a resident of Fulton County, residing at 2601 Canterbury Trail, N.E., Atlanta, Georgia 30324.  He is being sued pursuant to 42 U.S.C. § 1983 in his individual capacity.

20.     Defendant M. Todd Stansbury ("Defendant Stansbury") is the Director of Athletics at GT and the Chief Executive Officer of Defendant GTAA.  In these roles, Defendant Stansbury had the authority and discretion to allocate funding to GT's intercollegiate athletic programs, including to its men's and women's basketball programs.  He is a resident of Fulton County, residing at 115 17th Street, N.E., Atlanta, Georgia 30309.  He is being sued pursuant to 42 U.S.C. § 1983 in his individual capacity.

---

[1] For purposes of this Complaint, BOR is synonymous with GT.  Accordingly, any reference to GT is a reference to BOR and vice versa.

21.     Defendant Marvin Lewis ("Defendant Lewis") is the Associate Athletic Director of Administration and Finance at GT and Chief Financial Officer of Defendant GTAA.  In these roles, Defendant Lewis had the authority and discretion to allocate funding to GT's intercollegiate athletic programs, including to its men's and women's basketball programs. Defendant Lewis is a resident of Fulton County, residing at 2235 Main Street, N.W., Atlanta, Georgia 30319. He is being sued pursuant to 42 U.S.C. § 1983 in his individual capacity.

22.     Defendant Shoshanna Engel ("Defendant Engel") is the Associate Athletic Director of Compliance and Deputy Title IX Coordinator at GT.  She is a resident of Fulton County, residing at 2235 Main Street, N.W., Atlanta, Georgia 30319.  She is being sued pursuant to 42 U.S.C. § 1983 in her individual capacity.

## ADMINISTRATIVE PROCEDURES

23.     On April 16, 2019, within 180 days of the last discriminatory and retaliatory acts about which Coach Joseph complains, Coach Joseph filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") against Defendant BOR. On May 13, 2019, within 180 days of the last discriminatory and retaliatory acts about which Coach Joseph complains, Coach Joseph filed an Amended EEOC Charge adding Defendant GTAA as an employer.

24.     On November 25, 2019, Coach Joseph received a Right to Sue Notice from the EEOC as to both the April 16, 2019 and May 13, 2019 Charges.  She filed this action within 90 days of receipt of her Right to Sue Notices.

## FACTUAL ALLEGATIONS

**GT, a Federally Funded Institution, Operates its Athletic Department through GTAA.**

25.     BOR is a board of the state of Georgia that is vested with the government, control, and management of GT.  BOR oversees the operation and budget activities of the intercollegiate athletic programs of GT.

26.     BOR/GT receives federal financial assistance to fund GT's education programs and activities.

27.     GTAA is a non-profit corporation organized for the express purpose of administering the intercollegiate athletic programs of GT.  This includes providing facilities for and encouraging participation by the GT student body in GT's intercollegiate athletic programs. It is functionally indistinguishable from the GT Athletic Department, and acts on behalf of GT.

28.     GT, a federally funded institution, provides monetary contributions to fund GTAA so that it can carry out its mission of promoting the educational programs of GT.  These funds include institutional monetary support from GT, monies from seat and ticket sales for GT sporting events, and student athletic fees.

29.     Using the money and authority provided to it by GT, GTAA operates GT's Athletic Department on behalf of GT.

30.     GTAA enters into employment contracts with individuals who work in GT's Athletic Department, and exercises control over those individuals' daily job functions, including establishing rules and policies by which GT employees must abide and requiring GT employees to carry out numerous functions on its behalf.

31.    GTAA provides monetary payments to compensate individuals who work in the GT Athletic Department, and also has the authority to discipline and terminate individuals who work in the GT Athletic Department.

32.    GTAA expends money and resources on behalf of GT, including providing monetary support for GT's athletic activities, GT's athletic programs, GT's athletic facilities maintenance and enhancements, and for grants and scholarships to GT student-athletes, all to promote GT's educational programs.

### Prior to Her Termination, Coach Joseph Was a Long-Term, High Performing Coach at GT/GTAA Who GT/GTAA Paid Less Than Similarly Situated Male Employees for Equal Work.

33.    GT and GTAA hired Coach Joseph in approximately June 2001 as an Assistant Coach on the WBB Team.

34.    In May 2003, GT and GTAA promoted Coach Joseph to Head Coach of the WBB Team.

35.    From 2003 to 2014, Coach Joseph excelled in her role as Head Coach.

36.    On October 10, 2014, GT offered to renew Coach Joseph's employment as Head Coach of the GT WBB Team and provided her an Offer Letter that set forth the terms and conditions of her employment.

37.    A true and correct copy of the Offer Letter is attached hereto as Exhibit A and is incorporated herein by reference.

38.    On October 20, 2014, GTAA, acting on behalf of GT, tendered to Coach Joseph a six year employment contract (the "Employment Contract") that was effective until March 31, 2020.

39.     The Employment Contract could only be terminated without financial penalty prior to March 31, 2020 for "Good Cause."

40.     A true and correct copy of the Employment Contract is attached hereto as Exhibit B and is incorporated herein by reference.

41.     At all times relevant to this Complaint, GT and GTAA employed Coach Joseph.

42.     Both GT and GTAA controlled the manner and means of Coach Joseph's employment.

43.     Both GT and GTAA required Coach Joseph to perform duties on each entity's respective behalf and supervised her work.  Exhibit A, ¶¶ 1, 5 and Exhibit A; Exhibit B, Article II ¶¶ 2-4, 7, 10, 11, 14, 15, 19-21, and Article VI.

44.     Both GT and GTAA required Coach Joseph to abide by each entities' respective rules and policies.  Exhibit A, ¶¶ 4, 5; Exhibit B, Article II ¶¶ 2, 3, 15, and Article VI.

45.     Both GT and GTAA provided Coach Joseph compensation for her work.  Exhibit A, ¶¶ 2, 3; Exhibit B, Article I and Article III.

46.     Coach Joseph's role as Head Coach of the WBB Team was central to the mission of both GT and GTAA.  Exhibit B, Witnesseth, Article VI.

47.     Both GT and GTAA maintained separate personnel files on Coach Joseph.

48.     Both GT and GTAA had the power to discipline Coach Joseph and terminate her employment.  Exhibit A, ¶ 5; Exhibit B, Article VII.

49.     GTAA's official website is hosted on GT's webpage at http://www.ramblinwreck.com, and GTAA identifies employees who work in GT's Athletic Department as among the 51-100 employees listed on its public LinkedIn page.

50.     Throughout her employment, GT/GTAA paid Coach Joseph less than the male coaches of the GT MBB Team who had substantially similar job duties as Coach Joseph.  In particular, from 2008 to 2010, GT/GTAA paid Coach Joseph, on average, approximately $400,000 while paying Head Coach of the GT MBB Team Paul Hewitt, on average, approximately $1,400,000.  From 2011 to 2015, GT/GTAA paid Coach Joseph, on average, approximately $575,000, while paying Head Coach of the GT MBB Team Brian Gregory, on average, approximately $983,000.  From 2016 to March 26, 2019, GT/GTAA paid Coach Joseph, on average, approximately $765,000, while paying Head Coach of the GT MBB Team Josh Pastner, on average, approximately $1,686,000.

### The Defendants Discriminated Against Coach Joseph and the WBB Team on the Basis of Sex.

51.     Throughout Coach Joseph's employment, GT/GTAA provided her and the WBB Team significantly fewer benefits and resources than it provided to the MBB Team and its coaches, thereby interfering with the terms and conditions of her employment and denying the WBB Team equal athletic opportunity.

### Provision of Locker Rooms and Other Facilities

52.     GT/GTAA provided Coach Joseph and the WBB Team a locker room, offices, and other facilities that were substantially inferior to those it provided the MBB Team and its coaches.

53.     The locker rooms for the GT WBB and MBB Teams are located between McCamish Pavilion ("McCamish"), where the basketball teams compete, and Zelnak Basketball Center ("Zelnak"), where the basketball teams practice.

54.     The locker room GT/GTAA provided to Coach Joseph and the WBB Team was of substandard quality.  As of the time of her termination, GT/GTAA had not made any major

upgrades to the WBB locker room during Coach Joseph's 18-year tenure, and made only occasional minor improvements, such as converting a small storage space to an academic room and laying new carpet.  Apart from the new carpet, Coach Joseph and the WBB Team had to fundraise for most minor improvements.

55.     In the absence of any meaningful upgrades, the GT WBB lockers, as of the time of Coach Joseph's termination, were dated, small, broken and frequently did not lock.  The laundry space was small, with only one washer, one dryer, and one laundry bin for the entire WBB Team.  The WBB coaching staff shared one locker room and shower space for both the female and male coaches.  In addition to these deficiencies, the outdated state of the WBB locker room required regular upkeep and maintenance that also fell to Coach Joseph and her staff to address.

56.     By contrast, GT/GTAA provided the MBB Team and its coaches with a locker room that was significantly larger than the WBB locker room, and which they regularly upgraded, including with each major coaching change since 2011.  These upgrades included a new head coach office space in the MBB locker room area; new lockers; a new game room with TVs, gaming systems, a pool table, and leather furniture; a new lounge with comfortable furniture; a new family/recruiting space; a new kitchen/nutrition space with a bar; a new cold tub; upgraded training and equipment space; upgraded laundry space with three washers, four dryers, and individual laundry lockers; a built-out recovery space with three customized recovery chairs; and two sets of individual lockers.

57.     On information and belief, the MBB Team and coaches did not have to use fundraising dollars for most, if any, of these upgrades.

11

58.    The GT MBB locker room facilities were also more accessible to the Zelnak practice facilities and provided more amenities to the MBB coaching staff.  Since renovations in 2011, the MBB locker room has a door that provides the MBB Team direct access to Zelnak, while the GT WBB locker room has no such door.  Instead, to access the Zelnak practice facilities from their locker room, the WBB Team has to either travel through the MBB locker room, travel through the Callaway Club hospitality suites, or go outside and enter Zelnak from the front door.

59.    The fact that walking through the MBB locker room is frequently not feasible creates a number of issues for the WBB Team, including making it more difficult for the WBB Team to access the video room adjacent to the MBB locker room.

60.    The MBB coaches also have a dedicated office in the MBB locker room, while the WBB coaches have no such dedicated office in the WBB locker room.

61.    There was also significant disparity between the office space GT/GTAA provided to the coaches of the MBB and WBB Teams.  Although the offices for the coaches were located in the same building (Edge), the WBB office space was small, outdated, and shared with the women's swim team coaching staff.  Due to the lack of space, some of the WBB assistant coaches had to sit at desks in the hallway, while two other WBB staff members shared an office.

62.    By contrast, the office space for the MBB coaches was approximately double the size of the WBB office space, taking up an entire wing of the Edge building, with an upgraded conference room equipped with new technology, a re-branded space for the coaches, and its own video conference room.  Each MBB staff member also had their own dedicated office.

63.    At the time of Coach Joseph's termination, GT/GTAA had still not upgraded the WBB locker room.

64.    GT/GTAA's failure to provide Coach Joseph and the WBB Team a locker room and other facilities of similar quality and accessibility denied the WBB Team equal athletic opportunity and negatively impacted the terms and conditions of Coach Joseph's employment.  It required Coach Joseph to devote a substantial portion of extra time to fundraising for basic improvements; created significant impediments for Coach Joseph and the WBB Team on men's game days, when she and the team had to go through the Callaway Club or walk outside to reach practice;  and significantly hampered Coach Joseph's ability to recruit premier players and build her program, which in term limited her compensation, a portion of which was tied to her ability to build and coach teams to various collegiate tournaments.

65.    Upon information and belief, Defendants Peterson, Stansbury, and Lewis had the authority to allocate financial resources to improve the quality and accessibility of the WBB locker room and other facilities, but chose not to allocate them to Coach Joseph and the WBB Team because of Coach Joseph's sex and/or the sex of the athletes she coached.

66.    Defendant Engel held a position that vested her with the authority to ensure legal compliance, including compliance with Title IX and rules against sex discrimination, in the Athletic Department.  Upon information and belief, Defendant Engel, who was aware of Coach Joseph's concerns of GT/GTAA's disparate allocation of resources based on sex, failed to direct GT/GTAA to allocate financial resources to Coach Joseph and the WBB Team equitably because of Coach Joseph's sex and/or the sex of the athletes she coached.

### Publicity

67.    GT/GTAA provided Coach Joseph and the WBB Team resources for marketing and publicity that were substantially inferior to those it provided the MBB Team and its coaches.

68.     During Coach Joseph's last decade of employment, GT/GTAA limited the WBB Team's marketing budget to $22,000 and provided it no money for external advertisements such as articles, billboards, radio and TV appearances, or digital marketing.

69.     In contrast, GT/GTAA provided the MBB Team with its own marketing budget in addition to using funds from a general marketing account to support the MBB Team's external advertising efforts.

70.     Without sufficient marketing funds, Coach Joseph was unable to hire even one employee dedicated to marketing the Team during her employment as Head Coach, making her the only head basketball coach (among coaches who responded to a 2017-2018 ACC survey) without a full-time employee or intern responsible for marketing.

71.     Without the support of a dedicated marketing team, Coach Joseph was forced to dedicate other resources to GT WBB marketing efforts – either by marketing the team herself or by allocating a portion of her fundraising or assistant coach salary budget to hire part-time help.

72.     By contrast, GT/GTAA provided the coaches of the MBB Team more marketing dollars annually than it provided to Coach Joseph and the WBB Team.  With this money, the coaches of the MBB Team were able to support sizeable marketing and advertising efforts throughout the season for the MBB Team, including multiple billboards, radio appearances, media engagements, a coach's show, and significant product giveaways highlighting former GT MBB players. These efforts increased attendance, and therefore revenue, for MBB.

73.     In addition to allocating only minimal marketing dollars to Coach Joseph to market the WBB Team, GT/GTAA also provided only minimal institutional support for the achievements of the WBB Team, such as announcing the Team's accomplishments on its website.  To make up for the lack of institutional support in this area, many of the WBB players

14

started to publicize their own successes on Twitter, after seeing the Tweets, newsletters and web posts that GT/GTAA put out on behalf of the MBB Team (but not the WBB Team).

74.     GT/GTAA's failure to allocate adequate funds to the WBB Team for publicity and marketing was made worse by GT/GTAA's lack of support for the sale of WBB tickets. GT/GTAA used an outside sales group, Aspire Group, to sell MBB home game tickets while WBB had no access to Aspire Group or any other external sales operation.

75.     Further, while GT/GTAA provided additional benefits to MBB premium seat holders, such as parking, food, and alcohol, and access to the Callaway Club hospitality suites, it provided no similar benefits to WBB premium seat holders despite Coach Joseph's repeated requests.

76.     GT/GTAA's failure to provide Coach Joseph the resources to market and promote the WBB Team equivalent to what it provided the coaches of the MBB Team denied the WBB Team equal athletic opportunity and negatively impacted the terms and conditions of Coach Joseph's employment.  It impeded Coach Joseph's ability to implement and oversee promotional activities for her program; this in turn, inhibited her ability to attract fans and sell tickets, consistently depressing game attendance to among the lowest in the ACC for fiscal year 2018. The inferior publicity and marketing resources GT/GTAA provided Coach Joseph and the WBB Team also inhibited her ability to recruit top talent, unnecessarily depleted her fundraising proceeds, and required her to expend extra hours and energy to obtain basic support in this necessary program area.

77.     Upon information and belief, Defendants Peterson, Stansbury, and Lewis had the authority to allocate financial resources to improve the WBB Team's resources for marketing

and publicity, but chose not to allocate them to Coach Joseph and the WBB Team because of Coach Joseph's sex and/or the sex of the athletes she coached.

78.     Defendant Engel held a position that vested her with the authority to ensure legal compliance, including compliance with Title IX and rules against sex discrimination, in the Athletic Department.  Upon information and belief, Defendant Engel, who was aware of Coach Joseph's concerns about GT/GTAA's disparate allocation of resources based on sex, failed to direct GT/GTAA to allocate financial resources equitably to Coach Joseph and the WBB Team because of Coach Joseph's sex and/or the sex of the athletes she coached.

### Assignment and Compensation for Coaches and Staff

79.     GT/GTAA provided Coach Joseph and the WBB Team resources for coaches and staff that were substantially inferior to those which it provided the MBB Team and its coaches.

80.     Over the years, and particularly since fiscal year 2016, GT/GTAA allocated Coach Joseph significantly less for assistant coach salaries than they granted head coaches of the MBB Team.

81.     For example, the money GT/GTAA allocated to the head coaches of the MBB Team to hire assistant coaches has remained consistent or increased year after year, including a 35 percent increase for MBB assistant coach salaries for fiscal year 2017.

82.     In contrast, at the time of Coach Joseph's termination, the money GT/GTAA allocated to hire assistant coaches for the WBB program was approximately two percent less than it was in fiscal year 2016.

83.     GT/GTAA'S failure to provide Coach Joseph a budget sufficient to afford a similar quality and quantity of coaching staff relative to the MBB Team denied the WBB Team equal athletic opportunity and negatively impacted the terms and conditions of Coach Joseph's

employment.   It inhibited Coach Joseph's ability to recruit and retain qualified assistant basketball coaches, which in turn resulted in her losing desired coaches to other schools, hiring lesser quality coaches and staff, and using her fundraising budget to augment salaries or hire coaches, all of which hampered her ability to develop and administer the WBB program.

84.   Upon information and belief, Defendants Peterson, Stansbury, and Lewis had the authority to allocate financial resources to improve the resources for WBB coaches and staff, but chose not to allocate them to Coach Joseph and the WBB Team because of Coach Joseph's sex and/or the sex of the athletes she coached.

85.   Defendant Engel held a position that vested her with the authority to ensure legal compliance, including compliance with Title IX and rules against sex discrimination, in the Athletic Department.   Upon information and belief, Defendant Engel, who was aware of Coach Joseph's concerns about GT/GTAA's disparate allocation of resources based on sex, failed to direct GT/GTAA to allocate financial resources equitably to Coach Joseph and the WBB Team because of Coach Joseph's sex and/or the sex of the athletes she coached.

**Travel**

86.   GT/GTAA provided Coach Joseph and the WBB Team substantially inferior travel resources compared to those it provided the coaches of the MBB Team and the MBB Team.

87.   Over the years, GT/GTAA allocated the WBB Team less money for travel as compared to the MBB Team.   In 2007, for instance, the travel budget for the WBB Team was $225,000 less than the travel budget for the MBB Team.

88.   The difference in budgets resulted in the WBB Team traveling via less desirable and more inconvenient modes of transportation relative to the MBB Team, including traveling in

17

coach class on international flights while the MBB Team traveled in first class, and traveling by commercial airline for some games while the MBB Team almost always traveled by charter plane.

89.     In addition, while GT/GTAA permitted the MBB coaches to travel on recruiting trips by helicopter or private plane, the GT WBB coaches never had access to such options.

90.     GT/GTAA's failure to provide the WBB Team a similar travel budget relative to the MBB Team denied the WBB Team equal athletic opportunity and negatively impacted the terms and conditions of Coach Joseph's employment.   It interfered with Coach Joseph's ability to develop and administer the WBB program, as it often resulted in student-athlete welfare issues, such as fatigue, missed classes, and less time for game preparation, impacted game performance, and led recruits to question the school's commitment to the Team's success within the ACC and nationally.

91.     Upon information and belief, Defendants Peterson, Stansbury, and Lewis had the authority to allocate financial resources to improve the WBB resources for travel, but chose not to allocate them to Coach Joseph and the WBB Team because of Coach Joseph's sex and/or the sex of the athletes she coached.

92.     Defendant Engel held a position that vested her with the authority to ensure legal compliance, including compliance with Title IX and rules against sex discrimination, in the Athletic Department.   Upon information and belief, Defendant Engel, who was aware of Coach Joseph's concerns of GT/GTAA's disparate allocation of resources based on sex, failed to direct GT/GTAA to allocate financial resources equitably to Coach Joseph and the WBB Team because of Coach Joseph's sex and/or the sex of the athletes she coached.

18

**Coach Joseph Vocally Opposed the Defendants' Disparate Treatment of Her and the WBB Team.**

93.     Throughout her employment, Coach Joseph regularly raised concerns to supervisors, Athletic Directors, and compliance personnel in the Athletic Department about the Defendants' disparate treatment of her and her program relative to its treatment of the head coaches of the MBB Team and MBB program.

94.     Starting in 2013, changes in GT/GTAA's Athletic Department leadership ushered in a hostile perspective toward gender equity issues and led to increasing animus toward Coach Joseph for her advocacy for equal treatment for her and her team.

95.     In January 2013, GT/GTAA announced the hiring of a new Athletic Director, Mike Bobinski.

96.     Within the first eighteen months of his employment, Mr. Bobinski replaced the majority of the leadership in the Athletic Department, thereby eliminating leadership which had working knowledge of gender equity issues in GT/GTAA athletics, including an institutional program that had been in place for several years to address inequities in athletics, the Gender Equity and Minority Plan (the "Gender Equity Plan"), which required GT to regularly assess its commitment to fair and equitable treatment of male and female athletes and athletic department personnel.

97.     At this point, GT/GTAA's willingness to work with Coach Joseph to better ensure that it provided her equivalent resources to support and develop her program consistent with its treatment of the MBB Team and its coaches started to erode, as the new Athletic Department leadership adopted a different and decidedly negative perspective on gender equity issues.

98.     From 2013 to 2016, tensions emerged between Mr. Bobinski and his new leadership team (particularly Associate Athletic Director of Finance and Administration,

Defendant Lewis, and later, Associate Athletic Director of Compliance, Defendant Engel) on the one hand, and incumbent employees (particularly Coach Joseph and then-GT Assistant Athletic Director, Director of Title IX Compliance, and Senior Woman Administrator, Theresa Wenzel) on the other, regarding budget and Title IX compliance issues.

99.     Prior to 2014, Frank Hardymon, the then-Associate Athletic Director of Finance and Administration, and Ms. Wenzel oversaw finance and Title IX compliance in the Athletic Department.

100.    Under their leadership, GT/GTAA conducted an annual financial analysis of the dollars spent on the relevant Title IX program area – *e.g.*, facilities, publicity, coaching, etc. – by gender for each sport to ensure GT/GTAA's compliance with the Gender Equity Plan, hereinafter referred to as the "annual equity financial analysis."

101.    In mid to late 2014, Mr. Bobinski replaced Mr. Hardymon with Defendant Lewis, a former GT MBB player.

102.    As Associate Athletic Director of Finance and Administration, Defendant Lewis set the budget for each athletic program, and met with the individual coaches to go over that year's budgetary allotment.

103.    In or around April 2015, during Coach Joseph's first round of budget meetings with Defendant Lewis, Defendant Lewis failed to honor budgetary commitments Mr. Hardymon had made to her while he was still conducting the annual equity financial analysis.  Defendant Lewis's refusal to honor Mr. Hardymon's prior budget commitment required Coach Joseph to deplete her fundraising budget to make up for the losses in her budget, which in turn forced her to eliminate a graduate assistant position responsible for WBB laundry and equipment services.

104.   Over the next few months, Coach Joseph objected to Defendant Lewis's efforts to decrease her budget and told him she believed he was treating her and the WBB Team differently than the MBB Team and its coaches.

105.   Instead of engaging Coach Joseph on this topic, Defendant Lewis became increasingly frustrated and dismissive of her concerns and refused to change his position on budgetary decisions.

106.   Around the same time that Coach Joseph and Ms. Wenzel were discussing the WBB budget issues, Ms. Wenzel was separately encouraging Mr. Bobinski to conduct the annual Gender Equity Plan assessment.

### The Defendants Retaliated Against Coach Joseph for Her Opposition to GT's Disparate Treatment of Her and the WBB Team, and Continued to Subject Her to Disparate Treatment.

### September 2015-Septeber 2016:
### The September 2015 Reprimand

107.   Coach Joseph's and Ms. Wenzel's ongoing disagreements with Defendant Lewis over the budget and with Mr. Bobinski over Title IX compliance caused obvious tension between them and eventually escalated into retaliatory actions.

108.   On or around September 15, 2015, Mr. Bobinski issued Ms. Wenzel and Coach Joseph baseless reprimands for alleged excessive alcohol intake and unprofessional conduct at a football game.

109.   Shortly after Mr. Bobinski issued Coach Joseph and Ms. Wenzel the September 15, 2015 reprimand, Mr. Bobinski separately notified Ms. Wenzel that he did not intend to renew her contract for the following year.

110.   On or around October 22, 2015, Defendant Engel recommended to Defendant GTAA's Board of Trustees that it amend its bylaws to remove reference to the Gender Equity

Plan and eliminate its obligation to annually assess GT's and GTAA's compliance with it, which the Board subsequently agreed to do.

111.   The elimination of the Gender Equity Plan and the removal of Ms. Wenzel required Coach Joseph to assume an even greater role in advocating for basic program necessities for her and her team after Ms. Wenzel's departure in January 2016.

112.   From January through August 2016, Coach Joseph raised repeated concerns with Mr. Bobinski and Defendant Lewis about GT's failure to provide her adequate and equal resources for elements of her program, such as facilities, staffing, and professional development, and apprised them of her efforts to raise funds through donors to meet the minimal needs related to these program areas.

113.   During this same time period, Coach Joseph also continued to raise concerns with Mr. Bobinski and Defendant Lewis about Defendant Lewis's treatment of the WBB Team's budget.

114.   Tensions between Mr. Bobinski, Defendant Lewis, and Coach Joseph over budget issues became particularly acute from March through May 2016, during which time Defendant Lewis and Coach Joseph participated in their second annual budget meetings.

115.   Similar to their prior budget meetings, Defendant Lewis resisted Coach Joseph's request for a modest increase in her budget while Coach Joseph continued to push back on Defendant Lewis's seemingly baseless and discriminatory budget decisions.

116.   Coach Joseph's opposition to Defendant Lewis's discriminatory budgetary decisions visibly frustrated him, particularly during a series of discussions in which Coach Joseph requested that Defendant Lewis not require her to use fundraising dollars to supplement assistant coach salaries, as he had in the previous year.   Although Mr. Bobinski ultimately

authorized a $5,500 increase to Coach Joseph's assistant coaches' salary pool, he did so only after she spent days advocating that he do so.

117.    Mr. Bobinski's and Defendant Lewis's treatment of the WBB Team's assistant coach salary pool stood in stark contrast to their treatment of the MBB Team's assistant coach salary pool, which they increased by 35 percent, or by $190,000, that same budget cycle.

118.    As Defendant Lewis's hostile treatment of Coach Joseph intensified throughout 2016, leadership changes in the Athletic Department in early August 2016 set the stage for further retaliation against Coach Joseph.

119.    Around this time, GT/GTAA elevated Defendant Lewis to the position of MBB Sports Administrator, thereby giving him control of the Athletic Department budget *and* a vested interest in the success of the MBB Team.

120.    Around this time, and upon information and belief, a member of the Athletic Department also directed newly hired Associate Athletic Director, Senior Woman Administrator, and WBB Sports Administrator, Joeleen Akin, to get Coach Joseph "under control."

121.    Within weeks of receiving this directive, Ms. Akin took steps to do just that.

### September 2016-December 2016:
### The Ginger Sanford Investigation and Final Written Warning

122.    In early August 2016, shortly after she started at GT, Ms. Akin aggressively pursued a baseless complaint brought against Coach Joseph by her then-Office Manager/Special Assistant, Ginger Sanford, which she lodged after learning that Coach Joseph had complained to Ms. Akin about Ms. Sanford's performance.

123.    Although Ms. Sanford's complaint, which accused Coach Joseph of asking her to perform personal tasks, was obviously a preemptive strike calculated to protect her job despite

her poor performance, Ms. Akin, acting on behalf of GT/GTAA, nevertheless pursued the complaint aggressively, hereinafter referred to as the "Sanford Investigation."

124.    GT/GTAA retained an outside lawyer, Ginger McRae, to investigate the allegations.  On September 9, 2016, Ms. Akin demanded that Coach Joseph immediately appear – without any notice whatsoever – for an interview with Ms. McRae.  Although Coach Joseph told Ms. Akin that she could not meet with Ms. McRae that day because she had a scheduled flight to meet an important recruit that she could not miss, Ms. Akin insisted that she attend the meeting anyway.

125.    Coach Joseph complied with Ms. Akin's directive, and sat for the interview, during which Ms. McRae proceeded to interrogate Coach Joseph for three hours about her use of Ms. Sanford to perform some personal tasks.

126.    While being grilled by Ms. McRae on this topic, Coach Joseph made clear that she believed that had she been a male head coach, she would not have been questioned about having staff perform personal work for her.

127.    On the evening of September 9, 2016, after her meeting with Ms. McRae, Coach Joseph sent Ms. Akin an email stating, "I feel a level of harassment, inequity, and unfair treatment.  I am extremely disappointed this was allowed to happen.  I am left [wondering] why this happened in this manner and if it would have been handled in the same manner if I was the football coach or the men's basketball coach?"

128.    Ms. Akin never followed up or met with Coach Joseph about these concerns.

129.    Instead, the next time Coach Joseph heard about her complaints of disparate treatment was on November 21, 2016, when she sat for a meeting with interim Athletic Director Paul Griffin.  At this meeting, Mr. Griffin mocked Coach Joseph's position on the Sanford

Investigation, *i.e.* that GT/GTAA would not investigate a male coach or coach of a male team for asking his assistant to perform personal tasks. He stated "poor, pitiful MaChelle" who thinks "everyone is against [her]." Still maintaining the same adversarial tone, Mr. Griffin then accused Coach Joseph of "attacking" GT through her complaints of disparate treatment. At this, Coach Joseph reiterated her concern that GT was targeting her with an investigation of conduct that other male coaches and Athletic Department personnel engaged in without consequence. Mr. Griffin then stated defensively that the investigation would reveal what she had done wrong and ended the conversation.

130.   On November 29, 2016, approximately a week after Mr. Griffin accused Coach Joseph of "attacking" GT through her claims of disparate treatment, Ms. Akin issued Coach Joseph a two-page "Final Written Warning" (the "Final Warning"), which stated in a conclusory fashion without any explanation that Coach Joseph had violated USG Ethics Policy 2 by, *inter alia*, allegedly using USG "property" (Ms. Sanford) for personal use.

131.   In February 2017, Coach Joseph, through her attorney, submitted a detailed refutation of the allegations and conclusions in the Final Warning (the "Response") to Ms. Akin and Defendant Peterson. In the Response, Coach Joseph noted that GT/GTAA's treatment of her in the Sanford Investigation deviated from Institute policy and represented a selective enforcement of its policies, since it did not punish male employees for similar conduct. Coach Joseph further stated that these irregularities suggested that the Sanford Investigation may not have been legitimate, but rather driven by retaliatory motives. Coach Joseph ended the Response by requesting that GT rescind the Final Warning.

132.   While Coach Joseph waited to hear back from GT regarding her Response to the Final Warning, her concerns about GT/GTAA's ability to adequately and effectively address her

concerns of disparate treatment of her and the WBB Team deepened when she learned that Defendant Lewis – who controlled the Athletic Department purse – and Defendant Engel – who oversaw Title IX compliance in the Athletic Department – were in a romantic relationship.

133.   This was of concern to Coach Joseph because Defendant Lewis had been central in denying her the budgetary resources she needed to support and develop her program for reasons she believed to be discriminatory and retaliatory, and the person responsible for ensuring Defendant Lewis allocated funds and resources in an equitable manner was Defendant Engel.

134.   Worried about the obvious conflict of interest created by Defendant Lewis's and Defendant Engel's romantic relationship, and the impact it could have, and likely already had, on Coach Joseph and the WBB Team, Coach Joseph spoke to Ms. Akin regarding her concerns about the relationship.

135.   Coach Joseph's complaint to Ms. Akin raised serious legal and ethical concerns, including a potential violation of USG Ethics Policy 4, which specifically states that "[r]omantic or sexual relationships between employees and people in positions of authority are strongly discouraged," and Board of Regents Policy 6.8, which states that any employee who "acting individually or in concert with others, who clearly obstructs or disrupts…any teaching, research, administrative, disciplinary, public service or other activity at any University System of Georgia (USG) institution is considered by the Board to have committed a gross act of irresponsibility and shall be subject to disciplinary procedures, possibly resulting in academic dismissal or termination of employment."

136.   In response to Coach Joseph's complaint, neither Ms. Akin nor GT/GTAA retained outside counsel to investigate Coach Joseph's concerns, nor informed Coach Joseph of any other action they took or intended to take to address Coach Joseph's concerns regarding

Defendants Lewis's and Engel's romantic relationship and the conflict of interest it obviously created.

**February 2017-March 2018:**
**Ongoing Retaliation/Threats of Termination**

137.   Coach Joseph's complaints of disparate treatment and discipline in her Response, and her recent complaints to Ms. Akin regarding the conflict of interest created by Defendants Lewis's and Engel's romantic relationship, intensified GT's and GTAA's efforts to sideline her.

138.   Shortly after Coach Joseph submitted her Response, one of her players, Player 1, informed her that GT intended to fire her.   Specifically, Player 1 showed Coach Joseph a Snapchat message in which a GT employee, who was a friend of Defendant Lewis, said that GT intended to "get rid of" Coach Joseph.

139.   GT's apparent desire to fire Coach Joseph also played out in her efforts to renegotiate her employment contract.

140.   Under the Employment Contract, GT/GTAA had agreed to engage Coach Joseph in a "good faith reconsideration of the terms and conditions of the Employment Contract after the completion of the 2016-2017 season." Exhibit B, Article III ¶ 4.

141.   At the end of April 2017, after a successful 2016-2017 season, GT/GTAA made no attempt to engage with Coach Joseph or her agent about extending her contract or her future as Head Coach.

142.   Around this same time, GT/GTAA also flatly denied Coach Joseph's request to rescind the Final Warning.

143.   GT/GTAA's treatment of Coach Joseph and her contract contrasted sharply with its treatment of Coach Pastner and his contract a few months later.

144. On or around October 2, 2017, Coach Pastner self-reported potential NCAA violations to GT.

145. Two days after his self-disclosure, on October 4, 2017, GT and Defendant GTAA announced that it had extended Coach Pastner's original contract by one year, and provided him a $500,000 retention bonus if he remained the coach through the end of the 2021-2022 season.

146. Then, less than one week after the news of the NCAA violations by Coach Pastner broke, GT/GTAA immediately and publicly stated its full support for Coach Pastner. Defendant Peterson told the Atlanta Journal Constitution ("AJC"), "The NCAA's looking into it, and we'll see what happens, but I'm proud to have [Coach Pastner] as our basketball coach." Similarly, shortly after additional serious allegations emerged of a personal nature against Coach Pastner, Defendant Stansbury endorsed him in an interview with the AJC, stating, "I am still bullish on Josh . . . I think he is a great coach and a great person."

147. Even though Coach Joseph had achieved the same level of success as Coach Pastner that same 2016-2017 season and had not engaged in any conduct that violated NCAA rules or regulations, GT/GTAA continued to rebuff her efforts to engage in any conversations about extending her contract.

148. In or around May 2018, after the 2017-2018 season came to a close, Coach Joseph, through her agent, again initiated contract extension discussions with the new Deputy Director of Athletics and WBB Sports Administrator, Mark Rountree.

149. Even though Coach Joseph had just recently secured a top-10 recruiting class, including two McDonald's All-American players, Mr. Rountree and Defendant Stansbury remained tentative about extending Coach Joseph's contract.

**May 2018-November 2018:**
**The NCAA Inquiry and Increased Compliance Scrutiny**

150.   GT/GTAA's refusal to engage in good faith contract negotiations was not the only obstacle Coach Joseph faced at this time.

151.   On or around May 2, 2018, Defendant Engel met with Coach Joseph, Defendant Stansbury, and Mr. Rountree, and informed them that the NCAA had allegedly sent GT a letter asking it to conduct an internal review of the WBB Team's recruitment of a new player, "Player 2."

152.   Although a coach from another school had previously asked Coach Joseph if anyone on her staff had paid to get Player 2, the claim was baseless, had arisen nearly a year prior, had been thoroughly investigated by Coach Joseph and reported to Mr. Rountree, and Mr. Rountree had stated that he was not concerned about the allegation.

153.   Coach Joseph, through her attorney, asked GT's outside counsel, John Long, for a copy of the NCAA inquiry letter to more fully assess the legitimacy of the source of the inquiry, but Mr. Long refused to respond to Coach Joseph's attorney's repeated requests.

154.   The combination of the stalled contract negotiations and the new inquiry into a year-old issue made Coach Joseph concerned that the Institutional Defendants and/or the Individual Defendants may be developing a new tactic to achieve their goal to "get rid" of her.

155.   Despite the growing hostility toward Coach Joseph, and the ongoing internal investigation into the Player 2 issue, Coach Joseph continued to advocate for equal treatment for herself and the WBB Team.

156.   On May 31, 2018, Coach Joseph again raised concerns about several discrimination issues during a Staffing Audit presentation. During her presentation, Coach Joseph highlighted the historical inequities that she and her team had faced, including

29

discrimination in publicity and marketing, facilities, staff resources, and team travel. She also noted that the GT WBB budget for marketing, staffing, and travel were all in the bottom half of the ACC, and articulated a litany of concerns about the WBB facilities.

157.    In response to Coach Joseph's discussion of disparate treatment of her and the WBB Team, Defendant Engel sharply questioned why she needed more travel money, while Defendant Lewis challenged her on the accuracy of the budget figures she received from the ACC for other WBB programs.

158.    The hostile and disparate treatment by Ms. Akin, and Defendants GT/GTAA, Lewis, and Engel not only impacted Coach Joseph, but also her staff. On June 18, 2018, WBB Assistant Head Coach, Rob Norris, abruptly quit. In his resignation email to Coach Joseph, Mr. Norris noted that while Coach Joseph had "enjoyed more success than almost any other coach at Georgia Tech," he found the environment at GT "very difficult" and noted that throughout his tenure, GT did not give the WBB program the attention it deserved. Notably, at the conclusion of Mr. Norris' resignation email, he pointed out that during his tenure "it also seemed that Women's basketball was being targeted by various departments."

159.    In late June 2018, less than two months after Defendant Engel had investigated the Player 2 issue internally, GT/GTAA requested that the NCAA open up a formal investigation into the Player 2 issue and the WBB program.

160.    Not understanding how Defendant Engel could have possibly amassed enough evidence in her short investigation to warrant recommending a full NCAA investigation, Coach Joseph expressed concern about Defendant Engel's conduct to Ms. Akin. Coach Joseph told Ms. Akin that she continued to feel targeted and harassed by Defendant Lewis and Defendant Engel. Coach Joseph cited the baseless investigations into her conduct as an example of the harassment

to which she had been subjected and stated her belief that Defendant Lewis and/or Defendant Engel had precipitated the investigations. Coach Joseph reiterated again her concern that, due to her relationship with Defendant Lewis, Defendant Engel was not taking seriously her concerns about the inadequate support GT offered WBB as compared to MBB because Defendant Engel was reflexively defensive of Defendant Lewis's pro-MBB decisions.

161.   Ms. Akin responded she had previously raised with Defendant Stansbury the issue of the conflict of interest and impediments to grieving concerns of discriminatory budget decisions effectively as a result of Defendant Lewis's and Defendant Engel's relationship, but he stated that the relationship had the blessing of Defendant Peterson and therefore he could not do anything about it.

162.   Over the next month, neither Mr. Rountree nor Ms. Akin notified Coach Joseph of any steps they took, or intended to take, to address the concerns Coach Joseph had raised about the conflict of interest created by Defendant Lewis's and Defendant Engel's relationship and the continued discrimination, harassment, and retaliation she faced. This prompted Coach Joseph to convene a formal meeting with Defendant Stansbury and Mr. Rountree to once again implore them for help.

163.   On July 25, 2018, at a meeting with Defendant Stansbury and Mr. Rountree, Coach Joseph reiterated her concern that Defendant Lewis and Defendant Engel ran their departments in a manner that clearly benefited MBB to the detriment of WBB, and that she felt like she had no one with whom to raise her concerns about this disparate treatment in light of their romantic relationship. Coach Joseph also noted that other coaches of female sports felt like Defendant Lewis's preference for MBB also inappropriately and negatively impacted the financial resources he allocated to their respective teams, and that they also felt unable to address

the discrimination since his girlfriend oversaw Title IX compliance. On this point, Coach Joseph specifically noted that the volleyball coach was upset that she did not have enough lockers for her team, and she felt that she had no one to whom she could report her concerns.

164.    Defendant Stansbury reacted strongly, snapping at Coach Joseph, "Maybe they [the female coaches] all need to be fired!" or words to that effect. He explained that he had been there for a year and a half, and if the female coaches could not get on board with the way the Athletic Department was run, maybe they needed to be gone. Defendant Stansbury then pivoted and said that Defendant Peterson had approved Defendant Lewis's and Defendant Engel's relationship.

165.    Over the next month, Coach Joseph continued to raise concerns about Defendant Lewis and Defendant Engel, and their discriminatory and retaliatory treatment of her and the WBB Team, with various members of the Athletic Department.

166.    For instance, on August 9, 2018, Coach Joseph emailed Defendant Stansbury and Mr. Rountree, copying Ms. Akin, with her evaluations of the staff in the GT Athletics Department. In her evaluation, Coach Joseph raised concerns about several issues, including about Defendant Engel and Defendant Lewis, and sex discrimination in the Athletic Department. Coach Joseph stated that Defendant Engel did not have professional relationships with colleagues in the Athletic Department except with Defendant Lewis, and their romantic relationship created a conflict of interest. Coach Joseph explained that because Defendant Lewis oversees budgeting for GT WBB, and Defendant Engel is responsible for Title IX compliance, it was uncomfortable to discuss issues of gender equity without feeling that they were "on the same page" and exuding a "feeling of defensiveness." Coach Joseph added that Defendant Lewis was focused only on protecting and supporting GT MBB.

167. Coach Joseph's persistent complaints intensified Defendants' retaliation against her. A few weeks after her July 25, 2018, meeting with Defendant Stansbury and Mr. Rountree, Coach Joseph, through her agent, followed up with Defendant Stansbury about her contract extension, which Defendant Stansbury had not yet committed to extending.

168. Defendant Stansbury continued to delay committing to extending Coach Joseph's employment contract, this time claiming that GT/GTAA would not allow him to extend Coach Joseph's contract while the NCAA investigation into her program was underway. Defendant Stansbury claimed, however, that if the NCAA cleared Coach Joseph and her program of wrongdoing, he expected the process to move forward.

169. Around this same time, Defendant Engel's retaliatory harassment of Coach Joseph intensified when she subjected Coach Joseph's program to a seemingly baseless compliance inquiry regarding conduct the MBB Team engaged in without consequence.

170. On September 6, 2018, Coach Joseph emailed Defendant Engel regarding her harassing compliance investigation, copying Defendant Stansbury, Mr. Rountree, and Ms. Akin. Coach Joseph stated that "there appears to be a double standard and inequity between the men's and women's basketball programs," and noted, "Candidly, I am not sure how to properly raise these concerns as you have oversight of gender equity and Title IX issues, which seems in this instance to be a conflict of interest." Coach Joseph concluded by noting that she felt "compelled to address any apparent inequity or Title IX violation with appropriate Georgia Tech Athletic Association administrators."

171. Despite being put on explicit notice again that Coach Joseph believed that Defendant Lewis's and Defendant Engel's romantic relationship obstructed her ability to grieve legitimate concerns of sex discrimination, Defendant Stansbury, Mr. Rountree, and Defendant

33

Engel took no action to investigate or address Coach Joseph's concerns.  Instead, Defendant Engel simply stated that if Coach Joseph had Title IX concerns, she could direct them to Burns Newsome, GT's Executive Director of Compliance Programs.

172.    To address her growing concerns of discrimination and retaliation, Coach Joseph, through her attorney, sent Defendant Peterson a letter on November 21, 2018, (the "November 21 Letter") notifying him of Coach Joseph's ongoing concerns of sex discrimination and retaliation in violation of, *inter alia*, Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments Act of 1972.  The letter indicated that GT's discriminatory and retaliatory conduct had resulted in unusual and unreasonable delays in discussions about extending Coach Joseph's employment contract.  The letter also noted that Coach Joseph remained loyal to GT, and invited a discussion to address the problem collaboratively.

173.    Neither Defendant Peterson nor anyone else from GT or Defendant GTAA responded to the letter.

### December 2018-March 2019:
### Stalled Contract Negotiations, NCAA Clearance, Suspension, and Termination

174.    Instead of working with Coach Joseph to address the concerns outlined in the November 21 Letter, the Institutional Defendants and Individual Defendants thereafter undertook a course of conduct intended to isolate Coach Joseph and ultimately end her employment.

175.    Less than one month after the November 21 Letter, Mr. Rountree, who had previously been supportive of Coach Joseph, became increasingly distant and cold towards her. During a meeting with her on December 12, 2018, Mr. Rountree dismissed her attempt to confide in him about her ongoing concerns about Defendant Lewis, Defendant Engel, and gender equity, stating, among other things, that GT did not have any gender equity issues, and even if it did, no one would "die."  Thereafter, Mr. Rountree again refused to engage Coach Joseph in a

34

conversation about extending her contract, and stated instead that the Institute would consider renewing her contract if the NCAA cleared her of wrongdoing and she led the WBB Team to the NCAA tournament.

176.  Approximately one month later, on February 1, 2019, Mr. Rountree failed to support Coach Joseph when a long-time subordinate employee of hers, Felicia Tucker, treated her in a blatantly disrespectful manner during a staff meeting. Mr. Rountree's failure to support Coach Joseph concerned her, and also other staff members present at the meeting, most of whom submitted statements to Human Resources ("HR"), explaining their concern about Ms. Tucker's conduct and Mr. Rountree's silence in the face of her behavior.

177.  Even though several employees reported to HR and top leaders in the Athletic Department problematic conduct by Ms. Tucker and Mr. Rountree that clearly violated USG Ethics Policy 4 – requiring employees to "treat fellow employees . . . with dignity and respect" and "maintain a professional work environment" – GT did not retain outside counsel to investigate these employee complaints, as it had done in response to Ms. Sanford's complaints against Coach Joseph, or otherwise discipline Ms. Tucker and Mr. Rountree.

178.  On February 3, 2019, Coach Joseph followed up with HR Business Partner Kevin Cruse and Mr. Rountree by email to address the February 1 meeting. She told them that the February 1 staff meeting left her and her staff in a "very unsettled and unhealthy situation," and emphasized that she believed the way the meeting was facilitated, and the fact that Mr. Rountree provided no support for her, completely undermined her leadership.

179.  On February 5, 2019, Mr. Cruse told Coach Joseph that he was looking into her concerns and planned to discuss the matter with Defendant Stansbury the following day.

180.    On February 7, 2019, one day after Mr. Cruse spoke to Defendant Stansbury about her concerns, Defendant Stansbury downgraded Coach Joseph's reporting line from Mr. Rountree to Ms. Akin – the architect of the Sanford Investigation and Final Warning.

181.    On February 8, 2019, in light of GT/GTAA's repeated inaction in response to her concerns, Coach Joseph submitted a formal internal complaint (the "February 8 Complaint") outlining her concerns of discrimination, retaliation, and conflict of interest to Defendant Stansbury, Mr. Rountree, Ms. Akin, Executive Director of Compliance Burns Newsome, and Interim Vice President for Ethics, Compliance and Risk Management Aisha Oliver-Staley.

182.    On or around February 8, 2019, the NCAA notified GT that it had cleared Coach Joseph and her team of all Level I and Level II violations in connection with its investigation into Player 2.

183.    Even though Defendant Stansbury had previously stated to Coach Joseph's agent that GT/GTAA would renew her contract when the NCAA cleared her and her team of all potential wrongdoing, GT did not do so.

184.    Instead, GT/GTAA failed to inform Coach Joseph, her agent, or her lawyers of the NCAA's decision until days after it had received the notice.

185.    On February 19, 2019, Coach Joseph met with Mr. Cruse and told him that she believed Ms. Akin's replacement of Mr. Rountree as the WBB Sports Administrator was retaliatory. Mr. Cruse did not deny this possibility, but instead asked "Did Mark [Rountree] not tell you why he is not working with you?" After Coach Joseph told Mr. Cruse that Defendant Stansbury had claimed it was because Mr. Rountree needed to focus on the locker room project, Mr. Cruse asked, "Coach why do they all think you are going to sue them?"

186.    Three days later, on February 22, 2019, Ms. Akin notified Coach Joseph that her sophomore players could no longer live in off-campus housing, even though Mr. Rountree had previously supported the idea of these players living off campus in the 2019-2020 season, consistent with the Athletic Department's treatment of sophomore players on male athletic teams.

187.    On February 22, 2019, Coach Joseph, through her attorney, sent another letter to Defendant Peterson, copying Defendant Stansbury, Mr. Rountree, Ms. Akin, and Ms. Oliver-Staley, about GT's housing decision (the "February 22 Letter").  In the letter, Coach Joseph, through her attorney, told Defendant Peterson that she believed GT's recent housing decision was driven by discriminatory and/or retaliatory motives, noting that Defendant Stansbury, Mr. Rountree, and Ms. Akin made this seemingly baseless decision just two weeks after she submitted the February 8 Complaint.

188.    Five days later, on February 27, 2019, when the WBB Team had two games left in the season and was one win away from making the NCAA tournament, Defendant Stansbury notified Coach Joseph that she was suspended with pay pending an investigation into an undisclosed personnel matter.

189.    Hours later, GT/GTAA publicly announced Coach Joseph's suspension on Twitter, stating that it had placed her on leave pending an investigation into an unspecified personnel matter.

190.    Thereafter, GT/GTAA, through an outside lawyer whom it hired ("the Investigator"), initiated a sprawling inquiry into Coach Joseph and the WBB Team that probed into broad, subjective areas of Coach Joseph's behaviors and the WBB program (the "WBB Investigation").

191.   The investigation was not a truth-seeking exercise; it was a results-driven endeavor undertaken to manufacture a basis to justify terminating Coach Joseph's employment.

192.   During the pendency of the investigation, the Institutional Defendants and Individual Defendants attempted to restrict the flow of information between the WBB coaches and staff, the vast majority of whom had no complaints about Coach Joseph's coaching or leadership, and the WBB players.

193.   Defendant Stansbury and Ms. Akin prohibited the WBB coaches and staff from speaking to anyone about the investigation, including meeting individually with any of the players.  The Defendants' desire to create a wall between the WBB coaches and staff and the WBB players was so intense that on March 1, 2019, Ms. Akin abruptly terminated a former GT WBB player and then Graduate Assistant Coach Antonia Peresson – who had demonstrated great loyalty to GT, the WBB program, and Coach Joseph – for "insubordination" because she happened to speak with a WBB player while no one was present.

194.   At the same time the Defendants were restricting the WBB coaches and staff access to the players, they permitted and encouraged the WBB players, to keep a written record of the testimony they provided in their interviews with the Investigator in a shared Google document maintained by a select group of players.  The purpose of this was to provide players with a device which would help them match up their stories.  The Defendants also prohibited the WBB players from speaking to their parents during the investigation.

195.   On March 15, 2019, while Coach Joseph was still suspended, the NCAA announced that it had found Level 1 recruiting violations – the most serious category of rule breaking – in the MBB program, including evidence that a former Assistant Coach of Coach Pastner had provided a recruit money for a visit to a strip club, provided false or misleading

information to the NCAA about the strip club visit, and attempted to influence a team member to provide the NCAA false information about the visit. The NCAA also cited evidence that a former friend of Coach Pastner who the NCAA identified as a "representative of the institution's athletic interests" had provided over $2,000 in impermissible benefits to MBB recruits.

196.   Under Coach Pastner's employment contract with GT and GTAA, he has an affirmative obligation to monitor the MBB program for compliance with NCAA rules and regulations and is responsible for NCAA "violations by any coach, staff member or other person that reports directly or indirectly to the Head Coach," and "shall be held accountable for all [NCAA] violations within the program." Coach Pastner's contract also provides that "[f]ailure to render services or otherwise fulfill completely the duties and obligations" established in his employment contract constitutes a "for cause" basis to terminate his employment under this employment contract.

197.   After learning of the NCAA Level I violations levied against Coach Pastner and the GT MBB Team, GT/GTAA did not terminate Coach Pastner or, upon information and belief, otherwise discipline Coach Pastner, despite the widespread misconduct in his program.

198.   Three business days later, on March 20, 2019, Defendant Stansbury notified Coach Joseph that the Investigator had completed his investigation and concluded that Coach Joseph had engaged in unacceptable coaching practices. The basis for this conclusion was a vague report that recited allegations that were either false or taken completely out of context, and which downplayed or otherwise ignored input from Coach Joseph's coaching staff, players, and third party-consultants who had voiced their support of Coach Joseph.

199.   Defendant Stansbury provided Coach Joseph only two business days, until Monday March 25, 2019, to respond to the allegations in the March 20 Report, and asked her to meet with him to discuss "next steps" on Tuesday March 26, 2019 at 8:00 a.m.

200.   On March 25, 2019, at approximately 4:45 p.m., Coach Joseph submitted a detailed response to the March 20 Report (the "March 25 Response") to Defendant Stansbury rebutting the allegations regarding her coaching practices.  She included statements from former players which refuted and undermined the allegations that Coach Joseph mistreated her players in any way and made clear that she believed the investigation was driven by discriminatory and retaliatory motives.  She also stated that the conclusions in the March 20 Report, even if true, were based on sexist stereotypes and demonstrated a clear double standard for the treatment of female coaches – who are reprimanded for being aggressive and demanding – and male coaches – who are not punished for the same or similar conduct.

201.   Defendant Peterson was aware of the WBB Investigation, the March 20 Report, and the March 25 Response.

202.   On March 26, 2019, at approximately 12:00 p.m., without ever having even completed an investigation into Coach Joseph's February 8 Complaint alleging discrimination, retaliation and conflict of interest, Defendant Stansbury terminated Coach Joseph's employment with GT and GTAA, effective immediately.  Defendant Peterson had ultimate responsibility and authority for the operation, fiscal integrity, and personnel of GT's athletic department.  Upon information and belief, Defendant Peterson contributed to the decision to terminate Coach Joseph's employment.

203.   True and correct copies of the Termination Letters are attached as Exhibits C (GTAA termination letter) and D (GT termination letter).

204.   The termination of Coach Joseph's Employment Contract by GT and GTAA was discriminatory on the basis of sex and in retaliation for her complaints of sex discrimination in employment and in educational programs and activities.

205.   GT and GTAA did not have Good Cause to terminate Coach Joseph's Employment Contract.

206.   On March 26, 2019, after GT terminated Coach Joseph's employment, it provided a copy of the inflammatory March 20 Report to at least one press outlet.  After that time, the March 20 Report and false allegations that Coach Joseph had emotionally abused her players circulated throughout the news, subjecting her to public humiliation and disapproval.

207.   On March 27, 2019, Defendant Stansbury announced that GT/GTAA had initiated a review of statements (that GT/GTAA had affirmatively elicited) from current WBB players during the February 25 investigation which, if true, could constitute possible violations of NCAA rules or regulations.

208.   GT/GTAA has no legitimate grounds to investigate Coach Joseph or the WBB Team for NCAA violations.

209.   On April 1, 2019, Coach Joseph timely appealed the termination of her employment (the "Appeal") to Defendant Peterson.  In her appeal, Coach Joseph made clear that she believed the decision to terminate her employment was discriminatory and retaliatory.  She then requested that the Institute reverse its decision and reinstate her to the position of Head Coach of the WBB Team.

210.   On April 9, 2019, without addressing or responding to the issues raised in Coach Joseph's Appeal, GT/GTAA announced that it hired Nell Fortner to replace Coach Joseph as Head Coach of the GT WBB Team.

211.    On July 19, 2019, news articles reported that NCAA had reason to believe that Coach Pastner misled NCAA investigators during its 2018-2019 probe into the GT MBB program.

212.    Despite the fact that Coach Pastner's documented misconduct raises serious ethical and legal concerns, including potential violations of the USG Ethics Rule 4 – requiring him to "treat fellow employees, students and the public with dignity and respect" and could serve as a "for cause" basis to terminate his employment under his employment contract – he remains the Head Coach of the MBB Team, with the full support of the Institution.

213.    The discriminatory and retaliatory treatment to which GT/GTAA subjected Coach Joseph has caused her significant professional, emotional, and financial harm.

214.    GT's discriminatory treatment of Coach Joseph and the WBB Team required her to operate her program with fewer resources, benefits, and opportunities than available to both male coaches of the MBB Team and her competitors in the ACC.  This, in turn, required her to take time away from recruiting, coaching, and professional development to obtain the basic program necessities needed to do her job and enable her team to remain competitive in the ACC.

215.    The burden the Institute's discriminatory conduct placed on her was only compounded by the ongoing retaliation and retaliatory harassment to which she was subjected. It not only required Coach Joseph to devote an extraordinary amount of time and money toward defending herself, but it, together with GT's discriminatory treatment of her, had a profound emotional impact on her.

216.    The public manner in which GT/GTAA suspended, and later terminated Coach Joseph's employment, for false and inflammatory reasons has only compounded her professional and emotional harm.

**GT Deprived Coach Joseph of Public Records in
Violation of the Georgia Open Records Act**

217.    On March 1, 2019, and April 19, 2019, Coach Joseph through counsel submitted

written requests for records pursuant to the Georgia Open Records Act, O.C.G.A. §§ 50-18-70 *et*

*seq.* ("ORA").

218.    Among other requests, Coach Joseph requested the following records (the

"Request"):

> "All notes in any format including in hard copy, electronic, voice records, and text
> messages memorializing the interviews of GT WBB players and staff by Eric
> Hoffman of Littler Mendelson, P.C., including but not limited to the interview
> notes of the GT Human Resource personnel who participated in the interviews."

219.    On October 30, 2019, GT began producing records responsive to the Request on a

rolling basis.

220.    GT redacted substantial portions of these records, including the majority of all

statements players made to Mr. Hoffman during his investigation into Coach Joseph's alleged

conduct, as well as the names of players and parents who participated in Mr. Hoffman's

investigation or allegedly made complaints to GT about Coach Joseph's conduct.

221.    On October 30, 2019, in a letter to Coach Joseph's counsel, GT indicated that it

was redacting the records in accordance with O.C.G.A. § 50-18-72(a)(20) (exempting the

disclosure of certain sensitive personal information of any individual), (21) (exempting the

disclosure of public employees' sensitive personal information), and (37) (exempting the

disclosure of records not subject to disclosure under the Family Educational Rights and Privacy

Act, 20 U.S.C. § 1232g).

222.    None of the exemptions GT cited in the October 30, 2019 letter are applicable to

the Request.

223.    On November 26, 2019, Coach Joseph, through counsel, requested that GT produce the records in unredacted form as required by the ORA.   Coach Joseph noted that records of GT's investigation into its employees' conduct are not exempt from disclosure under any of the exemptions cited.

224.    Despite this request, GT has refused to produce the records in unredacted form as required by the ORA.

## CAUSES OF ACTION

## COUNT ONE:

### Discrimination on the Basis of Sex in Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* Against Defendants Board of Regents and GTAA.

225.    Paragraphs 1 through 224 above are hereby incorporated as though each of the factual allegations was restated.

226.    Title IX prohibits discrimination against any person on the basis of sex in education programs or activities receiving federal financial assistance.  20 U.S. § 1681(a). Title IX's protection against sex discrimination grants employees a private right of action against a covered institution.

227.    At all times relevant to this Complaint, Defendant BOR was an educational institution that receives federal funding within the meaning of Title IX.

228.    At all times relevant to this Complaint, Defendant BOR ceded control of its Athletic Department to Defendant GTAA, making Defendant GTAA an educational institution that receives federal funding within the meaning of Title IX.

229.    At all times relevant to this Complaint, Coach Joseph was an employee of Defendants BOR and GTAA.

230.    At all times relevant to this Complaint, Coach Joseph, a female, was a member of a protected class who was qualified for the position of Head Coach of the GT WBB Team.

231.    Defendants BOR and GTAA intentionally discriminated against Coach Joseph in its education related programs and activities on the basis of sex.  Defendants BOR and GTAA subjected Coach Joseph to adverse actions because of her sex (female), including by providing her and the GT WBB team fewer resources than it provided to the coaches of the MBB Team and the MBB Team (facilities, marketing, assistant coaches, recruitment funds, and travel) in a manner that adversely affected the terms and conditions of her employment, holding her to a higher standard of performance and conduct than similarly situated male coaches, and terminating her employment because of sex and her failure to conform to sex-stereotypes.

232.    Defendants BOR and GTAA treated Coach Joseph less favorably than similarly situated employees outside of her protected class.

233.    The actions of Defendants BOR and GTAA constitute discrimination on the basis of sex in violation of Title IX and its implementing regulations.

234.    The actions of Defendants BOR and GTAA described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT TWO:

**Discrimination on the Basis of the Sex and Association with a Protected Class (Women) in Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* Against Defendants Board of Regents and GTAA.**

235.    Paragraphs 1 through 234 above are hereby incorporated as though each of the factual allegations was restated.

236.    Title IX prohibits discrimination against any person on the basis of sex in education programs or activities receiving federal financial assistance, and on the basis of a person's association with someone within a protected class.  20 U.S. § 1681(a).  Title IX's protection against sex discrimination grants employees a private right of action against a covered institution.

237.    At all times relevant to this Complaint, Defendant BOR was an educational institution that receives federal funding within the meaning of Title IX.

238.    At all times relevant to this Complaint, Defendant BOR ceded control of its Athletic Department to Defendant GTAA, making Defendant GTAA an educational institution that receives federal funding within the meaning of Title IX.

239.    At all times relevant to this Complaint, Coach Joseph was an employee of Defendants BOR and GTAA.

240.    At all times relevant to this Complaint, Coach Joseph, a female, was a member of a protected class.  As the Head Coach of the WBB Team, Coach Joseph was also associated with a protected class, women.

241.    At all times relevant to this Complaint, Coach Joseph was qualified for the position of Head Coach of the GT WBB team.

242.    Defendants BOR and GTAA intentionally discriminated against Coach Joseph in its education related programs and activities on the basis of sex, and on the basis of her association with members of a protected class (women), including by providing Coach Joseph and the GT WBB team fewer resources than it provided to the coaches of the MBB Team and the MBB Team (facilities, marketing, assistant coaches, recruitment funds, and travel) in a manner that adversely affected the terms and conditions of her employment, holding her to a higher

46

standard of performance and conduct than similarly situated male coaches, and terminating her employment because of sex and her failure to conform to sex-stereotypes.

243.    Defendants BOR and GTAA treated Coach Joseph less favorably than similarly situated employees outside of her protected class and who were not associated with the protected class with which she was associated (women).

244.    The actions of Defendants BOR and GTAA constitute discrimination in violation of Title IX and its implementing regulations.

245.    The actions of Defendants BOR and GTAA described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

<strong>COUNT THREE:</strong>

<strong>Discrimination on the Basis of Sex in Violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(2) <em>et seq.</em>, Against Defendants Board of Regents and GTAA.</strong>

246.    Paragraphs 1 through 245 above are hereby incorporated as though each of the factual allegations was restated.

247.    Title VII prohibits an employer from discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of her sex. 42 U.S.C. § 2000e-2(a).

248.    At all times relevant to this Complaint, Defendants BOR and GTAA were persons engaged in an industry affecting commerce who had fifteen or more employees and were employers within the meaning of Title VII.

249.    At all times relevant to this Complaint, Coach Joseph was an employee of Defendants BOR and GTAA within the meaning of Title VII.

250.     At all times relevant to this Complaint, Coach Joseph, a female, was a member of a protected class who was qualified for the position of Head Coach of the GT WBB Team.

251.     Defendants BOR and GTAA intentionally discriminated against Coach Joseph in her employment on the basis of sex.  Defendants BOR and GTAA subjected Coach Joseph to adverse actions because of her sex (female), including by providing her and the GT WBB Team fewer resources than it provided to the coaches of the MBB Team and the MBB Team (facilities, marketing, assistant coaches, recruitment funds, and travel) in a manner that adversely affected the terms and conditions of her employment, holding her to a higher standard of performance and conduct than similarly situated male coaches, and terminating her employment because of sex and her failure to conform to sex-stereotypes.

252.     Defendants BOR and GTAA treated Coach Joseph less favorably than similarly situated employees outside of her protected class.

253.     Defendants BOR's and GTAA's actions constitute discrimination in violation of Title VII.

254.     Defendants BOR's and GTAA's actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT FOUR:

**Discrimination on the Basis of the Sex and Association with a Protected Class (Women) in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(2) *et seq.*, Against Defendants Board of Regents and GTAA.**

255.     Paragraphs 1 through 254 above are hereby incorporated as though each of the factual allegations was restated.

48

256.    Title VII prohibits an employer from discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of her sex, or on the basis of a person's association with someone within a protected class.  42 U.S.C. § 2000e-2(a).

257.    At all times relevant to this Complaint, Defendants BOR and GTAA were persons engaged in an industry affecting commerce who had fifteen or more employees and were employers within the meaning of Title VII.

258.    At all times relevant to this Complaint, Coach Joseph was an employee of Defendants BOR and GTAA within the meaning of Title VII.

259.    At all times relevant to this Complaint, Coach Joseph, a female, was a member of a protected class.  As the Head Coach of the WBB Team, Coach Joseph was also associated with a protected class (women).

260.    At all times relevant to this Complaint, Coach Joseph was qualified for the position of Head Coach of the GT WBB Team.

261.    Defendants BOR and GTAA intentionally discriminated against Coach Joseph in her employment on the basis of her sex and on the basis of the sex of the student-athletes she coached, including by providing her and the GT WBB Team fewer resources than it provided to the coaches of the MBB Team and the MBB Team (facilities, marketing, assistant coaches, recruitment funds, and travel) in a manner that adversely affected the terms and conditions of her employment, holding her to a higher standard of performance and conduct than similarly situated male coaches, and terminating her employment because of sex and her failure to conform to sex-stereotypes.

262.     Defendants BOR and GTAA treated Coach Joseph less favorably than similarly situated employees outside of her protected class and who were not associated with the protected class with which she was associated.

263.     Defendants BOR's and GTAA's actions constitute discrimination in violation of Title VII.

264.     Defendants BOR's and GTAA's actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT FIVE:

**Violation of Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause Against Defendant Stansbury in His Individual Capacity.**

265.     Paragraphs 1 through 264 above are hereby incorporated as though each of the factual allegations was restated.

266.     Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, employees of public institutions have the right to be free from unlawful employment discrimination on the basis of their sex. This constitutional right is clearly established. *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (citing *Davis v. Passman*, 442 U.S. 228, 235 (1979)); *Nicholson v. Georgia Dep't of Human Res. (DHR)*, 918 F.2d 145, 147-48 (11th Cir. 1990).

267.     Pursuant to 42 U.S.C. § 1983, persons who, acting under the color of state law, violate an individual's constitutional rights can be held liable for damages in their individual capacity.

268.   At all times relevant to this Complaint, Coach Joseph was an employee of a public institution.

269.   Defendant Stansbury, acting under the color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment by directly participating in Defendants GTAA's and BOR's discriminatory actions to provide Coach Joseph fewer resources for the GT WBB Team (facilities, marketing, assistant coaches, recruitment funds, and travel) in a manner that adversely affected the terms and conditions of her employment, and holding her to a higher standard of performance and conduct than similarly situated male coaches.

270.   Defendant Stansbury, acting under the color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment, because he, as Athletic Director, was in a position of authority to take responsive action to stop the violations of Coach Joseph's constitutional rights as described above in paragraphs 51-92, 269 (disparate funding), he knew about the violations of Coach Joseph's rights, yet he failed to act, thereby acquiescing in the discriminatory conduct and causing the discrimination against Coach Joseph to persist and worsen. Defendant Stansbury's failure to act in the face of known violations of Coach Joseph's constitutional rights amounted to deliberate indifference.

271.   Defendant Stansbury, acting under color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment by terminating her employment because of sex and her failure to conform to sex-stereotypes.

272.   As a direct result of the actions, statements and/or policies of Defendant Stansbury, Coach Joseph has suffered an unconstitutional deprivation of her rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

273.    Defendant Stansbury acted intentionally and with callous disregard for Coach Joseph's known statutory and constitutional rights.

274.    Defendant Stansbury's conduct described above has directly and proximately caused, and continues to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT SIX:

### Violation of Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause Against Defendant Lewis in His Individual Capacity.

275.    Paragraphs 1 through 274 above are hereby incorporated as though each of the factual allegations was restated.

276.    Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, employees of public institutions have the right to be free from unlawful employment discrimination on the basis of their sex. This constitutional right is clearly established. *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (citing *Davis v. Passman*, 442 U.S. 228, 235 (1979)); *Nicholson v. Georgia Dep't of Human Res. (DHR)*, 918 F.2d 145, 147-48 (11th Cir. 1990).

277.    Pursuant to 42 U.S.C. § 1983, persons who, acting under the color of state law, violate an individual's constitutional rights can be held liable for damages in their individual capacity.

278.    At all times relevant to this Complaint, Coach Joseph was an employee of a public institution.

279.    Defendant Lewis, acting under the color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment by directly participating

in Defendants GTAA's and BOR's discriminatory actions to provide Coach Joseph and the GT WBB Team fewer benefits than it provided the coaches of the GT MBB Team and the GT MBB Team (facilities, marketing, assistant coaches, recruitment funds, and travel) in a manner that adversely affected the terms and conditions of her employment.

280. Defendant Lewis, acting under the color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment, because he, as Associate Athletic Director of Administration and Finance, was in a position of authority to take responsive action to stop the violations of Coach Joseph's constitutional rights as described above in paragraphs 51-92, 279 (disparate funding), he knew about the violations of Coach Joseph's rights, yet he failed to act, thereby acquiescing in the discriminatory conduct and causing the discrimination against Coach Joseph to persist and worsen. Defendant Lewis's failure to act in the face of known violations of Coach Joseph's constitutional rights amounted to deliberate indifference.

281. As a direct result of the actions, statements and/or policies of Defendant Lewis, Coach Joseph has suffered an unconstitutional deprivation of her rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

282. Defendant Lewis acted intentionally and with callous disregard for Coach Joseph's known statutory and constitutional rights.

283. Defendant Lewis's conduct described above has directly and proximately caused, and continues to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

### COUNT SEVEN:

**Violation of Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause Against Defendant Engel in Her Individual Capacity.**

284.    Paragraphs 1 through 283 above are hereby incorporated as though each of the factual allegations was restated.

285.    Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, employees of public institutions have the right to be free from unlawful employment discrimination on the basis of their sex.   This constitutional right is clearly established. *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (citing *Davis v. Passman*, 442 U.S. 228, 235 (1979)); *Nicholson v. Georgia Dep't of Human Res. (DHR)*, 918 F.2d 145, 147-48 (11th Cir. 1990).

286.    Pursuant to 42 U.S.C. § 1983, persons who, acting under the color of state law, violate an individual's constitutional rights can be held liable for damages in their individual capacity.

287.    At all times relevant to this Complaint, Coach Joseph was an employee of a public institution.

288.    Defendant Engel, acting under the color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment because she, as Associate Athletic Director of Compliance, was in a position of authority to take action to stop the violations of Coach Joseph's constitutional rights as described above in paragraphs 51-92 (disparate funding), she knew about the violations of Coach Joseph's rights, yet she failed to act, thereby acquiescing in the discriminatory conduct and causing the discrimination against Coach Joseph to persist and worsen.  Defendant Engel's failure to act in the face of known violations of Coach Joseph's constitutional rights amounted to deliberate indifference.

289.    As a direct result of the actions, statements and/or policies of Defendant Engel, Coach Joseph has suffered an unconstitutional deprivation of her rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

290.    Defendant Engel acted intentionally and with callous disregard for Coach Joseph's known statutory and constitutional rights.

291.    Defendant Engel's conduct described above has directly and proximately caused, and continues to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT EIGHT:

**Violation of Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause Against Defendant Peterson in His Individual Capacity.**

292.    Paragraphs 1 through 291 above are hereby incorporated as though each of the factual allegations was restated.

293.    Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, employees of public institutions have the right to be free from unlawful employment discrimination on the basis of their sex.   This constitutional right is clearly established. *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (citing *Davis v. Passman*, 442 U.S. 228, 235 (1979)); *Nicholson v. Georgia Dep't of Human Res. (DHR)*, 918 F.2d 145, 147-48 (11th Cir. 1990).

294.    Pursuant to 42 U.S.C. § 1983, persons who, acting under the color of state law, violate an individual's constitutional rights can be held liable for damages in their individual capacity.

295.    At all times relevant to this Complaint, Coach Joseph was an employee of a public institution.

296.    Defendant Peterson, acting under the color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment by directly participating in Defendants GTAA's and BOR's discriminatory actions to provide Coach Joseph and the GT WBB Team fewer benefits than it provided the coaches of the GT MBB Team and the GT MBB Team (facilities, marketing, assistant coaches, recruitment funds, and travel) in a manner that adversely affected the terms and conditions of her employment, holding her to a higher standard of performance and conduct than similarly situated male coaches, and terminating her employment because of sex and failure to conform to sex-stereotypes.

297.    Defendant Peterson, acting under the color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment, because he was in a position of authority to take responsive action to stop the violations of Coach Joseph's constitutional rights as described above in paragraphs 51-92 (disparate funding) and 174-216 (termination based on sex and failure to conform to sex-stereotypes), he knew about the violations of Coach Joseph's rights, yet he failed to act, thereby acquiescing in the discriminatory conduct and causing the discrimination against Coach Joseph to persist and worsen.  Defendant Peterson's failure to act in the face of known violations of Coach Joseph's constitutional rights amounted to deliberate indifference.

298.    As a direct result of the actions, statements and/or policies of Defendant Peterson, Coach Joseph has suffered an unconstitutional deprivation of her rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

299.   Defendant Peterson acted intentionally and with callous disregard for Coach Joseph's known statutory and constitutional rights.

300.   Defendant Peterson's conduct described above has directly and proximately caused, and continues to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT NINE:

### Retaliation in Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* Against Defendants Board of Regents and GTAA.

301.   Paragraphs 1 through 300 above are hereby incorporated as though each of the factual allegations was restated.

302.   Title IX prohibits discrimination against any person on the basis of sex in education programs or activities receiving federal financial assistance.   20 U.S. § 1681(a). Retaliation against an employee because that person has complained of sex discrimination is a form of intentional discrimination encompassed by Title IX.   Title IX's protection against sex discrimination and retaliation grants employees a private right of action against a covered institution.

303.   At all times relevant to this Complaint, Defendant BOR was an educational institution that receives federal funding within the meaning of Title IX.

304.   At all times relevant to this Complaint, Defendant BOR ceded control of its Athletic Department to Defendant GTAA, making Defendant GTAA an educational institution that receives federal funding within the meaning of Title IX.

305.   At all times relevant to this Complaint, Coach Joseph was an employee of Defendants BOR and GTAA.

306.   Coach Joseph engaged in protected activity by opposing treatment that she reasonably believed constituted unlawful discrimination under Title IX and its implementing regulations.   She repeatedly opposed Defendants BOR's and GTAA's sex-based disparate funding and treatment of her and the WBB program, including but not limited to through the November 21, 2018 Letter, February 8, 2019 Complaint, February 22, 2019 Letter, and March 25, 2019 Response.

307.   Defendants BOR and GTAA were aware of Coach Joseph's protected activity.

308.   Defendants BOR and GTAA took adverse action against Coach Joseph because of her protected activity, including but not limited to failing to engage in contract negotiations, suspending her employment on February 27, 2019, terminating her employment on March 26, 2019, and making false statements to the press and NCAA regarding Coach Joseph and her alleged violations of NCAA rules or regulations.

309.   The adverse actions taken by Defendants BOR and GTAA against Coach Joseph were causally connected to Coach Joseph's protected activity.

310.   Defendants BOR's and GTAA's actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT TEN:

### Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* Against Defendants Board of Regents and GTAA.

311.   Paragraphs 1 through 310 above are hereby incorporated as though each of the factual allegations was restated.

312.     Title VII prohibits an employer from retaliating against an employee because she has opposed conduct she reasonably believes constitutes unlawful discrimination under Title VII. 42 U.S.C. § 2000(e)-3.

313.     At all times relevant to this Complaint, Defendants BOR and GTAA were persons engaged in an industry affecting commerce who had fifteen or more employees and were employers within the meaning of Title VII.

314.     At all times relevant to this Complaint, Coach Joseph was an employee of Defendants BOR and GTAA within the meaning of Title VII.

315.     Coach Joseph engaged in protected activity by opposing treatment that she reasonably believed constituted unlawful discrimination under Title VII.  She repeatedly opposed Defendants BOR's and GTAA's disparate treatment of her based on sex, including through her on-going complaints about BOR/GTAA's failure to provide her equal resources and benefits relative to the coaches of the MBB Team, as well as her specific complaints of sex discrimination in employment in the November 21, 2018 Letter, February 8, 2019 Complaint, February 22, 2019 Letter, and March 25, 2019 Response, and ultimately, in her EEOC Charges filed on April 16, 2019 and May 13, 2019.

316.     Defendants BOR and GTAA were aware of Coach Joseph's protected activity.

317.     Defendants BOR and GTAA took adverse action against Coach Joseph because of her protected activity, including but not limited to failing to engage her in contract negotiations, suspending her employment on February 27, 2019, terminating her employment on March 26, 2019, and making false statements to the press and NCAA regarding Coach Joseph and her alleged violations of NCAA rules or regulations.  This retaliation is calculated to ruin her career and render her unemployable and has done so.

318.   The adverse actions taken by Defendants BOR and GTAA against Coach Joseph were causally connected to Coach Joseph's protected activity.

319.   Defendants BOR's and GTAA's actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

### COUNT ELEVEN:

**Retaliation in Violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4
Against Defendants GTAA and Board of Regents.**

320.   Paragraphs 1 through 319 above are hereby incorporated as though each of the factual allegations was restated.

321.   The Georgia Whistleblower Act ("GWA") prohibits a public employer from retaliating against a public employee who discloses a violation or noncompliance with a law, rule, or regulation to a supervisor or government agency, or who objects to any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with the law.  O.C.G.A. § 45-1-4(d)(2)-(3).

322.   At all times relevant to this Complaint, Defendant BOR was a board of the state which employs or appoints a public employee or public employees.  Defendant GTAA was therefore a public employer within the meaning of the GWA.  O.C.G.A. § 45-1-4(a)(4).

323.   At all times relevant to this Complaint, Defendant GTAA functioned as an agent of state Defendant BOR and employed a public employee or public employees.  Defendant GTAA was therefore a public employer within the meaning of the GWA.  O.C.G.A. § 45-1-4(a)(4).

324.    At all times relevant to this Complaint, Coach Joseph was an employee of Defendants BOR and GTAA, and qualified as a public employee within the meaning of the GWA. O.C.G.A. § 45-1-4(a)(3).

325.    Coach Joseph's reports to various supervisors and Defendant Peterson regarding Defendants BOR's and GTAA's unlawful conduct, including unlawful discrimination on the basis of sex and unlawful retaliation in violation of federal law, as set forth herein, constituted protected disclosure of a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government agency.

326.    Coach Joseph's conduct of objecting to practices by Defendants BOR and GTAA that she reasonably believed were discriminatory and retaliatory in violation of federal law, as set forth herein, constituted objecting to, or refusing to participate in, any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with a law, rule, or regulation.

327.    Defendants BOR and GTAA were aware of Coach Joseph's protected activity.

328.    Defendants BOR and GTAA took adverse employment actions against Coach Joseph, including by failing to engage her in contract negotiations, suspending her employment on February 27, 2019, terminating her employment on March 26, 2019, and making false statements to the press and NCAA regarding Coach Joseph and her alleged violations of NCAA rules or regulations.

329.    The adverse employment actions taken by Defendants BOR and GTAA against Coach Joseph were causally connected to Coach Joseph's protected disclosures and opposition activity.

330.    Defendants BOR's and GTAA's actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT TWELVE:

**Retaliatory Hostile Work Environment in Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* Against Defendants Board of Regents and GTAA.**

331.    Paragraphs 1 through 330 above are hereby incorporated as though each of the factual allegations was restated.

332.    Title IX prohibits discrimination against any person on the basis of sex in education programs or activities receiving federal financial assistance.   20 U.S. § 1681(a). Retaliation against an employee because that person has complained of sex discrimination is a form of intentional discrimination encompassed by Title IX's private cause of action.   This prohibition against retaliation includes a prohibition against subjecting an employee to a retaliatory hostile work environment because of her protected activity.

333.    At all times relevant to this Complaint, Defendant BOR was an educational institution that receives federal funding within the meaning of Title IX.

334.    At all times relevant to this Complaint, Defendant BOR ceded control of its Athletic Department to Defendant GTAA, making Defendant GTAA an educational institution that receives federal funding within the meaning of Title IX.

335.    At all times relevant to this Complaint, Coach Joseph was an employee of Defendants BOR and GTAA.

336.   Coach Joseph engaged in protected activity by opposing treatment that she reasonably believed constituted unlawful discrimination under Title IX and its implementing regulations.   She repeatedly opposed Defendants BOR's and GTAA's sex-based disparate funding and treatment of her and the WBB program, including in the November 21, 2018 Letter, February 8, 2019 Complaint, February 22, 2019 Letter, and March 25, 2019 Response.

337.   Defendants BOR and GTAA were aware of Coach Joseph's protected activity.

338.   In retaliation for Coach Joseph's protected activity, Defendants BOR and GTAA subjected Coach Joseph to a pattern of retaliatory harassment that included issuing her a series of unwarranted reprimands, disciplinary actions, and investigations on baseless and frequently discriminatory grounds; holding her to a higher standard of performance and conduct than similarly situated male coaches; subjecting her to constant unwarranted compliance investigations; consistently treating her in an aggressive, hostile, and adversarial manner; unreasonably refusing to engage in discussions about extending her employment contract on reasonable terms; baselessly downgrading her reporting line; and abruptly rescinding a prior agreement to allow her sophomores to live off campus in the middle of her season and days before the Institute's housing deadline.

339.   This pattern of retaliatory harassment was sufficiently severe and pervasive so as to alter the terms and conditions of her employment and create a hostile work environment.   It caused Coach Joseph significant and ongoing anxiety; required her to expend significant time and money on legal fees to defend against these spurious accusations; created an environment in which Coach Joseph could not speak out for fear that she, her players, or her staff would be targeted further; and interfered with the terms and conditions of her employment.

340.    Defendants BOR and GTAA at all relevant times knew or should have known of the retaliatory actions being taken against Coach Joseph.

341.    Defendants BOR and GTAA failed to take necessary action to prevent or correct the retaliatory harassment and, in fact, ratified such conduct.

342.    Defendants BOR's and GTAA's actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT THIRTEEN:

**Retaliatory Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964, 45 U.S.C. §§ 2000e, *et seq.* Against Defendants Board of Regents and GTAA.**

343.    Paragraphs 1 through 342 above are hereby incorporated as though each of the factual allegations was restated.

344.    Title VII prohibits an employer from retaliating against an employee because she has opposed conduct she reasonably believes constitutes unlawful discrimination under Title VII. 42 U.S.C. § 2000(e)-3.   This prohibition against retaliation includes a prohibition against subjecting an employee to a retaliatory hostile work environment because of her protected activity.

345.    At all times relevant to this Complaint, Defendants BOR and GTAA were persons engaged in an industry affecting commerce who had fifteen or more employees and were employers within the meaning of Title VII.

346.    At all times relevant to this Complaint, Coach Joseph was an employee of Defendants BOR and GTAA within the meaning of Title VII.

347.    Coach Joseph engaged in protected activity by opposing treatment that she reasonably believed constituted unlawful discrimination under Title VII.  She repeatedly opposed Defendants BOR's and GTAA's disparate treatment of her based on sex, including through her on-going complaints about BOR/GTAA's failure to provide her equal resources and benefits relative to the coaches of the GT MBB Team, as well as her specific complaints of sex discrimination in employment in in the November 21, 2018 Letter, February 8, 2019 Complaint, February 22, 2019 Letter, and March 25, 2019 Response.

348.    Defendants BOR and GTAA were aware of Coach Joseph's protected activity.

349.    In retaliation for Coach Joseph's protected activity, Defendants BOR and GTAA subjected her to a pattern of retaliatory harassment, including but not limited to issuing her a series of unwarranted reprimands, disciplinary actions, and investigations on baseless and frequently discriminatory grounds; holding her to a higher standard of performance and conduct than similarly situated male coaches; subjecting her to constant and unwarranted compliance investigations; consistently treating her in an aggressive, hostile, and adversarial manner; mocking her complaints of discriminatory treatment; repeatedly refusing to engage in discussions about extending her employment contract; baselessly downgrading her reporting line; and abruptly rescinding a prior agreement to allow her sophomores to live off campus in the middle of her season and days before the Institute's housing deadline.

350.    This pattern of retaliatory harassment was sufficiently severe and/or pervasive to alter the terms and conditions of her employment and create a hostile work environment.  It caused her significant and ongoing anxiety; required her to expend significant time and money on legal fees to defend against these spurious accusations; created an environment in which

Coach Joseph could not speak out for fear that she, her players, or her staff would be targeted further; and interfered with the terms and conditions of her employment.

351.    Defendants BOR and GTAA at all relevant times knew or should have known of the retaliatory actions being taken against Coach Joseph.

352.    Defendants BOR and GTAA failed to take necessary action to prevent or correct the retaliatory harassment and, in fact, ratified such conduct.

353.    Defendants BOR's and GTAA's actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT FOURTEEN:

### Breach of Contract Against Defendants GTAA and Board of Regents

354.    Paragraphs 1 through 353 above are hereby incorporated as though each of the factual allegations was restated.

355.    GTAA and Coach Joseph were parties to a valid written contract, the Employment Contract, executed on October 20, 2014.  Under the terms of the Employment Contract, GT/BOR agreed to employ Coach Joseph until March 31, 2020 unless terminated earlier for Good Cause.  *See* Preamble ("the Georgia Institute of Technology…employs JOSEPH as Head Women's Basketball Coach); Article I ("This Contract is for a term of six (6) years…ending March 31, 2020"); Article VII ("This Contract will terminate if…Good Cause exists for such termination.").

356.    By authorizing GTAA to enter into contracts with employees on BOR's behalf, BOR voluntarily assumed the duty to employ Coach Joseph in accordance with the Employment Contract.

357.    Defendant BOR and Coach Joseph were also parties to a valid written contract, the Offer Letter, executed on October 20, 2014.   Under the terms of the Offer Letter, BOR agreed to employ Coach Joseph under the terms enumerated in the Offer Letter.   The Offer Letter specifically references the "formal contract" provided by GTAA (*i.e.*, the Employment Contract), as well as BOR/GT's policies and regulations, as governing Coach Joseph's employment with BOR.

358.    On March 26, 2019, Defendants GTAA and BOR terminated Coach Joseph's employment on the basis of her sex, and in retaliation for her protected activity.

359.    GTAA and BOR terminated Coach Joseph's employment without Good Cause.

360.    By terminating Coach Joseph's employment prior to March 31, 2020, without Good Cause, Defendants GTAA and BOR materially breached their duties under Articles I and Articles VII of the Employment Contract.

361.    Defendants' actions described above have directly and proximately caused, and continue to cause, Coach Joseph to suffer significant economic damages.

### COUNT FIFTEEN:

### Violation of the Georgia Open Records Act, O.G.C.A. § 50-18-71, Against Defendant Board of Regents.

362.    Paragraphs 217 through 224 above are hereby incorporated as though each of the factual allegations was restated.

363.    The ORA requires public agencies like BOR to produce for inspection all records responsive to a request, unless the records are specifically exempted from disclosure by law or court order. O.G.C.A. § 50-18-71(a), (b)(1)(A).

364.    The superior courts of this state have jurisdiction in law and in equity to enforce compliance with the ORA against agencies, like BOR, having custody of records subject to the ORA. O.G.C.A. § 50-18-73(a).

365.    On March 1, 2019, and April 19, 2019, Coach Joseph submitted to GT's counsel written requests for records pursuant to the ORA. Among the records sought was "All notes in any format . . .memorializing the interviews of GT WBB players and staff by Eric Hoffman of Littler Mendelson, P.C., including but not limited to the interview notes of the GT Human Resource personnel who participated in the interviews."

366.    On October 30, 2019, BOR began producing records on a rolling basis in response to Coach Joseph's request for records relating to Mr. Hoffman's interviews of GT WBB players and staff. BOR redacted substantial portions of these records.

367.    BOR redacted material not specifically exempt from disclosure under the ORA, namely, the substance of the players' statements to Mr. Hoffman, as well as the names of players and parents who participated in Mr. Hoffman's investigation into Coach Joseph's conduct or submitted complaints about Coach Joseph's conduct.

368.    BOR's redaction of the records violated the ORA's requirement that all public records shall be open for personal inspection, except where specifically exempt from disclosure under law or court order.

369.    BOR acted without substantial justification in violating the ORA.

## COUNT SIXTEEN:

### Claim for Expenses of Litigation under O.C.G.A. § 13-6-11, Against All Defendants

370.    Paragraphs 1 through 369 above are hereby incorporated as though each of the factual allegations was restated.

371.    Under O.C.G.A. § 13-6-11, a successful plaintiff may recover her attorneys' fees and other expenses of litigation where she specifically pleads and proves that a defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense.

372.    The Institutional and Individual Defendants acted in bad faith and caused Coach Joseph unnecessary trouble and expense by knowingly and intentionally discriminating against Coach Joseph on the basis of her sex in her terms and conditions of employment, terminating Coach Joseph's contract in bad faith and for a dishonest purpose in retaliation for her protected activity and in breach of its terms, and publishing false allegations of egregious misconduct to harm Coach Joseph's reputation.

373.    As a direct and proximate result of Defendants' bad faith violation of Coach Joseph's rights, Coach Joseph has suffered unnecessary trouble and expense.  These damages include court costs, reasonable attorneys' fees, and other litigation expenses, in an amount to be determined at trial by a jury.

### REQUESTED RELIEF

WHEREFORE, Coach Joseph demands a TRIAL BY JURY and for the following relief:

374.    A declaratory judgment that the Institutional Defendants have engaged in unlawful discrimination on the basis of sex in violation of Title IX and Title VII; and unlawful retaliation in in violation of Title IX, Title VII and the GWA;

375.    A declaratory judgment that the Individual Defendants have engaged in unlawful discrimination on the basis of sex in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. §1983;

376.    A declaratory judgment that the Institutional Defendants breached their contract with Coach Joseph without Good Cause;

377.    A declaratory judgement that Defendant BOR failed to produce public records in violation of the ORA;

378.    An injunction prohibiting the Institutional Defendants from engaging in unlawful discrimination on the basis of sex in violation of Title IX and Title VII, and retaliation in violation of Title IX, Title VII, and the GWA;

379.    An order requiring Defendant BOR to produce to Coach Joseph unredacted public records in compliance with the ORA;

380.    Award Coach Joseph damages in an amount to be proved at trial for economic losses, damage to professional reputation, and pain and suffering that she has experienced as a result of Defendants' unlawful conduct;

381.    Award Coach Joseph punitive damages against the Individual Defendants in an amount to be proven at trial;

382.    Award Coach Joseph pre-judgment and post-judgment interest;

383.    Award Coach Joseph reasonable attorney's fees and costs; and

384.    Award Coach Joseph other and further relief as the Court may deem appropriate.


Respectfully submitted this 23rd day of December, 2019.

/s/ *Edward D. Buckley*
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleybeal.com
**Buckley Beal LLP**
600 Peachtree Street NE, Suite 3900
Atlanta, GA 30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101

Lisa J. Banks*
banks@kmblegal.com
Colleen E. Coveney
Georgia Bar No. 686460
coveney@kmblegal.com
Joseph E. Abboud*
abboud@kmblegal.com
**Katz, Marshall & Banks, LLP**
1718 Connecticut Avenue, NW, Sixth Floor
Washington, D.C. 20009
Telephone: (202) 299-1140
Facsimile: (202) 299-1148

*(pro hac vice motion forthcoming)*

# EXHIBIT A



## Georgia Tech Athletic Association

October 10, 2014

MaChelle Joseph

Dear MaChelle:

It is with great pleasure that I renew your employment as Head Women's Basketball Coach for the Georgia Institute of Technology (the Institute). In addition, the Georgia Tech Athletic Association (Athletic Association) will offer to you a formal contract that will provide supplemental compensation and additional benefits.

Your employment by the Institute will be under the following terms:

1.  You will be employed as the Head Women's Basketball Coach of the Institute, with duties as described in Exhibit "A".
2.  Your annual salary as Head Women's Basketball Coach will be $334,000.00 and will be paid monthly through the Institute's normal payroll process. Your salary will be reviewed periodically in accordance with the Institute's performance management program.
3.  The Institute provides a comprehensive benefits package including health, dental and retirement plan options, paid holidays, vacation, and sick leave. A full description of the benefits package can be found at http://www.ohr.gatech.edu/benefits.
4.  Any additional athletically related contractual agreements or arrangements under which you receive income must receive advance written approval from the President of the Institute. Approval of all athletically related income and benefits shall be consistent with the Institute's policy related to outside income and benefits applicable to all full-time employees. You will provide a written detailed account annually for all athletically related income and benefits from sources outside the Institute.
5.  As Head Women's Basketball Coach, you will at all times perform your duties and responsibilities in compliance with and in a manner consistent with the rules, constitutional provisions, bylaws, policies, regulations, and interpretations governing the Institute and intercollegiate athletics, as now constituted or as subsequently amended. If you or the Institute is found in violation of any National Collegiate Athletic Association (NCAA) rule, policy, or regulation, or if you violate

any Institute policy or rule, you will be subject to appropriate disciplinary or corrective action, including suspension without pay or termination of employment.

By accepting this offer, you agree to comply with the Bylaws and Policies of the Board of Regents of the University System of Georgia and the policies, statutes and regulations of the Institute, which are available upon request or at *www.usg.edu* and *www.policies.gatech.edu*.

Sincerely,

Michael A. Bobinski
Director of Athletics
Georgia Institute of Technology

Accepted, this 20th day of October, 2014.

MaChelle Joseph

**Exhibit A**

Duties and Responsibilities of the Head Women's Basketball Coach

1. Report to the Senior Woman Administrator and plan, develop, administer, and evaluate the basketball program.

2. Abide by all applicable law, rules and regulations, including NCAA and ACC rules, Board of Regents policies, and Institute policies.

3. Advise the basketball staff and team of all applicable Institute and NCAA rules and policies, and ensure that the basketball staff and team are in compliance with such rules and policies at all times.

4. Provide administrative oversight in ensuring the academic progress of student-athletes to facilitate pursuit of a baccalaureate degree.

5. Recruit, direct, supervise and evaluate the assistant basketball coaches and all related basketball support personnel.

6. Recommend hiring, selection, compensation, discipline, and discharge of assistant basketball coaches and all related basketball support personnel.

8. Plan and supervise programs for player training, conditioning, and drug education and testing, using program development input from support sources such as the Director of Sports Medicine, Team Physician, and Strength and Conditioning Coach.

9. Develop, supervise, and conduct the recruiting program for student-athlete basketball players.

10. Direct staff and student-athlete basketball players to communicate with the appropriate Institute official for assistance regarding financial aid, academic advisement, and general student needs.

11. Provide appropriate program safety precautions by relying upon the professional advice of the head athletic trainer, risk assessment staff, and the team physician.

12. Evaluate individual and team strengths and develop strategies for skill improvement.

13. Supervise all games, scrimmages, and practices or delegate this responsibility to an appropriate staff member in JOSEPH'S absence.

14.     Discipline student-athletes for violations of team rules, Institute or Athletic Association regulations, or conduct impacting the reputation of the Institute or the Athletic Association.

15.     Oversee expending operational resources budgeted to the basketball program in a manner consistent with Institute policy to include timely submission of all paperwork required.

16.     Cooperate with the Sports Information Director in the preparation of brochures, programs, statistical reports, and press releases in support of the basketball program.

17.     Assist The Alexander Tharpe Fund, Inc., when reasonably requested, in fund-raising efforts to support the basketball program.

18.     Oversee basketball staff activity relating to public relations and promotions functions for the basketball program.

19.     Represent the Institute, when reasonably requested, in organizations governing the intercollegiate basketball program, as deemed necessary by the Director of Athletics, such as NCAA, ACC, etc.

20.     Perform duties assigned by the Senior Woman Administrator customary to the position of Head Women's Basketball Coach and the operation of the basketball program.

# EXHIBIT B

 **Georgia Tech Athletic Association**

## EMPLOYMENT CONTRACT

This Employment Contract (hereinafter referred to as the "Contract") is made by and between the Georgia Tech Athletic Association (hereinafter referred to as the "ASSOCIATION"), and MaChelle Joseph (hereinafter referred to as "JOSEPH"). The effective date of this Contract is October 30, 2014.

## WITNESSETH

WHEREAS, the Georgia Institute of Technology (the "Institute") employs JOSEPH as Head Women's Basketball Coach. As Head Women's Basketball Coach, JOSEPH is responsible for the operation of the women's intercollegiate basketball program conducted by the ASSOCIATION on behalf of the Institute; and

NOW, THEREFORE, in consideration of JOSEPH's employment as Head Women's Basketball Coach, the ASSOCIATION, in furtherance of its mission of supporting the intercollegiate athletic programs of the Institute, desires to enter into this contract in order to provide additional and supplemental benefits to JOSEPH.

## ARTICLE I

## TERM AND COMPENSATION

## BASE SALARY

In consideration for JOSEPH's services and for satisfactory performance of the terms, conditions, and duties stated herein, JOSEPH will be compensated as described in this Article:

This Contract is for a term of six (6) years, beginning April 1, 2014 and ending March 31, 2020. The annual schedule for the term is April 1 through March 31. Annual base salary amounts are as follows and will be paid in monthly installments.

| | |
|---|---|
| 2014 – 2015 | $334,000 |
| 2015 – 2016 | $342,000 |
| 2016 – 2017 through 2019 – 2020 | $350,000 |

## PERSONAL APPEARANCES AND SPEAKING FEE

JOSEPH agrees to make a minimum of eighteen (18) appearances or speaking engagements per year for the Alexander-Tharpe Fund, the Alumni Association, the Georgia Tech Foundation and all similar official Georgia Tech entities or affiliated organizations for the purpose of furthering the mission and interests of Georgia Tech athletics, if requested to do so. In exchange for this agreement, the ASSOCIATION agrees to pay JOSEPH an annual amount according to the following schedule, to be paid in equal monthly installments to JOSEPH or to her legal corporation on her behalf, as determined by JOSEPH.  Monthly payments will be made the last working day of each month.

| | |
|---|---|
| 2014 – 2015 | $225,000 |
| 2015 – 2016 | $250,000 |
| 2016 – 2017 | $275,000 |
| 2017 – 2018 through 2019 – 2020 | $300,000 |

## ARTICLE II

## DUTIES

The parties agree that JOSEPH'S duties as Head Women's Basketball Coach of the Georgia Institute of Technology shall include, but are not limited to, the following:

1. Report to the Senior Woman Administrator and plan, develop, administer, and evaluate the basketball program.

2. Abide by all applicable law, rules and regulations, including NCAA, ACC, Board of Regents, Institute and ASSOCIATION rules and policies.

3. Advise the basketball staff and team of all applicable ASSOCIATION and NCAA rules and policies, as directed by the administration of the ASSOCIATION, and make a determined effort to ensure that the basketball staff and team are in compliance with said rules and policies.

4. Cooperate with the ASSOCIATION administration in monitoring the academic progress of student-athlete basketball players to facilitate pursuit of a baccalaureate degree.

5. Recruit, direct, supervise and evaluate the assistant basketball coaches and all related basketball support personnel.

6. Recommend hiring, selection, compensation, discipline, and discharge of assistant basketball coaches and all related basketball support personnel.

7. Recommend students for athletic grant-in-aid scholarships from the ASSOCIATION.

8. Plan and supervise programs for player training and conditioning, using program development input from support sources such as the Director of Sports Medicine, Team Physician, and Strength and Conditioning Coach.

9. Develop, supervise, and conduct the recruiting program for student-athlete basketball players.

10. Direct student-athlete basketball players to the appropriate ASSOCIATION or Institute resource for assistance regarding financial aid, academic advisement, and general student services.

11. Provide appropriate program safety requirements by relying upon the professional advice of the athletic training staff and the team physician assigned by the ASSOCIATION.

12. Evaluate individual and team strengths and develop strategies for skill improvement.

13. Supervise all games, scrimmages, and practices or delegate this responsibility to an appropriate staff member in JOSEPH'S absence.

14. Discipline student-athletes for violations of team rules, ASSOCIATION regulations or conduct impacting upon team matters, team policies or the reputation of the ASSOCIATION.

15. Oversee expending operational resources budgeted to the basketball program in a manner consistent with ASSOCIATION policy to include timely submission of all paperwork required.

16. Cooperate with the Athletic Communications and Public Relations staff in the preparation of brochures, programs, statistical reports, and press releases in support of the basketball program.

17. Assist The Alexander Tharpe Fund, Inc., when reasonably requested, in fund-raising efforts to support the basketball program.

18.  Oversee basketball team and staff activity relating to public relations and promotions functions for the basketball program.

19.  Represent the ASSOCIATION, when reasonably requested, in organizations governing the intercollegiate basketball program, as deemed necessary by the Director of Athletics, such as NCAA, ACC, etc.

20.  As schedule permits, assist and promote the ASSOCIATION by soliciting and encouraging contributions to and support of the ASSOCIATION'S intercollegiate athletic program.

21.  As schedule permits, represent the ASSOCIATION and its intercollegiate athletic program at appropriate events, meetings and in webcast videos or other forms of media.

22.  Perform duties assigned by the Senior Woman Administrator customary to the position of Head Women's Basketball Coach and the operation of the basketball program.

## ARTICLE III

## BENEFITS

In consideration for JOSEPH'S services and for her satisfactory performance of the terms, conditions and duties stated herein, the ASSOCIATION agrees to provide JOSEPH following benefits:

## USE OF AUTOMOBILE

The ASSOCIATION shall annually provide JOSEPH with either (i) an automobile allowance in the amount of one thousand, three hundred dollars ($1,300.00) per month, or (ii) one dealer vehicle and a stipend of $650.00 per month.  Related income taxes will be withheld from JOSEPH through the payroll reporting system.

## CLUB MEMBERSHIPS

The ASSOCIATION agrees to provide JOSEPH with a membership to a Country Club provided the initiation fee is waived and, during the period this agreement is in effect, to pay the monthly dues and basketball business related charges for it.  While not a requirement, it is the express request of the ASSOCIATION that payments made, pursuant to this paragraph be used for

JOSEPH'S relaxation and enjoyment, and to market and promote the Georgia Institute of Technology, its academic curriculum, basketball program and alumni relations and fund raising. In absence of a membership at a single club, the ASSOCIATION will pay JOSEPH a monthly club allowance of two hundred sixty-five dollars ($265.00) per month. This election should be made as of the contract date.

## EXEMPLARY PERFORMANCE

In recognition of the fact that exemplary performance by the intercollegiate basketball team produces both tangible and intangible benefits for the ASSOCIATION and the Georgia Institute of Technology by focusing favorable, public attention on the ASSOCIATION and the Georgia Institute of Technology, and in further recognition of the additional work and sacrifice of JOSEPH to prepare and participate in a pre-season or post-season tournament game, the ASSOCIATION shall pay additional compensation to JOSEPH in each year of her  Contract in which any of the following events occur:

1. JOSEPH shall be paid an additional thirty-five thousand dollars ($35,000.00) for each season in which the team wins the ACC regular season championship;

    OR

2. JOSEPH shall be paid an additional twenty-five thousand dollars ($25,000.00) for each season in which the team wins the ACC post-season championship;

3. JOSEPH shall be paid an additional fifteen thousand dollars ($15,000.00) for each season in which the team participates in the NCAA post –season championship tournament ("NCAA Tournament");

4. JOSEPH shall be paid an additional fifteen thousand dollars ($15,000.00) per win in the NCAA Tournament;

5. JOSEPH shall be paid an additional fifty thousand dollars ($50,000.00) for participation in the National Final Four of the NCAA tournament;

6. JOSEPH shall be paid an additional fifty thousand dollars ($50,000.00) for winning the NCAA National Championship;

7. JOSEPH shall be paid an additional five thousand dollars ($5,000.00) for each season in which the team participates in the post season National Invitational Tournament (the "NIT");

8.     JOSEPH shall be paid an additional ten thousand dollars ($10,000.00) in any academic year in which the Georgia Tech Women's Basketball team earns an NCAA Academic Performance Rate of at least 950;

9.     JOSEPH shall be paid five thousand dollars ($5,000.00) for being named ACC Coach of the Year as determined by the ACSMA;

The amounts set forth above are cumulative and, in any Contract Year, JOSEPH may earn either of the amounts set forth in subsections (1) and (2) and any amounts earned in subsections (3) – (9) above. The maximum performance bonuses (noted in sections (1) – (9) above) earned in any one Academic Year shall not exceed two hundred thousand dollars ($200,000). It is understood and agreed that any incentive earned under this paragraph shall be payable 30 days following the end of the term year of the season in which it is earned and JOSEPH will be deemed fully vested and entitled to any incentive at the conclusion of the season in which it was earned, despite termination of employment subsequent thereto as long as JOSEPH participated in such event.

JOSEPH shall also be paid a series of lump sum longevity bonuses for the completion of the following milestone seasons as Head Coach for the ASSOCIATION.

| Season Completed | Employed Through | Pay Amount | Pay Date |
|---|---|---|---|
| 2016 – 2017 | March 31, 2017 | $100,000.00 | April 30, 2017 |
| 2019 – 2020 | March 31, 2020 | $100,000.00 | April 30, 2020 |

## SIDELINE, SHOES, HATS AND APPAREL

JOSEPH agrees to her right to negotiate separate NON "Official Provider" contracts for apparel, footwear, hats, uniforms, or other items. The ASSOCIATION will negotiate all "Official Provider" contracts for all apparel. The parties agree that all basketball-related contractual agreements between JOSEPH and persons, parties, or legal entities of any type, outside of the ASSOCIATION, shall first receive prior written approval from the ASSOCIATION'S Director of Athletics before commitments are made.

## MISCELLANEOUS

The ASSOCIATION agrees to grant JOSEPH the following additional benefits because of her position as Head Women's Basketball Coach:

1.     JOSEPH shall be entitled to life insurance (a twenty-five thousand dollar policy) provided to all employees plus an additional three times her annual base salary through the Board of Regents Group Life Insurance Policy, medical insurance, paid vacation leave, sick leave, and retirement benefits as other non-classified ASSOCIATION

employees.  Such employee benefits are set out in detail in the Georgia Institute of Technology website, to which reference is here made and which provisions are incorporated herein by reference

2.      Tickets - JOSEPH shall receive six (6) tickets to all home men and women's basketball games at no cost, six (6) tickets to all home football games and two (2) tournament tickets at no cost.  These tickets will be the best available and will be considered a taxable benefit.

2.      Summer Basketball Camps - JOSEPH shall be entitled to utilize the facilities of the Georgia Tech Athletic Association, to conduct an annual summer basketball camp. JOSEPH will be responsible for any costs incurred by GTAA as a result of wear and tear caused by such camps to include custodial services.  The ASSOCIATION waives any interest in the revenue generated by the camp conducted by JOSEPH.

3.      Speaking Engagements, Clinics, Publications, Coaching Videos, and Other Outside Activities - The ASSOCIATION expressly authorizes JOSEPH to participate in any speaking engagements, clinics, public appearances, videos, television appearances, and authorship of basketball-related books and articles, provided said activity does not conflict with JOSEPH'S responsibilities as Head Women's Basketball Coach and ASSOCIATION waives any interest in the revenue generated by these activities provided the revenue is disclosed annually in accordance with NCAA and ASSOCIATION policies.

4.      Contract Renegotiation:  There will be no automatic extension of this Contract. JOSEPH and ASSOCIATION agree to a good faith reconsideration of the terms and conditions of the Contract after the completion of the 2016-2017 season.

5.      Notwithstanding any other provision of this contract, the Board of Regents has authorized the President of the Institute to implement a mandatory furlough program requiring employees to take not more than 10 days of unpaid annual leave.  In the event it becomes necessary for the President to exercise this authority, employee furloughs will be implemented in accordance with guidelines promulgated by the Office of the Chancellor.

### ARTICLE IV

#### Outside Income

The parties agree that all basketball-related contractual agreements between JOSEPH and persons, parties, or legal entities of any type, outside of the ASSOCIATION, shall first receive

prior written approval from the President of the ASSOCIATION for all athletically related income, said approval being in addition to the requirements of NCAA Bylaw 11.2 and its subparts and any amendments thereto. The request for approval shall be in writing and shall include the amount and sources of the income. Sources of such income shall include but are not limited to income from annuities, sports camps, country club memberships, complimentary ticket sales, television and radio programs and endorsement or consultation contracts for athletic shoe, apparel or equipment manufacturers. In addition, such outside contracts shall be consistent with ASSOCIATION policies and procedures and the laws of the State of Georgia.

## ARTICLE V

## DEATH OR DISABILITY

Notwithstanding any other provision of this contract, the Contract shall terminate automatically and become null and void upon the death of JOSEP or if JOSEPH becomes totally or permanently disabled (as determined by the Institute's long-term disability carrier) or is otherwise unable to perform the essential functions of the job. If the Contract is terminated under this Article, no further money, compensation, or benefits shall be due to JOSEPH.

## ARTICLE VI

## CONDITIONS OF EMPLOYMENT

JOSEPH shall devote her full time, attention, energies and abilities to her duties as the ASSOCIATION'S Head Women's Basketball Coach, and during her employment, except as otherwise herein provided and authorized, she shall not engage in any other business or occupation, without first obtaining the written approval of the Athletic Director.

JOSEPH shall recognize and comply with the laws, policies, rules and regulations of and governing the Georgia Institute of Technology, the Georgia Tech Athletic Association and the rules of National Collegiate Athletic Association and the Atlantic Coast Conference as now constituted or as they may be amended during the term hereof. JOSEPH shall also endeavor to ensure that all assistant coaches and any other employees for whom she is administratively responsible comply with the aforesaid policies, rules and regulations as well.

JOSEPH shall have the right to incorporate herself into a personal service corporation for the purposes of protecting her personal assets from liability resulting from sports camp or other professional activities, and/or to shelter self-employed income in the appropriate retirement plan vehicles resulting from sources outside the ASSOCIATION'S system, and approved herein.

Any income resulting from clinics, professional activities, endorsements, speaking engagements, or self-employment income generated from activities relating to her conduct as Basketball Coach shall be non-W-2 income and paid directly to JOSEPH, but reportable to the NCAA and IRS.

Furthermore, it is recognized that any of the aforementioned income and benefits shall be subject to NCAA rules and regulations regarding the reporting and institutional controls regarding JOSEPH'S outside income as required by that governing body and its members, and must be consistent with ASSOCIATION and NCAA policies and procedures.
JOSEPH shall have the right to operate basketball camps during the summer months, using the ASSOCIATION'S facilities, personnel and other services, provided she provides adequate insurance against any claim, demand or action that might arise as a result of such operations. Staff compensation shall be solely subject to JOSEPH'S control. Any other costs incurred by the ASSOCIATION as a result of these camps will be the responsibility of JOSEPH.

JOSEPH shall conduct such travel as is necessary to carry out her duties as Head Women's Basketball Coach, and he shall be entitled to reimbursement for transportation and per diem expenses as authorized by State law and ASSOCIATION policy upon presentation of the appropriate vouchers and receipts in a timely manner. Said reasonable travel expenses shall include, but not be limited to, airline transportation, hotel expenses, meals, rental cars, and convention expenses including registration fees.

## ARTICLE VII

## TERMINATION

This Contract may be terminated for cause prior to the end of the Contract Term as described in this Article.  In the event of termination for cause, the ASSOCIATION shall immediately be relieved of any and all liabilities and/or obligations to JOSEPH under the Contract, other than for monies earned and due for services rendered prior to termination. Any such termination or suspension shall not be subject to the arbitration provisions hereafter set out.

This Contract will terminate if the employment of JOSEPH as the Institute's Head Women's Basketball Coach is terminated and if, in the sole discretion of the President and Chairman of the Athletic Association, "Good Cause" exists for such termination. "Good Cause" includes, but is not limited to, any of the following:

1. Conviction of (or entry into pre-trial intervention as a result of) a crime involving moral turpitude or conviction of a felony;

2. Involvement in conduct that the Athletic Association, in its sole discretion, reasonably considers injurious to the reputation of the Association or the Institute.

3. JOSEPH's failure to substantially perform any of her duties under this Contract;

4. The committing of a major violation of NCAA Legislation by JOSEPH while employed by the Institute or while previously employed at another NCAA member institution, or the committing of a series or pattern of secondary violations of NCAA Legislation while employed by the Institute;

5. The committing of a major violation of NCAA Legislation by a member of JOSEPH's staff while at the Institute of which JOSEPH had prior actual knowledge or should have had prior actual knowledge and did not report in a timely fashion in accordance with all appropriate NCAA, Association and Institute rules, policies and regulations;

6. The committing of a major violation of NCAA Legislation by any representative of the Institute's athletics programs while JOSEPH is at the Institute and of which JOSEP has actual knowledge or should have had actual knowledge, and which JOSEPH did not report in a timely fashion in accordance with all appropriate NCAA, Association and Institute rules, policies and regulations;

7. Serious or repeated misconduct; or

8. Any cause adequate to justify the termination of any other non-classified Institute employee.

JOSEPH shall be given thirty (30) days' notice, or thirty days' pay in lieu of notice, of any termination for "Good Cause".

The Association's right to terminate this Contract for cause shall not be construed to preclude the Association's imposition of lesser discipline (such as suspension with or without pay or other sanctions) on JOSEPH, whether for personal or Departmental violation of rules, policies or regulations, or for any other breach of this Contract.

JOSEPH shall have the right to terminate this agreement immediately in exchange for a buyout of two hundred, fifty thousand dollars ($250,000.00) in the first and second year and two hundred thousand dollars ($200,000.00) for any year thereafter, payable within sixty (60) days of such notice to the ASSOCIATION.

In the event the ASSOCIATION gives notice of termination to JOSEPH prior to the end of the contract term for any reason other than "good cause" (as defined herein), the ASSOCIATION shall buy out its further obligations under the Contract by providing Severance Pay to JOSEPH payable in monthly installments as earned for the number of years remaining on the contract. The Severance Pay amount shall only include percentages of unpaid Base Salary for those years

of the Contract Term that follow the year in which a termination without "good cause" occurs; it being understood that full Base Salary shall be payable to JOSEPH through the current year in which a termination without "good cause" occurs.  The applicable percentages are the following:

| | | |
|---|---|---|
| Year One | April 1, 2014 – March 31, 2015 | 100% of Base Salary |
| Year Two | April 1, 2015 – March 31, 2016 | 100% of Base Salary |
| Year Three | April 1, 2016 – March 31, 2017 | 100% of Base Salary |
| Year Four | April 1, 2017 – March 31, 2018 | 75% of Base Salary |
| Year Five | April 1, 2018 – March 31, 2019 | 75% of Base Salary |
| Year Six | April 1, 2019 – March 31, 2020 | 50% of Base Salary |

If buyout is executed, the ASSOCIATION shall have no further obligation or liability to JOSEPH for remuneration of any type.  Additionally, buyout would be mitigated should JOSEPH secure employment elsewhere, with an offset of earnings from JOSEPH's new employment up to the full amount owed.  JOSEPH hereby agrees to fully disclose the terms and compensation she is to receive during the years covered under this Contract.

## ARTICLE VIII

## WAIVER OF BREACH

The waiver by either party of a breach of any provision of this Contract shall not operate or be construed as a waiver by that party of any subsequent breaches.

## ARTICLE IX

## SEVERABILITY

In the event that any provision of this Contract shall be deemed invalid, unreasonable or unenforceable by any Court of competent jurisdiction or because of NCAA Rules or Bylaws, such provision shall be stricken from the Contract or modified so as to render it reasonable, and the remaining provisions of this Contract or the modified provision shall continue in full force and effect and be binding upon the parties so long as such remaining or modified provisions reflect the interest of the parties at the date of this Contract.  Any such stricken items shall be subject to renegotiations at the first possible time, subject to right of refusal by the ASSOCIATION.

## ARTICLE X

## NOTICE

All notices hereunder shall be in writing and shall be given by personal delivery, registered or certified mail or telegraph to the following addresses:

As to MACHELLE JOSEPH:
Head Women's Basketball Coach
Georgia Tech Athletic Association
150 Bobby Dodd Way
Atlanta, Georgia 30332-0455

As to ASSOCIATION:
Director of Athletics
Georgia Tech Athletic Association
150 Bobby Dodd Way
Atlanta, Georgia 30332-0455

## ARTICLE XI

## APPLICABLE LAW

This Contract shall be construed in accordance with the laws of the State of Georgia.

## ARTICLE XII

## SUCCESSORS AND ASSIGNS

This Contract shall inure to the benefit of and be binding upon the successors and assigns of the ASSOCIATION and JOSEPH.

## ARTICLE XIII

## HEADINGS

The headings at the beginning of each paragraph and sub-paragraph of this Contract are for convenience only and shall not in any way affect the interpretation of any paragraph of this Contract or the entire Contract.

## ARTICLE XIV

## EXECUTION IN COUNTERPARTS

This Contract may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same Contract.

-12-

## ARTICLE XV

### REMEDIES

The remedies provided for herein or otherwise available to the parties shall be cumulative and no one such remedy shall be exclusive of any other and the exercise of any one shall not preclude the exercise or be deemed to be a waiver of any right or remedy at law or in equity which may be available to a party, including any rights to damages or injunctive relief.

## ARTICLE XVI

### ADDITIONAL DOCUMENTS

The parties shall execute and deliver any and all additional papers, documents and other instruments and shall do any and all further acts and things reasonably necessary in connection with performance of their obligations hereunder to carry out the intent of this Contract.

## ARTICLE XVII

### ENTIRE AGREEMENT

This Contract represents the entire understanding of the parties, and neither party is relying upon any representation not contained in this Contract.

IN WITNESS WHEREOF, the parties have signed this contract on the 20th day of October, 2014.

MaChelle Joseph
Head Women's Basketball Coach

GEORGIA TECH ATHLETIC ASSOCIATION

Michael Bobinski
Director of Athletics

Marvin Lewis
Associate Athletic Director, Finance & Administration

Dr. G.P. "Bud" Peterson
President
Board of Trustees

-13-

# EXHIBIT C



**Via Hand Delivery**
March 26, 2019

MaChelle Joseph
1488 Sheridan Walk
Atlanta, GA 30324

Dear MaChelle,

As you are aware, Georgia Tech Human Resources (GTHR), in partnership with Littler Mendelson, P.C., investigated allegations regarding your conduct as a coach. I have reviewed and considered the investigation report as well as your response to that report.

As a result of your actions, your Employment Contract with GTAA is terminated, effective as of the date of this letter. As required by your Employment Contract, you will receive thirty (30) days' pay.

I have determined "Good Cause" exists for this decision, as defined in Article VII of your contract, and specifically the following subsections of that Article:

> (2)  Involvement in conduct that the Athletic Association, in its sole discretion, reasonably considers injurious to the reputation of the Association or the Institute.

> (7)  Serious or repeated misconduct.

> (8)  [Behavior and/or action] adequate to justify the termination of any other non-classified Institute employee.

This decision is final and is not subject to any appeal.

Sincerely,

Todd Stansbury
Georgia Tech Athletics Director

# EXHIBIT D



**Via Hand Delivery**

March 26, 2019

MaChelle Joseph
1488 Sheridan Walk
Atlanta, GA 30324

Dear MaChelle,

As you are aware, Georgia Tech Human Resources (GTHR), in partnership with Littler Mendelson, P.C., investigated allegations regarding your conduct as a coach. I have reviewed and considered the investigation report as well as your response to that report.

I have determined you are in violation of the University System of Georgia *Ethics Policy*: "Treat fellow employees, students and the public with dignity and respect." Further, your conduct adversely affected the well-being of the student athletes under your supervision.

As a result of your actions, your employment with Georgia Institute of Technology is terminated effective as of the date of this letter.

You have the right to appeal my decision to President G.P. Peterson within five (5) business days of the date of this letter. Your appeal should be submitted in writing indicating specifically why you believe the decision to terminate was improper and should be reversed.

If President Peterson's decision is unsatisfactory to you, you have the right to appeal to the Institute's Impartial Board of Review within five (5) business days of receiving President Peterson's decision. Assistance in filing a request for a hearing before the Impartial Board of Review is available at GTHR. You may contact Adrienne Richardson, Compliance Advisor, in GTHR at 404-385-1539 for assistance with filing an appeal.

Sincerely,

Todd Stansbury
Georgia Tech Athletics Director

Georgia Tech Athletic Association, 150 Bobby Dodd Way, N.W., Atlanta, Georgia 30332-0455