IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MACHELLE JOSEPH,<br><br>        Plaintiff,<br><br>v.<br><br>BOARD OF REGENTS OF THE<br>UNIVERSITY SYSTEM OF<br>GEORGIA; GEORGIA TECH<br>ATHLETIC ASSOCIATION;<br>GEORGE P. PETERSON; M.<br>TODD STANSBURY; MARVIS<br>LEWIS; and SHOSHANNA<br>ENGEL,<br><br>        Defendant. | CIVIL ACTION FILE<br><br>NO. 1:20-cv-502-TCB |

# **O R D E R**

## I.    **Background**

Plaintiff MaChelle Joseph became the head coach for the Georgia

Institute of Technology's women's basketball team in 2003. On March

26, 2019, her employment was terminated. She has sued various

entities and individuals affiliated with Georgia Tech, contending that

her termination was a result of unlawful discrimination and retaliation. She further contends that her employment was rife with discrimination between herself and her male counterparts.

Joseph alleges that she had an employment contract with Defendants the Board of Regents of the University System of Georgia and the Georgia Tech Athletic Association ("GTAA")[1] providing for her employment as head coach until 2020. Specifically, on October 10, 2014, Georgia Tech offered to renew her employment and provided her an offer letter setting forth the terms and conditions of her employment with Georgia Tech.

On October 20, 2014, Joseph signed a contract with GTAA providing for her employment with Georgia Tech from April 1, 2014 through March 31, 2020. The contract provided that it would be terminated if Joseph's employment as women's basketball head coach was terminated and if GTAA's president determined in his sole

---

[1] GTAA is a nonprofit organization that maintains the intercollegiate program at Georgia Tech.

discretion that good cause existed for termination. Good cause is defined

in the contract as including, but not limited to:

1.    Conviction of (or entry into pre-trial intervention as a
result of) a crime involving moral turpitude or conviction of a
felony;

2.    Involvement in conduct that the Athletic Association,
in its sole discretion, reasonably considers injurious to the
reputation of the Association or the Institute;

3.    JOSEPH's failure to substantially perform any of her
duties under this Contract;

4.    The committing of a major violation of NCAA
Legislation by JOSEPH while employed by the Institute or
while previously employed at another NCAA member
institution, or the committing of a series or pattern of
secondary violations of NCAA Legislation while employed by
the Institute;

5.    The committing of a major violation of NCAA
Legislation by a member of JOSEPH's staff while at the
Institute of which JOSEPH had prior actual knowledge or
should have had prior actual knowledge and did not report
in a timely fashion in accordance with all appropriate NCAA,
Association and Institute rules, policies and regulations;

6.    The committing of a major violation of NCAA
Legislation by any representative of the Institute's athletics
programs while JOSEPH is at the Institute and of which
JOSEP[H] has actual knowledge or should have had actual
knowledge, and which JOSEPH did not report in a timely
fashion in accordance with all appropriate NCAA,
Association and Institute rules, policies and regulations;

3

7.    Serious or repeated misconduct; or

8.    Any cause adequate to justify the termination of any other non-classified Institute employee.

[1-2] at 86–87.

Joseph alleges that while she was employed at Georgia Tech, she regularly complained that the women's basketball team received inferior treatment to the men's basketball team. She also alleges that the Board of Regents discriminated against her on the basis of her sex and the sex of her players by giving the women's basketball team inferior locker rooms and other facilities, publicity resources, funds for coach and staff salaries, and travel resources in comparison to the men's team. She avers that these differences negatively impacted the terms and conditions of her employment.

Joseph further alleges that her complaints about differential treatment caused the Board of Regents to subject her to unlawful retaliation. Specifically, she alleges what she contends was a baseless written reprimand for excessive alcohol intake from former Georgia Tech Athletic Director Mike Bobinski in 2015. She further alleges that

4

in 2016, Senior Women's Administrator Joeleen Akin pursued a complaint against Joseph too aggressively, leading to a final written warning in November 2016.

Joseph also refers to Georgia Tech's participation in a 2018 NCAA investigation into the women's basketball program and Georgia Tech's 2019 investigation into student-athlete complaints against Joseph. After Georgia Tech received these complaints, it hired a law firm, Littler Mendelson, P.C., to investigate complaints of player and staff mistreatment by Joseph. After investigating, Littler Mendelson compiled a report in which those interviewed described a toxic, suffocating, unhealthy, and hostile environment, which they attributed to Joseph.

At Georgia Tech's invitation, Joseph responded to the report. Nonetheless, when the investigation was concluded, Georgia Tech's Athletic Director (and GTAA's chief executive officer) Todd Stansbury terminated Joseph's employment.

Joseph has filed this action against Defendants GTAA, the Board of Regents (the "Board"), Stansbury, George "Bud" Peterson (then

president of Georgia Tech), Marvin Lewis (Associate Athletic Director of Administration and Finance at Georgia Tech and GTAA's Chief Financial Officer), and Shoshanna Engel (Associate Athletic Director of Compliance and Deputy Title IX Coordinator at Georgia Tech).

Her complaint contains the following claims: (1) discrimination on the basis of sex in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* (against the Board and GTAA); (2) discrimination on the basis of sex and association with a protected class (women) in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* (against the Board and GTAA); (3) discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)(2) (against the Board and GTAA); (4) discrimination on the basis of sex and association with a protected class (women) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)(2) (against the Board and GTAA); (5) violation of constitutional and civil rights pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause (against Stansbury in his individual capacity); (6) violation of constitutional and civil rights pursuant to 42

U.S.C. § 1983 and the Equal Protection Clause (against Lewis in his individual capacity); (7) violation of constitutional and civil rights pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause (against Engel in her individual capacity); (8) violation of constitutional and civil rights pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause (against Peterson in his individual capacity); (9) retaliation in violation of Title IX (against the Board and GTAA); (10) retaliation in violation of Title VII (against the Board and GTAA); (11) retaliation in violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4 (against the Board and GTAA); (12) retaliatory hostile work environment in violation of Title IX (against the Board and GTAA); (13) retaliatory hostile work environment in violation of Title VII (against the Board and GTAA); (14) breach of contract (against the Board and GTAA); (15) violation of the Georgia Open Records Act, O.C.G.A § 50-18-71 (against the Board); and (16) expenses of litigation under O.C.G.A § 13-6-11 (against all Defendants).

Before the Court are the following motions: (1) the Board's partial motion [3] to dismiss; (2) Engel, Lewis, Peterson, and Stansbury's

motion [4] to dismiss; (3) GTAA's motion [6] to dismiss; (4) the Board's

motion [29] for partial judgment on the pleadings; and (5) Joseph's

motion [32] for leave to file a surreply.

## II.   Legal Standards

### A.   Motions to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint

provide "a short and plain statement of the claim showing that the

pleader is entitled to relief[.]" This pleading standard does not require

"detailed factual allegations," but it does demand "more than an

unadorned, the-defendant-unlawfully-harmed-me accusation."

*Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012)

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Under Rule 12(b)(6), a plaintiff must plead "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007); *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695

F.3d 1194, 1199 (11th Cir. 2012) (quoting *id.*). The Supreme Court has

explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads
> factual content that allows the court to draw the reasonable

8

inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Iqbal*, 556 U.S. at 678 (citation omitted) (quoting *Twombly*, 550 U.S. at 556); *see also Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324–25 (11th Cir. 2012).

Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555–56 (citations omitted). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). While all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), the Court need not accept as true the plaintiff's legal conclusions, including those couched as factual allegations, *Iqbal*, 556 U.S. at 678.

Thus, evaluation of a motion to dismiss requires two steps: (1) eliminate any allegations in the pleading that are merely legal conclusions, and (2) where there are well-pleaded factual allegations,

9

"assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## B.   Judgment on the Pleadings

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial. . . ." FED. R. CIV. P. 12(c). Judgment on the pleadings is appropriate only "when no issues of material fact exist, and the movant is entitled to judgment as a matter of law." *Ortega v. Christian*, 85 F.3d 1521, 1524 (11th Cir. 1996). When reviewing a motion for judgment on the pleadings, the Court considers only the substance of the pleadings and any judicially noticed facts, and it accepts the facts in the pleadings as true and views them in the light most favorable to the nonmoving party. *See Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998).

## III.   Discussion

### A.   Board of Regents and GTAA's Motion to Dismiss

#### 1.   Title IX Claims

##### a.   Joseph Has Pleaded that GTAA Is a Federal Funding Recipient Under Title IX

GTAA contends that it is not subject to liability under Title IX because Joseph has failed to plead facts to show that it is a funding recipient under Title IX. Title IX coverage extends only to entities that receive federal funds. 20 U.S.C. § 1681(a); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999). At the motion to dismiss stage, a factual showing that a recipient of federal financial assistance has ceded control over one of its programs to a private entity, and provided that private entity funding, is sufficient to show that the private entity is a funding recipient subject to Title IX liability. *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007).

Joseph alleges that Georgia Tech (which is a recipient of federal funds) "provides monetary contributions to fund GTAA" including "institutional monetary support from [Georgia Tech], monies from seat and ticket sales for [Georgia Tech] sporting events, and student athletic

11

fees." [1-2] ¶ 28. Although GTAA argues that the complaint does not allege the amount or type of support, that the money from the alleged sales and fees derives from federal funds, or the way Georgia Tech controls and disperses funds to GTAA, the Court finds that Joseph has alleged sufficient facts at this stage.

### b.   Preemption

The parties also disagree about whether Title VII preempts two of Joseph's Title IX claims—counts one and two.[2] Defendants contend that Title VII is the only appropriate vehicle for claims of sex discrimination and retaliation in the employment context. "Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Title VII prohibits sex discrimination with respect to an employee's compensation, or the terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a).

Although Joseph contends that *Jackson* supports her position that her Title IX claims are not preempted by Title VII, that case determined

---

[2] Defendants initially argued that all four of Joseph's Title IX claims (counts one, two, nine, and twelve) are preempted, but concede in their reply brief that counts nine and twelve are not preempted.

12

whether Title IX included a private right of action for retaliation where the statute's text did not specifically provide for one.

Although there is a split of authority, courts, including those within this district, have determined that a plaintiff does not have a private right of action to bring employment-based claims under Title IX. *See, e.g.*, *Cooper v. Ga. Gwinnett Coll.*, No. 1:16-cv-1177-TWT-JFK, 2016 WL 6246888, at *6 (N.D. Ga. Sept. 16, 2016), *report and recommendation adopted*, 2016 WL 6217124 (N.D. Ga. Oct. 25, 2016) (noting that allowing employment discrimination claims under Title IX "would disrupt a carefully balanced remedial scheme for redressing employment discrimination by employers") (quoting *Lakoski v. James*, 66 F.3d 751, 754 (5th Cir. 1995); *Reese v. Emory Univ.*, No. 1:14-cv-2222-SCJ, 2015 WL 13649300 (N.D. Ga. Jan. 25, 2015).

The Court agrees with the reasoning of these courts that Title VII is intended to provide "the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions." *Lakoski*, 66 F.3d at 753. Therefore, the Court

13

will dismiss counts one and two. Counts nine and twelve will proceed against both the Board and GTAA.[3]

### 2.   Title VII Claims

The Board and GTAA also move to dismiss counts three and four as time-barred and for failure to state a claim, and to dismiss count thirteen for failure to state a claim.

### a.   Joseph's Claims Are Limited to Acts Occurring on or After October 18, 2018, but She Is Not Prohibited from Raising Earlier Factual Occurrences as Background Evidence

Before a plaintiff brings a lawsuit under Title VII, she must exhaust her administrative remedies by filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). 42 U.S.C. § 2000e-5(e)(1). The charge must be filed within

---

[3] Defendants briefly mention that they alternatively seek to dismiss the Title IX counts for failure to state a claim. However, Defendants do not explain how counts nine and twelve fail to state a claim, and the Court will not dismiss them on this basis.

Defendants also argue that to the extent Joseph seeks to assert the rights of the players, she does not have standing to do so. However, it appears Joseph may seek to assert an associational claim, which (unlike in Title VII, discussed *infra*) has been clearly determined to be permissible. See *Jackson*, 544 U.S. at 179.

180 days after the alleged unlawful employment practice occurred. *Id.*
Joseph filed her first EEOC charge on April 16, 2019, so Defendants
contend that she may not seek relief or any adverse actions that
occurred or of which she was aware before October 18, 2018.

Joseph includes in her complaint allegations of facts stretching
back many years, but concedes that she cannot seek relief under Title
VII for any adverse actions that occurred, or of which she was aware,
before October 18, 2018.

She states that she seeks relief for (1) the disparate allocation of
funding and resources to Joseph and the women's basketball team,
which was an adverse action that continued throughout her
employment until her termination; (2) holding her to a higher standard
of performance and conduct than her male counterparts, which was a
series of adverse actions continuing throughout her employment until
her termination; and (3) her March 26, 2019 termination.

However, she contends that the Court should consider the earlier
allegations as offering relevant background information to support her
claims.

15

Defendants argue that Joseph's contention about disparate
funding throughout her employment is not meritorious because
although a continuing violation extends a limitations period, continuing
consequences of a one-time violation do not. *Thigpen v. Bibb Cty.
Sheriff's Dep't*, 216 F.3d 1314, 1326 (11th Cir. 2000). They contend that
budgets for the athletic department are set once per year, so Joseph can
complain only of continuing effects.

Joseph, however, does not allege a single budget decision, but
instead that GTAA and the Board regularly made discrete
discriminatory decisions about funding and resources, materially
interfering with the terms and conditions of her employment. Because
Joseph's allegations must, at this stage, be taken as true, the Court
cannot credit Defendants' contentions that budget decisions were made
once annually. Therefore, Joseph has plausibly alleged that harm from
budget discrepancies occurred after October 18, 2018.

The Court agrees that Joseph's recovery is limited to events that
occurred on or after October 18, 2018. Clearly, her termination falls
within this category. Additionally, the complaint contains allegations of

16

discrimination and retaliation that occurred after this date, for which

Joseph may seek to recover. She also has alleged retaliatory events

(e.g., the change in her reporting line and housing decision) that

occurred after this date.

Although Joseph may not recover for the earlier allegations (which

she states she will not attempt to do), she may use them as background

evidence. *See, e.g.*, *Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d

1169, 1179 (11th Cir. 2005).

### b.    Merits

To state a claim for sex discrimination under Title VII, a plaintiff

must plausibly allege sufficient facts that would tend to show that her

employer took an adverse employment action against her on the basis of

her sex. *See* 42 U.S.C. § 2000e-2(a)(1); *McCone v. Pitney Bowes, Inc.*, 582

F. App'x 798, 799–800 (11th Cir. 2014).

### i.    Allegations Made upon Information and Belief

The parties dispute whether the Court should accept as true

averments in Joseph's complaint made upon information and belief. As

the Eleventh Circuit has held, the Court need not do so when the

17

allegations are conclusory and there are no corresponding facts to support them. *See Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013).[4]

The "information and belief" allegations may, however, be credited to support claims for which Joseph has pleaded sufficient facts. Ultimately, as will be discussed throughout the order, Joseph's allegations pleaded upon information and belief will be credited and considered to support several of her claims. However, for others, the only allegations to support them are those on information and belief. For these claims, the Court will not consider the "information and belief" allegations as true.

---

[4] Further, in the context of a motion to dismiss, "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)). Here, Defendants contend, the obvious alternative explanation drawn from the complaint's allegations is that Joseph was an abusive coach and was justifiably terminated after an external investigation. However, Defendants' argument appears to rely in large part on the substance of the Littler Mendelson Report which, as discussed *infra*, the Court will not consider at this stage.

### ii.    Associational Claim

To the extent Joseph seeks to assert an associational claim under Title VII unrelated to her own protected status, Defendants argue that such a claim fails because Title VII does not recognize such a claim. Title VII specifically provides that it "shall be an unlawful employment practice for an employer to . . . discriminate against any individual . . . because of *such individual's* race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added); *see also Jackson*, 544 U.S. at 179 (contrasting Title VII and Title IX, noting that Title IX does not contain the "such individual's" language and therefore holding that a claim of indirect discrimination is not forbidden under Title IX).

Although it appears that the Eleventh Circuit has not addressed this issue, other courts have held that notwithstanding the language of the statute, a party may assert a claim based on association with or advocacy on behalf of a protected class. *See, e.g.*, *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000) ("[T]he fact that Plaintiff has not alleged discrimination because of *his* race is of no moment inasmuch as it was a racial situation in which Plaintiff became

involved—Plaintiff's advocacy on behalf of women and minorities in relation to Defendant's alleged discriminatory hiring practices—that resulted in Plaintiff's discharge from employment."). The Court finds this reasoning persuasive and will allow Joseph to proceed on this theory.

### iii.   Retaliatory Hostile Work Environment

In support of Joseph's claim for retaliatory hostile work environment, she alleges various unwarranted reprimands, disciplinary actions, and investigations on baseless and often discriminatory grounds. Defendants respond that these alleged facts do not constitute an objectively severe or pervasive environment.

To state a claim for a retaliatory hostile work environment, Joseph must allege facts sufficient to show that (1) she engaged in a protected activity; (2) after doing so, she faced unwelcome harassment; (3) the protected activity was a "but for" cause of the harassment; (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment; and (5) her employer is responsible for the environment under either vicarious or direct liability. *See Adams v.*

20

*Austal, U.S.A., LLC*, 754 F.3d 1240, 1248–49 (11th Cir. 2014).

Defendants focus on the fourth element, contending that Joseph has not

alleged sufficient facts to support a finding that she experienced

harassment that was severe or pervasive.

"The requirement that the harassment be 'severe or pervasive'

contains an objective and a subjective component." *Gowski v. Peake*, 682

F.3d 1299, 1312 (11th Cir. 2012) (citing *Miller v. Kenworth of Dothan,

Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002)). "Thus, to be actionable, this

behavior must result in both an environment that a reasonable person

would find hostile or abusive and an environment that the victim

subjectively perceive[s] . . . to be abusive." *Id.*

Focusing on the objective severity of the alleged harassment,

courts "consider, among other factors: (1) the frequency of the conduct;

(2) the severity of the conduct; (3) whether the conduct is physically

threatening or humiliating, or a mere offensive utterance; and (4)

whether the conduct unreasonably interferes with the employee's job

performance." *Miller*, 277 F.3d at 1276.

Joseph does not allege threats, yelling, humiliation or physical intimidation, foul language, or the various other hallmarks of a hostile work environment. *See, e.g.*, *Harris v. Fla. Agency for Health Care Admin.*, 611 F. App'x 949, 953 (11th Cir. 2015). Rather, she alleges "a series of unwarranted reprimands, disciplinary actions, and investigations on baseless and frequently discriminatory grounds"; "constant unwarranted compliance investigations"; being consistently treated "in an adversarial manner" and being mocked for her complaints of discrimination; that the Board and GTAA engaged in "internal discussions about how to 'get rid' of her"; and "unreasonably refusing to engage in discussions about extending her contract on reasonable terms." [16] at 17.

She contends that following her February 3, 2019 complaint to human resources and February 8 complaint of discrimination and retaliation, the harassment became more acute. Specifically, she alleges that she was transferred to report to Joeleen Akin (who Joseph contends had previously "targeted" her) and that GTAA and the Board failed to inform her that she had been cleared of NCAA violations and

did not honor their promise to renew her contract after the end of the NCAA investigation.

Joseph contends that these actions interfered with her ability to do her job, created dissension and anxiety on her team, caused her significant anxiety, cost her substantial time and expenses on legal fees, intimidated her staff and caused them to feel targeted, and created an atmosphere of fear of speaking out lest further targeting occur.

Although Joseph's allegations are weaker than those in most successful retaliatory harassment claims, the Court nonetheless finds that she has stated a claim. Defendants' motion to dismiss this claim will be denied.

### iv.   Discrimination

In support of her claims for sex discrimination, Joseph relies on allegations regarding (1) disparate allocation of funding and resources; (2) being held to a higher standard of performance and conduct than her male counterparts; and (3) her termination.

Regarding disparate allocation of funding and resources, Joseph contends that she has alleged facts to show that throughout her tenure

GTAA and the Board paid similarly situated male employees (particularly the head coaches of the men's basketball team) substantially more than they paid her to perform similar work and provided them with more resources to perform the same tasks in a way that adversely affected the terms and conditions of her employment.

Although Title IX regulations[5] provide that a mere difference in funding is not enough to constitute discrimination, the Court finds that at this stage Joseph has pleaded sufficient facts to state a claim that the alleged underfunding was sufficiently severe as to constitute discrimination. *See, e.g.*, [1-2] ¶¶ 50 ("Throughout her employment, GT/GTAA paid Coach Joseph less than the male coaches of the GT MBB Team who had substantially similar duties as Coach Joseph."); 51 ("Throughout Coach Joseph's employment, GT/GTAA provided her and the WBB Team significantly fewer benefits than it provided to the MBB Team ad its coaches, thereby interfering with the terms and conditions of her employment and denying the WBB Team equal athletic

---

[5] The claim here is, of course, under Title VII.

opportunity."); 52–66 (elaborating on allegations with respect to locker rooms and other facilities; 67–78 (describing discrepancy between men's and women's basketball teams' budgets for marketing and publicity and impact on Joseph's employment); 79–85 (describing underfunding with respect to staff compensation); 86–92 (describing alleged underfunding with respect to travel).

Regarding being held to a higher standard of performance and conduct than her male counterparts, Joseph points to allegations showing "a long history" of GTAA and the Board "scrutinizing Joseph for conduct which other male Head Coaches engaged in with impunity . . . ." [16] at 13. She alleges that she complained about discriminatory treatment but that GTAA and the Board took no action.

However, Joseph has not pleaded facts to make plausible her allegations that male coaches engaged in identical conduct without consequence. To the extent she relies on allegations of a "higher standard of performance" based on her sex in support of her Title VII discrimination claim, the claim will be dismissed.

Finally, regarding her termination, Joseph contends that she alleged facts to show that, in terminating her, GTAA and the Board treated her differently than Josh Pastner, the head coach of the Georgia Tech men's basketball team. The Court agrees that Joseph has alleged sufficient facts to support her claim that her termination was based on sex discrimination. *See* [1-2] ¶¶ 143 ("GT/GTAA's treatment of Coach Joseph and her contract contrasted sharply with its treatment of Coach Pastner and his contract a few months later."); 147 ("Even though Coach Joseph had achieved the same level of success as Coach Pastner that same 2016–2017 season and had not engaged in any conduct that violated NCAA rules or regulations, GT/GTAA continued to rebuff her efforts to engage in any conversations about extending her contract."); 197 ("After learning of the NCAA Level I violations levied against Coach Pastner and the GT MBB Team GT/GTAA did not terminate Coach Pastner or, upon information and belief, otherwise discipline Coach Pastner, despite the widespread misconduct in his program.").

Joseph's Title VII discrimination may proceed with respect to her allegations of disparate funding and termination, but will be dismissed

with respect to her allegations of being held to a higher standard of performance.

### 3.  Whistleblower Claim

GTAA also moves to dismiss count eleven (under the Georgia Whistleblower Act). The GWA applies only to public employers, which are defined by the Act as "the executive, judicial, or legislative branch of the state; any other department, board, bureau, commission, authority, or other agency of the state which employs or appoints a public employee or public employees; or any local or regional governmental entity that receives any funds from the State of Georgia or any state agency." O.C.G.A. § 45-1-4(a)(4); *see Lamar v. Clayton Cty. Sch. Dist.*, 605 F. App'x 804, 806 (11th Cir. 2015).

GTAA contends that it does not fall within the definition of a "public employer" that is subject to the Georgia Whistleblower Act. Specifically, it asserts that it did not employ Joseph or pay her salary. The complaint alleges that GTAA is a nonprofit corporation (as opposed to a state institution). Although the complaint alleges that GTAA

27

functioned as an agent of the Board of Regents, it does not allege any facts to support this label.

Although Joseph contends that GTAA employed her because it controlled the time, manner, means, and method of her work, the cases she cites to support her contention do not demonstrate that this sort of control causes a party to be an employer for purposes of the Georgia Whistleblower Act.

The Court finds persuasive the reasoning in *Bradenburg v. MCG Health, Inc.*, No. 2015-RCCV-308 (Ga. Super. Ct. Richmond Cty. Feb. 3, 2020), *appeal filed* (Ga. Ct. App. Mar. 2, 2020). There, the court concluded that an entity managing staff and tasks associated with running the hospital connected to the Medical College of Georgia (operated by the Board of Regents) was not a "state agency" as defined in the GWA although it managed the plaintiff and other employees. Further, because the GWA did not refer to "joint employers" or an "integrated enterprise," the court concluded that a theory of liability based on this failed.

The GWA claim will be dismissed with respect to GTAA.

28

### 4.    Breach of Contract

GTAA further moves to dismiss count fourteen, which asserts a breach-of-contract claim. The parties do not dispute that Georgia law governs this claim. Joseph's claim is based on the October 10, 2014 offer letter and the October 20 contract.

To state a claim for a breach of contract, Joseph must allege (1) a breach of a contract and (2) resultant damages (3) for the party who has the right to complain about the contract being broken. *Bates v. JPMorgan Chase Bank, N.A.*, 768 F.3d 1126, 1130 (11th Cir. 2014).

### a.    The Court Will Not Consider the Substance of the Littler Mendelson Report at This Stage

GTAA contends that Joseph has failed to allege that it breached its contract with her. Specifically, it contends that the report from Littler Mendelson constituted good cause to terminate the contract by chronicling allegations of player and staff abuse. This type of behavior, contends GTAA, constituted "conduct that the Athletic Association, in its sole discretion, reasonably considers injurious to the reputation of

the Association or the Institute" and/or "serious or repeated misconduct." [1-2] at 86–87.

GTAA moves to dismiss this claim, contending that the Littler Mendelson report demonstrates that it did not breach the contract. It contends that the report may be considered without converting the motion into one for summary judgment because it is central to Joseph's claim and undisputed. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

Although Joseph does refer to the report in her complaint, she does so in a way that challenges its substance. She alleges that it is "a vague report that recited allegations that were either false or completely taken out of context, and which downplayed or otherwise ignored input from Coach Joseph's coaching staff, players, and third party-consultants [sic] who had voiced their support of Coach Joseph." [1-2] ¶ 198.

And as Joseph points out, her complaint only makes brief, passing references to the report. The report is far from central to her complaint. Defendants have made the report central to their defense. To consider

the report at this stage, as Defendants urge the Court to do, would be to credit its substance. The Court will not do so.

### b.   Who Is a Party to the Contract

For a valid contract to exist, the parties must agree to all material terms. O.C.G.A. § 13-3-2. The term of employment is an essential element of an employment contract. *Key v. Naylor, Inc.*, 602 S.E.2d 192, 195 (Ga. Ct. App. 2004). The October 10 offer letter does not contain a set term of employment. Therefore, the Court concludes that it does not constitute a contract.

And the October 20 contract, contends the Board, cannot bind it because it is not a party to the contract. O.C.G.A. § 9-2-20(a). That document states that it "is made by and between [GTAA] and MaChelle Joseph."

The Board of Regents contends that the contract is between only Joseph and GTAA. Although Bobinski, Lewis, and Peterson signed the contract, the Board contends that they did so on behalf of GTAA, not the Board.

31

Based on the plain language of the contract, the Court finds that the Board was not a party. The breach-of-contract claim will be dismissed against the Board. However, the claim will remain pending against GTAA.

## B.    Individual Defendants' Motion to Dismiss

The individual Defendants move to dismiss the claims against them (counts five, six, seven, and eight) under § 1983.[6] These Defendants acknowledge that Joseph need not plead a prima facie case at this stage, but contend that she fails to provide enough factual matter, taken as true, to suggest intentional discrimination.

"To prevail on a claim under § 1983, a plaintiff must demonstrate both (1) that the defendant deprived her of a right secured under the Constitution or federal law and (2) that such a deprivation occurred under color of state law." *Arrington v. Cobb Cty.*, 139 F.3d 865, 872 (11th Cir. 1998) (citing *Willis v. Univ. Health Serv.*, 993 F.2d 837, 840 (11th Cir. 1993)). "One such law is the Equal Protection Clause, U.S.

---

[6] The parties appear to agree that Joseph's recovery for § 1983 allegations is barred for actions that occurred prior to December 23, 2017.

Const. amend. XIV, § 1, which confers a federal constitutional right to be free from sex discrimination." *Hill v. Cundiff*, 797 F.3d 948, 976 (11th Cir. 2015) (citations omitted); *see also Williams*, 477 F.3d at 1300 (citation omitted) ("The Equal Protection Clause confers a federal constitutional right to be free from sex discrimination."); *Venice v. Fayette Cty.*, No. 3:09-cv-35-JTC, 2010 WL 11507614, at *2 (N.D. Ga. Sept. 16, 2010) (citation omitted) ("[T]he Equal Protection Clause of the United States Constitution[ ] prohibits unlawful sex discrimination in public employment."). "In order to establish a violation of the Equal Protection Clause, appellees must prove discriminatory motive or purpose." *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (citing *Whiting v. Jackson State Univ.*, 616 F.2d 116, 122 (5th Cir. 1980)).

The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike. *Glenn v. Brumby*, 632 F. Supp. 2d 1308, 1312 (N.D. Ga. 2009), *aff'd*, 663 F.3d 1312 (11th Cir. 2011) (citation and quotation omitted); *see also Hossain v. Steadman*, 855 F. Supp. 2d 1307, 1312 (S.D. Ala. Jan. 25, 2012)

(quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)) ("The mandate of the Equal Protection Clause essentially 'is that all persons similarly situated should be treated alike.'").

"In order to state an equal protection claim, the plaintiff must prove that he was discriminated against by establishing that other similarly-situated individuals outside of his protected class were treated more favorably." *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1180 (11th Cir. 2009); *see also Jarrett v. Alexander*, 235 F. Supp. 2d 1208, 1212 (M.D. Ala. 2002) (citation omitted) (explaining that to survive a motion to dismiss on an equal protection sex discrimination claim against a defendant in his individual capacity, "the Plaintiff[] still must show that [she was] treated differently from others similarly situated.").

"Employment discrimination claims brought against state actors for violation of the Equal Protection Clause . . . under § 1983[ ] are subject to the same standards of proof and use the same analytical framework as discrimination claims brought under Title VII of the Civil Rights Act of 1964[.]" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.6 (11th Cir. 2018); *see also Venice*, 2010 WL 11507614, at *2 (citing

34

*Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 n.5 (11th Cir. 2008))

("Where a plaintiff alleges intentional discrimination pursuant to

Section 1983 based on circumstantial evidence, courts apply the same

*McDonnell Douglas* framework that applies in Title VII cases.").

> A [p]laintiff makes out a prima facie case of discriminatory discharge where she shows that: (1) she is a member of a protected class, (2) she was qualified for the job, (3) she suffered an adverse employment action, and (4) she was replaced by someone outside her protected class or was treated less favorably than a similarly situated individual outside her protected class.

*Venice*, 2010 WL 11507614, at *2 (citation omitted).

> Although a Title VII complaint need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case, it must provide enough factual matter (taken as true) to suggest intentional [sex] discrimination. Further, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

*Jacobs v. Biando*, 592 F. App'x 838, 840 (11th Cir. 2014) (quotation and

citation omitted).

To prevail on a § 1983 claim, the plaintiff must allege that the

named defendant actually participated in the alleged constitutional

violation, or exercised control or direction over the alleged violation.

*Gilmere v. City of Atlanta*, 774 F.2d 1495, 1504 (11th Cir. 1985). There

35

must be an affirmative link between the defendant's action and the alleged deprivation of a constitutional right. *Brown v. Smith*, 813 F.2d 1187 (11th Cir. 1987). "[E]ach government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 667 (2009).

Section 1983 creates no substantive rights. *See Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Rather, it provides a vehicle through which an individual may seek redress when his federally protected rights have been violated by an individual acting under color of state law. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).

To state a claim for relief under § 1983, the plaintiff must satisfy two elements. First, she must allege that an act or omission deprived her of a right, privilege, or immunity secured by the U.S. Constitution. *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). Second, she must allege that the act or omission was committed by a state actor or a person acting under color of state law. *Id.*

Defendants contend that even if Joseph plausibly stated a claim against them, they are entitled to qualified immunity. "A district court

36

must dismiss a complaint under Fed. R. Civ. P. 12(b)(6) when the complaint's allegations, on their face, show that an affirmative defense bars recovery on the claim." *Nichols v. Maynard*, 204 F. App'x 826, 828 (11th Cir. 2006). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

To claim qualified immunity, the defendant must first show he was performing a discretionary function. *Moreno v. Turner*, 572 F. App'x 852, 855 (11th Cir. 2014). The parties do not dispute that Defendants were performing a discretionary function with respect to the allegations in the complaint.

37

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)).

The plaintiff demonstrates that qualified immunity does not apply by showing "(1) the defendant violated a constitutional right, and (2) th[e] right was clearly established at the time of the alleged violation." *Moreno*, 572 F. App'x at 855 (quoting *Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009)). The "clearly established" requirement may be met by one of three showings: (1) a materially similar case has already been decided; (2) an accepted general principle should control the novel facts of the case with obvious clarity; or (3) the conduct in question so obviously violated the Constitution that no prior case law is necessary. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204–05 (11th Cir. 2012).

There are three ways that law can be "clearly established" for purposes of qualified immunity. "First, the words of the pertinent

38

federal statute or federal constitutional provision in some cases will be
specific enough to establish clearly the law applicable to particular
conduct and circumstances and to overcome qualified immunity, even in
the *total absence of case law*." *Vinyard v. Wilson*, 311 F.3d 1340, 1350
(11th Cir. 2002).

Second, "some broad statements of principle in case law are not
tied to particularized facts and can clearly establish law applicable in
the future to different sets of detailed facts." *Id.* at 1351. These first two
examples involve cases of "obvious clarity" and are not implicated in the
case at hand.

The third and final way for a right to become clearly established is
"by decisions of the U.S. Supreme Court, Eleventh Circuit Court of
Appeals, or the highest court of the state where the case arose." *Jenkins
by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir.
1997); *accord Vinyard*, 311 F.3d at 1351-52 (further noting that "most
judicial precedents are tied to particularized facts and fall into this
category").

"In all but exceptional cases, qualified immunity protects government officials performing discretionary functions from the burdens of civil trials and from liability." *McMillian v. Johnson*, 88 F.3d 1554, 1562 (11th Cir. 1996) (citing *Lassiter v. Ala. A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994)). In the context of public employment cases, it is "only in the rarest of cases [that] reasonable governmental officials truly know that the termination or discipline of a public employee violated 'clearly established federal rights.'" *Anderson v. Burke Cty.*, 239 F.3d 1216, 1222 (11th Cir. 2001) (quoting *Hansen v. Soldenwagner*, 19 F.3d 573, 576 (11th Cir. 1994)). Because the purpose of qualified immunity is to provide "immunity from suit rather than a mere defense to liability," the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 231–32.

Whether law is clearly established must be considered "in light of the specific context of the case, not as a broad general proposition." *Leslie v. Hancock Cty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013).

40

Courts are permitted to determine whether a constitutional right is clearly established before reaching the question of whether the right even exists, because there will be "cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson v. Callahan*, 555 U.S. 223, 235–37 (2009).

Although Joseph points to *Cross*, 49 F.3d at 1507, and *Nicholson v. Georgia Department of Human Resources*, 918 F.2d 145 (11th Cir. 1990), those cases are factually distinguishable and serve only as a statement of the general proposition against sex discrimination. Here, the question is not whether sex discrimination is permissible. Instead, the question is whether Defendants' specific actions toward Joseph violated clearly established law.

The Court will analyze the allegations against each individual Defendant to determine whether each is entitled to qualified immunity.

### 1. Lewis

Joseph's claim against Lewis is based on his allocation of funds to women's basketball when he set the yearly budget for the athletics

41

department. Specifically, she alleges that he violated her constitutional rights by providing fewer benefits to women's basketball than to men's basketball in a way that adversely affected the terms and conditions of her employment and by failing to take responsive action to remedy the situation. She contends that, as the associate athletic director of finance for the Board and GTAA, Lewis had control over funding and resources, thereby directly participating in the alleged discriminatory funding decisions.

Defendants counter that Joseph has failed to allege that Lewis subjected her to any adverse employment action. A plaintiff alleging disparate treatment must show that she suffered an adverse action. *See Crawford v. Carroll*, 529 F.3d 961, 970–71 (11th Cir. 2008). When the allegations do not involve an ultimate employment decision, she must show that she suffered a "*serious and material* change in the terms, conditions, or privileges of employment." *Id.* (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)).

Joseph responds that she alleged that Lewis drastically underfunded (not a mere failure to match funding dollar for dollar)

women's basketball compared to men's basketball under circumstances giving rise to an inference of sex discrimination, constituting a serious and material change in the terms and conditions of her employment.[7]

Even if the Court were to conclude that Joseph had alleged a violation by Lewis, she has not demonstrated that her alleged right to a budget more in line with that of the men's basketball team was clearly established. In fact, Title IX implementing regulations provide that "unequal expenditures for male and female teams" do not by themselves constitute sex discrimination. 34 C.F.R. § 106.41(c). Although Title VII regulations do not contain such a statement, the Title IX regulations certainly cut against a determination that any alleged right that Lewis violated was clearly established.

And the law is clear in the Eleventh Circuit that "[n]ot everything that makes an employee unhappy is an actionable adverse action." *Doe v. DeKalb Cty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting

---

[7] Although Joseph contends in her response brief that Lewis made "hostile responses" to her complaints of discriminatory treatments, [16] at 33, the allegations in her complaint refer to her statements to Lewis and allege merely that Lewis was "visibly frustrated" with her. [1-2] ¶ 116. This is not enough to constitute discrimination.

43

*Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). "Otherwise . . . 'every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Id.* (quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.2d 270, 274 (7th cir. 1996)).

The law Joseph cites in support of her contention deals with a situation in which an organization was so drastically underfunded that it was unable to function. As much as Joseph decries the negative ramifications of flying economy class and not having leather furniture for her players, she has not pleaded (other than in conclusory terms) that these and other specific alleged underfunding decisions led her to be unable to function. She has pointed the Court to no binding authority, and the Court is aware of none, finding a right to the type of budget decision Joseph seeks.

The Court will therefore dismiss Joseph's claim against Lewis.

### 2.   Engel

Joseph's allegations against Engel are based upon "information and belief" that Engel failed to direct Georgia Tech or GTAA to allocate

financial resources equitably to her and the women's basketball team because of Joseph's or her athletes' sex. She does not allege facts to support the conclusion that Engel had or exercised authority over the budgeting process or personally participated in any disparate funding. Joseph does not allege that Engel personally participated in her termination.

Rather, she points to a 2018 compliance investigation, contending that Engel subjected the women's basketball program to a "seemingly baseless" inquiry. She contends that Engel held a position that gave her authority to ensure legal compliance, was aware of Joseph's concerns of disparate treatment, allowed and facilitated the allocation of inferior resources, and targeted Joseph and the women's basketball players with baseless and harassing investigations and inquiries.

She alleges no findings, no resulting disciplinary action, and no loss of pay or benefits that stemmed from the investigation. In this situation, the only allegations that Engel discriminated against Joseph based on sex are those pleaded upon information and belief. Joseph does not plead any facts to make her "information and belief" allegations

plausible. Therefore, the Court will not consider the allegations pleaded upon information and belief against Engel. The remaining allegations do not suffice to state a claim against Engel.[8]

Defendants' motion to dismiss the claim against Engel will be granted.

### 3.   Peterson

Joseph contends that Peterson's liability stems from his failure to act, arguing that he was aware of Joseph's past concerns of discrimination but refused to exercise his authority over Stansbury to prevent or rectify her termination. However, Joseph does not allege any facts to establish that Peterson directed anyone to act unlawfully or that he knew anyone would act unlawfully and failed to stop them. She does not allege that Peterson harbored discriminatory intent toward women in taking any specific actions.

Supervisory liability requires personal participation or a causal connection between the official's actions and the alleged constitutional

---

[8] Even if Joseph had stated a claim against Engel, Engel would be entitled to qualified immunity because the alleged actions did not violate clearly established law.

deprivation. *See Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

Joseph has not alleged that Peterson personally participated in her

termination. Therefore, the Court will examine whether there was a

causal connection. Such a connection exists

> when a history of widespread abuse puts the responsible
> supervisor on notice of the need to correct the alleged
> deprivation, and he fails to do so. Alternatively, the causal
> connection may be established when a supervisor's custom or
> policy . . . result[s] in deliberate indifference to constitutional
> rights or when facts support an inference that the supervisor
> directed the subordinates to act unlawfully or knew that the
> subordinates would act unlawfully and failed to stop them
> from doing so.

*Harper v. Lawrence Cty.*, 592 F.3d 1227, 1236 (11th Cir. 2010) (quoting

*id.* at 1360–61).

Joseph has not alleged a history of widespread abuse or that

Peterson had a custom or policy that resulted in deliberate indifference

to her rights. Nor has she alleged that Peterson directed her

termination. Rather, her allegation is that facts support an inference

that Peterson knew his subordinates (specifically, Stansbury) would act

unlawfully in terminating her or discriminating against her because of

her sex and failed to stop him from doing so.

47

Joseph's claim against Peterson fails because she has not alleged facts to make plausible that he knew of any *unlawful* act that was to occur against her and failed to stop it. The best she does is to allege that he was aware of the alleged disparate funding, holding to a higher standard, and termination in advance, and that these acts were unlawful. Even these allegations against the president of a large university are weak. However, assuming they make it across the line from possible to plausible, Joseph fails to allege facts to support a contention that he was aware these acts were occurring based on her sex.

Joseph's strongest allegations are that she sent Peterson two letters informing him of her concerns of sex discrimination, but that he never responded, and that he was aware of the investigation, the Littler Mendelson report, and Joseph's response thereto. However, she does not allege facts to make it plausible that Peterson was aware of a constitutional violation. *See Keating v. City of Miami*, 598 F.3d 753, 765 (11th Cir. 2010) (noting that a failure to stop claim under a theory of supervisory liability "requires that the supervisor (1) have the ability to

prevent or discontinue *a known constitutional violation* by exercising

his or her authority over the subordinate who commits the

constitutional violation, and (2) subsequently fails to exercise that

authority to stop it." (citing *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th

Cir. 2003))) (emphasis added).

As discussed, whether any constitutional violation occurred

against Joseph is not clear at this stage. With respect to Peterson's

alleged liability, however, it *is* clear that Joseph has not alleged facts to

make it plausible that he knew of an ongoing or forthcoming

constitutional violation against her.

Further, because Peterson asserts the defense of qualified

immunity, the claim against him will be dismissed unless he acted in

contravention of clear, binding authority. As noted above, there is a

question as to whether the actions against Joseph constituted sex

discrimination or retaliation. It is far from clearly established at this

stage. Peterson is therefore entitled to dismissal on this basis as well.

### 4.   Stansbury

Joseph contends that she has alleged a convincing mosaic of evidence to show that Stansbury treater her less favorably than similarly situated males.

Although the parties dispute in their briefs what, exactly, Joseph has alleged against Stansbury, her complaint clarifies the issue.[9] Factually, she alleges,

> Upon information and belief, Defendants Peterson, Stansbury, and Lewis had the authority to allocate financial resource to improve the equality and accessibility of the WBB locker room and other facilities, but chose not to allocate them to Coach Joseph and the WBB Team because of Coach Joseph's sex and/or the sex of the athletes she coached.

---

[9] Defendants contend that, because Stansbury only became the athletic director in late 2016 (at which point Joseph already had a reprimand and final written warning), the only action that conceivably supports a sex discrimination claim against him is Joseph's termination. They argue that the Court should not consider the other allegations as "background evidence" as Joseph suggests. However, as noted above, the Court will consider earlier allegations as background evidence to the extent they are relevant to establish a convincing mosaic of circumstantial evidence.

[1-2] ¶ 65. She makes nearly identical allegations (all upon information and belief) regarding resources for marketing and publicity, women's basketball coaches and staff, and travel (*id.* ¶¶ 77, 84, 91).

She contrasts Stansbury's endorsement of Pastner after news of NCAA violations (*id.* ¶ 146), with his tentativeness about extending her contract in spite of her top-ten recruiting class (*id.* ¶ 149).

She then refers to a May 2, 2018 meeting with Engel, Stansbury, and Rountree regarding a letter from the NCAA requesting an internal review of a new player's recruitment; Joseph contends the claim against her was baseless. *Id.* ¶ 152–53.

Joseph next alleges that she called a formal meeting with Stansbury and Rountree on July 25, 2018, in which she expressed concern that Lewis and Engel ran their departments in ways that benefitted men's basketball to the detriment of the women's basketball program and noted that other women's sports coaches had similar concerns. She contends that Stansbury reacted by "snapping" at her and explained that "if the female coaches could not get on board with the

way the Athletic Department was run, maybe they needed to be gone."
*Id.* ¶ 164.

Joseph then makes allegations regarding the following month: an August 9 email to Stansbury and Rountree expressing concern about issues such as sex discrimination, *id.* ¶ 166; following up with Stansbury about her contract extension, which Stansbury continued to delay after the NCAA investigation was finished, *id.* ¶¶ 167–68; a September 6 email to Engel (copying Stansbury, Rountree, and Akin) regarding her concerns of "a double standard and inequity between the men's and women's basketball programs" that resulted in no action to investigate or address her concerns, *id.* ¶¶ 170–71; that on February 7, 2019 (one day after HR business partner Kevin Cruse was to speak with Stansbury about Joseph's concerns), Stansbury "downgraded" Joseph's reporting line, *id.* ¶¶ 179–80; a February 8 formal internal complaint Joseph submitted to Stansbury (and several other individuals); a February 22 letter sent to Peterson (and copying Stansbury and others) stating that Joseph believed Georgia Tech's housing decision (not allowing Joseph's sophomore players to live in off-campus housing) was

52

based on discriminatory and/or retaliatory motives because Stansbury,

Rountree, and Akin made their decision two weeks after the February 8

complaint, *id.* ¶¶ 186–87; Stansbury notifying Joseph on February 27

that she was suspended with pay pending an investigation; that

Stansbury and Akin "prohibited the WBB coaches and staff from

speaking to anyone about the investigation," *id.* ¶ 193; that Stansbury

provided Joseph only two business days to respond to the Littler

Mendelson report, *id.* ¶ 199; that she provided a detailed response to

Stansbury but that on March 26 Stansbury terminated her employment

"without ever having even completed an investigation into Coach

Joseph's February 8 Complaint alleging discrimination, retaliation and

conflict of interest," *id.* ¶ 202.

In count five, she alleges:

> Defendant Stansbury, acting under the color of state
> law, violated Coach Joseph's constitutional right to be free
> from sex discrimination in employment by directly
> participating in Defendants GTAA's and BOR's
> discriminatory actions to provide Coach Joseph fewer
> resources for the GT WBB Team (facilities, marketing,
> assistant coaches, recruitment funds, and travel) in a
> manner that adversely affected the terms and conditions o
> her employment, and holding her to a higher standard of

performance and conduct than similarly situated male coaches.

[1-2] ¶ 269. She further avers,

> Defendant Stansbury, acting under the color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment, because he, as Athletic Director, was in a position of authority to take responsive action to stop the violations of Coach Joseph's constitutional rights as described above in paragraphs 51– 92, 269 (disparate funding), he knew about the violations of Coach Joseph's rights, yet he failed to act, thereby acquiescing in the discriminatory conduct and causing the discrimination against Coach Joseph to persist and worsen. Defendant Stansbury's failure to act in the face of known violations of Coach Joseph's constitutional rights amounted to deliberate indifference.

*Id.* ¶ 270. And further, she alleges that "Defendant Stansbury, acting under color of state law, violated Coach Joseph's constitutional right to be free from sex discrimination in employment because of sex and her failure to conform to sex-stereotypes." *Id.* ¶ 271.

Stansbury presents the closest question of the individual Defendants. Indeed, Joseph's allegations might state a claim against him. Nonetheless, the Court concludes that he is entitled to qualified immunity because his alleged actions did not violate clearly established law. As stated above, the relevant question is not whether sex

discrimination is legal. Rather, the relevant question is "when faced with a final report from an outside investigator which stated that Joseph engaged in unacceptable coaching practices and that she had abused her players, would a reasonable . . . Athletic Director know that it is a violation of clearly established law to then terminate her employment?" [4] at 21 (record citations omitted). "A government actor . . . cannot violate a plaintiff's equal protection rights unless the defendant has the intent to discriminate." *Mencer v. Hammonds*, 134 F.3d 1066, 1070 (11th Cir. 1998).

Joseph has pointed to no binding authority that would put Stansbury on notice that the actions he allegedly took violated her constitutional rights.[10] Stansbury is therefore entitled to qualified immunity, and the claim against him will be dismissed.

---

[10] Joseph contends that Pastner is an appropriate comparator with respect to her termination. However, Pastner was never accused of abusing student athletes (or found to have done so) or similar aggressive techniques but not investigated or disciplined for such. Joseph has not alleged that any other coach was on a final written warning by the time Stansbury became athletic director and that an outside investigation then found the coach to have engaged in misconduct.

## C.    Motion for Judgment on the Pleadings

The Board also has filed a motion [29] for judgment on the

pleadings as to Joseph's count fifteen under the Georgia Open Records

Act.

On March 1 and April 19, 2019, Joseph requested records

pursuant to the Georgia Open Records Act, O.C.G.A. §§ 50-18-70 *et seq.*

("ORA"). Her specific request was for notes memorializing the

interviews of Georgia Tech women's basketball players and staff by Eric

Hoffman from Littler Mendelson, including notes of Georgia Tech's

human resource personnel who participated in the interviews. Joseph

alleges that Georgia Tech improperly redacted material that was not

exempt from disclosure and claims that she is entitled to the substance

of the players' statements and the names of the players and parents

who participated in the investigation.

The Board argues that because the records Joseph sought were

protected, it did not violate the ORA in redacting certain information.

Specifically, it contends that it redacted the records in accordance with

its obligations under the Family and Educational Rights and Privacy

Act ("FERPA"), 20 U.S.C. § 1232(g), 34 C.F.R. Part 99, as specifically permitted by the ORA in O.C.G.A. § 50-18-72(a)(37).

The ORA allows educational institutions to decline to release documents that are protected by FERPA. *See* O.C.G.A. § 50-18-72(a)(37). Under 20 U.S.C. § 1232g(b) & (d), an educational institution that permits the release of the educational records, or personally identifiable information located within any such records, of any student without written consent of that student may face losing its federal funding. The Board contends that because FERPA defines "education records" broadly, Georgia Tech acted in accordance with the ORA by redacting the names of students and parents and the substance of their complaints.

FERPA defines "education records" to include "those records, files, documents, and other materials which contain information directly related to a student and are maintained by an educational agency or institution." 20 U.S.C.S. § 1232g(a)(4)(A). Further, in defining "personally identifiable information," 34 C.F.R. § 99.3 states:

The term includes, but is not limited to –

57

(a) The student's name;

(b) The name of the student's parent or other family members;

(c) The address of the student or student's family;

(d) A personal identifier, such as the student's social security number, student number, or biometric record;

(e) Other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name;

(f) Other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty; or

(g) Information requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the education record relates.

The Board contends that the students' and parents' names are "directly related" to the students, constituting personally identifiable information under subsections (a) and (b). It also contends that Joseph's personal relationship with the relevant students makes it likely that she would be able to identify the students by the contents of their complaints, making the records fall under subsection (g).

58

Joseph argues that by including the qualifier "directly" before "related," Congress excluded by inference any records containing information relating only indirectly to a student from the scope of "education records." *See United States v. Koonce*, 991 F.2d 693, 698 (11th Cir. 1993) (explaining the "well-established" doctrine of *inclusio unius est exclusio alterius*).

Joseph further argues that records that relate primarily to the conduct of an employee and only indirectly to the student are not considered education records, but instead as employee records exempt from FERPA. 20 U.S.C. § 1232g(a)(4)(B)(iii). *See, e.g.*, *Stanislaus v. Emory Univ.*, No. 1:05-cv-1496-RWS, 2006 WL 8432146, at *10 (N.D. Ga. July 28, 2006). Here, she argues, the records were created for the purpose of investigating her conduct as coach, relate exclusively to assessments of her conduct as an employee, and were allegedly used to justify her termination.

FERPA makes clear that "in the case of persons who are employed by an educational agency or institution but who are not in attendance at such agency or institution, records made and maintained in the

normal course of business which relate exclusively to such person in that person's capacity as an employee and are not available for us for any other purpose" are considered employee records, not educational records. 20 U.S.C. § 1232g(a)(4)(B)(iii). Based on this, Joseph contends that "relate exclusively" is intended to apply to the phrase "in that person's capacity as an employee" to address situations in which a school employee may become a student.

The Court is not convinced, at this stage, that the records at issue are educational records protected by FERPA. Therefore, the Board's motion [29] for judgment on the pleadings will be denied.

## IV.  Conclusion

For the foregoing reasons, the Board of Regents' partial motion [3] to dismiss and GTAA's motion [6] to dismiss are granted in part and denied in part as discussed above. The individual Defendants' motion [4] to dismiss is granted, and the Clerk is directed to drop the individual Defendants as parties. The Board of Regents' motion [29] for judgment on the pleadings is denied. Joseph's motion [32] for leave to file a

surreply is granted, and the Court has considered the substance of the

surreply in ruling on the motions.

    IT IS SO ORDERED this 8th day of May, 2020.

Timothy C. Batten, Sr.
United States District Judge

61