## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| MACHELLE JOSEPH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | 1:20-cv-00502-TCB |
| BOARD OF REGENTS OF | ) | |
| THE UNIVERSITY SYSTEM | ) | |
| OF GEORGIA and | ) | |
| GEORGIA TECH ATHLETIC | ) | |
| ASSOCIATION. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

Plaintiff respectfully requests that the Court order sanctions against Defendant Board of Regents of the University System of Georgia ("BOR" or "Defendant") for its repeated failures to take reasonable steps to preserve relevant text message evidence on the work-issued phones of three highly relevant witnesses while on notice of both potential and actual litigation with Plaintiff. BOR's failure to preserve this evidence resulted in months' worth of text messages from a critical time period

being destroyed or otherwise lost from these witnesses' phones.  BOR acted in bad faith and destroyed evidence crucial to Plaintiff's case.

## I.   RELEVANT BACKGROUND[1]

### A. Relevant Factual Background

Plaintiff is the former Head Coach of the Georgia Institute of Technology's ("GT" or the "Institute") women's basketball ("WBB") team.   On or around February 25, 2019, on the heels of Plaintiff's escalating complaints of unlawful sex discrimination and retaliation, GT retained the law firm of Littler Mendelson, P.C. ("Littler") to launch an expansive investigation into Plaintiff and her program (the "Littler Investigation") purportedly to assess the truth of complaints allegedly filed by four WBB players and two parents about Plaintiff's coaching.   On March 26, 2019, claiming to rely on the contents of the report prepared by Littler (the "Littler Report"), GT terminated Plaintiff's employment.   This lawsuit followed.

---

[1]On January 26, 2021, Plaintiff filed a Notice with the Court setting forth preliminary facts regarding BOR's failure to preserve the contested text message evidence.  Dkt. 123.  On February 2, 2021, BOR filed a Response to Plaintiff's Notice.  Dkt. 130. On February 5 and February 8, 2021, Plaintiff filed a Reply and Amended Reply to BOR's Response.  Dkt. 131 and 132.  On February 17, 2021, the Court issued an Order finding that the duty to preserve attached on February 26, 2019.  Dkt. 136. Plaintiff incorporates the factual allegations and arguments set forth in her Notice, Reply, and Amended Reply herein.

The central issue in the litigation is why GT terminated Plaintiff's employment.  BOR avers that it terminated Plaintiff's employment based on a good faith belief that the allegations in the Littler Report were true and warranted separating Plaintiff from employment.  Plaintiff contends that BOR had already decided to terminate Plaintiff's employment for discriminatory and retaliatory reasons before receiving the Littler Report, and that it manufactured a reason to investigate Plaintiff, and then controlled and influenced that investigation, to create a paper trial justifying BOR's predetermined termination decision.

### B. The Evidence Sought

In discovery, Plaintiff sought documents, including text messages, concerning, *inter alia,* the genesis of the Littler Investigation and the Littler Report. Specifically, Plaintiff sought to assess whether the Littler Investigation was actually a legitimate response to allegations of Plaintiff's misconduct from student-athletes and parents (as BOR avers) or whether it was a concerted effort to manufacture a pretextual basis for her termination (as Plaintiff alleges).

BOR's initial text message production contained highly relevant text message evidence bearing on this issue.  It included a text message from Lynn Durham, then-Chief of Staff to then-GT President George Peterson on February 13, 2019, approximately two weeks before GT retained Littler, to then-acting General Counsel

3

Aisha Oliver-Staley, stating that Durham believed GT Athletic Director Todd Stansbury wanted to use letters from parents about Plaintiff to "negotiate" her departure. BOR-005832-33 (Ex. 1). It also included a text message from Durham to Oliver-Staley on March 15, 2019, after receiving the draft Littler Report, stating that she hoped the final Littler Report had "more details" and that the draft was "not as compelling as" she "had hoped." BOR-005841 (Ex. 2) [2]

While the few text messages BOR produced in its initial production justify an inference of pretext, the text message evidence produced was incomplete. On November 9, 2020, Plaintiff informed GT that its production of text message evidence was deficient. She also noted that texts between former WBB Player Personnel Administrator Felicia Tucker and Oliver-Staley on Oliver-Staley's personal phone that were known to exist had not been produced. [3] Plaintiff requested that GT re-collect and produce all relevant text messages from the phones of certain

---

[2]BOR's initial production also contained twenty-three screenshots of text messages between Stansbury and Durham which appeared to relate to the transmission of the parents' letters to Stansbury and meetings and discussions that were held around the complaints. Many of the screenshots had dates and text cut off.

[3]Oliver-Staley used both a GT-issued phone and personal phone to text message about GT business, including Plaintiff and the Littler Investigation. Oliver-Staley Dep. 15:6-16:12 (Ex. 3). She obtained the personal phone in her new role "because" she was "discussing information that is more likely subject to open records." BOR-005796-97 (Ex. 4).

relevant witnesses, including Durham, Tucker, and Akin (collectively, the "Custodians") from September 1, 2018, to April 1, 2019 (the "Relevant Time Period").[4]

On December 1, 2020, BOR produced additional text messages between Tucker and Oliver-Staley from the latter's personal phone. These text messages revealed important information about the student/parent complaints upon which GT purportedly relied to retain Littler, including that the President's office had specifically asked that letters from parents and past players be written about Plaintiff and that the players' interest in submitting letters about Plaintiff may have been "fading" and they did not appear to want to "do it" as of January 31, 2019. BOR-0015445 at 51-54 (Ex. 5).

While these text messages filled in some gaps, several critical issues relating to the origins of the Littler Investigation still remain undisclosed. Plaintiff had reason to believe that the Custodians' text messages requested in the November 9 letter would resolve many of these unresolved issues as BOR's first production of text messages showed that Tucker, Durham, and Akin were all communicating via text message about the alleged player and parent complaints.

---

[4]*See also* Dkt. 123 at pp. 6-12.

### C. The Evidence Destroyed

In a series of subsequent correspondence following Plaintiff's November 9 deficiency letter, Plaintiff learned that BOR failed to take reasonable steps to preserve the Custodians' text messages and had, as a result, deleted or otherwise lost access to them for the Relevant Time Period. Specifically, BOR failed to ensure that Durham and Akin turned off the auto-delete settings on their phone, resulting in Durham's phone auto-deleting messages after 30 days and Akin's phone auto-deleting messages after 1 year. Dkt. 123 at pp. 10-11; Durham Dep. 83:21-84:15 (Ex. 6). BOR delayed issuing a litigation hold notice instructing Akin and Tucker to preserve text messages until June 11, 2019, and does not appear to have instructed Durham to preserve her text messages until August 7, 2019, when it notified her, Akin, and Tucker of its intent to image their phones. BOR-0024807 (Ex. 7); BOR-0024809 (Ex. 8); BOR-0024823 (Ex. 9); BOR-0024817 (Ex. 10); BOR-0024824 (Ex. 11).[5]

---

[5]BOR finally produced emails and the litigation hold notice related to its preservation efforts in this case on August 20, 2021, after the Court granted Plaintiff leave to file a motion to compel the letters. Five of the documents concern the preservation of text messages on the Custodians' phone. Exhibits 7-11. None of the others referenced the preservation of text messages, and BOR provided no context for the instruction that preceded or followed the issuing of these documents.

Then, on August 26, 2019, three weeks after acknowledging a need to preserve Durham's text messages and one month into litigation, BOR restored Durham's phone to factory settings and *deleted all text messages from her phone without imaging the device.* Dkt. 123 at p. 10.  Further, BOR delayed making images of Akin's and Tucker's phones until February 2020, seven months into litigation and six months after informing the Custodians of its intent to image their devices, at which point *a year of messages from Akin's phone had been automatically deleted* and *all of Tucker's messages from the Relevant Time Period were inexplicably unrecoverable. Id.*

### D. Efforts to Fill Gaps Left

To determine the extent of potentially relevant text messages that were lost, their importance to proving Plaintiff's case, and whether they could be replaced with other discovery, Plaintiff issued subpoenas for the Custodians' phone records, deposed a dozen witnesses, subpoenaed documents from third parties, and obtained additional paper discovery from BOR. The evidence obtained provided further support that BOR actively searched for a pretext to justify launching the Littler Investigation and that the Custodians played an important role in that process.

For example, Plaintiff obtained evidence supporting her belief that the complaints that led to the players' meeting with Oliver-Staley on January 26, 2019,

were more limited, general complaints that GT exploited to justify probing deeper into Plaintiff's program.  Both Tucker and Francesca Pan, one of the four players who allegedly complained to Oliver-Staley about Plaintiff on January 26, provided testimony indicating that Pan's initial complaint to Tucker about Plaintiff primarily related to the fact that players and coaches told her that she was bringing a negative attitude to practices and games.  Pan Dep. 127:15-131:11 (Ex. 12); Tucker Dep. 104:10-106:14; 109:1-9; 113:6-10 (Ex. 13).  Importantly, Pan testified more than once that she personally did not have a problem with Plaintiff's coaching.  Ex. 12 at 306:24-309:7; 269:18-270:6; 215:2-217:4.

Other evidence revealed that Tucker's disclosure of this general complaint about Pan to Oliver-Staley led to the gathering of additional students who could be "trusted" not to tell to anyone they were meeting with Oliver-Staley to subsequently meet with her and Tucker on January 26, 2019.  Tucker-00023-24 (Ex. 14); Ex. 13 at 125:10-128:2.  Tucker communicated with Kierra Fletcher, another player who attended the January 26, 2019, meeting about this meeting via Instagram direct message, which Tucker deleted in late February or early March 2019.  Ex. 13 at 24:19-26:3.

The evidence also showed that the complaints allegedly disclosed to Oliver-Staley at the January 26, 2019, meeting were too broad and unsubstantiated to

warrant an investigation on their own.  Oliver-Staley testified that she believed she needed the letters from the parents to "corroborate" what the players were saying and that she was not able to "launch an investigation based on an unsubstantiated complaint" or move forwarded based on a "mystery allegation."  Ex. 3 at 154:14-156:23; 289:21-290:12.  Fletcher testified that Oliver-Staley told the players on January 26 that what they had reported "wasn't enough."  Fletcher Dep. 189:13-18 (Ex. 15).  Akin testified that Tucker told her that Oliver-Staley said they "would need documents from parents" and that Oliver-Staley asked for parent letters because "they needed more than just hearsay."  Akin Dep. 132:3-133:10 (Ex. 16).

Witness testimony and other discovery further revealed that upon realizing the player complaints alone would not be enough to warrant opening an investigation into Plaintiff, GT administrators, including the Custodians, started actively searching for negative information on Plaintiff for the purpose of identifying a basis to investigate.  On January 28, 2019, two days after the January 26 meeting, Oliver-Staley, in consultation with the President's office, directed Tucker to get letters from parents and "past players" whom she "trusted", noting that Durham was an ally but it was important that "only people you guys absolutely trust are in the know."  *Id.*[6]

---

[6]BOR's handling of these alleged complaints against Plaintiff deviated sharply from how it handled the same type of complaint actually lodged by a male student-athlete

Later that day, Akin's calendar reflects that she met with "KP" – the initials of Kaylan Pugh, a former WBB player who left the team on bad terms.  Plaintiff-009342 (Ex. 19); Ex. 16 at 135:12-20.  The next day, Akin texted Oliver-Staley that she gave two people her number for "fellowship."  Ex. 4 at 97; Ex. 16 at 138:23-139:24.  Akin claimed not to recall to whom she gave Oliver-Staley's number, but admitted that the only thing Akin had reported to Oliver-Staley at this time were issues relating to WBB.  Ex. 16 at 139:15-24.[7]  Tucker expressly acknowledged the pretextual nature of this exercise, testifying that former players had "nothing" to do with the complaints that had been allegedly raised on January 26 and investigating those alleged complaints did not require going out and "looking for people to speak." Ex. 13 at 141:2-8; 160:24-162:11.

Further, the evidence indicates that GT administrators pushed current players to get letters from their parents, even when they appeared disinterested in providing

---

against former GT football coach Paul Johnson.  The documented Johnson complaint was not elevated to the President's office. Ex. 6 at 36:3-37:5; Peterson Dep. 88:16-19 (Ex. 17).  Instead, the complaint was routed to the Athletic Association Human Resources Business Partner, who reached out directly to the student (not his parents or former teammates) twice and then closed the complaint after the student did not respond to this limited outreach.  BOR-0015476 (Ex. 18).

[7]Akin also admitted to secretly recording Plaintiff at half time of a WBB game on January 27, the day after the players' meeting with Oliver-Staley. Ex. 16 at 141:2-146:22.

them. Pan testified that she and the other players forgot to ask their parents to write the letters and "another day like later on they asked us if our parents were willing to write a letter still."  Ex. 12 at 305:4-12.  While someone sent Tucker a letter about Pan on January 29, Tucker did not provide the letter to anyone for weeks.[8]  Further, although Fletcher's father sent her a copy of his letter on January 29, Fletcher did not immediately send the letter to a GT administrator.  Instead, the evidence suggests that the players may have started to change their minds about filing a complaint against Plaintiff.  Specifically, on January 31, 2019, Tucker texted Oliver-Staley that she would "try" to get letters but that she felt "like they are fading." Ex. 5 at 53-54. When Oliver-Staley asked what Tucker meant, Tucker stated "Not sure if they want to do it" and Oliver-Staley asked if she could help get them back "on track."  *Id.*

At or around this time in late January 2019, Akin held a meeting (which she convened via text messages to Fletcher that were not preserved) with the four players who had met with Oliver-Staley on January 26, *i.e.* Fletcher, Pan, Daijah Jefferson, and Anne Diouf, during which she asked them if they had provided the

---

[8]Tucker testified that she was the reason for the delay in submitting Pan's letter.  Ex 13 at 157:2-158:2. Assuming this is true, this conduct is also further evidence that the complaints raised by Pan were not the egregious allegations of abuse BOR purports them to be.  Indeed, if Tucker truly harbored concerns about Pan's well-being, she would not delay providing the evidence purportedly needed to investigate and remediate that alleged misconduct.

"documentation" Oliver-Staley had requested of them. Ex. 16 at 162:22-166:5. Fletcher, Diouf, and Jefferson responded they had not, and Akin told them they could send the documentation to her personal email. *Id.*   Fletcher still did not provide her letter for another nearly two weeks, as discussed below.   Neither Diouf's nor Jefferson's parents ever sent a letter, although Diouf's brother allegedly belatedly wrote one on her behalf and sent it to Akin.  Akin-0001-2 (Ex. 20).[9]

The evidence also suggests that Tucker and Akin communicated with the players about the letters in unusual ways, and in some instances deleted these communications, justifying further inferences of illicit motives.  In late January or early February 2019, Tucker started to communicate with Pan through Telegram, an app that automatically deletes messages after transmission.  Tucker-00022 (Ex. 22). Tucker said she communicated via Telegram for fear of someone finding the communications.   Ex. 13 at 166:14-167:14. Both Tucker and Akin also had the players send the letters to their personal email addresses even though that was not their normal practice and even though it violated GT policy.  Ex. 16 at 10:21-12:7; 162:22-166:11; Ex. 13 at 19:25-22:5; BOR-0024623 at 26 (Ex. 23).

---

[9] The document properties of the letter about Diouf list the WBB player, Anne Diouf, as the author, not her brother.  Littler did not even bother to interview Diouf's brother.  BOR-001128 (Ex. 21).

Further, Tucker testified that she had Pan send the letter to her personal email because she "knew that e-mails at Georgia Tech were open records and public records." Ex. 13 at 146:10-147:9.[10]  While Tucker claimed that she was not trying to "hide anything from anyone", she deleted the email sent to her personal email address, even though she did not typically delete emails. Ex. 13 at 20:24-21:24; 155:7-156:10.[11]  Tucker was not sure who sent her the email and admitted that she does not know for sure whether Pan's mother even wrote the letter attached to it. Ex. 13 at 20:24-24:5; 152:6-15.

While Akin did not delete the emails transmitting the letters sent to her, her explanation for using her personal email did not make sense. She claimed she told the players to send the letter to her personal email to make them feel better, though

---

[10]As noted in footnote 3, *infra,* Oliver-Staley also obtained a personal phone – which she used to communicate about Plaintiff and the Littler Investigation – because her communications were more likely subject to disclosure under the Open Records Act. This apparent practice of using a personal phone or email address to communicate about state-related business for the express purpose of making it more difficult for the documents to be disclosed pursuant to an Open Records Act request contravenes the spirit of the Open Records Act, which was enacted so the public has easy and broad access to government records. Ga. Code 50-18-70(a). It also potentially violates Ga. Code 50-18-74(a), which prohibits a person from "knowingly and willfully frustrating or attempting to frustrate the access to records by intentionally making records difficult to obtain or review."

[11]Tucker's subsequent testimony about the logic of having the letter sent to her personal email also casts doubt on the veracity of her claim that she was not trying to hide anything. Ex. 13 at 147:18-150:3.

she admitted that the players had not requested to send the letter to her personal email and she could not explain what about her personal email would make them feel better. Ex. 16 at 166:2-167:21. Further, Akin and/or BOR failed to produce the email and letter from Diouf's brother for approximately a year after Plaintiff had requested documents related to the alleged student and parent complaints and only after Plaintiff identified the existence of the email and letter in a text message between Akin and Diouf (which BOR also belatedly failed to produce).

The timing and nature of the escalation of the letters also grounds an inference that they were used as a pretext to justify opening an investigation into Plaintiff. As noted above, Pan and Fletcher had their letters on January 29, 2019. While Oliver-Staley had asked Tucker to try to get the players "back on track" on January 31, the letters were not escalated to Oliver-Staley or Durham for weeks. It was only after Plaintiff filed her internal complaint of discrimination and retaliation on February 8, that there was a rush to escalate complaints about Plaintiff upward. On February 11, 2019, at 11:23 a.m. Durham texted Stansbury to let him know that she was going to drop off an "envelope", the contents of which she wanted to discuss with him. BOR-014608 (Ex. 24). Stansbury testified that he received a letter from a parent in an envelope. Stansbury Dep. 182:4-24 (Ex. 28). At 3:43 p.m. that same day, Durham texted Oliver-Staley to let her know that she had "one letter", which she clarified in

her deposition was a letter about Pan that had just been anonymously dropped off at Durham's receptionist's desk.   BOR-005832 (Ex. 33); Ex. 6 at 106:18-109:24.

Later that evening, at 8:35 p.m., Akin somehow finally convinced Fletcher to forward her the letter from her father.   Akin-0003 (Ex. 25).   At 9:01 p.m., Akin texted Stansbury to ask for a call, and they arranged a time to talk that night.   BOR-0019970 (Ex. 26).   A text from Stansbury to Durham on February 12 suggests that at some point Akin provided Stansbury the letter from Fletcher's father, but BOR has not produced any evidence of the transmission of this letter.   BOR-014611 (Ex. 27).   Durham confirmed that around this same period of time she was involved in discussions with Stansbury to identify a "path" to separate Plaintiff's employment that would not be in the press.   Ex. 6 at 106:18-112:14.   On February 13, 2019, once Stansbury had the letters, Durham opined that she believed Stansbury wanted to use the letters to "negotiate" Plaintiff leaving.   Ex. 1.   Two weeks later, GT retained Littler ostensibly to investigate the allegations in the parent letters and a complaint filed with Human Resources by Tucker herself.[12]   Ex. 28 at 189:1-191:2.

### E. The Gaps That Remain

While Plaintiff has obtained important evidence supporting her belief that the player and parent complaints were a pretext to launch an investigation that would

---

[12]Tucker also filed the Human Resources complaint on February 11, 2019.

generate a report to justify her termination, she believes additional critical information about these complaints existed in the Custodians' text messages that were not preserved.  Tucker's phone records show she was texting with Fletcher, Pan, Jefferson, and/or Diouf on critical days from January 2019 through Plaintiff's termination, including January 26, the day they met with Oliver-Staley; January 28, the day Oliver-Staley gave the directive for Tucker to get letters from parents; January 30, the day before Tucker told Oliver-Staley that the players were "fading";[13] and March 25, 27, and 28, the days right before and after Plaintiff's termination.  Plaintiff-013055 (Ex. 29).[14]  Akin testified that she sent Fletcher a text message to convene a meeting with her, at which she asked Fletcher, Pan, Jefferson, and Diouf whether they had provided the "documentation" to Oliver-Staley.  Ex. 16 at 162:22-165:21.  Tucker testified that it was possible she texted Akin about the critical January 26 meeting.  Ex. 13 at 135:13-136:5.  None of these messages were preserved.

---

[13]Notably, Tucker exchanged *thirty* text messages with Fletcher on January 30, 2019, and then a day later told Oliver-Staley that she felt like the players were "fading."
[14]For purposes of Exhibit 29 the relevant phone numbers are: Tucker, 404-542-4855, Ex. 13 at 10:14; Pan, 478-390-0616, Ex. 12 at 15:22-16:1, Fletcher, 586-222-1880, Ex. 15 at 24:25-25:1; Diouf, 352-630-8981 and Jefferson, 804-503-7850, Ex. 32.

Further, Tucker and Akin testified that they texted each other and WBB players in the 2018-19 timeframe about Plaintiff.  Ex. 13 at 13:2-15:13; Ex. 16 at 266:24-269:2.[15] BOR failed to preserve their messages between September 1, 2018, and February 18, 2019, and has not produced a single text message between them from February 18, 2019, to April 1, 2019.  Akin and Durham also both testified that they texted each other in the 2018-19 timeframe about Plaintiff and issues relating to her employment, but BOR failed to preserve five months' worth of their text messages.  Ex. 16 at 266:24-267:17; Ex. 6 at 83:3-16; 129:13-130:1.  Tucker and Akin both testified that they texted with Dr. Kensa Gunter, a doctor to whom Tucker referred Pan and Fletcher about their alleged complaints about Plaintiff, but none of these messages were preserved or produced by BOR.  Ex. 13 at 13:2-14:11; Ex. 16 at 266:24-268:16.  Durham also testified that she texted with Peterson, Stansbury, Mark Rountree, and Kim Harrington about Plaintiff in the 2018-19 timeframe, but none of those messages were preserved on Durham's phone. Ex. 6 at 129:13-130:16.

## II.   LEGAL STANDARD

"[F]ederal law governs the imposition of spoliation sanctions." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)).  Federal Rule of Civil

---

[15] Tucker and Akin testified that they frequently used their work-issued phones to text about work-related issues.  Ex. 13 at 12:3-6; Ex. 16 266:16-23.

Procedure 37(e) addresses the spoliation of electronically stored information ("ESI") and provides that a party spoliates ESI if "a party failed to take reasonable steps" to preserve ESI that should have been preserved, and the ESI is lost and "cannot be restored or replaced through additional discovery."  Upon a finding of prejudice or intentional destruction of evidence, the court may order sanctions against a spoliating party.  Fed. R. Civ. P. 37(e)(1)-(2).

Before the amendment of Rule 37(e), the Eleventh Circuit adopted a multi-factor test to determine if sanctions are appropriate against a spoliating party.  *Flury*, 427 F.3d at 944-45.  Under pre-Rule 37(e) case law, Plaintiff must prove that: (1) "the missing evidence existed at one time"; (2) BOR "had a duty to preserve the evidence"; and (3) the evidence is crucial to Plaintiff's *prima facie* case.  *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011).  In fashioning an appropriate sanction, the Court must consider the following factors: (1) prejudice to Plaintiff as a result of the destruction of evidence; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether BOR acted in good or bad faith; and (5) the potential for abuse if sanctions are not imposed.  *Flury* 427 F.3d at 945.

The Eleventh Circuit has not determined if the *Flury* test applies when a party seeks spoliation sanctions for lost ESI under Rule 37(e).  *Pandya v. Marriott Hotel*

18

*Servs., Inc.*, No. 1:19-CV-2743-TCB, 2021 WL 3464263, at *3–4 (N.D. Ga. Aug. 5, 2021). Accordingly, Plaintiff will address both Rule 37(e) and the *Flury* test.

## III.   ARGUMENT

### A. BOR engaged in sanctionable spoliation of evidence.

The Court should find that BOR engaged in sanctionable spoliation of evidence by failing to take reasonable steps to preserve relevant text message evidence once on notice of litigation with Plaintiff and allowing the destruction of several months' worth of relevant text messages.

> **1.   BOR had a duty to preserve the Custodians' text messages.**

There is no reasonable dispute that the Custodians were relevant witnesses who had unique evidence in the form of text messages on their work-issued phones that BOR had a duty to preserve. *Dee Atta v. Cisco Sys., Inc.*, No. 1:18-cv-1558-CC-JKL, 2020 WL 7384689, at *5 (N.D. Ga. Aug. 3, 2020)*; Dkt. 123 at pp. 17-18; Dkt. 132 at pp. 6-7. BOR acknowledged as much when it belatedly attempted to preserve text messages on the Custodians' phones. *See* Exs. 7-11; s*ee also Connor v. Sun Tr. Bank*, 546 F. Supp. 2d 1360, 1367-68, 1376 (N.D. Ga. 2008) (analyzing preservation instructions given to "employees likely to possess relevant information" and awarding spoliation sanctions for deleted email). Any attempt to argue that BOR had no reason to believe that the Custodians had relevant text

messages on their phones when the duty to preserve attached on February 26, 2019, should be rejected. The Custodians were texting with GT's then-General Counsel about issues related to Plaintiff and her employment at the time the duty to preserve attached. *See* Dkt 123 at pp. 17-18; Dkt. 132 at pp. 6-7.

## 2.     The Custodians' text messages existed at one time.

The Custodians' text messages existed at one time.  In its initial production of documents, BOR produced text messages from the phones of Akin and Tucker before February 26, 2019,[16] meaning that at least as of the time BOR collected documents to produce to Plaintiff in litigation, text messages from before February 26, 2019, on Akin's and Tucker's phones existed.  When the duty to preserve attached, Durham's phone, which was set to delete text messages after 30 days, still contained text messages dating back to January 28, 2019, a critical time period.  The Custodians all confirmed at their deposition that the messages that existed on their phone included messages about Plaintiff during the Relevant Time Period.  Messages from the phones of other witnesses also strongly suggest that the Custodians were sending and receiving highly relevant text messages during the

---

[16]*See, e.g.,* BOR-005858 (Ex. 30) (text from Tucker to Oliver-Staley); Ex. 13 at 18:2-19:20 (clarifying that this text message was sent on October 2018); BOR-005859 (Ex. 31) (text from Akin to Plaintiff on November 17, 2018).

Relevant Time Period, both before and after the duty to preserve attached.[17]  *Cf.*

*Connor*, 546 F. Supp. 2d at 1376 (plaintiff's discovery of one relevant email deleted

from custodian's account "raises a concern that other relevant emails may have

existed at the time the duty to preserve arose but have since been deleted by Sun

Trust's email server").

> ### 3.   BOR failed to take reasonable steps to preserve the Custodians' text messages, causing their destruction.

When the duty to preserve attached on February 26, 2019, BOR had a duty to

take reasonable steps to preserve Custodians' text messages.  Fed. R. Civ. P. 37(e).

This duty included more than merely notifying relevant employees of a litigation

hold.  "Counsel must take affirmative steps to monitor compliance so that all sources

of discoverable information are identified and searched."  *Swofford v. Eslinger*, 671

F. Supp. 2d 1274, 1281 (M.D. Fla. 2009); *see also Hyundai Motor Am. Corp. v. N.*

*Am. Auto. Servs., Inc.*, No. 20-82102-CIV, 2021 WL 3111191, at *10-11 (S.D. Fla.

July 22, 2021) (awarding sanctions where party failed without explanation to follow

counsel's preservation instructions, allowing important evidence to be destroyed).

The record shows that BOR's steps to preserve the Custodians' text messages

were anything but reasonable.  Once on notice of potential litigation with Plaintiff,

---

[17]*See, e.g.,* Dkt 132 at pp. 5-9.

BOR failed to instruct the Custodians to turn off the automatic deletion settings on their phones; failed to timely issue a litigation hold notice; wiped Durham's phone while in active litigation; and delayed making images of Akin's and Tucker's phone for so long that a year's worth of messages from Akin's phone was automatically deleted and none of Tucker's messages were recoverable.  As a result, all text messages between Durham and Akin and Tucker and Akin from September 1, 2018, to February 18, 2019, a critical period of time when the Custodians were discussing the initial player complaints, are irretrievably lost.[18]  All text messages between Tucker and WBB student-athletes during the entire Relevant Time Period and Akin and WBB student-athletes before February 18, 2019, are also irretrievably lost. Additionally, Durham testified that she also texted Peterson and Harrington in 2018-19 about Plaintiff, but BOR has not produced any such text messages.

Plaintiff attempted to discover information regarding the Custodians' communications about the player and parent complaints through depositions, but the witnesses' memories on these issues were conveniently fuzzy and often contradictory, leading to serious issues of witness credibility.  Without the Custodians' text messages, Plaintiff's ability to impeach them, demonstrate pretext,

---

[18] BOR also has not produced a single text message between Akin and Tucker from February 18, 2019 to April 1, 2019, despite having some of Akin's text messages from that time period.

and elicit true testimony is greatly impaired. *See Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1379 (S.D. Ga. 2008) (depositions did not alleviate all prejudice where witnesses could not remember contents of destroyed documents, and where destroyed documents would assist plaintiff in impeaching witnesses' credibility).

Because BOR's destruction of the text messages is irreversible and Plaintiff's ability to discover the most reliable evidence about the Custodians' conduct is significantly impaired, factors two ("whether the prejudice can be cured") and five ("the potential for abuse") of the *Flury* test weigh in favor of sanctions. *Flury*, 427 F.3d at 945; *Connor*, 546 F. Supp. 2d at 1377.

### 4.    The lost text messages are crucial to Plaintiff's case.

The lost text messages would have greatly furthered Plaintiff's ability to prove her case, as they would have been central to Plaintiff's arguments on pretext. *See Brown*, 563 F. Supp. 2d at 1378 (destruction of notes prejudiced plaintiff's ability to prove pretext where notes "would have shed light on the decision-making process that led to his termination" and could reveal "employer's failure to follow its own policies"). Stansbury, the decision maker, testified that BOR decided to initiate the Littler Investigation because of the parent letters. Information bearing on whether these letters were legitimate or contrived for an improper purpose, and whether GT administrators were aware of this covert plan to elicit negative information about

23

Plaintiff in the wake of her protected speech, is critical information bearing on the issue of pretext.   Specifically, this information goes to whether the Littler Investigation was a legitimate response to player complaints, or whether it was a sham investigation ginned up as the result of Plaintiff's complaints of discrimination for the purpose of justifying Plaintiff's termination.

Messages from the Custodians that were preserved are a critical window into the events that led to the Littler Investigation and suggest that the letters were in fact the product of a coordinated, covert effort by the Custodians and Oliver-Staley to end Plaintiff's employment. Tucker spoke openly and candidly with Pan via Instagram direct message, including telling her to bring players to meet with Oliver-Staley only if they could be "trusted" not to talk to anyone about the meeting, and Oliver-Staley revealed to Tucker in text messages that the President's office wanted letters about Plaintiff.  Akin communicated by text message with Oliver-Staley about connecting people with Oliver-Staley for "fellowship."[19]  Durham admitted in text messages that she thought Stansbury wanted to use the letters from the parents to

---

[19]The 1,600 messages from Akin's phone that BOR eventually produced for the time period of February 18, 2019, to April 1, 2019, further showed that Akin communicated frequently about substantive issues relating to Plaintiff, the Littler Investigation, and Plaintiff's employment via text messages.

"negotiate" Plaintiff's departure before BOR retained Littler, and that the allegations in the first draft Littler Report were not as "compelling" as she had hoped.

The evidence also indicates that the Custodians had more text messages about the initial player complaints and letters that were not preserved. Tucker's phone records show that she exchanged text messages with the players who allegedly complained about Plaintiff leading up to and after the January 26 meeting. Tucker's phone records also show that she exchanged text messages with Fletcher one day before Tucker told Oliver-Staley that the players were "fading." The Custodians' testimony shows that Akin texted with Tucker and Durham in the 2018-19 timeframe about Plaintiff and the issues related to this case. Further, Akin admitted in her deposition that she texted Fletcher for the purpose of arranging a meeting with the four players to discuss why their parents had not yet submitted letters.

Given the existence of highly relevant text messages from the Custodians' phones that are known to exist, factor one of the *Flury* test (whether Plaintiff "was prejudiced as a result of the destruction of the evidence") weighs in favor of sanctions. *Connor,* 546 F. Supp. 2d 1360 at 1376 (holding "the absence of the relevant evidence prejudices the party that would have relied on it to prove its case" and that plaintiff's discovery of one relevant email deleted from custodian's account "raises a concern that other relevant emails may have existed at the time the duty to

25

preserve arose but have since been deleted").  Further, given the practical importance of the text messages to central elements of Plaintiff's case, factor three ("the practical importance of the evidence") also weighs in favor of sanctions.

### 5.     BOR acted in bad faith.

Spoliation warrants sanctions if the destruction of the evidence is predicated on bad faith.  *In re Delta*, 770 F. Supp. 2d at 1305.  While "mere negligence" is not sufficient to warrant sanctions, bad faith does not require a finding of "malice." *Pandya*, 2021 WL 3464263, at *4.  Prolonged delays in acting to preserve evidence, or short delays combined with evidence that the delay was intentional, are sufficient to warrant sanctions.

In *In re Delta*, the defendant immediately issued litigations holds after learning of its duty to preserve, and then waited three months before taking affirmative steps to acquire and preserve the contents of the custodians' hard drives 770 F. Supp. 2d at 1312-13.  Although potential evidence was automatically deleted in that three month period, the Court found that this short delay did not amount to sanctionable conduct "without some evidence that Delta's delay was intentional." *Id.* at 1313.  In contrast, in *Connor v. Sun Tr. Bank*, the Court awarded sanctions where a custodian did not produce a relevant email in response to counsel's preservation instruction and allowed it to be auto-deleted after 30 days because the

evidence suggested the custodian intentionally failed to produce the document. 546 F. Supp. 2d at 1376-77. In *Brown v. Chertoff*, the Court awarded sanctions where the defendant destroyed evidence as part of an agency-wide record purge seven months after the plaintiff initiated legal action. 563 F. Supp. 2d at 1381.

BOR's conduct warrants sanctions under the case law. Although BOR eventually issued a litigation hold to Akin and Tucker on June 11, 2019, it appears it did not instruct Durham to preserve relevant evidence until August 7, 2019. Further, even after it issued belated litigation holds, BOR took no affirmative steps to preserve the Custodians' text messages for many more months. BOR did not require the Custodians to disable auto-delete functions, *it wiped Durham's phone while the parties were in active litigation*, and it delayed making images of Akin's and Tucker's phones *for almost a year* after the duty to preserve attached, at which time *a years' worth of text messages had been automatically deleted from Akin's phone and all of Tucker's text messages from the Relevant Time Period had disappeared*. Unlike in *In re Delta*, where the defendant took good faith steps to preserve the evidence but just a little too late to avoid auto-deletion, BOR's extreme delays and affirmative destruction of evidence amounts to bad faith.

The Custodians' conduct also reflects bad faith, intentional efforts to hide evidence useful to Plaintiff's claims. The Custodians took affirmative steps to hide

their communications when pressuring the players to procure letters from their parents, including using communication methods they did not typically use to conduct BOR business (including personal phones, personal email addresses, social media, and other message apps) to conceal information, and intentionally deleting at least one critical email related to Pan's letter.  After receiving litigation holds from BOR, the Custodians appear to have taken no action to provide evidence from their cell phones to BOR's counsel or prevent the deletion of evidence.[20]  Like in *Connor*, the evidence suggests the Custodians affirmatively acted to conceal evidence, and this bad faith should be imputed to BOR.

The Custodians and/or BOR also repeatedly failed to turn over obviously relevant information that did exist and was potentially unfavorable to them.  Most notably, BOR did not initially produce a highly relevant text message thread between Oliver-Staley and Tucker on Oliver-Staley's personal phone in which they discussed gathering evidence about Plaintiff, BOR's solicitation of parent letters, and the reluctance of some of the students to move forward with filing complaints about Plaintiff.  BOR only produced the text message thread on December 1, 2020,

---

[20] In its initial production of documents, BOR produced one text message from Tucker's phone to Oliver-Staley; nine screenshots of text messages from Akin's phone; and zero text messages from Durham's phone.  Akin and Durham also took no steps to turn off the automatic deletion settings on their phone.

approximately nine months after Plaintiff had originally requested it, and only after Plaintiff provided BOR with Tucker's phone records showing that the text message thread existed. Text messages from Oliver-Staley's personal phone were included in BOR's first production, and it is curious that she and/or BOR overlooked this plainly relevant text message thread. Akin and/or BOR also failed to produce the email and letter from Diouf's brother for almost a year after Plaintiff had issued a document request to which they were responsive.

## IV.   CONCLUSION

BOR's repeated failures to take reasonable steps to preserve text message evidence on the work-issued phones of the Custodians that they knew was relevant to litigation with Plaintiff warrants sanctions. BOR's actions and inactions have resulted in months of text messages from a pivotal time period being deleted from the Custodians' phones. BOR, not Plaintiff, should bear the burden of the prejudice that has resulted from BOR's missteps. Failing to sanction BOR under these facts would set a precedent that a party may repeatedly fail to take reasonable steps to preserve relevant evidence for months without consequence.

Accordingly, Plaintiff requests that the Court sanction BOR for its misconduct. *Flury*, 427 F.3d at 943. First, because the facts evidence an intent to deprive Plaintiff of this information, the Court should issue a jury instruction that

the jury must or may infer the destroyed text messages demonstrated the Custodians were attempting to solicit damaging allegations against Plaintiff for an unlawful purpose. *Pandya*, 2021 WL 3464263, at *4; *see also* Fed. R. Civ. P. 37(e)(2). Second, because the destroyed text messages would have been critical evidence for Plaintiff's pretext arguments, the Court should deny summary judgment on the issue of pretext. *Brown*, 563 F. Supp. 2d at 1381 (denying summary judgment on the issue of pretext where defendant was "clearly culpable for the destruction of evidence" but there was no indication of intentional spoliation). Finally, the Court should award Plaintiff the costs and attorneys' fees incurred to redress BOR's spoliation, as well as any other remedy the Court deems fit to cure the prejudice to Plaintiff. *See, e.g.*, *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 747 (N.D. Ala. 2017) (awarding fees and costs incurred for Rule 37(e) motion).

Respectfully submitted,

/s/ *Colleen E. Coveney*
Lisa J. Banks*
banks@kmblegal.com
Colleen E. Coveney
Georgia Bar No. 686460
coveney@kmblegal.com
Joseph Abboud*
abboud@kmblegal.com
Marilyn Robb*
robb@kmblegal.com
**Katz, Marshall & Banks, LLP**
1718 Connecticut Avenue, NW, Seventh Fl.

Washington, D.C. 20009
Phone: (202) 299-1140
Fax: (202) 299-1148

*(admitted pro hac vice)*

Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleybeal.com
J. Kyle Brooks
Georgia Bar No. 773561
kbrooks@buckleybeal.com
**Buckley Beal LLP**
600 Peachtree Street NE, Suite 3900
Atlanta, GA 30308
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101

*Counsel for Plaintiff*

Dated:  August 31, 2021

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(C) in 14-point Times New Roman type face.

This 31th day of August, 2021.

<u>*s/ Colleen E. Coveney*</u>
Colleen E. Coveney
Georgia Bar No. 686460

*Counsel for Plaintiff*