**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| MACHELLE JOSEPH,<br><br>     *Plaintiff*,<br><br>     v.<br><br>BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA; GEORGIA TECH ATHLETIC ASSOCIATION; GEORGE P. PETERSON, in his individual capacity; M. TODD STANSBURY, in his individual capacity; MARVIN LEWIS, in his individual capacity; and SHOSHANNA ENGEL, in her individual capacity,<br><br>     *Defendants*. | CIVIL ACTION FILE NO. 1:20-CV-00502-TCB |

**BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA'S
MOTION FOR SANCTIONS**

MaChelle Joseph is the former head coach of the Georgia Tech Women's Basketball team ("WBB"). Her employment was terminated on March 26, 2019, following an investigation into allegations that she had abused her players and staff. Joseph subsequently filed suit in federal court, alleging that her termination was merely the latest in a long string of discriminatory and retaliatory acts, carried out in direct response to her unwavering advocacy for WBB and what she claims

1

were her repeated complaints that Georgia Tech was discriminating against her and WBB because of their gender, which she contends constituted unlawful retaliation under Title VII and Title IX. Of course, for that to be true, Joseph would have to establish that she did, in fact, complain that Georgia Tech was not in compliance with Title VII and Title IX. Joseph has stymied the Board of Regents' ability to defend itself against her claims by destroying communications which would likely indicate that, not only did she *not* make any valid complaints that Georgia Tech was in violation of Titles VII and IX; she *knew* her complaints were not valid, but were instead meant to lay the groundwork for a lawsuit against the Institute in an effort to insulate herself against any adverse job actions. The Board of Regents seeks sanctions in the form of a negative inference at summary judgment to remedy Joseph's spoliation. In the event the case proceeds to trial, the Board of Regents also requests leave to present evidence of Joseph's spoliation to the jury.

## I.   INTRODUCTION AND BACKGROUND

Joseph served as the head women's basketball coach at Georgia Tech for approximately 16 years. In 2014, she and the Georgia Tech Athletic Association entered into a contract which provided for her compensation through March 31, 2020, and which called for a good-faith reconsideration of the terms and conditions of that contract after the 2016-2017 season. *See* Complaint, Exhibit B. In the last

five years of her tenure, WBB failed to achieve a winning in-conference season and failed to secure a spot in the NCAA tournament. Pl. Dep. 55:21-57:3, 62:9-19. Then, in May, 2018, Joseph became aware that there was an NCAA investigation into allegations that one of her assistant coaches provided impermissible benefits in order to secure a recruit for WBB. *See* Pl. Dep. 239:12-242:18. She was interviewed as part of that investigation on or around May 18, 2018. Pl. Dep. 240:8-15. Joseph claims that she felt mistreated during that interview and she began to believe that Georgia Tech was going to fire her. *See, e.g.*, Pl. Dep. 557:19-558:8. She has also expressed her belief that allowing a coach to go into the last year of their contract is "a sign that you – you have intentions to fire that coach." Pl. Dep. 423:21-424:5.

The parties are in substantial agreement that, throughout her employment, Joseph, like most head coaches, regularly advocated for more resources for the WBB program. Further, the parties also agree that she complained more than once about WBB's treatment from the Compliance office. These two areas — budgetary allocations and compliance inquiries — are the two primary areas where Joseph contends WBB was treated unfairly. What is less clear, however, is whether any of her complaints rise to the level of protected conduct under either federal statute

invoked in Joseph's complaint.[1] Clearly, what would be helpful in reaching a

conclusion on that question would be evidence of the complaints themselves –

what, exactly, did Joseph say? Unfortunately for the Defendants in this action,

most of Joseph's alleged protected activity was conveyed orally and now,

predictably, the parties have differing views on what was said and understood at

the time the alleged complaints were made.

In an effort to gain more information about the exact substance of Joseph's

complaints, as well as her own understanding and perception of those complaints,

Defendant BOR submitted interrogatories and requests for production seeking

information related to Joseph's claimed protected activity. In response, the BOR

received, among other things, emails exchanged between Joseph and Theresa

Wenzel, a former employee of Georgia Tech.[2] Wenzel used to serve as an

Associate Dean, Director of Title IX Compliance, and Senior Women's

Administrator at Georgia Tech and, as part of her role, she acted as Joseph's

supervisor. Wenzel Dep. 61:15-20, 67:17-19. A few years after her departure from

GT, in 2018, Wenzel became a professional change management consultant and

---

[1] *See* Case No. 1:19-cv-03347-TCB. Joseph voluntarily dismissed the first federal action and re-filed in Fulton County Superior Court. The state action was then removed to this court on February 3, 2020. *See* ECF No. 1.
[2] Joseph mentions Wenzel several times in her Complaint. *See* Complaint, ¶¶ 98-99, 106-111.

Joseph was her first client. Wenzel 26:15-27:3. Beyond that, the two women are close friends and confidants and it has been established that Wenzel was actively assisting Joseph in preparing for this litigation. Pl. Dep. 15:3-20, 321:6-12, 348:17-21, 357:17-20, 430:25-431:2, 565:11-567:5; Wenzel Dep. 28:21-30. Interestingly, however, Joseph initially failed to produce a single text message[3] between her and Wenzel. At first, this could be explained by surmising that the two women simply did not text one another. Over time, however, it became apparent that this explanation was likely *not* the reason for the dearth of messages.

Because Joseph utilized cell phones and a computer which were issued to her by the Georgia Tech Athletic Association, and because she retained possession of those devices[4] upon her termination, co-Defendant GTAA and the Plaintiff were, over the course of 2020 and into 2021, involved in discussions regarding the return of the devices and/or the data thereon. Although it was aware that they were ongoing, the BOR was not involved in these talks. Thus, the BOR did not become fully aware until June, 2021, when the Athletic Association finally received a complete and correct set of device data from Joseph, that the entirety of the text

---

[3] The term "text message" is used throughout this brief to refer either to iMessages or WhatsApp messages interchangeably.
[4] Joseph retained possession of an iPhone 8, an iPhone XS, and a MacBook Pro which had been issued to her by the Athletic Association.

message communications exchanged directly between Joseph and Wenzel amounted to a single iMessage chain consisting of just 8 messages[5] (many of which appear to have no message body) and a single WhatsApp chain also consisting of just 8 messages. *See* Appendix Exhibits 1 & 2. For a variety of reasons explained more fully below, the BOR contends that Joseph actively deleted messages between her and Theresa Wenzel which were relevant to the issues in this case and which Joseph knew or should have known she had a duty to preserve. The BOR seeks sanctions in the form of a negative inference at summary judgment to remedy Joseph's spoliation of this evidence, which the BOR believes would have shown that Joseph did not have a good faith, reasonable belief that she was reporting or complaining of violations of Title VII or Title IX.

## II.     STANDARD OF REVIEW

"Spoliation is 'defined as the destruction of evidence or the significant and meaningful alternation of a document or instrument.'" *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020). Because the spoliated evidence now at issue took the form of text messages, any analysis of their loss is governed by Rule 37(e) of the Federal Rules of Civil Procedure which provides:

---

[5] The excel spreadsheet seems to indicate 9 messages in the iMessage chain. However, rows 8 and 9 refer to a single message which included a screenshot attachment. There are, therefore, only 8 messages in the chain.

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

1) Upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

2) Only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

   A) Presume that the lost information was unfavorable to the party;

   B) Instruct the jury that it may or must presume the information was unfavorable to the party; or

   C) Dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). Accordingly, upon a finding of an intent to deprive the BOR of evidence for use in this litigation, the court is authorized to impose sanctions on Joseph up to, and including, a presumption at summary judgment that the destroyed information was unfavorable to her. The court may also permit the BOR to introduce evidence of the spoliation to the jury in the event the case proceeds to trial. *See United States EEOC v. GMRI, Inc.*, Case No. 15-20561, 2017 U.S. Dist. LEXIS 181011, *62 (S.D. Fla. 2017).

## III.   ARGUMENT AND CITATION OF AUTHORITY

    *a. Evidence once existed and is now missing.*

The BOR contends that Joseph and Wenzel exchanged messages over iMessage and/or WhatsApp[6] related to Joseph's complaints of discrimination and retaliation and her plans to sue the Institute but those messages cannot now be retrieved. Joseph will argue that the BOR does not have definitive proof that any such messages ever existed in the first place.[7] The BOR acknowledges that there is no direct evidence that Joseph and Wenzel exchanged such messages, such as an admission from Joseph, however, the circumstantial evidence to that effect is compelling.

As noted above, Joseph and Wenzel are close friends and confidants. *See, e.g.,* Pl. Dep. 15:3-20, 321:6-12, 348:17-21, 357:17-20, 430:25-431:2, 565:11-567:5; Wenzel Dep. 28:21-30. They socialized together on a regular basis and communicated frequently, often about issues Joseph was facing in the workplace. Pl. Dep. 267:16-25, 355:11-14, 356:20-357:20, 546:11-547:16, 552:4-13, 553:5-12, 554:10-18, 561:22-562:22, 578:22-580:25; Pl. Dep. Ex. 32-36; *see also* App. Ex. 3-4. In her Initial Disclosures, Joseph listed Wenzel as a potential witness who

---

[6] iMessage is the default messaging application on iPhones and other Apple devices. WhatsApp is a separate messaging application available for free download.

[7] The parties are generally in agreement that, once messages of these kinds are lost, it is highly unlikely that any type of forensic analysis can fully retrieve them, particularly for the time frame at issue in this case.

might have information about her "allegations of disparate treatment in funding, resources, and standards of conduct and performance, Plaintiff's protected activity, Plaintiff's allegations of retaliation and retaliatory harassment, Plaintiff's job performance, and Plaintiff's suspension, investigation, and termination." *See* App. Ex. 5, Attachment A, p. 8. Further, Joseph relied on Wenzel for support and guidance as she made plans to sue the Institute, even going so far as to seek Wenzel's advice on what information to send to her attorneys or her feedback on information received from her attorneys. *See* App. Ex. 6-8.[8] Wenzel was helping Joseph keep track of her "Timeline of harassment" as early as July, 2018. *See* Wenzel Dep. 228:4-21, 230:21-232:22; App. Ex. 12-13. Despite the fact that she had not worked at GT for years prior, Wenzel also provided input on several documents Joseph submitted internally, such as staff evaluations, follow ups from internal meetings, and her February 8, 2019 internal complaint. *See* App. Ex. 11, 14-16. Finally, the few WhatsApp messages which were in the dataset provided to GTAA are an indication of the close personal relationship these two women had. Just a few days after Wenzel's last day at Georgia Tech, Joseph texted Wenzel

---

[8] Indeed, Joseph was apparently sending communications and drafts of documents written by her attorneys to Wenzel without her attorneys' knowledge or consent, *see* App. Ex. 9, and it appears as though Wenzel may have been drafting documents for Joseph to send to her counsel. *See* App. Ex. 10-11.

"Sitting in your office and I'm about to throw up I can't do this," an apparent reference to having to continue working at GT after Wenzel had left. App. Ex. 2. The amount and nature of correspondence between the two is a clear indication of their close personal relationship and of how heavily involved Wenzel was in assisting Joseph with navigating her workplace.

Given the close nature of their relationship, it is reasonable then to expect that there would be some level of text traffic between Joseph and Wenzel, particularly in light of how prone Joseph herself is to using text as a primary method of communication. In 2018 alone, Joseph sent or received more than 67,000 messages. App. Ex. 17, ¶ 17(e). During her deposition, Joseph testified that she and Wenzel texted each other a "normal" amount and estimated that it could be as often as "weekly." When asked how frequently they texted, she responded "I don't recall. I mean, it's – not a ton **but not very little either.** It's just normal." *See* Pl. Dep. 430:12-24 (emphasis added). Yet, in the dataset provided to GTAA, which Joseph purports to be complete,[9] there are virtually no text messages exchanged between the two; not so much as a "Happy Birthday," "Running late," or a "Can you call?" The complete sets of messages between Joseph and Wenzel

---

[9] *See* App. Ex. 18, June 30, 2021 letter from counsel, indicating that Defendants are in possession of "every single text message Plaintiff sent during her employment."

which were in the dataset provided by Joseph to GTAA are attached hereto.[10] The

iMessage chain, App. Ex. 1, contains just eight messages exchanged between

Joseph and Wenzel.[11] The WhatsApp chain, App. Ex. 2, goes dead after January,

2016.[12] Interestingly, there is not a single message sent from Joseph to Wenzel

from July 28, 2018 until March 4, 2019, during which time it has been established

she was actively preparing for this lawsuit, was discussing her workplace

complaints with Wenzel, and, in fact, had become a client of Wenzel's. *See, e.g.*,

Joseph Dep., 321:4-12, 355:11-24, 546:11-547:16, 562:16-22, 564:3-18; Wenzel

Dep., 26:9-27:3; 32:12-25.

Joseph provided confusing and somewhat self-contradictory testimony

related to her texting habits with respect to Wenzel. During the second day of her

deposition, Joseph was asked whether she and Theresa Wenzel exchanged text

---

[10] The attachments comprise those message chains which are one-on-one conversations between Joseph and Wenzel. There are a number of other "group" threads on which both women are included, along with other people, but the BOR's focus was and is on communications between Wenzel and Joseph only.
[11] It appears as though Joseph had Wenzel saved in her phone under a different name – Theresa Eckhler. *See* App. Ex. 1; App. Ex. 17, ¶ 19. Wenzel testified that the name Eckhler has no meaning to her. Wenzel Dep. 9:13-17; 43:21-44:4. The number in the iMessage chain, however, is that identified as belonging to Wenzel. *Compare* App. Ex. 1, iMessage chain, *with* App. Ex. 5, Attachment A., p. 8 (Plaintiff's Initial Disclosures, listing phone number for Wenzel).
[12] The only message in the WhatsApp chain that appears after January, 2016, is a message from the app itself, indicating that messages and calls were protected with end-to-end encryption. App. Ex. 2.

messages regarding Title IX and what it requires of college athletic departments.
Pl. Dep. 348:17-349:7. Joseph initially responded "It's possible," but added that
"we hardly text." In response to follow-up questions, she affirmed that she
frequently uses text messaging, but indicated that it was not Wenzel's preferred
method of communication. Pl. Dep. 349:8-18. Later in the deposition, however,
after the lunch break, Joseph, unprompted, indicated a desire to clarify the record.
She then corrected her prior testimony and seemed to indicate that, in fact, she did
not intend to agree with counsel's characterization that Wenzel was "not a big
texter." She asserted that she *does not* agree with that characterization and she and
Wenzel do exchange text messages. Pl. Dep. 429:11-431:10. It was at this point
that Joseph provided the testimony that she and Wenzel text "a normal amount."
Later, Joseph was asked whether she and Wenzel used any platforms other than
iMessage to text and she testified that they used WhatsApp at least while she was
in Europe. Pl. Dep. 572:15-21.

Wenzel also provided contradictory testimony regarding her texting habits
with Joseph. Early in her deposition, Wenzel was explicitly asked about her text
messages with Joseph and unequivocally confirmed that she had used both texts
and WhatsApp to communicate with Joseph. Wenzel Dep., 25:1-4. She was asked
specifically about whether she and Joseph used texting or WhatsApp more

frequently and she confirmed that she and Joseph probably used WhatsApp more than iMessage. Wenzel Dep., 25:5-10. When asked again, just moments later, that she probably used WhatsApp more than text messaging to communicate with Joseph, Wenzel again confirmed. Wenzel Dep., 26:4-8. Then, much later in the day, Wenzel backtracked and indicated that she actually meant to say that she used WhatsApp to communicate with her clients and that she did not believe she used that application to communicate with Joseph. Wenzel Dep. 169:3-22. Of course, in addition to being her friend, Joseph is also a client of hers. Pl. Dep. 26:4-27:3.

Even more curious is the fact that, almost immediately after Joseph was placed on administrative leave, text messages between she and Wenzel seem to resume at a steady pace. *See, e.g.,* App. Ex. 19, approximately 35 messages exchanged between February 27, 2019 and March 31, 2019.[13] Indeed, the post-termination messages which were produced do indicate a level of text traffic that one might expect from friends – there are a number of messages asking for a phone call or indicating a missed call, such as "Sorry, I can't talk right now." Joseph and

---

[13] Joseph produced these messages after her deposition and has indicated that they were pulled from a Samsung device that she obtained after her access to her GTAA-issued phone was cut off. *See* App. Ex. 18, p. 2. They were, therefore, not in the data set provided to GTAA, which only included information from Joseph's GTAA-issued devices.

Wenzel also used text messaging to make plans to meet up. *See*, *e.g.,* App. Ex. 20-21.

Joseph would have the BOR and this Court believe that, despite their close personal relationship, despite their purported professional relationship, and despite Joseph's testimony that she frequently sought Wenzel's guidance during what she has claimed was a tumultuous time for her in the workplace, she and Wenzel exchanged only eight messages over the course of more than three years. They then suddenly began texting on a regular basis, occasionally with references to Joseph's employment at GT and their collaborative efforts to prepare for this lawsuit. *See, e.g.* App. Ex. 22 (Joseph texting Wenzel "Before Todd is deposed we need the tv interviews he did"). The conspicuous absence of even mundane texts between them during the relevant time frame suggests that Joseph took steps to remove her messages with Wenzel from her GTAA-issued devices.

   *b.  Joseph was under a duty to preserve evidence.*

Every party to litigation has a duty to preserve evidence which it has reason to believe might be relevant to the anticipated litigation. *See Graff v. Baja Marine Corp.*, 310 Fed. App'x 298, 301 (11th Cir. 2009). Joseph's duty to preserve arose as early as May 1, 2018, but no later than June, 2018. These dates are known because they are the dates Joseph herself has identified as when attorney-client

privilege and work-product protections began to apply. *See* App. Ex. 23 (excerpts of Plaintiff's Privilege Log).[14] Work product only protects those documents which are prepared "in anticipation of litigation." *See* Fed. R. Civ. P. 26(b)(3)(A). Thus, Joseph was clearly anticipating litigation against Georgia Tech by the summer of 2018 and should have preserved her communications which she could reasonably foresee would be relevant to her claims or the BOR's defenses, including communications related either to her workplace complaints or her efforts to prepare for this lawsuit.

### c. Additional discovery cannot replace the lost evidence.

The BOR attempted to recover the missing messages by subpoenaing the only other person who could provide them: Theresa Wenzel. However, Ms. Wenzel testified that she has her phone set to auto-delete her WhatsApp messages after 7 days and her iMessages after 30 days. Wenzel Dep., 23:4-24:25. In addition to the auto-delete functions, she regularly goes through her messages and deletes threads. *Id.* Wenzel also testified that she does not believe she has anything set to back up to a cloud service. Wenzel Dep. 170:14-19. Further, as noted above, the parties are in agreement that once text messages have been lost, any attempts to

---

[14] The number of times Wenzel's name appears in Joseph's privilege log is another curious indicator of Wenzel's intimate involvement with this case. *See* App. Ex. 9.

retrieve them beyond those already made in this case are extremely costly,

imperfect, and unlikely to yield complete information. The BOR is therefore

unable to retrieve the missing messages through any additional discovery.

> d.  *The BOR has been prejudiced by the destruction of the evidence at issue.*

In any retaliation case under Title VII or Title IX, a plaintiff is first required

to establish a prima facie case by demonstrating, among other things, that she

engaged in protected conduct under the relevant statute. *See Holifield v. Reno*, 115

F.3d 1555, 1566 (11th Cir. 1997) (discussing the *prima facie* case under Title VII);

*Bowers v. Bd. of Regents of the Univ. Sys. of Ga.*, 509 Fed. App'x 906, 911 (11th

Cir. 2013) (applying Title VII framework to a Title IX claim of retaliation). "An

employee who seeks protection under the opposition clause [of Title VII] must

have a 'good faith, reasonable belief' that her employer has engaged in unlawful

[employment] discrimination." *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346,

1351 (11th Cir. 1999). The objective reasonableness of an employee's belief is

measured against existing substantive law. *Id.* Because Joseph attempts to bring

retaliation claims under both Title VII and Title IX, her retaliation claims must be

predicated on good faith, reasonable beliefs that Georgia Tech engaged in unlawful

employment discrimination (for the Title VII claims) and that it engaged in

unlawful discrimination in the provision of resources and benefits within its athletic department (for the Title IX claims). To prevail on her retaliation claims, Joseph must demonstrate that she not only *genuinely* believed that she and the WBB team were being discriminated against, but also that those beliefs were reasonable in light of the law as it existed at the time. Simply put, advocacy for additional resources, naked complaints that Georgia Tech failed to provide women's basketball with the same budget allocations as men's basketball, or even complaints that GT was treating Joseph or the women's basketball team unfairly, are not enough to establish protected conduct under either Title VII or Title IX. *See, e.g. Jeronimus v. Polk Cnty Oppt'y Council*, 145 Fed. App'x 319, 326 (11th Cir. 2005) (general complaints of "harassment" or "hostile environment" insufficient to establish protected conduct); *Boyland v. Corr. Corp. of Am.*, 390 Fed. App'x 973, 975 (11th Cir. 2010) ("Unfair treatment, absent discrimination …, is not an unlawful employment practice under Title VII."); *Stimson v. Stryker Sales Corp.*, Case No. 1:17-CV-00872-JPB, 2019 U.S. Dist. LEXIS 234773, *7-8 (N.D. Ga. 2019); *see also* 34 C.F.R. §106.41(c) (Title IX implementing regulation which states that "unequal expenditures for male and female teams … will not constitute noncompliance with this section.").

Because the relevant legal issues involve a close analysis of the plaintiff's claimed protected conduct, the BOR sought to discover more details about Joseph's complaints. As part of that effort, the BOR served upon Plaintiff a specific request for production which sought "all text messages, emails, letters, notes, chats, or any other document reflecting a communication between you and Theresa Wenzel which discusses, references, or documents any claims of discrimination or retaliation made during the course of your employment with GT." *See* App. Ex. 24, Board of Regents' Requests for Production of Documents, Req. No. 3. Communications with a trusted friend and confidant about her workplace struggles exchanged at or around the time of the verbal complaints or alleged adverse actions would be more competent evidence of Joseph's claimed protected conduct than *post hoc* discovery responses crafted by her attorneys, particularly where that friend assisted with editing the few written complaints Joseph does have, as Wenzel did. *See* App. Ex. 7, 14, 30. In response to this request, the BOR received over a hundred emails, but no text messages or other messages, notes, or letters of any kind.

As demonstrated above, it is clear from what was produced in discovery that Joseph and Wenzel regularly communicated about Joseph's workplace issues in the 2018-2019 school year. Joseph testified that she sent documents to Wenzel

because "I trusted her, and I didn't know who else to go to to help me sort through everything that was going on at Georgia Tech with the administration and the equity issues I had. She was a friend of mine." Pl. Dep. 321:4-12. She also testified that Wenzel was assisting Joseph with "organizing her documents," referencing the many emails she forwarded to Wenzel over the '18-'19 school year.[15] Pl. Dep. 546:11-20; 547:3-16.

It is also evident from what was produced that Joseph had some awareness that her complaints were not genuine or were not being made in good faith. *See*, *e.g.,* App. Ex. 26 (indicating that travel was not a problem anymore and asking whether Joseph should "beef up" her claims of harassment); Pl. Dep. Ex. 13, pp. 19-20 (transcript of an October 31, 2018, NCAA investigation interview during which Joseph indicates no issues "whatsoever" with Stansbury or Rountree, and that her issues with Engel and Lewis were "small issues, they're not big issues.").

---

[15] The '18-'19 school year would not mark the first time Joseph sought Wenzel's advice and guidance but endeavored to keep it a secret from GT. One detail from the 2016 Sanford investigation (during which Joseph was investigated based on her assistant's complaints that Joseph was mis-using the assistant) that elicited concern was the fact that Joseph had instructed her new assistant to reach out to Wenzel – who no longer worked at GT and had not for many months – to discuss the budget process. Joseph further instructed the assistant not to inform Marvin Lewis, the then-CFO, "or anyone downstairs." *See* App. Ex. 25.

Importantly, throughout this lawsuit, Joseph has claimed that she held these concerns about discrimination for *years*, yet, prior to February 8, 2019, she failed to put them in writing. The February 8 complaint itself was apparently only drafted following a December 12, 2018, meeting with her supervisor wherein he suggested that, if Joseph really had serious concerns, she should write them up. Pl. Dep. 376:14-21, 380:2-12. When questioned during her deposition about why she took so long to write up her concerns after her supervisor suggested she do so, Joseph responded that the holidays were the cause of the delay. Pl. Dep. 384:16-385:3. She also testified that she did not recall anyone helping her draft the document. Pl. Dep. 380:13-20, 381:14-382:16. Documents produced after her deposition revealed, however, that Joseph was working with her attorneys to craft the internal complaint and that she circulated drafts of the complaint to several of her friends, including Theresa Wenzel. [16] *See* App. Ex. 27-30.

> e.  *Joseph acted with an intent to deprive the BOR of the information for use in the litigation*

Before a court can issue sanctions such as a negative inference, the court must first find that the party "acted with the intent to deprive another party of the

---

[16] This is not to imply that there is anything nefarious about consulting with counsel during what one perceives to be a tense time in the workplace; the point is simply that one shouldn't be evasive about that fact in a deposition.

information's use in the litigation." Fed. R. Civ. P. 37(e)(2). In the Eleventh

Circuit, "parties can establish the requisite bad faith through either direct or

circumstantial evidence." *United States EEOC v. GMRI, Inc.*, Case No. 15-20561-

CIV-Lendard/Goodman, 2017 U.S. Dist. LEXIS 181011, *68 (S.D. Fla. 2017).

During her deposition, Joseph claimed ignorance as to the whereabouts of any

now-lost text messages. She testified that her current devices are set to retain

messages forever[17] and she repeatedly claimed that she "did not recall" deleting

any messages between she and Wenzel, or that she did not "recall deleting any text

messages from Theresa Wenzel that would be relevant." Pl. Dep. 572:25-573:23,

581:22-582:4. Joseph has never provided any alternative explanation for where the

now-missing messages between she and Wenzel could be. For instance, there has

been no claim that her phone malfunctioned in any way. In short, Joseph has not

provided any innocent explanation for where the messages are.

　　　Perhaps the most compelling piece of information which indicates that

Joseph acted with an intent to deprive the BOR of the now-missing data is the fact

that Joseph retained possession of her GTAA-issued electronic devices following

her termination, necessitating a months-long effort by GTAA to retrieve data from

---

[17] Although she indicated she did not remember what her phones were set to in
2018. Pl. Dep. 573:8-14.

those devices in a usable format. On its own, this might not be remarkable, if not for the following: Joseph was told the day she was fired that she needed to return her phone and computer.

During the course of discovery, the BOR requested copies of any recordings Joseph made during the course of her employment. *See* BOR RPD to Plaintiff, Req. No. 2, served on May 12, 2020. In her initial production, Joseph produced six recordings of staff meetings she attended with other GT employees in response to this request. Then, in or around December, 2020, during a telephone call between counsel, Plaintiff's counsel confirmed to the undersigned, after explicit inquiry, that there were no additional recordings to be produced. However, during the course of Joseph's deposition, it was revealed that Joseph recorded her termination meeting. Pl. Dep. 522:4-16; 528:4-529:14. That recording reveals that, during the brief conversation in which she was informed of her termination, Joseph specifically inquired about whether she needed to return anything to the school and was told she needed to turn in her phone and computer.[18] App. Ex. 31 at 3:00. Counsel for Joseph have indicated that, prior to her deposition, they were unaware of the existence of this recording because Joseph had forgotten about it. *See* App.

---

[18] Joseph was also somewhat evasive during her deposition when asked whether she was ever told to return her devices. *See* Pl. Dep. 538:21-539:18.

Ex. 18, p. 3. So, despite Joseph's claims that she had been anticipating litigation for nearly a year by the time she was actually fired, and despite the fact that she had been gathering documents, consulting with her friends, and represented by litigation counsel for at least six months prior to her termination, Joseph would have everyone believe that she recorded her termination meeting and simply forgot to tell her lawyers about it.

The alternative, and more likely, conclusion is this: despite unambiguous instructions to return her phone and computer (given in response to her own specific inquiry, no less), Joseph retained those devices in an effort to conceal information which might damage her case. Rather than immediately inform her attorneys, she made a conscious decision **not** to tell them that she had recorded the instructions to return the phones and computer, resulting in a lengthy negotiation which could have, and should have, been avoided. Joseph's actions are indicative of an intent to deprive the BOR of information for use in the litigation, warranting sanctions against her.

## IV.   CONCLUSION

Following several years of mediocre performance and notice of a major NCAA investigation into her program, MaChelle Joseph became afraid that she would lose her job. In an effort to insulate herself, she gathered documents and

consulted with attorneys and friends for months in an attempt to lay the

groundwork for a legal claim against the Institute. Despite these attempts, or

perhaps because of them, Joseph's claims of intentional discrimination remain

vague and ill-defined. Communications which reflect her actions and mindset at

the time she claims to have been engaging in protected conduct and experiencing

harassment and retaliation would go to the heart of any defense the BOR could

mount, yet there is a conspicuous absence of any messages between Joseph and

Wenzel, one of her most trusted confidants and a person who would, herself, have

a working knowledge of Title IX equity-in-athletics requirements. Those

communications might have been found on Joseph's GTAA-issued phone, had she

returned it when originally asked to do so. The weight of the evidence indicates

that Joseph intentionally retained her devices in an effort to prevent the Board of

Regents from using information on those devices in this case. Such conduct by a

party to litigation cannot be condoned. Therefore, pursuant to Rule 37(e)(2)(A), the

BOR respectfully requests an order that this Court will presume that the lost

information was unfavorable to Joseph, that it would have shown that her

complaints were not reasonable or being made in good faith, and that it will take

that presumption into account at summary judgment. In addition, should any

portion of the case survive summary judgment and proceed to trial, the BOR

requests that the Court permit it to introduce evidence related to Joseph's

spoliation for jury's consideration.

Respectfully submitted, this 31st day of August, 2021.

CHRISTOPHER M. CARR        112505
Attorney General

BRYAN K. WEBB              743580
Deputy Attorney General

KATHERINE POWERS STOFF     536807
Senior Assistant Attorney General

_s/ Courtney C. Poole_
COURTNEY C. POOLE          560587
Assistant Attorney General

Please serve:

Courtney C. Poole
Assistant Attorney General
Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone:  (404) 458-3353
Email: cpoole@law.ga.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(C) in 14-point Times New Roman type face.

This 31st day of August, 2021

*s/ Courtney C. Poole*
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2021, I electronically filed this

**DEFENDANT BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF**

**GEORGIA'S MOTION FOR SANCTIONS** with the Clerk of Court using the

CM/ECF system which will automatically send email notification of such filing to

the following attorneys of record:

Edward D. Buckley
edbuckley@buckleybeal.com
Colleen Coveney
Coveney@kmblegal.com
Lisa J. Banks
banks@kmblegal.com
Joseph E. Abboud
Abboud@kmblegal.com
Marilyn Robb
Robb@kmblegal.com
Kyle Brooks
kbrooks@buckleybeal.com
*Counsel for Plaintiff*

Christopher Paul Galanek
chris.galanek@bclplaw.com
Tania Faransso
tania.faransso@wilmerhale.com
Jamie Yood
Jamie.yood@wilmerhale.com
*Counsel for Defendant Georgia Tech Athletic Association*

*s/ Courtney C. Poole*
Assistant Attorney General