

# Transcript of Julie Joyce

**Date:** May 21, 2021
**Case:** Joseph -v- Board of Regents of the University System of Georgia, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF GEORGIA
                   ATLANTA DIVISION
 3   - - - - - - - - - - - - - -x
 4   MACHELLE JOSEPH,        :
 5          Plaintiff,       :
 6     v.                    :   Civil Action No.
 7   BOARD OF REGENTS OF     :   1:20-CV-00502-TCB
 8   THE UNIVERSITY SYSTEM   :
 9   OF GEORGIA and GEORGIA  :
10   TECH ATHLETIC           :
11   ASSOCIATION.,           :
12          Defendants.      :
13   - - - - - - - - - - - - - -x
14
15          Deposition of JULIE JOYCE
16              Conducted Virtually
17             Friday, May 21, 2021
18                  9:36 a.m.
19
20   Job No.: 372825
21   Pages: 1 - 238
22   Reported By: Michelle Taylor
23
24
25
```

## Page 2

```
 1      Deposition of JULIE JOYCE, conducted virtually:
 2
 3
 4
 5
 6
 7
 8      Pursuant to notice, before Michelle Taylor,
 9   Notary Public in and for the State of Maryland.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF:
 3      LISA J. BANKS, ESQUIRE
 4      COLLEEN E. COVENEY, ESQUIRE
 5      JOSEPH ABBOUD, ESQUIRE
 6      MARILYN ROBB, ESQUIRE
 7      Katz, Marshall & Banks, LLP
 8      1718 Connecticut Avenue, Northwest
 9      Sixth Floor
10      Washington, D.C. 20009
11      (202) 299-1140
12
13   ON BEHALF OF DEFENDANTS:
14      KATHERINE POWERS STOFF, ESQUIRE
15      Georgia Attorney General's Office
16      40 Capitol Square Southwest
17      Atlanta, Georgia, 30334-9057
18      (404) 656-3393
19
20
21
22
23
24
25
```

## Page 4

```
 1   A P P E A R A N C E S   C O N T I N U E D
 2   ON BEHALF OF DEFENDANTS:
 3      TANIA CHRISTINE FARANSSO, ESQUIRE
 4      BENJAMIN JAMES YOOD, ESQUIRE
 5      WilmerHale
 6      1875 Pennsylvania Avenue, Northwest
 7      Washington, D.C. 20006
 8      (202) 663-6000
 9
10   ALSO PRESENT:
11      MaChelle Joseph, Plaintiff
12      Caleb Welsh, AV Technician
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

C O N T E N T S

EXAMINATION OF JULIE JOYCE          PAGE
BY MS. COVENEY                        8

E X H I B I T S

(Attached to transcript.)

JOYCE DEPOSITION EXHIBITS           PAGE
Exhibit 1   LinkedIn Profile         27
Exhibit 2   BOR-010033               36
Exhibit 3   BOR-008748               39
Exhibit 4   BOR-0015476              55
Exhibit 5   Plaintiff 009883         65
Exhibit 6   BOR-010695               67
Exhibit 7   B0R-005124               71
Exhibit 8-1 BOR-001270               72
Exhibit 8-2 Report                   72
Exhibit 9   BOR-004810               79
Exhibit 10  BOR-005517               83
Exhibit 11  BOR-004725               86
Exhibit 12  BOR-004726               91
Exhibit 13  BOR-004476               93
Exhibit 14  BOR-004376 to 77         95

**7**

C O N T E N T S   C O N T I N U E D

Exhibit 37  BOR-002053              197
Exhibit 38  BOR-005386              201
Exhibit 39  BOR-001146              202
Exhibit 40  BOR-010654              206
Exhibit 41  BOR-003553              207
Exhibit 42  BOR-003231              214
Exhibit 43  BOR-004382              217
Exhibit 44  Joyce 00004             223
Exhibit 45  BOR-1                   224
Exhibit 46  BOR-004556              232
Exhibit 47  BOR-0024650             233

**6**

C O N T E N T S   C O N T I N U E D

Exhibit 15  BOR-004741              107
Exhibit 16  BOR-004379              109
Exhibit 17  BOR-004742              110
Exhibit 18  Document 69             112
Exhibit 19  Exhibit 67              115
Exhibit 20  Plaintiff's 0006961     116
Exhibit 21  Plaintiff's 014323      126
Exhibit 22  BOR-0016023             129
Exhibit 23  Plaintiff's 009330      132
Exhibit 24  Plaintiff's 007585      134
Exhibit 25  Joyce 00001             139
Exhibit 26  BOR-004422              140
Exhibit 27  BOR-001626              148
Exhibit 28  Plaintiff's 009702      149
Exhibit 29  BOR-001739              158
Exhibit 30  BOR-002826              164
Exhibit 31  Plaintiff's 009702      167
Exhibit 32  BOR-003109              170
Exhibit 33  BOR-001140              177
Exhibit 34  BOR-000583              181
Exhibit 35  BOR-03226               191
Exhibit 36  BOR-004390              195

**8**

P R O C E E D I N G S

THE REPORTER:  Will counsel please stipulate that in lieu of formally swearing in the witness, the reporter will instead ask the witness to acknowledge that their testimony will be true under the penalties of perjury, that counsel will not object to the admissibility of the transcript based on proceeding in this way, and that the witness has verified that she is, in fact, Julie Joyce.  Do you agree?

ALL COUNSEL:  I agree.

THE WITNESS:  I agree.

THE REPORTER:  Do you hereby acknowledge that your testimony will be true under the penalties of perjury?

THE WITNESS:  I do.

THE REPORTER: All set, Counsel.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MS. COVENEY:

Q  Good morning, Ms. Joyce.  Thank you for being here with us today.  As I said earlier, my name is Colleen.  I'm one of the lawyers representing MaChelle in this case and I will be taking your deposition today.  So I'm just going to start with some preliminary questions.

**9**

1    So you're under oath.  You have the
2 obligation to tell the truth under penalty of
3 perjury.  Do you understand?
4    **A Yes.**
5    Q Okay.  And so I'm going to be asking you
6 some questions.  The court reporter is going to be
7 transcribing your answers, so it is important that
8 you speak clearly and, you know, a yes or no
9 answer, just say that audibly and not nod your
10 head so she can get that down on the record.
11    If you don't understand a question, please
12 just ask me to clarify.  I'm happy to clarify
13 anything for you.
14    If you need to take a break for any
15 reason, just let me know and we can do that.
16    And from time to time, defense counsel may
17 object to some of my questions, so just let them
18 get their objection on the record and then you can
19 answer the question.  We just don't want people
20 talking over each other.  Okay?
21    **A Okay.**
22    Q All right.  And one last thing, which is
23 unique to this remote deposition.  As I have
24 multiple screens open, I have a huge binder, I
25 have documents everywhere, so if I'm not -- if it

**10**

1 doesn't look like I'm looking directly at you, I
2 am, or -- you know, you have my undivided
3 attention, so I apologize in advance.  It's a
4 little awkward.
5    Okay.  So Are you represented by counsel
6 today?
7    **A No.**
8    Q Have you ever been deposed before?
9    **A No.**
10    Q Is there any mental or physical reason why
11 you would not be able to give accurate testimony
12 today?
13    **A No.**
14    Q What did you do to prepare for this
15 deposition?
16    **A I gave the e-mails to you -- not -- sorry,**
17 **text messages, not e-mails.  I did speak briefly**
18 **with USG's counsel because I was not -- I was kind**
19 **of surprised I had to be deposed, and that's**
20 **pretty much it.**
21    Q And when did you speak with -- and
22 by USG's counsel, do you mean Courtney Poole or
23 Katie Stoff?
24    **A Yes.**
25    Q When did you speak with them?

**11**

1    **A Last Friday.**
2    Q And you reached out to them, and what did
3 you all discuss?
4    **A Just where the case was, and that was**
5 **pretty much it.  I asked why I was being asked to**
6 **be deposed and got more information on kind of**
7 **where we're at.**
8    Q And did you review any documents to
9 prepare for the deposition today?
10    **A Just the text and making sure I didn't**
11 **have any other documents to produce.**
12    Q And did you bring any notes with you
13 today?
14    **A No.**
15    Q Okay.  So given this is a remote
16 deposition, I'm going to ask a few questions like
17 I normally wouldn't ask.
18    Where are you right now?
19    **A In my house, which is a little weird.**
20    Q Is there anyone in the room with you?
21    **A No.**
22    Q Okay.  And do you have a smart phone or
23 any sort of tablet with you today?
24    **A I do.  I have my phone right here.**
25    Q So if you communicate with anyone on that

**12**

1 phone about the content of your testimony today,
2 I'm going to ask you to please preserve all of
3 those communications for us.  Okay?
4    **A Yes.**
5    Q And then -- so you have your web -- you
6 know, a web browser up.  Do you have any like
7 chats open or running, any other applications on
8 your computer going?
9    **A No.**
10    Q All right.  So I'm going to ask a little
11 background -- some questions about background and
12 how you communicated with people when you were at
13 Georgia Tech.  Okay?
14    **A Okay.**
15    Q It's my understanding you are no longer at
16 Georgia Tech; is that right?
17    **A Correct.**
18    Q And when you were at Georgia Tech, did you
19 have a Georgia Tech-issued cell phone?
20    **A I did, yes.**
21    Q Do you recall what that -- the phone
22 number was that was associated with that?
23    **A Yes.  It was (470) 786-1174.**
24    Q Okay.  And what kind of phone was it?
25    **A An iPhone.**

13

1    Q  And who paid the bill?

2    **A  Georgia Tech.**

3    Q  Okay.  And what did you use the phone for,

4    did you use it to speak on the phone to call

5    people?

6    **A  Yes.**

7    Q  Did you talk about work-related things?

8    **A  Yes.**

9    Q  Did you have an e-mail app on there were

10   you could communicate by e-mail on your Georgia

11   Tech e-mail?

12   **A  Yes.**

13   Q  Okay.  And did you have a text messaging

14   function on that phone?

15   **A  Yes.**

16   Q  And did you use text message as a way to

17   communicate with your colleagues about work?

18   **A  Yes.**

19   Q  Did you use text message frequently to do

20   that, to communicate about work?

21   **A  Probably daily.**

22   Q  And when you left Georgia Tech, what did

23   you do with that phone?

24   **A  I gave it back to Georgia Tech.**

25   Q  Okay.  And when did you leave Georgia

14

1    Tech?

2    **A  July -- July 1, 2020.**

3    Q  Okay.  And so prior to you leaving, at any

4    point in time did anyone from Georgia Tech ask you

5    to preserve text messages or evidence that was on

6    your work-issued phone?

7    **A  I don't recall.**

8    Q  Okay.  Do you recall anyone ever -- after

9    Coach Joseph was terminated, do you recall anyone

10   from Georgia Tech sending you any sort of

11   litigation hold letter or an e-mail saying you

12   need to preserve evidence related to MaChelle

13   Joseph and her termination?

14   **A  They may have.  I don't recall.**

15   Q  Okay.  And so in addition to your

16   work-issued phone, did you also have a personal

17   phone?

18   **A  Yes.**

19   Q  And what kind of phone was that?

20   **A  An iPhone.**

21   Q  And what was that phone number?

22   **A  (205) 994-1766.**

23   Q  Okay.  And did you use your personal phone

24   to communicate with your colleagues about work?

25   **A  Occasionally.**

15

1    Q  Okay.  And was there a reason that you

2    used your personal phone instead of your

3    work-issued phone to communicate at work?

4    **A  If I didn't have my work phone or it was**

5    **out of batteries, I may have reached out using my**

6    **personal phone, but only if I didn't have my work**

7    **phone.**

8    Q  Okay.  And would you text message on your

9    personal phone sometimes with Georgia Tech

10   colleagues?

11   **A  Yes.**

12   Q  About work-related issues?

13   **A  Yes.**

14   Q  Okay.  But you only did that when you

15   didn't have your Georgia Tech phone, as kind of a

16   one-off thing?

17   **A  Correct.**

18   Q  Okay.  So I'm going to run through a list

19   of people and I would like you to tell me whether

20   you recall texting with any of them in 2018, 2019.

21   So this is the year that Coach Joseph was

22   terminated, okay.  And if you recall texting them

23   about issues related to Coach Joseph.  Okay?

24        Aisha Oliver-Staley ?

25   **A  No, I don't recall.**

16

1    Q  No, or you don't recall?  Is it possible

2    you communicated?

3    **A  It's possible.**

4    Q  Okay.  What about Kevin Cruz (phonetic)?

5    **A  Yes.**

6    Q  Joeleen Akin?

7    **A  Yes.**

8    Q  Felicia Tucker?

9    **A  I don't recall.**

10   Q  Mark Roundtree?

11   **A  I don't recall.**

12   Q  Todd Stansbury (phonetic)?

13   **A  I would say no there.  I don't think we**

14   **ever texted.**

15   Q  Kim Harrington?

16   **A  I don't recall.**

17   Q  Okay.  Kate Wasch?

18   **A  Yes.**

19   Q  Bud Peterson?

20   **A  No.**

21   Q  Lynn Durham (phonetic)

22   **A  No.**

23   Q  Eric Hoffman?

24   **A  Yes.**

25   Q  Marsha Boles Steadaker (phonetic) ?

17

1    A I don't recall.
2    Q Burns Newsome?
3    A I don't recall.
4    Q And did you have any occasion to text
5  message with any players -- then current players
6  or former players on the women's basketball team?
7    A No.
8    Q What about any of their parents? Did you
9  text message with any of their parents?
10   A No.
11   Q All right. So I'm going to talk to you a
12 little bit about other ways you may have been
13 communicating with people at Georgia Tech. So
14 we've established that you had a work-issued
15 phone, that you used that phone to text message
16 your colleagues on a daily basis.
17      Did you have any other messaging platforms
18 or applications on your phone that you used to
19 text message or to message people, like WhatsApp
20 or Snapchat, Instagram, Facebook?
21   A No.
22   Q Okay. And then at Georgia Tech, did you
23 all have any sort of computer-based messaging apps
24 or instant messaging services like a Slack or
25 Microsoft teams?

18

1    A Teams.
2    Q You had teams. And did it have a chat
3  function in there?
4    A Yes.
5    Q Would you use the chat function to
6  communicate with your colleagues about
7  work-related issues?
8    A Yes.
9    Q Okay. How frequently did you use the chat
10 function?
11   A Not until the pandemic.
12   Q Okay. During the 2018, 2019 year, did you
13 have Microsoft teams chats that you were using?
14   A I don't recall using it until 2020.
15   Q 2020. Okay.
16      Okay. So now I'm going to talk a little
17 bit about your note taking practices. We have a
18 handful of documents that have been produced in
19 this litigation that appear to be typed-up notes
20 from you. And it appears from those that you are
21 a pretty thoughtful and detailed note taker; is
22 that fair to say?
23   A I think it's fair to say.
24   Q Okay. And what was your note -- what were
25 your note taking practices in your role in HR?

19

1  Did you take notes frequently?
2    A It's a -- can you kind of rephrase what --
3    Q Sure. So if -- you know, if you had
4  meetings with, you know, a person who wanted to
5  file a complaint with HR, would you take notes of
6  that meeting?
7    A Yes.
8    Q If you had a meeting with the respondent
9  who had been alleged of wrongdoing by the person
10 who had just come to you with an HR complaint,
11 would you take notes of that meeting?
12   A Yes. If I was the person taking the
13 notes, yes.
14   Q Okay. If you had a meeting with, you
15 know, Dr. Harrington or Kevin Cruz to talk about
16 these complaints that had been filed, would you
17 take notes of those meetings?
18   A No. And that's why I asked because some
19 meetings -- it would depend on the reason for the
20 meeting as to whether I was taking notes.
21   Q Okay. So there were -- it's my
22 understanding you participated in a lot of
23 meetings related to complaints that have been
24 filed against Coach Joseph in the 2018-2019 school
25 year. And I'm just going to run through some of

20

1  those meetings and I just want you to tell me if
2  you recall taking notes -- okay --
3    A Okay.
4    Q -- about these meetings. So do you recall
5  that at some points students -- it had been
6  alleged that students had filed complaints against
7  Coach Joseph? Do you recall that happening?
8    A Yes.
9    Q And did you participate in any meetings
10 about those student complaints?
11   A Yes.
12   Q Did you take any notes about any of those
13 meetings?
14   A I probably took some notes.
15   Q Okay. What about -- so at some points, a
16 couple of staff members also filed complaints
17 against Coach Joseph in the 2018-2019 school year,
18 Felicia Tucker and Brittany Oliver. Do you recall
19 that?
20   A Yes.
21   Q And did you take notes of any meetings
22 about their complaints?
23   A I don't recall specific notes I took, but
24 I probably took some notes.
25   Q Okay. All right. It's my understanding

**21**

1 that you were involved in the decision to retain
2 the law firm of Littler Mendelson to investigate
3 Coach Joseph; is that right? Were you involved in
4 discussions about that?
5    **A Was I in the discussion?**
6    Q Did you participate in any conversations
7 about retaining a law firm to investigate these
8 allegations that had been brought against Coach
9 Joseph?
10    **A I was not part of the decision making, but**
11 **I recall the discussion.**
12    Q And did you take any notes of that
13 conversation or any of those conversations?
14    **A No.**
15    Q No, you did not. Okay.
16      What about the decision to place Coach
17 Joseph on administrative leave, did you take any
18 notes around that?
19    **A No.**
20    Q Okay. And when you took notes, did you
21 take them -- did you handwrite them and then type
22 them up?
23    **A It depends if my notes were important.**
24 **Sometimes I would just take a note to remember**
25 **generally what was said so I can go back to it,**

**22**

1 like the date.
2    Q So did you --
3    **A I might taken a note. If I took notes**
4 **from -- in exercise where I was asked to take**
5 **notes, then I would take notes either on a**
6 **computer or by hand and then make sure I went**
7 **back -- I'm not the best typer -- and make sure**
8 **there were no typos and they were clear.**
9    Q Did you have a specific notebook where you
10 kept your notes?
11    **A Yes.**
12    Q Okay. And at any point, either before or
13 after Coach Joseph was terminated, did anyone from
14 Georgia Tech ask you to provide them your notes?
15    **A I don't recall. If I was asked, I**
16 **provided them.**
17    Q But you don't know if anyone ever asked?
18    **A I don't remember.**
19    Q Okay. And when you left Georgia Tech,
20 what did do with those notes?
21    **A I didn't save anything that I took with**
22 **me.**
23    Q Did you take your notes with you when you
24 left?
25    **A I don't have any notebooks.**

**23**

1    Q So did you leave them at Georgia Tech when
2 you left?
3    **A I don't know, but -- no. I don't think**
4 **so, no.**
5    Q Okay. So if you didn't leave them, then
6 you took them with you; is that --
7    **A I must have.**
8    Q So you took them with you, and do you
9 still have them?
10    **A No.**
11    Q Okay. So you threw them away, disposed of
12 them somehow?
13    **A Yes. I didn't need them anymore.**
14    Q Okay. Is it possible that these notes are
15 still at Georgia Tech somewhere?
16    **A I don't know.**
17    Q Okay. And so earlier I asked you -- are
18 you familiar with the term "litigation hold
19 letter."
20    **A Yes.**
21    Q Okay. And earlier I asked you if you
22 ever -- if you recall receiving a litigation hold
23 letter asking you or directing you to preserve
24 documents relevant to this case. Do you recall
25 receiving such a letter or communication?

**24**

1    **A Yes.**
2    Q You do?
3    **A I mean, I -- do I specifically recall**
4 **getting the e-mail with the hold, no. If it went**
5 **out, then I must have received it. I don't know.**
6 **I don't remember getting one specifically.**
7    Q Okay. Okay. At any point in time between
8 Coach Joseph's termination and today, did anyone
9 from Georgia Tech ask you to provide them any
10 documents? I know we talked about the text
11 messages, we talked about the handwritten notes,
12 but anyone come to you and say, do you have any
13 documents relevant to Coach Joseph and ask you to
14 provide those documents to them?
15    **A I don't remember.**
16    Q Okay. So now I'm going to switch gears a
17 little bit and talk about your employment
18 background a little bit.
19      So as I understand, you are not currently
20 a Georgia Tech employee; is that right?
21    **A Correct.**
22    Q Okay. And you left in July of 2020?
23    **A Correct.**
24    Q Why did you leave?
25    **A We agreed mutually that I would leave.**

25

1    Q  Was the separation voluntary?
2    A  Ultimately, yes.
3    Q  What did you mean by that?
4    A  We agreed mutually I would leave.
5    Q  Did you sign a separation agreement?
6    A  I did.
7    Q  Okay.  Did you assert any legal claims
8  against them?
9    A  I did.
10    Q  Okay.  And what claims did you assert
11  against them?
12    A  I'm not sure if I can share that.
13    MS. COVENEY:  I mean, this is in response
14  to a subpoena, so you can speak freely about the
15  facts.
16    THE WITNESS:  I had concerns because I did
17  feel like I was being asked to leave without cause
18  and the -- it was shortly after I had asked for
19  leave with the pandemic and to take care of
20  family.
21  BY MS. COVENEY:
22    Q  Okay.  So did you feel that you were being
23  discriminated against or retaliated against in any
24  sort of way?
25    A  I did.

26

1    Q  Okay.  And what type of discrimination did
2  you feel that you were facing?
3    A  Under the FMLA, so I felt like I had been
4  retaliated against for requesting FMLA, among
5  other things.
6    Q  And what were the other things?
7    A  I wasn't sure, to be honest.  Some to do
8  with just not understanding things and wondering
9  if it was personal.
10    Q  Okay.  And who did you believe that made
11  these decisions about your employment that you
12  thought were potentially retaliatory or
13  discriminatory?
14    A  My manager is the one who I communicated
15  with, so that is the person that I mentioned in
16  that complaint.
17    Q  And that manager was Dr. Harrington?
18    A  Correct.
19    Q  Okay.  Anyone else you thought was
20  involved in this or played a role?
21    A  No.
22    Q  Okay.  When you were at Georgia Tech, did
23  you ever have any concerns about any other forms
24  of discrimination or retaliation?
25    A  Against others that were unchecked?

27

1    Q  Yes.
2    A  Because that's my role is to investigate,
3  so if I had a concern, raise it.  So yes.
4    Q  You did have those concerns?
5    A  Yes, but that's my role is to raise it and
6  make sure it gets investigated and addressed.
7    Q  Okay.  Okay.  And did you have -- so you
8  asserted legal claims against Georgia Tech and
9  then you resolved -- you resolved those claims,
10  you entered into a separation agreement and you
11  left; is that right?
12    A  Correct.
13    Q  Okay.  And where are you working now?
14    A  I'm at RNDC, it's Republic National
15  Distributing Company.  It's a privately held
16  company based out of Atlanta.
17    Q  Okay.  All right.  I just want to go
18  through your employment history a little bit more.
19    MS. COVENEY:  Can you bring up Document 1,
20  Ms. Joyce's LinkedIn profile.
21    (JOYCE Deposition Exhibit 1 marked for
22  identification and attached.)
23  BY MS. COVENEY:
24    Q  Okay.  All right.  I'm sorry.  Ms. Joyce,
25  before we get to this -- to circle back quickly on

28

1  your separation from Georgia Tech, when
2  Dr. Harrington communicated that they were going
3  to let you go, did they give you a reason for
4  your -- for letting you go?
5    A  No.
6    Q  They just said it's not working out?
7    A  Correct.
8    Q  Okay.  So on the screen we have here your
9  LinkedIn profile.  Can you see that on your end?
10    A  Yes.
11    MS. COVENEY:  And can I have control of
12  this document?
13    Actually, can you give Ms. Joyce control
14  of this?  Sorry.
15  BY MS. COVENEY:
16    Q  Ms. Joyce, can you just scroll through
17  this and make sure everything here is accurate and
18  confirm that this is your LinkedIn profile.  I
19  just got it off the Internet.
20    A  So it looks like it, though it doesn't
21  have -- it doesn't look like it's on LinkedIn.
22    Q  Yeah.  So there is a function on the
23  LinkedIn page, if you want to convert it to a PDF,
24  like, this is how it looks.  This is how it will
25  reformat the document.  We will go through

---

29

1  specific entries so you can more -- you can review
2  each of those, and if there are any inaccuracies,
3  just let me know. Okay?
4      **A  Sure.**
5      Q  All right. So it looks like you have an
6  undergraduate degree and then a law school, and
7  after law school, you worked for three law firms;
8  is that right?
9      **A  Correct.**
10     Q  Okay. And did you have particular area of
11  practice at those firms?
12     **A  Uh-huh. Employment, labor and employment.**
13     Q  Were they all defense side firms?
14     **A  Yes.**
15     Q  Okay. All right. So then after working
16  in private practice, it looks like you moved over
17  to Coke in 2009 to work in an HR capacity.
18       And so why did you decide to leave the
19  practice of law and go into HR?
20     **A  My heart was not really into it. I didn't**
21  **enjoy it.**
22     Q  All right. Let's take a quick look at
23  the -- your experience listed there under the Coke
24  entry and just confirm if all of that is accurate.
25     **A  That looks correct.**

---

30

1      Q  All right. So then in August of 2016, you
2  left Coke to go work at Georgia Tech as the senior
3  director of HR; is that right?
4      **A  Yes.**
5      Q  And why did you leave Coke?
6      **A  So I came in with Coca-Cola Enterprises**
7  **and they were selling off. Coca-Cola Enterprises**
8  **is the bottler and Coca-Cola Refreshments was what**
9  **the company became and Coca-Cola company bought it**
10  **and they were selling back out pieces of CCE to**
11  **local bottlers, and my position was going away. I**
12  **started looking for other roles inside and outside**
13  **the company.**
14     Q  Okay. And it says here that you were the
15  senior director of HR at Georgia Tech. Is that
16  the role you held the entire time you were there?
17     **A  When I first started, I was senior HR**
18  **director HR VP, then -- employee relations and HR**
19  **VP, and then moved to senior director HR.**
20     Q  Okay. And in this role, who did you
21  report to?
22     **A  Kim Harrington.**
23     Q  And did you report to her the whole time
24  you were there?
25     **A  Yes.**

---

31

1      Q  So we're just going to walk through some
2  of the duties that you list here. So you say that
3  you oversaw and you directed HR business partner
4  teams.
5        So what are HR business partner teams?
6      **A  Teams of HR business partners. Yeah, team**
7  **of HR business partners.**
8      Q  Okay. So it looks like -- we have an org
9  chart. We'll go over that in a little bit, but it
10  looks like each department within Georgia Tech had
11  an HR business partner assigned to it.
12     **A  Correct.**
13     Q  So it was like you have the institute and
14  then you have all these various departments in it,
15  and there are people who are assigned to each of
16  those departments to do HR; is that right?
17     **A  Yes.**
18     Q  And you oversaw and directed their work?
19     **A  Correct.**
20     Q  Okay. Did these HR business partner
21  teams -- did they have separate HR policies that
22  applied to their departments or was it all within
23  Georgia Tech's HR policies?
24     **A  There were some different practices based**
25  **on the department, but the HR policies for the**

---

32

1  **institution applied across.**
2      Q  Okay. Okay. And did the athletic
3  department have an HR business partner?
4      **A  They had a couple while I was there.**
5      Q  All right. In 2018-2019, who was that
6  business partner, do you remember?
7      **A  I know Kevin Cruz was the business**
8  **partner, I believe, in 2018.**
9      Q  Okay.
10     **A  I believe maybe 2019 as well.**
11     Q  And then after MaChelle -- after
12  Ms. Joseph was terminated, did they replace Kevin
13  Cruz with someone else in athletics?
14     **A  I don't remember the timing exactly, but**
15  **Season Lewis took over that spot.**
16     Q  Do you know why?
17     **A  Yes, because I made that decision because**
18  **both of them were very unhappy, Season and Kevin,**
19  **to try a different arrangement to see if we could**
20  **find a better fit for them.**
21     Q  Okay. So you oversaw and directed HR
22  business teams, you were responsible for HR
23  policies, compliance, strategic human resource
24  management and employee relations.
25        So when you say you were responsible for

## 33

1  the HR policies, that was HR policies for the
2  entire institute you were responsible for?
3  **A   I didn't -- I supported, generally**
4  **speaking.  I was not the person for every HR**
5  **policy, no.**
6      Q   Okay.  And did you ever draft or revise
7  any of them?
8  **A   Yes.**
9      Q   Did you have any -- do anything to monitor
10 compliance with these HR policies and practices?
11 Did your team --
12 **A   Yes.**
13     Q   Okay.  And then it says you are
14 responsible for employee relations, you supported
15 a team of five employee relations professionals in
16 developing investigation best practices.
17     Okay.  When you use the term "employee
18 relations" what are you referring?  Is that like a
19 separate function in HR?
20 **A   Yes.**
21     Q   Okay.  What does the employee relations --
22 is it a department or just a set of people?
23 **A   It is a set of investigators, people that**
24 **are part of a group.  I don't know if we**
25 **technically termed it a department, but it's a**

## 34

1  **group in our office is  in employee relations.**
2      Q   Okay.  What were the primary duties of
3  those people?
4  **A   I don't have it in front of me, so I can't**
5  **give you the technical answer.  Just to make sure**
6  **if people had concerns about employee practices or**
7  **adherence with policies that we reviewed and**
8  **investigated and made recommendations on that.**
9      Q   Okay.  And you supervised those people as
10 well; is that right?
11 **A   Correct.**
12     Q   And then here it says you supported them
13 in the development of an investigation best
14 practices and processes and providing
15 institute-wide employee relations support and
16 counsel.
17     So you developed investigation best
18 practices at Georgia Tech?
19 **A   We did.**
20     Q   Okay.  And investigation of what?
21 Employee relations complaints?
22 **A   I don't totally understand the question.**
23     Q   What sort of things -- you developed
24 investigation best practices, but what were these
25 investigations?  What were these practices?  What

## 35

1  kind of complaints were they -- were you
2  investigating?
3  **A   As I said before, policy, questions,**
4  **concerns, anything around -- I have a manager who**
5  **isn't doing this correctly or any kind of employee**
6  **concerns with how they are being treated.**
7      Q   Okay.  And were these practices -- were
8  they written somewhere?
9  **A   The investigation practices?**
10 **A   Yes.**
11 **A   So that's what we were trying to do is to**
12 **make sure that we had a consistent practice SOP,**
13 **so to speak.  I don't know if we got -- we had --**
14 **I worked with my team to develop an SOP.  It never**
15 **became as formal as I would have liked.**
16     Q   Okay.  And what's an SOP?
17 **A   The -- I'm sorry, I can't think of what it**
18 **stands for.  I'm a little on the spot, but it's**
19 **basically to have -- make sure that we had**
20 **documented process and procedures.**
21     Q   Okay.  So you were working on that -- that
22 was one of the things you were working on in your
23 role at Georgia Tech, and it existed in some form
24 or fashion is; that right?
25 **A   Correct.**

## 36

1      Q   Okay.  And it was written?
2  **A   Yes.**
3      Q   Okay.  And is that what it was called, an
4  SOP?
5  **A   Yes.**
6      Q   Okay.  All right.  So in your role as
7  senior director of HR, did you put on any
8  trainings on the policies or procedures that you
9  were overseeing?
10 **A   Yes.**
11     Q   Okay.  Did you ever do trainings on
12 Title 7 or Title 9?
13 **A   Not on Title 9.  I can't recall one on**
14 **Title 7.**
15     Q   Okay.  What about any trainings on
16 retaliation, did you ever do any of those?
17 **A   I don't remember a training on**
18 **retaliation.**
19     Q   Okay.  So I'm just going to go over the
20 org structure on an HR real quickly.
21     MS. CONVENEY:  Caleb, can you pull up
22 Exhibit 4, BOR-010033.
23     (JOYCE Deposition Exhibit 2 marked for
24 identification and attached.)
25

37

1   BY MS. COVENEY:
2       Q   So here at the bottom of the document, it
3   says that this was updated January 23, 2019. And
4   here we have you right here at the top, and then
5   we have your -- it looks like employee relations,
6   people that you supervise. Are these the five
7   people who you supervised in employee relations in
8   2018, 2019?
9       A   I supervised those people. I don't
10  remember the dates.
11      Q   Okay. And then here are all the HR
12  business partners. You also supervised all of
13  these people, correct?
14      A   Yes.
15      Q   Okay. So we have here Kevin Cruz, HR
16  business partner of the athletic association. Is
17  that the same thing as the athletic department?
18      A   I don't know -- yes.
19      Q   Okay. And then who is Kevin Merkel, right
20  here on the left?
21      A   He's the senior director, total rewards
22  and payroll.
23      Q   And what did he do?
24      A   Total rewards and payroll compensation.
25      Q   Okay. And then real quick, there's

38

1   somewhere down here, Easter Warden (phonetic), HR
2   business partner of student life. What was her
3   role? What is student life?
4       A   It's a department within -- I just -- I
5   don't know the technical term for it, but it's a
6   department within Georgia Tech.
7       Q   And did she deal with student-related
8   issues?
9       A   Student life deals with student-related
10  issues, yes, but I don't know their full purview.
11      Q   All right. So what was the relationship
12  between the employee relations personnel and the
13  business partners? So if someone in the athletic
14  department had an employee relations concern,
15  would they go to Kevin Cruz or would they go to
16  you or one of the employee relations people?
17      A   I mean, they can go to whoever they feel
18  most comfortable going to, but the business
19  partner is generally the person they would go to
20  because they're the closest and have the most
21  direct relationship with the department.
22      Q   Okay. Was there an employee relations
23  consultant who works specifically with the
24  athletic department, for instance?
25      A   We did try to have assignments where

39

1   people would generally be associated with a
2   certain department. I don't remember who had
3   what.
4       Q   Okay. And do you remember in 2018, 2019
5   who was working -- which employee relations
6   consultant was working with the athletic
7   department?
8       A   I don't.
9       Q   Okay. I'm going to run through some HR
10  policies that we have quickly with you, see if
11  these are the ones that were in effect in the
12  2018-2019 school year and also ask just a couple
13  of questions.
14          MS. COVENEY: Caleb, can you bring up
15  Exhibit 8, BOR-008748.
16          (JOYCE Deposition Exhibit 3 marked for
17  identification and attached.)
18  BY MS. COVENEY:
19      Q   This was produced to us by Georgia Tech.
20  It's an employment policies manual. Is this a
21  document that was revised?
22      A   It is just showing the table of contents.
23  I don't see any that I revised.
24      Q   Have you ever seen this document before?
25      A   No. It was on -- online.

40

1       Q   It was on -- so you saw it online?
2       A   Well, the policies are online.
3       Q   Okay. But you don't recall reviewing this
4   document?
5       A   No.
6       Q   Okay.
7       A   It would have been nice to have.
8       Q   All right. So if you don't recall
9   reviewing this, I'm going to skip that for now.
10  We may go back to it at some point.
11          So I'm going to talk to you a little bit
12  about -- I'm going to talk to you a little about
13  investigations at Georgia Tech. It's my
14  understanding that you are with the person who was
15  developing the best practices for investigations
16  of HR complaints at Georgia Tech; is that right?
17      A   Correct.
18      Q   And so did every complaint -- well, I
19  guess, let me back up.
20          Is there a -- was there a general practice
21  for investigating complaints that were filed with
22  your office?
23      A   Can you give me more specifics?
24      Q   Yeah. Maybe we can use an example. So
25  let's assume that Katie here is -- I'm Katie's

41

1 subordinate employee, and I come to you and I
2 complain that Katie is being a bully to me. What
3 would you do with that complaint?
4 **A Well, like you said before, we meet with**
5 **the person and collect information first, before**
6 **we would figure out what we need to do next.**
7 Q Okay. So you would meet with me and --
8 **A Well, the investigator would, whoever was**
9 **assigned.**
10 Q So -- and if I had gone to someone else
11 first, like Katie's supervisor and said, Katie is
12 bullying me, would that supervisor -- were they
13 supposed to direct me to HR to say, why don't you
14 file a complaint with HR?
15 **A Not necessarily. Only if -- I mean,**
16 **because open door, if they feel like they can**
17 **address it, then they can have --**
18 Q So they may -- Katie's supervisor may try
19 to resolve the complaint first?
20 **A Correct.**
21 Q Okay. And if that didn't work, then
22 she -- the supervisor would generally refer me to
23 HR and say, talk to HR about this complaint?
24 **A That's their option. That's the option of**
25 **the employee is to go through the steps until they**

42

1 **feel like their complaint is resolved or we run**
2 **out of steps.**
3 Q Okay. So I end up filing a complaint with
4 HR. Someone on the employee relations team is
5 assigned to me. Is that to, like, my complaint?
6 Is that how that works?
7 **A Uh-huh.**
8 Q And then the first step is they'll gather
9 information about my complaint?
10 **A Yes.**
11 Q So they'll figure out why I think Katie is
12 bullying me?
13 **A Right.**
14 Q Okay. And -- so they will meet with me in
15 person, they'll get a complaint, they'll take --
16 will they take notes typically of my complaint or
17 have me right some sort of statement?
18 **A Yes, one of those.**
19 Q Okay. What about -- I know there is
20 something called EthicsPoint. Would you have me
21 file a complaint with EthicsPoint?
22 **A We didn't have a process consistent that**
23 **required you to go through EthicsPoint.**
24 Q So that would be an option?
25 **A It is an option.**

43

1 Q Okay. All right. So I tell the
2 investigator or the employee relations person my
3 complaint, they take down details or have me write
4 a statement, and then happens after that?
5 **A Well, it would depend on what your**
6 **complaint is and how best to address. But**
7 **generally speaking, if there were facts there that**
8 **needed to be investigated to understand if there**
9 **was a violation or some kind of concern or**
10 **something, just to better understand all of the**
11 **facts, we would investigate.**
12 Q Okay.
13 **A The investigator would.**
14 Q Okay. And before you opened up an
15 investigation, would you go to Katie and say,
16 listen, Colleen's filed this complaint against
17 you. She's alleging that you're bullying her?
18 **A We didn't have a consistent practice on**
19 **that, because the goal is to make sure we are**
20 **doing the investigation in a way that makes the**
21 **most sense to get it -- get it done without**
22 **causing further harm.**
23 Q Okay. Was there -- was it important or
24 was it a practice at Georgia Tech to try to
25 resolve complaints informally before they blew up

44

1 to a full-blown investigation?
2 **A I wouldn't say that was -- it depended.**
3 Q On what?
4 **A On how serious the allegations were. So**
5 **if something -- if someone came to us and we**
6 **talked to them and we -- we always asked people --**
7 **well, I'd like to think we do -- that the best**
8 **practice is to ask people, how would you like this**
9 **resolved. And so if there was a way to resolve it**
10 **without doing a full investigation, depending**
11 **again on the nature and the person and what they**
12 **want, then it may not be that we do a full-blown**
13 **investigation.**
14 Q Okay. So in the example of I come to you
15 and complain that Katie is bullying me, under what
16 circumstances would you not tell Katie about my
17 complaint?
18 **A Well, they would always be told, you know,**
19 **about the complaint at a point in the**
20 **investigation, because we're not -- it's -- we are**
21 **trying to make sure we are being fair to all**
22 **parties of concern.**
23 Q Okay. I mean, presumably, Katie would
24 have an explanation as to why -- as to what I
25 perceive to be bullying behavior, correct?

45

1    A I'm getting confused with the name. Katie
2  is my boss?
3    Q Katie is my boss.
4    A Okay. And she --
5    Q Katie's my boss and I think she's bullying
6  me, and I come to you and I say, Katie is bullying
7  me, I need help. And one of your investigators
8  says, okay, let me get some information, they take
9  down the facts. They either write it down or they
10 have me write a statement. And I'm wondering --
11 in my mind, it seems to make sense to go to Katie
12 and say, Colleen has filed a complaint alleging
13 that you are bullying her. What's your response
14 to that? That seems to make sense in terms of
15 trying to resolve a conflict.
16      And so what I want to know from you, is
17 that -- was that your general practice, typically?
18    A Is to go talk to the person and say that
19 they have this complaint against them?
20    Q Tell the respondent, so and so -- Colleen
21 has filed a complaint. She thinks you are
22 bullying her. What do you say to that?
23    A It depends on the allegations and the
24 context of the complaint. I can't give you a 100
25 percent answer. What we would try to do, though,

46

1  is make sure we've given both sides the
2  opportunity to speak. You know, we don't assume
3  something is correct. That's all I can say is we
4  would make sure we talk to both parties of
5  concern.
6    Q Okay. Before the investigation started?
7    A Not necessarily. No.
8    Q During the investigation. At some point
9  during the investigation -- I mean, if you're --
10 if --
11    A Yes. Yes. During the investigation.
12    Q And would you provide -- I mean, so I come
13 to you and I say, Katie is bullying me, and I give
14 you examples of what that bullying behavior is.
15 Would you tell that to Katie and say, Colleen has
16 alleged this. What is your response?
17    A Yes. That's -- I mean, yes. That's what
18 the investigator would do.
19    Q Okay. So when you say the investigation,
20 is this an investigation that your office is doing
21 or that an external resource is doing?
22    A My office.
23    Q Okay. And are there instances -- I mean,
24 we've seen them in this case, I assume there are.
25 But are there instances where your office would

47

1  retain an outside investigator to investigate a
2  complaint?
3    A My office doesn't retain the -- in this
4  case, we did not retain an external investigator,
5  but yes, there were instances.
6    Q Okay. So whose office retained Littler in
7  this case?
8    A I don't know.
9    Q But it was not you?
10    A No.
11    Q And it was not your office?
12    A No.
13    Q Okay. So -- well, does your -- does your
14 office ever retain an external investigator?
15    A Yes.
16    Q Okay. And who -- are you the person who
17 makes that decision typically?
18    A So I don't -- I did not determine every
19 single investigator. Sometimes the ER
20 investigator would just use the same person or go
21 to someone because we have a group of people.
22 They would usually run it by me that they were
23 going go with this group or that group.
24    Q When you say you had a group of people, so
25 you had like a list of like your go-to

48

1  investigators for a certain type of complaint that
2  you used over and over again?
3    A Uh-huh.
4    Q Okay. And was Littler one of those go-to
5  firms?
6    A Yes.
7    Q And had you ever worked with Eric Hoffman
8  before 2018, 2019?
9    A No.
10    Q Okay. So in terms of retaining an outside
11 law firm, it's typically your office that makes
12 that decision, either you or someone on your team;
13 is that right?
14    A Correct.
15    Q Okay. And When you retain the outside law
16 firm to investigate, what role does HR play in
17 that investigation typically? Like, do you sit
18 down with the investigator and say, here are the
19 facts, go do what you need to do, or are you kind
20 of working in tandem with the investigator?
21    A I wouldn't say in tandem. I would say the
22 hope -- because we are hiring someone to do an
23 independent investigation, that's the bonus, that
24 we can hand it off and it would go from there.
25 But we would be a resource if they needed to have

49

1  witnesses or know how do I get in touch with this
2  person or that person.  So we do support them
3  usually throughout the investigation -- or did.
4      Q  And typically with the investigator, they
5  would do most of the leg work.  Well, I guess, let
6  me rephrase that.
7          Would the investigator, the independent
8  investigator do most of the leg work in terms of
9  mapping out the investigation plan for the
10  investigation?
11     A  Yes.
12     Q  They would typically identify people who
13  they thought should be interviewed?
14     A  So they would work with different
15  resources to do that and they would ask us -- they
16  would ask the investigator, they would ask -- they
17  would try to get information to identify who are
18  the people we need to talk to given the facts.
19     Q  Okay.  But they would ultimately decide
20  who to interview?
21     A  Yes.
22     Q  And would they tell you what documents
23  they needed?
24     A  Yes.
25     Q  Okay.  So they do their investigation, and

50

1  with -- when they are investigating, would someone
2  from your office sit in on the investigator's
3  interviews?
4      A  At times.  We would support as necessary.
5      Q  Would you say more often than not you or
6  someone on your team would sit in with the
7  investigator?
8      A  No.
9      Q  How -- when would you sit in on the
10  interviews?
11     A  I can't say consistently there was a
12  practice.  It was case by case.
13     Q  Okay.  And what about -- so the
14  investigator -- the investigator interviews
15  people, and then at some point, does the
16  investigator write up a report of his or her
17  findings?
18     A  Yes.
19     Q  Okay.  And along the way does the
20  investigator provide updates to you or whoever is
21  leading the investigation from your office?
22     A  Yes.
23     Q  Are these updates like, I've interviewed
24  everyone?  Or are they, I've interviewed everyone
25  and here is what they said?

51

1      A  I can't say again.  It would be if they
2  wanted to update us and make us aware or ask
3  questions, they might give us more than "I'm
4  done."  It would really depend if they need
5  additional assistance or support.
6      Q  Okay.  And then they would draft up their
7  report.  Would they send their report to you or
8  whoever on your team is leading the investigation
9  to review before it went final?
10     A  Yes.
11     Q  Okay.  Did you ever edit any of those
12  reports?
13     A  There were multiple times we edited, yes.
14     Q  Okay.  So then -- so they draft the
15  report, they send it to you, you edit it if you
16  need to and --
17     A  We would edit and send it back and say
18  does this -- for typos, for making sure the names
19  are correct.  We don't edit for content.
20     Q  You don't edit for content?
21     A  No.
22     Q  Okay.  And then who would decide what
23  discipline to assess?
24     A  Ultimately it's the manager's
25  determination what discipline to assess.  We give

52

1  recommendations based on past practice.
2      Q  Okay.  And what role did President
3  Peterson play in a typical HR investigation?
4      A  What do you mean by "typical HR
5  investigation"?
6      Q  Generally speaking, did President Peterson
7  play a role in HR investigation?  Did you keep him
8  updated about most of your HR investigations?
9      A  No.
10     Q  Okay.  What about -- do you know who Lynn
11  Durham is?
12     A  Yes.
13     Q  Who is Lynn Durham?
14     A  I don't know her title.
15     Q  She was the chief of staff to President
16  Peterson, I think is her title.  So did you -- in
17  most of your HR investigations, did you keep Lynn
18  Durham in the loop about what was going on?
19     A  Not to my knowledge.
20     Q  Okay.  And then what about -- who is -- do
21  you know Kate Wasch?
22     A  Yes.
23     Q  And who is Kate Wasch?
24     A  I don't know her title.
25     Q  She is -- I believe she's Georgia Tech's

53

1 chief employment litigation counsel. She worked
2 in employment-related legal functions, I think, at
3 various points when you were there. But did she
4 play a role in HR investigations ever?
5 **A Yes. We were -- because we did labor and**
6 **employment legal, we would go to her for support**
7 **on occasion.**
8 Q And when would you go to her? Like, why
9 would you need to involve her?
10 **A Well, we're not legal for Georgia Tech, so**
11 **we would go if we had a legal question.**
12 Q Okay. And would you say that generally
13 speaking that you would consult with her on your
14 HR investigations or was it more of a one-off
15 thing?
16 **A It was as needed.**
17 Q Okay. So it wasn't a regular practice to
18 be consulting with her on HR investigations?
19 **A Only when we had a legal question.**
20 Q Okay. And so let's go back to my example
21 earlier where I come to your office and I file a
22 complaint. I say, Katie is being a bully. And I
23 meet with someone from your office and they take
24 notes. And before the investigation starts, I
25 come to the investigator, and I say, actually, I

54

1 don't want to do this anymore. I don't want to
2 move forward with this investigation, what would
3 you do?
4 **A If we have the facts, we don't just stop.**
5 **If there is information in our possession that**
6 **there is a wrongdoing, we would have to move**
7 **forward with it. If the person didn't want to**
8 **participate, there is actually a USG policy that**
9 **states they don't have to. But we would typically**
10 **just try to, you know, move it forward the best we**
11 **could.**
12 Q Okay. So if it was a serious allegation,
13 even if -- even if I didn't want to move forward
14 and even if I stop responding to you, you would
15 still move forward with the investigation?
16 **A Yes.**
17 Q I think that's all I have on that.
18 So I'm going to switch gears now and talk
19 about some specific HR investigations that
20 happened mostly when you were there. This one
21 we're about to talk about -- I don't think you
22 were there at the time, but I still want to go
23 over it with you real quick.
24 Okay. So do you know who Paul Johnson is?
25 **A I think so. Can you remind me?**

55

1 Q He is -- he was the football coach at
2 Georgia Tech.
3 **A I didn't know. The name is familiar, but**
4 **yeah, okay.**
5 Q So you don't -- you're not familiar with
6 Coach Johnson?
7 **A No.**
8 Q Okay. Do you recall if anyone ever
9 complained about Coach Johnson when you were
10 there?
11 **A No.**
12 Q You don't recall?
13 **A No.**
14 MS. COVENEY: All right. Can you bring up
15 Document 12. It's BOR-0015476.
16 (JOYCE Deposition Exhibit 4 marked for
17 identification and attached.)
18 BY MS. COVENEY:
19 Q So this is an EthicsPoint -- as I
20 understand it is an EthicsPoint complaint that was
21 filed by a student against Coach Johnson, it looks
22 like on March 7, 2016. So was that before you
23 started at Georgia Tech?
24 **A Yes.**
25 Q Okay. So I'm just going to go through

56

1 some things on this document with you.
2 So is this generally what an EthicsPoint
3 complaint looks like? Is this how?
4 **A Yes.**
5 Q And I guess to back up a little -- so what
6 is EthicsPoint?
7 **A An external site that people use for**
8 **filing confidential complaints. I mean, they can**
9 **also put their name in there, but it was developed**
10 **so people have a resource to file complaints**
11 **confidentially is my understanding.**
12 Q Okay. So you can remain anonymous?
13 **A Correct.**
14 Q Okay. And what was the point of filing
15 something anonymously like? Like, you just
16 wanted -- if you had a concern about something,
17 but you didn't want to be drug [sic] into the
18 investigation, you could just go on here, put it
19 in -- put your complaint into EthicsPoint and then
20 someone would investigate?
21 **A Yes.**
22 Q Okay. So the person who files it can
23 remain anonymous the whole time if they wanted to?
24 **A I think so. I don't know the -- if**
25 **somebody -- the hard part was sometimes people**

57

1  would put so much information, it was clear who it
2  was and that would come out.
3      Q  Okay.  So I'm just going to run through
4  some of the stuff with you.  So we have here --
5  there's this alert.  It says "green."  What does
6  this alert mean?
7      A  I don't know.  I never -- no.  I don't
8  know.
9      Q  You don't know.  Okay.
10      Okay.  Let's see.  Assigned tier GTI.  Do
11  you know, is that Georgia Tech Institute?
12      A  I don't know.
13      Q  Okay.  So here we have this is where you
14  input whoever is filing the complaint, the
15  information.  So you have the option to remain
16  anonymous, correct?
17      A  Yes.
18      Q  Okay.  And then we go down here.  It says,
19  What is the general nature of this matter?
20      So is this -- is There like a drop-down
21  menu where you can select things, or do you just
22  type in what your concern is?
23      A  I don't remember the exact.
24      Q  All right.  So he is alleging moral
25  misconduct and emotional abuse.  He's saying it's

58

1  happened several times.  And then he provides the
2  detail of his complaint here, which it looks like
3  he is copying and pasting a letter to a Dr. Paul
4  Kohn.  Do you know who that is?
5      A  No.
6      Q  So we're not -- we won't get into the
7  details of this.  I can tell you that he alleges
8  that Coach Johnson was bullying him and subjecting
9  him to emotional and verbal abuse and that when he
10  told Coach Johnson that he did not want to be on
11  the team anymore and asked that his scholarship be
12  upheld, Coach Johnson said, Fine, and then
13  subsequently, Coach Johnson canceled his
14  scholarship.  So I think he's alleging both abuse
15  and maybe retaliation here.
16      When a student complains like this about
17  emotional abuse, what policy -- Georgia Tech
18  policy does that implicate?
19      A  Well, it's a student, so my group would
20  not handle it.
21      Q  Your group typically does not handle
22  complaints by students; is that right?
23      A  Correct.
24      Q  And who typically handles complaints by
25  students?

59

1      A  Student life.
2      Q  Student life.  Okay.
3      So now if we go to the bottom here, there
4  is a note from Melissa Hall.  Do you know who
5  Melissa Hall is?
6      A  Yes.
7      Q  Who is she?
8      A  I don't know her title.  She worked in the
9  audit department, internal audit.
10      Q  And so then it says, Thank you.  The
11  institute takes these matters seriously and the
12  complaint will be routed to the appropriate
13  institute officials for action.
14      And who in this instant would be the
15  appropriate institute officials?
16      A  Someone who --
17      Q  Student life?
18      A  This was 2016?
19      Q  It was, yeah.
20      A  I don't know how this would have been
21  routed.
22      Q  Okay.  So then we have Latoya Peterson
23  saying, We reached out via e-mail on March 16th
24  regarding this matter.  To date we have not
25  received a response.  Please follow up by

60

1  April 15th, and if not, this matter will be
2  closed.
3      So earlier you said if you receive a
4  complaint that's serious that you would move
5  forward with it even if the complainant wasn't
6  responding; is that true?
7      A  Yes.
8      Q  Okay.  But they are saying here it is
9  going to be closed if he doesn't respond.
10      A  You have to ask them.
11      Q  Okay.  All right.  And then we have here
12  restricted access, so you can restrict people's
13  access to these complaints?
14      A  Uh-huh.  I think it's automatic.  If it is
15  about a person that they can't see it if they have
16  access to the system or their next level.  That's
17  what I was told.
18      Q  This case access list, what is this?  Are
19  these people who have viewed this at some point in
20  time?
21      A  I don't know.
22      Q  Okay.  Who would know?  Who monitors these
23  EthicsPoint complaints?
24      A  Who has access to the system and really
25  kinds of drives that, I think Melissa Hall would

61

1 be the right person to ask.
2 Q Okay. So now at the bottom of the page,
3 it said, We reached out twice to the initiator
4 with no response. We will continue to monitor for
5 trends should additional information or increase
6 come in, and promote best practices.
7 So when you came on board in August, did
8 you take any steps to monitor any trends in the
9 football team in terms of --
10 A No, not the students.
11 Q No.
12 A And I've never seen this before.
13 Q Okay. So that's all I have on that.
14 MS. COVENEY: I think we can take just a
15 quick break, maybe ten minutes, come back at
16 10:55.
17 THE WITNESS: Sure.
18 (A brief recess was taken.)
19 BY MS. COVENEY:
20 Q Ms. Joyce, now I am going to switch gears
21 and start talking about some investigations that
22 you worked on involving Coach Joseph. So we are
23 going to start way back in 2016. I know that was
24 a long time ago. And before we start talking
25 about this, remind me when you started -- when did

62

1 you start at Georgia Tech? What month?
2 A August 1, 2016.
3 Q Okay. So at some point in 2016, a woman
4 named Ginger Sanford (phonetic) filed a complaint
5 against Coach Joseph; do you recall that?
6 A Yes.
7 Q And had Ms. Sanford filed that complaint
8 with your office before you started working at
9 Georgia Tech?
10 A Not sure.
11 Q Did she file the complaint with you?
12 A No.
13 Q Okay. Do you recall who she filed it
14 with, who in HR she filed it with?
15 A So you said in HR. I don't know who she
16 filed it with.
17 Q You don't. Okay. Did you ever see a
18 written complaint from her?
19 A I don't recall a written complaint.
20 Q Okay. So Ms. Sanford filed this complaint
21 with HR, we believe, and at some point you are
22 pulled on to the investigation.
23 Do you remember who asked you to work on
24 the investigation?
25 A Well, the complaint came to me at some

63

1 point and we would have engaged to understand who
2 should investigate it. My understanding, we used
3 an outside investigator.
4 Q Okay. Did you make that decision to
5 retain an outside investigator?
6 A No.
7 Q Do you remember who did?
8 A No.
9 Q Was it someone at HR or someone in the
10 athletic department?
11 A I don't recall.
12 Q Okay. So you retained an outside
13 investigator whose name -- I can tell you was
14 Ginger -- also Ginger McRae. And at this point,
15 had you ever worked with Ms. McRae on an
16 investigation?
17 A No.
18 Q Okay. And so after Ms. Sanford files her
19 complaint and after Georgia Tech retains
20 Ms. McRae, you and Ms. McRae have a meeting with
21 Coach Joseph; do recall that?
22 A Yes.
23 Q Okay. And tell me what you recall from
24 that meeting?
25 A I was asked to sit in, so I did not ask

64

1 the questions. I was asked to sit in as an HR
2 resource.
3 Q Were you asked by Ms. McRae to sit in?
4 A No.
5 Q Who asked you to sit in?
6 A I don't recall who asked me to sit in. I
7 was asked to sit in.
8 Q So you sit in on this meeting, and do you
9 remember any of the specific, anything that was
10 discussed?
11 A Well, the allegations were discussed and
12 it was an interview, an investigatory interview.
13 Q Do you recall during that interview Coach
14 Joseph -- well, I guess, back up.
15 I can tell you that Ms. Sanford -- based
16 on the documents we have, Ms. Sanford had alleged
17 a couple of things. One of them was that Coach
18 Joseph had asked her -- Ms. Sanford was her
19 personal assistant -- sorry -- like executive
20 assistant. Coach Joseph had allegedly asked
21 Ms. Sanford to do some personal tasks for her and
22 she complained to HR about that.
23 Do you recall during this first meeting
24 with Coach Joseph and Ms. McRae, Coach Joseph
25 complaining that male coaches or male people in

65

1  the athletic department had been using their
2  executive assistants to do personal tasks and were
3  not being disciplined for that?
4      **A  I don't know when that came up.  I recall**
5  **that coming up at some point.**
6      Q  Okay.  All right.  I'm going -- I know
7  this was a very long time ago, so I'm going to use
8  a bunch of documents to work through this and
9  maybe that will help jog your memory on some of
10  this.  Okay?
11      MS. COVENEY:  Can you pull up Exhibit 15
12  for me, Plaintiff 009883.
13      (JOYCE Deposition Exhibit 5 marked for
14  identification and attached.)
15  BY MS. COVENEY:
16      Q  So this is an e-mail from Coach Joseph to
17  Joeleen Akin on September 9, 2016, so this, I can
18  tell you, was after your meeting with Coach Joseph
19  and Ms. McRae.  You don't need to read this whole
20  thing.  I am just going to point you to a couple
21  parts.  The bottom of this e-mail --
22      **A  I can't see it very well.**
23      Q  Oh, you can't, okay.  Is that better?
24      **A  Yes.**
25      Q  Okay.  So the bottom of this e-mail, Coach

66

1  Joseph complains to Ms. Aiken -- she's complaining
2  about the meeting that she had with Ms. McRae and
3  with you and she says, As a senior woman
4  administrator and my direct report, I feel it
5  necessary to let you know that I feel a level of
6  harassment, inequity, and unfair treatment.  I'm
7  extremely disappointed this was allowed to happen.
8  I am left wondering why this happened in this
9  manner and if it would have been handled in the
10  same manner if I was the football coach or the
11  men's basketball coach.
12      Okay.  So here she's lodging a
13  complaint -- or she's complaining that she feels
14  like she is being treated differently because of
15  her sex.  Do you understand it that way?
16      **A  She makes argument -- I mean, she's**
17  **talking about gender differences, yes.**
18      Q  Okay.  So then Joeleen Akin responds on
19  September 10th and says, Thanks for your e-mail
20  and thoughts.  I would like to sit down with Paul
21  and talk about this but need to talk with the HR
22  first and legal to make sure.
23      And Paul -- I can tell you was Paul
24  Griffin who was the interim athletic director at
25  the time.

67

1      **A  Lots of Pauls.**
2      Q  Pauls and Gingers.
3      So Joeleen is saying she wants to meet
4  with the HR person and legal about MaChelle's
5  complaint here.
6      Do you recall Joeleen meeting with you
7  about MaChelle's concern here?
8      **A  I don't recall a specific meeting.**
9      Q  Did Joeleen ever talk to you about this,
10  about MaChelle's complaint?
11      **A  She may have.  She may have.**
12      Q  Okay.  So after you -- you meet with Coach
13  Joseph, you get some information from her, you
14  tell her the allegations, and then do you remember
15  what happened next in the investigation?  Did
16  Ms. McRae interview other witnesses?
17      **A  I don't know what her witness schedule**
18  **was.**
19      Q  Okay.
20      MS. COVENEY:  Caleb, can you bring up
21  Exhibit 17, BOR-010695.
22      (JOYCE Deposition Exhibit 6 marked for
23  identification and attached.)
24  BY MS. COVENEY:
25      Q  So just go to the bottom.  Matt Johns,

68

1  Lee Hendrickson and copied someone,
2  nick@coachesinc, and sends a letter about the
3  investigation.  And Matt Johns was Coach Joseph's
4  lawyer at the time.  And who is Lee Hendrickson
5  here?
6      **A  She was an HR VP for athletics in 2016.**
7      Q  Okay.  And so was she working with you on
8  this investigation?
9      **A  She didn't have any involvement.  She was**
10  **just the HR VP.**
11      Q  Okay.  So you were leading this
12  investigation with Ms. -- or you were working on
13  it with Ms. Sanford.
14      **A  It was an employee relations matter, so it**
15  **was in my shop, but I was not leading it**
16  **technically.**
17      Q  But you were --
18      **A  I was working with --**
19      Q  Working with Ms. Sanford.  Okay.
20      Okay.  So Lee Hendrickson e-mails you and
21  asks how she should respond.  And we will get into
22  the letter from Matt Johns, who was just
23  complaining about some things related to the
24  investigation.  We're just going to go through a
25  few things in this e-mail here.

69

1    So Kate Wasch e-mails Lee Hendrickson and
2  you. We don't have the date of this e-mail. It's
3  sometime after September 19th. Okay. So Kate
4  Wasch is the employment litigation counsel,
5  correct?
6    A Yes.
7    Q Okay. So she gets involved in this
8  investigation at some point?
9    A Yes.
10   Q And do you know whose decision was it to
11 rope her into this?
12   A Well, Matt Johns is an attorney. We would
13 not respond to an attorney. We would then bring
14 in legal.
15   Q So Kate Wasch gets involved and there is
16 this issue in this paragraph. I still don't
17 understand what happened to audio recorders --
18 recordings, hard drives.
19    Do you recall this issue about these audio
20 recordings being taken?
21   A Oh, I'm reading it because I haven't seen
22 this, at least not in a long time. The collecting
23 of tapes, I don't know.
24   Q So do you know who Marvin Lewis is? Does
25 that name ring a bell?

70

1    A Yes.
2    Q So he was and is the associate athletic
3  director of administrative finance at Georgia Tech
4  in the athletic department. And he -- MaChelle --
5  Coach Joseph had budget meetings with him and she
6  had made some recordings of those meetings. Does
7  that -- do you recall any of that?
8    A What I recall is she had recorded -- I
9  understood she had recorded meetings and she was
10 concerned with making sure those were not -- that
11 those were preserved. I don't know. I actually
12 don't remember the issue with that. I remember
13 she had recorded some meetings.
14   Q Okay. All right. So then in this last
15 paragraph, you -- Kate Wasch says that maybe
16 someone misunderstood the scope of the litigation
17 hold.
18    So would -- did someone issue a litigation
19 hold at this point in 2016? Did people think
20 MaChelle was going to sue?
21   A Not to my knowledge.
22   Q So would -- your office ever issue
23 litigation holds?
24   A No.
25   Q Whose office would do that?

71

1    A Legal.
2    MS. COVENEY: Okay. Can you pull up
3  Exhibit 20 for me, please, B0R-005124.
4    (JOYCE Deposition Exhibit 7 marked for
5  identification and attached.)
6  BY MS. COVENEY:
7    Q So I'm going to focus on this e-mail right
8  here in the middle of the page. So it looks like
9  on September 20th, you respond to Lee Hendrickson
10 and Kate Wasch. And you say, Also don't know how
11 IT would have compensated anything as part of the
12 hold as they were not instructed to do so. My
13 e-mail request asked only that the two accounts be
14 placed only a hold.
15    So does this refresh your recollection
16 about what happened with this litigation hold?
17   A If I issued a litigation hold, and if we
18 issued a hold on their accounts, we would have
19 gone through legal to say the e-mail accounts,
20 which is just to make sure nothing gets deleted
21 or -- I don't even know if a hold is the right
22 word.
23   Q Okay. Do you remember anything about this
24 e-mail request right here, whose account you were
25 requesting being preserved?

72

1    A We would have tried not to make sure that
2  those accounts were preserved. But this is
3  different than the tapes and recordings and
4  things.
5    Q Okay. So Ms. McRae does her interview --
6  sorry -- does continue with her investigation, and
7  at some point sends you a report.
8    MS. COVENEY: Can you pull up Exhibit 18,
9  B0R-001270.
10    (JOYCE Deposition Exhibits 8-1 and 8-2
11 marked for identification and attached.)
12    MS. COVENEY: Is there -- there was an
13 e-mail that went with this.
14    Can you find -- well, I can -- can you
15 find BOR-001270. This is the e-mail that's
16 supposed to be attached to it.
17 BY MS. COVENEY:
18   Q So looks like on September 20th, Ginger
19 McRae sends you a copy of her report. And then
20 you forwarded it to Eric White. So who is Eric
21 White?
22   A He's the -- he was the employee relations
23 person assigned to athletics at the time.
24   Q Okay. So was he working on this with you?
25   A I wanted him to be aware of what was going

73

1  on in athletics, so at this point, now that the
2  investigation is done, we would make
3  recommendations on next steps.
4     Q  So he sends the report and then -- and did
5  you edit this report?
6     A  No, I don't recall editing it at all.
7     Q  All right.
8       MS. COVENEY:  Can we just click on the --
9  yeah, the report.
10 BY MS. COVENEY:
11    Q  So this is the report that was attached to
12 that e-mail.  Okay.
13      MS. COVENEY:  Can you give Ms. Joyce
14 control of this document real quick.  Just flip
15 through this.
16 BY MS. COVENEY:
17    Q  So in terms of format and detail, is this
18 report consistent with how outside investigators
19 prepare reports for you?
20    A  We did not have a template that we
21 provided them, so it really depended on the
22 investigator.  But this is consistent with
23 generally speaking, what their reports looks like.
24    Q  Okay.  And so let's look at BOR-1272.
25 There is numbers on the bottom.

74

1     A  I see that.  Okay.
2     Q  Okay.  So right here in this second
3  paragraph, this is a summary of -- sorry -- it
4  says, In her August 2016 complaint, she raised two
5  issues.
6       And just read that and let me know if this
7  is consistent with your recollection of what
8  Ms. Sanford had complained about and what was
9  investigated?
10    A  To the best of my recollection, that looks
11 right.
12    Q  And then there is this footnote 2, right
13 here.  Can you scroll just to the bottom.  Okay.
14 So it says, Sanford also raised concerns related
15 to Joseph's management style.  These concerns do
16 not implicate GT or USG policies.
17      Do you recall what allegations Sanford had
18 raised about Coach Joseph's management style?
19    A  I don't.
20    Q  And prior to moving forward with issuing
21 discipline to Coach Joseph in the case, in this
22 instance, did you try to talk to Coach Joseph
23 about these concerns?  Did anyone consider just
24 giving her like a verbal warning about it?
25    A  What do you mean "verbal warning?"

75

1     Q  Yeah.  Go to Coach Joseph and say, listen,
2  we have these allegations that you are using --
3  you're asking Ms. Sanford to do personal tasks.
4  You should not be doing that.  Please do not do
5  that going forward.
6     A  So verbal warning generally is like a
7  disciplinary step.  So you mean just a heads up
8  that the complaint had been filed and to stop if
9  she was doing that?
10    Q  Right.  I mean, was that -- did anyone
11 consider that as a possible disciplinary action
12 here?
13    A  We wouldn't do that.  We wouldn't take any
14 disciplinary action until we had the facts.
15    Q  Right.  So now you have the facts.  Now
16 you have, you know, that Coach -- Ms. Sanford is
17 alleging that Joseph had asked her to do a handful
18 of personal tasks.  I mean, would -- did anyone
19 talk about, okay, she is doing this, no one has
20 told her to do this before.  Maybe we should tell
21 her not do it and see what happens.  Was there
22 ever that discussion?
23    A  No one told her not to use her admin as a
24 personal assistant?
25    Q  Right.  Did anyone say, let's just give

76

1  her a verbal warning right now and say, don't do
2  this again?
3     A  I don't recall.  But we talked about what
4  level is appropriate given the violation and the
5  facts.
6     Q  Okay.  All right.  So here we have in
7  footnote 7, it says, When interviewed, Joseph
8  raised that she believed that had she been a male
9  coach, she would not have been questioned about
10 having staff perform personal work for her.  When
11 asked if she had information if a male or any
12 other head coaches had staff perform personal work
13 for him or her, Joseph said she did not want to
14 speculate or get in any trouble.  And then Joseph
15 provided no information about other head coaches.
16      Okay.  So here's this complaint again that
17 we talked about earlier, this complaint of you're
18 treating me differently than the male coaches.
19      Do you recall having the discussion with
20 anyone about investigating this particular issue?
21    A  Well, she did not provide specifics, but
22 we did go back and talk to the coaches and asked
23 them if they were doing that because we didn't
24 have any facts to investigate, but we did look
25 into it.

77

1    Q  And who made that decision?
2    A  It wasn't me, but I was involved in the
3  discussion.
4    Q  Okay.  Was it -- do you remember who it
5  was who made the decision to go back and
6  investigate?
7    A  No.
8    Q  Okay.  And so at this time, Joeleen Akin
9  was Coach Joseph's supervisor.  Were you -- were
10  you or Ms. McRae keeping Ms. Akin informed about
11  what was happening on the investigation, about
12  what they were finding?
13    A  We would have at the end and then she knew
14  the schedule -- we needed her help with the
15  interview schedule and making sure -- we were not
16  trying to burden Coach Joseph with the timing.  We
17  were trying to get them all done quickly and she
18  was helping with trying to schedule that and the
19  other interviews.
20    Q  But at any point in time, did you tell
21  her, hey, listen, Coach Joseph has raised this
22  concern of -- you know, she is being treated
23  differently than the male coaches?  Did you have a
24  conversation with Ms. Akin about that?
25    A  I don't recall having a conversation like

78

1  that with her.  There was an e-mail that you just
2  showed me.
3    Q  Okay.  All right.  So one last thing on
4  this.  So in her report, Ms. McRae makes some
5  findings with respect to Coach Joseph's request to
6  have Ms. Sanford do some personal tasks, and she
7  said, Joseph's actions are inconsistent with the
8  university system of Georgia ethics policy, which
9  in paragraph 2 provides that USG property shall
10  not be used for personal gain or purposes except
11  for incidental personal use of e-mail, telephone
12  or incidental Internet use.
13    So who gave -- well, first of all, the USG
14  ethics policy, was that a policy specific to
15  Georgia Tech or is that -- it's part of the whole
16  University System of Georgia policy?
17    A  If it is a USG policy, then my
18  understanding is that it's all of USG.
19    Q  Okay.  And did you -- so people could come
20  to HR and complain that someone had violated the
21  USG ethics policy and HR would do an investigation
22  of that?
23    A  Yes.
24    Q  Okay.  So here they are saying that Coach
25  Joseph's conduct violates paragraph -- sorry --

79

1  paragraph 2, which provides the USG property
2  should not be used for personal gains.  So
3  Ms. Sanford was the property here?
4    A  That's a tough word to use, but -- so
5  resource provided to the -- by the -- I mean, by
6  Georgia Tech.
7    Q  And had you ever -- after this -- and I
8  know you had just started when this investigation
9  was going on, but after this investigation, did
10  you ever reprimand someone for violating this USG
11  ethics policy?
12    A  I don't recall another case.  If that -- I
13  didn't have any cases where that came up, but it
14  did come up.
15    Q  The violation of this particular policy?
16    A  Misusing resources.
17    Q  And were the resources people?
18    A  Not to my recollection, no.
19    Q  Okay.
20    MS. COVENEY:  So, Caleb, can you pull up
21  document number 30, BOR-004810.
22    (JOYCE Deposition Exhibit 9 marked for
23  identification and attached.)
24  BY MS. COVENEY:
25    Q  So Ms. Joyce, earlier you said that you

80

1  recalled -- I think you said that you recalled
2  that in the course of this investigation that
3  Ms. McRae ended up following up with some other
4  coaches and asked about whether they used their
5  assistant to do personal tasks; is that right?  Do
6  you recall that?
7    A  Uh-huh.
8    Q  Okay.  And do you recall Ms. McRae
9  interviewing Jack Thompson?
10    A  I don't recall her interviewing Jack
11  Thompson.
12    Q  Okay.  So it looks like Eric White -- so
13  Ms. McRae followed up with Jack Thompson, and then
14  Eric White spoke to Harris -- I think her name is
15  Holland Harris, who was Jack Thompson's executive
16  assistant at the time.  And here we have
17  Ms. Harris stated she performs about 25 to
18  35 percent of personal work for her supervisor,
19  Mr. Jack Thompson.
20    So here we have a male employee in the
21  athletic department who -- there is now evidence
22  that he was having his executive assistant do
23  personal work for him, which is what Coach Joseph
24  had alleged to have done.
25    Do you recall -- do you recall this,

81

1  finding this information out?
2  **A  Yes.**
3  Q  And did you think this was relevant to
4  assessing whether discipline should be imposed on
5  Coach Joseph?
6  **A  I thought it was relevant to whether**
7  **discipline should be assessed to Mr. Thompson.**
8  Q  Well, had Mr. Thompson been disciplined
9  about this before?
10  **A  I don't recall him having been disciplined**
11  **on this before.**
12  Q  Okay.  I mean, so let's assume that
13  Mr. Thompson -- that someone -- Mr. Thompson's
14  supervisor was aware that he was asking Ms. Harris
15  to do personal tasks for him and that
16  Mr. Thompson's supervisor, once he had that
17  information, that he went to Jack Thompson, he
18  said, listen, please stop doing this, don't do
19  this again.  And then Jack Thompson kept doing it
20  and then his supervisor again said, please stop
21  doing that.
22      Do you think that would be relevant to
23  determining how to punish Coach Joseph for the
24  same conduct?  The fact that a supervisor had just
25  basically given Jack Thompson a slap on the wrist

82

1  for the same conduct before?
2  **A  I think it -- we look at how we address**
3  **things so we can be consistent, yes.  But we look**
4  **at it on a case-by-case basis too.**
5  Q  And so do -- I mean, what do you remember
6  about assessing this about -- did what happen to
7  Mr. Thompson inform how you disciplined Coach
8  Joseph?
9  **A  It informed how -- we wanted to make sure**
10  **we understood what was going on with Mr. Thompson,**
11  **so we went in and did more -- I interviewed**
12  **Ms. Holland to get more information.**
13  Q  And did you do that interview before or
14  after you disciplined Coach Joseph for this
15  conduct?
16  **A  I don't know.**
17      MS. STOFF:  I'm just going to object to
18  the form.  I don't think she testified ever that
19  she handed down the discipline of Coach Joseph.  I
20  think the prior testimony was recommendations
21  regarding discipline.
22      MS. COVENEY:  Okay.  So I can rephrase.
23  BY MS. COVENEY:
24  Q  Did you -- did you do this investigation
25  into Jack Thompson before you -- before discipline

83

1  was assessed on Coach Joseph?
2  **A  I don't know.**
3  Q  All right.  Well, do you think -- sitting
4  here today, do you think it would be important to
5  investigate what happened to Jack Thompson and how
6  he was disciplined for the same conduct before
7  somebody decided to discipline Coach Joseph for
8  this conduct?
9  **A  I think people should be treated**
10  **consistently.**
11  Q  So is that a yes, you do think it would be
12  important to figure out what happened with Jack
13  Thompson before figuring out what to do with Coach
14  Joseph?
15  **A  We had already done our investigation with**
16  **Coach Joseph and it was a policy violation and a**
17  **serious one.  I don't know that we would -- that**
18  **it would completely inform what exactly we did.**
19  **But at the same time, I mean, if we were being**
20  **inconsistent, we would have to take steps to make**
21  **sure we were being consistent.**
22      MS. COVENEY:  Okay.  Caleb, can you pull
23  up Exhibit 36, BOR-005517.
24      (JOYCE Deposition Exhibit 10 marked for
25  identification and attached.)

84

1  BY MS. COVENEY:
2  Q  Can you just take a look at this e-mail.
3  **A  Okay.**
4  Q  Okay.  So I'm going to focus on this
5  e-mail chain here.  It looks like you forwarded
6  Ms. Wasch this e-mail from Mr. White about Jack
7  Thompson and what Ms. Harris was doing for him in
8  terms of personal work.  And Kate Wasch says,
9  There's not so much of a rush on this if we are
10  separating it out from the other matter.  If we
11  can get that wrapped up and handed over to Paul,
12  we should be in good shape.
13      Okay.  So was a decision made to finish
14  the investigation into Coach Joseph and assess
15  discipline on her and then figure out what
16  happened to Jack Thompson?
17  **A  I remember -- my recollection is we waited**
18  **until we were done with looking at her concerns**
19  **and the men who may have had issues, and this**
20  **would be one of them before we made a final**
21  **decision.  But I don't recall dates.  I'm sorry.**
22  Q  Okay.  So I mean, it sounds here that you
23  are separating the two out, correct?  You had --
24  you just -- someone decided there's going to be
25  two investigations, one into Coach Joseph, and one

---

**85**

1  into Jack Thompson; is that right?
2    **A We wouldn't put them together. They were**
3  **treated separately in terms of who investigated.**
4  **We didn't amend the report is my recollection.**
5    Q Okay. But you -- do you recall if you did
6  the investigation into Jack Thompson before you --
7  before Ms. Akin issued Coach Joseph the final
8  written warning?
9    **A I don't recall specifically.**
10    Q Okay.
11    MS. COVENEY: And I'm sorry. I have to
12  take a real quick break. I just need like five
13  minutes. Can we come back at 11:45?
14    THE WITNESS: Sure.
15    (A brief recess was taken.)
16  BY MS. COVENEY:
17    Q So before we broke, we were talking about
18  Jack Thompson and this information that you all
19  discovered during the course of the Sanford
20  investigation that Jack Thompson had been asking
21  his assistant, Holland, to do some personal tasks
22  for him as well. And I believe you said that it
23  was important to ensure that the way that you
24  treated Jack Thompson was consistent with the way
25  that you treated Coach Joseph; is that right?

**86**

1    **A Yes.**
2    Q Okay. In terms of discipline, correct?
3    **A Yes.**
4    Q Okay.
5    MS. COVENEY: Okay. Caleb, can you pull
6  up Document 78 for me, BOR-004725.
7    (JOYCE Deposition Exhibit 11 marked for
8  identification and attached.)
9  BY MS. COVENEY:
10    Q If you can review this and let me know
11  when you're done.
12    **A Okay.**
13    Q Okay. So this is an e-mail from you to
14  Kim Harrington on December 5th. And I can
15  represent to you that Ms. Akin issued the final
16  written warning to Coach Joseph on November 29th,
17  so a few days before this Ms. Akin issued the
18  final written warning. So here you write that as
19  we discussed earlier, Marcia Stadeker from counsel
20  calls and reached out to Holland Harris to follow
21  up on the statement she made of the Joseph
22  investigation to obtain more information regarding
23  the type and extent of personal work she performed
24  for Mr. Thompson.
25    Okay. So you all decided to investigate

**87**

1  the Jack Thompson issue after you -- after
2  Ms. Akin issued the final written warning to Coach
3  Joseph, correct?
4    **A It looks like it.**
5    Q Okay. All right. And in the second
6  paragraph, you say, I have confirmed that there is
7  no documented counseling in Mr. Thompson's file.
8  Mr. Carson has also represented that he did not
9  document any counseling of Mr. Thompson, including
10  creating any documentation around the conversation
11  he had with Mr. Thompson approximately three to
12  five years, wherein he instructed Mr. Thompson to
13  refrain from having his administrative assistant
14  perform any work of a personal nature.
15    Barrett Carson, is that Mr. Thompson's
16  supervisor? Was it?
17    **A That's who I would have talked to, so I**
18  **believe so.**
19    Q Okay. So here -- so it sounds like
20  Mr. Carson was aware that Jack Thompson was having
21  Holland Harris do personal tasks for Mr. Thompson
22  and that he had previously only given Mr. Thompson
23  a verbal warning about that conduct, correct?
24    **A I mean, what's in the e-mail is what I**
25  **have to agree with. I don't recall any specifics**

**88**

1  **about it other than -- I think Eric spoke with**
2  **Mr. Carson about this, but there was no**
3  **counseling. And apparently, there was a verbal**
4  **conversation at some point -- three to five years**
5  **ago.**
6    Q Okay. And you say Eric White you mean?
7    **A Yes.**
8    Q So was there a whole separate
9  investigation done on Jack Thompson by -- did
10  Marcia Stadeker do a separate investigation?
11    **A I don't recall. So Eric tried to do it,**
12  **and then when he had what he had, we did more is**
13  **my recollection. Again, this is a long time ago,**
14  **but we had a hard time getting Holland to speak**
15  **with us.**
16    Q Okay. Was there any report generated from
17  this investigation?
18    **A I don't know.**
19    Q Okay. So let's backtrack a little bit to
20  before you -- Ms. Akin issued the final written
21  warning. So Ms. McRae does all these interviews.
22  She writes three different reports, and then after
23  she finishes her third report, we have an e-mail
24  from you transmitting what looks like a draft of a
25  letter of reprimand.

**89**

1    So before drafting the letter of
2 reprimand, did you meet with anyone to talk about
3 the findings of the Sanford information? Did you
4 meet with -- let's start -- Kim Harrington?
5    **A I don't recall specifically the meetings I**
6 **had. I'm sure I did discuss it with her.**
7    Q Okay. Did you meet with Joeleen Akin and
8 Paul Griffin?
9    **A To discuss the investigation findings?**
10    Q Yes.
11    **A We certainly discussed it. I -- I know I**
12 **discussed it with Joeleen and I think Joeleen**
13 **discussed it with Paul as the next level.**
14    Q Okay. And so you have McRae doing the
15 investigation. She has the findings, and she
16 sends the findings to you.
17    And do you -- did you recommend that this
18 be a final written warning or did someone else
19 have that idea?
20    **A What we would typically tell them is -- we**
21 **wouldn't just say this should be this. We would**
22 **give them -- these are the options. I mean, a**
23 **recommendation means that we would say this one**
24 **probably makes the most sense or that one does.**
25 **But ultimately, it's up to them what they want to**

**90**

1 **do. If it's something that's totally outside of**
2 **our past practice and all that, then we would**
3 **escalate with legal to make sure it's -- we can do**
4 **that.**
5    Q Okay.
6    **A But I don't exactly know what I**
7 **recommended specifically, but I don't recall that**
8 **this was outside of what I recommended.**
9    Q Okay. But Ms. Akin would have been the
10 one who ultimately made this decision to move
11 forward with this; is this right?
12    **A Yes. That's the manager's role is to**
13 **discipline the employee.**
14    Q Okay. And do you -- I mean, do you
15 remember whether Ms. Akin was the one who was
16 pushing for this to be a final written warning?
17    **A I don't recall her pushing for it to be a**
18 **final. I think she wanted to -- I remember**
19 **discussions in trying to make sure we were taking**
20 **the steps necessary to make sure it didn't happen**
21 **again and that we were addressing it in a complete**
22 **and fair way.**
23    Q Okay. So here -- I mean, if you were
24 working consistent with practices, you would have
25 taken the report, you would have identified

**91**

1 different options that Ms. Akin had in terms of
2 discipline. You would have presented that to her
3 and then she would have chosen which discipline
4 she wanted to assess; is that right?
5    **A Yes. And it sounds like she had**
6 **discussions with Paul on that as well.**
7    Q All right. So let's see.
8    MS. COVENEY: Caleb, can you pull up
9 Exhibit 41, BOR-004726.
10    (JOYCE Deposition Exhibit 12 marked for
11 identification and attached.)
12 BY MS. COVENEY:
13    Q Okay. Ms. Joyce, it looks like on
14 November 11th you send Eric White a draft letter
15 of reprimand.
16    And can you just take a look at this
17 letter of reprimand and let me know when you're
18 done.
19    **A I can't move it.**
20    Q Oh, I'm sorry.
21    MS. COVENEY: Caleb, can you give
22 Ms. Joyce control of this document.
23    THE WITNESS: Okay.
24 BY MS. COVENEY:
25    Q Okay. So is this -- is this the first

**92**

1 draft of this letter to your recollection?
2    **A I have no idea.**
3    Q Okay. So prior to drafting the letter of
4 the final written warning, did you talk to anyone
5 about what it should say?
6    **A Yeah, and I was new, so I would have tried**
7 **to figure out what the letter should look like**
8 **and -- so I think it was one of my first supports**
9 **of like a final written. So trying to get the**
10 **format right and make sure that I talked to the**
11 **manager in terms of what that need and want they**
12 **want to say -- usually they worked up the first**
13 **draft, but yeah.**
14    Q So would you have worked with Joeleen on
15 this?
16    **A Yes. I also would have worked with my**
17 **boss, Kim and Eric, as he had been in ER longer**
18 **than me just to make sure -- again, we want to**
19 **make sure the form is right.**
20    Q Okay. And to your knowledge, had anyone
21 counseled Coach Joseph before now about using the
22 Ms. Sanford -- asking Ms. Sanford to do personal
23 tasks?
24    **A I think from the report you showed me,**
25 **there is nothing formal about that.**

93

1     MS. COVENEY:  Okay.  So, Caleb, can you
2  bring up Document 43, BOR-004476.
3     (JOYCE Deposition Exhibit 13 marked for
4  identification and attached.)
5     THE WITNESS:  Okay.
6  BY MS. COVENEY:
7     Q  Okay.  So here we have you and Ms. Wasch
8  are exchanging drafts of the letter of reprimand,
9  and right here on November 16th, Ms. Wasch says,
10 One more point.  Pat suggested that Bud Peterson
11 be copied on the letter, and that Lynn be given
12 the opportunity to see it.  So who is Pat?
13    **A  Her boss, right, at the time -- I forgot**
14 **his last name.**
15    Q  Is it Pat McKenna (phonetic)?
16    **A  Yep.**
17    Q  Was he -- so he was the legal office of
18 general counsel?
19    **A  Yes.**
20    Q  All right.  So when did Bud Peterson and
21 Lynn Durham get involved in all of this?
22    **A  I don't know.  I mean, certainly the date**
23 **of this.**
24    Q  Do you know why they were involved and who
25 told them about all of this?

94

1     **A  It wasn't me.  I didn't have direct**
2  **discussions with them, but it might have been -- I**
3  **don't know who it was.**
4     Q  Okay.  But it wasn't you, correct?
5     **A  Correct.**
6     Q  So Bud Peterson and Lynn Durham are now
7  being copied in all of these communications.
8     Were they aware that Coach Joseph had
9  complained about being treated differently than
10 male coaches, to your knowledge?  Do you have any
11 reason to believe that they had been keyed in to
12 all of this?
13    **A  I can't speculate on that.**
14    Q  Okay.  Did you ever provide Lynn Durham
15 copies of Ms. Sanford's investigation reports?
16    **A  I saw it in the e-mail, so I did.  It just**
17 **looks like I sent -- I don't recall exactly -- I**
18 **don't recall providing her the report.  She**
19 **probably got a copy.  That's speculation, though.**
20    Q  Okay.  So here we have Lynn Durham on
21 November 21st saying, President Peterson and I had
22 talked with Paul Griffin and Joeleen Akin and also
23 read the full report you sent.
24    **A  Yeah, I thought I saw it.  I'm sorry.  I**
25 **couldn't recall specifically, but it's in the**

95

1  e-mail she got it.
2     Q  Okay.
3     MS. COVENEY:  Okay.  So, Caleb, can you
4  please take this down and pull up Document 50,
5  BOR-004376 to 77.
6     (JOYCE Deposition Exhibit 14 marked for
7  identification and attached.)
8  BY MS. COVENEY:
9     Q  Ms. Joyce, can you take a look at this,
10 and when you are done, let me know.
11    **A  Can you make it a little bigger.  I'm**
12 **sorry.  Even with my glasses --**
13    Q  Yeah, I think -- okay.
14    **A  It feels weird because it's in my face,**
15 **like pushed up against the screen.**
16    Q  I'm sorry.
17    **A  Okay.**
18    Q  Okay.  So I'm going to start here.  This
19 is an e-mail from you on November 18th to Joeleen
20 Akin and Paul Griffin and Kim Harrington, and
21 you're checking to see if they reviewed the
22 documentation to determine if you'd like to move
23 forward with scheduling the meeting for next week.
24    Okay.  So when you say "the documentation"
25 what are you referring to here?

96

1     **A  I don't know what I was referring to.**
2  **Probably the -- I don't know -- the report?**
3     Q  Okay.  If you sent this to them, would it
4  have been by e-mail, do you think?
5     **A  The report or the final warning?**
6     Q  So we don't have an e-mail from you
7  transmitting whatever information this is to
8  Joeleen Akin and Paul Griffin.  I'm just wondering
9  how you might have transmitted that to them.  Was
10 it -- would you typically send something like this
11 by e-mail to them?
12    **A  Yes.**
13    Q  Okay.  And you said you want to know if
14 they want to move forward with scheduling that
15 meeting for next week.
16    And what meeting were you trying to
17 schedule?
18    **A  Follow-up.  I'd say -- I don't know**
19 **exactly what I was referring to, but probably some**
20 **kind of follow-up meeting.**
21    Q  Okay.  And you say, I've also sent copies
22 of the investigation summary and attachments to
23 the president and Lynn Durham for review.
24    And by "investigation summary," what are
25 you referring to here?

97

1    A  Again, he had the copy of the -- I don't
2  know exactly what I'm referring to.  It could have
3  been I sent her Ginger's investigation.  I don't
4  know.  I wouldn't typically do that, but if I was
5  asked to do that, I would have.
6    Q  Okay.  All right.  So now, let's go up.
7  So Joeleen responds to you on November 18th and
8  she said, Paul and I have discussed the
9  investigation at length, and after reading the
10  materials provided to us, we feel it necessary to
11  share our concerns, see page 1 of the attachment,
12  and to implement a corrective action plan.
13    And then she asks to set up a meeting with
14  you and Lynn and was this you and Lynn to craft a
15  revised final written warning that includes both
16  pages of this attachment?
17    And the "Lynn" here, is that Lynn Durham?
18    MS. STOFF:  I'm going to object to the
19  form of the question as it is not written by her.
20    MS. COVENEY:  Okay.
21    THE WITNESS:  And I don't know what she
22  was referring to.
23  BY MS. COVENEY:
24    Q  Did you -- were there any other Lynns that
25  you were working with on this?

98

1    A  It's been a long time.  I don't recall one
2  at this point.
3    Q  Okay.  So now let's go to the bottom of
4  this.  So then this is the attachment that Joeleen
5  attaches to this e-mail.  And she asks that you
6  incorporate this into the final written warning.
7  And these -- and then she lists seven different
8  things.
9    Had Ginger McRae investigated any of these
10  issues in her investigation?
11    A  I don't know offhand.  That's a lot of --
12  I haven't reviewed the report again.
13    Q  Is it fair to say that what's in Ginger
14  Sanford's reports, that's what Ginger Sanford had
15  investigated, she made -- she made findings on
16  certain issues.  The things that she made findings
17  on, is that what she was being asked to
18  investigate?
19    A  I assume so.
20    Q  Okay.  So Joeleen sent you this letter and
21  she asked that all of this be incorporated in the
22  final written warning.  And then she asks that you
23  also tag on this corrective action plan.
24    And what is the purpose of a corrective
25  action plan?

99

1    A  So this was her wording.  When I talked to
2  Joeleen, I do recall talking with her about the
3  best path forward, and she wanted to make sure
4  they were on a good path and she was very
5  concerned with where they were, so she wanted to
6  provide specifics on accountabilities and
7  expectations.
8    Q  Is a final written warning the appropriate
9  vehicle to do that?
10    A  So the final was based on the
11  investigation.  This is not a PIP and it was not
12  meant to be a corrective action document.  And I
13  think it was meant to be, though, a next step plan
14  for them to get on the same page.  That was my
15  understanding.
16    Q  Okay.  But -- so, I mean, we will get to
17  the final written warning in a minute.  So this
18  corrective action plan is included with the final
19  written warning?
20    A  But it's not a disciplinary step above a
21  final written.  A final written is what it is.
22    Q  Okay.  So Ginger Sanford -- sorry --
23  Ginger McRae had investigated two things, one,
24  whether Coach Joseph had asked Ms. Sanford to do
25  personal tasks for her, and she also investigated

100

1  whether Coach Joseph had instructed Ms. Sanford
2  not to tell Marvin Lewis about a meeting that she
3  was having with an ex -- with a former Georgia
4  Tech employee.
5    Reading over this corrective action plan,
6  do any of these items address either of those two
7  issues that had been investigated?
8    A  No.
9    Q  I mean, is this really the purpose of a
10  final written warning in a corrective action plan?
11    A  It was a coaching plan to try to get them
12  on the same track.  You can coach as a manager,
13  and particularly with the final, the goal was to
14  not have anything else happen because she wanted
15  to be on a good path with MaChelle and make sure
16  that they didn't have any more investigations.
17    Q  But there are different ways to do that.
18  I mean --
19    A  There are.
20    Q  Okay.  I mean, could Ms. Akin have sat
21  MaChelle down and given her expectations as her
22  new manager saying, this is what I expect from
23  you?
24    A  She could have done that separately.  We
25  felt like this meeting could be used for that

**101**

1  because it hadn't been done yet.
2     Q  Okay.  And so in your time at Georgia
3  Tech, had you -- did you ever issue anyone a final
4  written warning other than this one?
5     **A  Yes, but I don't recall specifically.**
6     Q  Do you remember how many?
7     **A  No.  I didn't typically issue them.  I**
8  **mean, again, it comes from the manager.  We -- my**
9  **investigators do the investigation.  They usually**
10 **work with them on what they are going to issue.**
11 **And then it has to get approved up my chain, which**
12 **includes me.  So a final written has to be**
13 **approved by not just me but also Kim, and if there**
14 **are any kind of legal issues, then possibly**
15 **whoever Ken feels like it should be reviewed by.**
16    Q  Okay.  And -- so in your time at Georgia
17 Tech, would you say you issued -- I mean, can you
18 give me a range?  Was it one to five or a hundred
19 final written warnings?
20    **A  You --**
21    Q  I'm sorry.  I'm sorry that I'm -- let me
22 rephrase.
23    **A  You said me.**
24    Q  Did you recommend that they be issued
25 frequently?

**102**

1     **A  So again, people would come to me and say**
2  **what they want to do.  And a lot of times they ask**
3  **us to terminate or do a final or whatever you**
4  **recommend, tell me what to do, if I want to do**
5  **this step.  We recommended a final -- I can't say**
6  **how many times, but we did that as part of our**
7  **progressive discipline.  I wouldn't say it was**
8  **infrequently; I wouldn't say it was frequently**
9  **because that's a serious step.**
10    Q  And what is the purposes of a final
11 written warning?
12    **A  Well, again, it's the progressive**
13 **discipline, so that's really to say we need you to**
14 **get on track.  If this happens again, we may**
15 **terminate.**
16    Q  And I mean, is part of the purpose to put
17 the employee on notice of a specific performance
18 problem?
19    **A  Yes.**
20    Q  Okay.  And to say, if you do this specific
21 thing again, you're out, essentially?
22    **A  Yes, but I wouldn't say it's just the one**
23 **thing, if you do this very specific thing, it's an**
24 **issue you're addressing, and you are saying don't**
25 **have this type of violation again.**

**103**

1     Q  Okay.  And it's a serious form of
2  discipline, correct?
3     **A  Yes.**
4     Q  And typically, before you issue someone a
5  final written warning, is there other -- are there
6  usually steps taken before the final written
7  warning to address the behavior at issue, the
8  misconduct at issue?
9     **A  So the policy says typically, yes,**
10 **unless -- it's meant to address the level of**
11 **behavior, though, and it's on a case-by-case**
12 **basis.**
13    Q  And what does that mean?
14    **A  It means that what's the seriousness of**
15 **the violation and how egregious was it.**
16    Q  Okay.
17    **A  So the goal is to get the person to stop.**
18 **It's not meant to be just punitive.  It's really**
19 **meant to underline the seriousness and bring the**
20 **employee back in line with expectations.**
21    Q  Okay.  To your knowledge, had Coach Joseph
22 ever been counseled about using her executive
23 assistant to do personal tasks, to your knowledge?
24    **A  Not to my knowledge.  I haven't -- yeah.**
25    Q  Okay.  So no one had counseled her about

**104**

1  this before.  And you all had evidence that
2  someone else, a male in the athletic department
3  was asking his assistant to do basically the same
4  thing Coach Joseph had been asking Ms. Sanford to
5  do, correct?
6     MS. STOFF:  Objection to form because she
7  testified she doesn't know if anybody had
8  previously counseled her.  Not that no one had.
9  BY MS. COVENEY:
10    Q  Go ahead.
11    **A  The case with Jack and the case with**
12 **MaChelle were different.  One came from an**
13 **employee complaint; the other did not.  And there**
14 **was not as much information, but we still treated**
15 **it very seriously.**
16    Q  Well, there wasn't a lot of information at
17 the time as no one had investigated Jack
18 Thompson's request to Holland Harris before
19 disciplining MaChelle; isn't that right?  No one
20 looked into that with any sort of specificity
21 before issuing MaChelle the final written warning?
22    **A  I can't say that.**
23    Q  We reviewed an e-mail earlier that on
24 December 5th, so days after MaChelle was issued
25 the final written warning, you and Kate Wasch talk

105

1 about Marcia Stadeker doing a separate
2 investigation to look at the extent that Jack
3 Thompson was using his personal assistant. Do you
4 remember the e-mail?
5   A  Yes.
6   Q  Okay. So the purpose of a final written
7 warning is to discipline someone either for
8 repeated misconduct or for a serious violation; is
9 that right?
10   A  Yes.
11   Q  Serious policy violation. Okay.
12     And MaChelle had never been counseled
13 about using Ms. Sanford -- to your knowledge,
14 MaChelle had not been counseled about using her --
15 asking her executive assistants to do personal
16 tasks, correct?
17   A  Yes.
18   Q  And this must not have been a very serious
19 issue if Jack Thompson had just previously gotten
20 a slap on the wrist for it. He had just been --
21 Barrett Carson, according to your e-mail, had just
22 verbally counseled Jack Thompson about this
23 before. He had not issued him a final written
24 warning about this.
25   A  When you say "just," a year ago when I was

106

1 not here. I would consider it serious as the same
2 allegations had been made about Jack Thompson and
3 if there had been the same amount of evidence.
4 It's a serious violation.
5   Q  So an investigation was done into Jack
6 Thompson after Coach Joseph had -- someone looked
7 into something with respect to Jack Thompson after
8 MaChelle had received a final written warning.
9     Did Jack Thompson -- was he issued a final
10 written warning?
11   A  No.
12   Q  Okay. So we have in this e-mail that
13 on -- let's see -- November 18th, Joeleen sent you
14 these documents that she wants to be incorporated
15 into the final written warning.
16     And did you incorporate this feedback into
17 the final written warning document?
18   A  So it was on -- we just had it in the
19 second page. So it wasn't in the actual final
20 warning letter. It was attached.
21   Q  Okay.
22   A  And it was meant to be a conversation
23 after and, honestly, the conversation that I had
24 with Joeleen was, let's get -- let's -- now we
25 talked about that, but let's get back on track and

107

1 let's build this relationship so we don't have
2 anything else like this.
3   A  Okay.
4     MS. COVENEY: Okay. Caleb, can you pull
5 up Exhibit 52, BOR-004741.
6     (JOYCE Deposition Exhibit 15 marked for
7 identification and attached.)
8 BY MS. COVENEY:
9   Q  Can you just take a look at this and let
10 me know when you're done.
11   A  Okay.
12   Q  Okay. So in the e-mail we just looked at,
13 on November -- I think it was November 21st,
14 Joeleen had sent you her edits and then she
15 asked -- she said she wanted to meet with you and
16 Lynn to go over some things. And now we have on
17 November 22nd, Lynn Durham e-mails you and Kim
18 Harrington about Tuesday's meeting, and she says,
19 Julie, when we spoke yesterday, the concern was
20 raised about an attorney attending the meeting
21 with MJ. You indicated that would not be allowed
22 because it's an employment action. I gave the
23 president update this morning. He wanted me to
24 check with Pat McKenna it is accurate. Can you
25 please confirm that is the case.

108

1     So do you recall meeting with Lynn Durham
2 and Joeleen Akin about the final written warning?
3   A  I don't recall it specifically. If she is
4 referring to it in her e-mail, then it may have
5 occurred.
6   Q  Do you remember this concern that was
7 raised about an attorney attending the meeting?
8   A  No.
9   Q  Do you remember around this time
10 Ms. Durham or Ms. Akin expressing frustration with
11 Coach Joseph about getting a lawyer involved in
12 all of this?
13   A  No, I don't recall that. It's not the
14 first person.
15   Q  Okay. So -- all right. So then -- up
16 here you e-mail Kate Wasch and you said, you know,
17 Lynn wanted me to check with you and Pat about
18 bringing her attorneys. And then the other
19 question that came up from Lynn yesterday was
20 whether anyone such as another university could
21 request MaChelle's personnel file, which would
22 include this final warning under the Open Records
23 Act.
24     Do you remember Lynn Durham asking this
25 question about MaChelle's personnel file?

109

1    A  I would just go by what's on the e-mail.
2    Q  Does that strike you as kind of a strange
3  thing to be asking about?
4    A  I don't remember the context.
5      MS. COVENEY:  Okay, Caleb, can we see
6  Exhibit 221, BOR-004379.  Okay.  There should be a
7  an e-mail -- a covered e-mail.  It's 004379.
8      (JOYCE Deposition Exhibit 16 marked for
9  identification and attached.)
10 BY MS. COVENEY:
11   Q  Ms. Joyce, take a look and the let me know
12 when you are done.
13   A  Is this the whole thing, right here?
14   Q  Just this covered e-mail for now.
15   A  Okay.
16   Q  So on November 22nd, Joeleen Akin e-mails
17 you a new document, and she said she's in a
18 meeting until three, but she met with the business
19 office, and together we made a few changes to the
20 original document.
21      What office was she referring to when she
22 said "the business office?"
23   A  I don't know what she was referring to.
24   Q  You know, are there -- would the business
25 office have any reason to be editing MaChelle's

110

1  final written warning?
2    A  This was the corrective action plan, she
3  kept calling it, but it was really meant to be a
4  coaching plan.  It was not the final.
5    Q  Would someone other than MaChelle's
6  supervisor have any reason, legitimate reason to
7  be editing the corrective action plan -- or the
8  coaching document?
9    A  She may -- she says together we made
10 changes if she was looking for an understanding on
11 how process should -- I don't know.  If it is a
12 coaching document, if she wanted more information
13 for her to like, have the person draft it, no.
14 But if she worked with them to get information and
15 it helped with the coaching plan.
16   Q  Typically, it was the manager who would be
17 drafting a coaching plan like this, right?
18   A  Well, it's her ultimate responsibility,
19 most definitely.
20      MS. COVENEY:  Caleb, can you pull up
21 Document 63, BOR-004742.
22      (JOYCE Deposition Exhibit 17 marked for
23 identification and attached.)
24 BY MS. COVENEY:
25   Q  Ms. Joyce, let me know when you are done

111

1  reading.
2    A  Okay.
3    Q  So here we are.  Kate Wasch e-mails you
4  and Eric White to ask about the appeal policy for
5  a final written warning.  And then Eric white
6  says, There's no appeal policy or an appeal
7  process for a final written warning.
8      Does that mean that there is no policy on
9  appealing, or that the policy is you cannot appeal
10 it?
11   A  I don't know if it's addressed.  There was
12 nothing that provided for appeal.
13   Q  Okay.  So it was just silent on that
14 issue; is that right?
15   A  I'm trying to recall.  There was no
16 appeal.  Consistently we had people ask about
17 appealing discipline quite a bit, and we did not
18 let people appeal, but they can -- they can write
19 a rebuttal.
20   Q  And what would the -- so when he says you
21 can write a rebuttal to the progressive
22 disciplinary action, what would the purpose of the
23 rebuttal be?
24   A  To provide their concerns with the
25 discipline.  It's just like if you have a

112

1  document, it has the employee's signature, and a
2  lot of times they had something of concern that
3  they don't agree or that kind of thing, and that's
4  included.
5    Q  Okay.  So for this final written warning,
6  it was a serious disciplinary step, correct?
7    A  Uh-huh.
8    Q  And prior to it being issued, at least you
9  and Ms. Wasch knew that Coach Joseph would not
10 have an opportunity to appeal it, correct?
11   A  Well, I guess Kate asked, but I didn't
12 know one way or the other, actually.  I was still
13 pretty new, but that is the case, it is not
14 appealable.
15   Q  Okay.
16   A  And I've never been anywhere where it was
17 appealable.
18   Q  Okay.  And this final written warning was
19 going to go in her personnel file, correct?
20   A  Yes.
21   Q  And if she breached it, she could be
22 terminated?
23   A  Yes.
24      MS. COVENEY:  Can we look at Document 69.
25      (JOYCE Deposition Exhibit 18 marked for

113

1  identification and attached.)
2      MS. COVENEY:  This is unrelated to the
3  question.  It's around lunchtime.  I'm trying to
4  get through the Sanford investigation.  Are you
5  okay?  Are you hanging in there?
6      THE WITNESS:  This is a little longer than
7  I planned.  I need to take a break to take care of
8  some things, I had a meeting this afternoon.
9      MS. COVENEY:  Yeah, this may take -- this
10 may go all day today.
11     THE WITNESS:  Well, I need to take a break
12 then and move some things in childcare.
13     MS. COVENEY:  What time is your meeting?
14 Do you need to do it now?
15     THE WITNESS:  No.  I can move it.  So I do
16 need to move it.  I will look at this.  Can we
17 break close to 1:00 so I can let them know I need
18 to reschedule?
19     MS. COVENEY:  How about we break now?  You
20 want to come back at -- I don't know -- 1:15,
21 1:20?  Does that work for everyone?
22     So let's plan to reconvene at 1:20.
23     (A break taken at 12:39 p.m. to 1:16 p.m.)
24 BY MS. COVENEY:
25     Q  So Ms. Joyce, during your deposition [sic]

114

1  did you talk to anyone about your testimony?
2      **A  No.**
3      Q  Okay.  And I just want to circle back
4  quickly with a couple things you talked about at
5  the very beginning of the deposition.  You said
6  that prior to the deposition, you spoke with USG's
7  counsel about your deposition; is that right?
8      **A  Uh-huh.**
9      Q  And during that conversation, did they
10 provide you any direction as to how to testify
11 today?
12     **A  No, they didn't provide me any substantive**
13 **direction.**
14     Q  Did they provide you any advice?
15     **A  They did.  They said, listen to the**
16 **questions, look at the documents, those kind of**
17 **things.**
18     Q  Anything else?
19     **A  No.**
20     Q  Okay.  And how long was that call?
21     **A  20 minutes.  Around 20 minutes.**
22     Q  Okay.  And then earlier you had mentioned
23 that you have a separation agreement with Georgia
24 Tech, correct?
25     **A  Correct.**

115

1      Q  We obviously have not seen a copy of that.
2  My guess is there is some sort of
3  non-disparagement and confidentiality provision in
4  there.  You may know this, but the subpoena here
5  commands you to be here and give honest testimony,
6  good, bad or otherwise, so that non-disparagement
7  provision is not currently at play.  Okay.
8      Okay.  So let's jump back to 2016 again.
9  I'm almost done with the Sanford stuff and then we
10 can move forward more into the present.
11     MS. COVENEY:  Caleb, can you pull up
12 Exhibit 67, please.
13     (JOYCE Deposition Exhibit 19 marked for
14 identification and attached.)
15 BY MS. COVENEY:
16     Q  Okay.  Ms. Joyce, if you can just read
17 this first e-mail right here from Ms. Durham and
18 let me know when you're done.  I'm just going to
19 ask you about the first e-mail at the top.
20     **A  Okay.**
21     Q  Okay.  So on November 29th, Lynn Durham
22 e-mailed you and Joeleen about the upcoming
23 meeting with Coach Joseph and the final written
24 warning.  And Lynn Durham says, The president or I
25 will talk with her about this.  If she threatens

116

1  to sue his firm, if anyone threatens to sue, he
2  immediately says he would not discuss with him and
3  they must go through our attorneys.
4      Had Ms. Durham or Ms. Akin talked to you
5  at this point in time about concerns that MaChelle
6  was going to sue?
7      **A  I don't recall.**
8      Q  Do you recall there ever being discussions
9  about MaChelle potentially suing?
10     **A  I mean, with an attorney involved,**
11 **probably, but I don't recall the specific**
12 **discussion.**
13     Q  Do you recall who it was with?
14     **A  No.**
15     Q  Who was talking about this, the potential
16 that MaChelle may sue?
17     **A  No, not specifically.  But again,**
18 **attorneys involved and there is an e-mail here**
19 **discussing it.**
20     Q  Okay.  All right.
21     MS. COVENEY:  Caleb, can you bring up
22 Exhibit 74, please, Plaintiff's 0006961.
23     (JOYCE Deposition Exhibit 20 marked for
24 identification and attached.)
25 BY MS. COVENEY:

**117**

1    Q  Okay.  Ms. Joyce, if you can take a look
2  at this.  You don't have to read this word for
3  word, but please scan it.
4    **A  Okay.**
5    Q  Ms. Joyce, do you recognize this document?
6    **A  It says final written warning notice.  So**
7  **this must be the final written warning notice.**
8    Q  Okay.  So earlier in the deposition, we
9  reviewed your -- the first draft of the final
10  written warning that we have, at least from you,
11  and if you compare the two the first two
12  paragraphs here are largely the same.  So the same
13  as the draft that you had written.  And then this
14  third paragraph, this paragraph looks to me like
15  the letter that Joeleen had written and sent to
16  you with her additional concerns.
17      Is that -- do you recall taking part of
18  her letter and copied and pasted it into this
19  document?
20    **A  No.  I don't recall cutting and pasting**
21  **it, putting it into the document.**
22    Q  Do you recall writing these things into
23  the letter?  Was it your decision to do this, to
24  add this in there?
25    **A  I don't recall.**

**118**

1    Q  It's typically the manager who decides the
2  discipline to be assessed in a situation like
3  this, correct?
4    **A  Yes.**
5    Q  And you provided the final written warning
6  document to Ms. Akin for review and edit, correct?
7    **A  Right.**
8    Q  And we were up to the e-mails where the
9  two of you went back and forth and she provided
10  her feedback, correct?
11    **A  Yes.**
12    Q  Okay.  So we have in here this new
13  paragraph, and it says, in addition to violations
14  of USG ethics policy as determined by an outside
15  investigator, several actions taken by you as
16  recounted in the investigative report and
17  supplemental materials and attachments suggest
18  behavior and contradiction to our USG core values
19  and integrity, excellence, accountability, and
20  respect.
21      So it sounds from this paragraph that
22  Coach Joseph is being now reprimanded, not only
23  for the conduct that Ms. Sanford -- sorry --
24  Ms. McRae investigated, but also it looks like
25  someone picked out things from Ms. McRae's reports

**119**

1  and put it into this final written warning.  Is
2  that consistent with your memory of what happened?
3    **A  I don't recall the back-and-forth**
4  **drafting.**
5    Q  So when you issue a final written warning,
6  is the final written warning issued for conduct
7  that someone has investigated, someone's looked
8  into and assessed whether there is merit to
9  misconduct at issue?
10    **A  Yes.**
11    Q  All right.  And then this last paragraph
12  here, it says, This serves as your final warning
13  that any future violations of institute or USG
14  policy or process may warrant separation of your
15  employment with the institute for cause.
16      So as I read this, this is basically
17  saying they are putting her on notice that she
18  cannot violate any policy of the institute or any
19  policy of the University System of Georgia or
20  shall be fired.
21      Is that usually the purpose of a final
22  written warning to basically put them on notice
23  that any violation of any conceivable policy is
24  going to warrant termination?
25    **A  It says "may warrant."  So you can't**

**120**

1    **really tell people exactly.  It would be case by**
2    **case, and if the behavior was not related, then**
3    **likely it wouldn't.  It's case by case and it's to**
4    **put somebody on notice.**
5    Q  Well, what is it -- I mean, this isn't
6  really putting her on notice of a specific
7  performance problem, is it?  It's not giving her
8  really any direction as to what she can and cannot
9  do other than abide by the policies, which she has
10  to do anyway as an employee.  In other instances
11  where you've issued a final written warning,
12  have -- is this the language that you use?
13    **A  I don't have any of those in front of me.**
14    **But generally speaking, they say any additional**
15    **misconduct may result in termination.  I don't**
16    **have the specific wording.**
17    Q  But is -- I mean, generally speaking, is a
18  final written warning supposed to put an employee
19  on notice of a specific performance problem?
20    **A  It should give them a sense of -- yes.**
21    **Yeah.**
22    Q  Okay.  And then at the bottom here, Todd
23  Stansbury is copied here.
24      Do you know who Todd Stansbury is?
25    **A  Yes.**

121

1    Q  Was he involved in this investigation?
2    A  So this one was a -- he had just come in
3  is my recollection.  I don't remember.
4    Q  But he at least received a copy of this
5  letter, correct?
6    A  Looks like it.
7    Q  Okay.  So after the Sanford investigation
8  ends, what was your general impression of Coach
9  Joseph?
10   A  After the what investigation?
11   Q  The Sanford, the investigation we just --
12   A  Sanford.  Okay, yeah, I thought you said
13 Sanford.
14      What do you mean?
15   Q  It means did you have any opinions about
16 her -- about -- I mean, had -- other -- had
17 Ms. Akin or Ms. Durham talked to you about their
18 interactions with Coach Joseph and their feelings
19 about Coach Joseph?
20   A  They did.
21   Q  And what did they share with you?
22   A  I don't remember exactly and I'd hate to
23 speak for them, but they did -- some of it's in
24 the warning.
25   Q  Did you get the impression that they liked

122

1  Coach Joseph?
2    A  I did not get an impression either way.
3    Q  Okay.  All right.  So about two months
4  after Georgia Tech issued Coach Joseph the final
5  written warning, she submitted a response to the
6  final written warning.  Do you recall that?
7    A  Through her attorneys, I think.
8    Q  Through her attorneys, yeah.
9    A  I do recall there was a response
10 submitted.
11   Q  And did you do any sort of investigation
12 into that?
13   A  So it's not an appealable.  This was kind
14 of a gray area.  I don't recall doing a specific
15 investigation into it.  I do remember reviewing it
16 and talking with legal, because this is coming
17 from an attorney how we should handle it.
18   Q  But you didn't retain an outside
19 investigator to investigate any of these
20 allegations and the response?
21   A  I don't -- I really don't recall.  I don't
22 think we did get an external investigator to look
23 at it.  I don't exactly remember what was in it.
24   Q  Okay.  And had you gotten an external
25 investigator, would there have been a report

123

1  prepared about that investigation?
2    A  Yes.
3    Q  Okay.  Okay.  So I'm going to fast forward
4  a little bit to 2018.  Well, I'm going to try to
5  go back to 2017 to talk about the Malikah Willis
6  investigation, but for now, I'm going to go to
7  2018.
8       Okay.  Sometime in 2018, do you remember
9  there being some sort of ethics scandal at Georgia
10 Tech?
11   A  Can you give some more facts on that?
12   Q  So do you recall people -- and I think the
13 president's cabinet or high-level people at
14 Georgia Tech being implicated in some sort of -- I
15 don't -- I don't exactly what they were doing, but
16 there was allegations that there was some sort of
17 misconduct at the like highest levels at Georgia
18 Tech and several people were fired.
19   A  I don't know.  I don't even know if people
20 were fired.  I do remember ethics complaints about
21 high-level leaders.
22   Q  Do you recall any more details about that?
23   A  I mean, I do.  What specific details?
24   Q  I mean, what do you recall?
25   A  They were in my chain.  There's two people

124

1  who were called out in my chain, so I'm certainly
2  aware.  I don't even remember last names.  Paul
3  and Steve.
4    Q  And what had they been accused of doing?
5    A  So there were a couple of people accused
6  of misusing resources.
7    Q  Okay.  And so after all of the -- after
8  this -- these allegations came out and some people
9  were fired, were there internal discussions about,
10 you know, strengthening the checks and balances in
11 place to monitor misconduct?
12   A  Certainly, there was discussions on ethics
13 and improving awareness and doing everything we
14 can to make sure that people are doing the right
15 thing and held accountable.
16   Q  Okay.  I mean, was part of the problem
17 from the -- the ethics issues that arose in 2018,
18 did -- was that a product of like failing to have
19 proper controls in place to receive complaints
20 about misconduct and investigate them?
21   A  Please say that again.
22   Q  So the ethics scandal -- were there
23 concerns that that had been allowed to happen
24 because the institute was lacking controls to
25 receive and investigate complaints?

125

1    A I don't recall that being an issue.
2 There's certainly are we doing all we can or doing
3 enough? And there was a deeper view of that.
4    Q Was a triage team created in response to
5 this?
6    A I'm trying to remember if that was created
7 out of it. We met in triage before that happened.
8    Q Okay. And what -- who was on the triage
9 team?
10    A It was -- I don't mean to sound -- I can't
11 remember all the people. It was Oliver-Staley ,
12 Kate Wasch, Kim Harrington, Melissa. Is there
13 anyone else? Oh, yes. Melissa's boss and I can't
14 remember his name. But internal audit, legal and
15 HR.
16    Q And how frequently did you meet?
17    A Weekly.
18    Q And what did you discuss?
19    A Open cases.
20    Q Open, like what kind of cases? Like
21 EthicsPoint complaints?
22    A Mainly, yes. Because there are other ways
23 typically before. You can raise complaints, but
24 then, you know, because they wanted to make sure
25 they had a good sense of how many were being

126

1 filed, they said everything has to go through
2 EthicsPoint. So I would say actually just
3 EthicsPoint.
4    Q Sorry. Say that last point again. They
5 wanted to make sure everything was going through
6 EthicsPoint?
7    A Yeah.
8    Q And who wanted to make sure that was
9 happening?
10    A I don't know.
11    Q Was this -- was that a general policy, it
12 was like best practices to send complaints through
13 EthicsPoint?
14    A I don't know if it is a best practice, but
15 they wanted to make sure they had visibility.
16    Q Okay.
17    MS. COVENEY: Caleb, can you pull up
18 Exhibit 233. It's Plaintiff's 014323.
19    (JOYCE Deposition Exhibit 21 marked for
20 identification and attached.)
21 BY MS. COVENEY:
22    Q During this triage meetings, did you ever
23 take notes?
24    A I did. I took -- as I was saying before,
25 I am a good note taker when I'm the note taker.

127

1 I'm actually a horrible note taker when I'm just
2 in a meeting or, you know, just trying to keep
3 track of what we talked about. I scribble
4 scrabble a lot and just try to put one word down
5 so I will remember it later. But yeah, I did take
6 notes.
7    Q And those were handwritten notes?
8    A Yes.
9    Q And were those -- so at these triage
10 meetings, do you recall ever discussing any of the
11 complaints that were brought against Coach Joseph
12 during the 2018-2019 timeframe?
13    A I'm sure we did. I don't recall the
14 specific conversations.
15    Q Okay. So here is Exhibit 21.
16    MS. COVENEY: Can I have control of this,
17 please.
18 BY MS. COVENEY:
19    Q And -- so who is Aisha Oliver-Staley ? Did
20 you work with her at Georgia Tech?
21    A I mean, yes. She's not -- she's in a
22 different department.
23    Q Okay. So we have this e-mail on
24 Augusta 21, 2018, Aisha Oliver-Staley introduces
25 herself, and she says she's the interim vice

128

1 president for ethics compliance and risk
2 management.
3    So she was not in the HR department; is
4 that right?
5    A Correct.
6    Q What department? Is this like a separate
7 department, ethics compliance and risk management?
8    A Yes. I think it's under legal.
9    Q So she says, Please know that I'm fully
10 committed to working with you President Peterson,
11 to address the recent breakdown from ethical
12 behavior at Georgia Tech. There is nothing more
13 important to me professionally and personally than
14 to provide you with strong leadership on this
15 matter.
16    Okay. So here's she is talking about the
17 ethical breakdown that we just talked about,
18 right?
19    A Yes.
20    Q Okay. President Peterson has outlined
21 steps to strengthen the ethical culture at Georgia
22 Tech. And then, so here she says, If you are
23 aware of unethical or illegal behavior, please
24 call this number or visit EthicsPoint. You can
25 reman anonymous.

129

1    So it does sound like here that after this
2 EthicsPoint -- sorry -- after this ethical
3 scandal, there was kind of a renewed focus on
4 making sure complaints were filed through
5 EthicsPoint; is that correct?
6    **A Yes.**
7    Q And then she says here, In addition, I'm
8 directing immediately that all in-person
9 complaints must be inputted into the hotline
10 system anonymously by the person receiving the
11 complaint.
12    So does that mean, like, if my subordinate
13 employee complained to me about something that I
14 had an obligation to put it into the EthicsPoint
15 system?
16    **A I don't know what she intended exactly --**
17    Q Okay.
18    **A -- but all the complaints that came into**
19 **my investigators, they were to be put into the**
20 **system.**
21    Q Okay. So change topics a little bit.
22    MS. COVENEY: Caleb, can pull up
23 Exhibit 89. It's BOR-0016023.
24    (JOYCE Deposition Exhibit 22 marked for
25 identification and attached.)

130

1    MS. COVENEY: Can you give Ms. Joyce
2 control of this, please.
3 BY MS. COVENEY:
4    Q Ms. Joyce, can you take a look at this and
5 let me know when you're done.
6    **A Can you give blow it up again or can I do**
7 **it? I'm sorry. Okay.**
8    Q Okay. So do you recognize this e-mail,
9 Ms. Joyce?
10    **A My name is on it.**
11    Q Okay.
12    **A I don't remember it.**
13    Q Okay. All right. So in November of 2018,
14 Gay Rosenfield, who's Coach Joseph's agent,
15 e-mails Todd Stansbury, Mark Browntree, and he
16 complains about Shoshanna Engel and her repeated
17 attempts to undermine Coach Joseph.
18    Do you -- does the name Shoshanna Engel
19 sound familiar?
20    **A Yes.**
21    Q Okay. And who is Ms. Engel?
22    **A I don't know her title. She has Title 9,**
23 **I believe.**
24    Q Title 9. Was she in the athletic
25 department?

131

1    **A Yes. Or she was.**
2    Q So she handled Title 9 issues in
3 athletics, correct?
4    **A I think she had a couple things, and I'm**
5 **sorry, I don't recall specifically everything she**
6 **did.**
7    Q Okay. So then Mark Browntree forwards
8 this e-mail to Kevin Cruz, and then Kevin Cruz
9 loops you in here and says, I copied Julie because
10 she has some historical context that she can share
11 regarding the employee complaint.
12    So do you recall -- did You meet with
13 Kevin Cruz to talk about this?
14    **A I don't recall meeting with him to talk**
15 **about this.**
16    Q And historical context that you had, was
17 it with respect to Coach Joseph and Shoshanna or
18 just Coach Joseph generally?
19    **A I would say the latter, generally. I**
20 **don't know what he was referring to.**
21    Q So did you meet with -- I'm sorry. Who is
22 Adrienne Richardson?
23    **A She was on the employee relations team as**
24 **a compliance adviser.**
25    Q And did the three of you meet to talk

132

1 about this?
2    **A I don't recall meeting to talk about this.**
3    Q Okay. So this issue that they're -- that
4 Gary is describing right here, Shoshanna Engel and
5 her repeated attempts to undermine MaChelle Joseph
6 both as it relates to MaChelle Joseph's day-to-day
7 oversight as well as current NCAA investigations.
8    This conflict here, is this something -- a
9 conflict that your office would handle? Sounds
10 like an employee dispute.
11    **A I think we would handle employee disputes**
12 **with other employees, yes.**
13    Q Okay.
14    MS. COVENEY: Caleb, can you pull up
15 Exhibit 227. It's Plaintiff's 009330.
16    (JOYCE Deposition Exhibit 23 marked for
17 identification and attached.)
18 BY MS. COVENEY:
19    Q This is Joeleen Akin's calendar, and the
20 e-mail that I just showed you was sent on
21 November 7th of 2018. And here on Ms. Akin's
22 calendar on November 14th, so about a week later,
23 there is a meeting, GTAA and GTHR alignment
24 between at least Joeleen Akin and Kim Harrington.
25    Did you participate in a meeting around

133

1  this time with Ms. Akin? Was there any sort of
2  alignment between HR and the athletic association?
3  **A  I don't think I was in that meeting.**
4      Q  Do you know what it was about?
5  **A  No.**
6      Q  Was it -- could it have been about Coach
7  Joseph?
8  **A  I don't know what it was about.**
9      Q  So then on November 28th, so about two
10  weeks later, on Joeleen's calendar, there was a
11  meeting between you and Joeleen Akin to discuss
12  coach.
13      Did you and Joeleen talk about MaChelle
14  and about this issue with Shoshanna?
15  **A  So I -- I don't recall what the -- I don't**
16  **recall a meeting, what it was about. But I**
17  **specifically don't remember talking to her about**
18  **Shoshanna and Coach Joseph -- or really Shoshanna**
19  **at all.**
20      Q  So if you were to meet with Joeleen again
21  to discuss a coach, what would that meeting be
22  about? I mean, you are overseeing employee
23  relations in HR. If you are meeting with someone
24  in the athletic department, are you talking about
25  an employee's relations issues, presumably?

134

1  **A  Yes, yes. So it could be that or it could**
2  **just be strategic support. And it could be just**
3  **giving advice and support.**
4      Q  What do you mean when you say "strategic
5  support?"
6  **A  Well, we -- I mean, the business partners**
7  **don't just do employee relations. We do**
8  **organizational design and development and just --**
9  **you know, other things. People have questions**
10  **about benefits. So we -- you know, I ran the**
11  **whole gamut.**
12      Q  So -- but if you are discussing a coach --
13  **A  I couldn't tell you from that what we**
14  **talked about.**
15      Q  Okay.
16      MS. COVENEY:  Caleb, can you take this
17  down and put up Exhibit 91. It's Plaintiff's
18  007585.
19      (JOYCE Deposition Exhibit 24 marked for
20  identification and attached.)
21  BY MS. COVENEY:
22      Q  Okay. Have you ever seen this document?
23  **A  I may have. I may have. It was not given**
24  **to me as to do something with it, but I may have**
25  **seen it at some point.**

135

1      Q  And do you recall any of the circumstances
2  around that, who may have shown it to you and when
3  and why?
4  **A  I really don't.**
5      Q  But you recall at least being aware that
6  Coach Joseph had sent a letter to President
7  Peterson complaining of discrimination and
8  retaliation; is that right?
9  **A  I don't mean to be -- at that point, we**
10  **were flooded. We were really busy -- because we**
11  **were just overwhelmed at the time. I don't really**
12  **remember this letter.**
13      Q  But it's possible someone showed it to
14  you?
15  **A  It is possible.**
16      Q  Okay. In this letter, Coach Joseph,
17  through her attorneys, is complaining about
18  discrimination and retaliation and violation of
19  Title 7 and Title 9.
20      Is that a type of complaint that your
21  office would handle, an employee complaining of
22  discrimination and retaliation?
23  **A  I'm trying -- they kind of evolved,**
24  **because they got so -- they have a greater focus.**
25  **I don't know how they were assigning things at**

136

1  **that point. I don't know if they would have**
2  **assigned it to my office.**
3      Q  What other office would handle a complaint
4  alleging employment discrimination and
5  retaliation?
6  **A  Legal. To an investigator.**
7      Q  What's that? Sorry.
8  **A  They could send it to an external**
9  **investigator for handling.**
10      Q  And when you say "legal," you mean like
11  the -- like Kate Wasch, the employment counsel?
12  **A  Kate or Aisha . They wouldn't do the**
13  **investigation themselves, but they might have**
14  **contracted a third party to do it. I just don't**
15  **recall how this was handled, and I do recall there**
16  **were other people doing these because there were**
17  **quite a few.**
18      Q  When you say "doing these," what do you
19  mean by that?
20  **A  Well, if they got an EthicsPoint complaint**
21  **or just a complaint with Title 7-type violations,**
22  **then those need to be investigated but would not**
23  **necessarily come to my shop, though.**
24      Q  Were you handling some employment
25  discrimination, retaliation cases, just not all of

137

1  them?
2      A  We were definitely handling some.  I don't
3  think we had all of them.
4      Q  Okay.  But to your knowledge, no one asked
5  you to investigate this -- these issues in this
6  letter; is that right?
7      A  I don't recall being asked to investigate
8  those.
9      Q  If you had been asked to investigate, you
10 would have investigated this, correct?
11     A  We would have had someone investigate it.
12 You know, I'm not an investigator.  Typically, I
13 don't investigate.  But I would have had one of my
14 people or it would have been assigned out.
15     Q  Okay.  And there would have been some
16 report done on that investigation, correct, if
17 there had been an investigation done?
18     A  Yeah.  If there had been an investigation,
19 I would assume that it would be off of a report of
20 some kind.
21     Q  And to your knowledge, there is no report
22 summarizing an investigation of these complaints
23 at your office?
24     A  I don't recall that, no.
25     Q  Okay.  Okay.  So this letter was sent

138

1  about seven days before that November 28th meeting
2  with Ms. Akin where you discussed Coach.  Did you
3  all discuss this letter during that meeting?
4      A  I really don't recall talking to her about
5  this.
6      Q  Okay.  But you could have; you just don't
7  recall?
8      A  We could have --
9      Q  All right.
10     A  -- because I don't even recall the
11 meeting, so...
12     Q  Okay.  Does the name Felicia Tucker ring a
13 bell to you?
14     A  You said Felicia?
15     Q  Felicia Tucker.
16     A  That sounds familiar.
17     Q  Do you know -- recall who she is?
18     A  No.
19     Q  Okay.  So Felicia Tucker is a former -- is
20 a former employee of Coach Joseph.  She was -- she
21 worked for the women's basketball team.
22         And do you recall in late January of 2019
23 there being a staff dispute between Coach Joseph,
24 Felicia Tucker and Brittany Oliver?
25     A  I'm trying to keep them straight.  I do

139

1  remember both names and I know there was some kind
2  of dispute.
3      Q  Okay.  What do you recall about that
4  dispute?
5      A  I remember they were unhappy.  I don't
6  remember the specifics of it.
7      Q  Okay.
8         MS. COVENEY:  Caleb, can you bring up
9  Exhibit 234.  It's Joyce 00001.
10        (JOYCE Deposition Exhibit 25 marked for
11 identification and attached.)
12 BY MS. COVENEY:
13     Q  So Ms. Joyce, these are some of the text
14 messages you produced to us recently in response
15 to the subpoena we issued you.  And this number --
16 do you recognize this number, (404) 213-5248?
17     A  Not offhand.
18     Q  Well, this is, I believe, Joeleen Akin.
19 So it looks like on January 24th -- so this is the
20 day of the incident between Coach Joseph, Felicia
21 Tucker, and Brittany Oliver, January 24th.
22 Ms. Akin texted, I need to talk to you about an
23 incident that happened with MaChelle Joseph and
24 two staff members.  I'm not sure if Kevin has
25 reached out to you or not.  Can you talk while

140

1  you're driving home today?
2         Do you recall talking to Ms. Akin about
3  this?
4      A  No.
5      Q  Okay.  So I can represent to you that
6  Kevin Cruz eventually gets roped into this dispute
7  and he tries to mediate the conflict between
8  Coach Joseph and Felicia Tucker and Brittany
9  Oliver for a little bit.
10        Do you recall Mr. Cruz trying to resolve
11 this issue?
12     A  Not specifically, but you know, that would
13 be something he might do.
14     Q  Okay.
15        MS. COVENEY:  Caleb, can we see Exhibit
16 113, BOR-004422.
17        (JOYCE Deposition Exhibit 26 marked for
18 identification and attached.)
19 BY MS. COVENEY:
20     Q  So around this time, so around the late
21 January/ February timeframe, do you recall Coach
22 Joseph filing an internal complaint alleging
23 discrimination, retaliation and conflict of
24 interest?
25     Ms. Joyce?

141

1    A Oh, I'm sorry. I -- I was also around
2 looking at this.
3    Q And you can -- why don't you review this
4 and let me know when you are done and then we can
5 talk about this complaint .
6    A Okay. This helps in terms of remembering.
7 I remember Kevin trying to work to mediate some
8 staff issues, and that may have been what
9 Joeleen -- I have no idea. That's speculation.
10    What was your question on that?
11    Q Okay. So on February 11th, Kevin Cruz
12 e-mails you, copying Lori Douglas and Todd
13 Stansbury. Says he wants to make you aware of a
14 recent Title 9 complaint per Todd's e-mail I'm
15 forwarding. It was submitted by Coach MaChelle
16 Joseph. And then -- we don't have the complaint
17 on here.
18    Okay. There was a complaint attached to
19 this, but we'll look at it in a moment.
20    Was Kevin Cruz the first person who sent
21 you a copy of MaChelle's February 8th complaint?
22    A I don't know.
23    Q So had you seen it before Kevin Cruz sent
24 you this e-mail?
25    A I don't know.

142

1    Q And you remember -- so here he's talking
2 about this dispute with Coach Joseph and her
3 staff. So now you recall that Kevin Cruz was
4 trying to resolve this conflict between Felicia
5 Tucker and Brittany Oliver and Coach Joseph,
6 correct?
7    A Yes.
8    Q On February 11th, he says, I agree to have
9 follow-up with a second staff meeting so I can
10 conduct an exercise that was a part of our first
11 meeting.
12    Those remediation efforts appear to be
13 ongoing, correct?
14    A Yes.
15    Q All right. So then you respond to Kevin's
16 e-mail about the complaint and you ask who Coach
17 Joseph was addressing the title 9 complaints to.
18 It might be helpful to understand that timeline
19 with those.
20    Prior to this time, had you ever talked to
21 Coach Joseph about Title 9 issues or concerns?
22    A No. That's not my area.
23    Q Whose area was that?
24    A The person who had it when I left was
25 Marcia Stadeker , I believe.

143

1    Q And what about Shoshanna Engel, did she
2 have any sort of role?
3    A Yes.
4    Q All right. And then you said, The
5 investigations -- HR has been involved concerning
6 Coach Joseph -- the complaints made by her
7 administrative assistant. So was that the Sanford
8 allegations we talked about earlier?
9    A Yes.
10    Q Okay. An assistant coach, and was this
11 Malikah Willis?
12    A Yes.
13    Q Okay. And now other support staff.
14    So is this in relation to Felicia Tucker
15 and Brittany Oliver?
16    A Yes.
17    Q And had they filed complaints with HR by
18 this point in time -- Felicia Tucker and Brittany
19 Oliver?
20    A I don't know if they filed a formal
21 complaint. They had come and raised concerns. So
22 basically, they raised a complaint.
23    Q Okay. All right. And then you say, I
24 think Aisha's office should handle this
25 investigation as it appears to maybe claiming

144

1 retaliation but did want to mention that history.
2    And by Aisha's office, you mean Aisha
3 Oliver-Staley?
4    A Yes.
5    Q And why did you think she should handle --
6 sorry, when you say 'this investigation," you mean
7 the investigation of Coach Joseph's complaint?
8    A Yes.
9    Q And why did you think that Aisha's office
10 should handle that?
11    A Because we were given direction at that
12 point. Any Title 7, any kind of claims with legal
13 issues, specifically names, should go through
14 Aisha's office.
15    Q And who gave that direction?
16    A I don't know who specifically did it. I
17 mean, through Aisha's office.
18    Q When did they give that direction?
19    A I don't know.
20    Q Did they give it to you, to your office
21 specifically, or was this like an institute-wide
22 announcement?
23    A It was not institute wide. I don't know
24 who provided that direction specifically, but it
25 was given to HR to me.

145

1  Q It said that Aisha's office should handle
2  Title 7 and Title 9 complaints?
3  A Well, here -- I don't recall specifically.
4  I think Title 9 went to Marcia, but the
5  retaliation complaint -- I'm almost at the point
6  I'm guessing. But my recollection is that when
7  looking at this, I was repeating what I've been
8  told how they should be triaged.
9  Q And was it -- was it Aisha's office would
10 handle any type of complaint that alleged
11 discrimination or retaliation, or complaints that
12 a legal claim had been asserted?
13 A I don't recall. I don't recall.
14 Q Was your office at this time handling any
15 discrimination and retaliation matters?
16 A Yes, but not -- we were handling -- I
17 don't want to guess, but that specific direction,
18 I was provided to -- I was provided how to triage
19 that kind of complaint and it was to go to Aisha's
20 office.
21 Q And it was any complaint or just
22 complaints in the athletic department?
23 A No. It was complaints of a certain
24 nature, and I can't recall exact specifics on it,
25 but it wasn't to, you know, athletics -- it was

146

1  institute wide.
2  Q And when you say "certain nature," what do
3  you mean by that? Complaint in what nature?
4  A I don't want to guess. My recollection is
5  it was specifically Title 7. It would -- we
6  assign it there and then sometimes it would get
7  kicked back to us. So our office handled some of
8  them and she handled any claim that had a specific
9  legal claim in there, like Title 7 -- we would
10 kick off to Aisha's office first for assignment.
11 Q Okay. And what was she supposed to do
12 with them when she got them?
13 A Make sure they got --
14    MS. COVENEY: Object to the form of the
15 question, asking about what Aisha is supposed to
16 do.
17 BY MS. COVENEY:
18 Q So earlier we looked at an e-mail where it
19 said that Aisha was taking it upon herself to make
20 sure that any in-person complaint that was filed
21 would be put into EthicsPoint.
22    Was it your understanding that that was
23 the directive? If you -- if you received -- if
24 you in your office received a complaint, you were
25 supposed to input into EthicsPoint. Was that your

147

1  understanding?
2  A So yes, at that time period, and that got
3  dialed back. It was never a specific decree that
4  went out, but they told us to stop putting them
5  into EthicsPoint because people complained about
6  it.
7  Q Who told you that?
8  A It came from Aisha's office.
9  Q When?
10 A I don't recall.
11 Q Okay. If people were complaining that it
12 was too much, that there were too many complaints
13 of potential wrongdoing being filed in
14 EthicsPoint --
15 A No.
16 Q -- where the system was overwhelmed?
17 A No. It's all open records and they didn't
18 understand that, so they did not want their
19 complaint open to the public. So people would
20 complain that had put it into a system and that
21 was not their intent.
22 Q So who was complaining about this?
23 A We had several employees who complained.
24 I don't recall every single one's name. But
25 people were not -- we talked about it and decided

148

1  that didn't make sense to put everything in there,
2  even if the employee didn't want it in
3  EthicsPoint.
4  Q Okay. So this complaint comes in --
5  MaChelle's complaint comes in, you say you think
6  it should be handled by Aisha's office. Did you
7  forward it to Aisha's office?
8  A I don't know.
9    MS. COVENEY: Caleb, can you bring up
10 exhibit -- sorry. One second. Exhibit 116,
11 BOR-001626.
12    (JOYCE Deposition Exhibit 27 marked for
13 identification and attached.)
14 THE WITNESS: Can you give me one second.
15 MS. COVENEY: Sure.
16 THE WITNESS: It's the kids.
17 MS. COVENEY: No worries. I understand.
18 BY MS. COVENEY:
19 Q Ms. Joyce, can you just take a look at
20 this and let me know when you're done.
21 A Okay.
22 Q So on February 11th, Felicia Tucker
23 e-mails you and asks you to have a meeting to talk
24 about some concerns she has.
25    And at this time, did you know what her

149

1  concerns were?
2      A I don't know. I'm not sure.
3      Q Okay. But you are aware that Mr. Cruz had
4  been trying to mediate this conflict at this time.
5  We just saw an e-mail where, on February 11th,
6  Kevin Cruz e-mailed you and said, I'm trying to
7  work through these issues. I'm scheduling a
8  second follow-up meeting?
9      A Yeah. So given the timing of those
10 e-mails, I was aware.
11     Q Sorry. That was the wrong exhibit I
12 wanted to look at.
13     MS. COVENEY: Caleb, sorry, can you bring
14 up Exhibit 133, Plaintiff's 009702.
15     (JOYCE Deposition Exhibit 28 marked for
16 identification and attached.)
17 BY MS. COVENEY:
18     Q Ms. Joyce, can you take a look at this and
19 let me know when you're done.
20     A Okay.
21     Q The document before this -- it was
22 February 11th -- Felicia Tucker e-mails you and
23 asks to meet with you to talk about a complaint
24 that she had.
25     Do you recall meeting with Ms. Tucker?

150

1      A I do, yeah. I don't remember the date or
2  the time.
3      Q Okay. And who else -- was there anyone
4  else present for that interview?
5      A Lori who is the employee relations
6  consultant. I guess it was supporting athletics.
7      Q And did Ms. Tucker bring anyone else with
8  her?
9      A I believe Brittany was there as described
10 in the summary.
11     Q So on February 12th, you send this right
12 up to Kate Wasch and Kim Harrington. She said,
13 Per our earlier phone conversation, please see
14 below my summary of the meeting with Lori Douglas,
15 ERC and I had with two athletics employees.
16     So it sounds like after you met with
17 Felicia Tucker and Brittany Oliver, you called
18 Kate Wasch; is that right?
19     A It sounds like it from the e-mail.
20     Q Why would you do that?
21     A I'm not sure. I guess to let her know we
22 had the conversation. I don't know.
23     Q I mean, did you typically -- when you
24 received an HR complaint alleging -- it sounds
25 like some bullying and retaliation, did you

151

1  typically pick up the phone and call Kate Wasch?
2      A Not every time. So in this case, I don't
3  recall why I did.
4      Q Well, why would you? When you called Kate
5  Wasch, what was the purpose of that?
6      A Well, we had previous complaints. I may
7  have called her to make sure we were trying to be
8  very careful to handle these seriously. I
9  don't -- I don't recall why I called her.
10     Q So you called Kate Wasch, then you send
11 her this write-up. You say, I'm forwarding to you
12 the documents Kevin Cruz provided Lori that
13 concern, what's occurred between these two
14 employees and Coach Joe as well as HR's
15 remediation efforts.
16     And by these two employees, are you
17 referring to Felicia and Brittany?
18     A I assume so.
19     Q And "HR's remediation efforts," this is
20 the reference to Kevin Cruz's attempts to resolve
21 this conflict between Felicia and Brittany and
22 Coach Joe?
23     A That sounds right.
24     Q Then you say, My summary is lengthy as I
25 decided to capture all of my handwritten notes

152

1  while fresh.
2      So these handwritten notes, were they --
3  were they in a notebook somewhere?
4      A Yes.
5      Q And you -- so this was an instance where
6  you decided to take detailed notes, correct?
7      A Yes, because I was doing intake.
8      Q And did anyone ask you to preserve these
9  notes at any point in time? It sounds like Kate
10 Wasch is aware they existed.
11     A Like I said, I don't remember. It seems
12 reasonable they would have and I would have
13 provided what I had and preserved it.
14     Q But you don't know for sure?
15     A No. I don't even know if I kept a
16 notebook when I got a litigation hold. That's why
17 I try to type up things because my handwriting is
18 terrible and because I want to make sure I have
19 good notes when I need to.
20     Q I mean, if you had received a litigation
21 hold asking you to preserve documents relevant to
22 the case, would you have preserved documents
23 including handwritten notes relevant to this case?
24     A Absolutely. Yes.
25     Q But it sounds like when you left Georgia

153

1  Tech, you took your handwritten notes with you and
2  think you discarded them at some point.
3  **A  I don't know.  I didn't -- I don't -- I**
4  **don't really recall.  I wouldn't have any problem**
5  **giving those notes, and if they were requested of**
6  **me, I would have provided them.**
7    Q  Okay.  Okay.  All right.  So then you say,
8  The bottom line is that these two employees
9  believe they have been bullied by Coach Joe and
10  has fully -- has escalated because they raise
11  concerns about Coach Joe, either to next-level
12  leadership or to HR.
13    So it sounds like they're complaining that
14  Coach Joe's retaliating against them, correct?
15  **A  Sounds like it.**
16    Q  And did you refer this to Aisha
17  Oliver-Staley ?
18  **A  I don't know.  I'm sure it came up in**
19  **triage and it was assigned.**
20    Q  Assigned to who?
21  **A  I don't recall.**
22    Q  So explain more about this triage.
23  Complaints like this come in and then you all sit
24  in a room and you say, so and so filed a
25  complaint.  What do we do about it?

154

1  **A  Who do we -- I mean, we make sure the**
2  **complaints are -- the purpose of it was to make**
3  **sure we had visibility.  Aisha wanted to see**
4  **everything, that they were appropriately assigned**
5  **and handled timely.**
6    Q  Okay.  And so you don't -- you do recall
7  that -- or at least in that e-mail it appeared
8  that your recommendation was to assign Coach
9  Joseph's retaliation complaint to Aisha
10  Oliver-Staley, and you don't know what you did
11  with this retaliation complaint, Felicia and
12  Brittany's?
13  **A  I don't.**
14    Q  Okay.  So then you -- bottom line here, As
15  discussed in our call, we will wait to hear from
16  you on the investigator selected to investigate
17  these and other concerns involving women's
18  basketball.
19    So it sounds like someone had made a
20  decision within a day to investigate Felicia
21  Tucker's complaint.  That's how I'm reading that.
22  Is that your memory of what happened?
23  **A  They would have assigned an investigator**
24  **pretty quickly at that time if I recall.  So that**
25  **sounds right and it sounds like that's what was**

155

1  going on.
2    Q  You say "they."  Who would -- who do you
3  mean "they" would have assigned an investigator?
4  **A  Well, because we were under more scrutiny,**
5  **this would have been assigned out by legal.  So**
6  **they would tell us who investigates.**
7    Q  Okay.  And the other concerns involving
8  women's basketball, was that the complaint that
9  MaChelle had raised a few days before the
10  February 8th complaint?
11  **A  I don't know.**
12    Q  Okay.  All right.  So it sounds like -- so
13  you called -- Felicia meets with you, you call
14  Kate Wasch.  You say, I got this complaint, and
15  then Kate Wasch says, we are going to
16  investigate -- get an investigator?  Was that the
17  sequence of events?
18  **A  Pretty much.  I mean that's what we would**
19  **do -- so we -- I mean, that's -- we do intake and**
20  **assign out.  That's what we were doing at that**
21  **point.**
22    Q  And -- so at this point in time, Kevin
23  Cruz was trying to resolve this conflict between
24  MaChelle, Felicia, and Brittany, correct?
25  **A  Yes.**

156

1    Q  So why -- was that a -- did you consider
2  that when deciding to investigate?  Was someone
3  not like, Kevin Cruz is already dealing with this.
4  He said he has plans to have a second meeting in a
5  week to deal with it.  Let's see what he can do
6  with this.  Did anyone talk about that?
7  **A  Well, Kevin was part of the conversation.**
8    Q  He was part of this conversation?
9  **A  Well, in terms of -- all I recall is he --**
10  **it had gone to a point beyond what he was**
11  **originally trying to do and what -- it did not**
12  **seem to be working, and now we had a specific**
13  **complaint.  I don't even know if he still had the**
14  **second meeting.  I don't recall.  But since we had**
15  **the complaint, we had to assign it out for**
16  **investigation.**
17    Q  So is he part of this call with Kate
18  Wasch?
19  **A  No.  No.  I mean that in terms of he knew**
20  **there was a complaint.  I don't know if he did the**
21  **second interview or the second part of it, he**
22  **didn't disagree with the investigation nor would I**
23  **have expected him to, you know -- normal**
24  **complaint.  We pretty much assigned everything out**
25  **for investigation at that point.**

157

1    Q  Okay.  Just real quick, at the bottom of
2  this.  It says, Lori and I advised them that they
3  prepare statements and submit them to us.
4      Is that your normal practice to have the
5  complaints -- prepare statements and send them to
6  you?
7    A  It's not out of norm.
8    Q  And did they prepare those statements?
9    A  I don't recall.
10   Q  Okay.  So at this point in time, do you
11 recall anybody talking about the prospect of
12 MaChelle suing Georgia Tech?
13   A  "At this point," you mean February 2019?
14   Q  Yes.
15   A  I don't remember that -- I don't remember
16 anybody saying, hey, she's going to sue us.  But
17 it may have come up.  I mean, that may have come
18 up.
19   Q  I mean, did you think that she might sue
20 after reading all of these complaints?
21   A  I have to come at it every time as if
22 people might sue.  So you have to treat each one
23 seriously.
24   Q  And did you think -- do you think a
25 complaint of discrimination and retaliation is

158

1  serious?
2    A  Yes.
3    Q  Okay.  So -- all right.  So we have Coach
4  Joseph filing her complaint on February 8th and
5  Felicia Tucker filing a complaint on
6  February 11th.
7      MS. COVENEY:  Caleb, can you pull up
8  Exhibit 128 BOR-001200 -- sorry.  Actually, can
9  you do 001739.  It's Exhibit 129.
10     (JOYCE Deposition Exhibit 29 marked for
11 identification and attached.)
12 BY MS. COVENEY:
13   Q  Okay.  Do you recognize this e-mail?
14   A  I haven't seen it in a long time, but yes.
15   Q  So here we have Benson Pope e-mails you on
16 February 20th about an investigation.  He says
17 he's in a mediation.  He's trying to break away,
18 but Eric Hoffman does have Title 9 experience and
19 can assist.
20     So  Why are you reaching out to Benson
21 Pope at this time?
22   A  Because we talked about who would
23 investigate.  Ben is a Littler contact and we were
24 going to have Littler investigate it.
25   Q  And investigate what exactly?

159

1    A  The complaint from Felicia and -- from
2  Felicia.
3    Q  And who told you to -- who made the
4  decision to retain an outside investigator?
5    A  I don't know who made the exact decision,
6  but it was consistent with what we have been
7  doing.
8    Q  Was it you?
9    A  No.
10   Q  Who was involved in conversations about
11 retaining an outside investigator?
12   A  I don't know specifically.  It would have
13 been that triage group generally.
14   Q  So you would have discussed these
15 complaints against Coach Joseph, the Felicia
16 Tucker complaint, at least in the triage meeting;
17 is that right?
18   A  I image so.  I don't know for sure.
19   Q  Would you have taken some type of notes of
20 that meeting?
21   A  I didn't take a lot of notes during
22 triage.  I don't know.
23   Q  But you could have?
24   A  I could have.
25   Q  Okay.  So a decision was made to retain an

160

1  outside investigator.  It was not made by you, but
2  you cannot recall who made the decision.  Is that
3  your testimony?
4    A  Yes.
5    Q  Okay.  And who recommended that Littler
6  investigate?
7    A  So we had several investigation groups
8  that we used.  I don't know how we arrived at
9  Littler.
10   Q  Okay.  At this point in time, were you
11 aware of the student complaints against Coach
12 Joseph?
13   A  I don't know.  I don't know when those
14 came up.
15   Q  Do you -- so did you hear about them
16 before Felicia Tucker came to you on February
17 11th?
18   A  I don't recall.
19   Q  Do you recall what the complaints were
20 about?  The student complaints.
21   A  I remember the nature being bullying
22 generally.
23   Q  And did you think they were serious
24 complaints?
25   A  Yes.  I mean, they are from students.

161

1    Q  Okay.  And who brought the complaints to
2  your attention?
3    A  I don't recall.
4    Q  Did the students come to you and say, hey,
5  I got these complaints.  I want to file these
6  complaints to the office?
7    A  No.
8    Q  Did Felicia Tucker tell you about them?
9    A  No, not to my knowledge.
10    Q  Okay.  And you don't know when someone
11  told you about them.  Was it around the time that
12  you reached out to Benson Pope?
13    A  I don't know.  I mean, I reached out on
14  February 20th.
15    Q  Right.
16    A  I don't know when we got the student
17  complaints.
18    Q  If you had been presented with student
19  complaints alleging bullying by Coach Joseph, is
20  that something you would have sat on and waited
21  for a while to retain an investigator to
22  investigate?  Like, if you had received the
23  complaints in early January, would it -- would you
24  have just waited until February 20th to retain an
25  investigator to investigate?

162

1    A  If I had complaints from students, we
2  wouldn't handle them.  So we would send it to
3  someone else to take appropriate action.
4    Q  And who would you send them to?
5    A  I believe we would send it probably to
6  Aisha first, but then it would probably go to
7  student life, not us.
8    Q  Okay.  But at some point, they did come to
9  your attention, right?
10    A  Yes.
11    Q  And who brought them to your attention?
12    A  I don't know.
13    Q  I mean, so it definitely wasn't the
14  students, correct, that brought them to your
15  attention?
16    A  Yes.
17    Q  So it was somebody -- was it somebody at
18  Georgia Tech?
19    A  Yes.  Yes.
20    Q  Okay.
21    A  I guess.  I don't know who else would have
22  known of them that I talked to.
23    Q  Okay.  And did they ask you to investigate
24  them?
25    A  I don't recall a conversation about it.

163

1  They didn't ask me.  I am not investigating them.
2  They came up at some point and they were
3  determined how they would be investigated.  It was
4  not my call.
5    Q  Whose call was it?
6    A  I don't know.
7    Q  Were these student complaints discussed at
8  the triage meetings?
9    A  I don't recall whether they were
10  discussed.  At some point they were, yes.
11    Q  Okay.  So you contact Benson Pope on
12  February 20th about an investigation.  You know at
13  a minimum it's about Felicia Tucker, correct?  But
14  you don't know what else you wanted him to
15  investigate at this point in time?
16    A  I really don't remember where I was with
17  this at that point.
18    Q  All right.  And so you then respond, Okay,
19  great, Eric.  If you have time, call me on my cell
20  after three.  I also have time tomorrow before
21  9:30.  They have asked me to check with one other
22  firm and I will explain that we have an urgent
23  need to follow up on this ASAP.
24        Okay.  So, they have asked me to check
25  with one other firm.  Again, who asked you to do

164

1  this?
2    A  I don't -- I don't know.
3    Q  And we have an urgent need to follow up.
4        Why was this urgent?
5    A  I don't know.
6    Q  And then Eric asks for the names of the
7  people so he can run a conflicts check.  And here
8  you say, MaChelle Joseph and Felicia Tucker.
9        MS. COVENEY:  Caleb, Can you bring up
10  Exhibit 132, BOR-002826.
11        (JOYCE Deposition Exhibit 30 marked for
12  identification and attached.)
13  BY MS. COVENEY:
14    Q  It's basically the same document except
15  for the top.  It's different.
16    A  Okay.
17    Q  Okay.  So in one e-mail you say, The
18  responding complainants are MaChelle Joseph and
19  Felicia Tucker.  And then in this e-mail, you
20  changed that response.  Do you know why you did
21  that?
22    A  I guess because I at that point did
23  understand there were student complaints.
24    Q  So do you think it was around this time
25  that you found out about these student complaints?

165

1  A I mentioned students in this e-mail, so
2  it's possible.
3     Q So you say, I do not have the two
4  students' names and will request that.
5        So is it your understanding at this point
6  in time that two students had come forward?
7     A It sounds like it.
8     Q Do you recall who they were?
9     A No.
10    Q Okay. And so Eric Hoffman -- Georgia Tech
11 ends up retaining Eric Hoffman to investigate
12 these allegations, correct?
13    A Correct.
14    Q And were you involved in discussions about
15 retaining him?
16    A Yes.
17    Q And who else was involved in those
18 conversations?
19    A The only person I remember talking to is
20 Kate. I remember her saying, What about Eric?
21 And -- because everyone had experience with
22 investigators. Eric is a good investigator.
23    Q When you say everyone had experience with
24 him who do you -- who is everyone?
25    A Well, within the triage, the experience

166

1  with different investigators, because we assign
2  different investigators to different concerns. So
3  the one who came up as being timely and
4  complete -- I wouldn't say one, there was a
5  couple. Eric was one of them.
6     Q And did Eric have any experience in
7  athletics -- investigating things in athletics
8  departments?
9     A No. I don't recall.
10    Q Was that ever a consideration that you all
11 talked about?
12    A I don't recall talking about it with Kate.
13 And that's the only discussion I had was with her
14 on kind of who would maybe be able to get this
15 done and do a good job with it.
16    Q Okay. And so when you retained him, what
17 did you understand the scope of his investigation
18 to be?
19    A I don't recall. I don't recall.
20    Q So you had these complaints. You had
21 Felicia Tucker, and you had these two student
22 complaints. Typically, when you have specific
23 complaints about an employee's conduct, you ask
24 the investigator to investigate that specific
25 conduct, figure out if these allegations are true.

167

1        Would that be a typical direction to an
2  investigator?
3     A Yes.
4     Q Okay.
5        MS. COVENEY: Caleb, can you bring up
6  Exhibit 133, Plaintiff's 009702.
7        (JOYCE Deposition Exhibit 31 marked for
8  identification and attached.)
9  BY MS. COVENEY:
10    Q This is a document we reviewed earlier.
11 We didn't go over this top e-mail.
12       On February 20th -- so the day that you
13 all -- you and Eric are talking about this
14 investigation, you e-mail him a bunch of documents
15 and you say, I'm sending you what I have regarding
16 complaints and issues of concern and wanted to
17 fast forward at this point . What I don't have is
18 the student complaints. I reviewed hard copies,
19 so I need to get those.
20    Q So the student complaints, they were hard
21 copy complaints; is that right?
22    A It sounds like it.
23    Q Okay. Did somebody show you those
24 complaints?
25    A It sounds like it.

168

1     Q Who showed them to you?
2     A I don't -- I really don't remember who
3  exactly showed it to me.
4     Q And what did they show you? Did they just
5  show you -- what did they show you? Sorry.
6     A I don't know. I guess the complaints.
7     Q Okay.
8        MS. COVENEY: Can we take a five-minute
9  break? Come back at three?
10       THE WITNESS: Okay.
11       (A brief recess was taken.)
12 BY MS. COVENEY:
13    Q All right. So when we broke, we were
14 talking about the student complaints that had been
15 filed. And we were looking at an e-mail where you
16 said you had just seen hard copies of the
17 complaints. I guess before we go there, just
18 quickly, for these triage meetings that we have
19 been talking about, was Shoshanna Engel part of
20 the triage teem?
21    A No.
22    Q She was not. So she did not participate
23 in any of the triage meetings?
24    A Not when I was in it. I don't recall her
25 being in any of them.

169

1    Q  And the -- and for the meeting -- the
2  meeting notes, I understand that sometimes you may
3  have taken notes during those meetings and
4  sometimes not.  Were there minutes that were
5  reported by somebody, not you, but somebody?
6    **A  They had an agenda, so actually, they**
7  **would send out the spreadsheet.  They would send**
8  **out a spreadsheet and agenda, and often I would**
9  **jot notes on that.  And then there were usually**
10 **things like call so and so, check on this, past**
11 **due date.  And then I would not necessarily keep**
12 **those unless there was something of substance to**
13 **keep.**
14   Q  And the agenda, was it circulated by
15 e-mail to the triage team, like before the
16 meeting?
17   **A  Yes.  I wouldn't say every time, but most**
18 **of the time, yes.**
19   Q  And if there were complaints that were
20 being discussed and the team was trying to decide
21 what to do with them, would information about
22 those open complaints be in the agenda?
23   **A  No.  Just the complaint.**
24   Q  But it would identify what complaints were
25 being discussed?

170

1    **A  Yes.**
2    Q  Okay.  So back to the student complaints.
3  So at some point somebody tells you that there
4  have been two student complaints filed against
5  Coach Joseph; is that right?
6    **A  From the e-mail, yes.  I knew at some**
7  **point complaints were filed, yes.**
8    Q  And you saw hard copies of the complaints;
9  is that right?
10   **A  Yes, from the e-mail, it's like I saw hard**
11 **copies.**
12     MS. COVENEY:  Caleb, can you bring up
13 Exhibit 228.  It's BOR-003109.
14     (JOYCE Deposition Exhibit 32 marked for
15 identification and attached.)
16 BY MS. COVENEY:
17   Q  Ms. Joyce, can you take a look at this and
18 let me know when you're done.
19   **A  Yes.**
20   Q  So is this one of the student complaints
21 you were shown?
22   **A  I really don't remember the student**
23 **complaints I saw.**
24   Q  But you know that you saw you student
25 complaints?

171

1    **A  I know from the e-mail.**
2    Q  Okay.  And when you saw the complaints,
3  did they -- were they presented to you in hard
4  copy?
5    **A  That's what the e-mail said.  I really**
6  **don't recall.**
7    Q  Okay.  So let's take a look at this
8  letter.  It's not signed or dated.  Are complaints
9  filed with your office typically signed or dated?
10   **A  So I don't know if this is from the**
11 **parents or who this -- they're not typically**
12 **signed and dated.  As they come into the**
13 **EthicsPoint, obviously, they would be dated.  We**
14 **get them every which way.  So this is from a**
15 **student.  Again, we did not handle student**
16 **complaints.**
17   Q  If a student complaint came in to your
18 office, what would you typically do with it?
19   **A  Trying to actually remember, exactly, but**
20 **we would basically send it up to be reassigned.**
21   Q  So there was a team of people who dealt
22 with student complaints, correct?  Is that right?
23   **A  Correct.**
24   Q  And they would do their own
25 investigations; is that right?

172

1    **A  Yes.  I mean, sometimes they would also**
2  **hire an investigator, an external investigator,**
3  **but it was not in my shop, so I can't speak to**
4  **exactly how they assigned them or how -- their**
5  **process.**
6    Q  Nevertheless, for some reason, these
7  complaints came to your office?
8    **A  Yes.**
9    Q  Okay.  And when you receive a complaint in
10 your office, do you usually have a way to identify
11 who authored the complaint, either assigned or you
12 have an e-mail sending you the complaint or you've
13 met with the person and you took down their
14 information.  Is that -- I mean, do you normally
15 have a way to connect the complaint to the person
16 filing it?
17   **A  I'm not exactly sure what you mean.**
18   Q  I mean, is it important when someone files
19 a complaint with your office for you to know who
20 filed it?
21   **A  Like, some people can do it anonymous.  We**
22 **would -- we have to look at the facts, so we would**
23 **want to know who wrote it.  If it's confidential,**
24 **it's confidential.  But we would -- I don't know.**
25 **I mean, it would be part of the investigation is**

173

1  to make sure we understood whose --
2  Q  Where it came from?
3  A  Yeah.
4  Q  So when were shown the student letters,
5  were you shown any evidence about how they were
6  transmitted to Georgia Tech?
7  A  I don't recall.
8  Q  Okay.  And when you were told about the
9  student complaints, what was your understanding
10 about how they came about?
11 A  I don't -- I don't know how they came
12 about.
13 Q  Was it -- I mean -- okay.
14     So I mean, was it your understanding the
15 players come forward on their own and file these
16 complaints?
17 A  I don't remember having a conversation
18 about it, specifically me.
19 Q  But I mean, and you -- were you aware of
20 anyone else having a conversation about it?
21 A  I feel like I have a blank spot where
22 these came from and I don't remember where they
23 came from.  It would -- I can't remember if they
24 came from Kevin or someone else in athletics.
25 Q  So did Aisha Oliver-Staley show you these

174

1  letters?
2  A  I don't know.
3  Q  Were you aware that about a month before
4  you retained -- you reached out to Littler to
5  investigate these that the students had met with
6  Aisha Oliver-Staley and Felicia Tucker on a
7  Saturday night at an off campus Starbucks?
8  A  I was not aware of that.
9  Q  Were you aware that after that meeting,
10 Aisha Oliver-Staley reported -- appears to have
11 reported the complaints to Lynn Durham?
12 A  She could have.
13 Q  Or were you aware of that?
14 A  I don't recall that.
15 Q  Were you aware that after Aisha
16 Oliver-Staley reported these student complaints to
17 Ms. Durham that Ms. Aisha Oliver-Staley
18 specifically asked Ms. Tucker to have the students
19 get their parents to write these complaints about
20 Coach Joseph?
21 A  I don't know anything about that.
22 Q  Does that sound strange to you?
23 A  I don't know if I would say strange.  I
24 didn't -- I didn't know that happened.  I don't
25 know anything about it.

175

1  Q  Okay.  Is that typically how HR -- or how
2  these HR complaints are brought forward?
3     MS. STOFF:  I'm going to object.  She
4  already said that she doesn't deal with the
5  student complaints and that's not a part of her
6  role in HR.
7  BY MS. COVENEY:
8  Q  Well, as someone who is in charge of
9  implementing best practices for HR for
10 investigations at Georgia Tech during this
11 relevant timeframe, does that seem like a best
12 practice?
13 A  We typically don't ask our employees to
14 get their parents to write in.  But it's a
15 different situation.  It's hard for me to say.  I
16 didn't handle any student complaints.  In my
17 world, no, we would not do that.
18 Q  Okay.  And then are you aware that after
19 Ms. Tucker asked the students to write the
20 complaint that -- I guess, after Ms. Tucker asked
21 Francesca Pond to have her parents allegedly write
22 a complaint that Ms. Tucker directed Francesca
23 Pond to send the parents' letters to her Gmail
24 account?
25 A  No.

176

1  Q  Okay.  In your time at Georgia Tech in the
2  HR department, did you ever have a person who
3  filed a complaint send the complaint to your
4  personal e-mail account?
5  A  No.
6  Q  Would that be unusual for you to have
7  done?
8  A  For me?
9  Q  Yes.
10 A  Yes.
11 Q  Do you think -- do you think that the dean
12 of students would have these students send these
13 allegedly serious complaints of abuse to his or
14 her personal e-mail account?
15 A  I can't speculate on what the dean would
16 do.
17 Q  Okay.  Are you aware that after Ms. Tucker
18 had Ms. Pond send this complaint to her personal
19 e-mail account, she then deleted the e-mail
20 transmitting the complaint to her Gmail account?
21 A  I don't know.
22 Q  She printed out the letter, she put it in
23 an envelope and hand delivered to -- we think
24 either Joeleen Akin or Lynn Durham and then
25 deleted the e-mail transmitting this complaint

177

1  such that there is no evidence of who actually
2  sent this complaint to Ms. Tucker.
3      MS. COVENEY: I object to the line of
4  questioning. I don't think it's really a question
5  nor is it a narrative. So I'm objecting to the
6  form.
7  BY MS. COVENEY:
8     Q  Were you aware of any of that?
9     A  No.
10    Q  Does that seem strange to you?
11    A  I don't -- I was not involved with what
12 was going on with that, and it's hard to say
13 strange because I don't know the context, but -- I
14 don't know.
15    Q  Okay.
16        MS. COVENEY: Okay. Can can we look at
17 Exhibit 102, BOR-001140.
18        (JOYCE Deposition Exhibit 33 marked for
19 identification and attached.)
20 BY MS. COVENEY:
21    Q  Ms. Joyce, just let me know when you are
22 done looking at this.
23    A  Okay.
24    Q  And do you recognize this complaint?
25    A  I've seen it.

178

1     Q  So is this one of those student complaints
2  that you were provided?
3     A  I don't know. But I've seen it.
4     Q  When did you see it?
5     A  I don't know.
6     Q  Okay. Is this one of the complaints that
7  Eric Hoffman was asked to investigate?
8     A  Well, his name was at the top, so it looks
9  like it was provided to him.
10    Q  And so by February 25th, Eric Hoffman had
11 been retained to investigate the staff complaints
12 and the student complaints against Coach Joseph.
13 And as I understand it from the evidence, there
14 was a meeting on February 25th before Eric Hoffman
15 started his investigation that you participated
16 in.
17        After Eric Hoffman was retained but before
18 that meeting, did you meet with anybody -- anyone
19 at Georgia Tech to talk about the scope of his
20 investigation, what it should be?
21    A  I can't recall a specific meeting. It may
22 have been during triage. I don't recall a
23 specific meeting, but I know we talked about it.
24    Q  And what do you remember talking about
25 that issue about the scope, what the scope of his

179

1  investigation should be?
2     A  I think they were trying to figure out
3  whether -- I do remember conversations on whether
4  the Title 9 company should be treated separately.
5     Q  And what were the discussions around that?
6     A  I was only involved in understanding that
7  that was -- Kate told me that was being looked at.
8  I didn't make the decision. I know ultimately
9  they ended up bifurcating them.
10    Q  And the Title 9 complaints -- when you say
11 the Title 9 complaints, do you mean Coach Joseph's
12 Title 9 complaints?
13    A  Yes.
14    Q  So there was a -- a decision was made to
15 have Eric Hoffman to look into the allegations by
16 Felicia Tucker and Brittany Oliver and the
17 students and then have someone else look into
18 Coach Joseph's Title 9 concerns; is that right?
19    A  That's my recollection.
20    Q  Okay. And your office was working in
21 conjunction with Eric Hoffman in his
22 investigation; is that right?
23    A  The reason I sound vague on some of this,
24 at a certain point, it really wasn't my office.
25 It was Aisha's office.

180

1     Q  So she was leading the charge on this?
2     A  Yeah.
3     Q  Okay. So we have a calendar invite on
4  February 25th at 9:00 a.m. There is an athletics
5  meeting you, Lori Douglas, Eric Hoffman, and Kevin
6  Cruz. That's who is on the calendar invite?
7        Do you recall that meeting -- the
8  athletics meeting?
9     A  Who did you say? Lori, Kevin --
10    Q  Lori, Kevin, Eric, and you, and I believe
11 Joeleen Akin may have also participated.
12    A  And what day was that?
13    Q  February 25th?
14    A  So I don't recall -- I recall a meeting
15 with Eric with Lori and Kevin. I don't remember
16 if Joeleen was there -- she may have been -- just
17 to make sure we've given him everything because --
18 and answer any questions and provide -- if he had
19 questions on who reports to who, the usual.
20    Q  Okay. And prior to that meeting, had
21 anyone at Georgia Tech talked to you about
22 MaChelle -- the status of MaChelle's employment,
23 about whether they were considering terminating
24 her for -- based on these allegations?
25    A  Not prior to the investigation.

181

1    Q  At some point, did someone direct you or
2  your office to give Eric Hoffman Coach Joseph's
3  employment contract?
4    A  I don't recall.
5    Q  So in that meeting with Eric Hoffman and
6  Lori Douglas and Kevin Cruz to talk about the
7  scope of the investigation, do you remember if
8  Mr. Stansbury called in?
9    A  He may have.
10    Q  Okay.  Do you remember if anyone else
11  participated in that meeting?
12    A  I barely remember the meeting.  I don't
13  recall anyone else being -- participating.
14    Q  Okay.  All right.
15        MS. COVENEY:  So let's -- Caleb, can you
16  pull up Exhibit 144, BOR-000583.  Exhibit 544.
17        (JOYCE Deposition Exhibit 34 marked for
18  identification and attached.)
19  BY MS. COVENEY:
20    Q  So these are experts from a binder that
21  Eric Hoffman produced to us of his handwritten
22  notice of the investigation?  At the top of these
23  notes, it says, This is a meeting on 2:25.  So I'm
24  going to walk through these and see if you recall
25  any of these items being discussed when you were

182

1  present at this meeting.
2        Do you recall there being a discussion of
3  Title 9?
4    A  It looks like -- I think we may have
5  talked about who would handle.
6    Q  Okay.  What about NCAA issues?  Do you
7  remember that ever coming up?
8    A  I remember it coming up.  That's really
9  not my purview and I didn't have anything with it.
10  It was just who -- that was going on.
11    Q  What was going on with that, with the NCAA
12  stuff?
13    A  I don't want to speak to it specifically.
14  There was violations they were concerned about
15  that they were being investigated on.
16    Q  And was that something that you all asked
17  Eric to investigate was NCAA -- potential NCAA
18  violations?
19    A  No, not to -- not to my recollection.
20    Q  Okay.  Then it says, comprehensive review
21  of athletics.
22        Did someone ask Eric to do a comprehensive
23  review of Coach Joseph's program?
24    A  Did they ask Eric to do that?
25    Q  Yes.

183

1    A  I don't recall them asking him to do that.
2  I'm not sure about comprehensive review.  I don't
3  recall that.
4    Q  All right.  And then MJ claim being picked
5  on by investigation.
6        Do you remember that being discussed?
7    A  I don't remember this meeting, but if it's
8  there, then we may have talked about it.  We did
9  probably talk about it.
10    Q  All right.  So then we have Joeleen Akin,
11  senior woman (phonetic) administrator, very
12  nervous.
13        So do remember Joeleen being present for
14  this meeting?
15    A  Like I said, she could have been.  I don't
16  remember.
17    Q  And do you remember talking with Joeleen
18  during the course of the Littler investigation?
19    A  Yes.
20    Q  Did she seem nervous at all?
21    A  Yes.
22    Q  What did she seem nervous about?
23    A  She was nervous how things would end
24  either way, what it would mean to the team.
25    Q  And Ms. Akin had been Coach Joseph's

184

1  supervisor at some point in time, correct?
2    A  Yes.
3    Q  But in the beginning of the 2018-2019
4  season, she was not Coach Joseph's supervisor,
5  correct?
6    A  I don't remember, but that aligns.
7    Q  And she played a pretty -- she was pretty
8  involved in the Littler investigation.
9        Do you remember her involvement in the
10  Littler investigation?
11    A  She was -- she provided information that
12  she had brought to her is my only recollection.
13    Q  Okay.
14    A  And she probably was interviewed, I
15  believe.
16    Q  I don't believe she was interviewed.
17    A  I haven't seen her in a long time.
18    Q  She was in communication with the players
19  to schedule their interviews and schedule some
20  meetings with them throughout the investigation.
21        Were you aware of that?
22    A  Can you say that again.  I'm sorry.
23    Q  Ms. Akin was texting a lot with the
24  players during the investigation to schedule their
25  interviews and --

185

1    A  Yeah.
2    Q  You remember that?
3    A  Yes.
4    Q  And did she play a role in identifying
5  people to interview?
6    A  She may have.
7    Q  Okay.  At this time, you know, about a
8  month before the Littler investigation started,
9  Coach Joseph had filed that February 8th complaint
10  of discrimination and retaliation and conflict of
11  interest that we talked about earlier.
12      Do you recall that?  Coach Joseph's
13  internal complaint that she had filed?
14    A  Uh-huh.  Yes.
15    Q  And in that complaint, she -- Coach Joseph
16  had complained about a number of things, including
17  retaliation, and she identified a number of people
18  who she believed was -- were retaliating against
19  her.  And among those people was Joeleen Akin.
20  And Ms. Akin had received a copy of Coach Joseph's
21  February 8th complaint.
22      Does this seem like a good idea for
23  Joeleen Akin to have played a role in identifying
24  and communicating with witnesses in this
25  investigation?

186

1    A  I think she was the person best placed to
2  help with just setting and scheduling up people.
3  That's all I can say.
4    Q  But I mean, as both an employment lawyer
5  and as an HR professional, does it seem like a
6  good idea to have somebody who has just been
7  accused of retaliating against someone and
8  identified as a retaliator, not only to herself
9  but to the athletic -- the director of her entire
10  department?  Does it seem like a good idea to be
11  having her involved in an investigation of the
12  person who has just accused her of retaliation?
13    A  I don't know to the extent she was
14  involved with that.  And I don't know -- I can't
15  really speculate.  I believe if she was asked,
16  there may have been reasons for asking her to do
17  that.
18    Q  I mean, can you see a reason why that can
19  be problematic?
20    A  Yes.
21    Q  In your role as an HR professional?
22    A  I can see where that could be problematic.
23    Q  So then we have here workplace violence
24  policy.
25      Do you remember a discussion about the

187

1  workplace violence policy?
2    A  I don't remember the specific discussion
3  on the policy.
4    Q  Was that a policy that someone thought may
5  be implicated here?
6    A  I don't recall.
7    Q  What about players transfer out, what kind
8  of numbers?  Do you remember a discussion about
9  players transferring out?
10    A  No.  I think that may have just been
11  something asked.  I don't know.  I don't know.
12    Q  All right.  So then we have notes that say
13  Joeleen Akin and I -- I don't know -- it's not
14  clear to me whether this was a one-on-one meeting
15  with Joeleen and Eric or whether this was still
16  part of the group meeting.
17      Take a look at this and let me know if you
18  recall any of this being discussed in the meeting
19  that you attended.
20    A  It could have been.  Some looks familiar.
21    Q  What looks familiar here?
22    A  I think I remember some discussion on how
23  many complaints and the audio recording.
24    Q  Tell me what you remember about the audio
25  recording.

188

1    A  I don't remember anything except there was
2  one.
3    Q  Did someone play it at that meeting?
4    A  No.  Not to my recollection, no.
5    Q  Did someone mentioned there had been an
6  audio recording?
7    A  I thought so, yeah.
8    Q  And do you remember what it said?
9    A  No.  Uh-uh.
10    Q  Okay.  What about this?  Do you remember
11  anyone saying avoid inferno prior to?
12    A  No.
13    Q  And then there is a series of what looks
14  like potential areas of inquiry.
15      Did you all talk about topics that Eric
16  Hoffman should cover in his investigation?
17    A  No.
18    Q  So is it your understanding that Eric
19  Hoffman had been retained to investigate the truth
20  of the allegations that had been brought against
21  Coach Joseph?
22    A  Yes.
23    Q  So he was retained to determine whether
24  Coach Joseph had retaliated against Felicia Tucker
25  and Brittany Oliver or bullied them, whatever was

189

1  in your write-up.  He was supposed to figure out
2  if those allegations were true; is that right?
3  **A Yes.**
4    Q  And then there are these student
5  complaints, and he was tasked with figuring out
6  whether the allegations in those student
7  complaints were true; is that right?
8  **A Yes.**
9    Q  Did anyone meet with Coach Joseph at any
10 point in time, either before Littler was retained
11 up through her termination to tell her what
12 complaints had been brought against her?
13 **A I don't know.**
14   Q  Okay.  Well, let's assume that no one told
15 her the specific allegations that had been brought
16 against her.  Would that be consistent with best
17 practices at Georgia Tech in terms of
18 investigations?
19 **A If she was never told, no.  She should**
20 **have an idea and be able to respond to the**
21 **allegation.**
22   Q  Okay.  When you say "if she was never
23 told," you mean if she was never told before she
24 was terminated about the allegation, that would
25 not be consistent with best practices?

190

1  **A Right.**
2    Q  Okay.  So this meeting happens on
3  February 25th, and do you recall a decision being
4  made to place Coach Joseph on some sort of leave
5  shortly after this investigation started?
6  **A I know she was placed on leave.**
7    Q  And what -- were you involved in the
8  decision to place her on leave?
9  **A No.**
10   Q  Okay.  And was that -- was that
11 considered -- was it administrative leave or
12 something else?
13 **A I don't know.**
14   Q  Have you ever heard of the term
15 "investigation suspension"?
16 **A No.**
17   Q  So do you recall any of the circumstances
18 around the decision to place her on leave?
19 **A I don't recall her situation.  There are**
20 **situations we put people on leave just to make**
21 **sure we got a fair shake at getting the**
22 **information and there was no shadow on the person**
23 **that the information wasn't able to be gathered.**
24 **It was meant to keep the -- even the appearance of**
25 **the investigation fairness intact.  But we didn't**

191

1  **call it a suspension.**
2    Q  Okay.
3    MS. COVENEY:  Can we look at Exhibit 148
4  BOR-03226.
5    (JOYCE Deposition Exhibit 35 marked for
6  identification and attached.)
7  BY MS. COVENEY:
8    Q  Ms. Joyce, let me know when you are done
9  reviewing this.
10 **A Okay.**
11   Q  So on February 25th, Aisha Oliver-Staley
12 e-mails you, Kate Wasch, and Kim Harrington,
13 saying, I'm following up on our conversation last
14 week regarding Littler's investigation into the
15 women's basketball program as we discussed.  We
16 need this handled as quickly as possible, and then
17 it's deemed a high priority/time sensitive matter
18 by the institute.  Please let me know if there is
19 any way I can assist with moving this forward.
20   So it sounds like you, Aisha
21 Oliver-Staley, and at least Kate Wasch met to talk
22 about the Littler investigation.
23   Do you recall that meeting?
24 **A I don't.  I think it was just triage.  I**
25 **don't remember having separate meetings on it.  I**

192

1  **do recall her checking in on a timeline that she's**
2  **referring to.**
3    Q  And why did Ms. Aisha Oliver-Staley want
4  this to move as quickly as possible?
5  **A I don't recall.**
6    Q  Had Aisha Oliver-Staley asked your office
7  to handle other investigations around this time?
8  **A What do you mean?**
9    Q  Other investigations -- sorry -- with
10 external investigators?
11 **A We worked a lot with external**
12 **investigators, yes.**
13   Q  And those other investigators that Aisha
14 Oliver-Staley delegated to your office to handle,
15 did she direct you to complete those
16 investigations as quickly as possible?
17 **A Some.**
18   Q  And what were the considerations?  Why did
19 she do it with some and not with others?
20 **A It varied.  Timeliness, seriousness.**
21   Q  Okay.  But you can't recall why she wanted
22 this handled so quickly, this -- MaChelle's case?
23 **A No.**
24   Q  So then you respond, We met with the
25 investigator today -- which I think is the meeting

193

1  that we just talked about earlier with Kevin Cruz
2  and Lori Douglas -- and also spoke with Todd and
3  Joeleen regarding next steps.
4      So did you have a separate meeting with
5  Todd and Joeleen about next steps?
6  **A Maybe. I know we spoke with them about**
7  **coordinating with, Eric, so Eric would now need**
8  **assistance with scheduling the interviews and all**
9  **that.**
10  Q Again, do you know why Joeleen was being
11  included in this?
12  **A No.**
13  Q Typically, an investigation with an
14  external investigator -- what role do people
15  outside of HR's office play in the investigation?
16  **A Can you say that again.**
17  Q Yeah. So when a typical investigation
18  that your office is working on with an external
19  investigator, how frequently do you have people
20  outside of the HR office work on that
21  investigation with you? So here we have your
22  office, Eric Hoffman, Todd Stansbury, and Joeleen
23  Akin being keyed into the investigation and
24  Joeleen at least working to help organize
25  interviews.

194

1      Is that normal? Is that typically how you
2  handle these investigations?
3  **A We do have people help us with scheduling.**
4  **It depends on the matter, sensitivity. I mean, I**
5  **wouldn't say it's a -- this was -- I wouldn't say**
6  **there is just a typical matter. Depending on the**
7  **number of people, who's best to coordinate. But**
8  **ultimately, the investigator should be the one**
9  **saying what he or she needs and that shouldn't**
10  **come from anyone else.**
11  Q Okay. So in this e-mail right here from
12  Aisha Oliver-Staley, it looks like you were trying
13  to coordinate a call to talk about some stuff, and
14  Aisha says she couldn't make it, and she said, I
15  spoke with Lynn and the mandate is still to move
16  quickly on this matter. No need to wait for me.
17      So was Lynn Durham involved in discussions
18  about retaining an outside investigator?
19  **A I didn't talk with Lynn about it.**
20  Q Okay. Did -- were you --
21  **A Somebody -- I don't know.**
22  Q So you don't know -- you don't know if
23  other people were talking with her about this?
24  **A I don't know.**
25  Q Okay.

195

1      MS. COVENEY: Can we see Exhibit 151,
2  BOR-004390.
3      (JOYCE Deposition Exhibit 36 marked for
4  identification and attached.)
5  BY MS. COVENEY:
6  Q Ms. Joyce, just let me know when you are
7  done reviewing this.
8  **A Okay.**
9  Q Okay. So this e-mail exchange appears to
10  be placing Coach Joseph on leave. It looks like
11  you draft the first draft of the letter and then
12  you and Kevin e-mail about it. And then -- sorry.
13  Okay. And then you say here, Kate confirmed she
14  is okay with the template. This isn't necessary
15  for the actual meeting.
16      It sounds like they are presenting
17  multiple options as well, so the letter may not be
18  necessary.
19      So what do you recall about that?
20  **A I really don't -- I don't recall what**
21  **options. I actually was trying to rack my brain.**
22  **I don't know what options would be.**
23  Q Was resignation one of them?
24  **A I don't know.**
25  Q What other options -- what's an alterative

196

1  to administrative leave?
2  **A I mean, taking PTO, I guess. I don't**
3  **know.**
4  Q So were you involved in the decision to
5  take the multiple options off the table?
6  **A No.**
7  Q Do you remember who told you that they
8  were presenting multiple options?
9  **A It doesn't say in the e-mail, but it**
10  **sounds like somebody told me. Sorry.**
11  Q No -- it's okay.
12      And did you sit in on the administrative
13  leave meeting?
14  **A No. I believe Kevin did.**
15  Q Have you ever placed someone on
16  administrative leave?
17  **A Oh, man. You mean have I been in a**
18  **meeting or have we participated in doing that? I**
19  **have participated in doing that.**
20  Q You have?
21  **A Yes.**
22  Q And when you place someone on leave, do
23  you usually -- did you usually tell them why they
24  were being placed on leave?
25  **A We would tell them there's an**

197

1  investigation. We wouldn't necessarily go into
2  all of the -- usually, we didn't go into -- it's
3  not great timing to go through every single
4  complaint. It's just generally speaking, the
5  nature of the investigation and the reason for the
6  leave, which is to, you know, conduct a full and
7  fair investigation and that there's no even
8  opportunity for somebody to believe that things
9  had been, you know, changed by that person who is
10 under investigation for continuous harm.
11    Q  And so would you tell them more than we
12 are investigating some misconduct by you?
13    A  I'm pretty chatty, so I do tell them a
14 little bit more, yeah.
15    Q  Okay.
16    MS. COVENEY:  So let's look at look at
17 Exhibit 167, BOR-002053.
18    (JOYCE Deposition Exhibit 37 marked for
19 identification and attached.)
20    THE WITNESS:  Okay.
21 BY MS. COVENEY:
22    Q  Okay.  So on February 27th, Lisa Banks,
23 one of MaChelle's lawyers, e-mails Todd Stansbury,
24 President Peterson, copying me and Matt Johns.  It
25 says, Today you suspended my client, head women's

198

1  basketball coach, MaChelle Joseph without
2  providing her any explanation as to the purported
3  reasons and then publicized that suspension via
4  Twitter.  Coach Joseph came back and stated any
5  action or inaction that would warrant such drastic
6  and punitive measures.  Your actions have
7  irrevocably harmed Coach Joseph's reputation,
8  unnecessarily escalated a situation that was
9  already difficult with respect to ongoing
10 discrimination and retaliation.  She has reported
11 to you in that  we created significant additional
12 legal liability for Georgia Tech.
13    So reading that, does it sound like Coach
14 Joseph agreed with the decision to suspend her or
15 place her on leave?
16    A  I mean can't --
17    Q  Just reading that, what is your takeaway?
18 What do you understand her to be communicating
19 here?
20    A  Just that she did not agree with the
21 decision.
22    Q  And she says, Your actions have escalated
23 a situation that was already difficult with
24 respect to ongoing discrimination and retaliation
25 that she reported to you.

199

1    So she's saying she thinks this is another
2  act of discrimination and retaliation; does she
3  not?
4    A  Yeah, through her attorney.
5    Q  Did anyone show you -- I guess up here
6  someone did show you this statement.  It looks
7  like Kate Wasch sends it to you and Eric Hoffman
8  and just says FYI.
9    Did anyone ask you or your office to
10 investigate this claim by Coach Joseph that she
11 felt like what was happening was retaliatory?
12    A  No.
13    Q  To your knowledge, did anyone ask Eric
14 Hoffman to investigate these allegations?
15    A  To my knowledge, no.
16    Q  Do you think someone should have
17 investigated these allegations before deciding
18 whether to terminate her?
19    A  That's tough because it's pretty
20 straightforward.
21    Q  I mean -- so you have on the one hand
22 people claiming these complaints that say Coach
23 Joseph is bullying me.  And you have Georgia Tech
24 opening up an investigation.  And then you have on
25 the other hand Coach Joseph saying this is

200

1  retaliatory, these are not -- what is happening is
2  not legitimate.
3    Don't you have to assess Coach Joseph's
4  claim to figure out the truth of the allegations
5  that are being asserted?  I mean, if these -- it
6  seems like the crux of the issue, the purpose of
7  this investigation is to find out whether these
8  allegations are true.  And isn't it important to
9  give the other side of the story to assess that?
10    A  I think at a certain point it should be
11 reviewed, yes.  I just don't know if it will put
12 off the investigation, particularly when they
13 just -- administrative leave is -- they didn't do
14 a suspension.  They did a leave when you read the
15 letter, which is pretty normal.  And then I don't
16 know about the Twitter thing.  But there is just
17 not a lot yet that would -- she has concerns when
18 those are looked at.  Maybe this would be part of
19 it, yes.
20    Q  Just to be clear, you do think that -- I
21 guess rephrase that.
22    Do you think that in order to assess the
23 allegations that have been brought about Coach
24 Joseph to figure out if those allegations are true
25 that it would be important to hear Coach Joseph's

201

1  side of the story, Coach Joseph's response to
2  those allegations?
3     A  Yes.
4     Q  Okay.  We will go back to this document in
5  a second.
6        MS. COVENEY:  Can you pull up Exhibit 159,
7  BOR-005386.
8        (JOYCE Deposition Exhibit 38 marked for
9  identification and attached.)
10 BY MS. COVENEY:
11    Q  Ms. Joyce, just let me know when you are
12 done reviewing this.
13    A  Yes.
14    Q  Okay.  So on February 28th, Lisa Banks,
15 Coach Joseph's lawyer issues a press release,
16 Official statement from counsel for Coach MaChelle
17 Joseph.  Head women's ball coach, MaChelle Joseph
18 was suspended yesterday without explanation from
19 the Georgia Institute of Technology.  Given that
20 the school has failed to provide any explanation
21 to Coach Joseph, her agent or her lawyers despite
22 repeated requests, we are left to conclude this is
23 the latest and most serious action in a string of
24 ongoing retaliation that she has suffered for
25 raising concerns about gender equity issues in the

202

1  athletic department.
2        Did anyone -- so here again, we have Coach
3  Joseph complaining that what's happening to her,
4  the suspension and this investigation are
5  retaliatory.
6        Did anyone ask you to investigate these
7  allegations?
8     A  No.
9     Q  And to your knowledge, did anyone ask
10 Mr. Hoffman to investigate these allegations?
11    A  I don't know, but not to my knowledge.
12    Q  Okay.  And then here we have -- so
13 February 28th at 2:49 p.m., we have Laura Spence
14 e-mails Joeleen Akin, Todd Stansbury, and Bud
15 Peterson and forwards this press release to them
16 and basically complains about how they are
17 treating MaChelle.  Okay?
18       MS. COVENEY:  Caleb, can you bring now up
19 Exhibit 161, BOR-001146.
20       (JOYCE Deposition Exhibit 39 marked for
21 identification and attached.)
22 BY MS. COVENEY:
23    Q  So Ms. Spence sends that e-mail,
24 forwarding the press release to Joeleen, Todd, and
25 Bud Peterson at 2:49 p.m.  And then at 3:11 p.m.,

203

1  Aisha Oliver-Staley e-mails you and Kate Wasch and
2  says, We need to accelerate the women's basketball
3  investigation and bring it to a conclusion as
4  quickly as possible.  I need to convene a call
5  with the investigator today to discuss further.
6  Julie, can you help get this scheduled with
7  Jeff -- who she later clarifies as Eric -- and
8  circulate a call in.
9        Okay.  So then we had a calendar invite
10 that shows that there was a call scheduled for
11 later that afternoon between Aisha Oliver-Staley,
12 Kate Wasch, Lori Douglas, Eric Hoffman, Kevin
13 Cruz, and Kim Harrington and you.
14       Do you recall this telephone call about
15 accelerating the women's basketball program -- I
16 mean, the women's basketball investigation?
17    A  I don't know recall the call specifically.
18 I do remember they were trying to get it down
19 fast, and it ended up taking more time.  So I know
20 they were trying to get it done.
21    Q  And do you -- I mean -- we saw e-mails
22 earlier that on February 20th -- around
23 February 20th, Aisha Oliver-Staley, I believe had
24 directed that this investigation move quickly,
25 right?  But here we have on February 28th that not

204

1  only does it need to move quickly, but you need to
2  accelerate it.  It needs to go faster.
3        So why was that?  Why did it need to go
4  faster than it was already going?
5     A  I don't know.
6     Q  Was there any discussion about Coach
7  Joseph is about to sue, we need to get this
8  wrapped up?
9     A  I don't recall that.
10    Q  Do you recall any discussion about
11 potential legal action by Coach Joseph?
12    A  Not specifically.  I'm sure it came up.
13    Q  And when do you think it came up?
14    A  When they made their decision, I'm sure.
15    Q  By their decision, you mean the decision
16 to terminate her?
17    A  Yes.
18    Q  Okay.  So let's go back to -- I think it
19 was -- let's go back to Exhibit 167, BOR-002053.
20       So we have 2/28 -- on February 28th at
21 2:49 p.m., Laura Spence forwards the -- Coach
22 Joseph's lawyer press statement saying the
23 suspension is retaliatory.  Less than an hour
24 later, Aisha Oliver-Staley says, We need to
25 accelerate the women's basketball program

205

1  investigation, and she convenes a call with a
2  number of people, including Eric Hoffman and you
3  and Kate Wasch. According to the calendar entry,
4  it was a 4:30.
5      At 4:59, Kate Wasch forwards you and Eric
6  Hoffman Coach Joseph's attorney's February 27th
7  e-mail, claiming the suspension was retaliatory
8  and just says FYI.
9      Does this help refresh your recollection
10 about whether Coach Joseph threatening to sue was
11 discussed at that February 28th call to accelerate
12 the women's basketball investigation?
13 **A No. I don't remember what we talked**
14 **about.**
15     Q Okay. And then at 5:45 p.m., Kate Wasch
16 forwards all of this to B. Webb, who I believe is
17 Brian Webb at the attorney general's office.
18     Were you ever included on e-mails to the
19 attorney general's office about this?
20 **A Not to my recollection. Maybe.**
21     Q Do you recall, were there ever meetings at
22 the attorney general's office? I don't want to
23 know the details of this.
24 **A No. No. Not that I was at.**
25     MS. COVENEY: Okay. And Caleb, can we get

206

1  Exhibit 169, BOR-010654.
2      (JOYCE Deposition Exhibit 40 marked for
3  identification and attached.)
4  BY MS. COVENEY:
5      Q Ms. Joyce, take a look at this and let me
6  know when you are done.
7  **A Okay.**
8      Q So here we have that February 27th e-mail
9  from Coach Joseph's counsel to Todd Stansbury
10 complaining about the suspension, and we have Kate
11 Wasch's response to that. And then we have Kate
12 Wasch forwarding this entire thread to Brian Webb
13 again, Joeleen Akin, Aisha Oliver-Staley, and you.
14     Do you know why you were included on this
15 e-mail?
16 **A She said she was going to respond back. I**
17 **guess she copied me on that, so it was this is how**
18 **I responded.**
19     Q And Joeleen Akin included here. I thought
20 she was just playing a role in coordinating an
21 investigation -- sorry -- in coordinating the
22 interviews.
23     Did she start playing more of a role in
24 the Littler investigation as it went on?
25 **A I think it's a better question for Eric.**

207

1  **But I don't recall her taking on more of a role**
2  **with the investigation.**
3      Q Okay. I'm going to go back quickly to --
4      MS. COVENEY: Actually, pull up
5  Exhibit 194, BOR-003553.
6      (JOYCE Deposition Exhibit 41 marked for
7  identification and attached.)
8  BY MS. COVENEY:
9      Q Ms. Joyce, can you take a look at this and
10 let me know when you are done. We looked at most
11 of this. The new part is this e-mail at the top.
12 **A I recognize it.**
13     Q So this is the e-mail -- apparently, the
14 e-mail from Lisa Spence where she's getting upset
15 about MaChelle's suspension. It is eventually
16 forwarded to your attention and you respond to
17 her. And then there is this e-mail to you -- from
18 you to Kim Harrington where you are apologizing
19 for responding.
20     So did Kim Harrington get mad that you
21 sent this?
22 **A Yes.**
23     Q And why was she mad?
24 **A Well, this person is -- Laura was outside**
25 **the institute and they didn't want me to respond**

208

1  to anyone who was outside the institute.
2      Q Why is that?
3  **A They want that to be coordinated through**
4  **communications.**
5      Q For every case or for this case in
6  particular?
7  **A I don't know.**
8      Q Was there anything in particular? Did she
9  point out anything in here that was particularly
10 problematic?
11 **A No.**
12     Q Did she say that you had said more than
13 what she wanted you to say?
14 **A Yes.**
15     Q What else do you recall from that
16 conversation?
17 **A What do you mean?**
18     Q What else do you recall Kim Harrington
19 saying about this?
20 **A She said -- I remember this one, that I**
21 **Aisha and -- Aisha's furious and told Kim to**
22 **handle it and that I was going to get a verbal**
23 **warning for it.**
24     Q So you were disciplined for this?
25 **A Yes.**

209

1    Q  Did you think that was fair?  Did you
2  think it was warranted?  Do you think you had said
3  anything that was problematic here?
4    A  No.
5    Q  Do you recall anything else from that
6  conversation with Kim Harrington about this?
7    A  No.  That was pretty much the gist.
8    Q  Is there any e-mail traffic between the
9  two of you about this other than what we have
10  here?
11    A  When I complained, I included it.
12    Q  So you sent -- when you -- what do up mean
13  when you complained?
14    A  When I complained at the end of my
15  employment, I complained about this.
16    Q  And what did you -- how did you frame that
17  complaint?  What did you say about this?
18    A  Well, I didn't think it was fair.
19    Q  I mean, did you think it was retaliatory
20  in some way?
21    A  Not really.  I just didn't think it was
22  fair.  I thought it was disproportionate.
23    Q  And this letter or communication that you
24  sent to them at the end of your employment, did
25  you send that or did a lawyer?

210

1    A  A lawyer.
2    Q  Was it a demand letter?
3    A  Yes.
4    Q  Just remind me, the complaint that you
5  asserted at the end of your employment, it had to
6  do -- apparently, you included this in your
7  complaint.  And did you say you also complained
8  about FMLA retaliation?
9    A  Yes.
10    Q  And did you add any -- was there anything
11  in there about family responsibility
12  discrimination?  You mentioned something about
13  caretaking during the pandemic or something.
14    A  Yes.
15    Q  There was that allegation in there?
16    A  There was information about that, yes.
17    Q  Okay.  What else -- what other allegations
18  did you assert against them?
19    A  I don't recall right off, and this is
20  nothing related to this matter, none other --
21  otherwise, this, though, yes, but nothing else
22  related to this.
23    Q  So we got FMLA retaliation, family
24  responsibility discrimination, this, were there
25  any other allegations included in your letter?

211

1    A  Not in a direct sense.  More just things
2  that didn't make sense.  It's been resolved, moved
3  on, but some things did not make sense to me.
4    Q  And what were those things?
5    A  Just when I mentioned this is one of them,
6  and one reason I wasn't as involved as employee
7  relations moved to Kim.  She decided she wanted to
8  take that on, and that happened after this, but
9  she said it was -- I had 17 direct reports, so I
10  could focus on the HR business partner population
11  in particular, which was, you know, big.  But I
12  had asked for an ER director and didn't get it,
13  though it was planned to be hired.  And she
14  decided to take that piece out, so that concerned
15  me.
16    Q  Did you think what was happening to Coach
17  Joseph around this time -- during this
18  investigation, did you think there was anything
19  problematic about how Georgia Tech was treating
20  her?
21    A  I didn't.
22    Q  Do you now?
23    A  I don't know.
24    Q  What do you mean you don't know?
25    A  I don't know everything about this and

212

1  seen -- some things I didn't know.  There's
2  nothing that sticks out to me, though.
3    Q  So during the course of the Littler
4  investigation, did Eric Hoffman provide you any
5  updates about the status of his investigation?
6    A  He did.
7    Q  And were those updates e-mail updates or
8  in person or phone updates?
9    A  They weren't in person.  He occasionally
10  called me.  It was kind of being taken over by
11  Aisha's office.  I would redirect him to make sure
12  he was giving her the update and I wasn't playing
13  telephone.  But he sometimes e-mailed -- he texted
14  me.  I gave you the text.  So yeah.
15    Q  What were the nature of his updates?  Was
16  he just giving you updates on timing or was he
17  saying this is what I'm finding or both?
18    A  It was more on timing a little bit, on who
19  he interviewed and -- not really what he was
20  getting into the meat of it, no.
21    Q  You said that he was also -- that you were
22  directing him to Aisha, too, to give updates?
23    A  Aisha or Kate.  I don't remember.
24    Q  So you said Aisha was leading this
25  investigation?

213

1    A  I wouldn't say leading.  It was kind of
2  confusing.  She was ultimately in charge, so that
3  sounds like leading, but -- yeah, she was
4  ultimately in charge.
5    Q  Was that typically how external
6  investigations that your office was working on?
7  Was that's how it was structured, that Aisha was
8  leading and you were -- I don't know -- serving as
9  like a go-between the investigator and her?  Was
10  that normal?
11    A  It wasn't the only investigation where
12  that happened, but it wasn't the norm.
13    Q  Okay.  And did Eric Hoffman ever send you
14  any of his draft reports -- any drafts of his
15  report?
16    A  I don't know.  I think so.  I think so.
17    Q  Did you edit any of those reports?
18    A  No.  I was kind of out by then.  No, I
19  don't recall editing it.
20    Q  Do you know if anyone edited the reports?
21    A  I wouldn't know.
22    Q  Do you know if Eric Hoffman gave any oral
23  briefings on his findings?
24    A  I'm not sure.  I don't recall.
25    Q  Okay.  All right.  So Eric Hoffman was

214

1  keeping you updated and you believe he was keeping
2  Aisha updated; is that right?
3    A  Yes.
4    Q  DO you know --
5    A  And then -- till the end of the report,
6  yes.
7    Q  Okay.
8    A  And then that's is the end of his kind of
9  piece.
10    Q  Okay.
11    MS. COVENEY:  So, Caleb, can you bring up
12  Exhibit 171, BOR-003231.
13    (JOYCE Deposition Exhibit 42 marked for
14  identification and attached.)
15  BY MS. COVENEY:
16    Q  Ms. Joyce, let me know when you are done.
17  Mostly redacted it probably shouldn't take long.
18    A  Okay.
19    Q  So let's look at the e-mail at the bottom
20  of the page, page 2, from Aisha Oliver-Staley to
21  Melissa Hall, Phillip Herr (phonetic) , Kim
22  Harrington, Julie Joyce, Kate Wasch.  And says,
23  Please see the agenda for tomorrow's triage
24  meeting.
25    So did Aisha typically send something like

215

1  this out or did someone send something like this
2  out before each triage meeting, an agenda?
3    A  Yes.
4    Q  Okay.  And what would that say?
5    A  Oh, well, so -- I'm sorry.  Process check.
6  I don't know if they sent it via e-mail or post it
7  in a Box, like in Box.
8    Q  What's Box?
9    A  Like a Cloud just so anyone can upload an
10  item that they wanted to add to the triage agenda.
11    Q  So Box -- is it like Dropbox or -- you
12  would just move things into that?
13    A  I'm sorry.  I can't -- it's an application
14  where you could share but only with certain people
15  who had access and could add to the agendas, you
16  know.
17    Q  Was that -- did you have a Box account for
18  the triage team where you would put relevant
19  information in there?
20    A  We did.  I don't know if it's Box.  That's
21  what I use now, but it was --
22    Q  Something like a Cloud-based platform?
23    A  Right.
24    Q  And the agenda, what -- I mean, obviously,
25  we can't see this because it's redacted.  What

216

1  would it say, just like the complaints that you
2  were going to talk about or what?
3    A  Yes.
4    Q  Okay.  All right.  Let's go to the e-mail
5  at the top.  I think you still have control.
6  Well, let's go to the very top of the e-mail.  All
7  right.  So you send an e-mail to Kim and say, My
8  updates for today's triage meeting.
9    So was this before the meeting happens?
10    A  Yes.
11    Q  Okay.  And would you typically send Kim an
12  e-mail like this?
13    A  No.  It would have been because I wasn't
14  there.
15    Q  So you were not going to attend this
16  meeting?
17    A  That's --  I mean, that's why I would have
18  sent it.
19    Q  Okay.  All right.  So you say, From Kate,
20  one more addition.  GTAA investigation ORA
21  request.
22    So this is something that Kate wanted to
23  talk about in the meeting?  If you go to your
24  addition in the middle of the page.
25    A  I can't really tell.  I think I'm asking

217

1  her to bring this up -- or this is something Kate
2  needed an answer to or needed to answer. I don't
3  recall.
4      Q  So this was sent on March 7th, and one of
5  Kate's questions, Who handles this case if it were
6  to go to litigation?
7      A  Yeah.
8      Q  So at this point, had people been talking
9  about if Coach Joseph was going to sue?
10     A  This was from Littler, so they were
11  asking, like, if they do get questions -- because
12  it was starting to get in the media -- and then
13  they were trying to understand what to do with the
14  documentation and that kind of thing. But yes. I
15  don't recall specifically when that started, but I
16  guess this kind of speaks to litigation.
17     Q  Okay.
18        MS. COVENEY: Okay. And can -- Caleb, can
19  we see Exhibit 174, BOR-004382.
20        (JOYCE Deposition Exhibit 43 marked for
21  identification and attached.)
22  BY MS. COVENEY:
23     Q  Ms. Joyce, let me know when you are done
24  reviewing it.
25     A  Can you make it a little bigger. I'm

218

1  sorry, I'm getting tired too.
2     Thank you. Okay.
3     Q  So do you recall whether this is about
4  what discussions with the coaching staff on
5  Monday. Was it with the women's basketball
6  program or coaches or -- the coaches of other
7  programs?
8     A  I'm not sure.
9     Q  Let's just go quickly -- so you draw up
10  these talking points to -- for someone to present
11  at some meeting with the coaches, and I just --
12  this last second to last bullet. So if you have
13  some specific requests, you can make them here.
14  For example, please consider that speculation and
15  gossip is not helpful to this process, which is
16  focused on facts.
17        So were there -- was there speculation and
18  were there rumors going around about what was
19  happening?
20     A  I don't recall specifically, but there may
21  have been.
22     Q  Okay.
23        MS. COVENEY: Can we see Exhibit 234,
24  Joyce 00001.
25  BY MS. COVENEY:

219

1      Q  I'm going to focus on this text message
2  here. So we have on March 8th at 12:29 -- and
3  this is -- this is your text message thread with
4  Joeleen Akin. So she says, Hey, Julie, it's
5  Joeleen and I need to talk to you about the
6  situation and next steps, Tuesday in particular.
7        And I can represent to you, based on an
8  e-mail after this -- the Tuesday was, I believe --
9  sorry -- March 11, which is when the
10  head coaches -- sorry -- the assistant coaches on
11  the women's basketball team were going to be
12  interviewed.
13        Do you recall speaking with Joeleen about
14  those interviews?
15     A  I don't recall a specific conversation,
16  but from this thread, it looks like I may have.
17     Q  So earlier we talked about the fact that
18  Joeleen Akin was kind of interfacing with the
19  student athletes to coordinate their interviews,
20  correct?
21     A  Yes.
22     Q  You recall her doing that? Okay.
23        Were you also aware that she was -- well,
24  I guess, let me rephrase that. Was she also
25  having input into the order of the interview, so

220

1  when Eric Hoffman interviewed certain people?
2     A  I think -- again, that's a better question
3  for Eric. I don't recall specifically.
4     Q  Would that be unusual for her to do?
5  Would she have any business doing that?
6     A  Well, I think the only reasons she or
7  someone else would have say in what people get
8  interviewed is if there is timing consideration,
9  like somebody -- they were trying to be
10  nondisruptive with the group as much as possible
11  with their class schedule.
12     Q  Okay. Okay. So you say, I'm free after
13  4:30. I have a call with Kate on this at three,
14  too .
15        And then she says, Okay. I think it's
16  important to have a female in the same room as
17  EH -- which may be Eric Hoffman -- on Tuesday. It
18  needs to be someone who is detailed and
19  conscientious and take great notes.
20        Do you know why she wanted to have a
21  female in the room with Eric when he interviewed
22  the assisting coaches? Did she explain that to
23  you?
24     A  She may have. I don't recall
25  specifically. I really don't.

221

1    Q  Did you sit in on Eric Hoffman's
2  interviews with his student athletes?
3    **A  I -- let me think.  I only sat in one day.**
4  **So I sat in on one day of interviews and one of**
5  **the interviews was MaChelle.**
6    Q  But did you sit in on any of the
7  interviews with the students?
8    **A  I don't know, actually.  I remember it was**
9  **mostly employees.**
10    Q  And if you had sat on the interviews with
11  the students, would you have taken notes of that?
12    **A  I took notes that day.**
13    Q  So your memory is you sat in on one day of
14  interviews; is that right?
15    **A  Correct.**
16    Q  And one of the interviews was MaChelle?
17    **A  Right.**
18    Q  Okay.  Can you think of a reason why
19  Joeleen would want you to sit in and take really
20  great notes of the interviews with the assistant
21  coaches but not the student athletes?
22    **A  I don't know why she requested that.  I**
23  **took notes for Eric so he wouldn't have to focus**
24  **on that as much.  That was my goal.**
25    Q  Did you sit in on any briefings between

222

1  Eric Hoffman and President Peterson?
2    **A  No.**
3    Q  Did anyone tell you about those briefings?
4    **A  I don't recall.**
5    Q  And so earlier you said you sat in on Eric
6  Hoffman's interview of MaChelle; is that right?
7    **A  Yes.**
8    Q  And during that interview, do you recall
9  MaChelle mentioning a few people who she thought
10  should be interviewed as part of the
11  investigation?
12    **A  Not specifically, but that may have**
13  **occurred.**
14    Q  Okay.  So for the extra interviews, there
15  were offered up a few consultants who had worked
16  with the women's basketball team in 2018 and 2019
17  as potential additional interviews.
18      Do you remember anything about that, about
19  her saying that?
20    **A  Not specifically.**
21    Q  Okay.  Do you remember whether Aisha
22  Oliver-Staley pushed back on the suggestion that
23  Eric Hoffman should interview these consultants?
24    **A  I don't -- I don't know.**
25      MS. COVENEY:  Caleb, can we see

223

1  Exhibit 236, Joyce 00004.
2      THE WITNESS:  If we can end at 5:30.  If
3  we need to pick it up, then I'll have to pick it
4  up, but I need to end at 5:30 otherwise I am going
5  to be in hot water.
6      MS. COVENEY:  Okay.  All right.  Let's see
7  where we stand at 5:30.
8      THE WITNESS:  Okay.
9      (JOYCE Deposition Exhibit 44 marked for
10  identification and attached.)
11  BY MS. COVENEY:
12    Q  So these are text messages produced to us
13  between you and Eric Hoffman.  So on March 13th,
14  Eric texted you, Just had a long conversation with
15  Aisha.  She expressed concern re-changing
16  timeline.  I explained our conversation earlier
17  today and our rationale for additional interviews
18  just in case you get a call or questions tomorrow.
19      Do you remember anything -- do you
20  remember this?
21    **A  Well, just reading the text, my**
22  **recollection is that we were being asked to wrap**
23  **up.  He said he wasn't ready.  That's why I said,**
24  **that's not good because they were pushing the**
25  **acceleration piece and I let Kate know and she was**

224

1  **okay.  That's -- just what the text says.**
2      MS. COVENEY:  Okay.  Caleb, can we see
3  Exhibit 198, BOR-1.
4      (JOYCE Deposition Exhibit 45 marked for
5  identification and attached.)
6  BY MS. COVENEY:
7    Q  Okay.  Ms. Joyce, this is the final
8  investigation report that Eric Hoffman sent to
9  you.
10      Did you review it at some point when it
11  was sent to you?
12    **A  Yes.**
13    Q  So you don't need to review it all, but
14  just click through it to make sure this is -- you
15  know, this is what you received.
16    **A  I don't remember exactly what I reviewed.**
17  **This looks like it.  Do you need me to read the**
18  **whole --**
19    Q  No.  That's okay.
20    **A  Okay.**
21    Q  So the report is anonymized, to a large
22  extent.  No one's names are identified in here.
23  And he doesn't -- Eric Hoffman doesn't really
24  identify witnesses or attribute a statement to a
25  particular person.

225

1    Was that typical of outside investigator
2 reports, to keep the witnesses anonymous?
3    **A So we had a lot of problems with it. It**
4 **was challenging because they're open records, and**
5 **you could imagine people could get them and be**
6 **upset when they saw the things that were said.**
7 **But we would tell people, if it's critical for the**
8 **investigation, it has to be in there, but you**
9 **know, where it is not, use good judgment.**
10    Q Okay. I mean, in this case we have Coach
11 Joseph complaining that this investigation is
12 retaliatory and that these complaints are being
13 blown up into something that they -- bigger than
14 they really are, and this entire thing is not
15 legitimate.
16    Do you think it would be important for
17 Coach Joseph to know what -- who was saying what
18 about her in this report so that she could respond
19 to those allegations?
20    **A What would she respond with?**
21    Q I mean, this report, she can't -- she
22 doesn't know -- she knows that something said the
23 environment was, you know, toxic or unhealthy.
24 But doesn't know who said that. She doesn't know
25 what the context for that comment was. And if she

226

1 had known, you know, student A made this comment,
2 she might have an explanation for that. She might
3 say, well, yeah, on X date, I told student A that,
4 but here's the context. Let me explain this to
5 you.
6    Don't you think that would be important
7 for her to be able to do to respond to these
8 allegations, for her to know who was saying what
9 about her?
10    **A I'm not sure.**
11    Q So why not? Why don't you think that she
12 should have been told who was saying these things
13 about her?
14    **A I think even if there's -- I think it's up**
15 **to the investigator, but generally speaking, if**
16 **you have what people are saying in the context --**
17 **that's why I asked what would the context be? Oh,**
18 **she didn't like that I didn't pay her or that kind**
19 **of thing. You have people giving this feedback.**
20 **It kind of speaks for itself. And if we start**
21 **putting everybody in there, and this student said**
22 **this and this student said that, it's also a**
23 **concern students wouldn't say anything at all.**
24    **We have a hard enough time getting anyone**
25 **to kind of came very open with the open records,**

227

1 **getting anyone to say anything at all.**
2    Q I mean, could you not redact their names?
3    **A That's a good question. I mean, you can**
4 **redact students' names. I just think people may**
5 **not feel as comfortable. And I remember reading**
6 **the report and did not feel like there was**
7 **anything missing. I didn't feel like the lack of**
8 **identification was different.**
9    Q Different than what?
10    **A I didn't think it compromised the**
11 **investigation because you do want to make sure**
12 **it's clear, there's enough specifics in there to**
13 **understand the nature of what was reviewed, what**
14 **was the facts, and then what were the findings. I**
15 **mean, Coach Joseph should have had an opportunity**
16 **in her interview to respond to some of the**
17 **statements that were made, and that should be part**
18 **of the investigation.**
19    Q But no one ever told her what allegations
20 had been brought against her. How was she
21 supposed to respond to the allegations if no one
22 told her what they were?
23    **A I understood Eric went through them during**
24 **the interview.**
25    Q He went through -- what did he go through?

228

1 He went through statements that students had said
2 during the course of their interviews?
3    **A I think he went through some of them. I**
4 **don't have perfect recollection on what was**
5 **covered.**
6    Q Okay. And to be clear, the purpose of
7 this investigation was to uncover the truth of the
8 three or four allegations that had been brought to
9 Georgia Tech's attention by Felicia Tucker and
10 Brittany Oliver and the allegations in the two
11 student complaints that had been submitted to
12 Georgia Tech. That was the purpose of this
13 investigation, correct, to figure out the truth of
14 those allegations?
15    **A That's why it started, yes.**
16    Q And no one ever told Coach Joseph what
17 those allegations were. I don't think she found
18 out what the students had said and the complaint
19 until we were well into this litigation. So how
20 was she supposed to respond to the allegations
21 against her if no one had told her about it?
22    **A I can't -- I don't know what was shared**
23 **with her exactly.**
24    Q Well, let's assume she was not told the
25 allegations against her, she could not respond.

229

1      MS. COVENEY:  I'm going to object to the
2  form of the question.  You're asking her to
3  speculate.
4  BY MS. COVENEY:
5      Q  Can you respond to allegations that you
6  are not aware of?
7      A  No.
8      Q  And were you involved in the decision to
9  make this report anonymous?
10     A  No.
11     Q  Who made that decision?
12     A  I don't know.  I mean, it would have been
13  up to the investigator how best to present the
14  information and then -- and it would have been
15  reviewed and -- I'm not sure.
16     Q  Okay.  Okay.  So Eric Hoffman sends you
17  this report on March 20th, and then what do you do
18  with it?  What did you do with it?
19     A  I read it.  I don't -- I didn't really
20  have -- I read it.  I gave my thoughts to Kim and
21  it was immediately, obviously, sent over to others
22  for review, I think -- obviously, Aisha and Kate .
23     Q  And when you say you gave your thoughts to
24  Kim, what did you mean by that?  Did you -- did
25  you have a conversation with her?  Did you e-mail

230

1  her?
2      A  I don't recall e-mailing her.  I don't
3  know.  I think I said I thought he did a good job.
4      Q  Okay.  So he sends the report and then --
5  and then Georgia Tech gave Coach Joseph an
6  opportunity to respond to this report to the
7  extent that she could.
8          Were you provided a copy of her response?
9      A  I don't recall reviewing her response.
10     Q  Do you know if Eric Hoffman was provided a
11  copy of her response?
12     A  I don't.
13     Q  Okay.  Were you involved in any of the
14  discussions about the decision to terminate Coach
15  Joseph's employment?
16     A  No.
17     Q  Okay.  So earlier we talked about HR
18  investigations and the role that you usually
19  played in those investigations.  And I believe you
20  said that it was typically your role to take the
21  findings of the outside investigator, look at them
22  and then present options to the employee's
23  supervisor about the discipline that could be
24  assessed under the circumstances.
25          Is that typically what you did?

231

1      A  Yes, me or someone on my team.
2      Q  But in this instance, you did not do that,
3  correct?
4      A  I don't recall doing that at all.
5      Q  Did you or did you not?  You don't -- is
6  it possible you didn't?
7      A  I don't remember.  I remember discussions
8  about options with other triage members.  I don't
9  recall who presented those and, certainly,
10  management did not ask me directly or communicate
11  their decision to me.
12     Q  In the presentation of options, was that
13  after this report had been issued or before?
14     A  After as far as I can remember.
15     Q  Okay.  And what were the options?
16     A  I mean, one is termination, but her final
17  warning was in 2016, so it wasn't required.  You
18  can -- there was final warning or termination
19  being two of the options.
20     THE WITNESS:  I know we are trying to
21  wrap.  Can you just give me two minutes.  I need
22  to give some instructions.
23     MS. COVENEY:  Okay.  Why don't we -- while
24  you do that, I'm going to pop off for three
25  minutes just to gather my thoughts.

232

1          You all want to come back at 5:15?
2          THE WITNESS:  Yes.
3          (A brief recess was taken.)
4  BY MS. COVENEY:
5      Q  Just a moment ago we talked about a triage
6  meeting where there's a discussion of potential
7  options about -- concerning Coach Joseph.
8          What would happen after -- with Coach
9  Joseph after the Littler investigation?  Was Todd
10  Stansbury at that triage meeting?
11     A  No.
12     Q  Okay.
13     MS. COVENEY:  Caleb, can we see
14  Exhibit 206, BOR-004556.
15     (JOYCE Deposition Exhibit 46 marked for
16  identification and attached.)
17  BY MS. COVENEY:
18     Q  Can you quickly take a look at this.  I'm
19  not going to ask you about the substance of the
20  statement.  You can take a look at the whole
21  thing.
22     A  Okay.
23     Q  Okay.  So after Coach Joseph is
24  terminated, Shoshanna Engel sends Burns Newsome an
25  e-mail and attaches a statement from Niesha Butler

233

1  that he just discussed by phone and said that,
2  Todd Stansbury hand delivered this to me just
3  before I called you. And in the complaint that's
4  attached -- it's a complaint of sexual harassment.
5      And did Shoshanna usually receive employee
6  complaints of sexual harassment?
7      MS. COVENEY: I'm going to object to the
8  form. Don't think she has knowledge about
9  Shoshanna's typical practices.
10 BY MS. COVENEY:
11     Q You can answer.
12     **A She did Title 9, so if it was tied to**
13 **Title 9, but that's -- her purview is Title 9.**
14     Q Okay. What do you recall about this
15 Niesha Butler?
16     **A Nothing, really. I remember receiving it.**
17     Q And did anyone do any sort of
18 investigation into it?
19     **A I don't recall. It was a former student.**
20     MS. COVENEY: All right. Can we look at
21 Exhibit 215, BOR-0024650.
22     (JOYCE Deposition Exhibit 47 marked for
23 identification and attached.)
24     THE WITNESS: Can I clarify? It doesn't
25 matter if they're a former student. So I misspoke

234

1  about why we would or would not have done an
2  investigation.
3  BY MS. COVENEY:
4      Q So you don't have to read it word for
5  word, but scroll through it.
6      **A Okay.**
7      Q So this looks -- okay. So this is a memo
8  from Littler Mendelsohn to you on August 14, 2019,
9  regarding an investigation they had done into vice
10 president facilities, management Charles Rhode
11 (phonetic) alleging discriminatory, retaliatory
12 and professional conduct.
13     So is this an investigation that your
14 office led in conjunction with Littler?
15     **A I started it, but then the office moved it**
16 **under Kim, and I think June, so...**
17     Q Sorry. What was that last part?
18     **A ER moved under Kim, July 1st, I think.**
19     Q And did Aisha Oliver-Staley also
20 coordinate this investigation?
21     **A No -- I don't know. I don't think so.**
22     Q All right. And so earlier we talked about
23 a complaint -- complaints against Coach Joseph and
24 investigations that have been done into Coach
25 Joseph, in which the external investigators

235

1  considered whether her conduct violated USG's
2  ethics policies.
3      Did you provide this investigator USG's
4  ethics policy to determine whether Mr. Rhode's
5  conduct violated any of those?
6      **A The allegation was -- I don't think it was**
7  **an ethics violation. We wouldn't go to the**
8  **ethics -- we wouldn't provide all of the policies**
9  **every single time.**
10     Q Well, when would you provide the ethics
11 policy?
12     **A If it's an ethics violation. If it was in**
13 **play, then we should have reviewed it. That's all**
14 **I can say. I don't remember this one that much or**
15 **whether the ethics policy was involved.**
16     Q Okay. I mean, Coach Joseph was ultimately
17 terminated for failing to -- I mean, one of the --
18 one of the policies cited in termination was
19 she -- I think she failed to treat people with
20 dignity and respect and so -- let's see. And she
21 was cited as having violated -- allegedly creating
22 a toxic culture in her program.
23     So based on the investigation findings,
24 there is substantive evidence that Rhode has
25 repeatedly engaged in offensive and unwelcome

236

1  verbal and nonverbal conduct that contributed to a
2  perception of a hostile work environment.
3  Multiple investigation participants expressed a
4  deep mistrust of Rhode and a suspicion of racial
5  animus due to Rhode's inappropriate comments,
6  inconsistent leadership. These repots raise
7  concern about the overall culture of this the
8  facilities department, which many participants of
9  this investigation described as toxic.
10     Do you recall if Mr. Rhode was disciplined
11 as a result of this?
12     **A Trying to remember. I think we ended**
13 **up -- I don't remember.**
14     Q So right here, it says, Rhode should also
15 receive coaching to ensure that he understands
16 Georgia Tech's expectations of professionalism and
17 respect for others, which includes learning,
18 correctly pronouncing and using team members'
19 preferred names.
20     Does this -- did he just get a coaching or
21 was he disciplined?
22     **A I don't know exactly. He did receive**
23 **coaching.**
24     Q Okay.
25     MS. COVENEY: So I don't think I have any

237

1 more questions for you, Ms. Joyce. Thank you for
2 your time today.
3      Katie, or Tania  may have questions.  I'm
4 not sure.
5      MS. STOFF :  Can we put Tania and I into a
6 breakout room just for a couple minutes and
7 then...  No further questions for Tania nor I.
8      (The deposition was concluded at 5:26 p.m.
9 with reading and signing having been waived.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

238

1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2      I, MICHELLE TAYLOR, the officer before whom the
3 foregoing deposition was taken, do hereby certify
4 that the foregoing transcript is a true and
5 correct record of the testimony given; that said
6 testimony was taken by me stenographically and
7 thereafter reduced to typewriting under my
8 direction; that reading and signing was not
9 requested; and that I am neither counsel for,
10 related to, nor employed by any of the parties to
11 this case and have no interest, financial or
12 otherwise, in its outcome.
13
14 IN WITNESS WHEREOF, I have hereunto set my hand
15 and affixed my notarial seal this 21st day of May,
16 2021.
17
18 My commission expires:  September 20, 2020.
19
20
21 _____
22 NOTARY PUBLIC IN AND FOR
23 THE STATE OF MARYLAND
24
25

| A |
|---|

**abboud**
3:5
**abide**
120:9
**able**
10:11, 166:14,
189:20, 190:23,
226:7
**above**
99:20
**absolutely**
152:24
**abuse**
57:25, 58:9,
58:14, 58:17,
176:13
**accelerate**
203:2, 204:2,
204:25, 205:11
**accelerating**
203:15
**acceleration**
223:25
**access**
60:12, 60:13,
60:16, 60:18,
60:24, 215:15
**according**
105:21, 205:3
**account**
71:24, 175:24,
176:4, 176:14,
176:19, 176:20,
215:17
**accountabilities**
99:6
**accountability**
118:19
**accountable**
124:15
**accounts**
71:13, 71:18,
71:19, 72:2
**accurate**
10:11, 28:17,
29:24, 107:24

**accused**
124:4, 124:5,
186:7, 186:12
**acknowledge**
8:5, 8:13
**across**
32:1
**act**
108:23, 199:2
**action**
1:7, 59:13,
75:11, 75:14,
97:12, 98:23,
98:25, 99:12,
99:18, 100:5,
100:10, 107:22,
110:2, 110:7,
111:22, 162:3,
198:5, 201:23,
204:11
**actions**
78:7, 118:15,
198:6, 198:22
**actual**
106:19, 195:15
**actually**
28:13, 53:25,
54:8, 70:11,
112:12, 126:2,
127:1, 158:8,
169:6, 171:19,
177:1, 195:21,
207:4, 221:8
**add**
117:24, 210:10,
215:10, 215:15
**addition**
14:15, 118:13,
129:7, 216:20,
216:24
**additional**
51:5, 61:5,
117:16, 120:14,
198:11, 222:17,
223:17
**address**
41:17, 43:6,
82:2, 100:6,

**accused**
103:7, 103:10,
128:11
**addressed**
27:6, 111:11
**addressing**
90:21, 102:24,
142:17
**adherence**
34:7
**admin**
75:23
**administrative**
21:17, 70:3,
87:13, 143:7,
190:11, 196:1,
196:12, 196:16,
200:13
**administrator**
66:4, 183:11
**admissibility**
8:7
**adrienne**
131:22
**advance**
10:3
**advice**
114:14, 134:3
**advised**
157:2
**adviser**
131:24
**affixed**
238:15
**after**
14:8, 22:13,
25:18, 29:7,
29:15, 32:11,
43:4, 63:18,
63:19, 65:18,
67:12, 69:3,
79:7, 79:9,
82:14, 87:1,
88:22, 97:9,
104:24, 106:6,
106:7, 106:23,
121:7, 121:10,
122:4, 124:7,
129:1, 129:2,

150:16, 157:20,
163:20, 174:9,
174:15, 175:18,
175:20, 176:17,
178:17, 190:5,
211:8, 219:8,
220:12, 231:13,
231:14, 232:8,
232:9, 232:23
**afternoon**
113:8, 203:11
**again**
44:11, 48:2,
51:1, 76:2,
76:16, 81:19,
81:20, 88:13,
90:21, 92:18,
97:1, 98:12,
101:8, 102:1,
102:12, 102:14,
102:21, 102:25,
115:8, 116:17,
124:21, 126:4,
130:6, 133:20,
163:25, 171:15,
184:22, 193:10,
193:16, 202:2,
206:13, 220:2
**against**
19:24, 20:6,
20:17, 21:8,
25:8, 25:11,
25:23, 26:4,
26:25, 27:8,
43:16, 45:19,
55:21, 62:5,
95:15, 127:11,
153:14, 159:15,
160:11, 170:4,
178:12, 185:18,
186:7, 188:20,
188:24, 189:12,
189:16, 210:18,
227:20, 228:21,
228:25, 234:23
**agenda**
169:6, 169:8,
169:14, 169:22,

214:23, 215:2,
215:10, 215:24

**agendas**
215:15

**agent**
130:14, 201:21

**ago**
61:24, 65:7,
88:5, 88:13,
105:25, 232:5

**agree**
8:10, 8:11,
8:12, 87:25,
112:3, 142:8,
198:20

**agreed**
24:25, 25:4,
198:14

**agreement**
25:5, 27:10,
114:23

**ahead**
104:10

**aiken**
66:1

**aisha**
15:24, 127:19,
127:24, 136:12,
144:2, 146:15,
146:19, 153:16,
154:3, 154:9,
162:6, 173:25,
174:6, 174:10,
174:15, 174:17,
191:11, 191:20,
192:3, 192:6,
192:13, 194:12,
194:14, 203:1,
203:11, 203:23,
204:24, 206:13,
208:21, 212:22,
212:23, 212:24,
213:7, 214:2,
214:20, 214:25,
222:21, 223:15,
229:22, 234:19

**aisha's**
143:24, 144:2,

144:9, 144:14,
144:17, 145:1,
145:9, 145:19,
146:10, 147:8,
148:6, 148:7,
179:25, 208:21,
212:11

**akin**
16:6, 65:17,
66:18, 77:8,
77:10, 77:24,
85:7, 86:15,
86:17, 87:2,
88:20, 89:7,
90:9, 90:15,
91:1, 94:22,
95:20, 96:8,
100:20, 108:2,
108:10, 109:16,
116:4, 118:6,
121:17, 132:24,
133:1, 133:11,
138:2, 139:18,
139:22, 140:2,
176:24, 180:11,
183:10, 183:25,
184:23, 185:19,
185:20, 185:23,
187:13, 193:23,
202:14, 206:13,
206:19, 219:4,
219:18

**akin's**
132:19, 132:21

**alert**
57:5, 57:6

**alignment**
132:23, 133:2

**aligns**
184:6

**allegation**
54:12, 189:21,
189:24, 210:15,
235:6

**allegations**
21:8, 44:4,
45:23, 64:11,
67:14, 74:17,

75:2, 106:2,
122:20, 123:16,
124:8, 143:8,
165:12, 166:25,
179:15, 180:24,
188:20, 189:2,
189:6, 189:15,
199:14, 199:17,
200:4, 200:8,
200:23, 200:24,
201:2, 202:7,
202:10, 210:17,
210:25, 225:19,
226:8, 227:19,
227:21, 228:8,
228:10, 228:14,
228:17, 228:20,
228:25, 229:5

**alleged**
19:9, 20:6,
46:16, 64:16,
80:24, 145:10

**allegedly**
64:20, 175:21,
176:13, 235:21

**alleges**
58:7

**alleging**
43:17, 45:12,
57:24, 58:14,
75:17, 136:4,
140:22, 150:24,
161:19, 234:11

**allowed**
66:7, 107:21,
124:23

**almost**
115:9, 145:5

**along**
50:19

**already**
83:15, 156:3,
175:4, 198:9,
198:23, 204:4

**also**
4:10, 14:16,
20:16, 37:12,
39:12, 56:9,

63:14, 71:10,
74:14, 87:8,
92:16, 94:22,
96:21, 98:23,
99:25, 101:13,
118:24, 141:1,
163:20, 172:1,
180:11, 193:2,
210:7, 212:21,
219:23, 219:24,
226:22, 234:19,
236:14

**alterative**
195:25

**always**
44:6, 44:18

**amend**
85:4

**among**
26:4, 185:19

**amount**
106:3

**animus**
236:5

**announcement**
144:22

**anonymized**
224:21

**anonymous**
56:12, 56:23,
57:16, 128:25,
172:21, 225:2,
229:9

**anonymously**
56:15, 129:10

**another**
79:12, 108:20,
199:1

**answer**
9:9, 9:19,
34:5, 45:25,
180:18, 217:2,
233:11

**answers**
9:7

**anybody**
104:7, 157:11,
157:16, 178:18

anymore
23:13, 54:1,
58:11
anyone
11:20, 11:25,
14:4, 14:8,
14:9, 22:13,
22:17, 24:8,
24:12, 26:19,
55:8, 74:23,
75:10, 75:18,
75:25, 76:20,
89:2, 92:4,
92:20, 101:3,
108:20, 114:1,
116:1, 125:13,
150:3, 150:7,
152:8, 156:6,
173:20, 178:18,
180:21, 181:10,
181:13, 188:11,
189:9, 194:10,
199:5, 199:9,
199:13, 202:2,
202:6, 202:9,
208:1, 213:20,
215:9, 222:3,
226:24, 227:1,
233:17
anything
9:13, 22:21,
33:9, 35:4,
64:9, 71:11,
71:23, 100:14,
107:2, 114:18,
174:21, 174:25,
182:9, 188:1,
208:8, 208:9,
209:3, 209:5,
210:10, 211:18,
222:18, 223:19,
226:23, 227:1,
227:7
anyway
120:10
anywhere
112:16
apologize
10:3

apologizing
207:18
app
13:9
apparently
88:3, 207:13,
210:6
appeal
111:4, 111:6,
111:9, 111:12,
111:16, 111:18,
112:10
appealable
112:14, 112:17,
122:13
appealing
111:9, 111:17
appear
18:19, 142:12
appearance
190:24
appeared
154:7
appears
18:20, 143:25,
174:10, 195:9
application
215:13
applications
12:7, 17:18
applied
31:22, 32:1
appropriate
59:12, 59:15,
76:4, 99:8,
162:3
appropriately
154:4
approved
101:11, 101:13
approximately
87:11
apps
17:23
april
60:1
area
29:10, 122:14,

142:22, 142:23
areas
188:14
argument
66:16
arose
124:17
around
21:18, 35:4,
87:10, 108:9,
113:3, 114:21,
132:25, 135:2,
140:20, 141:1,
161:11, 164:24,
179:5, 190:18,
192:7, 203:22,
211:17, 218:18
arrangement
32:19
arrived
160:8
asap
163:23
asked
11:5, 19:18,
22:4, 22:15,
22:17, 23:17,
23:21, 25:17,
25:18, 44:6,
58:11, 62:23,
63:25, 64:1,
64:3, 64:5,
64:6, 64:7,
64:18, 64:20,
71:13, 75:17,
76:11, 76:22,
80:4, 97:5,
98:17, 98:21,
99:24, 107:15,
112:11, 137:4,
137:7, 137:9,
163:21, 163:24,
163:25, 174:18,
175:19, 175:20,
178:7, 182:16,
186:15, 187:11,
192:6, 211:12,
223:22, 226:17

asking
9:5, 23:23,
75:3, 81:14,
85:20, 92:22,
104:3, 104:4,
105:15, 108:24,
109:3, 146:15,
152:21, 183:1,
186:16, 216:25,
217:11, 229:2
asks
68:21, 97:13,
98:5, 98:22,
148:23, 149:23,
164:6
assert
25:7, 25:10,
210:18
asserted
27:8, 145:12,
200:5, 210:5
assess
51:23, 51:25,
84:14, 91:4,
200:3, 200:9,
200:22
assessed
81:7, 83:1,
118:2, 119:8,
230:24
assessing
81:4, 82:6
assign
146:6, 154:8,
155:20, 156:15,
166:1
assigned
31:11, 31:15,
41:9, 42:5,
57:10, 72:23,
136:2, 137:14,
153:19, 153:20,
154:4, 154:23,
155:3, 155:5,
156:24, 172:4,
172:11
assigning
135:25

assignment
146:10
assignments
38:25
assist
158:19, 191:19
assistance
51:5, 193:8
assistant
64:19, 64:20,
75:24, 80:5,
80:16, 80:22,
85:21, 87:13,
103:23, 104:3,
105:3, 143:7,
143:10, 219:10,
221:20
assistants
65:2, 105:15
assisting
220:22
associate
70:2
associated
12:22, 39:1
association
1:12, 37:16,
133:2
assume
40:25, 46:2,
46:24, 81:12,
98:19, 137:19,
151:18, 189:14,
228:24
athletes
219:19, 221:2,
221:21
athletic
1:11, 32:2,
37:16, 37:17,
38:13, 38:24,
39:6, 63:10,
65:1, 66:24,
70:2, 70:4,
80:21, 104:2,
130:24, 133:2,
133:24, 145:22,
186:9, 202:1

athletics
32:13, 68:6,
72:23, 73:1,
131:3, 145:25,
150:6, 150:15,
166:7, 173:24,
180:4, 180:8,
182:21
atlanta
1:3, 3:17,
27:16
attached
5:7, 27:22,
36:24, 39:17,
55:17, 65:14,
67:23, 71:5,
72:11, 72:16,
73:11, 79:23,
83:25, 86:8,
91:11, 93:4,
95:7, 106:20,
107:7, 109:9,
110:23, 113:1,
115:14, 116:24,
126:20, 129:25,
132:17, 134:20,
139:11, 140:18,
141:18, 148:13,
149:16, 158:11,
164:12, 167:8,
170:15, 177:19,
181:18, 191:6,
195:4, 197:19,
201:9, 202:21,
206:3, 207:7,
214:14, 217:21,
223:10, 224:5,
232:16, 233:4,
233:23
attaches
98:5, 232:25
attachment
97:11, 97:16,
98:4
attachments
96:22, 118:17
attempts
130:17, 132:5,

151:20
attend
216:15
attended
187:19
attending
107:20, 108:7
attention
10:3, 161:2,
162:9, 162:11,
162:15, 207:16,
228:9
attorney
3:15, 69:12,
69:13, 107:20,
108:7, 116:10,
122:17, 199:4,
205:17, 205:19,
205:22
attorney's
205:6
attorneys
108:18, 116:3,
116:18, 122:7,
122:8, 135:17
attribute
224:24
audibly
9:9
audio
69:17, 69:19,
187:23, 187:24,
188:6
audit
59:9, 125:14
august
30:1, 61:7,
62:2, 74:4,
234:8
augusta
127:24
authored
172:11
automatic
60:14
av
4:12
avenue
3:8, 4:6

avoid
188:11
aware
51:2, 72:25,
81:14, 87:20,
94:8, 124:2,
128:23, 135:5,
141:13, 149:3,
149:10, 152:10,
160:11, 173:19,
174:3, 174:8,
174:9, 174:13,
174:15, 175:18,
176:17, 177:8,
184:21, 219:23,
229:6
awareness
124:13
away
23:11, 30:11,
158:17
awkward
10:4

**B**

b0r
5:15, 5:16,
71:3, 72:9
back
13:24, 21:25,
22:7, 27:25,
30:10, 40:10,
40:19, 51:17,
53:20, 56:5,
61:15, 61:23,
64:14, 76:22,
77:5, 85:13,
103:20, 106:25,
113:20, 114:3,
115:8, 118:9,
123:5, 146:7,
147:3, 168:9,
170:2, 198:4,
201:4, 204:18,
204:19, 206:16,
207:3, 222:22,
232:1
back-and-forth
119:3

background
12:11, 24:18
backtrack
88:19
bad
115:6
balances
124:10
ball
201:17
banks
3:3, 3:7,
197:22, 201:14
barely
181:12
barrett
87:15, 105:21
based
8:8, 27:16,
31:24, 52:1,
64:15, 99:10,
180:24, 219:7,
235:23
basically
35:19, 81:25,
104:3, 119:16,
119:22, 143:22,
164:14, 171:20,
202:16
basis
17:16, 82:4,
103:12
basketball
17:6, 66:11,
138:21, 154:18,
155:8, 191:15,
198:1, 203:2,
203:15, 203:16,
204:25, 205:12,
218:5, 219:11,
222:16
batteries
15:5
became
30:9, 35:15
because
10:18, 19:18,
25:16, 27:2,

32:17, 38:20,
41:16, 43:19,
44:20, 47:21,
48:22, 53:5,
66:14, 69:21,
76:23, 95:14,
100:14, 101:1,
102:9, 104:6,
107:22, 122:16,
124:24, 125:22,
125:24, 131:9,
135:10, 135:24,
136:16, 138:10,
144:11, 147:5,
152:7, 152:17,
152:18, 153:10,
155:4, 158:22,
164:22, 165:21,
166:1, 177:13,
180:17, 199:19,
215:25, 216:13,
217:11, 223:24,
225:4, 227:11
been
10:8, 17:12,
18:18, 19:9,
19:16, 19:23,
20:5, 21:8,
26:3, 40:7,
59:20, 65:1,
66:9, 75:8,
76:8, 76:9,
80:24, 81:8,
81:10, 85:20,
90:9, 92:17,
94:2, 94:11,
96:4, 97:3,
98:1, 100:7,
101:1, 103:22,
104:4, 105:12,
105:14, 105:18,
105:20, 106:2,
106:3, 112:16,
122:25, 124:4,
124:23, 133:6,
137:9, 137:14,
137:15, 137:17,
137:18, 141:8,

143:5, 145:7,
145:12, 149:4,
153:9, 155:5,
159:6, 159:13,
161:18, 168:14,
168:19, 170:4,
178:11, 178:22,
180:16, 183:15,
183:25, 186:6,
186:16, 187:10,
187:20, 188:5,
188:19, 188:20,
189:12, 189:15,
196:17, 197:9,
200:23, 211:2,
216:13, 217:8,
218:21, 226:12,
227:20, 228:8,
228:11, 229:12,
229:14, 231:13,
234:24, 237:9
before
2:8, 10:8,
22:12, 27:25,
35:3, 39:24,
41:4, 41:5,
43:14, 43:25,
46:6, 48:8,
51:9, 53:24,
55:22, 61:12,
61:24, 62:8,
75:20, 81:9,
81:11, 82:1,
82:13, 82:25,
83:6, 83:13,
84:20, 85:6,
85:7, 85:17,
86:17, 88:20,
89:1, 92:21,
103:4, 103:6,
104:1, 104:18,
104:21, 105:23,
125:7, 125:23,
126:24, 138:1,
141:23, 149:21,
155:9, 160:16,
163:20, 168:17,
169:15, 174:3,

178:14, 178:17,
185:8, 189:10,
189:23, 199:17,
215:2, 216:9,
231:13, 233:3,
238:2
beginning
114:5, 184:3
behalf
3:2, 3:13, 4:2
behavior
44:25, 46:14,
103:7, 103:11,
118:18, 120:2,
128:12, 128:23
being
8:21, 11:5,
25:17, 25:22,
35:6, 41:2,
44:21, 53:22,
65:3, 66:14,
69:20, 71:25,
77:22, 83:19,
83:21, 94:7,
94:9, 98:17,
112:8, 116:8,
118:22, 123:9,
123:14, 125:1,
125:25, 135:5,
137:7, 138:23,
147:13, 160:21,
166:3, 168:25,
169:20, 169:25,
179:7, 181:13,
181:25, 182:2,
182:15, 183:4,
183:6, 183:13,
187:18, 190:3,
193:10, 193:23,
196:24, 200:5,
212:10, 223:22,
225:12, 231:19
believe
26:10, 32:8,
32:10, 52:25,
62:21, 85:22,
87:18, 94:11,
130:23, 139:18,

142:25, 150:9,
153:9, 162:5,
180:10, 184:15,
184:16, 186:15,
196:14, 197:8,
203:23, 205:16,
214:1, 219:8,
230:19

**believed**
76:8, 185:18

**bell**
69:25, 138:13

**below**
150:14

**ben**
158:23

**benefits**
134:10

**benjamin**
4:4

**benson**
158:15, 158:20,
161:12, 163:11

**best**
22:7, 33:16,
34:13, 34:17,
34:24, 40:15,
43:6, 44:7,
54:10, 61:6,
74:10, 99:3,
126:12, 126:14,
175:9, 175:11,
186:1, 189:16,
189:25, 194:7,
229:13

**better**
32:20, 43:10,
65:23, 206:25,
220:2

**between**
24:7, 38:12,
132:24, 133:2,
133:11, 138:23,
139:20, 140:7,
142:4, 151:13,
151:21, 155:23,
203:11, 209:8,
221:25, 223:13

**beyond**
156:10

**bifurcating**
179:9

**big**
211:11

**bigger**
95:11, 217:25,
225:13

**bill**
13:1

**binder**
9:24, 181:20

**bit**
17:12, 18:17,
24:17, 24:18,
27:18, 31:9,
40:11, 88:19,
111:17, 123:4,
129:21, 140:9,
197:14, 212:18

**blank**
173:21

**blew**
43:25

**blow**
130:6

**blown**
225:13

**board**
1:8, 61:7

**boles**
16:25

**bonus**
48:23

**bor**
5:10, 5:11,
5:12, 5:14,
5:18, 5:19,
5:20, 5:21,
5:22, 5:23, 6:3,
6:4, 6:5, 6:10,
6:14, 6:15,
6:17, 6:18,
6:20, 6:21,
6:22, 6:23,
6:24, 7:3, 7:5,
7:6, 7:7, 7:8,

7:12, 7:13,
36:22, 39:15,
55:15, 67:21,
72:15, 73:24,
79:21, 83:23,
86:6, 91:9,
93:2, 95:5,
107:5, 109:6,
110:21, 129:23,
140:16, 148:11,
158:8, 164:10,
170:13, 177:17,
181:16, 191:4,
195:2, 197:17,
201:7, 202:19,
204:19, 206:1,
207:5, 214:12,
217:19, 232:14,
233:21

**bor-0056**
7:4

**bor-0082**
7:9

**bor-1**
7:11, 224:3

**boss**
45:2, 45:3,
45:5, 92:17,
93:13, 125:13

**both**
32:18, 46:1,
46:4, 58:14,
97:15, 132:6,
139:1, 186:4,
212:17

**bottler**
30:8

**bottlers**
30:11

**bottom**
37:2, 59:3,
61:2, 65:21,
65:25, 67:25,
73:25, 74:13,
98:3, 120:22,
153:8, 154:14,
157:1, 214:19

**bought**
30:9

**box**
215:7, 215:8,
215:11, 215:17,
215:20

**brain**
195:21

**breached**
112:21

**break**
9:14, 61:15,
85:12, 113:7,
113:11, 113:17,
113:19, 113:23,
158:17, 168:9

**breakdown**
128:11, 128:17

**breakout**
237:6

**brian**
205:17, 206:12

**brief**
61:18, 85:15,
168:11, 232:3

**briefings**
213:23, 221:25,
222:3

**briefly**
10:17

**bring**
11:12, 27:19,
39:14, 55:14,
67:20, 69:13,
93:2, 103:19,
116:21, 139:8,
148:9, 149:13,
150:7, 164:9,
167:5, 170:12,
202:18, 203:3,
214:11, 217:1

**bringing**
108:18

**brittany**
20:18, 138:24,
139:21, 140:8,
142:5, 143:15,
143:18, 150:9,
150:17, 151:17,
151:21, 155:24,

179:16, 188:25,
228:10
**brittany's**
154:12
**broke**
85:17, 168:13
**brought**
21:8, 127:11,
161:1, 162:11,
162:14, 175:2,
184:12, 188:20,
189:12, 189:15,
200:23, 227:20,
228:8
**browntree**
130:15, 131:7
**browser**
12:6
**bud**
16:19, 93:10,
93:20, 94:6,
202:14, 202:25
**budget**
70:5
**build**
107:1
**bullet**
218:12
**bullied**
153:9, 188:25
**bully**
41:2, 53:22
**bullying**
41:12, 42:12,
43:17, 44:15,
44:25, 45:5,
45:6, 45:13,
45:22, 46:13,
46:14, 58:8,
150:25, 160:21,
161:19, 199:23
**bunch**
65:8, 167:14
**burden**
77:16
**burns**
17:2, 232:24
**business**
31:3, 31:5,

31:6, 31:7,
31:11, 31:20,
32:3, 32:6,
32:7, 32:22,
37:12, 37:16,
38:2, 38:13,
38:18, 109:18,
109:22, 109:24,
134:6, 211:10,
220:5
**busy**
135:10
**butler**
232:25, 233:15

## C

**cabinet**
123:13
**caleb**
4:12, 36:21,
39:14, 67:20,
79:20, 83:22,
86:5, 91:8,
91:21, 93:1,
95:3, 107:4,
109:5, 110:20,
115:11, 116:21,
126:17, 129:22,
132:14, 134:16,
139:8, 140:15,
148:9, 149:13,
158:7, 164:9,
167:5, 170:12,
181:15, 202:18,
205:25, 214:11,
217:18, 222:25,
224:2, 232:13
**calendar**
132:19, 132:22,
133:10, 180:3,
180:6, 203:9,
205:3
**call**
13:4, 114:20,
128:24, 151:1,
154:15, 155:13,
156:17, 163:4,
163:5, 163:19,

169:10, 191:1,
194:13, 203:4,
203:8, 203:10,
203:14, 203:17,
205:1, 205:11,
220:13, 223:18
**called**
36:3, 42:20,
124:1, 150:17,
151:4, 151:7,
151:9, 151:10,
155:13, 181:8,
212:10, 233:3
**calling**
110:3
**calls**
86:20
**came**
30:6, 44:5,
61:7, 62:25,
65:4, 79:13,
104:12, 108:19,
124:8, 129:18,
147:8, 153:18,
160:14, 160:16,
163:2, 166:3,
171:17, 172:7,
173:2, 173:10,
173:11, 173:22,
173:23, 173:24,
198:4, 204:12,
204:13, 226:25
**campus**
174:7
**can't**
34:4, 35:17,
36:13, 45:24,
50:11, 51:1,
60:15, 65:22,
65:23, 91:19,
94:13, 102:5,
104:22, 119:25,
125:10, 125:13,
145:24, 172:3,
173:23, 176:15,
178:21, 186:14,
192:21, 198:16,
215:13, 215:25,

216:25, 225:21,
228:22
**canceled**
58:13
**cannot**
111:9, 119:18,
120:8, 160:2
**capacity**
29:17
**capitol**
3:16
**capture**
151:25
**care**
25:19, 113:7
**careful**
151:8
**caretaking**
210:13
**carson**
87:8, 87:15,
87:20, 88:2,
105:21
**case**
8:23, 11:4,
23:24, 46:24,
47:4, 47:7,
50:12, 60:18,
74:21, 79:12,
104:11, 107:25,
112:13, 120:1,
120:2, 120:3,
151:2, 152:22,
152:23, 192:22,
208:5, 217:5,
223:18, 225:10,
238:11
**case-by-case**
82:4, 103:11
**cases**
79:13, 125:19,
125:20, 136:25
**cause**
25:17, 119:15
**causing**
43:22
**cce**
30:10

cell
12:19, 163:19
certain
39:2, 48:1,
98:16, 145:23,
146:2, 179:24,
200:10, 215:14,
220:1
certainly
89:11, 93:22,
124:1, 124:12,
125:2, 231:9
certificate
238:1
certify
238:3
chain
84:5, 101:11,
123:25, 124:1
challenging
225:4
change
129:21
changed
164:20, 197:9
changes
109:19, 110:10
charge
175:8, 180:1,
213:2, 213:4
charles
234:10
chart
31:9
chat
18:2, 18:5,
18:9
chats
12:7, 18:13
chatty
197:13
check
107:24, 108:17,
163:21, 163:24,
164:7, 169:10,
215:5
checking
95:21, 192:1

checks
124:10
chief
52:15, 53:1
childcare
113:12
chosen
91:3
christine
4:3
circle
27:25, 114:3
circulate
203:8
circulated
169:14
circumstances
44:16, 135:1,
190:17, 230:24
cited
235:18, 235:21
civil
1:7
claim
145:12, 146:8,
146:9, 183:4,
199:10, 200:4
claiming
143:25, 199:22,
205:7
claims
25:7, 25:10,
27:8, 27:9,
144:12
clarifies
203:7
clarify
9:12, 233:24
class
220:11
clear
22:8, 57:1,
187:14, 200:20,
227:12, 228:6
clearly
9:8
click
73:8, 224:14

client
197:25
close
113:17
closed
60:2, 60:9
closest
38:20
cloud
215:9
cloud-based
215:22
coaches
64:25, 76:12,
76:15, 76:18,
76:22, 77:23,
80:4, 94:10,
218:6, 218:11,
219:10, 220:22,
221:21
coaching
100:11, 110:4,
110:8, 110:12,
110:15, 110:17,
218:4, 236:15,
236:20, 236:23
coca-cola
30:6, 30:7,
30:8, 30:9
coke
29:17, 29:23,
30:2, 30:5
colleagues
13:17, 14:24,
15:10, 17:16,
18:6
collect
41:5
collecting
69:22
colleen
3:4, 8:22,
45:12, 45:20,
46:15
colleen's
43:16
come
19:10, 24:12,

41:1, 44:14,
45:6, 46:12,
53:21, 53:25,
57:2, 61:6,
61:15, 78:19,
79:14, 85:13,
102:1, 113:20,
121:2, 136:23,
143:21, 153:23,
157:17, 157:21,
161:4, 162:8,
165:6, 168:9,
171:12, 173:15,
194:10, 232:1
comes
101:8, 148:4,
148:5
comfortable
38:18, 227:5
coming
65:5, 122:16,
182:7, 182:8
commands
115:5
comment
225:25, 226:1
comments
236:5
commission
238:18
committed
128:10
communicate
11:25, 13:10,
13:17, 13:20,
14:24, 15:3,
18:6, 231:10
communicated
12:12, 16:2,
26:14, 28:2
communicating
17:13, 185:24,
198:18
communication
23:25, 184:18,
209:23
communications
12:3, 94:7,

208:4
**company**
27:15, 27:16,
30:9, 30:13,
179:4
**compare**
117:11
**compensated**
71:11
**compensation**
37:24
**complain**
41:2, 44:15,
78:20, 147:20
**complainant**
60:5
**complainants**
164:18
**complained**
55:9, 64:22,
74:8, 94:9,
129:13, 147:5,
147:23, 185:16,
209:11, 209:13,
209:14, 209:15,
210:7
**complaining**
64:25, 66:1,
66:13, 68:23,
135:7, 135:17,
135:21, 147:11,
147:22, 153:13,
202:3, 206:10,
225:11
**complains**
58:16, 66:1,
130:16, 202:16
**complete**
90:21, 166:4,
192:15
**completely**
83:18
**compliance**
32:23, 33:10,
128:1, 128:7,
131:24
**comprehensive**
182:20, 182:22,

183:2
**compromised**
227:10
**computer**
12:8, 22:6
**computer-based**
17:23
**conceivable**
119:23
**concern**
27:3, 38:14,
43:9, 44:22,
46:5, 56:16,
57:22, 67:7,
77:22, 107:19,
108:6, 112:2,
151:13, 167:16,
223:15, 226:23,
236:7
**concerned**
70:10, 99:5,
182:14, 211:14
**concerning**
143:5, 232:7
**concerns**
25:16, 26:23,
27:4, 34:6,
35:4, 35:6,
74:14, 74:15,
74:23, 84:18,
97:11, 111:24,
116:5, 117:16,
124:23, 142:21,
143:21, 148:24,
149:1, 153:11,
154:17, 155:7,
166:2, 179:18,
200:17, 201:25
**conclude**
201:22
**concluded**
237:8
**conclusion**
203:3
**conduct**
78:25, 81:24,
82:1, 82:15,
83:6, 83:8,

87:23, 118:23,
119:6, 142:10,
166:23, 166:25,
197:6, 234:12,
235:1, 235:5,
236:1
**conducted**
1:17, 2:1
**confidential**
56:8, 172:23,
172:24
**confidentiality**
115:3
**confidentially**
56:11
**confirm**
28:18, 29:24,
107:25
**confirmed**
87:6, 195:13
**conflict**
45:15, 132:8,
132:9, 140:7,
140:23, 142:4,
149:4, 151:21,
155:23, 185:10
**conflicts**
164:7
**confused**
45:1
**confusing**
213:2
**conjunction**
179:21, 234:14
**connect**
172:15
**connecticut**
3:8
**conscientious**
220:19
**consider**
74:23, 75:11,
106:1, 156:1,
218:14
**consideration**
166:10, 220:8
**considerations**
192:18

**considered**
190:11, 235:1
**considering**
180:23
**consistent**
35:12, 42:22,
43:18, 73:18,
73:22, 74:7,
82:3, 83:21,
85:24, 90:24,
119:2, 159:6,
189:16, 189:25
**consistently**
50:11, 83:10,
111:16
**consult**
53:13
**consultant**
38:23, 39:6,
150:6
**consultants**
222:15, 222:23
**consulting**
53:18
**contact**
158:23, 163:11
**content**
12:1, 51:19,
51:20
**contents**
39:22
**context**
45:24, 109:4,
131:10, 131:16,
177:13, 225:25,
226:4, 226:16,
226:17
**continue**
61:4, 72:6
**continuous**
197:10
**contract**
181:3
**contracted**
136:14
**contradiction**
118:18
**contributed**
236:1

control
28:11, 28:13,
73:14, 91:22,
127:16, 130:2,
216:5
controls
124:19, 124:24
convene
203:4
convenes
205:1
conveney
36:21
conversation
21:13, 77:24,
77:25, 87:10,
88:4, 106:22,
106:23, 114:9,
150:13, 150:22,
156:7, 156:8,
162:25, 173:17,
173:20, 191:13,
208:16, 209:6,
219:15, 223:14,
223:16, 229:25
conversations
21:6, 21:13,
127:14, 159:10,
165:18, 179:3
convert
28:23
coordinate
194:7, 194:13,
219:19, 234:20
coordinated
208:3
coordinating
193:7, 206:20,
206:21
copied
68:1, 93:11,
94:7, 117:18,
120:23, 131:9,
206:17
copies
94:15, 96:21,
167:18, 168:16,
170:8, 170:11

copy
72:19, 94:19,
97:1, 115:1,
121:4, 141:21,
167:21, 171:4,
185:20, 230:8,
230:11
copying
58:3, 141:12,
197:24
core
118:18
correct
12:17, 15:17,
24:21, 24:23,
26:18, 27:12,
28:7, 29:9,
29:25, 31:12,
31:19, 34:11,
35:25, 37:13,
40:17, 41:20,
44:25, 46:3,
48:14, 51:19,
56:13, 57:16,
58:23, 69:5,
84:23, 86:2,
87:3, 87:23,
94:4, 94:5,
103:2, 104:5,
105:16, 112:6,
112:10, 112:19,
114:24, 114:25,
118:3, 118:6,
118:10, 121:5,
128:5, 129:5,
131:3, 137:10,
137:16, 142:6,
142:13, 152:6,
153:14, 155:24,
162:14, 163:13,
165:12, 165:13,
171:22, 171:23,
184:1, 184:5,
219:20, 221:15,
228:13, 231:3,
238:5
corrective
97:12, 98:23,

98:24, 99:12,
99:18, 100:5,
100:10, 110:2,
110:7
correctly
35:5, 236:18
could
13:10, 32:19,
54:11, 56:18,
78:19, 97:2,
100:20, 100:24,
100:25, 108:20,
112:21, 133:6,
134:1, 134:2,
136:8, 138:6,
138:8, 159:23,
159:24, 174:12,
183:15, 186:22,
187:20, 211:10,
215:14, 215:15,
225:5, 225:18,
227:2, 228:25,
230:7, 230:23
couldn't
94:25, 134:13,
194:14
counsel
8:2, 8:6, 8:11,
8:17, 8:18,
9:16, 10:5,
10:18, 10:22,
34:16, 53:1,
69:4, 86:19,
93:18, 114:7,
136:11, 201:16,
206:9, 238:9
counseled
92:21, 103:22,
103:25, 104:8,
105:12, 105:14,
105:22
counseling
87:7, 87:9,
88:3
couple
20:16, 32:4,
39:12, 64:17,
65:20, 114:4,

124:5, 131:4,
166:5, 237:6
course
80:2, 85:19,
183:18, 212:3,
228:2
court
1:1, 9:6
courtney
10:22
cover
188:16
covered
109:7, 109:14,
228:5
craft
97:14
created
125:4, 125:6,
198:11
creating
87:10, 235:21
critical
225:7
crux
200:6
cruz
16:4, 19:15,
32:7, 32:13,
37:15, 38:15,
131:8, 131:13,
140:6, 140:10,
141:11, 141:20,
141:23, 142:3,
149:3, 149:6,
151:12, 155:23,
156:3, 180:6,
181:6, 193:1,
203:13
cruz's
151:20
culture
128:21, 235:22,
236:7
current
17:5, 132:7
currently
24:19, 115:7

cutting
117:20

**D**

daily
13:21, 17:16
date
22:1, 59:24,
69:2, 93:22,
150:1, 169:11,
226:3
dated
171:8, 171:9,
171:12, 171:13
dates
37:10, 84:21
day
113:10, 139:20,
154:20, 167:12,
180:12, 221:3,
221:4, 221:12,
221:13, 238:15
day-to-day
132:6
days
86:17, 104:24,
138:1, 155:9
deal
38:7, 156:5,
175:4
dealing
156:3
deals
38:9
dealt
171:21
dean
176:11, 176:15
december
86:14, 104:24
decide
29:18, 49:19,
51:22, 169:20
decided
83:7, 84:24,
86:25, 147:25,
151:25, 152:6,
211:7, 211:14

decides
118:1
deciding
156:2, 199:17
decision
21:1, 21:10,
21:16, 32:17,
47:17, 48:12,
63:4, 69:10,
77:1, 77:5,
84:13, 84:21,
90:10, 117:23,
154:20, 159:4,
159:5, 159:25,
160:2, 179:8,
179:14, 190:3,
190:8, 190:18,
196:4, 198:14,
198:21, 204:14,
204:15, 229:8,
229:11, 230:14,
231:11
decisions
26:11
decree
147:3
deemed
191:17
deep
236:4
deeper
125:3
defendants
1:13, 3:13, 4:2
defense
9:16, 29:13
definitely
110:19, 137:2,
162:13
degree
29:6
delegated
192:14
deleted
71:20, 176:19,
176:25
delivered
176:23, 233:2

demand
210:2
department
31:10, 31:25,
32:3, 33:22,
33:25, 37:17,
38:4, 38:6,
38:14, 38:21,
38:24, 39:2,
39:7, 59:9,
63:10, 65:1,
70:4, 80:21,
104:2, 127:22,
128:3, 128:6,
128:7, 130:25,
133:24, 145:22,
176:2, 186:10,
202:1, 236:8
departments
31:14, 31:16,
31:22, 166:8
depend
19:19, 43:5,
51:4
depended
44:2, 73:21
depending
44:10, 194:6
depends
21:23, 45:23,
194:4
deposed
10:8, 10:19,
11:6
deposition
1:16, 2:1, 5:8,
8:24, 9:23,
10:15, 11:9,
11:16, 27:21,
36:23, 39:16,
55:16, 65:13,
67:22, 71:4,
72:10, 79:22,
83:24, 86:7,
91:10, 93:3,
95:6, 107:6,
109:18, 110:22,
112:25, 113:25,

114:5, 114:6,
114:7, 115:13,
116:23, 117:8,
126:19, 129:24,
132:16, 134:19,
139:10, 140:17,
148:12, 149:15,
158:10, 164:11,
167:7, 170:14,
177:18, 181:17,
191:5, 195:3,
197:18, 201:8,
202:20, 206:2,
207:6, 214:13,
217:20, 223:9,
224:4, 232:15,
233:22, 237:8,
238:3
described
150:9, 236:9
describing
132:4
design
134:8
despite
201:21
detail
58:2, 73:17
detailed
18:21, 152:6,
220:18
details
43:3, 58:7,
123:22, 123:23,
205:23
determination
51:25
determine
47:18, 95:22,
188:23, 235:4
determined
118:14, 163:3
determining
81:23
develop
35:14
developed
34:17, 34:23,

56:9
**developing**
33:16, 40:15
**development**
34:13, 134:8
**dialed**
147:3
**differences**
66:17
**different**
31:24, 32:19,
49:14, 72:3,
88:22, 91:1,
98:7, 100:17,
104:12, 127:22,
164:15, 166:1,
166:2, 175:15,
227:8, 227:9
**differently**
66:14, 76:18,
77:23, 94:9
**difficult**
198:9, 198:23
**dignity**
235:20
**direct**
38:21, 41:13,
66:4, 94:1,
181:1, 192:15,
211:1, 211:9
**directed**
31:3, 31:18,
32:21, 175:22,
203:24
**directing**
23:23, 129:8,
212:22
**direction**
114:10, 114:13,
120:8, 144:11,
144:15, 144:18,
144:24, 145:17,
167:1, 238:8
**directive**
146:23
**directly**
10:1, 231:10
**director**
30:3, 30:15,

30:18, 30:19,
36:7, 37:21,
66:24, 70:3,
186:9, 211:12
**disagree**
156:22
**disappointed**
66:7
**discarded**
153:2
**disciplinary**
75:7, 75:11,
75:14, 99:20,
111:22, 112:6
**discipline**
51:23, 51:25,
74:21, 81:4,
81:7, 82:19,
82:21, 82:25,
83:7, 84:15,
86:2, 90:13,
91:2, 91:3,
102:7, 102:13,
103:2, 105:7,
111:17, 111:25,
118:2, 230:23
**disciplined**
65:3, 81:8,
81:10, 82:7,
82:14, 83:6,
208:24, 236:10,
236:21
**disciplining**
104:19
**discovered**
85:19
**discriminated**
25:23
**discrimination**
26:1, 26:24,
135:7, 135:18,
135:22, 136:4,
136:25, 140:23,
145:11, 145:15,
157:25, 185:10,
198:10, 198:24,
199:2, 210:12,
210:24

**discriminatory**
26:13, 234:11
**discuss**
11:3, 89:6,
89:9, 116:2,
125:18, 133:11,
133:21, 138:3,
203:5
**discussed**
64:10, 64:11,
86:19, 89:11,
89:12, 89:13,
97:8, 138:2,
154:15, 159:14,
163:7, 163:10,
169:20, 169:25,
181:25, 183:6,
187:18, 191:15,
205:11, 233:1
**discussing**
116:19, 127:10,
134:12
**discussion**
21:5, 21:11,
75:22, 76:19,
77:3, 116:12,
166:13, 182:2,
186:25, 187:2,
187:8, 187:22,
204:6, 204:10,
232:6
**discussions**
21:4, 90:19,
91:6, 94:2,
116:8, 124:9,
124:12, 165:14,
179:5, 194:17,
218:4, 230:14,
231:7
**disposed**
23:11
**disproportionate**
209:22
**dispute**
132:10, 138:23,
139:2, 139:4,
140:6, 142:2
**disputes**
132:11

**distributing**
27:15
**district**
1:1, 1:2
**division**
1:3
**document**
6:6, 27:19,
28:12, 28:25,
37:2, 39:21,
39:24, 40:4,
55:15, 56:1,
73:14, 79:21,
86:6, 87:9,
91:22, 93:2,
95:4, 99:12,
106:17, 109:17,
109:20, 110:8,
110:12, 110:21,
112:1, 112:24,
117:5, 117:19,
117:21, 118:6,
134:22, 149:21,
164:14, 167:10,
201:4
**documentation**
87:10, 95:22,
95:24, 217:14
**documented**
35:20, 87:7
**documents**
9:25, 11:8,
11:11, 18:18,
23:24, 24:10,
24:13, 24:14,
49:22, 64:16,
65:8, 106:14,
114:16, 151:12,
152:21, 152:22,
167:14
**doing**
35:5, 43:20,
44:10, 46:20,
46:21, 75:4,
75:9, 75:19,
76:23, 81:18,
81:19, 81:21,
84:7, 89:14,

105:1, 122:14,
123:15, 124:4,
124:13, 124:14,
125:2, 136:16,
136:18, 152:7,
155:20, 159:7,
196:18, 196:19,
219:22, 220:5,
231:4
**done**
43:21, 51:4,
73:2, 77:17,
80:24, 83:15,
84:18, 86:11,
88:9, 91:18,
95:10, 100:24,
101:1, 106:5,
107:10, 109:12,
110:25, 115:9,
115:18, 130:5,
137:16, 137:17,
141:4, 148:20,
149:19, 166:15,
170:18, 176:7,
177:22, 191:8,
195:7, 201:12,
203:20, 206:6,
207:10, 214:16,
217:23, 234:1,
234:9, 234:24
**door**
41:16
**douglas**
141:12, 150:14,
180:5, 181:6,
193:2, 203:12
**down**
9:10, 38:1,
43:3, 45:9,
48:18, 57:18,
66:20, 82:19,
95:4, 100:21,
127:4, 134:17,
172:13, 203:18
**dr**
19:15, 26:17,
28:2, 58:3
**draft**
33:6, 51:6,

51:14, 88:24,
91:14, 92:1,
92:13, 110:13,
117:9, 117:13,
195:11, 213:14
**drafting**
89:1, 92:3,
110:17, 119:4
**drafts**
93:8, 213:14
**drastic**
198:5
**draw**
218:9
**drives**
60:25, 69:18
**driving**
140:1
**drop-down**
57:20
**dropbox**
215:11
**drug**
56:17
**due**
169:11, 236:5
**durham**
16:21, 52:11,
52:13, 52:18,
93:21, 94:6,
94:14, 94:20,
96:23, 97:17,
107:17, 108:1,
108:10, 108:24,
115:17, 115:21,
115:24, 116:4,
121:17, 174:11,
174:17, 176:24,
194:17
**during**
18:12, 46:8,
46:9, 46:11,
64:13, 64:23,
85:19, 113:25,
114:9, 126:22,
127:12, 138:3,
159:21, 169:3,
175:10, 178:22,

183:18, 184:24,
210:13, 211:17,
212:3, 222:8,
227:23, 228:2
**duties**
31:2, 34:2

## E

**e-mail**
13:9, 13:10,
13:11, 14:11,
24:4, 59:23,
65:16, 65:21,
65:25, 66:19,
68:25, 69:2,
71:7, 71:13,
71:19, 71:24,
72:13, 72:15,
73:12, 78:1,
78:11, 84:2,
84:5, 84:6,
86:13, 87:24,
88:23, 94:16,
95:1, 95:19,
96:4, 96:6,
96:11, 98:5,
104:23, 105:4,
105:21, 106:12,
107:12, 108:4,
108:16, 109:1,
109:7, 109:14,
115:17, 115:19,
116:18, 127:23,
130:8, 131:8,
132:20, 141:14,
141:24, 142:16,
146:18, 149:5,
150:19, 154:7,
158:13, 164:17,
164:19, 165:1,
167:11, 167:14,
168:15, 169:15,
170:6, 170:10,
171:1, 171:5,
172:12, 176:4,
176:14, 176:19,
176:25, 194:11,
195:9, 195:12,

196:9, 202:23,
205:7, 206:8,
206:15, 207:11,
207:13, 207:14,
207:17, 209:8,
212:7, 214:19,
215:6, 216:4,
216:6, 216:7,
216:12, 219:8,
229:25, 232:25
**e-mailed**
115:22, 149:6,
212:13
**e-mailing**
230:2
**e-mails**
10:16, 10:17,
68:20, 69:1,
107:17, 109:16,
111:3, 118:8,
130:15, 141:12,
148:23, 149:10,
149:22, 158:15,
191:12, 197:23,
202:14, 203:1,
203:21, 205:18
**each**
9:20, 29:2,
31:10, 31:15,
157:22, 215:2
**earlier**
8:21, 23:17,
23:21, 53:21,
60:3, 76:17,
79:25, 86:19,
104:23, 114:22,
117:8, 143:8,
146:18, 150:13,
167:10, 185:11,
193:1, 203:22,
219:17, 222:5,
223:16, 230:17,
234:22
**early**
161:23
**easter**
38:1
**edit**
51:11, 51:15,

51:17, 51:19,
51:20, 73:5,
118:6, 213:17
**edited**
51:13, 213:20
**editing**
73:6, 109:25,
110:7, 213:19
**edits**
107:14
**effect**
39:11
**efforts**
142:12, 151:15,
151:19
**egregious**
103:15
**eh**
220:17
**either**
22:5, 22:12,
45:9, 48:12,
100:6, 105:7,
122:2, 153:11,
172:11, 176:24,
183:24, 189:10
**else**
26:19, 32:13,
41:10, 89:18,
100:14, 104:2,
107:2, 114:18,
125:13, 150:3,
150:4, 150:7,
162:3, 162:21,
163:14, 165:17,
173:20, 173:24,
179:17, 181:10,
181:13, 190:12,
194:10, 208:15,
208:18, 209:5,
210:17, 210:21,
220:7
**emotional**
57:25, 58:9,
58:17
**employed**
238:10
**employee**
24:20, 30:18,

32:24, 33:14,
33:15, 33:17,
33:21, 34:1,
34:6, 34:15,
34:21, 35:5,
37:5, 37:7,
38:12, 38:14,
38:16, 38:22,
39:5, 41:1,
41:25, 42:4,
43:2, 68:14,
72:22, 80:20,
90:13, 100:4,
102:17, 103:20,
104:13, 120:10,
120:18, 129:13,
131:11, 131:23,
132:10, 132:11,
133:22, 134:7,
135:21, 138:20,
148:2, 150:5,
211:6, 233:5
**employee's**
112:1, 133:25,
166:23, 230:22
**employees**
132:12, 147:23,
150:15, 151:14,
151:16, 153:8,
175:13, 221:9
**employment**
24:17, 26:11,
27:18, 29:12,
39:20, 53:1,
53:6, 69:4,
107:22, 119:15,
136:4, 136:11,
136:24, 180:22,
181:3, 186:4,
209:15, 209:24,
210:5, 230:15
**employment-relat-
ed**
53:2
**end**
28:9, 42:3,
77:13, 183:23,
209:14, 209:24,

210:5, 214:5,
214:8, 223:2,
223:4
**ended**
80:3, 179:9,
203:19, 236:12
**ends**
121:8, 165:11
**engaged**
63:1, 235:25
**engel**
130:16, 130:18,
130:21, 132:4,
143:1, 168:19,
232:24
**enjoy**
29:21
**enough**
125:3, 226:24,
227:12
**ensure**
85:23, 236:15
**entered**
27:10
**enterprises**
30:6, 30:7
**entire**
30:16, 33:2,
186:9, 206:12,
225:14
**entries**
29:1
**entry**
29:24, 205:3
**envelope**
176:23
**environment**
225:23, 236:2
**equity**
201:25
**er**
47:19, 92:17,
211:12, 234:18
**erc**
150:15
**eric**
16:23, 48:7,
72:20, 80:12,

80:14, 88:1,
88:6, 88:11,
91:14, 92:17,
111:4, 111:5,
158:18, 163:19,
164:6, 165:10,
165:11, 165:20,
165:22, 166:5,
166:6, 167:13,
178:7, 178:10,
178:14, 178:17,
179:15, 179:21,
180:5, 180:10,
180:15, 181:2,
181:5, 181:21,
182:17, 182:22,
182:24, 187:15,
188:15, 188:18,
193:7, 193:22,
199:7, 199:13,
203:7, 203:12,
205:2, 205:5,
206:25, 212:4,
213:13, 213:22,
213:25, 220:1,
220:3, 220:17,
220:21, 221:1,
221:23, 222:1,
222:5, 222:23,
223:13, 223:14,
224:8, 224:23,
227:23, 229:16,
230:10
**escalate**
90:3
**escalated**
153:10, 198:8,
198:22
**esquire**
3:3, 3:4, 3:5,
3:6, 3:14, 4:3,
4:4
**essentially**
102:21
**established**
17:14
**ethical**
128:11, 128:17,

128:21, 129:2
**ethics**
78:8, 78:14,
78:21, 79:11,
118:14, 123:9,
123:20, 124:12,
124:17, 124:22,
128:1, 128:7,
235:2, 235:4,
235:7, 235:8,
235:10, 235:12,
235:15
**ethicspoint**
42:20, 42:21,
42:23, 55:19,
55:20, 56:2,
56:6, 56:19,
60:23, 125:21,
126:2, 126:3,
126:6, 126:13,
128:24, 129:2,
129:5, 129:14,
136:20, 146:21,
146:25, 147:5,
147:14, 148:3,
171:13
**even**
54:13, 54:14,
60:5, 71:21,
95:12, 123:19,
124:2, 138:10,
148:2, 152:15,
156:13, 190:24,
197:7, 226:14
**events**
155:17
**eventually**
140:6, 207:15
**ever**
10:8, 14:8,
16:14, 22:17,
23:22, 26:23,
33:6, 36:11,
36:16, 39:24,
47:14, 48:7,
51:11, 53:4,
55:8, 62:17,
63:15, 67:9,

70:22, 75:22,
79:7, 79:10,
82:18, 94:14,
101:3, 103:22,
116:8, 126:22,
127:10, 134:22,
142:20, 166:10,
176:2, 182:7,
190:14, 196:15,
205:18, 205:21,
213:13, 227:19,
228:16
**every**
33:4, 40:18,
47:18, 147:24,
151:2, 157:21,
169:17, 171:14,
197:3, 208:5,
235:9
**everybody**
226:21
**everyone**
50:24, 113:21,
165:21, 165:23,
165:24
**everything**
28:17, 124:13,
126:1, 126:5,
131:5, 148:1,
154:4, 156:24,
180:17, 211:25
**everywhere**
9:25
**evidence**
14:5, 14:12,
80:21, 104:1,
106:3, 173:5,
177:1, 178:13,
235:24
**evolved**
135:23
**ex**
100:3
**exact**
57:23, 145:24,
159:5
**exactly**
32:14, 83:18,

90:6, 94:17,
96:19, 97:2,
120:1, 121:22,
122:23, 123:15,
129:16, 158:25,
168:3, 171:19,
172:4, 172:17,
224:16, 228:23,
236:22
**examination**
5:3, 8:18
**example**
40:24, 44:14,
53:20, 218:14
**examples**
46:14
**excellence**
118:19
**except**
78:10, 164:14,
188:1
**exchange**
195:9
**exchanging**
93:8
**executive**
64:19, 65:2,
80:15, 80:22,
103:22, 105:15
**exercise**
22:4, 142:10
**exhibits**
5:8, 72:10
**existed**
35:23, 152:10
**expect**
100:22
**expectations**
99:7, 100:21,
103:20, 236:16
**expected**
156:23
**experience**
29:23, 158:18,
165:21, 165:23,
165:25, 166:6
**experts**
181:20

**expires**
238:18
**explain**
153:22, 163:22,
220:22, 226:4
**explained**
223:16
**explanation**
44:24, 198:2,
201:18, 201:20,
226:2
**expressed**
223:15, 236:3
**expressing**
108:10
**extent**
86:23, 105:2,
186:13, 224:22,
230:7
**external**
46:21, 47:4,
47:14, 56:7,
122:22, 122:24,
136:8, 172:2,
192:10, 192:11,
193:14, 193:18,
213:5, 234:25
**extra**
222:14
**extremely**
66:7

| F |
| --- |

**face**
95:14
**facebook**
17:20
**facilities**
234:10, 236:8
**facing**
26:2
**fact**
8:9, 81:24,
219:17
**facts**
25:15, 43:7,
43:11, 45:9,
48:19, 49:18,

54:4, 75:14,
75:15, 76:5,
76:24, 123:11,
172:22, 218:16,
227:14
**failed**
201:20, 235:19
**failing**
124:18, 235:17
**fair**
18:22, 18:23,
44:21, 90:22,
98:13, 190:21,
197:7, 209:1,
209:18, 209:22
**fairness**
190:25
**familiar**
23:18, 55:3,
55:5, 130:19,
138:16, 187:20,
187:21
**family**
25:20, 210:11,
210:23
**far**
231:14
**faransso**
4:3
**fashion**
35:24
**fast**
123:3, 167:17,
203:19
**faster**
204:2, 204:4
**february**
140:21, 141:11,
141:21, 142:8,
148:22, 149:5,
149:22, 150:11,
155:10, 157:13,
158:4, 158:6,
158:16, 160:16,
161:14, 161:24,
163:12, 167:12,
178:10, 178:14,
180:4, 180:13,

185:9, 185:21,
190:3, 191:11,
197:22, 201:14,
202:13, 203:22,
203:23, 203:25,
204:20, 205:6,
205:11, 206:8
**feedback**
106:16, 118:10,
226:19
**feel**
25:17, 25:22,
26:2, 38:17,
41:16, 42:1,
66:4, 66:5,
97:10, 173:21,
227:5, 227:6,
227:7
**feelings**
121:18
**feels**
66:13, 95:14,
101:15
**felicia**
16:8, 20:18,
138:12, 138:14,
138:15, 138:19,
138:24, 139:20,
140:8, 142:4,
143:14, 143:18,
148:22, 149:22,
150:17, 151:17,
151:21, 154:11,
154:20, 155:13,
155:24, 158:5,
159:1, 159:2,
159:15, 160:16,
161:8, 163:13,
164:8, 164:19,
166:21, 174:6,
179:16, 188:24,
228:9
**felt**
26:3, 100:25,
199:11
**female**
220:16, 220:21
**few**
11:16, 68:25,

86:17, 109:19,
136:17, 155:9,
222:9, 222:15
**figure**
41:6, 42:11,
83:12, 84:15,
92:7, 166:25,
179:2, 189:1,
200:4, 200:24,
228:13
**figuring**
83:13, 189:5
**file**
19:5, 41:14,
42:21, 53:21,
56:10, 62:11,
87:7, 108:21,
108:25, 112:19,
161:5, 173:15
**filed**
19:16, 19:24,
20:6, 20:16,
40:21, 43:16,
45:12, 45:21,
55:21, 62:4,
62:7, 62:13,
62:14, 62:16,
62:20, 75:8,
126:1, 129:4,
143:17, 143:20,
146:20, 147:13,
153:24, 168:15,
170:4, 170:7,
171:9, 172:20,
176:3, 185:9,
185:13
**files**
56:22, 63:18,
172:18
**filing**
42:3, 56:8,
56:14, 57:14,
140:22, 158:4,
158:5, 172:16
**final**
51:9, 84:20,
85:7, 86:15,
86:18, 87:2,

88:20, 89:18,
90:16, 90:18,
92:4, 92:9,
96:5, 97:15,
98:6, 98:22,
99:8, 99:10,
99:17, 99:18,
99:21, 100:10,
100:13, 101:3,
101:12, 101:19,
102:3, 102:5,
102:10, 103:5,
103:6, 104:21,
104:25, 105:6,
105:23, 106:8,
106:9, 106:15,
106:17, 106:19,
108:2, 108:22,
110:1, 110:4,
111:5, 111:7,
112:5, 112:18,
115:23, 117:6,
117:7, 117:9,
118:5, 119:1,
119:5, 119:6,
119:12, 119:21,
120:11, 120:18,
122:4, 122:6,
224:7, 231:16,
231:18
**finance**
70:3
**financial**
238:11
**find**
32:20, 72:14,
72:15, 200:7
**finding**
77:12, 81:1,
212:17
**findings**
50:17, 78:5,
89:3, 89:9,
89:15, 89:16,
98:15, 98:16,
213:23, 227:14,
230:21, 235:23
**fine**
58:12

finish
84:13
finishes
88:23
fired
119:20, 123:18,
123:20, 124:9
firm
21:2, 21:7,
48:11, 48:16,
116:1, 163:22,
163:25
firms
29:7, 29:11,
29:13, 48:5
first
30:17, 41:5,
41:11, 41:19,
42:8, 64:23,
66:22, 78:13,
91:25, 92:8,
92:12, 108:14,
115:17, 115:19,
117:9, 117:11,
141:20, 142:10,
146:10, 162:6,
195:11
fit
32:20
five
33:15, 37:6,
85:12, 87:12,
88:4, 101:18
five-minute
168:8
flip
73:14
flooded
135:10
floor
3:9
fmla
26:3, 26:4,
210:8, 210:23
focus
71:7, 84:4,
129:3, 135:24,
211:10, 219:1,

221:23
focused
218:16
follow
59:25, 86:20,
163:23, 164:3
follow-up
96:18, 96:20,
142:9, 149:8
followed
80:13
following
80:3, 191:13
football
55:1, 61:9,
66:10
footnote
74:12, 76:7
foregoing
238:3, 238:4
forgot
93:13
form
35:23, 82:18,
92:19, 97:19,
103:1, 104:6,
146:14, 177:6,
229:2, 233:8
formal
35:15, 92:25,
143:20
formally
8:3
format
73:17, 92:10
former
17:6, 100:3,
138:19, 138:20,
233:19, 233:25
forms
26:23
forth
118:9
forward
54:2, 54:7,
54:10, 54:13,
54:15, 60:5,
74:20, 75:5,

90:11, 95:23,
96:14, 99:3,
115:10, 123:3,
148:7, 165:6,
167:17, 173:15,
175:2, 191:19
forwarded
72:20, 84:5,
207:16
forwarding
141:15, 151:11,
202:24, 206:12
forwards
131:7, 202:15,
204:21, 205:5,
205:16
found
164:25, 228:17
four
228:8
frame
209:16
francesca
175:21, 175:22
free
220:12
freely
25:14
frequently
13:19, 18:9,
19:1, 101:25,
102:8, 125:16,
193:19
fresh
152:1
friday
1:18, 11:1
front
34:4, 120:13
frustration
108:10
full
38:10, 44:10,
94:23, 197:6
full-blown
44:1, 44:12
fully
128:9, 153:10

function
13:14, 18:3,
18:5, 18:10,
28:22, 33:19
functions
53:2
furious
208:21
further
43:22, 203:5,
237:7
future
119:13
fyi
199:8, 205:8

G

gain
78:10
gains
79:2
gamut
134:11
gary
132:4
gather
42:8, 231:25
gathered
190:23
gave
10:16, 13:24,
78:13, 107:22,
144:15, 212:14,
213:22, 229:20,
229:23, 230:5
gay
130:14
gears
24:16, 54:18,
61:20
gender
66:17, 201:25
general
40:20, 45:17,
57:19, 93:18,
121:8, 126:11
general's
3:15, 205:17,

205:19, 205:22

**generally**
21:25, 33:3,
38:19, 39:1,
41:22, 43:7,
52:6, 53:12,
56:2, 73:23,
75:6, 120:14,
120:17, 131:18,
131:19, 159:13,
160:22, 197:4,
226:15

**generated**
88:16

**georgia**
1:2, 1:10,
3:15, 3:17,
12:13, 12:16,
12:18, 12:19,
13:2, 13:10,
13:22, 13:24,
13:25, 14:4,
14:10, 15:9,
15:15, 17:13,
17:22, 22:14,
22:19, 23:1,
23:15, 24:9,
24:20, 26:22,
27:8, 28:1,
30:2, 30:15,
31:10, 31:23,
34:18, 35:23,
38:6, 39:19,
40:13, 40:16,
43:24, 52:25,
53:10, 55:2,
55:23, 57:11,
58:17, 62:1,
62:9, 63:19,
70:3, 78:8,
78:15, 78:16,
79:6, 100:3,
101:2, 101:16,
114:23, 119:19,
122:4, 123:9,
123:14, 123:17,
127:20, 128:12,
128:21, 152:25,

157:12, 162:18,
165:10, 173:6,
175:10, 176:1,
178:19, 180:21,
189:17, 198:12,
199:23, 201:19,
211:19, 228:9,
228:12, 230:5,
236:16

**getting**
24:4, 24:6,
45:1, 88:14,
108:11, 190:21,
207:14, 212:20,
218:1, 226:24,
227:1

**ginger**
62:4, 63:14,
72:18, 98:9,
98:13, 98:14,
99:22, 99:23

**ginger's**
97:3

**gingers**
67:2

**gist**
209:7

**give**
10:11, 28:3,
28:13, 34:5,
40:23, 45:24,
46:13, 51:3,
51:25, 73:13,
75:25, 89:22,
91:21, 101:18,
115:5, 120:20,
123:11, 130:1,
130:6, 144:18,
144:20, 148:14,
181:2, 200:9,
212:22, 231:21,
231:22

**given**
11:15, 46:1,
49:18, 76:4,
81:25, 87:22,
93:11, 100:21,
134:23, 144:11,

144:25, 149:9,
180:17, 201:19,
238:5

**giving**
74:24, 120:7,
134:3, 153:5,
212:12, 212:16,
226:19

**glasses**
95:12

**gmail**
175:23, 176:20

**go**
21:25, 27:17,
28:3, 28:4,
28:25, 29:19,
30:2, 31:9,
36:19, 38:15,
38:17, 38:19,
40:10, 41:25,
42:23, 43:15,
45:11, 45:18,
47:20, 47:23,
48:19, 48:24,
53:6, 53:8,
53:11, 53:20,
54:22, 55:25,
56:18, 57:18,
59:3, 67:25,
68:24, 75:1,
76:22, 77:5,
97:6, 98:3,
104:10, 107:16,
109:1, 112:19,
113:10, 116:3,
123:5, 123:6,
126:1, 144:13,
145:19, 162:6,
167:11, 168:17,
197:1, 197:2,
197:3, 201:4,
204:2, 204:3,
204:18, 204:19,
207:3, 216:4,
216:6, 216:23,
217:6, 218:9,
227:25, 235:7

**go-between**
213:9

**go-to**
47:25, 48:4

**goal**
43:19, 100:13,
103:17, 221:24

**going**
8:24, 9:5, 9:6,
11:16, 12:2,
12:8, 12:10,
15:18, 17:11,
18:16, 19:25,
24:16, 28:2,
30:11, 31:1,
36:19, 38:18,
39:9, 40:9,
40:11, 40:12,
47:23, 52:18,
54:18, 55:25,
57:3, 60:9,
61:20, 61:23,
65:6, 65:7,
65:20, 68:24,
70:20, 71:7,
72:25, 75:5,
79:9, 82:10,
82:17, 84:4,
84:24, 95:18,
97:18, 101:10,
112:19, 115:18,
116:6, 119:24,
123:3, 123:4,
123:6, 126:5,
155:1, 155:15,
157:16, 158:24,
175:3, 177:12,
181:24, 182:10,
182:11, 204:4,
206:16, 207:3,
208:22, 216:2,
216:15, 217:9,
218:18, 219:1,
219:11, 223:4,
229:1, 231:24,
232:19, 233:7

**gone**
41:10, 71:19,
156:10

**good**
8:20, 84:12,

99:4, 100:15,
115:6, 125:25,
126:25, 152:19,
165:22, 166:15,
185:22, 186:6,
186:10, 223:24,
225:9, 227:3,
230:3
**gossip**
218:15
**gotten**
105:19, 122:24
**gray**
122:14
**great**
163:19, 197:3,
220:19, 221:20
**greater**
135:24
**green**
57:5
**griffin**
66:24, 89:8,
94:22, 95:20,
96:8
**group**
33:24, 34:1,
47:21, 47:23,
47:24, 58:19,
58:21, 159:13,
187:16, 220:10
**groups**
160:7
**gt**
74:16
**gtaa**
132:23, 216:20
**gthr**
132:23
**gti**
57:10
**guess**
40:19, 49:5,
56:5, 64:14,
112:11, 115:2,
145:17, 146:4,
150:6, 150:21,
162:21, 164:22,

168:6, 168:17,
175:20, 196:2,
199:5, 200:21,
206:17, 217:16,
219:24
**guessing**
145:6

**H**

**hall**
59:4, 59:5,
60:25, 214:21
**hand**
22:6, 48:24,
176:23, 199:21,
199:25, 233:2,
238:14
**handed**
82:19, 84:11
**handful**
18:18, 75:17
**handle**
58:20, 58:21,
122:17, 132:9,
132:11, 135:21,
136:3, 143:24,
144:5, 144:10,
145:1, 145:10,
151:8, 162:2,
171:15, 175:16,
182:5, 192:7,
192:14, 194:2,
208:22
**handled**
66:9, 131:2,
136:15, 146:7,
146:8, 148:6,
154:5, 191:16,
192:22
**handles**
58:24, 217:5
**handling**
136:9, 136:24,
137:2, 145:14,
145:16
**handwrite**
21:21
**handwriting**
152:17

**handwritten**
24:11, 127:7,
151:25, 152:2,
152:23, 153:1,
181:21
**hanging**
113:5
**happen**
66:7, 82:6,
90:20, 100:14,
124:23, 232:8
**happened**
54:20, 58:1,
66:8, 67:15,
69:17, 71:16,
83:5, 83:12,
84:16, 119:2,
125:7, 139:23,
154:22, 174:24,
211:8, 213:12
**happening**
20:7, 77:11,
126:9, 199:11,
200:1, 202:3,
211:16, 218:19
**happens**
43:4, 75:21,
102:14, 190:2,
216:9
**happy**
9:12
**harassment**
66:6, 233:4,
233:6
**hard**
56:25, 69:18,
88:14, 167:18,
167:20, 168:16,
170:8, 170:10,
171:3, 175:15,
177:12, 226:24
**harm**
43:22, 197:10
**harmed**
198:7
**harrington**
16:15, 19:15,
26:17, 28:2,

30:22, 86:14,
89:4, 95:20,
107:18, 125:12,
132:24, 150:12,
191:12, 203:13,
207:18, 207:20,
208:18, 209:6,
214:22
**harris**
80:14, 80:15,
80:17, 81:14,
84:7, 86:20,
87:21, 104:18
**hate**
121:22
**head**
9:10, 76:12,
76:15, 197:25,
201:17, 219:10
**heads**
75:7
**hear**
154:15, 160:15,
200:25
**heard**
190:14
**heart**
29:20
**held**
27:15, 30:16,
124:15
**help**
45:7, 65:9,
77:14, 186:2,
193:24, 194:3,
203:6, 205:9
**helped**
110:15
**helpful**
142:18, 218:15
**helping**
77:18
**helps**
141:6
**hendrickson**
68:1, 68:4,
68:20, 69:1,
71:9

**here**
8:21, 11:24,
28:8, 28:17,
30:14, 31:2,
34:12, 37:2,
37:4, 37:11,
37:15, 37:20,
38:1, 40:25,
48:18, 50:25,
56:18, 57:4,
57:13, 57:18,
58:2, 58:15,
59:3, 60:8,
60:11, 66:12,
67:5, 67:7,
68:5, 68:25,
71:8, 71:24,
74:2, 74:13,
75:12, 76:6,
78:24, 79:3,
80:16, 80:20,
83:4, 84:5,
84:22, 86:18,
87:19, 90:23,
93:7, 93:9,
94:20, 95:18,
95:25, 96:25,
97:17, 106:1,
108:16, 109:13,
111:3, 115:4,
115:5, 115:17,
116:18, 117:12,
118:12, 119:12,
120:22, 120:23,
127:15, 128:22,
129:1, 129:7,
131:9, 132:4,
132:8, 132:21,
141:17, 142:1,
145:3, 154:14,
158:15, 164:7,
186:23, 187:5,
187:21, 193:21,
194:11, 195:13,
198:19, 199:5,
202:2, 202:12,
203:25, 206:8,
206:19, 208:9,

209:3, 209:10,
218:13, 219:2,
224:22, 236:14
**here's**
76:16, 128:16,
226:4
**hereby**
8:13, 238:3
**hereunto**
238:14
**herr**
214:21
**herself**
127:25, 146:19,
186:8
**hey**
77:21, 157:16,
161:4, 219:4
**high**
191:17
**high-level**
123:13, 123:21
**highest**
123:17
**hire**
172:2
**hired**
211:13
**hiring**
48:22
**historical**
131:10, 131:16
**history**
27:18, 144:1
**hoffman**
16:23, 48:7,
158:18, 165:10,
165:11, 178:7,
178:10, 178:14,
178:17, 179:15,
179:21, 180:5,
181:2, 181:5,
181:21, 188:16,
188:19, 193:22,
199:7, 199:14,
202:10, 203:12,
205:2, 205:6,
212:4, 213:13,

213:22, 213:25,
220:1, 220:17,
222:1, 222:23,
223:13, 224:8,
224:23, 229:16,
230:10
**hoffman's**
221:1, 222:6
**hold**
14:11, 23:18,
23:22, 24:4,
70:17, 70:19,
71:12, 71:14,
71:16, 71:17,
71:18, 71:21,
152:16, 152:21
**holds**
70:23
**holland**
80:15, 82:12,
85:21, 86:20,
87:21, 88:14,
104:18
**home**
140:1
**honest**
26:7, 115:5
**honestly**
106:23
**hope**
48:22
**horrible**
127:1
**hostile**
236:2
**hot**
223:5
**hotline**
129:9
**hour**
204:23
**house**
11:19
**hr**
18:25, 19:5,
19:10, 29:17,
29:19, 30:3,
30:15, 30:17,

30:18, 30:19,
31:3, 31:5,
31:6, 31:7,
31:11, 31:16,
31:20, 31:21,
31:23, 31:25,
32:3, 32:21,
32:22, 33:1,
33:4, 33:10,
33:19, 36:7,
36:20, 37:11,
37:15, 38:1,
39:9, 40:16,
41:13, 41:14,
41:23, 42:4,
48:16, 52:3,
52:4, 52:7,
52:8, 52:17,
53:4, 53:14,
53:18, 54:19,
62:14, 62:15,
62:21, 63:9,
64:1, 64:22,
66:21, 67:4,
68:6, 68:10,
78:20, 78:21,
125:15, 128:3,
133:2, 133:23,
143:5, 143:17,
144:25, 150:24,
153:12, 175:1,
175:2, 175:6,
175:9, 176:2,
186:5, 186:21,
193:20, 211:10,
230:17
**hr's**
151:14, 151:19,
193:15
**huge**
9:24
**human**
32:23
**hundred**
101:18

---
**I**
---
**idea**
89:19, 92:2,

141:9, 185:22,
186:6, 186:10,
189:20
**identification**
27:22, 36:24,
39:17, 55:17,
65:14, 67:23,
71:5, 72:11,
79:23, 83:25,
86:8, 91:11,
93:4, 95:7,
107:7, 109:9,
110:23, 113:1,
115:14, 116:24,
126:20, 129:25,
132:17, 134:20,
139:11, 140:18,
148:13, 149:16,
158:11, 164:12,
167:8, 170:15,
177:19, 181:18,
191:6, 195:4,
197:19, 201:9,
202:21, 206:3,
207:7, 214:14,
217:21, 223:10,
224:5, 227:8,
232:16, 233:23
**identified**
90:25, 185:17,
186:8, 224:22
**identify**
49:12, 49:17,
169:24, 172:10,
224:24
**identifying**
185:4, 185:23
**illegal**
128:23
**image**
159:18
**imagine**
225:5
**immediately**
116:2, 129:8,
229:21
**implement**
97:12

**implementing**
175:9
**implicate**
58:18, 74:16
**implicated**
123:14, 187:5
**important**
9:7, 21:23,
43:23, 83:4,
83:12, 85:23,
128:13, 172:18,
200:8, 200:25,
220:16, 225:16,
226:6
**imposed**
81:4
**impression**
121:8, 121:25,
122:2
**improving**
124:13
**in-person**
129:8, 146:20
**inaccuracies**
29:2
**inaction**
198:5
**inappropriate**
236:5
**incident**
139:20, 139:23
**incidental**
78:11, 78:12
**include**
108:22
**included**
99:18, 112:4,
193:11, 205:18,
206:14, 206:19,
209:11, 210:6,
210:25
**includes**
97:15, 101:12,
236:17
**including**
87:9, 152:23,
185:16, 205:2
**inconsistent**
78:7, 83:20,

236:6
**incorporate**
98:6, 106:16
**incorporated**
98:21, 106:14
**increase**
61:5
**independent**
48:23, 49:7
**indicated**
107:21
**inequity**
66:6
**inferno**
188:11
**inform**
82:7, 83:18
**informally**
43:25
**information**
11:6, 41:5,
42:9, 45:8,
49:17, 54:5,
57:1, 57:15,
61:5, 67:13,
76:11, 76:15,
81:1, 81:17,
82:12, 85:18,
86:22, 89:3,
96:7, 104:14,
104:16, 110:12,
110:14, 169:21,
172:14, 184:11,
190:22, 190:23,
210:16, 215:19,
229:14
**informed**
77:10, 82:9
**infrequently**
102:8
**initiator**
61:3
**input**
57:14, 146:25,
219:25
**inputted**
129:9
**inquiry**
188:14

**inside**
30:12
**instagram**
17:20
**instance**
38:24, 74:22,
152:5, 231:2
**instances**
46:23, 46:25,
47:5, 120:10
**instant**
17:24, 59:14
**instead**
8:4, 15:2
**institute**
31:13, 33:2,
57:11, 59:11,
59:13, 59:15,
119:13, 119:15,
119:18, 124:24,
144:23, 146:1,
191:18, 201:19,
207:25, 208:1
**institute-wide**
34:15, 144:21
**institution**
32:1
**instructed**
71:12, 87:12,
100:1
**instructions**
231:22
**intact**
190:25
**intake**
152:7, 155:19
**integrity**
118:19
**intended**
129:16
**intent**
147:21
**interactions**
121:18
**interest**
140:24, 185:11,
238:11
**interfacing**
219:18

interim
66:24, 127:25
internal
59:9, 124:9,
125:14, 140:22,
185:13
internet
28:19, 78:12
interview
49:20, 64:12,
64:13, 67:16,
72:5, 77:15,
82:13, 150:4,
156:21, 185:5,
219:25, 222:6,
222:8, 222:23,
227:16, 227:24
interviewed
49:13, 50:23,
50:24, 76:7,
82:11, 184:14,
184:16, 212:19,
219:12, 220:1,
220:8, 220:21,
222:10
interviewing
80:9, 80:10
interviews
50:3, 50:10,
50:14, 77:19,
88:21, 184:19,
184:25, 193:8,
193:25, 206:22,
219:14, 219:19,
221:2, 221:4,
221:5, 221:7,
221:10, 221:14,
221:16, 221:20,
222:14, 222:17,
223:17, 228:2
introduces
127:24
investigate
21:2, 21:7,
27:2, 43:11,
47:1, 48:16,
56:20, 63:2,
76:24, 77:6,

83:5, 86:25,
98:18, 122:19,
124:20, 124:25,
137:5, 137:7,
137:9, 137:11,
137:13, 154:16,
154:20, 155:16,
156:2, 158:23,
158:24, 158:25,
160:6, 161:22,
161:25, 162:23,
163:15, 165:11,
166:24, 174:5,
178:7, 178:11,
182:17, 188:19,
199:10, 199:14,
202:6, 202:10
investigated
27:6, 34:8,
43:8, 74:9,
85:3, 98:9,
98:15, 99:23,
99:25, 100:7,
104:17, 118:24,
119:7, 136:22,
137:10, 163:3,
182:15, 199:17
investigates
155:6
investigating
35:2, 40:21,
50:1, 76:20,
163:1, 166:7,
197:12
investigations
34:25, 40:13,
40:15, 52:8,
52:17, 53:4,
53:14, 53:18,
54:19, 61:21,
84:25, 100:16,
132:7, 143:5,
171:25, 175:10,
189:18, 192:7,
192:9, 192:16,
194:2, 213:6,
230:18, 230:19,
234:24

investigative
118:16
investigator
41:8, 43:2,
43:13, 46:18,
47:1, 47:4,
47:14, 47:19,
47:20, 48:18,
48:20, 49:4,
49:7, 49:8,
49:16, 50:7,
50:14, 50:16,
50:20, 53:25,
63:3, 63:5,
63:13, 73:22,
118:15, 122:19,
122:22, 122:25,
136:6, 136:9,
137:12, 154:16,
154:23, 155:3,
155:16, 159:4,
159:11, 160:1,
161:21, 161:25,
165:22, 166:24,
167:2, 172:2,
192:25, 193:14,
193:19, 194:8,
194:18, 203:5,
213:9, 225:1,
226:15, 229:13,
230:21, 235:3
investigator's
50:2
investigators
33:23, 45:7,
48:1, 73:18,
101:9, 129:19,
165:22, 166:1,
166:2, 192:10,
192:12, 192:13,
234:25
investigatory
64:12
invite
180:3, 180:6,
203:9
involve
53:9

involved
21:1, 21:3,
26:20, 69:7,
69:15, 77:2,
93:21, 93:24,
108:11, 116:10,
116:18, 121:1,
143:5, 159:10,
165:14, 165:17,
177:11, 179:6,
184:8, 186:11,
186:14, 190:7,
194:17, 196:4,
211:6, 229:8,
230:13, 235:15
involvement
68:9, 184:9
involving
61:22, 154:17,
155:7
iphone
12:25, 14:20
irrevocably
198:7
issue
69:16, 69:19,
70:12, 70:18,
70:22, 76:20,
87:1, 101:3,
101:7, 101:10,
102:24, 103:4,
103:7, 103:8,
105:19, 111:14,
119:5, 119:9,
125:1, 132:3,
133:14, 140:11,
178:25, 200:6
issued
71:17, 71:18,
85:7, 86:15,
86:17, 87:2,
88:20, 101:17,
101:24, 104:24,
105:23, 106:9,
112:8, 119:6,
120:11, 122:4,
139:15, 231:13
issues
15:12, 15:23,

18:7, 38:8,
38:10, 74:5,
84:19, 98:10,
98:16, 100:7,
101:14, 124:17,
131:2, 133:25,
137:5, 141:8,
142:21, 144:13,
149:7, 167:16,
182:6, 201:15,
201:25
**issuing**
74:20, 104:21
**item**
215:10
**items**
100:6, 181:25
**itself**
226:20

**J**

**jack**
80:9, 80:10,
80:13, 80:15,
80:19, 81:17,
81:19, 81:25,
82:25, 83:5,
83:12, 84:6,
84:16, 85:1,
85:6, 85:18,
85:20, 85:24,
87:1, 87:20,
88:9, 104:11,
104:17, 105:2,
105:19, 105:22,
106:2, 106:5,
106:7, 106:9
**james**
4:4
**january**
37:3, 138:22,
139:19, 139:21,
140:21, 161:23
**jeff**
203:7
**job**
1:21, 166:15,
230:3

**joe**
151:14, 151:22,
153:9, 153:11
**joe's**
153:14
**joeleen**
16:6, 65:17,
66:18, 67:3,
67:6, 67:9,
77:8, 89:7,
89:12, 92:14,
94:22, 95:19,
96:8, 97:7,
98:4, 98:20,
99:2, 106:13,
106:24, 107:14,
108:2, 109:16,
115:22, 117:15,
132:19, 132:24,
133:11, 133:13,
133:20, 139:18,
141:9, 176:24,
180:11, 180:16,
183:10, 183:13,
183:17, 185:19,
185:23, 187:13,
187:15, 193:3,
193:5, 193:10,
193:22, 193:24,
202:14, 202:24,
206:13, 206:19,
219:4, 219:5,
219:13, 219:18,
221:19
**joeleen's**
133:10
**jog**
65:9
**johns**
67:25, 68:3,
68:22, 69:12,
197:24
**johnson**
54:24, 55:6,
55:9, 55:21,
58:8, 58:10,
58:12, 58:13
**joseph's**
24:8, 68:3,

74:15, 74:18,
77:9, 78:5,
78:7, 78:25,
130:14, 132:6,
144:7, 154:9,
179:11, 179:18,
181:2, 182:23,
183:25, 184:4,
185:12, 185:20,
198:7, 200:3,
200:25, 201:1,
201:15, 204:22,
205:6, 206:9,
230:15
**jot**
169:9
**joyce**
1:16, 2:1, 5:3,
5:8, 6:13, 7:10,
8:10, 8:20,
27:21, 27:24,
28:13, 28:16,
36:23, 39:16,
55:16, 61:20,
65:13, 67:22,
71:4, 72:10,
73:13, 79:22,
79:25, 83:24,
86:7, 91:10,
91:13, 91:22,
93:3, 95:6,
95:9, 107:6,
109:8, 109:11,
110:22, 110:25,
112:25, 113:25,
115:13, 115:16,
116:23, 117:1,
117:5, 126:19,
129:24, 130:1,
130:4, 130:9,
132:16, 134:19,
139:9, 139:10,
139:13, 140:17,
140:25, 148:12,
148:19, 149:15,
149:18, 158:10,
164:11, 167:7,
170:14, 170:17,

177:18, 177:21,
181:17, 191:5,
191:8, 195:3,
195:6, 197:18,
201:8, 201:11,
202:20, 206:2,
206:5, 207:6,
207:9, 214:13,
214:16, 214:22,
217:20, 217:23,
218:24, 223:1,
223:9, 224:4,
224:7, 232:15,
233:22, 237:1
**joyce's**
27:20
**judgment**
225:9
**julie**
1:16, 2:1, 5:3,
8:10, 107:19,
131:9, 203:6,
214:22, 219:4
**july**
14:2, 24:22,
234:18
**jump**
115:8
**june**
234:16

**K**

**kate**
16:17, 52:21,
52:23, 69:1,
69:3, 69:15,
70:15, 71:10,
84:8, 104:25,
108:16, 111:3,
112:11, 125:12,
136:11, 136:12,
150:12, 150:18,
151:1, 151:4,
151:10, 152:9,
155:14, 155:15,
156:17, 165:20,
166:12, 179:7,
191:12, 191:21,

195:13, 199:7,
203:1, 203:12,
205:3, 205:5,
205:15, 206:10,
206:11, 212:23,
214:22, 216:19,
216:22, 217:1,
220:13, 223:25,
229:22
**kate's**
217:5
**katherine**
3:14
**katie**
10:23, 40:25,
41:2, 41:11,
42:11, 43:15,
44:15, 44:16,
44:23, 45:1,
45:3, 45:6,
45:11, 46:13,
46:15, 53:22,
237:3
**katie's**
40:25, 41:11,
41:18, 45:5
**katz**
3:7
**keep**
52:7, 52:17,
127:2, 138:25,
169:11, 169:13,
190:24, 225:2
**keeping**
77:10, 214:1
**ken**
101:15
**kept**
22:10, 81:19,
110:3, 152:15
**kevin**
16:4, 19:15,
32:7, 32:12,
32:18, 37:15,
37:19, 38:15,
131:8, 131:13,
139:24, 140:6,
141:7, 141:11,

141:20, 141:23,
142:3, 149:6,
151:12, 151:20,
155:22, 156:3,
156:7, 173:24,
180:5, 180:9,
180:10, 180:15,
181:6, 193:1,
195:12, 196:14,
203:12
**kevin's**
142:15
**keyed**
94:11, 193:23
**kick**
146:10
**kicked**
146:7
**kids**
148:16
**kim**
16:15, 30:22,
86:14, 89:4,
92:17, 95:20,
101:13, 107:17,
125:12, 132:24,
150:12, 191:12,
203:13, 207:18,
207:20, 208:18,
208:21, 209:6,
211:7, 214:21,
216:7, 216:11,
229:20, 229:24,
234:16, 234:18
**kind**
10:18, 11:6,
12:24, 14:19,
15:15, 19:2,
35:1, 35:5,
43:9, 48:19,
96:20, 101:14,
109:2, 112:3,
114:16, 122:13,
125:20, 129:3,
135:23, 137:20,
139:1, 144:12,
145:19, 166:14,
187:7, 212:10,

213:1, 213:18,
214:8, 217:14,
217:16, 219:18,
226:18, 226:20,
226:25
**kinds**
60:25
**knew**
77:13, 112:9,
156:19, 170:6
**knowledge**
52:19, 70:21,
92:20, 94:10,
103:21, 103:23,
103:24, 105:13,
137:4, 137:21,
161:9, 199:13,
199:15, 202:9,
202:11, 233:8
**known**
162:22, 226:1
**knows**
225:22
**kohn**
58:4

**L**

**labor**
29:12, 53:5
**lack**
227:7
**lacking**
124:24
**language**
120:12
**large**
224:21
**largely**
117:12
**last**
9:22, 11:1,
70:14, 78:3,
93:14, 119:11,
124:2, 126:4,
191:13, 218:12,
234:17
**late**
138:22, 140:20

**later**
127:5, 132:22,
133:10, 203:7,
203:11, 204:24
**latest**
201:23
**latoya**
59:22
**latter**
131:19
**laura**
202:13, 204:21,
207:24
**law**
21:2, 21:7,
29:6, 29:7,
29:19, 48:11,
48:15
**lawyer**
68:4, 108:11,
186:4, 201:15,
204:22, 209:25,
210:1
**lawyers**
8:22, 197:23,
201:21
**leaders**
123:21
**leadership**
128:14, 153:12,
236:6
**leading**
50:21, 51:8,
68:11, 68:15,
180:1, 212:24,
213:1, 213:3,
213:8
**learning**
236:17
**least**
69:22, 112:8,
117:10, 121:4,
132:24, 135:5,
154:7, 159:16,
191:21, 193:24
**leave**
13:25, 21:17,
23:1, 23:5,

24:24, 24:25,
25:4, 25:17,
25:19, 29:18,
30:5, 190:4,
190:6, 190:8,
190:11, 190:18,
190:20, 195:10,
196:1, 196:13,
196:16, 196:22,
196:24, 197:6,
198:15, 200:13,
200:14
**leaving**
14:3
**led**
234:14
**lee**
68:1, 68:4,
68:20, 69:1,
71:9
**left**
13:22, 22:19,
22:24, 23:2,
24:22, 27:11,
30:2, 37:20,
66:8, 142:24,
152:25, 201:22
**leg**
49:5, 49:8
**legal**
25:7, 27:8,
53:2, 53:6,
53:10, 53:11,
53:19, 66:22,
67:4, 69:14,
71:1, 71:19,
90:3, 93:17,
101:14, 122:16,
125:14, 128:8,
136:6, 136:10,
144:12, 145:12,
146:9, 155:5,
198:12, 204:11
**legitimate**
110:6, 200:2,
225:15
**length**
97:9

**lengthy**
151:24
**less**
204:23
**let's**
29:22, 40:25,
53:20, 57:10,
73:24, 75:25,
81:12, 88:19,
89:4, 91:7,
97:6, 98:3,
106:13, 106:24,
106:25, 107:1,
113:22, 115:8,
156:5, 171:7,
181:15, 189:14,
197:16, 204:18,
204:19, 214:19,
216:4, 216:6,
218:9, 223:6,
228:24, 235:20
**letter**
14:11, 23:19,
23:23, 23:25,
58:3, 68:2,
68:22, 88:25,
89:1, 91:14,
91:17, 92:1,
92:3, 92:7,
93:8, 93:11,
98:20, 106:20,
117:15, 117:18,
117:23, 121:5,
135:6, 135:12,
135:16, 137:6,
137:25, 138:3,
171:8, 176:22,
195:11, 195:17,
200:15, 209:23,
210:2, 210:25
**letters**
173:4, 174:1,
175:23
**letting**
28:4
**level**
60:16, 66:5,
76:4, 89:13,

103:10
**levels**
123:17
**lewis**
32:15, 69:24,
100:2
**liability**
198:12
**lieu**
8:3
**life**
38:2, 38:3,
38:9, 59:1,
59:2, 59:17,
162:7
**liked**
35:15, 121:25
**likely**
120:3
**line**
103:20, 153:8,
154:14, 177:3
**linkedin**
5:9, 27:20,
28:9, 28:18,
28:21, 28:23
**lisa**
3:3, 197:22,
201:14, 207:14
**list**
15:18, 31:2,
47:25, 60:18
**listed**
29:23
**listen**
43:16, 75:1,
77:21, 81:18,
114:15
**lists**
98:7
**litigation**
14:11, 18:19,
23:18, 23:22,
53:1, 69:4,
70:16, 70:18,
70:23, 71:16,
71:17, 152:16,
152:20, 217:6,

217:16, 228:19
**little**
10:4, 11:19,
12:10, 17:12,
18:16, 24:17,
24:18, 27:18,
31:9, 35:18,
40:11, 40:12,
56:5, 88:19,
95:11, 113:6,
123:4, 129:21,
140:9, 197:14,
212:18, 217:25
**littler**
21:2, 47:6,
48:4, 158:23,
158:24, 160:5,
160:9, 174:4,
183:18, 184:8,
184:10, 185:8,
189:10, 191:22,
206:24, 212:3,
217:10, 232:9,
234:8, 234:14
**littler's**
191:14
**llp**
3:7
**local**
30:11
**lodging**
66:12
**long**
61:24, 65:7,
69:22, 88:13,
98:1, 114:20,
158:14, 184:17,
214:17, 223:14
**longer**
12:15, 92:17,
113:6
**look**
10:1, 28:21,
29:22, 73:24,
76:24, 82:2,
82:3, 84:2,
91:16, 92:7,
95:9, 105:2,

107:9, 109:11,
112:24, 113:16,
114:16, 117:1,
122:22, 130:4,
141:19, 148:19,
149:12, 149:18,
170:17, 171:7,
172:22, 177:16,
179:15, 179:17,
187:17, 191:3,
197:16, 206:5,
207:9, 214:19,
230:21, 232:18,
232:20, 233:20
**looked**
104:20, 106:6,
107:12, 119:7,
146:18, 179:7,
200:18, 207:10
**looking**
10:1, 30:12,
84:18, 110:10,
141:2, 145:7,
168:15, 177:22
**looks**
28:20, 28:24,
29:5, 29:16,
29:25, 31:8,
31:10, 37:5,
55:21, 56:3,
58:2, 71:8,
72:18, 73:23,
74:10, 80:12,
84:5, 87:4,
88:24, 91:13,
94:17, 117:14,
118:24, 121:6,
139:19, 178:8,
182:4, 187:20,
187:21, 188:13,
194:12, 195:10,
199:6, 219:16,
224:17, 234:7
**loop**
52:18
**loops**
131:9
**lori**
141:12, 150:5,

150:14, 151:12,
157:2, 180:5,
180:9, 180:10,
180:15, 181:6,
193:2, 203:12
**lot**
19:22, 98:11,
102:2, 104:16,
112:2, 127:4,
159:21, 184:23,
192:11, 200:17,
225:3
**lots**
67:1
**lunchtime**
113:3
**lynn**
16:21, 52:10,
52:13, 52:17,
93:11, 93:21,
94:6, 94:14,
94:20, 96:23,
97:14, 97:17,
107:16, 107:17,
108:1, 108:17,
108:19, 108:24,
115:21, 115:24,
174:11, 176:24,
194:15, 194:17,
194:19
**lynns**
97:24

---

### M

**machelle**
1:5, 4:11,
8:23, 14:12,
32:11, 70:4,
70:20, 100:15,
100:21, 104:12,
104:19, 104:21,
104:24, 105:12,
105:14, 106:8,
116:5, 116:9,
116:16, 132:5,
132:6, 133:13,
139:23, 141:15,
155:9, 155:24,

157:12, 164:8,
164:18, 180:22,
198:1, 201:16,
201:17, 202:17,
221:5, 221:16,
222:6, 222:9
**machelle's**
67:4, 67:7,
67:10, 108:21,
108:25, 109:25,
110:5, 141:21,
148:5, 180:22,
192:22, 197:23,
207:15
**mad**
207:20, 207:23
**made**
26:10, 32:17,
34:8, 70:6,
77:1, 77:5,
84:13, 84:20,
86:21, 90:10,
98:15, 98:16,
106:2, 109:19,
110:9, 143:6,
154:19, 159:3,
159:5, 159:25,
160:1, 160:2,
179:14, 190:4,
204:14, 226:1,
227:17, 229:11
**mainly**
125:22
**make**
22:6, 22:7,
27:6, 28:17,
34:5, 35:12,
35:19, 43:19,
44:21, 45:11,
45:14, 46:1,
46:4, 51:2,
63:4, 66:22,
71:20, 72:1,
73:2, 82:9,
83:20, 90:3,
90:19, 90:20,
92:10, 92:18,
92:19, 95:11,

99:3, 100:15,
124:14, 125:24,
126:5, 126:8,
126:15, 141:13,
146:13, 146:19,
148:1, 151:7,
152:18, 154:1,
154:2, 173:1,
179:8, 180:17,
190:20, 194:14,
211:2, 211:3,
212:11, 217:25,
218:13, 224:14,
227:11, 229:9
**makes**
43:20, 47:17,
48:11, 66:16,
78:4, 89:24
**making**
11:10, 21:10,
51:18, 70:10,
77:15, 129:4
**male**
64:25, 76:8,
76:11, 76:18,
77:23, 80:20,
94:10, 104:2
**malikah**
123:5, 143:11
**man**
196:17
**management**
32:24, 74:15,
74:18, 128:2,
128:7, 231:10,
234:10
**manager**
26:14, 26:17,
35:4, 92:11,
100:12, 100:22,
101:8, 110:16,
118:1
**manager's**
51:24, 90:12
**mandate**
194:15
**manner**
66:9, 66:10

manual
39:20
many
101:6, 102:6,
125:25, 147:12,
187:23, 236:8
mapping
49:9
march
55:22, 59:23,
217:4, 219:2,
219:9, 223:13,
229:17
marcia
86:19, 88:10,
105:1, 142:25,
145:4
marilyn
3:6
mark
16:10, 130:15,
131:7
marked
27:21, 36:23,
39:16, 55:16,
65:13, 67:22,
71:4, 72:11,
79:22, 83:24,
86:7, 91:10,
93:3, 95:6,
107:6, 109:8,
110:22, 112:25,
115:13, 116:23,
126:19, 129:24,
132:16, 134:19,
139:10, 140:17,
148:12, 149:15,
158:10, 164:11,
167:7, 170:14,
177:18, 181:17,
191:5, 195:3,
197:18, 201:8,
202:20, 206:2,
207:6, 214:13,
217:20, 223:9,
224:4, 232:15,
233:22
marsha
16:25

marshall
3:7
marvin
69:24, 100:2
maryland
2:9, 238:23
materials
97:10, 118:17
matt
67:25, 68:3,
68:22, 69:12,
197:24
matter
57:19, 59:24,
60:1, 68:14,
84:10, 128:15,
191:17, 194:4,
194:6, 194:16,
210:20, 233:25
matters
59:11, 145:15
maybe
32:10, 40:24,
58:15, 61:15,
65:9, 70:15,
75:20, 143:25,
166:14, 193:6,
200:18, 205:20
mckenna
93:15, 107:24
mcrae
63:14, 63:15,
63:20, 64:3,
64:24, 65:19,
66:2, 67:16,
72:5, 72:19,
77:10, 78:4,
80:3, 80:8,
80:13, 88:21,
89:14, 98:9,
99:23, 118:24
mcrae's
118:25
means
89:23, 103:14,
121:15
meant
99:12, 99:13,

103:10, 103:18,
103:19, 106:22,
110:3, 190:24
measures
198:6
meat
212:20
media
217:12
mediate
140:7, 141:7,
149:4
mediation
158:17
meet
41:4, 41:7,
42:14, 53:23,
67:3, 67:12,
89:2, 89:4,
89:7, 107:15,
125:16, 131:12,
131:21, 131:25,
133:20, 149:23,
178:18, 189:9
meeting
19:6, 19:8,
19:11, 19:14,
19:20, 63:20,
63:24, 64:8,
64:23, 65:18,
66:2, 67:6,
67:8, 95:23,
96:15, 96:16,
96:20, 97:13,
100:2, 100:25,
107:18, 107:20,
108:1, 108:7,
109:18, 113:8,
113:13, 115:23,
127:2, 131:14,
132:2, 132:23,
132:25, 133:3,
133:11, 133:16,
133:21, 133:23,
138:1, 138:3,
138:11, 142:9,
142:11, 148:23,
149:8, 149:25,

150:14, 156:4,
156:14, 159:16,
159:20, 169:1,
169:2, 169:16,
174:9, 178:14,
178:18, 178:21,
178:23, 180:5,
180:7, 180:8,
180:14, 180:20,
181:5, 181:11,
181:12, 181:23,
182:1, 183:7,
183:14, 187:14,
187:16, 187:18,
188:3, 190:2,
191:23, 192:25,
193:4, 195:15,
196:13, 196:18,
214:24, 215:2,
216:8, 216:9,
216:16, 216:23,
218:11, 232:6,
232:10
meetings
19:4, 19:17,
19:19, 19:23,
20:1, 20:4,
20:9, 20:13,
20:21, 70:5,
70:6, 70:9,
70:13, 89:5,
126:22, 127:10,
163:8, 168:18,
168:23, 169:3,
184:20, 191:25,
205:21
meets
155:13
melissa
59:4, 59:5,
60:25, 125:12,
214:21
melissa's
125:13
members
20:16, 139:24,
231:8, 236:18
memo
234:7

memory
65:9, 119:2,
154:22, 221:13
men
84:19
men's
66:11
mendelsohn
234:8
mendelson
21:2
mental
10:10
mention
144:1
mentioned
26:15, 114:22,
165:1, 188:5,
210:12, 211:5
mentioning
222:9
menu
57:21
merit
119:8
merkel
37:19
message
13:16, 13:19,
15:8, 17:5,
17:9, 17:15,
17:19, 219:1,
219:3
messages
10:17, 14:5,
24:11, 139:14,
223:12
messaging
13:13, 17:17,
17:23, 17:24
met
109:18, 125:7,
150:16, 172:13,
174:5, 191:21,
192:24
michelle
1:23, 2:8,
238:2

microsoft
17:25, 18:13
middle
71:8, 216:24
might
22:3, 51:3,
94:2, 96:9,
136:13, 140:13,
142:18, 157:19,
157:22, 226:2
mind
45:11
minimum
163:13
minute
99:17
minutes
61:15, 85:13,
114:21, 169:4,
231:21, 231:25,
237:6
misconduct
57:25, 103:8,
105:8, 119:9,
120:15, 123:17,
124:11, 124:20,
197:12
missing
227:7
misspoke
233:25
mistrust
236:4
misunderstood
70:16
misusing
79:16, 124:6
mj
107:21, 183:4
moment
141:19, 232:5
monday
218:5
monitor
33:9, 61:4,
61:8, 124:11
monitors
60:22

month
62:1, 174:3,
185:8
months
122:3
moral
57:24
more
11:6, 27:18,
29:1, 40:23,
50:5, 51:3,
53:14, 82:11,
82:12, 86:22,
88:12, 93:10,
100:16, 110:12,
115:10, 123:11,
123:22, 128:12,
153:22, 155:4,
197:11, 197:14,
203:19, 206:23,
207:1, 208:12,
211:1, 212:18,
216:20, 237:1
morning
8:20, 107:23
most
38:18, 38:20,
43:21, 49:5,
49:8, 52:8,
52:17, 89:24,
110:19, 169:17,
201:23, 207:10
mostly
54:20, 214:17,
221:9
move
54:2, 54:6,
54:10, 54:13,
54:15, 60:4,
90:10, 91:19,
95:22, 96:14,
113:12, 113:15,
113:16, 115:10,
192:4, 194:15,
203:24, 204:1,
215:12
moved
29:16, 30:19,

211:2, 211:7,
234:15, 234:18
moving
74:20, 191:19
much
10:20, 11:5,
57:1, 84:9,
104:14, 147:12,
155:18, 156:24,
209:7, 220:10,
221:24, 235:14
multiple
9:24, 51:13,
195:17, 196:5,
196:8, 236:3
must
23:7, 24:5,
105:18, 116:3,
117:7, 129:9
mutually
24:25, 25:4

## N

name
8:22, 45:1,
55:3, 56:9,
63:13, 69:25,
80:14, 93:14,
125:14, 130:10,
130:18, 138:12,
147:24, 178:8
named
62:4
names
51:18, 124:2,
139:1, 144:13,
164:6, 165:4,
224:22, 227:2,
227:4, 236:19
narrative
177:5
national
27:14
nature
44:11, 57:19,
87:14, 145:24,
146:2, 146:3,
160:21, 197:5,

212:15, 227:13
**ncaa**
132:7, 182:6,
182:11, 182:17
**nd**
107:17, 109:16
**necessarily**
41:15, 46:7,
136:23, 169:11,
197:1
**necessary**
50:4, 66:5,
90:20, 97:10,
195:14, 195:18
**need**
9:14, 14:12,
23:13, 41:6,
45:7, 48:19,
49:18, 51:4,
51:16, 53:9,
65:19, 66:21,
85:12, 92:11,
102:13, 113:7,
113:11, 113:14,
113:16, 113:17,
136:22, 139:22,
152:19, 163:23,
164:3, 167:19,
191:16, 193:7,
194:16, 203:2,
203:4, 204:1,
204:3, 204:7,
204:24, 219:5,
223:3, 223:4,
224:13, 224:17,
231:21
**needed**
43:8, 48:25,
49:23, 53:16,
77:14, 217:2
**needs**
194:9, 204:2,
220:18
**neither**
238:9
**nervous**
183:12, 183:20,
183:22, 183:23

**never**
35:14, 57:7,
61:12, 105:12,
112:16, 147:3,
189:19, 189:22,
189:23
**nevertheless**
172:6
**new**
92:6, 100:22,
109:17, 112:13,
118:12, 207:11
**newsome**
17:2, 232:24
**next**
41:6, 60:16,
67:15, 73:3,
89:13, 95:23,
96:15, 99:13,
193:3, 193:5,
219:6
**next-level**
153:11
**nice**
40:7
**nick@coachesinc**
68:2
**niesha**
232:25, 233:15
**night**
174:7
**nod**
9:9
**non-disparagement**
115:3, 115:6
**nondisruptive**
220:10
**none**
210:20
**nonverbal**
236:1
**norm**
157:7, 213:12
**normal**
156:23, 157:4,
194:1, 200:15,
213:10
**normally**
11:17, 172:14

**northern**
1:2
**northwest**
3:8, 4:6
**notarial**
238:15
**notary**
2:9, 238:22
**note**
18:17, 18:21,
18:24, 18:25,
21:24, 22:3,
59:4, 126:25,
127:1
**notebook**
22:9, 152:3,
152:16
**notebooks**
22:25
**notes**
11:12, 18:19,
19:1, 19:5,
19:11, 19:13,
19:17, 19:20,
20:2, 20:12,
20:14, 20:21,
20:23, 20:24,
21:12, 21:18,
21:20, 21:23,
22:3, 22:5,
22:10, 22:14,
22:20, 22:23,
23:14, 24:11,
42:16, 53:24,
126:23, 127:6,
127:7, 151:25,
152:2, 152:6,
152:9, 152:19,
152:23, 153:1,
153:5, 159:19,
159:21, 169:2,
169:3, 169:9,
181:23, 187:12,
220:19, 221:11,
221:12, 221:20,
221:23
**nothing**
71:20, 92:25,

111:12, 128:12,
210:20, 210:21,
212:2, 233:16
**notice**
2:8, 102:17,
117:6, 117:7,
119:17, 119:22,
120:4, 120:6,
120:19, 181:22
**november**
86:16, 91:14,
93:9, 94:21,
95:19, 97:7,
106:13, 107:13,
107:17, 109:16,
115:21, 130:13,
132:21, 132:22,
133:9, 138:1
**number**
12:22, 14:21,
79:21, 128:24,
139:15, 139:16,
185:16, 185:17,
194:7, 205:2
**numbers**
73:25, 187:8

**O**

**oath**
9:1
**object**
8:7, 9:17,
82:17, 97:18,
146:14, 175:3,
177:3, 229:1,
233:7
**objecting**
177:5
**objection**
9:18, 104:6
**obligation**
9:2, 129:14
**obtain**
86:22
**obviously**
115:1, 171:13,
215:24, 229:21,
229:22

occasion
17:4, 53:7
occasionally
14:25, 212:9
occurred
108:5, 151:13,
222:13
offensive
235:25
offered
222:15
offhand
98:11, 139:17
office
3:15, 34:1,
40:22, 46:20,
46:22, 46:25,
47:3, 47:6,
47:11, 47:14,
48:11, 50:2,
50:21, 53:21,
53:23, 62:8,
70:22, 70:25,
93:17, 109:19,
109:21, 109:22,
109:25, 132:9,
135:21, 136:2,
136:3, 137:23,
143:24, 144:2,
144:9, 144:14,
144:17, 144:20,
145:1, 145:9,
145:14, 145:20,
146:7, 146:10,
146:24, 147:8,
148:6, 148:7,
161:6, 171:9,
171:18, 172:7,
172:10, 172:19,
179:20, 179:24,
179:25, 181:2,
192:6, 192:14,
193:15, 193:18,
193:20, 193:22,
199:9, 205:17,
205:19, 205:22,
212:11, 213:6,
234:14, 234:15

officer
238:2
official
201:16
officials
59:13, 59:15
often
50:5, 169:8
oh
65:23, 69:21,
91:20, 125:13,
141:1, 196:17,
215:5, 226:17
oliver
20:18, 138:24,
139:21, 140:9,
142:5, 143:15,
143:19, 150:17,
179:16, 188:25,
228:10
oliver-staley
15:24, 125:11,
127:19, 127:24,
144:3, 153:17,
154:10, 173:25,
174:6, 174:10,
174:16, 174:17,
191:11, 191:21,
192:3, 192:6,
192:14, 194:12,
203:1, 203:11,
203:23, 204:24,
206:13, 214:20,
222:22, 234:19
once
81:16
one
8:22, 9:22,
24:6, 26:14,
35:22, 36:13,
38:16, 42:18,
45:7, 48:4,
54:20, 64:17,
75:19, 75:23,
78:3, 83:17,
84:20, 84:25,
89:23, 89:24,
90:10, 90:15,

92:8, 93:10,
98:1, 99:23,
101:4, 101:18,
102:22, 103:25,
104:8, 104:12,
104:17, 104:19,
112:12, 121:2,
127:4, 137:4,
137:13, 148:10,
148:14, 157:22,
163:21, 163:25,
164:17, 166:3,
166:4, 166:5,
170:20, 178:1,
178:6, 188:2,
189:14, 194:8,
195:23, 197:23,
199:21, 208:20,
211:5, 211:6,
216:20, 217:4,
221:3, 221:4,
221:13, 221:16,
227:19, 227:21,
228:16, 228:21,
231:16, 235:14,
235:17, 235:18
one's
147:24, 224:22
one-off
15:16, 53:14
one-on-one
187:14
ones
39:11
ongoing
142:13, 198:9,
198:24, 201:24
online
39:25, 40:1,
40:2
only
15:6, 15:14,
41:15, 53:19,
71:13, 71:14,
87:22, 118:22,
165:19, 166:13,
179:6, 184:12,
186:8, 204:1,

213:11, 215:14,
220:6, 221:3
open
9:24, 12:7,
41:16, 108:22,
125:19, 125:20,
147:17, 147:19,
169:22, 225:4,
226:25
opened
43:14
opening
199:24
opinions
121:15
opportunity
46:2, 93:12,
112:10, 197:8,
227:15, 230:6
option
41:24, 42:24,
42:25, 57:15
options
89:22, 91:1,
195:17, 195:21,
195:22, 195:25,
196:5, 196:8,
230:22, 231:8,
231:12, 231:15,
231:19, 232:7
ora
216:20
oral
213:22
order
200:22, 219:25
org
31:8, 36:20
organizational
134:8
organize
193:24
original
109:20
originally
156:11
other
9:20, 11:11,

12:7, 17:12,
17:17, 26:5,
26:6, 26:23,
30:12, 67:16,
76:12, 76:15,
77:19, 80:3,
84:10, 88:1,
97:24, 101:4,
103:5, 104:13,
108:18, 110:5,
112:12, 120:9,
120:10, 121:16,
125:22, 132:12,
134:9, 136:3,
136:16, 143:13,
154:17, 155:7,
163:21, 163:25,
192:7, 192:9,
192:13, 194:23,
195:25, 199:25,
200:9, 209:9,
210:17, 210:20,
210:25, 218:6,
231:8
**others**
26:25, 192:19,
229:21, 236:17
**otherwise**
115:6, 210:21,
223:4, 238:12
**out**
11:2, 15:5,
24:5, 27:16,
28:6, 30:10,
41:6, 42:2,
42:11, 49:9,
57:2, 59:23,
61:3, 81:1,
83:12, 83:13,
84:10, 84:15,
84:23, 86:20,
92:7, 102:21,
118:25, 124:1,
124:8, 125:7,
137:14, 139:25,
147:4, 155:5,
155:20, 156:15,
156:24, 157:7,

158:20, 161:12,
161:13, 164:25,
166:25, 169:7,
169:8, 174:4,
176:22, 179:2,
187:7, 187:9,
189:1, 189:5,
200:4, 200:7,
200:24, 208:9,
211:14, 212:2,
213:18, 215:1,
215:2, 228:13,
228:18
**outcome**
238:12
**outlined**
128:20
**outside**
30:12, 47:1,
48:10, 48:15,
63:3, 63:5,
63:12, 73:18,
90:1, 90:8,
118:14, 122:18,
159:4, 159:11,
160:1, 193:15,
193:20, 194:18,
207:24, 208:1,
225:1, 230:21
**over**
9:20, 29:16,
31:9, 32:15,
36:19, 48:2,
54:23, 84:11,
100:5, 107:16,
167:11, 212:10,
229:21
**overall**
236:7
**oversaw**
31:3, 31:18,
32:21
**overseeing**
36:9, 133:22
**oversight**
132:7
**overwhelmed**
135:11, 147:16

**own**
171:24, 173:15

**P**

**page**
5:3, 5:8,
28:23, 61:2,
71:8, 97:11,
99:14, 106:19,
214:20, 216:24
**pages**
1:22, 97:16
**paid**
13:1
**pandemic**
18:11, 25:19,
210:13
**paragraph**
69:16, 70:15,
74:3, 78:9,
78:25, 79:1,
87:6, 117:14,
118:13, 118:21,
119:11
**paragraphs**
117:12
**parents**
17:8, 17:9,
171:11, 174:19,
175:14, 175:21,
175:23
**part**
21:10, 33:24,
56:25, 71:11,
78:15, 102:6,
102:16, 117:17,
124:16, 142:10,
156:7, 156:8,
156:17, 156:21,
168:19, 172:25,
175:5, 187:16,
200:18, 207:11,
222:10, 227:17,
234:17
**participants**
236:3, 236:8
**participate**
20:9, 21:6,

**participated**
19:22, 178:15,
180:11, 181:11,
196:18, 196:19
**participating**
181:13
**particular**
29:10, 76:20,
79:15, 208:6,
208:8, 211:11,
219:6, 224:25
**particularly**
100:13, 200:12,
208:9
**parties**
44:22, 46:4,
238:10
**partner**
31:3, 31:5,
31:11, 31:20,
32:3, 32:6,
32:8, 37:16,
38:2, 38:19,
211:10
**partners**
31:6, 31:7,
37:12, 38:13,
134:6
**parts**
65:21
**party**
136:14
**past**
52:1, 90:2,
169:10
**pasted**
117:18
**pasting**
58:3, 117:20
**pat**
93:10, 93:12,
93:15, 107:24,
108:17
**path**
99:3, 99:4,
100:15

54:8, 132:25,
168:22

**paul**
54:24, 58:3,
66:20, 66:23,
84:11, 89:8,
89:13, 91:6,
94:22, 95:20,
96:8, 97:8,
124:2
**pauls**
67:1, 67:2
**pay**
226:18
**payroll**
37:22, 37:24
**pdf**
28:23
**penalties**
8:6, 8:15
**penalty**
9:2
**pennsylvania**
4:6
**people**
9:19, 12:12,
13:5, 15:19,
17:13, 17:19,
31:15, 33:22,
33:23, 34:3,
34:6, 34:9,
37:6, 37:7,
37:9, 37:13,
38:16, 39:1,
44:6, 44:8,
47:21, 47:24,
49:12, 49:18,
50:15, 56:7,
56:10, 56:25,
60:19, 64:25,
70:19, 78:19,
79:17, 83:9,
102:1, 111:16,
111:18, 120:1,
123:12, 123:13,
123:18, 123:19,
123:25, 124:5,
124:8, 124:14,
125:11, 134:9,
136:16, 137:14,

147:5, 147:11,
147:19, 147:25,
157:22, 164:7,
171:21, 172:21,
185:5, 185:17,
185:19, 186:2,
190:20, 193:14,
193:19, 194:3,
194:7, 194:23,
199:22, 205:2,
215:14, 217:8,
220:1, 220:7,
222:9, 225:5,
225:7, 226:16,
226:19, 227:4,
235:19
**people's**
60:12
**perceive**
44:25
**percent**
45:25, 80:18
**perception**
236:2
**perfect**
228:4
**perform**
76:10, 76:12,
87:14
**performance**
102:17, 120:7,
120:19
**performed**
86:23
**performs**
80:17
**period**
147:2
**perjury**
8:6, 8:15, 9:3
**person**
19:4, 19:9,
19:12, 26:15,
33:4, 38:19,
40:14, 41:5,
42:15, 43:2,
44:11, 45:18,
47:16, 47:20,

49:2, 54:7,
56:22, 60:15,
61:1, 67:4,
72:23, 103:17,
108:14, 110:13,
129:10, 141:20,
142:24, 165:19,
172:13, 172:15,
176:2, 186:1,
186:12, 190:22,
197:9, 207:24,
212:8, 212:9,
224:25
**personal**
14:16, 14:23,
15:2, 15:6,
15:9, 26:9,
64:19, 64:21,
65:2, 75:3,
75:18, 75:24,
76:10, 76:12,
78:6, 78:10,
78:11, 79:2,
80:5, 80:18,
80:23, 81:15,
84:8, 85:21,
86:23, 87:14,
87:21, 92:22,
99:25, 103:23,
105:3, 105:15,
176:4, 176:14,
176:18
**personally**
128:13
**personnel**
38:12, 108:21,
108:25, 112:19
**peterson**
16:19, 52:3,
52:6, 52:16,
59:22, 93:10,
93:20, 94:6,
94:21, 128:10,
128:20, 135:7,
197:24, 202:15,
202:25, 222:1
**phillip**
214:21

**phone**
11:22, 11:24,
12:1, 12:19,
12:21, 12:24,
13:3, 13:4,
13:14, 13:23,
14:6, 14:16,
14:17, 14:19,
14:21, 14:23,
15:2, 15:3,
15:4, 15:6,
15:7, 15:9,
15:15, 17:15,
17:18, 150:13,
151:1, 212:8,
233:1
**phonetic**
16:4, 16:12,
16:21, 16:25,
38:1, 62:4,
93:15, 183:11,
214:21, 234:11
**physical**
10:10
**pick**
151:1, 223:3
**picked**
118:25, 183:4
**piece**
211:14, 214:9,
223:25
**pieces**
30:10
**pip**
99:11
**place**
21:16, 124:11,
124:19, 190:4,
190:8, 190:18,
196:22, 198:15
**placed**
71:14, 186:1,
190:6, 196:15,
196:24
**placing**
195:10
**plaintiff**
1:6, 3:2, 4:11,

5:13, 8:18,
65:12
**plaintiff's**
6:8, 6:9, 6:11,
6:12, 6:16,
6:19, 116:22,
126:18, 132:15,
134:17, 149:14,
167:6
**plan**
49:9, 97:12,
98:23, 98:25,
99:13, 99:18,
100:5, 100:10,
100:11, 110:2,
110:4, 110:7,
110:15, 110:17,
113:22
**planned**
113:7, 211:13
**plans**
156:4
**platform**
215:22
**platforms**
17:17
**play**
48:16, 52:3,
52:7, 53:4,
115:7, 185:4,
188:3, 193:15,
235:13
**played**
26:20, 184:7,
185:23, 230:19
**players**
17:5, 17:6,
173:15, 184:18,
184:24, 187:7,
187:9
**playing**
206:20, 206:23,
212:12
**please**
8:2, 9:11,
12:2, 59:25,
71:3, 75:4,
81:18, 81:20,

95:4, 107:25,
115:12, 116:22,
117:3, 124:21,
127:17, 128:9,
128:23, 130:2,
150:13, 191:18,
214:23, 218:14
**point**
14:4, 22:12,
24:7, 40:10,
44:19, 46:8,
50:15, 56:14,
60:19, 62:3,
62:21, 63:1,
63:14, 65:5,
65:20, 69:8,
70:19, 72:7,
73:1, 77:20,
88:4, 93:10,
98:2, 116:5,
126:4, 134:25,
135:9, 136:1,
143:18, 144:12,
145:5, 152:9,
153:2, 155:21,
155:22, 156:10,
156:25, 157:10,
157:13, 160:10,
162:8, 163:2,
163:10, 163:15,
163:17, 164:22,
165:5, 167:17,
170:3, 170:7,
179:24, 181:1,
184:1, 189:10,
200:10, 208:9,
217:8, 224:10
**points**
20:5, 20:15,
53:3, 218:10
**policies**
31:21, 31:23,
31:25, 32:23,
33:1, 33:10,
34:7, 36:8,
39:10, 39:20,
40:2, 74:16,
120:9, 235:2,

235:8, 235:18
**policy**
33:5, 35:3,
54:8, 58:17,
58:18, 78:8,
78:14, 78:16,
78:17, 78:21,
79:11, 79:15,
83:16, 103:9,
105:11, 111:4,
111:6, 111:8,
111:9, 118:14,
119:14, 119:18,
119:19, 119:23,
126:11, 186:24,
187:1, 187:3,
187:4, 235:4,
235:11, 235:15
**pond**
175:21, 175:23,
176:18
**poole**
10:22
**pop**
231:24
**pope**
158:15, 158:21,
161:12, 163:11
**population**
211:10
**position**
30:11
**possession**
54:5
**possible**
16:1, 16:3,
23:14, 75:11,
135:13, 135:15,
165:2, 191:16,
192:4, 192:16,
203:4, 220:10,
231:6
**possibly**
101:14
**post**
215:6
**potential**
116:15, 147:13,

182:17, 188:14,
204:11, 222:17,
232:6
**potentially**
26:12, 116:9
**powers**
3:14
**practice**
29:11, 29:16,
29:19, 35:12,
40:20, 43:18,
43:24, 44:8,
45:17, 50:12,
52:1, 53:17,
90:2, 126:14,
157:4, 175:12
**practices**
18:17, 18:25,
31:24, 33:10,
33:16, 34:6,
34:14, 34:18,
34:24, 34:25,
35:7, 35:9,
40:15, 61:6,
90:24, 126:12,
175:9, 189:17,
189:25, 233:9
**preferred**
236:19
**preliminary**
8:25
**prepare**
10:14, 11:9,
73:19, 157:3,
157:5, 157:8
**prepared**
123:1
**present**
4:10, 115:10,
150:4, 182:1,
183:13, 218:10,
229:13, 230:22
**presentation**
231:12
**presented**
91:2, 161:18,
171:3, 231:9
**presenting**
195:16, 196:8

preserve
12:2, 14:5,
14:12, 23:23,
152:8, 152:21
preserved
70:11, 71:25,
72:2, 152:13,
152:22
president
52:2, 52:6,
52:15, 94:21,
96:23, 107:23,
115:24, 128:1,
128:10, 128:20,
135:6, 197:24,
222:1, 234:10
president's
123:13
press
201:15, 202:15,
202:24, 204:22
presumably
44:23, 133:25
pretty
10:20, 11:5,
18:21, 112:13,
154:24, 155:18,
156:24, 184:7,
197:13, 199:19,
200:15, 209:7
previous
151:6
previously
87:22, 104:8,
105:19
primary
34:2
printed
176:22
prior
14:3, 74:20,
82:20, 92:3,
112:8, 114:6,
142:20, 180:20,
180:25, 188:11
priority
191:17
private
29:16

privately
27:15
probably
13:21, 20:14,
20:24, 89:24,
94:19, 96:2,
96:19, 116:11,
162:5, 162:6,
183:9, 184:14,
214:17
problem
102:18, 120:7,
120:19, 124:16,
153:4
problematic
186:19, 186:22,
208:10, 209:3,
211:19
problems
225:3
procedures
35:20, 36:8
proceeding
8:8
process
35:20, 42:22,
110:11, 111:7,
119:14, 172:5,
215:5, 218:15
processes
34:14
produce
11:11
produced
18:18, 39:19,
139:14, 181:21,
223:12
product
124:18
professional
186:5, 186:21,
234:12
professionalism
236:16
professionally
128:13
professionals
33:15

profile
5:9, 27:20,
28:9, 28:18
program
182:23, 191:15,
203:15, 204:25,
218:6, 235:22
programs
218:7
progressive
102:7, 102:12,
111:21
promote
61:6
pronouncing
236:18
proper
124:19
property
78:9, 79:1,
79:3
prospect
157:11
provide
22:14, 24:9,
24:14, 46:12,
50:20, 76:21,
94:14, 99:6,
111:24, 114:10,
114:12, 114:14,
128:14, 180:18,
201:20, 212:4,
235:3, 235:8,
235:10
provided
22:16, 73:21,
76:15, 79:5,
97:10, 111:12,
118:5, 118:9,
144:24, 145:18,
151:12, 152:13,
153:6, 178:2,
178:9, 184:11,
230:8, 230:10
provides
58:1, 78:9,
79:1
providing
34:14, 94:18,

198:2
provision
115:3, 115:7
pto
196:2
public
2:9, 147:19,
238:1, 238:22
publicized
198:3
pull
36:21, 65:11,
71:2, 72:8,
79:20, 83:22,
86:5, 91:8,
95:4, 107:4,
110:20, 115:11,
126:17, 129:22,
132:14, 158:7,
181:16, 201:6,
207:4
pulled
62:22
punish
81:23
punitive
103:18, 198:6
purported
198:2
purpose
98:24, 100:9,
102:16, 105:6,
111:22, 119:21,
151:5, 154:2,
200:6, 228:6,
228:12
purposes
78:10, 102:10
pursuant
2:8
purview
38:10, 182:9,
233:13
pushed
95:15, 222:22
pushing
90:16, 90:17,
223:24

**put**
36:7, 56:9,
56:18, 56:19,
57:1, 85:2,
102:16, 119:1,
119:22, 120:4,
120:18, 127:4,
129:14, 129:19,
134:17, 146:21,
147:20, 148:1,
176:22, 190:20,
200:11, 215:18,
237:5

**putting**
117:21, 119:17,
120:6, 147:4,
226:21

**Q**

**question**
9:11, 9:19,
34:22, 53:11,
53:19, 97:19,
108:19, 108:25,
113:3, 141:10,
146:15, 177:4,
206:25, 220:2,
227:3, 229:2

**questioned**
76:9

**questioning**
177:4

**questions**
8:25, 9:6,
9:17, 11:16,
12:11, 35:3,
39:13, 51:3,
64:1, 114:16,
134:9, 180:18,
180:19, 217:5,
217:11, 223:18,
237:1, 237:3,
237:7

**quick**
29:22, 37:25,
54:23, 61:15,
73:14, 85:12,
157:1

**quickly**
27:25, 36:20,
39:10, 77:17,
114:4, 154:24,
168:18, 191:16,
192:4, 192:16,
192:22, 194:16,
203:4, 203:24,
204:1, 207:3,
218:9, 232:18

**quite**
111:17, 136:17

**R**

**racial**
236:4

**rack**
195:21

**raise**
27:3, 27:5,
125:23, 153:10,
236:6

**raised**
74:4, 74:14,
74:18, 76:8,
77:21, 107:20,
108:7, 143:21,
143:22, 155:9

**raising**
201:25

**ran**
134:10

**range**
101:18

**rationale**
223:17

**re-changing**
223:15

**reached**
11:2, 15:5,
59:23, 61:3,
86:20, 139:25,
161:12, 161:13,
174:4

**reaching**
158:20

**read**
65:19, 74:6,

94:23, 115:16,
117:2, 119:16,
200:14, 224:17,
229:19, 229:20,
234:4

**reading**
69:21, 97:9,
100:5, 111:1,
154:21, 157:20,
198:13, 198:17,
223:21, 227:5,
237:9, 238:8

**ready**
223:23

**real**
36:20, 37:25,
54:23, 73:14,
85:12, 157:1

**really**
29:20, 51:4,
60:24, 73:21,
100:9, 102:13,
103:18, 110:3,
120:1, 120:6,
120:8, 122:21,
133:18, 135:4,
135:10, 135:11,
138:4, 153:4,
163:16, 168:2,
170:22, 171:5,
177:4, 179:24,
182:8, 186:15,
195:20, 209:21,
212:19, 216:25,
220:25, 221:19,
224:23, 225:14,
229:19, 233:16

**reason**
9:15, 10:10,
15:1, 19:19,
28:3, 94:11,
109:25, 110:6,
172:6, 179:23,
186:18, 197:5,
211:6, 221:18

**reasonable**
152:12

**reasons**
186:16, 198:3,

220:6

**reassigned**
171:20

**rebuttal**
111:19, 111:21,
111:23

**recalled**
80:1

**receive**
60:3, 124:19,
124:25, 172:9,
233:5, 236:15,
236:22

**received**
24:5, 59:25,
106:8, 121:4,
146:23, 146:24,
150:24, 152:20,
161:22, 185:20,
224:15

**receiving**
23:22, 23:25,
129:10, 233:16

**recent**
128:11, 141:14

**recently**
139:14

**recess**
61:18, 85:15,
168:11, 232:3

**recognize**
117:5, 130:8,
139:16, 158:13,
177:24, 207:12

**recollection**
71:15, 74:7,
74:10, 79:18,
84:17, 85:4,
88:13, 92:1,
121:3, 145:6,
146:4, 179:19,
182:19, 184:12,
188:4, 205:9,
205:20, 223:22,
228:4

**recommend**
89:17, 101:24,
102:4

recommendation
89:23, 154:8
recommendations
34:8, 52:1,
73:3, 82:20
recommended
90:7, 90:8,
102:5, 160:5
reconvene
113:22
record
9:10, 9:18,
238:5
recorded
70:8, 70:9,
70:13
recorders
69:17
recording
187:23, 187:25,
188:6
recordings
69:18, 69:20,
70:6, 72:3
records
108:22, 147:17,
225:4, 226:25
recounted
118:16
redact
227:2, 227:4
redacted
214:17, 215:25
redirect
212:11
reduced
238:7
refer
41:22, 153:16
reference
151:20
referring
33:18, 95:25,
96:1, 96:19,
96:25, 97:2,
97:22, 108:4,
109:21, 109:23,
131:20, 151:17,

192:2
reformat
28:25
refrain
87:13
refresh
71:15, 205:9
refreshments
30:8
regarding
59:24, 82:21,
86:22, 131:11,
167:15, 191:14,
193:3, 234:9
regents
1:8
regular
53:17
related
14:12, 15:23,
19:23, 68:23,
74:14, 120:2,
210:20, 210:22,
238:10
relates
132:6
relation
143:14
relations
30:18, 32:24,
33:14, 33:15,
33:18, 33:21,
34:1, 34:15,
34:21, 37:5,
37:7, 38:12,
38:14, 38:16,
38:22, 39:5,
42:4, 43:2,
68:14, 72:22,
131:23, 133:23,
133:25, 134:7,
150:5, 211:7
relationship
38:11, 38:21,
107:1
release
201:15, 202:15,
202:24

relevant
23:24, 24:13,
81:3, 81:6,
81:22, 152:21,
152:23, 175:11,
215:18
remain
56:12, 56:23,
57:15
reman
128:25
remediation
142:12, 151:15,
151:19
remembering
141:6
remind
54:25, 61:25,
210:4
remote
9:23, 11:15
renewed
129:3
repeated
105:8, 130:16,
132:5, 201:22
repeatedly
235:25
repeating
145:7
rephrase
19:2, 49:6,
82:22, 101:22,
200:21, 219:24
replace
32:12
report
5:17, 30:21,
30:23, 50:16,
51:7, 51:15,
66:4, 72:7,
72:19, 73:4,
73:5, 73:9,
73:11, 73:18,
78:4, 85:4,
88:16, 88:23,
90:25, 92:24,
94:18, 94:23,

96:2, 96:5,
98:12, 118:16,
122:25, 137:16,
137:19, 137:21,
213:15, 214:5,
224:8, 224:21,
225:18, 225:21,
227:6, 229:9,
229:17, 230:4,
230:6, 231:13
reported
1:23, 169:5,
174:10, 174:11,
174:16, 198:10,
198:25
reporter
8:2, 8:4, 8:13,
8:17, 9:6
reporter-notary
238:1
reports
51:12, 73:19,
73:23, 88:22,
94:15, 98:14,
118:25, 180:19,
211:9, 213:14,
213:17, 213:20,
225:2
repots
236:6
represent
86:15, 140:5,
219:7
represented
10:5, 87:8
representing
8:23
reprimand
79:10, 88:25,
89:2, 91:15,
91:17, 93:8
reprimanded
118:22
republic
27:14
reputation
198:7
request
71:13, 71:24,

78:5, 104:18,
108:21, 165:4,
216:21
**requested**
153:5, 221:22,
238:9
**requesting**
26:4, 71:25
**requests**
201:22, 218:13
**required**
42:23, 231:17
**reschedule**
113:18
**resignation**
195:23
**resolve**
41:19, 43:25,
44:9, 45:15,
140:10, 142:4,
151:20, 155:23
**resolved**
27:9, 42:1,
44:9, 211:2
**resource**
32:23, 46:21,
48:25, 56:10,
64:2, 79:5
**resources**
49:15, 79:16,
79:17, 124:6
**respect**
78:5, 106:7,
118:20, 131:17,
198:9, 198:24,
235:20, 236:17
**respond**
60:9, 68:21,
69:13, 71:9,
142:15, 163:18,
189:20, 192:24,
206:16, 207:16,
207:25, 225:18,
225:20, 226:7,
227:16, 227:21,
228:20, 228:25,
229:5, 230:6
**responded**
206:18

**respondent**
19:8, 45:20
**responding**
54:14, 60:6,
164:18, 207:19
**responds**
66:18, 97:7
**response**
25:13, 45:13,
46:16, 59:25,
61:4, 122:5,
122:9, 122:20,
125:4, 139:14,
164:20, 201:1,
206:11, 230:8,
230:9, 230:11
**responsibility**
110:18, 210:11,
210:24
**responsible**
32:22, 32:25,
33:2, 33:14
**restrict**
60:12
**restricted**
60:12
**result**
120:15, 236:11
**retain**
21:1, 47:1,
47:3, 47:4,
47:14, 48:15,
63:5, 122:18,
159:4, 159:25,
161:21, 161:24
**retained**
47:6, 63:12,
166:16, 174:4,
178:11, 178:17,
188:19, 188:23,
189:10
**retaining**
21:7, 48:10,
159:11, 165:11,
165:15, 194:18
**retains**
63:19
**retaliated**
25:23, 26:4,

188:24
**retaliating**
153:14, 185:18,
186:7
**retaliation**
26:24, 36:16,
36:18, 58:15,
135:8, 135:18,
135:22, 136:5,
136:25, 140:23,
144:1, 145:5,
145:11, 145:15,
150:25, 154:9,
154:11, 157:25,
185:10, 185:17,
186:12, 198:10,
198:24, 199:2,
201:24, 210:8,
210:23
**retaliator**
186:8
**retaliatory**
26:12, 199:11,
200:1, 202:5,
204:23, 205:7,
209:19, 225:12,
234:11
**review**
11:8, 29:1,
51:9, 86:10,
96:23, 118:6,
141:3, 182:20,
182:23, 183:2,
224:10, 224:13,
229:22
**reviewed**
34:7, 95:21,
98:12, 101:15,
104:23, 117:9,
167:10, 167:18,
200:11, 224:16,
227:13, 229:15,
235:13
**reviewing**
40:3, 40:9,
122:15, 191:9,
195:7, 201:12,
217:24, 230:9

**revise**
33:6
**revised**
39:21, 39:23,
97:15
**rewards**
37:21, 37:24
**rhode**
234:10, 235:24,
236:4, 236:10,
236:14
**rhode's**
235:4, 236:5
**richardson**
131:22
**ring**
69:25, 138:12
**risk**
128:1, 128:7
**rndc**
27:14
**robb**
3:6
**role**
18:25, 26:20,
27:2, 27:5,
30:16, 30:20,
35:23, 36:6,
38:3, 48:16,
52:2, 52:7,
53:4, 90:12,
143:2, 175:6,
185:4, 185:23,
186:21, 193:14,
206:20, 206:23,
207:1, 230:18,
230:20
**roles**
30:12
**room**
11:20, 153:24,
220:16, 220:21,
237:6
**rope**
69:11
**roped**
140:6
**rosenfield**
130:14

roundtree
16:10
routed
59:12, 59:21
rumors
218:18
run
15:18, 19:25,
39:9, 42:1,
47:22, 57:3,
164:7
running
12:7
rush
84:9

**S**

said
8:21, 21:25,
28:6, 35:3,
41:4, 41:11,
50:25, 58:12,
60:3, 61:3,
62:15, 76:13,
78:7, 79:25,
80:1, 81:18,
81:20, 85:22,
96:13, 97:8,
101:23, 107:15,
108:16, 109:17,
109:22, 114:5,
114:15, 121:12,
126:1, 138:14,
143:4, 145:1,
146:19, 149:6,
150:12, 152:11,
156:4, 168:16,
171:5, 175:4,
183:15, 188:8,
194:14, 206:16,
208:12, 208:20,
209:2, 211:9,
212:21, 212:24,
222:5, 223:23,
225:6, 225:22,
225:24, 226:21,
226:22, 228:1,
228:18, 230:3,

230:20, 233:1,
238:5
same
37:17, 47:20,
66:10, 81:24,
82:1, 83:6,
83:19, 99:14,
100:12, 104:3,
106:1, 106:3,
117:12, 164:14,
220:16
sanford
62:4, 62:7,
62:20, 63:18,
64:15, 64:16,
64:18, 64:21,
68:13, 68:19,
74:8, 74:14,
74:17, 75:3,
75:16, 78:6,
79:3, 85:19,
89:3, 92:22,
98:14, 99:22,
99:24, 100:1,
104:4, 105:13,
113:4, 115:9,
118:23, 121:7,
121:11, 121:12,
121:13, 143:7
sanford's
94:15, 98:14
sat
100:20, 161:20,
221:3, 221:4,
221:10, 221:13,
222:5
saturday
174:7
save
22:21
saw
40:1, 94:16,
94:24, 149:5,
170:8, 170:10,
170:23, 170:24,
171:2, 203:21,
225:6
saying
14:11, 57:25,

59:23, 60:8,
67:3, 78:24,
94:21, 100:22,
102:24, 119:17,
126:24, 157:16,
165:20, 188:11,
191:13, 194:9,
199:1, 199:25,
204:22, 208:19,
212:17, 222:19,
225:17, 226:8,
226:12, 226:16
says
30:14, 33:13,
34:12, 37:3,
45:8, 57:5,
57:18, 59:10,
66:3, 66:19,
70:15, 74:4,
74:14, 76:7,
84:8, 93:9,
103:9, 107:18,
110:9, 111:6,
111:20, 115:24,
116:2, 117:6,
118:13, 119:12,
119:25, 127:25,
128:9, 128:22,
129:7, 131:9,
141:13, 142:8,
155:15, 157:2,
158:16, 181:23,
182:20, 194:14,
197:25, 198:22,
199:8, 203:2,
204:24, 205:8,
214:22, 219:4,
220:15, 224:1,
236:14
scan
117:3
scandal
123:9, 124:22,
129:3
schedule
67:17, 77:14,
77:15, 77:18,
96:17, 184:19,

184:24, 220:11
scheduled
203:6, 203:10
scheduling
95:23, 96:14,
149:7, 186:2,
193:8, 194:3
scholarship
58:11, 58:14
school
19:24, 20:17,
29:6, 29:7,
39:12, 201:20
scope
70:16, 166:17,
178:19, 178:25,
181:7
scrabble
127:4
screen
28:8, 95:15
screens
9:24
scribble
127:3
scroll
28:16, 74:13,
234:5
scrutiny
155:4
seal
238:15
season
32:15, 32:18,
184:4
second
74:2, 87:5,
106:19, 142:9,
148:10, 148:14,
149:8, 156:4,
156:14, 156:21,
201:5, 218:12
see
28:9, 32:19,
39:10, 39:23,
57:10, 60:15,
62:17, 65:22,
74:1, 75:21,

91:7, 93:12,
95:21, 97:11,
106:13, 109:5,
140:15, 150:13,
154:3, 156:5,
178:4, 181:24,
186:18, 186:22,
195:1, 214:23,
215:25, 217:19,
218:23, 222:25,
223:6, 224:2,
232:13, 235:20
**seem**
156:12, 175:11,
177:10, 183:20,
183:22, 185:22,
186:5, 186:10
**seems**
45:11, 45:14,
152:11, 200:6
**seen**
39:24, 46:24,
61:12, 69:21,
115:1, 134:22,
134:25, 141:23,
158:14, 168:16,
177:25, 178:3,
184:17, 212:1
**select**
57:21
**selected**
154:16
**selling**
30:7, 30:10
**send**
51:7, 51:15,
51:17, 91:14,
96:10, 126:12,
136:8, 150:11,
151:10, 157:5,
162:2, 162:4,
162:5, 169:7,
171:20, 175:23,
176:3, 176:12,
176:18, 209:25,
213:13, 214:25,
215:1, 216:7,
216:11

**sending**
14:10, 167:15,
172:12
**sends**
68:2, 72:7,
72:19, 73:4,
89:16, 199:7,
202:23, 229:16,
230:4, 232:24
**senior**
30:2, 30:15,
30:17, 30:19,
36:7, 37:21,
66:3, 183:11
**sense**
43:21, 45:11,
45:14, 89:24,
120:20, 125:25,
148:1, 211:1,
211:2, 211:3
**sensitive**
191:17
**sensitivity**
194:4
**sent**
94:17, 94:23,
96:3, 96:21,
97:3, 98:20,
106:13, 107:14,
117:15, 132:20,
135:6, 137:25,
141:20, 141:23,
177:2, 207:21,
209:12, 209:24,
215:6, 216:18,
217:4, 224:8,
224:11, 229:21
**separate**
31:21, 33:19,
88:8, 88:10,
105:1, 128:6,
191:25, 193:4
**separately**
85:3, 100:24,
179:4
**separating**
84:10, 84:23
**separation**
25:1, 25:5,

27:10, 28:1,
114:23, 119:14
**september**
65:17, 66:19,
69:3, 71:9,
72:18, 238:18
**sequence**
155:17
**series**
188:13
**serious**
44:4, 54:12,
60:4, 83:17,
102:9, 103:1,
105:8, 105:11,
105:18, 106:1,
106:4, 112:6,
158:1, 160:23,
176:13, 201:23
**seriously**
59:11, 104:15,
151:8, 157:23
**seriousness**
103:14, 103:19,
192:20
**serves**
119:12
**services**
17:24
**serving**
213:8
**set**
8:17, 33:22,
33:23, 97:13,
238:14
**setting**
186:2
**seven**
98:7, 138:1
**several**
58:1, 118:15,
123:18, 147:23,
160:7
**sex**
66:15
**sexual**
233:4, 233:6
**shadow**
190:22

**shake**
190:21
**shall**
78:9, 119:20
**shape**
84:12
**share**
25:12, 97:11,
121:21, 131:10,
215:14
**shared**
228:22
**shop**
68:15, 136:23,
172:3
**shorthand**
238:1
**shortly**
25:18, 190:5
**shoshanna**
130:16, 130:18,
131:17, 132:4,
133:14, 133:18,
143:1, 168:19,
232:24, 233:5
**shoshanna's**
233:9
**should**
49:13, 61:5,
63:2, 68:21,
75:4, 75:20,
79:2, 81:4,
81:7, 83:9,
84:12, 89:21,
92:5, 92:7,
101:15, 109:6,
110:11, 120:20,
122:17, 143:24,
144:5, 144:10,
144:13, 145:1,
145:8, 148:6,
178:20, 179:1,
179:4, 188:16,
189:19, 194:8,
199:16, 200:10,
222:10, 222:23,
226:12, 227:15,
227:17, 235:13,

236:14
**shouldn't**
194:9, 214:17
**show**
167:23, 168:4,
168:5, 173:25,
199:5, 199:6
**showed**
78:2, 92:24,
132:20, 135:13,
168:1, 168:3
**showing**
39:22
**shown**
135:2, 170:21,
173:4, 173:5
**shows**
203:10
**sic**
56:17, 113:25
**side**
29:13, 200:9,
201:1
**sides**
46:1
**sign**
25:5
**signature**
112:1
**signature-1apgj**
238:20
**signed**
171:8, 171:9,
171:12
**significant**
198:11
**signing**
237:9, 238:8
**silent**
111:13
**since**
156:14
**single**
47:19, 147:24,
197:3, 235:9
**sit**
48:17, 50:2,
50:6, 50:9,

63:25, 64:1,
64:3, 64:5,
64:6, 64:7,
64:8, 66:20,
153:23, 196:12,
221:1, 221:6,
221:19, 221:25
**site**
56:7
**sitting**
83:3
**situation**
118:2, 175:15,
190:19, 198:8,
198:23, 219:6
**situations**
190:20
**sixth**
3:9
**skip**
40:9
**slack**
17:24
**slap**
81:25, 105:20
**smart**
11:22
**snapchat**
17:20
**some**
8:25, 9:6,
9:17, 12:11,
19:18, 19:25,
20:5, 20:14,
20:15, 20:24,
26:7, 31:1,
31:24, 35:23,
39:9, 40:10,
42:17, 43:9,
45:8, 46:8,
50:15, 54:19,
56:1, 57:4,
60:19, 61:21,
62:3, 62:21,
62:25, 64:21,
65:5, 65:9,
67:13, 68:23,
69:8, 70:6,

70:13, 72:7,
78:4, 78:6,
80:3, 85:21,
88:4, 96:19,
107:16, 113:8,
113:12, 115:2,
121:23, 123:9,
123:11, 123:14,
123:16, 124:8,
131:10, 134:25,
136:24, 137:2,
137:15, 137:20,
139:1, 139:13,
141:7, 146:7,
148:24, 150:25,
153:2, 159:19,
162:8, 163:2,
163:10, 170:3,
170:6, 172:6,
172:21, 179:23,
181:1, 184:1,
184:19, 187:20,
187:22, 190:4,
192:17, 192:19,
194:13, 197:12,
209:20, 211:3,
212:1, 218:11,
218:13, 224:10,
227:16, 228:3,
231:22
**somebody**
56:25, 83:7,
120:4, 162:17,
167:23, 169:5,
170:3, 186:6,
194:21, 196:10,
197:8, 220:9
**somehow**
23:12
**someone**
32:13, 38:13,
41:10, 42:4,
44:5, 47:21,
48:12, 48:22,
50:1, 50:6,
53:23, 56:20,
59:16, 63:9,
68:1, 70:16,

70:18, 78:20,
79:10, 81:13,
84:24, 89:18,
103:4, 104:2,
105:7, 106:6,
110:5, 118:25,
119:7, 133:23,
135:13, 137:11,
154:19, 156:2,
161:10, 162:3,
172:18, 173:24,
175:8, 179:17,
181:1, 182:22,
186:7, 187:4,
188:3, 188:5,
196:15, 196:22,
199:6, 199:16,
215:1, 218:10,
220:7, 220:18,
231:1
**someone's**
119:7
**something**
42:20, 43:10,
44:5, 46:3,
56:15, 56:16,
90:1, 96:10,
106:7, 112:2,
129:13, 132:8,
134:24, 140:13,
161:20, 169:12,
182:16, 187:11,
190:12, 210:12,
210:13, 214:25,
215:1, 215:22,
216:22, 217:1,
225:13, 225:22
**sometime**
69:3, 123:8
**sometimes**
15:9, 21:24,
47:19, 56:25,
146:6, 169:2,
169:4, 172:1,
212:13
**somewhere**
23:15, 35:8,
38:1, 152:3

sop
35:12, 35:14,
35:16, 36:4

sorry
10:16, 27:24,
28:14, 35:17,
64:19, 72:6,
74:3, 78:25,
84:21, 85:11,
91:20, 94:24,
95:12, 95:16,
99:22, 101:21,
118:23, 126:4,
129:2, 130:7,
131:5, 131:21,
136:7, 141:1,
144:6, 148:10,
149:11, 149:13,
158:8, 168:5,
184:22, 192:9,
195:12, 196:10,
206:21, 215:5,
215:13, 218:1,
219:9, 219:10,
234:17

sort
11:23, 14:10,
17:23, 25:24,
34:23, 42:17,
104:20, 115:2,
122:11, 123:9,
123:14, 123:16,
133:1, 143:2,
190:4, 233:17

sound
125:10, 129:1,
130:19, 174:22,
179:23, 198:13

sounds
84:22, 87:19,
91:5, 118:21,
132:9, 138:16,
150:16, 150:19,
150:24, 151:23,
152:9, 152:25,
153:13, 153:15,
154:19, 154:25,
155:12, 165:7,

167:22, 167:25,
191:20, 195:16,
196:10, 213:3

southwest
3:16

speak
9:8, 10:17,
10:21, 10:25,
13:4, 25:14,
35:13, 46:2,
88:14, 121:23,
172:3, 182:13

speaking
33:4, 43:7,
52:6, 53:13,
73:23, 120:14,
120:17, 197:4,
219:13, 226:15

speaks
217:16, 226:20

specific
20:23, 22:9,
29:1, 54:19,
64:9, 67:8,
78:14, 102:17,
102:20, 102:23,
116:11, 120:6,
120:16, 120:19,
122:14, 123:23,
127:14, 145:17,
146:8, 147:3,
156:12, 166:22,
166:24, 178:21,
178:23, 187:2,
189:15, 218:13,
219:15

specifically
24:3, 24:6,
38:23, 85:9,
89:5, 90:7,
94:25, 101:5,
108:3, 116:17,
131:5, 133:17,
140:12, 144:13,
144:16, 144:21,
144:24, 145:3,
146:5, 159:12,
173:18, 174:18,

182:13, 203:17,
204:12, 217:15,
218:20, 220:3,
220:25, 222:12,
222:20

specificity
104:20

specifics
40:23, 76:21,
87:25, 99:6,
139:6, 145:24,
227:12

speculate
76:14, 94:13,
176:15, 186:15,
229:3

speculation
94:19, 141:9,
218:14, 218:17

spence
202:13, 202:23,
204:21, 207:14

spoke
80:14, 88:1,
107:19, 114:6,
193:2, 193:6,
194:15

spot
32:15, 35:18,
173:21

spreadsheet
169:7, 169:8

square
3:16

st
94:21, 107:13,
238:15

stadeker
86:19, 88:10,
105:1, 142:25

staff
20:16, 52:15,
76:10, 76:12,
138:23, 139:24,
141:8, 142:3,
142:9, 143:13,
178:11, 218:4

stand
223:7

stands
35:18

stansbury
16:12, 120:23,
120:24, 130:15,
141:13, 181:8,
193:22, 197:23,
202:14, 206:9,
232:10, 233:2

starbucks
174:7

start
8:25, 61:21,
61:23, 61:24,
62:1, 89:4,
95:18, 206:23,
226:20

started
30:12, 30:17,
46:6, 55:23,
61:25, 62:8,
79:8, 178:15,
185:8, 190:5,
217:15, 228:15,
234:15

starting
217:12

starts
53:24

state
2:9, 238:23

stated
80:17, 198:4

statement
42:17, 43:4,
45:10, 86:21,
199:6, 201:16,
204:22, 224:24,
232:20, 232:25

statements
157:3, 157:5,
157:8, 227:17,
228:1

states
1:1, 54:9

status
180:22, 212:5

steadaker
16:25

**stenographically**
238:6
**step**
42:8, 75:7,
99:13, 99:20,
102:5, 102:9,
112:6
**steps**
41:25, 42:2,
61:8, 73:3,
83:20, 90:20,
103:6, 128:21,
193:3, 193:5,
219:6
**steve**
124:3
**sticks**
212:2
**still**
23:9, 23:15,
54:15, 54:22,
69:16, 104:14,
112:12, 156:13,
187:15, 194:15,
216:5
**stipulate**
8:3
**stoff**
3:14, 10:23,
82:17, 97:18,
104:6, 175:3,
237:5
**stop**
54:4, 54:14,
75:8, 81:18,
81:20, 103:17,
147:4
**story**
200:9, 201:1
**straight**
138:25
**straightforward**
199:20
**strange**
109:2, 174:22,
174:23, 177:10,
177:13
**strategic**
32:23, 134:2,

134:4
**strengthen**
128:21
**strengthening**
124:10
**strike**
109:2
**string**
201:23
**strong**
128:14
**structure**
36:20
**structured**
213:7
**student**
20:10, 38:2,
38:3, 38:9,
55:21, 58:16,
58:19, 59:1,
59:2, 59:17,
160:11, 160:20,
161:16, 161:18,
162:7, 163:7,
164:23, 164:25,
166:21, 167:18,
167:20, 168:14,
170:2, 170:4,
170:7, 170:20,
170:22, 170:24,
171:15, 171:17,
171:22, 173:4,
173:9, 174:16,
175:5, 175:16,
178:1, 178:12,
189:4, 189:6,
219:19, 221:2,
221:21, 226:1,
226:3, 226:21,
226:22, 228:11,
233:19, 233:25
**student-related**
38:7, 38:9
**students**
20:5, 20:6,
58:22, 58:25,
61:10, 160:25,
161:4, 162:1,

162:14, 165:1,
165:4, 165:6,
174:5, 174:18,
175:19, 176:12,
179:17, 221:7,
221:11, 226:23,
227:4, 228:1,
228:18
**stuff**
57:4, 115:9,
182:12, 194:13
**style**
74:15, 74:18
**subjecting**
58:8
**submit**
157:3
**submitted**
122:5, 122:10,
141:15, 228:11
**subordinate**
41:1, 129:12
**subpoena**
25:14, 115:4,
139:15
**subsequently**
58:13
**substance**
169:12, 232:19
**substantive**
114:12, 235:24
**sue**
70:20, 116:1,
116:6, 116:16,
157:16, 157:19,
157:22, 204:7,
205:10, 217:9
**suffered**
201:24
**suggest**
118:17
**suggested**
93:10
**suggestion**
222:22
**suing**
116:9, 157:12
**summarizing**
137:22

**summary**
74:3, 96:22,
96:24, 150:10,
150:14, 151:24
**supervise**
37:6
**supervised**
34:9, 37:7,
37:9, 37:12
**supervisor**
41:11, 41:12,
41:18, 41:22,
77:9, 80:18,
81:14, 81:16,
81:20, 81:24,
87:16, 110:6,
184:1, 184:4,
230:23
**supplemental**
118:17
**support**
34:15, 49:2,
50:4, 51:5,
53:6, 134:2,
134:3, 134:5,
143:13
**supported**
33:3, 33:14,
34:12
**supporting**
150:6
**supports**
92:8
**supposed**
41:13, 72:16,
120:18, 146:11,
146:15, 146:25,
189:1, 227:21,
228:20
**sure**
11:10, 19:3,
22:6, 22:7,
25:12, 26:7,
27:6, 28:17,
29:4, 34:5,
35:12, 35:19,
43:19, 44:21,
46:1, 46:4,

51:18, 61:17,
62:10, 66:22,
70:10, 71:20,
72:1, 77:15,
82:9, 83:21,
85:14, 89:6,
90:3, 90:19,
90:20, 92:10,
92:18, 92:19,
99:3, 100:15,
124:14, 125:24,
126:5, 126:8,
126:15, 127:13,
129:4, 139:24,
146:13, 146:20,
148:15, 149:2,
150:21, 151:7,
152:14, 152:18,
153:18, 154:1,
154:3, 159:18,
172:17, 173:1,
180:17, 183:2,
190:21, 204:12,
204:14, 212:11,
213:24, 218:8,
224:14, 226:10,
227:11, 229:15,
237:4
**surprised**
10:19
**suspend**
198:14
**suspended**
197:25, 201:18
**suspension**
190:15, 191:1,
198:3, 200:14,
202:4, 204:23,
205:7, 206:10,
207:15
**suspicion**
236:4
**swearing**
8:3
**switch**
24:16, 54:18,
61:20
**system**
1:9, 60:16,

60:24, 78:8,
78:16, 119:19,
129:10, 129:15,
129:20, 147:16,
147:20

---
**T**
---
**table**
39:22, 196:5
**tablet**
11:23
**tag**
98:23
**take**
9:14, 19:1,
19:5, 19:11,
19:17, 20:12,
20:21, 21:12,
21:17, 21:21,
21:24, 22:4,
22:5, 22:23,
25:19, 29:22,
42:15, 42:16,
43:3, 45:8,
53:23, 61:8,
61:14, 75:13,
83:20, 84:2,
85:12, 91:16,
95:4, 95:9,
107:9, 109:11,
113:7, 113:9,
113:11, 117:1,
126:23, 127:5,
130:4, 134:16,
148:19, 149:18,
152:6, 159:21,
162:3, 168:8,
170:17, 171:7,
187:17, 196:5,
206:5, 207:9,
211:8, 211:14,
214:17, 220:19,
221:19, 230:20,
232:18, 232:20
**takeaway**
198:17
**taken**
22:3, 61:18,

69:20, 85:15,
90:25, 103:6,
113:23, 118:15,
159:19, 168:11,
169:3, 212:10,
221:11, 232:3,
238:3, 238:6
**taker**
18:21, 126:25,
127:1
**takes**
59:11
**taking**
8:24, 18:17,
18:25, 19:12,
19:20, 20:2,
90:19, 117:17,
146:19, 196:2,
203:19, 207:1
**talk**
13:7, 17:11,
18:16, 19:15,
24:17, 40:11,
40:12, 41:23,
45:18, 46:4,
49:18, 54:18,
54:21, 66:21,
67:9, 74:22,
75:19, 76:22,
89:2, 92:4,
104:25, 114:1,
115:25, 123:5,
131:13, 131:14,
131:25, 132:2,
133:13, 139:22,
139:25, 141:5,
148:23, 149:23,
156:6, 178:19,
181:6, 183:9,
188:15, 191:21,
194:13, 194:19,
216:2, 216:23,
219:5
**talked**
24:10, 24:11,
44:6, 76:3,
76:17, 87:17,
92:10, 94:22,

99:1, 106:25,
114:4, 116:4,
121:17, 127:3,
128:17, 134:14,
142:20, 143:8,
147:25, 158:22,
162:22, 166:11,
178:23, 180:21,
182:5, 183:8,
185:11, 193:1,
205:13, 219:17,
230:17, 232:5,
234:22
**talking**
9:20, 61:21,
61:24, 66:17,
85:17, 99:2,
116:15, 122:16,
128:16, 133:17,
133:24, 138:4,
140:2, 142:1,
157:11, 165:19,
166:12, 167:13,
168:14, 168:19,
178:24, 183:17,
194:23, 217:8,
218:10
**tandem**
48:20, 48:21
**tania**
4:3, 237:3,
237:5, 237:7
**tapes**
69:23, 72:3
**tasked**
189:5
**tasks**
64:21, 65:2,
75:3, 75:18,
78:6, 80:5,
81:15, 85:21,
87:21, 92:23,
99:25, 103:23,
105:16
**taylor**
1:23, 2:8,
238:2
**team**
17:6, 31:6,

33:11, 33:15,
35:14, 42:4,
48:12, 50:6,
51:8, 58:11,
61:9, 125:4,
125:9, 131:23,
138:21, 169:15,
169:20, 171:21,
183:24, 215:18,
219:11, 222:16,
231:1, 236:18

**teams**
17:25, 18:1,
18:2, 18:13,
31:4, 31:5,
31:6, 31:21,
32:22

**tech**
1:11, 12:13,
12:16, 12:18,
13:2, 13:11,
13:22, 13:24,
14:1, 14:4,
14:10, 15:9,
15:15, 17:13,
17:22, 22:14,
22:19, 23:1,
23:15, 24:9,
24:20, 26:22,
27:8, 28:1,
30:2, 30:15,
31:10, 34:18,
35:23, 38:6,
39:19, 40:13,
40:16, 43:24,
53:10, 55:2,
55:23, 57:11,
58:17, 62:1,
62:9, 63:19,
70:3, 78:15,
79:6, 100:4,
101:3, 101:17,
114:24, 122:4,
123:10, 123:14,
123:18, 127:20,
128:12, 128:22,
153:1, 157:12,
162:18, 165:10,

173:6, 175:10,
176:1, 178:19,
180:21, 189:17,
198:12, 199:23,
211:19, 228:12,
230:5

**tech's**
31:23, 52:25,
228:9, 236:16

**tech-issued**
12:19

**technical**
34:5, 38:5

**technically**
33:25, 68:16

**technician**
4:12

**technology**
201:19

**teem**
168:20

**telephone**
78:11, 203:14,
212:13

**tell**
9:2, 15:19,
20:1, 43:1,
44:16, 45:20,
46:15, 49:22,
58:7, 63:13,
63:23, 64:15,
65:18, 66:23,
67:14, 75:20,
77:20, 89:20,
100:2, 102:4,
120:1, 134:13,
155:6, 161:8,
187:24, 189:11,
196:23, 196:25,
197:11, 197:13,
216:25, 222:3,
225:7

**tells**
170:3

**template**
73:20, 195:14

**ten**
61:15

**term**
23:18, 33:17,
38:5, 190:14

**termed**
33:25

**terminate**
102:3, 102:15,
199:18, 204:16,
230:14

**terminated**
14:9, 15:22,
22:13, 32:12,
112:22, 189:24,
232:24, 235:17

**terminating**
180:23

**termination**
14:13, 24:8,
119:24, 120:15,
189:11, 231:16,
231:18, 235:18

**terms**
45:14, 48:10,
49:8, 61:9,
73:17, 84:8,
85:3, 86:2,
91:1, 92:11,
141:6, 156:9,
156:19, 189:17

**terrible**
152:18

**testified**
82:18, 104:7

**testify**
114:10

**testimony**
8:5, 8:14,
10:11, 12:1,
82:20, 114:1,
115:5, 160:3,
238:5, 238:6

**text**
10:17, 11:10,
13:13, 13:16,
13:19, 14:5,
15:8, 17:4,
17:9, 17:15,
17:19, 24:10,

139:13, 212:14,
219:1, 219:3,
223:12, 223:21,
224:1

**texted**
16:14, 139:22,
212:13, 223:14

**texting**
15:20, 15:22,
184:23

**th**
59:23, 60:1,
66:19, 69:3,
71:9, 72:18,
86:16, 91:14,
93:9, 95:19,
97:7, 106:13,
115:21, 132:22,
133:9, 138:1,
139:19, 139:21,
141:11, 142:8,
148:22, 149:5,
149:22, 150:11,
158:6, 158:16,
160:17, 161:14,
161:24, 163:12,
167:12, 178:10,
178:14, 180:4,
180:13, 190:3,
191:11, 197:22,
201:14, 202:13,
203:22, 203:23,
203:25, 204:20,
205:6, 205:11,
206:8, 223:13,
229:17

**thank**
8:20, 59:10,
218:2, 237:1

**thanks**
66:19

**themselves**
136:13

**thereafter**
238:7

**thing**
9:22, 15:16,
37:17, 53:15,

65:20, 78:3,
102:21, 102:23,
104:4, 109:3,
109:13, 112:3,
124:15, 200:16,
217:14, 225:14,
226:19, 232:21
**things**
13:7, 26:5,
26:6, 26:8,
34:23, 35:22,
56:1, 57:21,
64:17, 68:23,
68:25, 72:4,
82:3, 98:8,
98:16, 99:23,
107:16, 113:8,
113:12, 114:4,
114:17, 117:22,
118:25, 131:4,
134:9, 135:25,
152:17, 166:7,
169:10, 183:23,
185:16, 197:8,
211:1, 211:3,
211:4, 212:1,
215:12, 225:6,
226:12
**thinks**
45:21, 199:1
**third**
88:23, 117:14,
136:14
**thompson**
80:9, 80:11,
80:13, 80:19,
81:7, 81:8,
81:13, 81:17,
81:19, 81:25,
82:7, 82:10,
82:25, 83:5,
83:13, 84:7,
84:16, 85:1,
85:6, 85:18,
85:20, 85:24,
86:24, 87:1,
87:9, 87:11,
87:12, 87:20,

87:21, 87:22,
88:9, 105:3,
105:19, 105:22,
106:2, 106:6,
106:7, 106:9
**thompson's**
80:15, 81:13,
81:16, 87:7,
87:15, 104:18
**thought**
26:12, 26:19,
49:13, 81:6,
94:24, 121:12,
187:4, 188:7,
206:19, 209:22,
222:9, 230:3
**thoughtful**
18:21
**thoughts**
66:20, 229:20,
229:23, 231:25
**thread**
206:12, 219:3,
219:16
**threatening**
205:10
**threatens**
115:25, 116:1
**three**
29:7, 87:11,
88:4, 88:22,
109:18, 131:25,
163:20, 168:9,
220:13, 228:8,
231:24
**threw**
23:11
**through**
15:18, 19:25,
27:18, 28:16,
28:25, 31:1,
39:9, 41:25,
42:23, 55:25,
57:3, 65:8,
68:24, 71:19,
73:15, 113:4,
116:3, 122:7,
122:8, 126:1,

126:5, 126:12,
129:4, 135:17,
144:13, 144:17,
149:7, 181:24,
189:11, 197:3,
199:4, 208:3,
224:14, 227:23,
227:25, 228:1,
228:3, 234:5
**throughout**
49:3, 184:20
**tied**
233:12
**tier**
57:10
**till**
214:5
**time**
9:16, 14:4,
24:7, 30:16,
30:23, 54:22,
56:23, 60:20,
61:24, 65:7,
66:25, 68:4,
69:22, 72:23,
77:8, 77:20,
80:16, 83:19,
88:13, 88:14,
93:13, 98:1,
101:2, 101:16,
104:17, 108:9,
113:13, 116:5,
133:1, 135:11,
140:20, 142:20,
143:18, 145:14,
147:2, 148:25,
149:4, 150:2,
151:2, 152:9,
154:24, 155:22,
157:10, 157:21,
158:14, 158:21,
160:10, 161:11,
163:15, 163:19,
163:20, 164:24,
165:6, 169:17,
169:18, 176:1,
184:1, 184:17,
185:7, 189:10,

191:17, 192:7,
203:19, 211:17,
226:24, 235:9,
237:2
**timeframe**
127:12, 140:21,
175:11
**timeline**
142:18, 192:1,
223:16
**timeliness**
192:20
**timely**
154:5, 166:3
**times**
50:4, 51:13,
58:1, 102:2,
102:6, 112:2
**timing**
32:14, 77:16,
149:9, 197:3,
212:16, 212:18,
220:8
**tired**
218:1
**title**
36:12, 36:13,
36:14, 52:14,
52:16, 52:24,
59:8, 130:22,
130:24, 131:2,
135:19, 136:21,
141:14, 142:17,
142:21, 144:12,
145:2, 145:4,
146:5, 146:9,
158:18, 179:4,
179:10, 179:11,
179:12, 179:18,
182:3, 233:12,
233:13
**today**
8:21, 8:24,
10:6, 10:12,
11:9, 11:13,
11:23, 12:1,
24:8, 83:4,
113:10, 114:11,

140:1, 192:25,
197:25, 203:5,
223:17, 237:2
**today's**
216:8
**todd**
16:12, 120:22,
120:24, 130:15,
141:12, 193:2,
193:5, 193:22,
197:23, 202:14,
202:24, 206:9,
232:9, 233:2
**todd's**
141:14
**together**
85:2, 109:19,
110:9
**told**
44:18, 58:10,
60:17, 75:20,
75:23, 93:25,
145:8, 147:4,
147:7, 159:3,
161:11, 173:8,
179:7, 189:14,
189:19, 189:23,
196:7, 196:10,
208:21, 226:3,
226:12, 227:19,
227:22, 228:16,
228:21, 228:24
**tomorrow**
163:20, 223:18
**tomorrow's**
214:23
**took**
20:14, 20:23,
20:24, 21:20,
22:3, 22:21,
23:6, 23:8,
32:15, 126:24,
153:1, 172:13,
221:12, 221:23
**top**
37:4, 115:19,
164:15, 167:11,
178:8, 181:22,

207:11, 216:5,
216:6
**topics**
129:21, 188:15
**total**
37:21, 37:24
**totally**
34:22, 90:1
**touch**
49:1
**tough**
79:4, 199:19
**toxic**
225:23, 235:22,
236:9
**track**
100:12, 102:14,
106:25, 127:3
**traffic**
209:8
**training**
36:17
**trainings**
36:8, 36:11,
36:15
**transcribing**
9:7
**transcript**
5:7, 8:7, 238:4
**transfer**
187:7
**transferring**
187:9
**transmitted**
96:9, 173:6
**transmitting**
88:24, 96:7,
176:20, 176:25
**treat**
157:22, 235:19
**treated**
35:6, 66:14,
77:22, 83:9,
85:3, 85:24,
85:25, 94:9,
104:14, 179:4
**treating**
76:18, 202:17,

211:19
**treatment**
66:6
**trends**
61:5, 61:8
**triage**
125:4, 125:7,
125:8, 126:22,
127:9, 145:18,
153:19, 153:22,
159:13, 159:16,
159:22, 163:8,
165:25, 168:18,
168:20, 168:23,
169:15, 178:22,
191:24, 214:23,
215:2, 215:10,
215:18, 216:8,
231:8, 232:5,
232:10
**triaged**
145:8
**tried**
72:1, 88:11,
92:6
**tries**
140:7
**trouble**
76:14
**true**
8:5, 8:14,
60:6, 166:25,
189:2, 189:7,
200:8, 200:24,
238:4
**truth**
9:2, 188:19,
200:4, 228:7,
228:13
**try**
32:19, 38:25,
41:18, 43:24,
45:25, 49:17,
54:10, 74:22,
100:11, 123:4,
127:4, 152:17
**trying**
35:11, 44:21,

45:15, 77:16,
77:17, 77:18,
90:19, 92:9,
96:16, 111:15,
113:3, 125:6,
127:2, 135:23,
138:25, 140:10,
141:7, 142:4,
149:4, 149:6,
151:7, 155:23,
156:11, 158:17,
169:20, 171:19,
179:2, 194:12,
195:21, 203:18,
203:20, 217:13,
220:9, 231:20,
236:12
**tucker**
16:8, 20:18,
138:12, 138:15,
138:19, 138:24,
139:21, 140:8,
142:5, 143:14,
143:18, 148:22,
149:22, 149:25,
150:7, 150:17,
158:5, 159:16,
160:16, 161:8,
163:13, 164:8,
164:19, 166:21,
174:6, 174:18,
175:19, 175:20,
175:22, 176:17,
177:2, 179:16,
188:24, 228:9
**tucker's**
154:21
**tuesday**
219:6, 219:8,
220:17
**tuesday's**
107:18
**twice**
61:3
**twitter**
198:4, 200:16
**two**
71:13, 74:4,

84:23, 84:25,
99:23, 100:6,
117:11, 118:9,
122:3, 123:25,
133:9, 139:24,
150:15, 151:13,
151:16, 153:8,
165:3, 165:6,
166:21, 170:4,
209:9, 228:10,
231:19, 231:21

**type**
21:21, 26:1,
48:1, 57:22,
86:23, 102:25,
135:20, 145:10,
152:17, 159:19

**typed-up**
18:19

**typer**
22:7

**typewriting**
238:7

**typical**
52:3, 52:4,
167:1, 193:17,
194:6, 225:1,
233:9

**typically**
42:16, 45:17,
47:17, 48:11,
48:17, 49:4,
49:12, 54:9,
58:21, 58:24,
89:20, 96:10,
97:4, 101:7,
103:4, 103:9,
110:16, 118:1,
125:23, 137:12,
150:23, 151:1,
166:22, 171:9,
171:11, 171:18,
175:1, 175:13,
193:13, 194:1,
213:5, 214:25,
216:11, 230:20,
230:25

**typos**
22:8, 51:18

## U

**uh-huh**
29:12, 42:7,
48:3, 60:14,
80:7, 112:7,
114:8, 185:14

**uh-uh**
188:9

**ultimate**
110:18

**ultimately**
25:2, 49:19,
51:24, 89:25,
90:10, 179:8,
194:8, 213:2,
213:4, 235:16

**unchecked**
26:25

**uncover**
228:7

**under**
8:6, 8:14, 9:1,
9:2, 26:3,
29:23, 44:15,
108:22, 128:8,
155:4, 197:10,
230:24, 234:16,
234:18, 238:7

**undergraduate**
29:6

**underline**
103:19

**undermine**
130:17, 132:5

**understand**
9:3, 9:11,
24:19, 34:22,
43:8, 43:10,
55:20, 63:1,
66:15, 69:17,
142:18, 147:18,
148:17, 164:23,
166:17, 169:2,
178:13, 198:18,
217:13, 227:13

**understanding**
12:15, 19:22,

20:25, 26:8,
40:14, 56:11,
63:2, 78:18,
99:15, 110:10,
146:22, 147:1,
165:5, 173:9,
173:14, 179:6,
188:18

**understands**
236:15

**understood**
70:9, 82:10,
173:1, 227:23

**undivided**
10:2

**unethical**
128:23

**unfair**
66:6

**unhappy**
32:18, 139:5

**unhealthy**
225:23

**unique**
9:23

**united**
1:1

**university**
1:9, 78:8,
78:16, 108:20,
119:19

**unless**
103:10, 169:12

**unnecessarily**
198:8

**unrelated**
113:2

**until**
18:11, 18:14,
41:25, 75:14,
84:18, 109:18,
161:24, 228:19

**unusual**
176:6, 220:4

**unwelcome**
235:25

**upcoming**
115:22

**update**
51:2, 107:23,
212:12

**updated**
37:3, 52:8,
214:1, 214:2

**updates**
50:20, 50:23,
212:5, 212:7,
212:8, 212:15,
212:16, 212:22,
216:8

**upheld**
58:12

**upload**
215:9

**upset**
207:14, 225:6

**urgent**
163:22, 164:3,
164:4

**use**
13:3, 13:4,
13:16, 13:19,
14:23, 18:5,
18:9, 33:17,
40:24, 47:20,
56:7, 65:7,
75:23, 78:11,
78:12, 79:4,
120:12, 215:21,
225:9

**usg**
54:8, 74:16,
78:9, 78:13,
78:17, 78:18,
78:21, 79:1,
79:10, 118:14,
118:18, 119:13

**usg's**
10:18, 10:22,
114:6, 235:1,
235:3

**using**
15:5, 18:13,
18:14, 65:1,
75:2, 92:21,
103:22, 105:3,

105:13, 105:14,
236:18
**usual**
180:19
**usually**
47:22, 49:3,
92:12, 101:9,
103:6, 119:21,
169:9, 172:10,
196:23, 197:2,
230:18, 233:5

---
**V**
---

**vague**
179:23
**values**
118:18
**varied**
192:20
**various**
31:14, 53:3
**vehicle**
99:9
**verbal**
58:9, 74:24,
74:25, 75:6,
76:1, 87:23,
88:3, 208:22,
236:1
**verbally**
105:22
**verified**
8:9
**via**
59:23, 198:3,
215:6
**vice**
127:25, 234:9
**view**
125:3
**viewed**
60:19
**violate**
119:18
**violated**
78:20, 235:1,
235:5, 235:21
**violates**
78:25

**violating**
79:10
**violation**
43:9, 76:4,
79:15, 83:16,
102:25, 103:15,
105:8, 105:11,
106:4, 119:23,
135:18, 235:7,
235:12
**violations**
118:13, 119:13,
136:21, 182:14,
182:18
**violence**
186:23, 187:1
**virtually**
1:17, 2:1
**visibility**
126:15, 154:3
**visit**
128:24
**voluntary**
25:1
**vp**
30:18, 30:19,
68:6, 68:10

---
**W**
---

**wait**
154:15, 194:16
**waited**
84:17, 161:20,
161:24
**waived**
237:9
**walk**
31:1, 181:24
**want**
9:19, 20:1,
27:17, 28:23,
44:12, 45:16,
54:1, 54:7,
54:13, 54:22,
56:17, 58:10,
76:13, 89:25,
92:11, 92:12,
92:18, 96:13,

96:14, 102:2,
102:4, 113:20,
114:3, 144:1,
145:17, 146:4,
147:18, 148:2,
152:18, 161:5,
172:23, 182:13,
192:3, 205:22,
207:25, 208:3,
221:19, 227:11,
232:1
**wanted**
19:4, 51:2,
56:16, 56:23,
72:25, 82:9,
90:18, 91:4,
99:3, 99:5,
100:14, 107:15,
107:23, 108:17,
110:12, 125:24,
126:5, 126:8,
126:15, 149:12,
154:3, 163:14,
167:16, 192:21,
208:13, 211:7,
215:10, 216:22,
220:20
**wants**
67:3, 106:14,
141:13
**warden**
38:1
**warning**
74:24, 74:25,
75:6, 76:1,
85:8, 86:16,
86:18, 87:2,
87:23, 88:21,
89:18, 90:16,
92:4, 96:5,
97:15, 98:6,
98:22, 99:8,
99:17, 99:19,
100:10, 101:4,
102:11, 103:5,
103:7, 104:21,
104:25, 105:7,
105:24, 106:8,

106:10, 106:15,
106:17, 106:20,
108:2, 108:22,
110:1, 111:5,
111:7, 112:5,
112:18, 115:24,
117:6, 117:7,
117:10, 118:5,
119:1, 119:5,
119:6, 119:12,
119:22, 120:11,
120:18, 121:24,
122:5, 122:6,
208:23, 231:17,
231:18
**warnings**
101:19
**warrant**
119:14, 119:24,
119:25, 198:5
**warranted**
209:2
**wasch**
16:17, 52:21,
52:23, 69:1,
69:4, 69:15,
70:15, 71:10,
84:6, 84:8,
93:7, 93:9,
104:25, 108:16,
111:3, 112:9,
125:12, 136:11,
150:12, 150:18,
151:1, 151:5,
151:10, 152:10,
155:14, 155:15,
156:18, 191:12,
191:21, 199:7,
203:1, 203:12,
205:3, 205:5,
205:15, 206:12,
214:22
**wasch's**
206:11
**washington**
3:10, 4:7
**water**
223:5

**way**
8:8, 13:16,
25:24, 43:20,
44:9, 50:19,
61:23, 66:15,
85:23, 85:24,
90:22, 112:12,
122:2, 171:14,
172:10, 172:15,
183:24, 191:19,
209:20

**ways**
17:12, 100:17,
125:22

**we'll**
31:9, 141:19

**we're**
11:7, 31:1,
44:20, 53:10,
54:21, 58:6,
68:24

**we've**
17:14, 46:1,
46:24, 180:17

**web**
12:5, 12:6

**webb**
205:16, 205:17,
206:12

**week**
95:23, 96:15,
132:22, 156:5,
191:14

**weekly**
125:17

**weeks**
133:10

**weird**
11:19, 95:14

**welsh**
4:12

**went**
22:6, 24:4,
51:9, 72:13,
81:17, 82:11,
118:9, 145:4,
147:4, 206:24,
227:23, 227:25,

228:1, 228:3

**weren't**
212:9

**whatever**
96:7, 102:3,
188:25

**whatsapp**
17:19

**wherein**
87:12

**whereof**
238:14

**whether**
15:19, 19:20,
80:4, 81:4,
81:6, 90:15,
99:24, 100:1,
108:20, 119:8,
163:9, 179:3,
180:23, 187:14,
187:15, 188:23,
189:6, 199:18,
200:7, 205:10,
218:3, 222:21,
235:1, 235:4,
235:15

**white**
72:20, 72:21,
80:12, 80:14,
84:6, 88:6,
91:14, 111:4,
111:5

**whoever**
38:17, 41:8,
50:20, 51:8,
57:14, 101:15

**whole**
30:23, 56:23,
65:19, 78:15,
88:8, 109:13,
134:11, 224:18,
232:20

**wide**
144:23, 146:1

**willis**
123:5, 143:11

**wilmerhale**
4:5

**within**
31:10, 31:22,
38:4, 38:6,
154:20, 165:25

**without**
25:17, 43:21,
44:10, 198:1,
201:18

**witness**
8:4, 8:9, 8:12,
8:16, 25:16,
61:17, 67:17,
85:14, 91:23,
93:5, 97:21,
113:6, 113:11,
113:15, 148:14,
148:16, 168:10,
197:20, 223:2,
223:8, 231:20,
232:2, 233:24,
238:14

**witnesses**
49:1, 67:16,
185:24, 224:24,
225:2

**woman**
62:3, 66:3,
183:11

**women's**
17:6, 138:21,
154:17, 155:8,
191:15, 197:25,
201:17, 203:2,
203:15, 203:16,
204:25, 205:12,
218:5, 219:11,
222:16

**wondering**
26:8, 45:10,
66:8, 96:8

**word**
71:22, 79:4,
117:2, 117:3,
127:4, 234:4,
234:5

**wording**
99:1, 120:16

**work**
13:17, 13:20,

14:24, 15:3,
15:4, 15:6,
29:17, 30:2,
31:18, 41:21,
49:5, 49:8,
49:14, 62:23,
65:8, 76:10,
76:12, 80:18,
80:23, 84:8,
86:23, 87:14,
101:10, 113:21,
127:20, 141:7,
149:7, 193:20,
236:2

**work-issued**
14:6, 14:16,
15:3, 17:14

**work-related**
13:7, 15:12,
18:7

**worked**
29:7, 35:14,
48:7, 53:1,
59:8, 61:22,
63:15, 92:12,
92:14, 92:16,
110:14, 138:21,
192:11, 222:15

**working**
27:13, 28:6,
29:15, 35:21,
35:22, 39:5,
39:6, 48:20,
62:8, 68:7,
68:12, 68:18,
68:19, 72:24,
90:24, 97:25,
128:10, 156:12,
179:20, 193:18,
193:24, 213:6

**workplace**
186:23, 187:1

**works**
38:23, 42:6

**world**
175:17

**worries**
148:17

**wouldn't**
11:17, 44:2,
48:21, 75:13,
85:2, 89:21,
97:4, 102:7,
102:8, 102:22,
120:3, 136:12,
153:4, 162:2,
166:4, 169:17,
194:5, 197:1,
213:1, 213:21,
221:23, 226:23,
235:7, 235:8

**wrap**
223:22, 231:21

**wrapped**
84:11, 204:8

**wrist**
81:25, 105:20

**write**
43:3, 45:9,
45:10, 50:16,
86:18, 111:18,
111:21, 174:19,
175:14, 175:19,
175:21

**write-up**
151:11, 189:1

**writes**
88:22

**writing**
117:22

**written**
35:8, 36:1,
62:18, 62:19,
85:8, 86:16,
86:18, 87:2,
88:20, 89:18,
90:16, 92:4,
92:9, 97:15,
97:19, 98:6,
98:22, 99:8,
99:17, 99:19,
99:21, 100:10,
101:4, 101:12,
101:19, 102:11,
103:5, 103:6,
104:21, 104:25,

105:6, 105:23,
106:8, 106:10,
106:15, 106:17,
108:2, 110:1,
111:5, 111:7,
112:5, 112:18,
115:23, 117:6,
117:7, 117:10,
117:13, 117:15,
118:5, 119:1,
119:5, 119:6,
119:22, 120:11,
120:18, 122:5,
122:6

**wrong**
149:11

**wrongdoing**
19:9, 54:6,
147:13

**wrote**
172:23

**X**

**x**
1:4, 1:14

**Y**

**yeah**
28:22, 31:6,
40:24, 55:4,
59:19, 73:9,
75:1, 92:6,
92:13, 94:24,
95:13, 103:24,
113:9, 120:21,
121:12, 122:8,
126:7, 127:5,
137:18, 149:9,
150:1, 173:3,
180:2, 185:1,
188:7, 193:17,
197:14, 199:4,
212:14, 213:3,
217:7, 226:3

**year**
15:21, 18:12,
19:25, 20:17,
39:12, 105:25

**years**
87:12, 88:4

**yep**
93:16

**yesterday**
107:19, 108:19,
201:18

**yood**
4:4

**0**

**00**
113:17, 180:4

**00001**
6:13, 139:9,
218:24

**00004**
7:10, 223:1

**000583**
6:22, 181:16

**0006961**
6:8, 116:22

**001140**
6:21, 177:17

**001146**
7:5, 202:19

**001200**
158:8

**001270**
5:16, 72:9,
72:15

**0015476**
5:12, 55:15

**0016023**
6:10, 129:23

**001626**
6:15, 148:11

**001739**
6:17, 158:9

**002053**
7:3, 197:17,
204:19

**0024650**
7:13, 233:21

**002826**
6:18, 164:10

**003109**
6:20, 170:13

**003231**
7:8, 214:12

**003553**
7:7, 207:5

**004376**
5:23, 95:5

**004379**
6:4, 109:6,
109:7

**004382**
7:9, 217:19

**004390**
6:24, 195:2

**004422**
6:14, 140:16

**004476**
5:22, 93:2

**004556**
7:12, 232:14

**004725**
5:20, 86:6

**004726**
5:21, 91:9

**004741**
6:3, 107:5

**004742**
6:5, 110:21

**004810**
5:18, 79:21

**00502**
1:8

**005124**
5:15, 71:3

**005386**
7:4, 201:7

**005517**
5:19, 83:23

**007585**
6:12, 134:18

**008748**
5:11, 39:15

**009330**
6:11, 132:15

**009702**
6:16, 6:19,
149:14, 167:6

**009883**
5:13, 65:12

**010033**
5:10, 36:22
**010654**
7:6, 206:1
**010695**
5:14, 67:21
**014323**
6:9, 126:18
**03226**
6:23, 191:4

**1**

**1**
113:17, 113:20,
113:21, 113:22,
113:23
**10**
5:19, 61:16,
66:19, 83:24
**100**
45:24
**102**
177:17
**107**
6:3
**109**
6:4
**11**
5:20, 85:13,
86:7, 91:14,
141:11, 142:8,
148:22, 149:5,
149:22, 158:6,
160:17, 202:25,
219:9
**110**
6:5
**112**
6:6
**113**
140:16
**1140**
3:11
**115**
6:7
**116**
6:8, 148:10
**1174**
12:23

**12**
5:21, 55:15,
91:10, 113:23,
150:11, 219:2
**126**
6:9
**1272**
73:24
**128**
158:8
**129**
6:10, 158:9
**13**
5:22, 93:3,
223:13
**132**
6:11, 164:10
**133**
149:14, 167:6
**134**
6:12
**139**
6:13
**14**
5:23, 95:6,
132:22, 234:8
**140**
6:14
**144**
181:16
**148**
6:15, 191:3
**149**
6:16
**15**
6:3, 60:1,
65:11, 107:6,
113:20, 232:1
**151**
195:1
**158**
6:17
**159**
201:6
**16**
6:4, 59:23,
93:9, 109:8,
113:23

**161**
202:19
**164**
6:18
**167**
6:19, 197:17,
204:19
**169**
206:1
**17**
6:5, 67:21,
110:22, 211:9
**170**
6:20
**171**
214:12
**1718**
3:8
**174**
217:19
**1766**
14:22
**177**
6:21
**18**
6:6, 72:8,
95:19, 97:7,
106:13, 112:25
**181**
6:22
**1875**
4:6
**19**
6:7, 69:3,
115:13
**191**
6:23
**194**
207:5
**195**
6:24
**197**
7:3
**198**
224:3
**1:-cv--tcb**
1:8
**1st**
234:18

**2**

**2**
181:23, 202:13,
202:25, 204:21
**20**
1:8, 1:18, 6:8,
71:3, 71:9,
72:18, 113:21,
113:22, 114:21,
116:23, 158:16,
161:14, 161:24,
163:12, 167:12,
203:22, 203:23,
229:17, 238:18
**20006**
4:7
**20009**
3:10
**2009**
29:17
**201**
7:4
**2016**
30:1, 55:22,
59:18, 61:23,
62:2, 62:3,
65:17, 68:6,
70:19, 74:4,
115:8, 231:17
**2017**
123:5
**2018**
15:20, 18:12,
19:24, 20:17,
32:5, 32:8,
37:8, 39:4,
39:12, 48:8,
123:4, 123:7,
123:8, 124:17,
127:12, 127:24,
130:13, 132:21,
184:3, 222:16
**2019**
15:20, 18:12,
19:24, 20:17,
32:5, 32:10,
37:3, 37:8,

39:4, 39:12,
48:8, 127:12,
138:22, 157:13,
184:3, 222:16,
234:8
**202**
3:11, 4:8, 7:5
**2020**
14:2, 18:14,
18:15, 24:22,
238:18
**2021**
1:18, 238:16
**205**
14:22
**206**
7:6, 232:14
**207**
7:7
**21**
1:18, 6:9,
94:21, 107:13,
126:19, 127:15,
127:24, 238:15
**213**
139:16
**214**
7:8
**215**
233:21
**217**
7:9
**22**
6:10, 107:17,
109:16, 129:24
**221**
109:6
**223**
7:10
**224**
7:11
**227**
132:15
**228**
170:13
**23**
6:11, 37:3,
132:16

**232**
7:12
**233**
7:13, 126:18
**234**
139:9, 218:23
**236**
223:1
**238**
1:22
**24**
6:12, 134:19,
139:19, 139:21
**25**
6:13, 80:17,
139:10, 178:10,
178:14, 180:4,
180:13, 181:23,
190:3, 191:11
**26**
6:14, 140:17,
237:8
**27**
5:9, 6:15,
148:12, 197:22,
205:6, 206:8
**28**
6:16, 133:9,
138:1, 149:15,
201:14, 202:13,
203:25, 204:20,
205:11
**29**
6:17, 86:16,
115:21, 158:10,
219:2
**299**
3:11

___ **3** ___

**3**
202:25
**30**
6:18, 79:21,
163:21, 164:11,
205:4, 220:13,
223:2, 223:4,
223:7

**30334**
3:17
**31**
6:19, 167:7
**32**
6:20, 170:14
**33**
6:21, 177:18
**3393**
3:18
**34**
6:22, 181:17
**35**
6:23, 80:18,
191:5
**36**
1:19, 5:10,
6:24, 83:23,
195:3
**37**
7:3, 197:18
**372825**
1:21
**38**
7:4, 201:8
**39**
5:11, 7:5,
113:23, 202:20

___ **4** ___

**4**
205:4, 205:5,
220:13
**40**
3:16, 7:6,
206:2
**404**
3:18, 139:16
**41**
7:7, 91:9,
207:6
**42**
7:8, 214:13
**43**
7:9, 93:2,
217:20
**44**
7:10, 223:9

**45**
7:11, 85:13,
205:15, 224:4
**46**
7:12, 232:15
**47**
7:13, 233:22
**470**
12:23
**49**
202:13, 202:25,
204:21

___ **5** ___

**5**
205:15, 223:2,
223:4, 223:7,
232:1, 237:8
**50**
95:4
**52**
107:5
**5248**
139:16
**544**
181:16
**55**
5:12, 61:16
**59**
205:5
**5th**
86:14, 104:24

___ **6** ___

**6000**
4:8
**63**
110:21
**65**
5:13
**656**
3:18
**663**
4:8
**67**
5:14, 6:7,
115:12
**69**
6:6, 112:24

| 7 | 994 | |
|---|---|---|
| **7-type** | 14:22 | |
| 136:21 | | |
| **71** | | |
| 5:15 | | |
| **72** | | |
| 5:16, 5:17 | | |
| **74** | | |
| 116:22 | | |
| **77** | | |
| 5:23, 95:5 | | |
| **78** | | |
| 86:6 | | |
| **786** | | |
| 12:23 | | |
| **79** | | |
| 5:18 | | |
| **7th** | | |
| 132:21, 217:4 | | |

| 8 |
|---|
| **8-1** |
| 5:16, 72:10 |
| **8-2** |
| 5:17, 72:10 |
| **83** |
| 5:19 |
| **86** |
| 5:20 |
| **89** |
| 129:23 |
| **8th** |
| 141:21, 155:10, |
| 158:4, 185:9, |
| 185:21, 219:2 |

| 9 |
|---|
| **9** |
| 1:19, 163:21, |
| 180:4 |
| **9057** |
| 3:17 |
| **91** |
| 5:21, 134:17 |
| **93** |
| 5:22 |
| **95** |
| 5:23 |