IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MACHELLE JOSEPH,

     Plaintiff,

v.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF
GEORGIA and GEORGIA TECH
ATHLETIC ASSOCIATION,

     Defendants.

CIVIL ACTION FILE

NO. 1:20-cv-502-TCB

## ORDER DENYING PLAINTIFF'S MOTION FOR SANCTIONS

## I.    Background

Plaintiff MaChelle Joseph, former head coach of the Georgia Tech women's basketball team, filed this action after her termination. She alleges that Defendants discriminated against her on the basis of her and her players' sex and retaliated against her following her complaints of differential treatment. Defendants deny Joseph's claims.

Joseph has filed a motion [168] for sanctions. She contends that Defendant Board of Regents of the University System of Georgia ("BOR") failed to take reasonable steps to preserve relevant text messages on work-issued phones of three witnesses while BOR was on notice of potential and actual litigation. She argues that the deleted messages are critical to demonstrating whether the investigation against her, the results of which formed the putative basis of her termination, was commenced in good faith.

At issue are text messages of (1) Lynn Durham, who at the relevant time served as chief-of-staff to George Peterson, then-president of Georgia Tech; (2) Joeleen Akin, associate athletic director of student-athlete development; and (3) Felicia Tucker, the former women's basketball player personnel administrator. Joseph argues that these individuals' text messages likely would have contained information that would have shown that the investigation into her was commenced for pretextual reasons.

Through discovery, Joseph sought documents—including text messages—related to the genesis of the investigation against her. On

November 9, 2020, Joseph's counsel notified counsel for the Georgia Tech Athletic Association ("GTAA") that its initial production was deficient. She requested that GTAA re-collect and produce all relevant text messages from the phone of certain relevant witnesses including Durham, Tucker, and Akin from September 1, 2018 through April 1, 2019. However, it was ultimately determined that access to these individuals' text messages for the relevant time period was lost.

Joseph contends that what she learned through discovery supports her belief that BOR manufactured a pretext to justify the investigation into her and that the relevant individuals played an important role in that process.

Joseph requests that the Court (1) deny summary judgment on the issue of pretext; (2) issue an instruction that a jury "must or may infer the destroyed text messages demonstrated the Custodians were attempting to solicit damaging allegations against Plaintiff for an unlawful purpose;" and (3) award her the costs and attorneys' fees incurred with respect to BOR's alleged spoliation. [168-1] at 29–30.

BOR responds that the commencement of the investigation was not pretext and that—just as importantly—the commencement of the investigation was not the cause of Joseph's termination. With respect to why the investigation was commenced, BOR states:

> If it appears as though Oliver-Staley, Durham, Akin, and Tucker all wanted an investigation to take place, it is for good reason: they did. Having heard, or at least been made aware of, the students' complaints, they were concerned about the welfare of the athletes and wanted to get to the bottom of things. Contrary to Joseph's claims, this is not evidence that they were unlawfully targeting her.

[189] at 6. BOR contends that Aisha Oliver-Staley, who at the time was interim general counsel and vice president for legal and ethical affairs, pushed for the investigation and that Todd Stansbury, Georgia Tech's athletic director, decided to terminate Joseph's employment based on the report. In other words, BOR argues, Joseph was terminated because of the results, not the commencement, of the investigation.

As discussed below, it is doubtful that the missing text messages would have benefitted Joseph's case. Regardless, Joseph has failed to

4

show that they were deleted in bad faith. Therefore, her motion for sanctions will be denied.[1]

## II.   Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.*" In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011) (quoting *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009)).

"[F]ederal law governs the imposition of spoliation sanctions." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (quoting *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)). However, courts in this district borrow a multi-factor test from Georgia spoliation law to determine whether spoliation sanctions are warranted. *Flury*, 427 F.3d at 944–45. The relevant factors include (1) prejudice to the non-spoiling party as a result of the destruction of

---

[1] In its response brief, BOR requests that the motion for sanctions be denied and that BOR be awarded its costs and fees in responding. Although the Court finds sanctions are not warranted, it will not award costs or fees.

evidence; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the spoiling party acted in good or bad faith; and (5) the potential for abuse if sanctions are not imposed. *Id.* at 945; *see also Tesoriero*, 965 F.3d at 1184 (quoting *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018)).

Further, Rule 37 of the Federal Rules of Civil Procedure addresses the spoliation of electronically stored information. *See* FED. R. CIV. P. 37(e). Rule 37(e) provides,

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;

6

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

The party seeking sanctions bears the burden of proof of the issue of spoliation and its legal elements. *In re Delta/AirTran*, 770 F. Supp. 2d at 1308 (citing *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 615 F.3d 1305, 1318 (11th Cir. 2010)).

The Eleventh Circuit has not yet determined whether the multi-factor *Flury* test is still applicable when a party seeks sanctions based on the spoliation of electronically stored evidence. *ML Healthcare Servs., LLC*, 881 F.3d at 1308.

Under the *Flury* test, "[s]poliation sanctions—and in particular adverse inferences—cannot be imposed for negligently losing or destroying evidence." *Tesoriero*, 965 F.3d at 1184. Instead, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Id.* (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)).

7

To find bad faith, the Court is not required to find malice. *Flury*, 427 F.3d at 946. However, it must find more than mere negligence, "which is insufficient to support spoliation sanctions under the law of this circuit." *In re Delta/AirTran*, 770 F. Supp. 2d at 1313 (citations omitted). Bad faith "generally means destruction for the purpose of hiding adverse evidence." *Tesoriero*, 965 F.3d at 1184 (quoting *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015)); *see also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009).

Likewise, to obtain an adverse inference instruction or a default judgment sanction under Rule 37(e), the Court must find "that the spoliating party 'acted with the intent to deprive another party of the information's use in the litigation.'" *ML Healthcare Servs., LLC*, 881 F.3d at 1308 (quoting FED. R. CIV. P. 37(e)(2)).

## III.   Discussion

### A.    Prejudice—Whether the Text Messages Were Crucial to Joseph's Case

Joseph has not shown a likelihood that the missing messages would have benefitted her case. Her problem is two-fold: (1) she does not provide evidence to justify an inference that the missing messages

would have demonstrated that the investigation was commenced for pretextual reasons; and (2) the individuals whose messages were deleted were not decisionmakers.

### 1.    Substance

Joseph fails to establish prejudice because she only speculates that the deleted messages would have helped her case. The following are messages to which Joseph points that were not preserved:

- Messages convening the meeting between Akin and the four complaining student-athletes to ask if they had provided documentation;

- Tucker's texts with the student-athletes from January 2019 through Joseph's termination;

- Possible texts between Tucker and Akin about the January 26 meeting;

- Texts between Tucker and Akin or with student-athletes between September 1, 2018 and February 18, 2019 (with none produced through April 1);

- Texts between Tucker and Akin with the doctor to whom Tucker referred two student-athletes;

- Texts between Durham and Peterson, Stansbury, Mark Rountree, and Kim Harrington about Joseph in 2018 and 2019;

9

- Texts between Tucker and student-athletes during the relevant time period, and between Akin and student-athletes before February 18, 2019; and

- Texts between Durham and Peterson and Harrington in 2018 and 2019 about Joseph.

Joseph relies on evidence that was produced in discovery to argue that the missing messages would have been favorable to her. None of the discovery to which she points, however, supports an inference that the missing messages likely would have shown pretext.

Discovery reveals that students from Joseph's basketball team began complaining to Tucker in the fall of 2018 about how Joseph treated them. Tucker (who already had concerns about how Joseph treated her players) put the students in touch with Oliver-Staley.

In January 2019, Oliver-Staley met with four of the complaining students. She testifies that the students appeared to have "genuine terror" at the meeting. [179] at 153:24-25. To make them more comfortable, she gave them her personal phone number. *Id.* at 101:15-20 ("In an effort to earn their trust, rightly or wrongly so, I gave them my personal e-mail, my personal phone number. And in giving them my

personal phone number, I said to them that I'm giving you my personal phone number so you know you can reach me any time.").

Despite having Oliver-Staley's personal phone number, the students still wanted to remain anonymous. *Id.* at 292:12-15 ("[T]hey just were terrified. They did not want to come forward themselves and stand on their own and say we are making these accusations."); 342:1-2 ("They did not want to be identified as the individuals who made the complaints.").

Oliver-Staley was hesitant to potentially impact Joseph's employment based solely on anonymous complaints. *Id.* at 154:7-13 ("[I]t would be unfair to Coach Jo[seph] to have unsubstantiated, uncorroborated allegations made against her that could impact her livelihood by people who were not . . . willing to come forward and say I am making these allegations. And I'm not prepared to do that.").

Thus, during the meeting, Oliver-Staley decided to have the students ask their parents to write letters to document the concerns. *Id.* at 154:16-19 ("I told them . . . if your parents are willing to send me something that says that they are corroborating what you're saying,

that would be helpful."). The students testify that Oliver-Staley asked for the letters at the meeting.

Following the meeting and receipt of the letters, GTAA hired the law firm Littler Mendelson to investigate Joseph. Oliver-Staley pushed for the investigation; Peterson agreed (as did Durham), and Peterson authorized the investigation.

After the conclusion of the investigation and receipt of the Littler Mendelson report, GTAA fired Joseph.

Joseph contends that the evidence that has been produced demonstrates that the students' initial complaints were too broad and unsubstantiated to warrant an investigation. She argues that Oliver-Staley's subsequent request for letters from parents and Georgia Tech administrators—including the relevant individuals—was a search for negative information about her.

A few days after the January 26 meeting, Akin met with the same four students and asked them if they had provided the requested documentation. Three of the students responded that they had not done so, and Akin told them they could send the documentation to her

12

personal email. And as discussed above, Oliver-Staley provided the students her own personal contact information.

Joseph argues that nontraditional communication methods (such as the Telegram app or via personal email) with the students about the letters, with the communications sometimes deleted, support an inference that the investigation was commenced for pretextual reasons. The Court disagrees.

As stated above, Oliver-Staley noted that the students seemed to have "genuine terror" in the meeting. To reassure them, she gave them her personal phone number. Tucker and Akin testify that their modes of communication arose from privacy concerns or concerns for the students' wellbeing. Whether they should have done so or whether their concerns were warranted is not the issue before the Court. But the Court does not find their proffered reasons so implausible as to demonstrate that the deleted texts were likely to contain information showing pretext.[2]

---

[2] Joseph also contends that the Court should infer pretext because Akin met with or gave her number to former players, though Tucker has stated that former

Joseph next points to the solicitation of the parent letters as evidence of pretext. She relies upon a text message from Durham before Georgia Tech retained Littler Mendelson stating that she believed athletic director Todd Stansbury wanted to use letters from parents to "negotiate" Joseph's departure.[3] However, Durham testifies that she was speculating when she sent the message. [181] at 111:18-20 ("I don't think he told me he would use them. That was my supposition."). More importantly, as discussed in greater detail below, Durham was not a decisionmaker with respect to Joseph's employment, so her statement is not sufficient to show pretext.

The Court finds that soliciting parent letters does not support an inference of pretext. As BOR states in its response, even after Oliver-Staley provided the students with her personal contact information, they wanted to remain anonymous. What they told her made her want

---

players had nothing to do with the complaints raised at the January 26 meeting. Nothing about that gives rise to the inference of pretext.

[3] BOR argues that this statement is inadmissible hearsay. Joseph argues that the statement is admissible pursuant to Federal Rule of Evidence 804(d)(2)(D). There is no such numbered rule. Even assuming the statement is admissible, it does not help Joseph's case.

14

to open an investigation, but she was reluctant to do so based solely on anonymous complaints. Thus, during the meeting, she decided to ask them to have their parents write letters to document the concerns; she then pushed for an investigation.[4] Oliver-Staley's choice to solicit parent letters in no way demonstrates pretext.

Joseph also refers to a text message from Durham to Oliver-Staley stating that she (Durham) hoped the final report had more details than the draft and that the draft was not as compelling as Durham had hoped it would be. This fails to show that the investigation was launched for pretextual reasons, and it certainly does not show that the missing messages likely would have contained evidence of pretext. The evidence to which Joseph points demonstrates that Georgia Tech correctly sensed that Joseph would make for a formidable adversary in any conflict that might arise. It does not, however, indicate *why* any individuals wanted the investigation to occur or why they wanted

---

[4] Joseph argues that two days after the January meeting, Oliver-Staley requested that Tucker solicit letters from parents and past players whom she trusted. However, as noted above, the evidence demonstrates that Oliver-Staley solicited the letters at the meeting. Tucker merely sent a follow-up text.

15

Joseph to leave Georgia Tech. The messages produced do not demonstrate that it is likely that GTAA launched the investigation or fired Joseph for a pretextual reason.

Joseph also points to testimony from a player who purportedly complained, noting that the student's initial complaint was that students and coaches told her that Joseph was bringing a negative attitude to practices and games, not that she—the student—personally had a problem with Joseph's coaching. Again, nothing about this gives rise to an inference of pretext.

Joseph further contends that the timing and escalation of the letters demonstrates that they were used as a pretext; only after Joseph filed her internal complaint of discrimination and retaliation on February 8 were the complaints escalated. The evidence does not support this contention. As BOR responds, one student's father sent his letter to his daughter three days after the meeting; the student delayed forwarding it because she did not know to whom she should send it. Another student forwarded her mother's letter to Tucker three days after the meeting; Tucker waited several days to pass it along because

she was nervous about the fallout, but testifies that the students were not reluctant.[5] Thus, the Court is not persuaded that the timing supports an inference of pretext.

Because Joseph fails to show that the evidence produced supports an inference of pretext, she logically would need to point to something specific with respect to what is known about the deleted messages that would support a finding that they likely contained evidence of pretext. This, however, she fails to do.

The substance of any of these messages is sheer speculation. Joseph provides no evidence to persuade the Court that any of them would likely demonstrate that the investigation was commenced for pretextual reasons. Because Joseph has failed to show that the evidence adduced in discovery indicates that the missing messages would likely contain evidence of pretext, the Court will not make that inference.

---

[5] Further, Oliver-Staley was checking in regularly with Tucker before receiving Joseph's February 8 complaint.

17

### 2.     Not Decisionmakers

As noted above, Joseph's attempt to show prejudice suffers from another problem: none of the individuals whose messages were deleted were decisionmakers with respect to her employment. Statements made by non-decisionmakers do not satisfy a plaintiff's burden of showing pretext. *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)). Indeed, BOR has produced every relevant text message with Stansbury, the decisionmaker. And Stansbury testifies that he terminated Joseph's employment based on the outcome, not the complaints leading to, the investigation. [182] at 231:1-3 (stating that the decision to terminate Joseph's employment "would have been decided around the reading and discussion of [the Littler] report.").

Hoffman, the investigator who prepared the report, testifies that he did not believe anyone from Georgia Tech was directing or unduly influencing his investigation and that he "had no reason to know or believe that" "Akin or anybody at Georgia Tech was soliciting negative

18

information about MaChelle Joseph from past or current players or parents." [186] at 60:17-21. The main focus of his report was the experience of the 2018–19 team. Indeed, he interviewed forty witnesses including the entire 2018–19 roster, all staff and assistant coaches with the program, several parents (including those of two of the complaining students), and witnesses identified by Joseph. Hoffman did not view or consider messages between Tucker and the complaining students.

A brief examination of each of the three individuals' roles in this situation further clarifies why the missing text messages are unlikely to be probative.

There is no evidence that Akin or Tucker played any part in the decision to terminate Joseph's employment. Indeed, Tucker was subordinate to Joseph, was not consulted on the decision to terminate Joseph's employment, and did not decide to ask for parent letters; there is no evidence that she was part of the decision to launch the investigation or that anyone responsible for making decisions related to Joseph's employment saw or relied on messages between Tucker and

19

any of the students. As BOR argues, her messages appear to be of limited—if any—usefulness.

Akin did not personally solicit information from parents and had limited contact with respect to the students' complaints. Specifically, she met with the students on only one occasion to ask if they had submitted the requested letters. That day, one student forwarded her father's letter to Akin. Akin provided names of potential witnesses to Hoffman, but many of those names were given to her by the students. Her text messages are similarly unlikely to be relevant.

And although Peterson solicited Durham's input, he made his own personnel decisions. Durham played no role in the investigation or in deciding to seek parent letters. The most relevant messages from Durham's phone would have been those with Oliver-Staley, who asked for the parent letters, and Stansbury, the final decisionmaker. Those messages were obtained through the other individuals' phones and produced. Therefore, the missing texts are of limited usefulness.

Because Joseph fails to show that the deleted messages likely contained evidence of pretext and because of the individuals' limited

roles, she fails to demonstrate that she has been prejudiced by the loss of the messages.

## B.    Bad Faith

Even if Joseph could show that she was prejudiced by lack of access to the messages, she fails to show that they were deleted in bad faith or with intent to deprive her of evidence. As stated above, bad faith generally means destruction for the purpose of hiding adverse evidence.

Joseph argues that BOR's steps to preserve were far from reasonable. Instead, she contends, when BOR was on notice of potential litigation, it failed to instruct the individuals to turn off their phones' auto-delete settings; failed to timely issue a litigation hold notice; wiped Durham's phone; and delayed imaging Akin's and Tucker's phones.[6]

---

[6] Joseph also argues that the individuals' use of nontraditional communication methods, such as personal phones, personal email addresses, social media, and other messaging apps, and intentionally deleting at least one email constitute bad faith. She further contends BOR's delay in producing information that was potentially unfavorable to Defendants evinces bad faith. The Court does not agree.

21

To be sure, the preservation efforts were not perfect. The Court found in its earlier order that a duty to preserve attached as early as February 26, 2019. BOR issued a litigation hold notice to Akin and Tucker on June 11, 2019. Only in February 2020, however, did the IT department image their phones. By this point, many of their messages had been deleted.[7] Indeed, Akin's phone was set to automatically delete messages after one year.

Durham's phone also was set to automatically delete messages, after thirty days. And BOR appears to have first instructed Durham to preserve her text messages on August 7, 2019. On August 26, 2019, BOR restored Durham's phone to factory settings, deleting all her text messages without imaging the phone.

Critical to the analysis is Joseph's failure to show that any loss of evidence on BOR's part was the result of anything other than ordinary negligence. BOR points out that the IT department had been told on

---

[7] Joseph argues that a year of messages from Akin's phone were deleted. However, BOR responds that Akin's texts from February 17, 2019 forward were produced, leaving only a three-week window from which messages may have been lost. The parties do not appear to dispute that all of Tucker's messages from the relevant time period were unrecoverable.

August 7, 2019, to image witnesses' devices or to coordinate the task as needed. Yet the phones were not cloned for several months. Ultimately, there was a failure of the IT department to follow instructions from Georgia Tech's office of legal affairs.

Further, BOR had taken many reasonable steps to preserve evidence that it knew or should know could be relevant. Days after Joseph's employment was terminated, chief employment and litigation counsel Kate Wasch contacted Georgia Tech's IT department to place or confirm litigation holds on several potential witnesses' email accounts. A few weeks later, she reminded Hoffman to continue to preserve documents and communication related to the investigation.

On May 14, 2019, GTAA received Joseph's charge of discrimination. A few weeks later, several individuals who BOR believed may have had relevant information received a litigation hold notice. A few days after that, Engel sent another email with additional information and tools for preserving relevant documents.

On August 7, 2019, after Joseph filed her first complaint in this Court, Wasch sent two more emails to IT employees containing instructions about preserving information on GTAA-issued devices.

Indeed, it is not clear that BOR should have anticipated that Tucker, Akin, or Durham would have relevant evidence in their text messages before it issued litigation holds to these individuals. Joseph's initial complaint did not indicate that these three were likely to have significant probative evidence. It was only as the lawsuit progressed that this might be the case.

Ultimately, as unfortunate as the loss of messages is, Joseph has shown no evidence of bad faith on BOR's part. Even if it should have done more to preserve messages, she has shown no more than—at most—negligence by BOR. This is not enough to warrant the sanctions she seeks. *See, e.g.*, *Tesoriero*, 965 F.3d at 1184 ("Spoliation sanctions— and in particular adverse inferences—cannot be imposed for negligently losing or destroying evidence.").[8]

---

[8] The cases upon which Joseph relies are distinguishable and/or unhelpful to her case. *See, e.g.*, *Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360 (N.D. Ga. 2008) (predating amended Rule 37(e) and involving failure to produce an email from the

## IV.    Conclusion

For the foregoing reasons, Joseph's motion [168] for sanctions is denied.

IT IS SO ORDERED this 22nd day of November, 2021.

_____
Timothy C. Batten, Sr.
Chief United States District Judge

---

plaintiff's supervisor); *Brown v. Chertoff*, 563 F. Supp. 2d 1372 (S.D. Ga. 2008) (predating amended Rule 37(e), dealing with physical documents, and finding no bad faith but rather negligence when case file containing notes written by investigator was destroyed).