IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| MACHELLE JOSEPH,<br><br>      Plaintiff,<br><br>v.<br><br>BOARD OF REGENTS OF THE<br>UNIVERSITY SYSTEM OF<br>GEORGIA and GEORGIA TECH<br>ATHLETIC ASSOCIATION,<br><br>      Defendants. | CIVIL ACTION FILE<br><br>NO. 1:20-cv-502-TCB |

## ORDER GRANTING DEFENDANT'S MOTION FOR SANCTIONS

### I.  Background

Plaintiff MaChelle Joseph, former head coach of the Georgia Tech women's basketball team, filed this action after the termination of her employment. She alleges that Defendants discriminated against her on the basis of her and her players' sex and retaliated against her following her complaints about differential treatment. Defendants deny Joseph's claims.

The parties agree that Joseph made various internal complaints while she was employed at Georgia Tech. They dispute, however, whether any of her complaints rose to the level of protected conduct. For her complaints to be considered protected conduct, Joseph must show two elements: (1) she possessed a good-faith belief of discrimination, and (2) the complaints were objectively reasonable in light of the law as it existed at the time.

Because Joseph's internal complaints were primarily conveyed verbally, Defendant Board of Regents of the University System of Georgia ("BOR") propounded interrogatories and document requests seeking information related to the substance of the complaints.

In response, Joseph produced emails between herself and Theresa Wenzel, a former Georgia Tech employee who served as the associate dean, director of Title IX compliance, and senior women's administrator. Wenzel also acted as Joseph's supervisor. After Wenzel left Georgia Tech in 2018, she became a professional change management

consultant;[1] Joseph was one of her first clients. The two were close friends, and Wenzel was helping Joseph prepare for this lawsuit.

Joseph testifies that Wenzel helped her "put [her] documents in order" and "fact-check" dates, "[r]eorganized [her] documents" and helped her "make sure [her] information was accurate." [177] at 546:15-20. She further testifies—in response to a question about Wenzel editing Joseph's internal complaints—that Wenzel was her "professional consultant, and she was checking my—making sure everything I was sending was correct at that point it looks like." *Id.* at 564:7-10.

The only text messages produced between just Joseph and Wenzel (as opposed to exchanges within a larger group message) for a period of over three years were (1) a single iMessage chain with eight messages, and (2) a single WhatsApp chain also containing eight messages. Indeed, no messages from Joseph to Wenzel from July 28, 2018 through

---

[1] Wenzel testifies that change management is similar to Elisabeth Kubler-Ross's defined stages of grief, taking clients through the various stages to help them learn how to manage the emotions they are dealing with because of changes in their lives.

late February 2019 were produced. During this time, Joseph was actively preparing for this lawsuit, was discussing her workplace complaints with Wenzel, and had become Wenzel's client. Joseph testifies that "sometime around 2018," Wenzel "started working with me as a consultant. And I trusted her, and I didn't know who else to go to to help me sort through everything that was going on at Georgia Tech with the administration and the equity issues I had. She was a friend of mine." [177] at 321:6-12.

BOR contends that Joseph purposely deleted messages with Wenzel that were relevant to the issues in this case and that Joseph knew or should have known she had a duty to preserve those messages. BOR points out that the two were close friends and colleagues, and asserts that it is not plausible that these were the only messages they exchanged in what Joseph now contends was such a traumatic period in her life. BOR argues that Joseph likely deleted messages with Wenzel that would have shown that Joseph's complaints were not made in good faith and/or that she did not have a reasonable belief of discrimination.

BOR has filed a motion [171] for sanctions, arguing that Joseph destroyed communications—specifically, text messages with Wenzel—that would likely indicate that Joseph knew that her internal complaints of discrimination were not valid. BOR seeks a negative inference at summary judgment and, if the case proceeds to trial, leave to present evidence of Joseph's purported spoliation to the jury.

## II.    Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011) (quoting *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009)).

"[F]ederal law governs the imposition of spoliation sanctions." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (quoting *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)). However, courts in this district borrow a multi-factor test from Georgia spoliation law to determine whether spoliation sanctions are

warranted. *Flury*, 427 F.3d at 944–45. The relevant factors include (1) prejudice to the non-spoiling party as a result of the destruction of evidence; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the spoiling party acted in good or bad faith; and (5) the potential for abuse if sanctions are not imposed. *Id.* at 945; *see also Tesoriero*, 965 F.3d at 1184 (quoting *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018)).

Further, Rule 37 of the Federal Rules of Civil Procedure addresses the spoliation of electronically stored information. *See* Fed. R. Civ. P. 37(e). Rule 37(e) provides,

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

6

> (A) presume that the lost information was
>     unfavorable to the party;
>
> (B) instruct the jury that it may or must presume
>     the information was unfavorable to the party;
>     or
>
> (C) dismiss the action or enter a default
>     judgment.

The party seeking sanctions bears the burden of proof of the issue of spoliation and its legal elements. *In re Delta/AirTran*, 770 F. Supp. 2d at 1308 (citing *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 615 F.3d 1305, 1318 (11th Cir. 2010)).

The Eleventh Circuit has not yet determined whether the multi-factor *Flury* test is still applicable when a party seeks sanctions based on the spoliation of electronically stored evidence. *ML Healthcare Servs., LLC*, 881 F.3d at 1308.

Under the *Flury* test, "[s]poliation sanctions—and in particular adverse inferences—cannot be imposed for negligently losing or destroying evidence." *Tesoriero*, 965 F.3d at 1184. Instead, "an adverse inference is drawn from a party's failure to preserve evidence only when

the absence of that evidence is predicated on bad faith." *Id.* (quoting

*Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)).

To find bad faith, the Court is not required to find malice. *Flury*,

427 F.3d at 946. However, it must find more than mere negligence,

"which is insufficient to support spoliation sanctions under the law of

this circuit." *In re Delta/AirTran*, 770 F. Supp. 2d at 1313 (citations

omitted). Bad faith "generally means destruction for the purpose of

hiding adverse evidence." *Tesoriero*, 965 F.3d at 1184 (quoting *Guzman*

*v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015)); *see also Mann v. Taser Int'l,*

*Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009).

Likewise, to obtain an adverse inference instruction or a default

judgment sanction under Rule 37(e), the Court must find "that the

spoliating party 'acted with the intent to deprive another party of the

information's use in the litigation.'" *ML Healthcare Servs., LLC*, 881

F.3d at 1308 (quoting Fed. R. Civ. P. 37(e)(2)).

## III. Discussion

Before turning to the contested issues, the Court addresses a few

preliminary matters. First, Joseph's privilege log indicates that she

began applying attorney-client privilege and work-product protections to documents in May and June 2018. Work-product protection applies only to documents that are prepared in anticipation of litigation. FED. R. CIV. P. 26(b)(3)(A). Therefore, Joseph was anticipating litigation and was under a duty to preserve no later than June 2018. As such, her duty to preserve had attached by the time a large number of the purported missing messages were exchanged.

Next, the Court agrees with BOR that no additional discovery can replace the missing messages. BOR attempted to recover the messages by subpoena to Wenzel, but she was not able to provide them. Wenzel testifies that her phone is set to automatically delete her WhatsApp messages after seven days and her iMessages after thirty days. She also testifies that she regularly goes through her messages and deletes threads and that she does not believe she has anything set to back up to a cloud service. And Joseph does not dispute that any further attempts to retrieve lost text messages are highly costly, imperfect, and unlikely to yield complete information.

## A.     Whether the Evidence Existed

Of course, under either *Flury* or Rule 37, BOR must demonstrate that evidence was destroyed, which requires demonstrating that the evidence existed at one time. BOR acknowledges that no direct evidence shows that Joseph and Wenzel exchanged relevant messages that were deleted but contends that the circumstantial evidence is compelling. The Court agrees.

Joseph's deposition testimony with respect to her texting habits with Wenzel was somewhat equivocal and contradictory. Initially, in response to a question about whether she and Wenzel had discussed Title IX requirements via text, the following exchange occurred:

Q.     Would you have text messages about that?

A.     It's possible. I—I don't think we would text about that. We hardly text so . . .

Q.     Okay. You're a big texter. I've seen a lot of your text messages. You text frequently; is that fair to say?

A.     I did when I was at Georgia Tech. It was my job.

Q.     Okay. Is it—is it Theresa [Wenzel], she's not a big texter?

A.     She's not a big texter.

10

Q.   Okay. She prefers email?

A.   Of written communication, she prefers email, correct.

[177] at 349:5-18.

Immediately following the lunch break, Joseph stated that she needed to correct her earlier testimony that morning:

Q.   Ms. Joseph, welcome back. Of course you understand that you are still under oath and I trust that you had a good lunch.

A.   Yes, I did. Thank you. I have something I wanted to clarify before we start when you're ready.

Q.   Sure. Go ahead.

A.   You had asked a question, and I agreed with you, and I'm not—I don't—I didn't mean to—I don't know that I agree with you. And you asked a question if I agreed with you that Theresa Wenzel wasn't a texter. And, first, I didn't know what a texter was. I don't understand your term "texter." And, second of all, I want to make sure that I was clear that you made some comment about Theresa Wenzel and I not texting. Theresa Wenzel and I have text[ed] before, and I want to make sure that's clear for the record. I was not saying that we had not text[ed]. And you—I don't understand what you meant by "texter," and you said she wasn't much of a texter. I'm assuming you meant she didn't text a lot, but I just wanted to clarify that— that I didn't agree—I don't agree with you, but I did agree with you when you said that so . . .

11

Q.   So, just to be clear, Theresa Wenzel does use text
     message or you do text message with her?

A.   I have text messaged with Theresa Wenzel. I'm not
     saying I have not. But I don't know if she's a texter or
     not a texter.

Q.   Okay. How frequently did Theresa text you?

A.   I don't recall. I mean, it's—not a ton but not very little
     either. It's just normal.

Q.   On a daily basis?

A.   I don't recall.

Q.   On a weekly basis?

A.   Possibly.

Q.   I mean, you guys are close friends. You communicate
     frequently; is that fair to say?

A.   Yes.

Q.   And communicate a variety of ways; is that fair to say?

A.   Yeah, I guess so.

Q.   Like, email, phone call, in person?

A.   Yes, we do communicate in those three ways, in person,
     phone calls, emails, correct.

Q.   And you also text?

12

A.     Yes, we have text[ed].

[177] at 429:11–431:10.

Wenzel's testimony was similarly equivocal. Initially, she testified that the two had exchanged both text and WhatsApp messages, probably using WhatsApp "a little bit more" than text. [173] at 25:1-10. Later, she stated that she "generally communicated with [Joseph] on text message" rather than WhatsApp and used WhatsApp for her "other clients, not MaChelle." *Id.* at 169:14-19.

Clearly, both Joseph and Wenzel initially minimized the extent to which they texted, then backtracked later in their depositions, conceding that there was some amount of text traffic between them. Although the Court is not prepared at this stage to conclude that this of itself evidences dishonesty on each individual's part, it also is not willing to resolve the equivocal testimony in Joseph's favor. Joseph would have the Court focus on the testimony that Wenzel does not text frequently and minimize the importance of Joseph's testimony that the two texted on a "normal" basis, possibly as often as weekly. This, the Court will not do.

The extent and depth of the individuals' relationship supports a finding that they exchanged far more text messages than Joseph produced. Joseph and Wenzel are close friends and confidantes who socialized and communicated regularly, often about Joseph's workplace issues. Joseph testifies that Wenzel is "a good friend" of hers and that the two of them talk often—probably daily. [175] at 15:5-8.

Joseph identified Wenzel as a potential witness in this lawsuit. Indeed, Joseph relied on Wenzel for support and guidance in preparing her suit, and Wenzel provided input on documents Joseph submitted internally at Georgia Tech (even years after Wenzel had left her employment at Georgia Tech).

Joseph's texting habits further support a finding that the two exchanged text messages beyond those produced. Joseph sent or received over 67,000 text messages in 2018. Joseph testifies that the two texted a normal amount, possibly as often as weekly. However, Joseph has not produced any messages to Wenzel between July 28, 2018 and late February 2019, when she was Wenzel's client and the two were discussing her workplace concerns.

14

BOR argues that "[t]he conspicuous absence of even mundane texts between them during the relevant time frame suggests that Joseph took steps to remove her messages with Wenzel from her GTAA-issued devices." [171] at 14.

The Court agrees. A review of the text messages produced between the two individuals after Joseph's termination—approximately thirty-five messages between February 27 and March 31, 2019—indicates that the two were indeed close friends who exchanged regular texts. It is simply not plausible that the type of messages exchanged were preceded by years of virtual text silence.

Joseph contends that the additional texting after her suspension and termination occurred because she moved to Florida, so she and Wenzel saw each other in person less frequently. Her contention, however, does not explain this discrepancy. The sort of text messages produced between the two range from "Pls call me ASAP" to a simple "hey" to a list of food items. That the two would previously—before Joseph moved to Florida—have had such communications in person rather than via text is inconceivable.

15

Some of the text messages produced from after Joseph's termination contradict her explanation of geographical distance between the two. Indeed, some—"Sitting in the corner up front" or "U want me to order u something," both from March 2019—indicate that the two were planning to have an in-person meeting. [171-18] at 3. The two clearly were in the same town at this point. An assertion that Joseph and Wenzel suddenly began this level of regular text communication after years of virtual silence between them strains credulity.

BOR has met its burden of showing that additional text messages between Joseph and Wenzel existed and have been deleted.

## B.   Practical Importance and Prejudice

The Court next turns to BOR's burden of demonstrating the practical importance of the messages and that the loss of the text messages between Joseph and Wenzel results in prejudice to its case.

Joseph's retaliation claims under Title VII and Title IX must be predicated on good-faith, reasonable beliefs that Georgia Tech engaged in unlawful employment discrimination (Title VII) and unlawful

16

discrimination in providing resources and benefits in its athletic department (Title IX). *See, e.g.*, *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). In other words, she must demonstrate (1) that she genuinely believed she and the basketball team were being discriminated against, and (2) that her beliefs were reasonable in the light of the law at the time.

Naked complaints or mere advocacy for additional resources do not establish protected conduct. *See, e.g.*, *Boyland v. Corr. Corp. of Am.*, 390 F. App'x 973, 975 (11th Cir. 2010) (per curiam). Even referring to something as a Title IX complaint does not turn a grievance into protected conduct. *See, e.g.*, *Pinder v. John Marshall Law Sch., LLC*, 11 F. Supp. 3d 1208, 1263 (N.D. Ga. 2014) ("The use of a particular Title VII 'buzzword' does not turn his complaints into protected activities under Title VII."), *report and recommendation adopted*, 11 F. Supp. 3d at 1224.

As stated above, the complaints themselves were primarily conveyed verbally. Therefore, BOR argues that contemporaneous communications about the substance of Joseph's complaints with

17

Joseph's trusted friend, confidant, and former supervisor—with whom Joseph is known to have communicated about her workplace problems—are irreplaceable.

BOR contends that documents produced demonstrate "that Joseph had some awareness that her complaints were not genuine or were not being made in good faith." [171] at 19. For instance, she points to an email from Kathy Betty—another friend of Joseph's—to Joseph (copying Wenzel) in which Betty suggests that Joseph "beef up the harassment a little" in her internal complaint. [171-25] at 1. BOR also points out that Joseph argues in this lawsuit that she was concerned about discrimination for years yet failed to put her concerns in writing before February 2019.

In addition, BOR states, "a close examination of her subsequent written internal complaint reveals inconsistencies and exaggerations which belie the notion that Joseph was acting reasonably or in good faith." [201] at 11. It points out that Joseph alleged that the women's basketball team was given inferior competitive facilities despite both

the women's and men's teams using the same facility—McCamish

Pavilion—for competition.

BOR also notes Joseph's claim that GTAA employees Marvin

Lewis's and Shoshenna Engel's conduct during the 2015 budget

discussions—roughly four years before this[2] lawsuit—demonstrated to

Joseph that they did not support equal athletic opportunities for women

and men. Yet Joseph testifies in her deposition that Engel was not

involved in the budget discussions.

In addition, BOR points out, Joseph's complaint avers that Lewis

continually refused to increase Joseph's budget while raising the men's

team's budget. But Joseph testifies that she had no personal knowledge

about this. And in fact, though the allocations differ, both teams saw

budget increases from fiscal years 2016 through 2018, then a reduction

in fiscal year 2019.

Indeed, the evidence compels the question of whether Joseph's

internal complaints were made in good faith or were objectively

---

[2] Actually, this case is Joseph's second case against these Defendants. She
filed her first complaint on July 23, 2019, and she voluntarily dismissed that
complaint on October 23, 2019.

reasonable. But the Court need not resolve the issue at this stage.

Rather, it need only determine whether BOR has met its burden of

showing that the missing text messages were of substantial practical

importance to its defense and that the loss of the messages has resulted

in prejudice to it. This, BOR unquestionably has done.

> As BOR contends, Joseph's communications with Wenzel,
>
> a trusted friend and confidant[,] about her workplace
> struggles exchanged at or around the time of the verbal
> complaints or alleged adverse actions would be more
> competent evidence of Joseph's claimed protected conduct
> than *post hoc* discovery responses crafted by her attorneys,
> particularly where that friend assisted with editing the few
> written complaints Joseph does have, as Wenzel did.

[171] at 18.

It is clear that the deleted messages likely would have substantial

bearing on the issues in this case. Because most of Joseph's internal

complaints were verbal, contemporaneous communications with a

trusted friend and confidant are irreplaceable. Joseph does not point to

any discovery that has been produced that would take the place of such

communications. And the Court finds that the deposition testimony of

the individuals—especially where it is equivocal as it is here—is no substitute.

Given the close relationship between Joseph and Wenzel and Wenzel's involvement with Joseph's complaints at Georgia Tech, BOR has met its burden of showing that the missing texts would have contained probative information related to Joseph's subjective beliefs about her complaints, the objective reasonableness of those complaints, or both. It also has met its burden of showing that the loss of the messages has resulted in prejudice to it. As discussed above, no additional discovery can cure the prejudice to BOR from the loss of the messages. All these factors weigh in BOR's favor.

## C.   Intent to Deprive

Finally, BOR must show that any messages were deleted based on bad faith or intent to deprive. Bad faith can be established through direct or circumstantial evidence. BOR acknowledges its lack of direct evidence but contends that circumstantial evidence demonstrates intent to deprive. The Court agrees.

In Joseph's deposition, she testifies that she did not recall deleting messages with Wenzel. She further testifies that her phone is not set to automatically delete messages, and she does not provide any alternative explanation for the deletion. She provides no credible argument that if the messages did exist—as the Court found—anything other than bad faith is behind their deletion.

Because Joseph's phone does not automatically delete messages and she has not testified of any problems with her phone that resulted in the loss of messages, the only possibility is that Joseph actively deleted these messages. And the fact that she testifies otherwise is—at a minimum—a source of concern for the Court.

The evidence demonstrates that Joseph had been planning to file this lawsuit for years—long before Georgia Tech had taken any adverse action before her. She had hired attorneys, begun compiling documents and timelines, and spent months conferring with friends and drafting her internal complaint. Joseph has not offered any possible innocent explanation for the missing texts in light of her knowledge of and preparation for this lawsuit.

A few other facts support the finding of bad faith. First, in response to a request for production of any recordings Joseph made during the course of her employment, Joseph initially produced six recordings of staff meetings. Her counsel confirmed that there were no additional recordings to be produced. But during her deposition, Joseph testified that she recorded her termination meeting. Although Joseph contends she forgot about recording the meeting, the Court is skeptical. As BOR points out, Joseph contends that she had been anticipating litigation for nearly a year by the time she was terminated, had been gathering documents and consulting friends, and had been represented by counsel for at least six months before her termination. The idea that she recorded her termination meeting and forgot to tell her attorneys strains credulity.

Additionally, Joseph had saved Wenzel in her phone as "Theresa Eckhler" rather than Theresa Wenzel. Wenzel testifies that the surname Eckhler has no meaning to her. That Joseph had Wenzel—her supervisor, friend, and confidant of well over a decade—listed under a

pseudonym is further indication that Joseph was attempting to hide her communications with Wenzel.

Finally, BOR also points to Joseph's retention of her GTAA-issued devices after her termination. She was told to return her phone and computer on the day she was terminated but retained them, causing GTAA to engage in a month-long effort to retrieve data from them. BOR contends that Joseph likely retained her devices to conceal information that might damage her case. Such evidence is sufficient to support a finding of bad faith or intent to deprive BOR of evidence.

Accordingly, the Court finds that BOR has met its burden of showing that the messages were deleted in bad faith and/or with intent to deprive it of evidence.

Now the Court must determine the appropriate sanction. It will not allow an adverse inference but will allow BOR to present evidence to a jury—if the case is heard before a jury—of the alleged spoliation

and will permit a jury to make the decision with respect to whether spoliation occurred and what the messages likely said.[3]

## IV.   Conclusion

For the foregoing reasons, BOR's motion [171] for sanctions is granted. BOR will be permitted to present evidence of the alleged spoliation to the jury.

IT IS SO ORDERED this 22nd day of November, 2021.

_____
Timothy C. Batten, Sr.
Chief United States District Judge

---

[3] The Court declines to award fees and/or expenses to BOR.