

# Transcript of Shoshanna Engel Lewis

**Date:** June 2, 2021
**Case:** Joseph -v- Board of Regents of the University System of Georgia, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Case 1:20-cv-00502-TCB   Document 210   Filed 12/30/21   Page 2 of 77
Transcript of Shoshanna Engel Lewis                                    1 (1 to 4)
Conducted on June 2, 2021

**1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF GEORGIA
3               ATLANTA DIVISION
4   --------------------------------X
5   MACHELLE JOSEPH,                 :
6               Plaintiff,  :
7        v.              :Civil Action No:
8                        :1:20-cv-00502-TCB
9   BOARD OF REGENTS OF THE          :
10  UNIVERSITY SYSTEM OF GEORGIA     :
11  and GEORGIA TECH ATHLETIC        :
12  ASSOCIATION                      :
13              Defendants.  :
14  --------------------------------X
15       DEPOSITION OF SHOSHANNA ENGEL LEWIS
16    APPEARING REMOTELY FROM ATLANTA, GEORGIA
17          WEDNESDAY, JUNE 2, 2021
18             9:30 A.M.
19
20
21
22  Job No.: 372842
23  Pages 1-301
24  Reported by: Adrienne Mignano, RPR
25  Appearing remotely
```

**2**

```
1        Deposition of SHOSHANNA ENGEL LEWIS, held
2   via Zoom videoconferencing, Pursuant to Notice, before
3   Adrienne M. Mignano, a Registered Professional
4   Reporter and a Notary Public in and for the State of
5   New York.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1             A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFF:
4       LISA J. BANKS, ESQUIRE
5       JOSEPH ABBOUD, ESQUIRE
6       KATZ, MARSHALL & BANKS, LLP
7       1718 Connecticut Avenue, NW
8       Sixth Floor
9       Washington, D.C. 20009
10      (202) 299-1140
11
12
13  ON BEHALF OF DEFENDANT:
14      COURTNEY C. POOLE, ESQUIRE
15      STATE OF GEORGIA
16      OFFICE OF THE ATTORNEY GENERAL
17      40 Capitol Square SW
18      Atlanta, Georgia 30334
19      (404) 458-3600
20
21
22
23
24
25
```

**4**

```
1       APPEARANCES (Continued)
2
3   ON BEHALF OF DEFENDANT - ATHLETIC ASSOCIATION
4       TANIA FARANSSO, ESQUIRE
5       WILMERHALE
6       1875 Pennsylvania Avenue
7       Washington, D.C. 20006
8       (202) 663-6000
9
10
11  ALSO PRESENT:
12  Cameron Cilano - Board of Regents Rep.
13  MaChelle Joseph - Plaintiff
14  Caleb Welsh - Remote Technician
15
16
17
18
19
20
21
22
23
24
25
```

C O N T E N T S

EXAMINATION OF SHOSHANNA ENGEL LEWIS          PAGE

By Ms. Banks          7
By Ms. Poole          294
By Ms. Banks          298

E X H I B I T S
(Attached to the Transcript)

LEWIS DEPOSITION EXHIBIT          PAGE

Exhibit 1    Job Description              17
Exhibit 2    Minutes from January 2016 Meeting  30
Exhibit 3    Bylaws                        36
Exhibit 4    Bylaws                        37
Exhibit 5    Letter of Reprimand           98
Exhibit 6    E-mail                       117
Exhibit 7    Timeline of Events           158
Exhibit 8    Notes                        172
Exhibit 9    Notification                 175
Exhibit 10   Text Messages                182
Exhibit 11   E-mail                       191
Exhibit 12   PowerPoint presentation      191
Exhibit 13   E-mail                       200
Exhibit 14   Support Staff Evaluations    204
Exhibit 15   E-mail                       206

E X H I B I T S
(Attached to the Transcript)

LEWIS DEPOSITION EXHIBIT          PAGE

Exhibit 16   E-mail                       209
Exhibit 17   E-mail                       216
Exhibit 18   E-mail                       218
Exhibit 19   E-mail                       225
Exhibit 20   E-mail                       227
Exhibit 21   Text message exchange        229
Exhibit 22   E-mail                       234
Exhibit 23   Text Messages                244
Exhibit 24   E-mail exchange              248
Exhibit 25   E-mail                       250
Exhibit 26   Request from Ken Sugiura     253
Exhibit 27   Letter dated March 22, 2019  254
Exhibit 28   Interrogatory Responses      257
Exhibit 29   Internal Investigation Report 279
Exhibit 30   March 7th, 2016 EthicsPoint  287
             Complaint
Exhibit 31   Recommendation               289

REMOTE TECH:  Thank you to everyone for attending this proceeding remotely, which we anticipate will run smoothly.  Please remember to speak slowly and do your best not to talk over one another.

Please be aware we are recording this proceeding for backup purposes.  Any off-the-record discussions should be had away from the computer.  Please remember to mute your mic for those conversations.

Please have your video enabled to help the reporter identify who is speaking.  If you are unable to connect with video and are connecting via phone, please identify yourself each time before speaking.

I apologize in advance for any technical-related interruptions.  Thank you.

Whereupon,

SHOSHANNA ENGEL LEWIS, being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MS. BANKS:

Q   Good morning, Ms. Engel.  My name is Lisa Banks.  I'm one of the attorneys for Coach Joseph, and I'll be taking your deposition today.

First thing I want to ask you is should I refer to you as Ms. Engel or Ms. Lewis?

A   Ms. Lewis works, please.  Thank you.

Q   Okay.  Well, all my notes are Ms. Engel, so if I screw that up, I'm sorry.

A   No problem.

Q   I'll do my best.

So have you ever been deposed before?

A   No, I have not.

Q   Well, you are under oath.  I'm going to be asking questions, you're going to be answering.  You will be under oath, as you just took an oath, and so that subjects you to penalty of perjury.  Do you understand that?

A   Yes, I do.

Q   I will be asking you questions and the court reporter will be transcribing them, so you need to speak clearly and audibly.  And if you don't understand one of my questions, just ask me and I will repeat the question.  If you need a break, let me know.  We'll take breaks periodically throughout.  But if you need one, just let me know or let your attorney know.

9

1        From time to time defense counsel may
2   object.  Let them get their objection on the
3   record and then you're free to answer the question
4   unless they instruct you not to.  Do you
5   understand?
6        A   I understand.
7        Q   Okay.  So is there any mental or
8   physical reason why you can't answer questions
9   today accurately and completely?
10       A   No, there is not.
11       Q   And are you represented today by
12   counsel?
13       A   No.
14       Q   And what did you do today to prepare
15   for the deposition?
16       A   Today, I --
17       Q   No, what did you do to prepare for the
18   deposition today?
19       A   Thank you for the clarification.  I met
20   last week with Ms. Poole and Ms. Ferrando to cover
21   logistics and some basic preparation.
22       Q   And did you review any documents?
23       A   I believe we reviewed a couple
24   documents during that meeting, but I don't recall
25   any additional documents.

10

1        Q   Can you tell me which documents you
2   reviewed?
3        A   No, I do not recall exactly which
4   documents we reviewed.
5        Q   Okay.  And did you bring any notes with
6   you to the deposition today?
7        A   No, I did not.
8        Q   Okay.  And this is a remote deposition,
9   which is a little bit new for everybody, although
10  we're quickly becoming used to it.  So I have to
11  ask you a few odd questions.  Where are you
12  located right now?
13       A   I'm located in a conference room in the
14  legal affairs office at Georgia Tech.
15       Q   Okay.  And is there anybody else with
16  you in the room?
17       A   No.
18       Q   And did you bring materials with you
19  that you are going to refer to during the
20  deposition?
21       A   No.
22       Q   And do you have a smart phone or any
23  other sort of electronic device with you that you
24  have next to you or near you?
25       A   Yes, it is in the room.  I have a

11

1   phone.
2        Q   Okay.  So what I'll ask is that you
3   keep that off and that during the course of the
4   deposition you not text with anybody or
5   communicate with anybody while the deposition is
6   happening and particularly when a question is
7   pending.  Is that clear?
8        A   Yes.
9        Q   So at some point were you asked to
10  preserve documents in this case?
11       A   Yes, I was.
12       Q   Do you recall when that was?
13       A   Not specifically.
14       Q   Generally?
15       A   I believe following receipt of the
16  original complaint.
17       Q   What original complaint was that?
18       A   The original legal filing concerning
19  this case.
20       Q   The actual lawsuit that was filed in
21  court or some other document?
22       A   I believe there were some open records
23  requests that were made and I was asked to retain
24  documents at that time and then again on an
25  ongoing basis when there were legal findings.

12

1        Q   So at the time that Open Records Act
2   requests were received about MaChelle Joseph,
3   that's when you were asked to preserve records?
4        A   I believe so.
5        Q   And who asked you to preserve those
6   records?
7        A   I remember receiving a notification
8   from the Office of Legal Affairs at Georgia Tech.
9        Q   Any particular individual associated
10  with that office?
11       A   I don't recall the specific individual.
12       Q   And did you look for and produce all
13  relevant e-mails and text messages or any other
14  documents that were in your possession that were
15  relevant?
16       A   Yes.
17           MS. POOLE:  I'll object to the question
18  to the extent Ms. Lewis may not know everything
19  that is or isn't relevant.
20           MS. BANKS:  Okay.
21       Q   I'm sorry, could you answer again,
22  Ms. Lewis?
23       A   Yes.
24       Q   Okay.  And do you have a Georgia Tech
25  issued e-mail address?

Case 1:20-cv-00502-TCB   Document 210   Filed 12/30/21   Page 5 of 77
Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

4 (13 to 16)

13

1    A   I do.
2    Q   Is that the e-mail you use to
3 communicate about work?
4    A   Yes.
5    Q   Do you also have a personal e-mail
6 address?
7    A   Yes.
8    Q   And do you use that to communicate for
9 work matters also?
10    A   No.
11    Q   Have you ever directed anybody from
12 work, whether it's a student or a staff member, to
13 communicate with you on your personal e-mail
14 address?
15    A   I do not specifically recall.
16    Q   So you don't recall whether you've ever
17 directed anyone to use your personal e-mail
18 address?
19    A   I don't believe I've ever directed
20 anyone to use my personal e-mail address, but I
21 don't recall if I've ever shared that e-mail
22 address.
23    Q   Okay.  But, generally speaking, work
24 matters are dealt with with your work-related
25 e-mail -- with your work e-mail?

14

1    A   Yes.
2    Q   Did you attend college?
3    A   I did.
4    Q   Where did you attend?
5    A   Yale University.
6    Q   And what degree did you receive?
7    A   I received a BA in political science.
8    Q   What year?
9    A   2003.
10    Q   And are you a current Georgia Tech
11 employee?
12    A   I am.
13    Q   And you have worked there since 2013,
14 correct?
15    A   Yes.
16    Q   What is your current position?
17    A   My current position is associate
18 vice-president for athletics, governance and
19 inclusion.
20    Q   What other positions have you held at
21 Georgia Tech?
22    A   Associate director of athletics for
23 compliance and senior associate athletics director
24 for compliance.
25    Q   And so you began as associate athletic

15

1 director for compliance in 2013?
2    A   Yes.
3    Q   And what year did you become senior
4 associate athletic director for compliance?
5    A   2020.
6    Q   And then when did you ascend to the
7 associate VP position?
8    A   Also in 2020.
9    Q   Okay.  So how long did you hold the
10 senior associate athletic director position before you got
11 the VP position?
12    A   I believe approximately six or seven
13 months.
14    Q   And what month did you receive the
15 promotion to senior associate athletic director?
16    A   I believe it was September 2020.  Oh,
17 excuse me, can you repeat that question?
18    Q   Yes.  What month did you receive the
19 promotion to senior associate athletic director
20 for compliance?
21    A   February 2020.
22    Q   And then your promotion to associate
23 vice president was in what month?
24    A   September.
25    Q   During the 2018-2019 school year, what

16

1 position did you hold at that time?
2    A   Associate athletics director for
3 compliance.
4    Q   So the questions I'm going to ask you
5 today are going to relate to your role as
6 associate athletic director for compliance and the
7 time period when MaChelle Joseph worked at Georgia
8 Tech and the time period directly after, just so
9 you're clear when I'm asking you questions, okay?
10    A   Yes.
11    MS. BANKS:  Caleb, would you bring up
12 document number 3, please.
13    REMOTE TECH:  Yes, one moment.
14    MS. BANKS:  I'm trying to get this to
15 be the right size on my screen.
16    REMOTE TECH:  Would you like me to give
17 you control, Counsel?
18    MS. BANKS:  Yes, please.
19    Q   Ms. Lewis, I want to take -- for you to
20 take a look at this document that we have marked
21 as Exhibit 1.  It is a long document, but I want
22 you to focus only on a couple of particular pages.
23    MS. BANKS:  So Caleb, if you could give
24 Ms. Lewis control of the document, she can scroll
25 to where I want her to look.

17

1    And Ms. Lewis, you just need to scroll
2  down with your mouse.  And I would like you to go
3  to pages 24754 and 24755.
4       (Lewis Exhibit 1 marked for
5  identification and attached to the transcript.)
6    Q    Do you recognize the document that goes
7  from 24754 to 24755?
8    A    Yes.
9    Q    And that's a job description from
10 Georgia Tech Athletics for the position associate
11 athletic director for compliance.  That was your
12 position, correct?
13   A    Yes.
14   Q    Does this job description accurately
15 reflect your job duties for associate athletic
16 director for compliance?
17   A    Yes.
18   Q    Is this position with Georgia Tech, the
19 Georgia Tech Athletic Association or both?
20   A    Georgia Tech.
21   Q    And in this role you were a member of
22 the Georgia Tech Athletic senior leadership team,
23 correct?
24   A    Yes.
25   Q    And you oversaw compliance with NCAA

18

1  rules and policies; is that correct?
2    A    Yes.
3    Q    And you would educate and advise staff
4  on compliance with NCAA rules and policies,
5  correct?
6    A    Yes.
7    Q    And you were also the deputy Title IX
8  coordinator; is that correct?
9    A    Yes.
10   Q    Was there a Title IX coordinator above
11 you?
12   A    Yes.
13   Q    Who was that?
14   A    What time period specifically?
15   Q    Let's say from 2014 to 2020.
16   A    There were 2 Title IX coordinators, I
17 believe, during that time period.  One was Burns
18 Newsome and then Marcia Bull Stadeker.
19   Q    And did you report to them on Title IX
20 matters?
21   A    Yes.
22   Q    Were you responsible for day-to-day
23 Title IX compliance efforts?
24   A    Yes.
25   Q    How did your role as deputy Title IX

19

1  coordinator differ from their role as Title IX
2  coordinator?
3    A    My role as deputy Title IX coordinator
4  was to assist in delivering education and assist
5  in processing at their direction for any Title IX
6  related matters in athletics.  And then also I
7  assisted and worked collaboratively to pursue
8  matters of athletics equity.
9    Q    Okay.  And what did -- what role did
10 the Title IX coordinator himself or herself have?
11   A    I am not totally sure of what was
12 covered in the scope of their job descriptions,
13 but the institute Title IX coordinator was
14 responsible for Title IX across the entire campus
15 and all members of the campus, students, faculty
16 and staff.
17   Q    The focus was then on the Athletics
18 Department?
19   A    Please repeat that.
20   Q    Your focus as deputy Title IX
21 coordinator was focused on the Athletics
22 Department?
23   A    Yes.
24   Q    So if somebody had a complaint or
25 concern that implicated Title IX, they would come

20

1  to you, correct?
2    A    They could come to me, but they could
3  also go straight to the Title IX office.
4    Q    Okay.  And you had the authority to
5  commence a Title IX investigation?
6    A    No.
7    Q    How would you go about commencing a
8  Title IX investigation?
9    A    I would report any information that was
10 reported to me to -- directly to the Title IX
11 coordinator and executive director of compliance
12 programs.  And at their direction, I would assist
13 with any investigation but I did not have the
14 authority nor did I conduct investigations.
15   Q    Okay.  So you couldn't conduct
16 investigations.  What specifically did your job
17 entail?  Education?
18   A    I was -- it was an appointment in
19 addition to my job as the associate athletics
20 director for compliance, and my responsibilities
21 included coordinating education in an integral
22 manner with institute Title IX partners and also
23 developing monitoring systems and creating
24 pathways so that there was open communication,
25 knowledge of Title IX and predominantly an

21

1  understanding of how to report issues and what
2  support was available to community members.
3      Q   So education?
4      A   Yes.
5      Q   And no investigation at all fell within
6  your purview?
7      A   No Title IX investigation, no.
8      Q   What other types of investigations?
9  Compliance investigations?
10     A   Yes.
11     Q   And how would compliance investigations
12 differ from Title IX investigations?
13     A   I was responsible and had oversight of
14 NCAA compliance matters, and so I advised the
15 athletics director, vice-president of legal
16 affairs and then general counsel, faculty
17 athletics representative, and the president, when
18 necessary, on NCAA compliance investigations.
19     Q   Okay.  What training or experience did
20 you possess prior to joining Georgia Tech in the
21 area of Title IX?
22     A   I was a participant in Title IX related
23 activities and efforts in my previous position at
24 Tulane University, and that was the only
25 experience prior.  Though I do remember as a

22

1  graduate student I did participate in a Title IX
2  self-study at the University of North Carolina.
3      Q   And at Tulane, what position did you
4  hold there?
5      A   Assistant provost for student athlete
6  compliance.
7      Q   And what sort of Title IX matters did
8  you deal with there?
9      A   At times, when questions or the need to
10 collaborate would arise from either the Office of
11 the General Counsel or the Office for
12 Institutional Equity, I served as the primary
13 liaison to assist as requested.
14     Q   Did you have any substantive knowledge
15 of the -- of Title IX itself, the law, Title IX?
16     A   Yes.
17     Q   How did you acquire that knowledge?
18     A   During graduate school.
19     Q   This was your self-study?
20     A   No.  I participated in a self-study as
21 an intern in the University of North Carolina
22 athletics administration.  During graduate school,
23 I took a course on sports law.
24     Q   Where did you attend graduate school?
25     A   The University of North Carolina at

23

1  Chapel Hill.
2          MS. BANKS:  Caleb, you can take this
3  document down.
4      Q   And what sort of training or experience
5  do you possess in the field of compliance?
6      A   What specifically are you referring to?
7  Formal training or --
8      Q   Well, let's start with formal training,
9  yes.
10     A   So as I mentioned, I did graduate
11 school at the University of North Carolina at
12 Chapel Hill, and a large portion of the second
13 year of study is a full-time internship in the
14 Athletics Department.  And my internship was in
15 the compliance office at UNC Chapel Hill, and that
16 is where I began my study in addition to sports
17 law and basic sport administration courses that we
18 took as part of that master's program.
19     Q   Any other formal training or experience
20 in compliance?
21     A   I have attended numerous NCAA Regional
22 Rules Seminars and participated in many other
23 professional development and organizational
24 educational opportunities.
25     Q   Okay.  And did you hold any compliance

24

1  position while you were at Tulane?
2      A   I did.
3      Q   What was that?
4      A   Assistant provost for student athlete
5  compliance.
6      Q   So in your role at Georgia Tech as
7  associate athletic director for compliance, you
8  reported directly to the athletic director; is
9  that correct?
10     A   Yes.  When I began at Georgia Tech,
11 yes.
12     Q   And who was that during your tenure in
13 this position?
14     A   When I began at Georgia Tech, it was
15 Mike Bobinski.
16     Q   And then it became Todd Stansbury; is
17 that correct?
18     A   Yes.
19     Q   Okay.  And so in your role you said
20 before that you reported to them.  Would you speak
21 with the athletic director regularly about matters
22 related to compliance and/or Title IX?
23     A   Yes.
24     Q   And would you say you spoke to the
25 athletic director daily?

25

1    A   I don't recall specifically if I spoke
2 to the athletic director daily.
3    Q   But if not daily, certainly a few times
4 a week.  How often would you estimate it was?
5    A   I believe or recall that we interacted
6 regularly and held standing meetings at periodic
7 frequency.  I do not recall exactly what that
8 frequency was.
9    Q   Okay.  But the idea is that you're
10 going to keep him apprised of what you're doing
11 with respect to compliance and Title IX matters,
12 correct?
13    A   Yes.
14    Q   Did you also report to the Office of
15 the President?
16    A   No.
17    Q   Did you have occasion to speak with
18 either the president or any of his staff on
19 matters that you were working with or on?
20    A   Yes.
21    Q   How frequently would you estimate that
22 you spoke to either the president or members of
23 his staff?
24    A   I do not specifically recall.  I would
25 say that depended on what was happening in the

27

1    A   Yes.  Level 1 and level 2.
2    Q   Okay.  Who was the -- sorry, the
3 president at the time during your tenure, was that
4 Bud Peterson?
5    A   Yes.
6    Q   And did you have occasion to speak with
7 President Peterson from time to time about
8 compliance matters?
9    A   Yes.
10    Q   And you spoke also with his chief of
11 staff, Lynn Durham, during your tenure?
12    A   Yes.
13    Q   Would you say that you spoke more with
14 Lynn Durham than you did with Bud Peterson?
15    A   About compliance matters specifically?
16    Q   Yes.  Sorry.
17    A   I don't recall if it was more
18 frequently.
19    Q   So you spoke with him and her would you
20 say an equal amount?
21    A   Specifically about NCAA compliance
22 matters, yes.
23    Q   Who was the vice-president of
24 institute -- vice-president, institute of legal
25 affairs and risk management, in sort of the 2018,

26

1 course of compliance or whether there were
2 meetings that provided the opportunity to
3 interact.
4    Q   But if there was an issue related to
5 compliance or Title IX matters, would there be
6 occasions when you would brief the president or
7 his office on those matters?
8    A   Yes.  Specifically on NCAA compliance
9 matters, I would.  I would say less so with
10 Title IX because I did not have broad oversight
11 for institutional Title IX.
12    Q   Okay.  And for NCAA matters, was the
13 president kept in the loop for all NCAA matters
14 and investigations or only certain ones?
15    A   The president was looped in per our
16 investigation protocols for all potential major
17 violations and issues that could represent student
18 athlete eligibility concerns and possible
19 withholding from competition.  Other compliance
20 matters may have been routinely updated during
21 other meetings, but the president was not briefed
22 on all compliance matters.
23    Q   Okay.  So when you say "major
24 violations," what do you mean by that?  Level 1 or
25 level 2?

28

1 2019 time period?
2    A   Pat McKenna.
3    Q   Did you report to Pat also?
4    A   I had a dotted line report to Pat.
5    Q   And what sort of matters would you
6 bring to him, if any?
7    A   I discussed all matters of NCAA
8 compliance as routine updates, and then, again, if
9 enacted by our investigation protocol, anything
10 that escalated to the major violation level.
11    Q   So would you say that it was similar to
12 when you would update President Peterson you would
13 also update -- was his name McKenna?
14    A   Pat McKenna?
15    Q   Yes.
16    A   No, I spoke more frequently with Pat.
17 We had a standing monthly meeting to brief him on
18 all matters under my purview.
19    Q   Okay.  Did Mr. McKenna give you
20 direction on how to proceed in compliance matters?
21    A   At times, yes.
22    Q   What was your position at Georgia Tech
23 as opposed to the Georgia Tech Athletic
24 Association?
25    A   My position was the same.  I worked for

Case 1:20-cv-00502-TCB   Document 210   Filed 12/30/21   Page 9 of 77
Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021                                    8 (29 to 32)

29

1    Georgia Tech but worked within the Athletic
2    Association to operate the athletics program.
3        Q    Okay.  Did you have separate job
4    descriptions for your positions at Georgia Tech at
5    the Athletic Association?
6        A    I only had one position, as far as I
7    understood, as an institute employee.  I believe
8    there were draft job descriptions that -- one of
9    which you showed me -- that differed from what was
10   in the university system.
11       Q    How do you know that there was another
12   one in the system that differed?
13       A    I believe I inquired whether, when we
14   updated job descriptions, they were updated in the
15   system and was told not yet.
16       Q    So it's just a different version of the
17   same job description.
18       A    Yes.
19       Q    And that was because one of them just
20   didn't get updated.
21       A    I believe so.
22       Q    Did you have separate e-mail addresses
23   for Georgia Tech and the Athletic Association?
24       A    No.
25       Q    Did you have separate phones?

30

1        A    No.
2        Q    Separate computers.
3        A    No.
4        Q    Do you know who owns your phone or pays
5    the bill?
6        A    I believe the Georgia Tech Athletic
7    Association pays the bill for my phone.
8        Q    What about your compensation?  Are you
9    paid separately by Georgia Tech and the Athletic
10   Association?
11       A    No.
12       Q    So in your position, you are also a
13   member of the Committee on Compliance and Equity;
14   is that right?
15       A    Yes.
16            MS. BANKS:  Caleb, can you bring up
17   document 12, please.
18            REMOTE TECH:  Yes.  One moment.
19            (Lewis Exhibit 2 marked for
20   identification and attached to the transcript.)
21            MS. BANKS:  If you could give Ms. Lewis
22   control of the document, that would be great.
23       Q    So these are minutes from a
24   January 21st, 2016 meeting of the Committee on
25   Compliance and Equity, correct?

31

1        A    That's what it looks like, yes.
2        Q    And can you tell me what the purpose of
3    this particular committee is?
4        A    I believe the purpose -- and I don't
5    have the Georgia Tech Athletic Association bylaws
6    in front of me, but the purpose of the committee
7    is to provide support and make recommendations to
8    ensure that the Athletic Association can sustain
9    and meet obligations for compliance and equity.
10       Q    Okay.  If you turn to page 1639, the
11   Bates numbers in the bottom right, do you see the
12   paragraph titled "General Equity Committee
13   Update"?
14       A    Yes.
15       Q    And what is the General Equity
16   Committee?
17       A    I do not recall specifically what a
18   General Equity Committee is.  I would read that as
19   the Committee on Compliance and Equity.
20       Q    Well, if you read a little further, it
21   suggests that this was a working group that you
22   created.  Do you recall that?
23       A    Yes, I do.
24       Q    And so this is a working group, and it
25   says here you will oversee it.  Is that accurate?

32

1    Did you oversee this working group?
2        A    Yes.
3        Q    Do you recall how long you oversaw the
4    working group?
5        A    No, not specifically.  The working
6    group, I believe, was referring to the Diversity,
7    Equity and Inclusion Working Group, and that has
8    evolved over time and at times was not active.
9        Q    Is the Diversity, Equity and Inclusion
10   Working Group -- are you saying it's the same as
11   this General Equity Committee update -- sorry,
12   General Equity Committee that is described here as
13   a working group?
14       A    I believe so, yes.
15       Q    It also says here, "The purpose of this
16   committee is to assist with all equity matters,
17   including monitoring participation, resources and
18   equitable best practices, as well as make
19   recommendations regarding equity matters."
20            Is that accurate, to the best of your
21   recollection, about what this working group did?
22       A    Yes.
23       Q    And do you recall how long the working
24   group was in effect?
25       A    Not specifically.

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

33

1    Q   Do you know whether it is still in
2  effect?
3    A   We do have a Diversity, Equity and
4  Inclusion huddle that is active.
5    Q   But you don't know whether that is the
6  same working group or group that is referenced
7  here?
8    A   It is an involved version of that
9  original working group.
10   Q   And what was your role in this working
11 group?  Do you remember what you did or what your
12 duties were?
13   A   I brought the group together and wanted
14 to set goals in making sure that we had processes
15 in place to track certain pieces of data and to
16 make recommendations based on studying that data.
17   Q   Okay.  And were you able to do that?
18   A   Not fully.
19   Q   What were you unable to accomplish?
20   A   There were lots of personnel changes
21 over time, and so it was challenging to collect
22 all of the necessary data and engage all of the
23 necessary individuals over time.  So again this
24 group has evolved and it is still working in that
25 capacity but has broadened in scope.

34

1    Q   And what sort of data were you looking
2  for?
3    A   There were several pieces of data.
4  Specifically, athletics participation and
5  scholarship allocations was one big piece of data.
6  Data pertaining to financial budgetary allocations
7  and/or end-of-year spending allocations across
8  different areas are two specific pieces of data I
9  remember.
10   Q   Were you also looking at allocations
11 between men's and women's sports to ensure
12 equitable distributions?
13   A   That was intended to be part of the
14 review, yes.
15   Q   But that didn't come to pass?
16   A   No.  I would say each year there was
17 data available, broken down by gender, on resource
18 allocation.
19   Q   And as a result of that data that you
20 had on resource allocation, do you recall whether
21 you ever took any action to address or correct any
22 issues that you saw?
23   A   I did take pieces of that information,
24 and I believe that information was reviewed with
25 other members of the athletic leadership team.

35

1  And I do recall indicating that it would be very
2  helpful for us to review that data further and to
3  try and understand the reasons for allocation as
4  we set budget priorities moving forward.
5    Q   So the effect was then to study that
6  data to determine whether different decisions
7  could be made about resource allocation?
8    A   Yes.
9    Q   Do you recall who you discussed that
10 data with in athletics leadership?
11   A   I believe it was discussed with the
12 entire leadership team, but I do specifically
13 remember having a discussion with Lee Hendrickson
14 who was the HR business partner at the time;
15 Marvin Lewis, who was the associate athletics
16 director for finance and administration; and I
17 believe the athletics director, Mike Bobinski.
18   Q   Do you know whether any decisions were
19 made to adjust allocation based on the data that
20 was reviewed?
21   A   I do not specifically know that.
22       MS. BANKS:  Caleb, you can take that
23 down, and if you can bring up document 8.
24       (Lewis Exhibit 3 marked for
25 identification and attached to the transcript.)

36

1        MS. BANKS:  If you could give Ms. Lewis
2  control of that document, please.
3    Q   Ms. Lewis, do you recognize this
4  document?
5    A   Yes.
6    Q   Have you seen it before?
7    A   Yes.
8    Q   This particular document, if you look
9  at the bottom right-hand corner, says it was
10 amended October 22nd, 2015.  So that's just this
11 particular iteration of this document.  You
12 understood that it was amended from time to time?
13   A   Yes.
14   Q   Okay.  If you could turn to GTAA 103.
15 It's several pages in.
16       So on this page of the bylaws, in
17 Section 4, it talks about the Committee on
18 Compliance and Equity, and you were a member of
19 that committee, correct?
20   A   Yes.
21   Q   And so when it lists the members of the
22 committee, it starts with "Associate Director of
23 Athletics for Compliance."  That's you, right?
24   A   Yes.
25   Q   Okay.  And then if you look at the last

37

1  sentence of that section, "The committee will
2  provide a comprehensive report at least annually
3  to the President of the Institute, the Board of
4  Trustees of the Association, and the Executive
5  Board of the Institute." Do you see that?
6      A  I do.
7      Q  And do you recall the committee
8  executing on that goal?
9      A  I do not specifically recall a
10  comprehensive report.
11      MS. BANKS:  Okay.  If we can take this
12  down and bring up document 7, please.
13      (Lewis Exhibit 4 marked for
14  identification and attached to the transcript.)
15      MS. BANKS:  And if you could give her
16  control of the document, please.
17      Q  This is another copy of bylaws, but I
18  think if you look through the first page, you'll
19  see that this is a different iteration, would you
20  agree?
21      A  Yes.
22      Q  Okay.  If you could turn to page 131.
23  So there is a section here again, Section 4,
24  "Committee on Compliance and Equity." It looks a
25  little different here so it's a different

38

1  iteration. If you look at what it's comprised of,
2  the committee, it does not list your position,
3  correct?
4      A  Correct.
5      Q  And you were a member of this committee
6  since 2015, the version we just reviewed
7  previously, correct?
8      A  I was a member in 2015.  I believe I
9  was a member previously when my position began at
10  Georgia Tech.
11      Q  Okay.  Well, in this particular
12  version, you are not listed as a member, correct?
13      A  My position title was not listed, but I
14  was appointed as a member.
15      Q  So you believe you were still a member
16  even prior to 2015, even if you're not listed
17  here?
18      A  Yes.
19      Q  Okay.  At the bottom here, where it
20  talks about the principal responsibilities, it
21  says, "Among the committee's principal
22  responsibilities is to monitor and report status
23  towards fulfillment of the Gender-Equity Plan and
24  the Minority-Opportunities Plan as approved and/or
25  amended by the NCAA Committee on Athletics

39

1  Certification.  The committee will provide a
2  comprehensive report at least annually to the
3  President of the Institute, the Board of Trustees
4  of the Association, and the Executive Board of the
5  Institute."
6      This is a little different than the
7  responsibilities we read for the last iteration,
8  correct?
9      A  Yes.
10      Q  All right.  The Gender-Equity Plan and
11  the Minority-Opportunities Plan, those were plans
12  that were mandated by the NCAA at that time,
13  correct, or at some point?
14      A  At some point, yes.
15      Q  And do you know -- during your tenure
16  there, do you know how long that requirement had
17  been in place from the NCAA?
18      A  I do not know when that requirement
19  began at the NCAA, no.
20      Q  But it was part of the -- but it was a
21  requirement when you first began as a member of
22  the Committee on Compliance and Equity, correct?
23      A  I do not specifically know the timing
24  because the NCAA suspended the athletics
25  certification program.

40

1      Q  But they did that while you were there,
2  correct, while you were a member of the committee?
3      A  I do not recall if it was prior to or
4  while I was at Georgia Tech, no.
5      Q  Do you recall what the purpose of the
6  Gender-Equity Plan and Minority-Opportunities Plan
7  was?
8      A  Are you referring generally or specific
9  to Georgia Tech?
10      Q  Well, let's start generally.
11      A  Yes.  As part of the Division I
12  athletics certification process, each institution,
13  in order to maintain membership, was required to
14  conduct a self-study, and part of that self-study
15  was a Gender-Equity Plan and
16  Minority-Opportunities Plan, during each course of
17  certification.
18      Q  Okay.  And -- that was the requirement,
19  but what purpose did it serve or what goals was it
20  intended to serve, to your knowledge?
21      A  To my knowledge, it was intended to
22  ensure that institutions were self-studying
23  matters of gender and racial and ethnic equity and
24  opportunity and that the plans were designed to
25  provide a road map toward more equitable

41

1  practices.
2      Q   Okay.  And those goals, you would
3  agree, are important, correct?
4      A   Yes.
5      Q   Did this plan also help Georgia Tech
6  ensure that it remained compliant in Title IX
7  matters?
8      A   I was not involved with this plan at
9  Georgia Tech, so I don't believe I can speak to
10 that.
11     Q   Okay.  Well, who did play a role in
12 enforcing or monitoring or drafting the
13 Gender-Equity Plan?
14     A   I am not specifically sure which
15 individuals were involved.  I believe it was
16 created in -- somewhere in the 2006 to 2008 range,
17 when Georgia Tech last went through athletics
18 certification.
19     Q   Okay.  Well, you were the associate
20 athletic director for compliance, correct?  And
21 this is a compliance matter.  So --
22     A   I was the --
23     Q   I'm sorry.
24     A   Sorry, go ahead.
25     Q   So I'm wondering why you wouldn't have

42

1  been more familiar with this or working with this
2  plan.
3      A   I was the associate athletics director
4  for compliance.  At the time I did not have
5  oversight of Title IX, and I believe, when I
6  arrived at Georgia Tech, the familiarity I have
7  with the plan is that it was provided to me by a
8  colleague at the time in the Athletics Department.
9      Q   Provided to you how?
10     A   I don't specifically recall.  I believe
11 it was reviewed and then maybe e-mailed to me.
12     Q   So you had no role in enforcing this
13 plan or with Georgia Tech's efforts to comply with
14 it?
15     A   No.  And to my knowledge, I am unaware
16 of whether the plan was active when I arrived at
17 Georgia Tech.
18     Q   Well, at some point you recommended
19 removing this language from the bylaws, correct?
20     A   Yes.
21     Q   And why did you do that?
22     A   I made that recommendation because the
23 NCAA had suspended the athletics certification
24 program and the Gender-Equity Plan and Minorities
25 Opportunities -- Minority-Opportunities Plan were

43

1  no longer part of an NCAA requirement.  After
2  consultation with the athletics director, he did
3  not want to continue with the plan as it existed.
4      Q   That was Todd Stansbury?
5      A   No.
6      Q   Mike Bobinski?
7      A   Yes.
8      Q   Okay.  And did Mr. Bobinski tell you
9  why he did not want to continue with it?
10     A   I don't specifically recall an
11 individual reason, but I do recall that we
12 discussed wanting to build a comprehensive plan
13 based on current data and information.
14     Q   Did you agree with his desire to remove
15 this from the bylaws?
16     A   I was amenable, yes, to removing
17 outdated language from the bylaws.
18     Q   Did he direct you to write or to
19 recommend that this be removed?
20     A   I don't specifically recall.
21     Q   You said that you and Mr. Bobinski
22 discussed creating a new comprehensive plan.  Did
23 that happen?
24     A   Unfortunately, no.
25     Q   So this particular Gender-Equity and

44

1  Minority-Opportunity plan was not replaced with
2  any other plan?
3      A   Not specifically at that time.
4      Q   Has it been replaced with a plan as we
5  sit here today?
6      A   There is a plan in working progress,
7  yes.
8      Q   But it is not completed or in place?
9      A   It is in practice and in
10 implementation, but it is not complete.
11     Q   How can it be in practice and in
12 implementation but not be complete?
13     A   Not all portions of the plan have been
14 built out or completed.
15     Q   Okay.  So you would agree, then, that
16 Georgia Tech did not abandon -- by removing this
17 language, which you refer to as outdated, Georgia
18 Tech did not abandon the goals of gender equity or
19 minority opportunity, correct?
20     A   No.
21     Q   And it was still important for the
22 institution to achieve?
23     A   Yes.
24         MS. BANKS:  Caleb, you can take this
25 document down.

45

1    Q   So as associate director of compliance,
2  how many employees did you directly supervise?
3    A   My team consisted of three additional
4  full-time compliance staff members.
5    Q   And around the 2018, 2019 time period,
6  do you remember who they were?
7    A   Yes.  I believe it was Lance Marcos,
8  Brett Cooley and Chardonnay Buford.
9    Q   And was each of these individuals
10 assigned to a particular athletic program, or did
11 each employee have a certain area of expertise?
12   A   Each employee had primary areas of
13 responsibilities, but we did not assign to
14 specific sports.  So each staff member worked with
15 each sport.
16   Q   Do you recall what those areas of
17 responsibility were for those three individuals?
18   A   I believe that Lance Marcos had
19 oversight of rules education, eligibility and
20 playing and practice seasons.  I believe Brett
21 Cooley had oversight of financial aid and roster
22 management, and Chardonnay Buford predominantly
23 oversaw recruiting, initial eligibility and
24 monitoring.
25   Q   And did these employees regularly

46

1  inform you about their work?
2    A   Yes.
3    Q   And they sought direction and approval
4  from you on the performance of their duties?
5    A   Yes.
6    Q   So if they were investigating a
7  potential violation in an athletic program, would
8  they need to come to you before taking any actions
9  or making any decisions of import?
10   A   I typically would be aware, so I
11 believe yes, that would be the protocol.
12   Q   Okay.  And certainly your staff
13 couldn't report a potential violation to the NCAA
14 without your knowledge or approval, correct?
15   A   Typically, no.
16   Q   Are there circumstances in which they
17 would report something to the NCAA without your
18 knowledge or approval?
19   A   Not any specific circumstances that I
20 can think of.
21   Q   And they couldn't impose sanctions on
22 an athletic program without your knowledge and
23 approval, correct?
24   A   Typically, no.
25   Q   Were there any occasions when they did

47

1  so?
2    A   Not that I recall.
3    Q   So did the duties and responsibilities
4  of your compliance department overlap with other
5  departments like ethics or human resources?
6    A   Not other members of the compliance
7  team, but my duties at times overlapped with other
8  areas.
9    Q   How was that?
10   A   I -- at various points you spoke
11 earlier about Title IX.  I worked with the
12 Institute Title IX office.  I worked with legal
13 affairs on matters of Open Records Act requests
14 and other --
15   Q   Excuse me.  That was one of your duties
16 too, right, overseeing Open Records Act requests?
17   A   Yes.
18   Q   All right.  Sorry.  Continue.
19   A   No problem.  I also worked with the
20 Office of Legal Affairs on various matters as
21 assigned to me or indicated by either the director
22 of athletics or the vice-president for legal
23 affairs and risk management.
24   Q   Okay.  And what about human resources?
25   A   My day-to-day duties typically did not

48

1  overlap with human resources.
2    Q   So if a student or a staff member filed
3  a complaint with ethics or human resources, would
4  there ever be occasion where you would be
5  notified?
6    A   Yes.  I was the primary contact for
7  some matters.
8    Q   What sorts of matters?
9    A   I believe I served as the primary or
10 co-contact for EthicsPoint complaints, which is
11 the reporting hot line that Georgia Tech utilized.
12 So anything that was reported through that.
13   Q   Okay.  So anything that was reported
14 through ethics, if it involved gender issues, for
15 example, or NCAA issues in athletics, you would be
16 notified even if the complaint had gone to human
17 resources first or ethics first?
18   A   I would say definitely for NCAA
19 compliance matters.  I cannot speak specifically
20 whether all matters of equity or gender were
21 reported to me.
22   Q   If it was gender or equity in the
23 Athletics Department, would it come to you?
24   A   It could come to me.  Again, if the --
25 if an inquiry went to someone else, I can't say

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

49

1  with certainty that all matters were then pushed
2  to me.
3      Q   Should they have been?
4      A   I believe so.
5      Q   So -- and then, so on the flip side, if
6  a student or a staff member filed a complaint
7  through your office, in compliance, when would you
8  find it necessary to involve ethics or human
9  resources or any other office?
10     A   I would perform an analysis and learn
11  to any complaint or information we receive and
12  determine what falls under the purview of the
13  athletics compliance office, and if there other
14  things that don't fall under that purview, I would
15  make that call to escalate and forward those to
16  the appropriate individuals or teams.
17     Q   Can you briefly describe for me what
18  falls under the compliance purview?
19     A   So all matters of NCAA compliance fell
20  under our unit and then any additional matters
21  again, I would determine with either the director
22  of athletics, if appropriate, or the
23  vice-president of legal affairs and risk
24  management where they should be directed.
25     Q   Was gender equity issues in athletics

---

50

1  part of your purview?
2      A   As the deputy Title IX coordinator,
3  yes.
4      Q   Did it fall under compliance's purview
5  generally?
6      A   Not the NCAA compliance purview, no.
7      Q   Any compliance purview, is it a
8  compliance issue?  Is gender equity a compliance
9  issue?
10     A   Yes.
11     Q   So in the 2018, 2019 time period, Aisha
12  Oliver-Staley led the ethics department and Kevin
13  Cruse led the human resources department, correct?
14     A   Kevin Cruse led -- he was the HR
15  business partner for athletics, yes, and Aisha
16  Oliver-Staley had oversight of ethics and
17  compliance. I'm not sure if that was during her
18  interim role. I believe it was.
19     Q   What interim role was that?
20     A   She was interim vice-president for --
21  I'm not sure of her exact title, but following Pat
22  McKenna's retirement, she was an interim
23  vice-president.
24     Q   Okay.  And do you recall when that was?
25     A   Not specifically.

---

51

1      Q   Generally?
2      A   I believe Pat retired in the summer of
3  2018.
4      Q   So then you had a dotted line reporting
5  to her during that period when she took over for
6  Pat McKenna?
7      A   Aisha Oliver-Staley?
8      Q   Yes.
9      A   Yes.
10     Q   And so she oversaw compliance at that
11  time, correct?
12     A   For the Institute, I believe so, yes.
13     Q   And how long have you known
14  Ms. Oliver-Staley?
15     A   I believe I met her during my first
16  year at Georgia Tech.
17     Q   Do you consider her a friend as well as
18  a colleague?
19     A   Yes.
20     Q   So once she took over -- once
21  Ms. Oliver-Staley took over as the interim VP,
22  ethics, compliance and legal affairs, what role
23  did she play in your department, in the compliance
24  department?
25     A   She provided the same level of support

---

52

1  that Pat McKenna had so she was my dotted line
2  report and would advise on any matters as
3  necessary that fell under my purview or our unit's
4  purview.
5      Q   So NCAA matters, gender equity matters,
6  whatever may occur.
7      A   Yes.
8      Q   I know you said you were friends with
9  Ms. Oliver-Staley, so did you have occasion to
10  communicate with her on her personal cell phone?
11     A   I am not sure whether it was her
12  personal or Georgia Tech cell phone, but yes, on
13  occasion, we corresponded.
14     Q   Do you recall ever communicating with
15  her about work-related matters on her personal
16  cell phone?
17     A   Again, I'm not sure whether I was
18  communicating with her on her personal or her
19  work.
20     Q   Did you have more than one number for
21  her where you called her or texted her?
22     A   I believe at some point I went from
23  having one number to two numbers.  Yes.
24     Q   And do you know when that was, when you
25  went to two?

---

53

1    A   No, I do not.
2    Q   And do you recall Ms. Staley directing
3  you to use one number or another at any point?
4    A   Not specifically.
5    Q   Generally?
6    A   No.
7    Q   Okay. So you have no recollection of
8  her indicating that she would prefer you use one
9  number rather than another when texting about
10 certain issues?
11   A   No.
12   Q   Okay. So as head of human resources
13 for Georgia Tech athletics, what role did
14 Mr. Cruse play in compliance?
15   A   Mr. Cruse played a very limited role in
16 NCAA compliance. I would say there were some
17 routine matters where he was cc'd on
18 correspondence with coaches that were very
19 routine, for informational purposes, and then,
20 again, if any matter escalated through compliance
21 to become a personnel matter, he would be engaged.
22 And otherwise, if I received any matters that were
23 outside of my purview but inside human resources,
24 I would refer them.
25   Q   Okay. And would either

54

1  Ms. Oliver-Staley or Mr. Cruse keep you apprised
2  of any of their investigations related to
3  athletics department personnel in the course of
4  their duties?
5    A   I don't believe so unless it involved,
6  again, a matter under my purview.
7    Q   Okay. So a significant part of your
8  job was to oversee compliance with NCAA rules and
9  policies, correct?
10   A   Yes.
11   Q   And to investigate potential NCAA
12 violations by coaches at Georgia Tech, correct?
13   A   Yes.
14   Q   Okay. So I want to better understand
15 how you became aware of these violations, what you
16 do with them and, sort of, what the process was in
17 handling those, okay.
18       So what are the different ways that
19 potential NCAA violations can come to your
20 attention?
21   A   So we receive or identify possible NCAA
22 violations in various manners, as you described.
23 One is our monitoring systems. We have several
24 systems in place to monitor compliance with NCAA
25 rules and regulations. So those routine systems

55

1  may flag a potential violation that we need to
2  collect more information and look into.
3    Q   Is that a computer system? Is that
4  what you're referring to?
5    A   It's several different types of a
6  system. One example is a computer software system
7  that assists in reconciling phone records to
8  measure our recruiting database against the phone
9  calls our coaches make and the various recruiting
10 phone call rules. So that is one system.
11       Another example of a monitoring system
12 is the reporting of playing and practice season
13 activity. So we have a mechanism to collect
14 information from sport programs on how much they
15 practice, and there is a methodology to reconcile
16 or track that. So those are two examples of
17 monitoring systems we have in place.
18   Q   Okay. And those systems can flag
19 issues for you to look into further; is that
20 right?
21   A   Yes.
22   Q   How else might a potential violation
23 come to your attention?
24   A   We often receive self-reports. So a
25 student athlete, staff member or coach or any

56

1  individual who realizes that they may have
2  committed a violation reports that to our office.
3    Q   Okay. And then you would follow up and
4  look into that self-reporting.
5    A   Yes.
6    Q   Okay. How else might violations come
7  to your attention?
8    A   Violations can also come to our
9  attention being reported by internal or external
10 parties. I mentioned EthicsPoint earlier. That
11 is one mechanism that a potential violation can be
12 reported through. We have received other external
13 possible violations from other institutions, from
14 the Atlantic Coast Conference, from the NCAA and
15 from other external parties. And on the internal
16 side we certainly could receive information if
17 someone has witnessed something or believes there
18 may have been a violation.
19   Q   And those people who are internal would
20 report it how, just verbally or through
21 EthicsPoint or some or way?
22   A   I think they could report it in many
23 different ways, either verbally, over the phone,
24 in person, via e-mail. There are a multitude of
25 ways that folks could report to the compliance

57

1 staff.
2    Q   Okay.  So the report can also -- the
3 NCAA can contact you or report something to you
4 themselves, correct?  They can come to you and say
5 we think there's been a violation?
6    A   Yes.
7    Q   So explain to me how that typically
8 works.  How might the NCAA get that information
9 and then how do they go about reporting it back to
10 an institution like Georgia Tech?
11    A   Sure.  I think similarly to at the
12 institutional level, there are a multitude of
13 different ways that the NCAA can collect
14 information for more routine or level 3
15 violations.  I would say typically an enforcement
16 staff member, usually from the enforcement
17 development staff, would give the institution a
18 call and let them know they've heard some
19 information, and the institution then has an
20 obligation to look into it.
21        For more serious allegations, in that
22 level 1, level 2 area, an enforcement staff
23 member, I believe, calls the chief compliance
24 officer or the highest ranking compliance officer
25 on file in the NCAA directory and provides

58

1 notification that they have information about a
2 possible violation.
3    Q   Okay.  And will they ask the school or
4 institution to begin an investigation even if it's
5 a level 1 or a level 2?
6    A   That depends.  Every case, I imagine,
7 is very different and the circumstances and source
8 of information is very different in every case.
9 Most of the time the institution defers to the
10 enforcement staff at their direction whether they
11 want to conduct an investigation themselves, a
12 joint investigation or if they want the
13 institution to lead that investigation.  But
14 typically that person is solely given notification
15 and determination of the next steps.
16    Q   Okay.  How often would you say -- well,
17 how would you break down how often it happens that
18 either the NCAA investigates something itself,
19 Georgia Tech investigates something itself, at
20 least initially, or it's a joint investigation?
21    A   I don't know that I can provide that
22 breakdown necessarily.  It is so fact specific.
23    Q   In your experience, what happened most
24 frequently in terms of the investigation and who
25 conducted it?

59

1    A   Are you referring to here at Georgia
2 Tech?
3    Q   Yes, I am.
4    A   Okay.  For major violations
5 allegations, the level 1 and level 2, in my time
6 here at Georgia Tech, the NCAA predominantly has
7 conducted the investigations -- well, let me
8 think.  There have really only been two such
9 investigations, and one was conducted by the NCAA.
10 The other, they asked Georgia Tech to conduct with
11 their knowledge and advising along the way, and
12 then partway through that investigation the NCAA
13 took it over.
14    Q   Okay.  And the one that you're just
15 speaking of now, is that the MaChelle Joseph
16 investigation?
17    A   The one where we -- Georgia Tech began
18 the investigation and the NCAA took it over?
19    Q   Yes.
20    A   It was an investigation into the
21 women's basketball program, yes.
22    Q   Okay.  And the other one that you
23 talked about that was led by the NCAA, was that an
24 investigation into the men's basketball program?
25    A   Yes.

60

1    Q   Is there ever an occasion where
2 somebody at Georgia would report a violation or a
3 potential violation to the NCAA?
4    A   I can't speak specifically to how that
5 would happen, but sure, anyone is free to call the
6 NCAA.
7    Q   Have you, yourself, contacted the NCAA
8 to provide information to it about a potential
9 violation that you've learned of?
10    A   Yes, I have.
11    Q   And how many times have you done that?
12    A   I'm not certain of how many times that
13 has occurred.
14    Q   Okay.  At what point -- when you're
15 notified of a potential violation, at what point
16 do you notify officials in the athletic department
17 or elsewhere at Georgia Tech?  How did that work?
18    A   Are you speaking of routine, sort of,
19 level 3 common violations or level 1 or level 2
20 major violations?
21    Q   Well, let's discuss them all.  So let's
22 start with level 3.  How would you -- once you
23 receive that information from the NCAA, at what
24 point would you, if you did, notify Georgia Tech
25 officials?

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

61

1      A    Sure.  So, typically, level 3
2  information is very rare that we would hear
3  directly from the NCAA, but the protocol, if they
4  provide us information, would be the same as all
5  other level 3 violations.  And that typically
6  would entail a preliminary assessment of the
7  information, a determination of what next steps
8  are needed and then, depending on the nature of
9  the facts, who's involved, we would determine who
10 else needs to be aware.  And that could include an
11 involved individual, the head coach if it's
12 specific to a sport program, a sport administrator
13 that has oversight of that sport, and then again,
14 when necessary, the director of athletics and
15 vice-president for legal affairs.
16     Q    Okay.  So, basically, anybody involved
17 in that particular program that is identified
18 as -- where there is a potential violation,
19 correct?
20     A    Yes, through the course of collecting
21 information and then reporting that violation,
22 yes.
23     Q    And that applies to level 3?
24     A    Yes.
25     Q    And what about level 1 or 2?  If you

62

1  get notification from the NCAA about that, who do
2  you go about notifying and when?
3      A    So Georgia Tech has a very specific
4  investigation protocol, and that protocol
5  indicates that when information is received about
6  a possible level 1 or level 2 major violation,
7  that the vice-president for legal affairs, now the
8  general counsel, the faculty athletics
9  representative, the president and athletics
10 director are briefed unless one of them is
11 involved in the possible allegation.
12     Q    Okay.  And then what happens?
13     A    And then that group consults and at the
14 direction of the general counsel it's determined
15 whether to engage outside counsel and what the
16 next steps are, again, depending on how the NCAA
17 wants to move forward with that investigation.
18     Q    And at what point is the program itself
19 notified, either through the sport administrator,
20 the coach, anybody else?
21     A    So, typically, with level 1 and level 2
22 allegations, no one besides the individuals I
23 named previously are notified because there are --
24 there's enforcement -- internal operating
25 procedures that require confidentiality of any

63

1  investigations.  And so we work collaboratively
2  with the NCAA to determine who and at what point
3  anyone else is notified.
4      Q    So, typically, the sport administrator
5  and the coach is not notified if there is a
6  level 1 or level 2 investigation proceeding?
7      A    Correct.
8      Q    And is that consistent, or are there
9  times in which that procedure is deviated from?
10     A    That is consistent.
11     Q    For those level 1 and level 2, can you
12 tell me again those top-level officials that are
13 typically notified unless they are implicated?
14     A    Sure.  It's the president of the
15 institution, the general counsel, the faculty
16 athletics representative and the director of
17 athletics.
18     Q    Okay.  And you defer to the NCAA on how
19 to proceed with an investigation, that is, whether
20 to investigate it internally or to bring in an
21 outside law firm or to leave it with the NCAA?
22     A    Yes.
23     Q    And are there occasions in which the
24 NCAA and Georgia Tech both investigate at the same
25 time, it's a joint investigation of a level 1 and

64

1  level 2?
2      A    Yes, that is certainly possible.
3      Q    What would you say happens most
4  frequently for level 1 or level 2 violations in
5  terms of who investigates?
6      A    Are you speaking generally or specific
7  to Georgia Tech?
8      Q    Well, can you speak generally outside
9  of Georgia Tech?
10     A    No.
11     Q    Okay.  So let's keep it inside of
12 Georgia Tech, then.
13     A    Again, I mentioned that in one instance
14 the NCAA led the investigation.  And even with the
15 NCAA leading the investigation, they charged the
16 institution, Georgia Tech, with collecting
17 information and really working to support their
18 investigation.  So we worked at the direction of
19 the NCAA in terms of what records they needed,
20 setting up interviews.  Again, they led the
21 investigation and created the investigation plan,
22 but Georgia Tech was a collaborator along the way.
23     In the other instance, when at the
24 onset Georgia Tech led the investigation, again,
25 that was at the request of the NCAA, and Georgia

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

65

1  Tech and outside counsel did not commence that
2  investigation without reviewing all plans and
3  information with the NCAA, and the NCAA actually
4  made along the way document requests, record
5  requests so that they could also collect that
6  information as we moved through that
7  investigation.
8      Q   Okay.  When you do bring in outside
9  counsel, is that something that the NCAA directs
10 you to do or do you decide you should do it and
11 seek, essentially, permission from them?  How does
12 it work?
13     A   That is an institutional decision and
14 does not require NCAA permission.  So the
15 institution decides when it's appropriate to bring
16 in outside counsel.  And then once on board with
17 outside counsel, the NCAA is notified, the
18 enforcement staff, so that they are aware of who
19 the primary contacts are for an investigation.
20     Q   Okay.  And to your knowledge, what are
21 the factors that go into determining whether to
22 bring in outside counsel to investigate?
23     A   To my knowledge, it's the scope of the
24 investigation, the potential risk if the
25 allegations have merit, and the capacity to devote

---

66

1  the appropriate amount of time and expertise to
2  the matter.
3      Q   What do you mean by the level of risk?
4      A   I'm just referring to a major violation
5  being a more high risk, both operationally and
6  reputationally.
7      Q   And so in that instance you would be
8  more likely to bring in outside counsel, then?
9      A   More likely than --
10     Q   Than in a lower risk situation.
11     A   Yes.
12     Q   Okay.  And when you talk about merit,
13 what do you mean by that?
14     A   If the allegations have merit?
15     Q   Right.  So if the allegations have
16 merit, you're more likely to bring in outside
17 counsel to dig through it and find out what's
18 going on?
19     A   No.  What I meant by that is that the
20 risk is evaluated based on if the allegations do
21 have merit, what is the risk to the institution.
22 It's not an evaluation of whether the allegations
23 have merit at that time.
24     Q   So it's sort of the same thing as risk
25 to some extent?

---

67

1      A   Yes.
2      Q   Okay.  And time.  You said -- mentioned
3  time also being a factor.  Is that if it's going
4  to be a significant time expenditure, you're more
5  likely to bring in outside counsel?
6      A   I don't know if that makes an
7  institution more likely, but I think it is a
8  factor to consider, do institutional
9  representatives have the capacity or expertise to
10 move through and navigate a major investigation.
11     Q   In your tenure in this position, what
12 percentage of time did Georgia Tech bring in
13 outside counsel to investigate a level 1 or
14 level 2 violation?
15     A   Both investigations of level 1 and
16 level 2 violations, outside counsel was engaged.
17     Q   Okay.  When Georgia Tech is involved in
18 the investigation, either themselves or in concert
19 with the NCAA, do you create an investigation
20 plan?
21     A   Yes, I'd say there is an investigation
22 plan created.
23     Q   Is that a written plan that you create?
24     A   Not necessarily, no.
25     Q   So if it's not written, how do you

---

68

1  memorialize this plan?
2      A   In discussions with outside counsel and
3  the NCAA enforcement staff.
4      Q   Okay.  And part of the investigation
5  obviously includes interviewing people, correct?
6      A   Yes.
7      Q   How do you go about deciding who to
8  interview?
9      A   Similar to any investigation, there is
10 an evaluation of preliminary facts.  With respect
11 specifically to level 1 and level 2 allegations,
12 Georgia Tech would work collaboratively with the
13 NCAA enforcement staff to identify individuals
14 that may have knowledge that would be relevant to
15 that investigation.  Sometimes the enforcement
16 staff has a list -- preliminary list already, and
17 we would consult or they would ask us questions
18 about whether there were any additional
19 individuals.  And, likewise, if Georgia Tech felt
20 like there were additional individuals that could
21 have relevant knowledge, we would recommend them
22 to that list.
23     Q   Okay.  In addition to these interviews
24 or interviewees that you identified, do you talk
25 to people informally in order to gather

---

69

1  information, whether that's coaches, assistant
2  coaches, staff, players, anybody?
3      A  Generally, no.
4      Q  So if you're going to talk to somebody
5  about it, it's part of a formal interview?
6      A  If we're speaking specific to the
7  allegation, typically, yes, that would be in a
8  formal interview.
9      Q  Do you recall instances where that was
10 not the case, where there were more informal
11 discussions related to an investigation?
12     A  Not about specific allegations, no.
13     Q  When you're conducting an
14 investigation, do you give the head coach notice
15 before interviewing or talking to staff or
16 players?
17     A  No.
18     Q  Never?
19     A  No.
20     Q  In these interviews, who generally
21 participates?
22     A  Within the interview itself?
23     Q  Yes.
24     A  So if the NCAA is participating in the
25 investigation, the NCAA enforcement staff member

70

1  would typically lead that interview; the lead
2  compliance officer -- athletics compliance officer
3  would typically be present; a member of the --
4  either the general counsel or a member of the
5  general counsel staff; and our outside counsel, in
6  addition to the individual being interviewed.
7      Q  And does that line up pretty standard
8  for interviews?
9      A  Yes.  And I did omit at times a faculty
10 athletics representative may sit in on those
11 interviews as well.
12     Q  Okay.  And is the interview typically
13 taped or otherwise recorded?
14     A  Yes.
15     Q  How is it taped or recorded?
16     A  Typically, the NCAA enforcement staff
17 records, and then any additional outside counsel,
18 either for the institution or representing the
19 individual being interviewed, is also able to
20 record those meetings.
21     Q  But I'm talking about recording it on a
22 phone or --
23     A  No.
24     Q  -- tape recording or something like
25 that?

71

1      A  I think that depends on who is
2  recording.  I have seen individuals use a phone,
3  use a computer if doing it virtually where not all
4  members are present in the same room, and I have
5  also seen tape recorders, digital -- I think
6  digital tape recorders.
7      Q  Okay.  What about note taking?  Do
8  people typically take notes as well?
9      A  Yes, that is common.
10     Q  Okay.  And all of these measures, the
11 handwritten notes and recording, it's important --
12 is important, right, because you want to,
13 obviously, have an accurate transcription of what
14 is said -- what is asked and what is said?
15     A  Yes.
16     Q  Do you write a report of your findings?
17     A  For each interview or are you
18 speaking --
19     Q  No, for the investigation.
20     A  -- for the internal investigation?
21     Q  I'm sorry, for the investigation
22 itself, is a report created at the end?
23     A  It depends.  Again, if the NCAA
24 enforcement staff is leading that investigation,
25 typically the institution does not create a

72

1  written report.  In an instance where the
2  institution is leading an investigation, I would
3  say yes, it's common to create a written report --
4  a written self-report if allegations are
5  substantiated.
6      Q  Okay.  If they are not substantiated,
7  you don't write a report?
8      A  I think that would depend on the
9  circumstances.  And I would say it would be
10 likely, if allegations are not substantiated, to
11 either just close the case or document with,
12 perhaps, a general report.  I'm not sure.
13     Q  Okay.  As you're investigating, do you
14 share your findings with anyone at Georgia Tech as
15 you go, and if so, who?
16     A  I would say there are periodic status
17 updates that are provided to that list I mentioned
18 earlier, so the president, the faculty athletics
19 representative, the general counsel is typically
20 very engaged and helps provide that status update,
21 and the athletics director, again, either routine
22 status updates or if there's, you know, a notable
23 change in the investigation.
24     Q  Okay.  If you're interviewing people
25 and going around, isn't it sort of -- do people

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

**73**

1  get a sense that there is an investigation
2  happening?  I know you don't notify the -- you
3  said you don't notify the head coach or that
4  program sport administrator, but do they ever get
5  an inkling that this is happening?
6      A   I think that's possible, but we take
7  every effort to uphold the operating procedures of
8  the NCAA enforcement staff, and that includes a
9  pretty lengthy notification to each individual
10 that is interviewed that the information should be
11 kept confidential.  So we make every effort to
12 enforce that.
13     Q   Sure.  I mean, the people who are being
14 interviewed keep it confidential, but just in
15 terms of somebody being whisked away for an
16 interview, is it, in your experience, a situation
17 where it becomes sort of an open secret that an
18 investigation is happening or is it really
19 something that is kept under wraps pretty
20 effectively?
21     A   I think that depends on the
22 circumstances.
23     Q   And I'm talking about the fact of the
24 investigation, not necessarily the substance or
25 the testimony being gotten.  The fact of the

---

**74**

1  investigation, is that typically known?
2      A   I don't know that I can speak with any
3  certainty on that.  Again, from my role, we take
4  every effort to create an environment that that's
5  not known, but I don't know if it generally
6  becomes known.
7      Q   Okay.
8          All right.  So under what circumstances
9  would you take it upon yourself to report
10 potential violations by Georgia Tech individuals
11 to the NCAA?
12     A   Are you speaking about major violations
13 or routine level 3 violations?
14     Q   Well, let's start quickly with routine
15 level 3.  I assume that is done as a matter of
16 course?
17     A   Yes.  There is a required reporting
18 system that once we've determined a violation has
19 occurred, we report that information directly to
20 the NCAA via their desired platform.
21     Q   Okay.  And there are rules that govern
22 that in terms of what you're supposed to do and
23 how you're supposed to do it?
24     A   Yes.
25     Q   If you believe that perhaps there's

---

**75**

1  some sort of level 1 or level 2 violation but
2  you're not sure, there is an inkling, what -- how
3  do you go about determining whether and when to
4  report it to the NCAA?
5      A   So, again, I would gather, based on our
6  investigation protocol, that group that is enacted
7  or made aware of any potential level 1 or level 2
8  violations.  And in consultation with that group,
9  we determine whether we should move forward
10 investigating on our own or if we should call the
11 NCAA enforcement staff and request either a joint
12 investigation or seek advisement from them.  And
13 that's -- what I just said is specific to
14 information that is not received from the NCAA.
15     Q   Right.  So if you're not certain, of
16 course, whether an actual violation has occurred
17 yet or not, do you look into it first before you
18 turn around and share that information with the
19 NCAA?
20     A   Again, I would say at the outset we
21 would make a determination on not just whether we
22 want to investigate on our own or engage the NCAA,
23 but that might be an instance where we seek
24 guidance from outside counsel as well.  And so
25 it's so fact specific that I don't think I can

---

**76**

1  make a general statement about when we would
2  escalate it.
3      Q   But generally speaking, Georgia Tech,
4  like any institution, wants to avoid sanctions --
5  if possible -- sanctions and violations if at all
6  possible, correct?
7      A   Yes.
8      Q   Okay.  And it's better for Georgia Tech
9  if a program's conduct and actions complies with
10 NCAA rules, correct?
11     A   Yes.
12     Q   So to the extent that you don't have to
13 report something to the NCAA because you're not
14 yet sure, would you sort of slow your role to try
15 to determine what's happening here before you call
16 up the NCAA and say, I think we've got a problem
17 here?
18     A   Again, I think that's a very
19 fact-specific analysis.  Georgia Tech has
20 obligations under Division I membership to pursue
21 and investigate all possible allegations.  So the
22 speed at which that is done, you know, is
23 secondary to creating a plan and making sure we
24 uphold those obligations.
25     Q   Okay.  When you report something to the

---

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

77

1  NCAA, do they always investigate?
2      A  I can't answer that question.
3      Q  Well, in your experience and based on
4  your knowledge of NCAA practices, if something is
5  reported to the NCAA, are there times when they
6  might say, We don't see any violation here, there
7  is no there there, so we're just going to let this
8  one go, you guys can deal with it as you want?
9      A  I certainly think that's possible, yes.
10     Q  So they don't -- the NCAA doesn't have
11 to take in every potential violation and run it to
12 ground and do a formal investigation; is that
13 right?
14     A  No, not necessarily.
15     Q  When the NCAA does decide it's going to
16 conduct an investigation, either itself or jointly
17 with Georgia Tech, what role would you play in the
18 investigation and the interviews that they do?
19 For example, do you identify witnesses, do you
20 attend the interviews, do you have a speaking role
21 at those interviews?  What is your role as this
22 investigation unfolds?
23     A  Sure.  So my primary role would be to
24 support and lead the investigation as directed by
25 the general counsel or the NCAA enforcement staff.

---

78

1  So typically my role is to collect requested
2  documentation.  I identify any potential
3  individuals that may have been involved or may
4  have knowledge, depending on what the allegation
5  is, to provide any records or information that is
6  requested, sit in on interviews and at times ask
7  questions during those interviews if they have --
8  if there is an area I believe relevant that has
9  not been covered.
10     Q  Okay.
11         So you are active in the investigation
12 and in the interviews, correct?
13     A  In my experience, yes.
14     Q  In your experience, when the NCAA
15 concludes its investigation, it notifies Georgia
16 Tech that it has completed its investigation and
17 what its conclusion is, correct?
18     A  Yes.
19     Q  And what do you do with that
20 information when you receive it?
21     A  I have not received that information
22 directly.  That information has come to me via
23 outside counsel, and I make that determination, in
24 conjunction with the general counsel, who to
25 notify next.

---

79

1      Q  And how do you determine who to notify
2  next?
3      A  Part of that discussion is typically
4  who is already aware.  Certainly the individuals,
5  the president, the faculty athletics
6  representative and the director of athletics.  And
7  then I think it's an evaluation of who needs to be
8  aware that there are or are not any further steps.
9      Q  Okay.  So at that point the subject of
10 the investigation would need to be notified,
11 correct, whether there were steps or no steps to
12 be taken?
13     A  Yes.
14     Q  Okay.  And what is the timeline -- when
15 you consult with legal counsel, what is the
16 timeline for notifying that group of people?  Is
17 it as soon as possible, or is there some other
18 timeline that you have to consider?
19     A  There is not a formal -- excuse me.
20 There is not a formal timeline, but I believe,
21 based on the specific circumstance that that
22 judgment is made, whether it needs to be immediate
23 or whether there is a planned communication.
24     Q  So it is just based, like, on the
25 discretion and judgment of the people, like

---

80

1  yourself, making that decision?
2      A  Yes.
3      Q  Okay.  In 2018, 2019 time period, Lynn
4  Durham was President Peterson's chief of staff,
5  correct?
6      A  Yes.
7      Q  And what role did she play, if any, in
8  athletics compliance?
9      A  Overall, I think I mentioned that I
10 would update the president and the chief of staff
11 generally of compliance matters.  During the time
12 period you mentioned, I believe President Peterson
13 had asked that his chief of staff be briefed on
14 all matters or participate in those status updates
15 for any major violation investigation.
16     Q  Do you know who President Peterson
17 asked that his chief of staff be involved or be
18 briefed?
19     A  I do not specifically recall.
20     Q  Do you recall when he made this
21 request?
22     A  Not specifically.  I vaguely remember
23 that when we first notified that there were
24 possible allegations in 2017, he asked that his
25 chief of staff join the group at that point.

---

81

1     Q   Do you have any knowledge as to why he
2   wanted Ms. Durham to join the discussion at that
3   point?
4     A   No, I do not.
5     Q   Was that unusual, in your experience,
6   for Ms. Durham to play such an active role on
7   behalf of President Peterson?
8     A   No.
9     Q   But previously you had said that your
10  interactions were more directly with the president
11  and not so much with Ms. Durham, correct?
12    A   No. I think they were at times both
13  individually or together, but it just varied
14  depending on the subject matter.
15    Q   And Ms. Durham, obviously, worked
16  closely with President Peterson in your
17  experience, correct?
18    A   Yes.
19    Q   And so she was essentially, in your
20  view, his proxy so that if you're talking to
21  Ms. Durham, you feel like your information is
22  going to be shared with President Peterson,
23  correct?
24    A   Not necessarily. If that was
25  explicitly discussed, then that was known but I

82

1   would not say that she was his proxy.
2     Q   Okay. But if you share important
3   matters with her related to compliance or
4   investigations, did you have any reason to believe
5   that she wouldn't inform President Peterson and
6   keep him updated as well?
7     A   No. I would typically make that
8   request specifically with information I was
9   sharing.
10    Q   "Please tell President Peterson about
11  this"?
12    A   Yes, if it was relevant or appropriate,
13  yes.
14    Q   Okay. But if you were sharing
15  information or developments with her and you
16  didn't make that request, was it your
17  understanding that she was not going to share that
18  with President Peterson?
19    A   I don't know that I had that thought or
20  not.
21    Q   Okay. So you didn't know one way or
22  the other whether Ms. Durham was sharing this
23  information with President Peterson?
24    A   Not specifically, no.
25    Q   Did Ms. Durham ever convey to you

83

1   thoughts of President Peterson about any
2   particular matters you were working with her on?
3     A   Not that I recall specifically.
4     Q   So she never shared President
5   Peterson's views or requests about any matters
6   that you worked on with Lynn Durham?
7     A   I don't recall any specific matters
8   that she made that conveyance.
9     Q   Okay. Was it your understanding
10  that --
11        MS. BANKS: Well, strike that.
12    Q   Was she providing any direction in
13  terms of what to do or not to do in any particular
14  investigation that you were involved in?
15    A   No.
16    Q   So what role was she playing when you
17  worked with her on matters of compliance or any
18  investigations that you were involved in?
19    A   Typically her role was to sit in on the
20  status update meetings. That's as much as I
21  recall her participation in any investigation that
22  I was involved in.
23    Q   And did you understand why she was
24  sitting in?
25    A   At the president's request.

84

1     Q   So that the president could be informed
2   of what was happening?
3     A   Typically, the president also
4   participated in those meetings.
5     Q   So why would they both need to be
6   there? Do you have any understanding of that?
7     A   I do not.
8     Q   And if only she was there and
9   not the president, was it your understanding that
10  she was there on behalf of the Office of the
11  President to gain the information that -- of that
12  meeting or of that decision-making process?
13    A   I don't specifically recall any status
14  updates or case updates that we provided relative
15  to any investigation that the president did not
16  participate in, but if he -- if on occasion he was
17  not there, I would assume she is representing him.
18    Q   Okay. In 2018, 2019, Mark Rountree was
19  the deputy athletics director and a sports
20  administrator for certain programs; is that right?
21    A   Yes.
22    Q   And what role did Mr. Rountree play, if
23  any, in athletics compliance?
24    A   He had no formal role in athletics
25  compliance but would collaborate, upon our

85

1 request, as any other staff member would.
2     Q   And on what occasions might he
3 collaborate with you or be involved in anything
4 that you were doing?
5     A   Certainly if we had a request out for
6 information from him, he would participate and
7 collaborate in providing that information.  I
8 mentioned earlier that with level 3 violations,
9 typically we notify the sport administrator so he
10 would collaborate on that and in any follow-up
11 information that was needed.
12    Q   So you mentioned that you notified the
13 sport administrator and sometimes the coach of
14 level 3 violations but that you don't notify the
15 sports administrator or the coach about level 1 or
16 2 violations.  Can you explain to me why that is?
17    A   Yes.  So I mentioned earlier that the
18 NCAA enforcement staff has internal operating
19 procedures for the conduct of all investigations.
20 And so it is made clear, when the NCAA notifies
21 the institution of a possible level 1 or level 2
22 violation, who is permitted to be notified.
23    Q   Okay.  So that is an NCAA rule?
24    A   It's part of their operating
25 procedures, yes.

86

1     Q   Okay.  And -- but during the course of
2 the level 1 or level 2 investigation, you do
3 interview the coach or the sports administrator to
4 the extent they either are implicated or have
5 relevant information; is that right?
6     A   If they are identified, yes.
7     Q   So at that point they would be aware
8 that there was an investigation happening?
9     A   They would be made aware that there is
10 an interview about knowledge of or possible
11 involvement in an NCAA violation.
12    Q   Okay.  So they would understand that
13 you were looking into that at that point.
14    A   At notification they would understand
15 where there's something being investigated, but
16 they are not informed as to what at that point.
17    Q   Okay.  Other than the questions that
18 are asked of them in the interview.
19    A   During the interview they are then
20 informed generally about what is being
21 investigated.
22    Q   But not the -- are you talking -- when
23 you say "notification," you mean the notification
24 of the interview or the notification of
25 violations?

87

1     A   Notification of the interview.
2     Q   Okay.
3         In your position did you provide
4 training to players and staff about what to do if
5 they have compliance or equity concerns?
6     A   Yes, we discussed how to report
7 possible violations.
8     Q   And was that a formal training that you
9 did, like a class?  How did that go?
10    A   It was not part of a class, but there
11 were several occasions and several different
12 platforms and formats in which rules, education
13 and information about reporting was presented to
14 student athletes, coaches and staff working with
15 the athletics program.
16        There were team meetings at the
17 beginning of each academic year prior to
18 participation in activities where that information
19 was discussed.  There were typically additional
20 periodic team meetings throughout the year where
21 members of the compliance team or myself --
22 including myself may visit and discuss various
23 items or reporting mechanisms.  Information was
24 also distributed via e-mail.
25        And then, similarly, on the coach and

88

1 staff side, at all-staff meetings and individual
2 sport or abroad rules education meetings, and
3 then, of course, via e-mail as well.
4     Q   Okay.  So there were both oral and
5 written directions about policies or procedures
6 related to reporting any compliance or equity
7 concerns; is that accurate?
8     A   Yes.
9     Q   And is there a formal Georgia Tech
10 policy or procedure for reporting compliance or
11 equity concerns?
12    A   I mentioned the investigation protocol
13 earlier.  That protocol includes, specific to NCAA
14 violations, who they may be reported to to fulfill
15 your obligations, but otherwise, I'm not aware of
16 an Institute policy about reporting an allegation.
17    Q   Okay.  So if somebody has -- whether
18 it's a student or a staff member -- has a concern
19 about gender equity issues, is there a formal
20 process by which they can file a complaint?
21    A   Yes.  I believe there are a multitude
22 of ways a complaint can be filed.  It can be filed
23 verbally in person, via e-mail, and I believe
24 there is an intake form where someone can file a
25 written complaint, in addition to the EthicsPoint

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

89

1 system I mentioned earlier.
2    Q   Okay.  And would any of those gender
3 equity concerns be routed through your office or
4 come to your office initially?
5    A   I suppose they could absolutely come to
6 my office.
7    Q   Because you're the deputy Title IX
8 coordinator, correct?
9    A   I was previously, yes.
10   Q   What about a Georgia tech policy or
11 procedure for reporting a concern about a coach or
12 staff member's conduct?  Does that exist, to your
13 knowledge?
14   A   I am not sure of a formal procedure
15 specific to coaches, but I do believe the
16 Institute has mechanisms to report alleged
17 employee misconduct.
18   Q   Well, and that would include a coach,
19 right?  A coach is an employee.
20   A   Yes.
21   Q   So there are policies or procedures
22 related to employee misconduct?
23   A   Yes.
24   Q   And are those policies and procedures
25 gone over in the verbal and written information

90

1 that you provide to people about filing
2 complaints?
3    A   I think some are likely touched on.
4 Not every policy that exists is reviewed in
5 detail.
6    Q   Is the employee misconduct policy
7 reviewed, either orally or in writing, when you do
8 these trainings?
9    A   So my education sessions were mostly
10 relevant to NCAA compliance.  And at the time I
11 was serving as deputy Title IX coordinator to
12 those areas, I did not have broad oversight of
13 employee misconduct.  So while maybe referenced,
14 that was not under my purview.
15   Q   Do you know if anybody on your team
16 referenced employee misconduct or coach misconduct
17 allegations and what to do with those?
18   A   I do not know specifically.
19   Q   And do you have a specific recollection
20 of whether you, in fact, talked about what to do
21 with concerns about coach misconduct in
22 presentations that you made?
23   A   I don't recall specifically.
24   Q   If a manager -- to your knowledge, if a
25 manager at Georgia Tech receives a complaint or a

91

1 concern about issues related to gender equity or
2 compliance, are they obligated to report that to
3 anyone?
4    A   When you say "manager," do you mean a
5 supervisor of an employee or a manager of a team?
6    Q   Oh, like a -- more of a supervisor-type
7 individual.
8    A   Thank you.  Yes, certainly on the
9 Title IX side and what falls under that umbrella,
10 that, you know, all staff members have an
11 obligation to report that, any information they
12 have or allegation that they have.  On the NCAA
13 compliance side, I would say yes, that's
14 absolutely the expectation as well.
15   Q   Okay.  And so if somebody raises that
16 concern to a supervisor that -- and the supervisor
17 then takes the appropriate action, you would
18 expect that it should be addressed by Georgia Tech
19 at some level, correct?
20   A   Yes.
21       MS. BANKS:  Okay.  It's 11:30.  If it's
22 all right with everybody, I would like to take
23 maybe a ten-minute break or -- and, Courtney, what
24 are you thinking in terms of a lunch break?
25       MS. POOLE:  I was trying to walk that

92

1 through my head.  I think a break now would be
2 good, but do you think that we could break, I
3 don't know, around 12:30-ish for lunch, or is that
4 not a long enough stretch?
5       MS. BANKS:  Whatever we do is fine, you
6 know, and we'll just pick up where we left off.
7       So let's get back on the record at --
8 it's now 11:28, so 11:40.  And then we'll go to
9 12:30, and I'll do my best to, sort of, get us off
10 to the lunch break between, like, 12:30 and 12:45.
11       MS. POOLE:  Great.
12       MS. BANKS:  Thank you.
13       MS. POOLE:  Thanks.
14       (A recess was taken.)
15 BY MS. BANKS:
16   Q   Okay.  Ms. Lewis, so you joined Georgia
17 Tech as the associate athletic director of
18 compliance in September 2013, correct?
19   A   Yes.
20   Q   And Coach Joseph was already the head
21 coach of women's basketball at that point,
22 correct?
23   A   Yes.
24   Q   What, if anything, were you told about
25 Coach Joseph and/or her program when you started?

93

1     A   I was made aware that Georgia Tech was
2  navigating a NCAA major violation at the time and
3  that the involved programs were football, men's
4  basketball and women's basketball.  Outside of
5  that, that's all I recall being notified of.
6     Q   Did anybody share -- I'm sorry.
7     A   I was going to say, I will add, I also
8  remember, and I do not recall if it was prior to
9  arriving on campus or after, but that there had
10 been a lot of changes on the women's basketball
11 coaching staff.
12    Q   That's what you were told?
13    A   Yes.
14    Q   By whom?
15    A   I do not recall.
16    Q   And do you know why you were told that
17 information, what the purpose of that information
18 was?
19    A   I believe it was as part of navigating
20 through the violation I just mentioned.  It was
21 not resolved when I began, so that was going to be
22 work ahead of me, to assist and process that
23 violation as needed.
24    Q   Do you recall what the violation was
25 that was in process related to the women's

94

1  basketball program when you began?
2     A   Yes.  It was a violation that entailed
3  telephone call and text message violations across
4  the three programs I mentioned, football, men's
5  basketball and women's basketball, and I believe
6  the women's basketball involvement had, again, it
7  was involved with text messages and phone calls.
8     Q   So there were ongoing investigations,
9  when you began, into all three of those programs?
10    A   I don't know that any investigation was
11 active.  I believe it had moved out of the
12 investigation phase and into the processing phase
13 for that violation.
14    Q   Okay.  And were those level 3
15 violations?
16    A   No.  I believe they were level 2
17 violations.
18    Q   Do you recall what the result or the
19 upshot was of those allegations of level 2
20 violations for each of the programs?
21    A   Yes.  I don't recall all of the
22 specific details, but there was in the football
23 program one named individual that was no longer
24 with the institution following discovery of the
25 violations.  I believe the institution prior to my

95

1  arrival had self-imposed recruiting restrictions
2  across all three programs.  And so the result was
3  a case resolved by summary disposition, which the
4  enforcement staff and the institution agreed on
5  the facts and associated penalties, and then
6  Georgia Tech was already on probation at the time
7  and probation was extended as part of that case.
8     Q   Other than the status of this -- of
9  these violations, were you told anything else
10 about either MaChelle Joseph or her program, that
11 you recall?
12    A   Not that I recall, no.
13    Q   I want to jump forward to 2015.  In
14 September of 2015 Coach Joseph attended a Georgia
15 Tech football game after which she was reprimanded
16 for allegedly being intoxicated.  Do you recall
17 that incident?
18    A   Recall the football game or the --
19    Q   Any of it.
20    A   I do recall the football game vaguely.
21 I believe I interacted with Coach Joseph during
22 that game.  After that, I don't recall any
23 follow-up specifically.
24    Q   Were you aware at the time that
25 somebody filed a complaint against Coach Joseph

96

1  related to her alleged behavior at that football
2  game?
3     A   In the -- immediately following the
4  game, no, I was not aware.  I believe that at some
5  time well after, the athletics director informed
6  me that there had been a reprimand, but I was
7  unaware prior to that.
8     Q   And do you know how long after the game
9  before you were told that there was a reprimand?
10    A   No.  I do not.
11    Q   And the athletic director was Mike
12 Bobinski or Todd Stansbury?
13    A   Mike Bobinski.
14    Q   Do you have any knowledge as to who
15 filed the complaint or complained about Coach
16 Joseph related to this football game?
17    A   No, I do not.
18    Q   So it wasn't you?
19    A   No.
20    Q   And do you have any knowledge as to
21 whether it was Marvin Lewis?
22    A   I do not know.
23    Q   Did you and Marvin Lewis ever discuss
24 the allegations about Coach Joseph and this
25 football game?

97

1    A   Not to my recollection, no.
2    Q   So you were not related to or involved
3 in the investigation of Coach Joseph in this
4 incident?
5    A   No.
6    Q   Do you know who was involved in the
7 investigation?
8    A   No, I do not.
9    Q   And were you questioned by anyone as
10 part of the investigation?
11    A   No, I was not.
12    Q   Were you aware of any sort of e-mail or
13 communication by an individual or individuals who
14 said that they observed Coach Joseph at the game
15 and that she did not appear to be intoxicated?  Do
16 you have any knowledge of such an e-mail or such
17 communication?
18    A   No, I do not.
19    Q   Were you involved in any way as to
20 whether or how to discipline Coach Joseph related
21 to this incident?
22    A   No, I was not.
23    Q   Also in September of 2015 you issued a
24 letter of admonition directed to Coach Joseph and
25 the women's basketball video coordinator Mike

98

1 Harkness.  Do you remember that?
2    A   I do not specifically remember it, no.
3    Q   Okay.  It was related to apparently
4 Mr. Harkness engaged in impermissible text
5 messages connected with recruiting.  Does that jog
6 your memory at all?
7    A   No, not specifically.
8    Q   Okay.
9    MS. BANKS:  Caleb, can you bring up
10 document 6, please.
11    (Lewis Exhibit 5 marked for
12 identification and attached to the transcript.)
13    REMOTE TECH:  Was document 6 recently
14 uploaded?  I'm not seeing it.  Let me check the
15 link one more time.
16    I don't have that document 6 in the
17 link.
18    MS. BANKS:  Well, Joe, is that
19 something you can get uploaded and we'll come back
20 to it?
21    MR. ABRAHAMS:  It's uploading now.  I
22 apologize about that.
23    MS. BANKS:  If it's uploading now, does
24 that mean, Caleb, you can bring it up now or
25 should we come back to it later?

99

1    REMOTE TECH:  No, I have it right now.
2 I can bring it up.
3    MS. BANKS:  If you could give Ms. Lewis
4 control over the document, please.
5    Q   Ms. Lewis, do you recognize this
6 document?
7    A   I would have to read it to familiarize
8 myself, but it appears to be my e-mail address.
9    Q   Why don't you take a minute and just
10 review it quickly.
11    A   I don't specifically recall this
12 incident, but I have read through the document.
13    Q   So this does or does not refresh your
14 recollection about this incident?
15    A   It honestly does not much.
16    Q   Okay.  Do you have any recollection
17 about whether this letter of reprimand as to Coach
18 Joseph was withdrawn?
19    A   Well, I will make a distinction.  In
20 NCAA terms, there is a very drastic difference
21 between a letter of admonishment and a letter of
22 reprimand.  So I see here that letters of
23 admonishment, which are more documenting that a
24 violation occurred and what the follow-up was, was
25 issued.  I do not specifically recall any next

100

1 steps to this.
2    Q   Okay.  So we're dealing with a letter
3 of admonishment here, it appears.  Would you, as a
4 matter of course, issue a letter of admonishment
5 to an individual who had no part in the alleged
6 violation?
7    A   I would say that's not typical, but I
8 can't say that it's never happened, depending on
9 the situation.
10    Q   Why would an uninvolved, unimplicated
11 individual get a letter of admonishment?
12    A   I don't specifically know.  It seems
13 here that one was issued, and I don't recall the
14 facts.  So I'm not sure under what circumstances.
15 Again, I -- typically, I don't think one would be
16 issued.
17    Q   So in this situation, if Mike Harkness
18 engaged in some sort of text message violation
19 about which Coach Joseph had no knowledge or
20 involvement, is it your opinion, sitting here
21 today, that a letter of admonishment would be
22 inappropriate for her?
23    A   Yes.  I would say, typically, that a
24 head coach would be cc'd on a letter of
25 admonishment to the involved individual if they

101

1  had no part in the violation.
2      Q   Okay.
3          MS. BANKS:  You can take that down,
4  Caleb.  Thank you.
5      Q   Okay.  In the fall of 2016, do you
6  recall an incident in which Coach Joseph's
7  assistant, Ginger Sanford, filed a complaint about
8  her?
9      A   I am aware of that now.  I don't
10 believe I was aware of that at the time.
11     Q   You were not aware of it at the time?
12     A   No.
13     Q   Were you aware, at or around that time,
14 that Georgia Tech hired an investigator to look
15 into the complaint and that it resulted in Coach
16 Joseph receiving a final written warning?
17     A   I was made aware, I believe, at the
18 conclusion of that investigation, yes.
19     Q   Okay.  So you had no involvement in the
20 investigation and, in fact, no knowledge that one
21 was taking place?
22     A   Correct.
23     Q   Are you aware whether or not Marvin
24 Lewis knew Ginger Sanford prior to her becoming
25 Coach Joseph's assistant?

102

1      A   I'm not specifically aware, no.
2      Q   Are you generally aware?
3      A   I don't believe I've ever spoken to
4  Marvin about whether he knew Ms. Sanford prior to
5  her joining Georgia Tech, but I don't specifically
6  recall.
7      Q   Okay.  Have you had occasion to meet
8  Ms. Sanford at any point during or after her
9  employment?
10     A   I met her once she began employment at
11 Georgia Tech, and I have not spoken with her since
12 her employment ended.
13     Q   Okay.  And when you spoke with her when
14 her employment began, what was the reason for that
15 communication?
16     A   I don't specifically recall.  I imagine
17 it was an introduction since we would be working
18 together in the capacity of each of our positions.
19     Q   Did Mr. Lewis ever speak to you about
20 Ginger Sanford or the Ginger Sanford
21 investigation?
22     A   Not that I recall, no.
23     Q   Do you have any knowledge about whether
24 Mr. Lewis knows Ms. Sanford's son?
25     A   I do not.

103

1      Q   So you had no knowledge of the
2  investigation -- the Sanford investigation.  Do
3  you know whether anyone else in compliance did or
4  played a role?
5      A   I am not aware of whether anyone else
6  in the athletics compliance office knew.
7      Q   If they did, you would be made aware of
8  it, correct, being the --
9      A   I don't --
10     Q   -- in that department?
11     A   I don't think necessarily.  I think
12 that all depends on the investigation protocol of
13 whomever is conducting that investigation.  I
14 wouldn't feel obligated to be made aware.
15     Q   Okay.  In the compliance department,
16 did you have staff meetings from time to time?
17     A   Sure.
18     Q   And at those staff meetings did the
19 various individuals report out on what they were
20 working on?
21     A   Yes.
22     Q   So if somebody was working on the
23 Sanford investigation, they would inform you
24 during that meeting, correct?
25     A   Again, not necessarily.  When you say

104

1  "working on," do you mean interviewed as part of
2  that investigation or actively, you know, helping
3  to conduct the investigation?
4      A   Actively helping to conduct the
5  investigation.
6      A   Ah.  I imagine I would be made aware of
7  that, if a member of my staff was asked to
8  participate in that context.  And I would imagine
9  that they would inform me of that, but I don't
10 know that that would be discussed at a group staff
11 meeting.
12     Q   But you would agree it would be unusual
13 for a member of your staff be actively engaged in
14 an investigation about which you knew nothing?
15     A   It would be unusual, certainly.
16     Q   Are you aware of any of the allegations
17 that were made as part of the Sanford
18 investigation either by Coach Joseph or against
19 Coach Joseph?
20     A   Not specifically.
21     Q   Okay.  Were you aware that in the
22 course of the Sanford investigation, Coach Joseph
23 alleged that Joeleen Akin and athletic director,
24 Paul Griffin, were treating her differently than
25 they treated male employees in the athletic

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

105

1  department by investigating her for asking
2  Ms. Sanford to do personal tasks?
3      A   Again, I don't recall any specific
4  information about that other than at the
5  conclusion of the investigation being provided a
6  broad overview.
7      Q   Okay.  But nobody brought to your
8  attention this allegation by Ms. Joseph that she
9  was being treated differently than male coaches in
10 the athletic department?
11     A   No.
12     Q   So you weren't asked to investigate
13 that allegation as a Title IX complaint?
14     A   No.
15     Q   Do you have any knowledge as to whether
16 anyone else investigated this as a gender
17 discrimination or gender equity issue?
18     A   I do not have any knowledge of that.
19     Q   Okay.
20         We've mentioned Marvin Lewis through
21 the course of today already.  You're married to
22 Mr. Lewis, correct?
23     A   Yes.
24     Q   And for how long have you been married?
25     A   Since October 17, 2020.

106

1      Q   Okay.  Right in the middle of the
2  pandemic.
3      A   Yes.
4      Q   Okay.  So he also works for Georgia
5  Tech Athletics, correct?
6      A   Yes, he works for Georgia Tech.
7      Q   Georgia Tech.  And do you know when he
8  began working at Georgia Tech?
9      A   I believe it was on or around September
10 2014.
11     Q   So about a year after you?
12     A   Yes.
13     Q   And when did you begin your romantic
14 relationship with him?
15     A   Sometime in the spring of 2016.
16     Q   Okay.  At that time he was the
17 associate athletic director of administration and
18 finance, correct?
19     A   Yes.
20     Q   So, effectively, the chief financial
21 officer for Georgia Tech Athletics?
22     A   Yes.
23     Q   And this put him in charge of the
24 budgets for the sports programs; is that right?
25     A   Yes.

107

1      Q   Were you aware at any point that Coach
2  Joseph had complained that Mr. Lewis did not
3  provide sufficient funding to women's basketball
4  as compared to men's basketball?
5      A   Not specifically, no.
6      Q   You never came to be aware of those
7  allegations?
8      A   I -- I do not recall receiving an
9  allegation or any sort of formal complaint or
10 conversation about that, no.
11     Q   Okay.  I'm not talking about a formal
12 complaint.  I'm just saying, generally speaking,
13 were you aware that Coach Joseph took the position
14 that Mr. Lewis didn't provide sufficient funding
15 to women's basketball as compared to men's
16 basketball?
17     A   So I've never -- I don't recall ever
18 speaking to Ms. Joseph about that specifically.
19 And so, if I was aware, which, again, I don't
20 specifically recall, it would have been through
21 third parties or, you know, hearing it from
22 someone else.  I've never --
23     Q   Right.  And that's --
24     A   -- spoken with Ms. Joseph.
25     Q   Okay.  Understood.  I'm just trying to

108

1  get a sense of whether you understood that, and I
2  assume it would be from third parties if not
3  Ms. Joseph.  So were you made aware by Mr. Lewis
4  or anybody else that she had taken this position?
5      A   Not that I recall specifically, no.
6      Q   So your testimony is that you never had
7  knowledge that she believed that women's
8  basketball and men's basketball were treated
9  differently in terms of funding?
10     A   So I -- I would say I don't remember
11 any specific conversations or who they were with,
12 but I would say I understood generally perhaps
13 that she had, you know, made that claim or that
14 Ms. Joseph was upset about that.  But again, I
15 never had a specific conversation that I can
16 recall.
17     Q   Okay.  So how did you come to
18 understand generally that she had made that claim
19 or was upset about that?
20     A   I do not remember.
21     Q   But you do recall having a -- having
22 general knowledge of that?
23     A   Yes.
24     Q   And when do you believe you first
25 gained that general knowledge that she held those

109

1  beliefs?
2      A   I honestly do not recall.
3      Q   Do you recall having a conversation
4  with Mr. Lewis about that issue?
5      A   Not specifically, no.
6      Q   Generally?
7      A   Not that I can recall.
8      Q   Okay.  And did Mr. Lewis, to your
9  recollection, ever share with you what he thought
10  of those claims or complaints by Coach Joseph?
11      A   Not that I remember, no.
12      Q   Did Mr. Lewis ever express frustration
13  or anger about Coach Joseph and her concerns or
14  complaints about his treatment of her program?
15      A   Will you please repeat the question.
16      Q   Did Mr. Lewis ever express frustration
17  or anger about Coach Joseph and her concerns that
18  she was raising about his treatment of her
19  program?
20      A   I don't recall the specific scenarios
21  or specific causes, but I do recall at times, and
22  not specifically when, Mr. Lewis expressing
23  frustration that there was tension in that
24  relationship.
25      Q   And to what did he attribute that

110

1  tension, if you know?
2      A   I do not know.
3      Q   What did he say to you about Coach
4  Joseph and the tension in that relationship?
5      A   I don't specifically recall.
6      Q   Can you tell me generally what he said?
7      A   What I remember is that there was
8  tension and that, if I recall, he didn't want
9  there to be and he wanted a better working
10  relationship.
11      Q   Fair to say that he was not happy with
12  the claims that she was making about his treatment
13  of her program?
14      A   I don't think I can answer that because
15  I don't specifically remember, you know, those --
16  the claims that you reference.
17      Q   Would you characterize his attitude
18  towards Coach Joseph as one of personal dislike?
19      A   No, I don't believe so.
20      Q   How would you characterize -- to the
21  extent that you know, how would you characterize
22  his opinion of Coach Joseph as a person or as a
23  colleague?
24      A   I don't --
25          MS. POOLE:  One question.  Hold on,

111

1  Sho.  Before she answers, I object to that
2  question as calling for speculation, but you can
3  answer, if you know.
4      Q   And I think I characterized it as to
5  the extent you know.
6      A   Thank you.  I don't feel like I can
7  answer how he viewed that relationship or
8  Ms. Joseph as a person or a colleague.
9      Q   So it's your testimony that he never
10  shared that opinion with you or an opinion of
11  Coach Joseph as a person or as a colleague?
12      A   Not that I specifically recall.
13      Q   Do you generally recall?
14      A   As I mentioned earlier, I generally
15  recall frustration that -- or remember hearing
16  that the working relationship wasn't as positive
17  and that he wanted that to improve.
18      Q   Uh-huh.  And did he ever convey to you
19  how he thought it might improve, that
20  relationship?
21      A   Not that I specifically remember, no.
22      Q   Did you have any thoughts or offer him
23  any advice on how to improve that relationship?
24      A   I don't specifically recall.
25      Q   Do you recall generally?

112

1      A   I do not recall a conversation about
2  ways to improve the relationship, no.
3      Q   Do you recall having conversations with
4  Mr. Lewis about Coach Joseph and the tension in
5  their relationship?
6      A   Not beyond what I have already
7  mentioned.  I don't recall any specific or lengthy
8  conversations about that.
9      Q   Okay.  And did you and Mr. Lewis
10  discuss work-related matters?
11      A   When?
12      Q   In your personal life, did you and
13  you typically discuss work-related matters outside
14  of work or just in general, based on your
15  relationship with each other?
16      A   At times, yes.
17      Q   And do you try to support each other
18  and help each other work through difficult
19  professional events?
20      A   Yes.
21      Q   And so would you think that it would be
22  likely that during this time, when he expressed a
23  concern about the relationship and a desire to
24  improve it, that you might have offered him advice
25  or guidance on how to do that?

113

1    A   Yes, that seems reasonable, and I may
2  have.  I just don't recall those conversations.
3    Q   Okay.  Did you, yourself, have any
4  opinions about the cause of that tension in their
5  relationship or how best to approach it?
6    A   I was not engaged in their professional
7  or interpersonal relationship for the most part,
8  so I don't have any inclination on exactly what
9  would have caused the tension, no.
10   Q   Did you or anybody in your office ever
11 investigate allegations of Mr. Lewis's treatment
12 of women's basketball and whether there was an
13 inequity there?
14   A   I did not, no.
15   Q   And did anyone in your office conduct
16 an investigation?
17   A   Not to my knowledge, no.
18   Q   When did you first disclose to Georgia
19 Tech that you were in a relationship with
20 Mr. Lewis?
21   A   In the fall of 2016.
22   Q   And to whom did you report this?
23   A   Todd Stansbury.
24   Q   What was Mr. Stansbury's response?
25   A   I would characterize it as a little bit

114

1  surprised, and then he also inquired about whether
2  we knew what any appropriate policies were, and
3  then said he would follow up, if needed, with any
4  additional conversation and wished us luck.
5    Q   And did you identify any policies that
6  were at issue?
7    A   Yes.
8    Q   What policies were those?
9    A   I'm not sure of the exact title, but we
10 referenced it's either a University System of
11 Georgia Board of Regents or Georgia Tech amorous
12 relationships policy.
13   Q   And what were your obligations under
14 that policy relating to the amorous relationship?
15   A   Sure.  The policy indicates that an
16 amorous relationship cannot occur in the workplace
17 between a supervisor and a supervisee, and we had
18 looked into that policy and indicated to him at
19 that time that we read it and it was our
20 understanding that we were not in violation of it
21 in continuing our relationship and continuing as
22 colleagues.
23   Q   Okay.  So you did not believe you were
24 in violation of that policy, correct?
25   A   Correct.

115

1    Q   And did you have any belief or
2  understanding that this relationship could be
3  possibly viewed as a conflict of interest?
4    A   At that time, not specifically, but we
5  were certainly aware of maintaining professional
6  conduct in the workplace so as to, really,
7  continue our working relationship as it had been
8  where no conflict existed.
9    Q   Okay.  There would be times, of course,
10 where your job duties and his would overlap,
11 correct?
12   A   Yes.
13   Q   And potentially come into conflict or
14 tension, correct?
15   A   I can't say that specifically.  I think
16 that would depend on the circumstance, and I don't
17 believe there were many occasions where that would
18 occur.
19   Q   Well, any time you had a need to
20 investigate the men's basketball program, for
21 example -- he was the sports administrator,
22 correct, for men's basketball?
23   A   Yes.
24   Q   And so any time you would need to
25 conduct an investigation, an NCAA investigation or

116

1  any other type of investigation, Title IX,
2  et cetera, you would be investigating his program,
3  correct?
4    A   Yes, in part.  He had administrative
5  oversight of the program.
6    Q   And so was that something that you
7  considered or thought through in terms of your
8  approach to Todd Stansbury or how you were going
9  to handle your relationship in the workplace?
10   A   Yes, it's something that I discussed in
11 the capacity of my role with both Todd Stansbury
12 and Pat McKenna, who at the time was vice
13 president for legal affairs and risk management.
14 And so, depending on the nature of any -- you
15 know, looking into facts or investigating a
16 level 3 violation and then, of course, with any
17 major violations, that was a discussion we had at
18 the onset.
19   Q   Okay.  And what was the view of either
20 Pat McKenna or Todd Stansbury about how you could
21 resolve that potential conflict if you had to
22 investigate Mr. Lewis's program for something?
23       MS. POOLE:  Objection.  Calls for
24 speculation.  You can answer, if you know.
25   A   I think it would depend, again, on the

117

1  circumstances.  I received a charge from both of
2  them to proceed in my job as normal.  With respect
3  to a level 1 or level 2 investigation, again, that
4  conversation occurred in advance of the onset of
5  the investigation, and it was Pat McKenna's
6  decision on how to move forward as he did not
7  believe there was a conflict.
8     Q   Okay.  Does Georgia Tech have a policy
9  about how you're supposed to report or divulge a
10 relationship that might cause a potential
11 conflict?
12    A   Not to my knowledge, no.
13    MS. BANKS:  Caleb, can we bring up
14 document 94, please.
15    (Lewis Exhibit 6 marked for
16 identification and attached to the transcript.)
17    Q   Can you take a look at this document
18 and tell me whether you have ever seen it before.
19    A   I do not believe I have ever seen --
20 oh, wait.  I do not believe I have seen this
21 document, no.
22    Q   Okay.  Well, if you look at the bottom
23 of the document, it's an e-mail from Lisa Harris
24 to Kim Harrington, and it references an "Annual
25 Certification from Shoshanna Engel" and notes that

118

1  you disclose "a relationship that has previously
2  been under review.  This is outside the knowledge
3  of the RCOI office."
4     On or around April 9th of 2019 did you
5  file an annual certification -- conflict of
6  interest certification, do you recall?
7     A   I don't recall the specific date, but I
8  do vaguely remember including that on my annual
9  disclosure, yes.
10    Q   Okay.  So you file an annual disclosure
11 each year with a certification as to conflict of
12 interest?
13    A   Yes.
14    Q   And so in 2019 you disclosed the
15 relationship with Mr. Lewis on that certification?
16    A   Yes.
17    Q   Were you instructed to do so?
18    A   No.
19    Q   So nobody asked you to file the
20 certification and include that information?
21    A   No.
22    Q   What caused you to include that
23 information in your disclosure in 2019?
24    A   To the best of my recollection, I
25 believe I had thought through -- because there

119

1  was, as is referenced in this e-mail, a review of
2  the relationship.  And I felt like no one had
3  instructed me to document that so formally
4  previously, but it couldn't hurt, that I had
5  disclosed it many times to many other high-ranking
6  individuals, but to document it certainly could
7  not hurt.
8     Q   Okay.  And why did you not include it
9  in a prior certification if you understood that it
10 could potentially raise a conflict of interest?
11    A   I did not believe that it, at the time,
12 really constituted a conflict or could raise that
13 conflict, and no one had ever approached me about
14 it.  Typically, this disclosure is related to
15 business conflicts and research conflicts.  But,
16 again, after participating in a review earlier
17 that year, I just decided to document it more
18 formally.
19    Q   Uh-huh.  And, again, your testimony is
20 that nobody encouraged you to document it or
21 instructed you to document it?
22    A   No.
23    Q   Okay.  Did you -- including this
24 relationship in the certification in 2019, did
25 that have anything to do with the termination of

120

1  MaChelle Joseph's employment that had happened in
2  March of that year?
3     A   No.
4     Q   And were you ever disciplined, either
5  formally or informally, for failing to disclose
6  the relationship earlier or to file a
7  certification?
8     A   No.
9     MS. BANKS:  Caleb, you can take that
10 document down now.
11    Q   Now, you -- I understand you didn't
12 view it necessarily as a conflict of interest, but
13 you understood that MaChelle Joseph had complained
14 that your relationship with Mr. Lewis created a
15 conflict of interest, right, because she felt she
16 couldn't raise Title IX issues about Mr. Lewis
17 with you?
18    A   When -- what time period are you
19 referring to?
20    Q   Well, we'll get to that.  But I'm just
21 asking you generally, you understood that
22 Ms. Joseph had raised those issues?
23    A   At some point I became aware, yes, that
24 she had raised that issue.
25    Q   Okay.  And do you recall when you first

121

1  learned that she raised that issue?
2      A   Yes.  I don't recall the exact date,
3  but I believe we had an e-mail exchange following
4  myself and my team looking into a possible
5  violation within her program that involved one of
6  her student athletes.  And following that, I
7  believe she corresponded with me via e-mail in
8  which she raised that concern.
9      Q   Okay.  And that e-mail -- when you saw
10 it via e-mail was the first time you understood
11 that she was raising that concern?
12     A   Yes.
13     Q   Now, do you recall whether -- as early
14 as 2017, did you ever have any conversations
15 around that time with Joeleen Akin about this
16 issue and this potential conflict as seen by
17 MaChelle Joseph?
18     A   I honestly have no idea.  I do not
19 recall specifically.
20     Q   Okay.
21     A   I do not recall any indication that
22 Ms. Joseph had brought forward the concern.
23     Q   Do you recall ever discussing this
24 issue with Joeleen Akin?
25     A   Which issue are you referring to?

122

1      Q   The perceived conflict of interest that
2  she raised.
3      A   I honestly don't recall if that was
4  discussed after I became aware of the concern.
5      Q   Do you recall who you discussed this
6  concern with once you became aware of it?
7      A   I believe in my response to that e-mail
8  correspondence -- and if I recall, both Todd
9  Stansbury and Joeleen Akin were copied and perhaps
10 Kevin Cruse, the human resources business partner,
11 but I'm not certain.  I believe in my response I
12 indicated if Ms. Joseph feels strongly and wants
13 to raise that concern, I provided contact
14 information for the Title IX office where that
15 could be escalated.  Since it certainly is an
16 allegation or a concern about me, it would not
17 fall under my purview.
18     Q   And from the time that you first
19 understood that this was a concern of hers, did
20 you also understand that she continued to complain
21 about this perceived conflict of interest until
22 the end of her employment at Georgia Tech?
23     A   I became aware in some specific
24 instances that the concern was raised, but I don't
25 know that I'm even aware today of the full context

123

1  of what that means.
2      Q   What do you mean?
3      A   I know it was raised during the course
4  of an interview with the NCAA enforcement staff.
5  Lynn Durham on one occasion indicated that a
6  concern had been forwarded, and I don't really
7  know what that means.  I did not ask for
8  follow-up.  And then following the end of
9  Ms. Joseph's employment, certainly I'm aware of
10 the complaint.
11     Q   Okay.  And how did these complaints
12 about your relationship make you feel?
13     A   Disappointed.
14     Q   Fair to say you were unhappy with them?
15     A   I don't know that I would characterize
16 it as unhappiness.  Disappointed and maybe a
17 little frustrated, but I don't know that it
18 impacted my happiness.
19     Q   Okay.  You were frustrated, you were
20 disappointed.  Were you upset or angry that she
21 had raised this issue and continued to raise the
22 issue?
23     A   I don't know that I was angry.
24 Certainly several years after disclosing the
25 relationship, understanding that it either had --

124

1  a concern had perpetuated and not been addressed
2  with me was very frustrating.
3      Q   Had not been addressed with you by
4  whom?
5      A   Anyone.
6      Q   At Georgia Tech?
7      A   Correct.
8      Q   That she had raised these issues and
9  nobody told you about it?
10     A   I don't know that -- whether it was
11 that no one told me about it, or, if there was
12 going to be follow-up action, why none had
13 occurred.  You know, I wasn't hiding anything,
14 which is why I disclosed it when I did.
15     Q   Right, right.  So what sort of
16 follow-up action were you looking for from Georgia
17 Tech officials?
18     A   I wasn't looking for any specific
19 follow-up action.  I think -- I would characterize
20 my thoughts as, well, if this is an issue, is it
21 an issue, does a review need to be done -- which
22 ultimately a review was done, but it was several
23 years after the relationship was disclosed.  So I
24 think any frustration was, you know, could that
25 have been done sooner.

125

1    Q    Uh-huh.
2    A    But I don't -- you know, I can't speak
3  to any expectations I had.
4    Q    Okay. And no -- to your knowledge, no
5  Title IX investigation occurred at or around the
6  time that MaChelle Joseph first raised this in an
7  e-mail to you?
8    A    The Title IX investigation of myself or
9  the relationship?
10    Q    Right.
11    A    I am not aware of any such
12  investigation, no.
13    Q    Would you say that her complaints about
14  this negatively impacted your view of her
15  personally or professionally?
16    A    No.
17    Q    You said that you were frustrated by
18  this and disappointed. Did you share your
19  feelings about her complaint with anyone in
20  Georgia Tech administration?
21    A    I believe I forwarded my response to
22  Ms. Joseph about where she could file that
23  complaint to both Aisha Oliver-Staley and Burns
24  Newsome, both as a heads-up and if they thought it
25  appropriate to follow up just from that

126

1  information, so they could do so.
2    Q    Sure. So you forwarded it to them, and
3  then they had that information where she raised
4  her concern?
5    A    Yes.
6    Q    Okay. So it really would have been
7  duplicative for her to then raise it with a -- the
8  Title IX office, correct?
9    A    No, I wouldn't say that specifically.
10  I wasn't making a complaint on her behalf. I was
11  passing along information that someone had raised
12  a concern. I don't remember there being any
13  specific concern or situation outlined that
14  indicated what the conflict was or any specific
15  scenario. So I don't -- I wouldn't characterize
16  it as it would have been duplicative for
17  Ms. Joseph to make that report directly. I did
18  not indicate in my response that I was going to be
19  forwarded it.
20    Q    Okay. You understood from her e-mail
21  that she felt that she couldn't raise her concerns
22  about Marvin Lewis's treatment of women's
23  basketball, which she viewed as a gender equity
24  concern, that she couldn't raise that to you as
25  the Title IX person because you were in a romantic

127

1  relationship with him and she felt that that was a
2  conflict of interest. You understood that --
3    A    Yes.
4    Q    -- to be the broad outlines of her
5  concerns?
6    A    Yes.
7    Q    Okay. Now, you said that -- you know,
8  when I asked you whether you had talked to anybody
9  about your feelings about her filing this
10  complaint or -- not filing the complaint, but
11  sharing her concerns in writing, do you -- you
12  mentioned that you forwarded her e-mail. But what
13  I was asking about is conversations. In other
14  words, did you have a conversation with Marvin
15  Lewis or Todd Stansbury or Aisha Oliver-Staley or
16  anybody like that about Coach Joseph's position on
17  this issue and how it made you feel or what you
18  thought should be done?
19    A    Sure. I don't specifically recall
20  having conversations, though I imagine and
21  generally remember sharing things like that with
22  Marvin Lewis, that I had received that e-mail and
23  that I had forwarded it and that I was
24  disappointed to hear that, you know, several years
25  after disclosing and entering into a relationship,

128

1  that the concern -- this was the first time that
2  someone has raised that concern directly to me.
3  And I was disappointed, as I mentioned earlier,
4  but beyond that, I don't remember discussing it
5  specifically. Nor my feelings about it
6  specifically with anyone.
7    Q    Okay. And to your knowledge, was
8  Mr. Lewis similarly frustrated and disappointed
9  that she had taken this position?
10    A    I think so, but I don't specifically
11  recall what he said or how he reacted.
12    Q    What about Todd Stansbury? Did you
13  have a conversation with him about MaChelle
14  Joseph's concerns about this perceived conflict of
15  interest?
16    A    I don't specifically recall a
17  conversation surrounding the conflict. I vaguely
18  remember discussing the violation, and especially
19  since a certain was raised, I wanted Mr. Stansbury
20  to be very aware of the steps we had taken and
21  were taking and that I was passing that
22  information along. And, again, I welcomed anyone
23  to look into that conflict or address Ms. Joseph's
24  concerns because I wouldn't want, you know, anyone
25  to feel they can't navigate or report things

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

129

1 appropriately. But that's the extent of what I
2 remember discussing with Mr. Stansbury.
3     Q   And when you mentioned the steps taken,
4 what are you talking about? What are you
5 referring to?
6     A   The summary of the steps we took to
7 look into and address the information that had
8 been reported to us about the possible NCAA
9 violation, which I believe was the precursor or
10 the impetus for Ms. Joseph's e-mail to me.
11     Q   Okay. But you understood that she had
12 a more general concern, not necessarily just about
13 this particular NCAA investigation, but just in
14 general that she couldn't bring those concerns of
15 gender-based inequities to you, in her mind,
16 because they involved Marvin Lewis?
17     A   Yes, I understood that after reading
18 her e-mail.
19     Q   Okay.
20         What about President Peterson? Did you
21 have any conversations with President Peterson
22 about the allegations of a conflict of interest by
23 Coach Joseph?
24     A   Not that I recall, no.
25     Q   What about Aisha Oliver-Staley, did you

---

130

1 have a conversation with her about that at any
2 point?
3     A   The only time I remember, yes, I
4 remember having a conversation with Aisha
5 Oliver-Staley following Ms. Joseph's interview
6 with the NCAA enforcement staff, of which I did
7 not participate, but I was briefed as to what was
8 discussed, and Ms. Oliver-Staley did indicate that
9 Ms. Joseph raised that issue within the interview.
10     Q   Okay. And what was your feelings about
11 that being raised during the interview?
12     A   Similarly, you know, at that point, I
13 understood, given our previous e-mail exchange,
14 that she had those concerns. And I was unaware of
15 how they were -- if or how they were being
16 addressed or whether they had been escalated by
17 Ms. Joseph or anyone else aside from me forwarding
18 my response, as I indicated.
19     Q   Okay. Did Ms. Oliver-Staley have any
20 comments on how she perceived this complaint of a
21 conflict of interest?
22     A   I don't specifically recall her giving
23 me an opinion on it.
24     Q   Okay. No opinion, no impressions?
25     A   The only thing I remember is somewhat

---

131

1 of a feeling of surprise that it was that strong
2 of a feeling by Ms. Joseph, but that's just what I
3 can recall. No additional thoughts or opinions or
4 determination of action.
5     Q   Okay. And when you talked to
6 Mr. Stansbury about this, what sort of reaction or
7 response did you get from him?
8     A   I do not remember. Again, I believe it
9 was in the context of discussing both the
10 violation and the e-mail that had been received.
11 So I don't remember any specific response.
12     Q   Okay. And do you recall whether you
13 discussed this issue of a conflict of interest
14 with Joeleen Akin at any point?
15     A   I do not specifically recall.
16     Q   Do you recall discussing it with
17 anybody else in leadership positions at Georgia
18 Tech?
19     A   There is one instance -- I believe I
20 mentioned it earlier -- where Lynn Durham had
21 mentioned almost in passing that there was a
22 concern, or that she was aware that Coach Joseph
23 had a concern about the relationship, and, again,
24 I did not probe for further information. I
25 understood the concern because of that e-mail, and

---

132

1 the conversation with Lynn Durham was prior to the
2 conversation with Aisha Oliver-Staley. It
3 occurred before that interview took place. So I
4 didn't pursue it further and that's the only
5 additional conversation I remember having.
6     Q   Okay. Do you recall when this
7 conversation with Ms. Durham occurred?
8     A   Yes. It was on or around October 4th
9 of 2018, somewhere in that range.
10     Q   Okay. And how do you happen to have
11 such a specific recollection of that date?
12     A   That date is my birthday, and we
13 were -- I was traveling with the Georgia Tech
14 football team to a game at the University of
15 Louisville. And so I remember having a
16 challenging conversation with Ms. Joseph, and I
17 believe I had taken her phone call while I was in
18 the hotel lobby or something and had moved to the
19 side. And following that phone call, Lynn Durham,
20 who was also on the trip, approached me and just
21 started general conversation.
22     Q   And do you remember what the nature of
23 the phone call was with Coach Joseph at that time?
24     A   I believe it was something about
25 documentation related to camps and clinics.

133

1    Q    And it was challenging because of why?
2    A    That -- I don't remember the specifics
3  of the conversation, but I remember it becoming
4  very tense. I remember Ms. Joseph raising her
5  voice at me and getting very frustrated and upset
6  during our conversation. Again, I don't remember
7  the specifics as to why.
8    Q    Okay. And so you then had a
9  conversation with Ms. Durham shortly after hanging
10 up with Coach Joseph; is that correct?
11   A    Yes.
12   Q    And you said you had a general
13 conversation that ultimately included these
14 allegations of a conflict of interest. Tell me a
15 little bit about that conversation with Ms. Durham
16 and what was discussed.
17   A    From what I remember, she just asked if
18 everything was okay since she had seen me pacing
19 or, you know, moving to the side in the hotel
20 lobby. And I indicated that everything was fine,
21 I had just had a challenging conversation, but I
22 think we resolved maybe whatever issue. And I
23 remember her indicating, Well, Ms. Joseph is still
24 frustrated or concerned about this relationship
25 between you and Marvin. And beyond that, again, I

134

1  did not ask any questions, and that's all I
2  remember about that conversation.
3    Q    You had said that you were -- and
4  correct me if I'm wrong, but that you were
5  frustrated that you weren't sure whether Georgia
6  Tech was taking any actions in response to her
7  raising this issue. Is that correct or did I get
8  that wrong?
9    A    I wouldn't characterize it that way. I
10 was frustrated that years after a disclosure, that
11 there were continued -- apparently after becoming
12 aware that there had been concerns raised and
13 that -- not just that I had not been made aware,
14 but if there was action required or that was
15 appropriate, that, you know, why hadn't we taken
16 it sooner. I was not, you know, frustrated that
17 any specific action hadn't been taken. I think
18 that frustration was -- again, I'd characterize as
19 I continued to hear that this is an issue, but I
20 don't know of any update response. So that's just
21 the uncertainty of what was happening, if
22 anything.
23   Q    Sure. And so when you're having this
24 conversation with Ms. Durham, did you raise that
25 concern or the uncertainty and ask her what, if

135

1  anything, could or should or would be done?
2    A    Not that I specifically remember.
3    Q    So other than this conversation with
4  Ms. Durham, do you remember -- and we talked about
5  a conversation you had with Mr. Stansbury and
6  Ms. Oliver-Staley. Anybody else that you recall
7  discussing this issue, other than Marvin Lewis? I
8  think you also said him.
9    A    Not specifically, no.
10   Q    Now, at some point Georgia Tech did
11 investigate whether your relationship with
12 Mr. Lewis created an improper conflict of
13 interest, correct?
14   A    Yes, there was an administrative
15 review.
16   Q    And when did that occur?
17   A    I'm not sure of the exact dates, but I
18 believe it was in the winter or spring of 2019.
19   Q    And do you know how it happened to
20 occur at that time, what caused it to come about?
21   A    No, I'm not aware.
22   Q    Nobody told you, hey, we're going to
23 conduct this administrative review now on this
24 issue?
25   A    I was contacted by the individual, who

136

1  I believe performed much of the review, to set up
2  a meeting. But beyond that, I am not sure what
3  the impetus for the review was.
4    Q    Okay. And who was the individual who
5  conducted the review?
6    A    Bing Wang.
7    Q    Do you know whether Mr. Lewis was
8  contacted also by Mr. Wang? Is Bing Wang a man?
9    A    It's a woman.
10   Q    Oh, sorry. Sorry. Okay. Do you know
11 whether she contacted Mr. Lewis also?
12   A    I believe so.
13   Q    Did you and Mr. Lewis discuss the fact
14 that there was going to be this administrative
15 review?
16   A    I believe we acknowledged it but felt
17 very strongly that we needed to be as objective or
18 individual in our participation, so we didn't
19 discuss the content of the review at all.
20   Q    Did you discuss the timing, like it's
21 odd that they're doing it now when didn't do it
22 before?
23   A    I don't specifically recall whether we
24 discussed that.
25   Q    So you said you didn't discuss the

137

1  content, you were trying to be careful about that.
2  Was there anything, apart from the content, about
3  this review that you did discuss?
4      A  No.  Again, just that -- I think we
5  acknowledged that we both had been contacted and
6  that we'll participate fully.
7      Q  But nothing, to your recollection,
8  about isn't it odd that we're starting it now when
9  we hadn't done it before?
10     A  Not that I specifically remember, no.
11     Q  Do you generally remember any sort of
12 head scratching about that?
13     A  No.
14     Q  What role, if any, did you play in this
15 administrative review or this investigation?
16     A  I was interviewed by Bing, as I
17 mentioned.  And I don't remember anything
18 additional to that.  I'm unsure of whether I was
19 asked to provide any additional information.
20     Q  Okay.  What do you recall was the
21 result of the administrative review?
22     A  From what I remember, sometime later in
23 the spring there was a memo released to Todd
24 Stansbury, and I recall that he reviewed that memo
25 with Marvin and I together.  It included some

138

1  recommendations about management of either
2  potential or perceived conflict, and we later did
3  discuss it with the entire athletics leadership
4  team as well.
5      Q  Okay.  Was there anything in the
6  content of that report that was surprising to you?
7      A  I don't specifically -- I can't think
8  of anything off the top of my head that was
9  surprising, but that was quite a while ago that I
10 first reviewed it.
11     Q  Well, do you recall generally whether
12 you were satisfied with the result of the inquiry?
13     A  I believe I was -- I don't know if I
14 would say satisfied.  I think I was satisfied,
15 maybe, that it had concluded and that there was no
16 major conflict found and was all on board with,
17 you know, changing or modifying anything as needed
18 to manage any perceived or possible real conflict.
19     Q  Uh-huh.  Do you recall that in that
20 report it said that others in the department also
21 held the view, the Athletics Department, that your
22 relationship might create the appearance of a
23 conflict of interest?
24     A  I would have to review it specifically,
25 but that doesn't sound foreign to me.  So yes, I

139

1  mean, I think that's possible that was included.
2      Q  Okay.  And do you recall there was some
3  feedback that on occasion it seemed like perhaps
4  you and Mr. Lewis were too closely aligned on
5  certain issues?
6      A  Yes.
7      Q  Did any of that surprise you when you
8  read that?
9      A  I don't think it surprised me, no.
10     Q  There was also an issue in there about
11 your travel to men's basketball games.  Were you
12 questioned regarding your travel to men's
13 basketball games as part of this inquiry, do you
14 recall?
15     A  I don't specifically recall what those
16 questions were.
17     Q  Do you recall that being an issue, your
18 travel to men's basketball games and whether that
19 was necessary to your job?
20     A  An issue with whom and how, I guess?
21     Q  As part of that inquiry.
22     A  I don't specifically -- again, it's
23 entirely possible that there were questions about
24 travel and how we allocate travel and make those
25 decisions.  I just don't specifically recall that

140

1  discussion.
2      Q  Were you ever asked to stop or curtail
3  your travel to men's basketball games?
4      A  No.
5      Q  Okay.  And to your knowledge, was your
6  promotion in 2020, early 2020, did that have
7  anything to do with this potential or perceived
8  conflict in your role as it stood in 2019?
9      A  Not to my knowledge, no.
10     MS. BANKS:  All right.  I think this is
11 a good time to take a break for lunch if everybody
12 agrees.  It's 12:45.  Should we say 1:30, or do
13 you want until 1:45?
14     MS. POOLE:  Let's say 1:30.  I aspire
15 for 1:30.
16     MS. BANKS:  Okay.  All right.  We'll
17 see you back here at 1:30.
18     MS. POOLE:  Thanks.
19     (A luncheon recess was taken.)
20 BY MS. BANKS:
21     Q  Ms. Lewis, earlier this morning I think
22 you testified that you were notified when Coach
23 Joseph was reprimanded after the football game for
24 the alcohol incident, and after she was given the
25 final written warning after the Sanford

141

1  investigation; is that correct?
2      A   Yes, that is what I recall.
3      Q   Okay.  And do you have any knowledge as
4  to why you were notified?
5      A   No, I do not.
6      Q   Okay.  Who notified you?
7      A   I believe it was Mike Bobinski.
8      Q   In both of these instances?
9      A   I believe it was one and the same, if I
10  recall.  I'm not totally certain, but yes.
11     Q   Well, there are two different -- I'm
12  talking about the football game, the alcohol
13  incident, and then the Ginger Sanford
14  investigation.
15     A   Ah.  The first incident was Mike
16  Bobinski.  I believe the second, related to the
17  Sanford investigation, was Joeleen Akin.
18     Q   That's who notified you?
19     A   Yes.
20     Q   Okay.  And, again, do you have any
21  knowledge as to why you, in your position, would
22  be notified?
23     A   In the first instance, I am unsure.
24  In -- with respect to the Sanford investigation,
25  what I recall is that Ms. Akin wanted to make me

142

1  aware of the investigation and a concern related
2  to compliance activities that was included in the
3  report.
4      Q   In the final written warning?
5      A   I believe it was -- she was letting me
6  know about a concern brought forward in the report
7  or in the investigation, not --
8      Q   Of the Ginger Sanford matter?
9      A   Yes.
10     Q   Okay.  So she brought it to you in your
11  capacity as compliance because there was something
12  in that that raised a compliance concern?
13     A   Yes.
14     Q   Would you typically be brought into the
15  loop on investigations of this nature about
16  alleged misconduct by a head coach?
17     A   I would say that only if it intersected
18  or somehow involved areas under my purview or at
19  the discretion, certainly, of the director of
20  athletics.
21     Q   Okay.  If the director of athletics
22  thought it was necessary for whatever reason for
23  you to have that information.
24     A   Yes.
25     Q   Okay.

143

1          And you also testified earlier that
2  when you began in 2013, there was an
3  investigation, I think you said, basically
4  wrapping up around telephone calls made by the
5  women's basketball program, men's basketball
6  program and the football program, correct?
7      A   Yes.
8      Q   And as to the women's basketball
9  program, that did not include Coach Joseph,
10  correct, in terms of the allegations?  It was her
11  assistant coaches?
12     A   I don't recall the specifics.  From
13  what I can remember -- and I would have to go back
14  and review the final report or the files.  I was
15  not involved in the investigation portion of that
16  case.  I was not yet employed.  From what I
17  remember, a member of Ms. Joseph's staff was the
18  recruiting coordinator or something of the like
19  and would map out what phone calls folks needed to
20  make, including all the coaches, so I believe
21  Coach Joseph was included in that.  And I believe
22  that was the root of the violation, that
23  impermissible calls were made at the direction of
24  one of her staff members.
25     Q   Okay.  But the allegations of

144

1  misconduct did not include misconduct by the head
2  coach or MaChelle Joseph, correct?
3      A   Again, not that I recall, although -- I
4  believe I mentioned it earlier.  There was only
5  one individual named in that violation publicly,
6  and that was not a member of the women's
7  basketball staff.
8      Q   Who was it?
9      A   It was a former assistant coach with
10  the football program.
11     Q   Okay.  All right.
12         When did President Peterson learn of
13  your relationship with Marvin Lewis, to your
14  knowledge?
15     A   I have no idea.
16     Q   Did you speak with him about it
17  directly?
18     A   No.
19     Q   Do you know whether Marvin Lewis spoke
20  with President Peterson about it directly?
21     A   I do not know.
22     Q   So your only direct conversation was
23  with Todd Stansbury; is that right?
24     A   No.  We disclosed to Todd Stansbury, as
25  our direct supervisor, but there were other

145

1    individuals that I spoke with, certainly.
2        Q    To disclose the relationship?
3        A    Yes, to notify them that we were in a
4    relationship.
5        Q    Okay.  And who were those people that
6    you notified?
7        A    To the best I can remember, and I may
8    be leaving someone off this list, but I remember
9    having a conversation with Lynn Durham, with Aisha
10   Oliver-Staley, with Pat McKenna.  And I'm sure
11   there were other colleagues.  At some point a
12   request was made that we notify the athletics
13   leadership team, and so I don't remember exactly
14   who I spoke with, but I know I individually spoke
15   with several members of that team as well.
16       Q    Who were the members of the athletics
17   leadership team?
18       A    At that time, it would have been
19   Joeleen Akin, Mark Rountree, Derek Grice, Rick
20   Thorpe, and I'm honestly not sure who else.
21       Q    And you said you were asked to notify
22   those individuals.  Who asked you to do that?
23       A    I don't recall if it was Todd or the
24   human resources business partner at the time, Lee
25   Hendrickson, but I believe it was one of them.

146

1        Q    To your knowledge, did others know of
2    your relationship with Mr. Lewis before you
3    disclosed it to Todd Stansbury?
4        A    I am not positive, and I did just
5    realize I omitted one person from the list.  I did
6    speak with Dr. Reggie DesRoches, who was our
7    faculty athletics rep at the time.  I am unsure
8    whether or who knew about our relationship.
9        Q    Did you disclose it to Todd Stansbury
10   when you did because you believed others already
11   knew and you needed to come clean?
12       A    No.
13       Q    At the time you disclosed it to Todd
14   Stansbury, do you know whether Joeleen Akin was
15   aware of your relationship?
16       A    I do not know.
17       Q    Early on in your tenure, like, say, the
18   2014, 2015 time frame, did anyone -- or even
19   earlier than that, to the extent it happened, but
20   did anyone ever come to you from HR to tell you
21   that MaChelle Joseph had complained about the way
22   you were treating her?
23       A    What was the time frame you mentioned
24   again?
25       Q    Earlyish, like, you know, let's start

147

1    with, say 2013 to 2014.
2        A    I don't remember anyone from human
3    resources coming to me with that information.
4        Q    Do you remember anybody at all coming
5    to you during that first year of your employment
6    and saying MaChelle had complained about how you
7    were treating her?
8        A    I recall Ms. Joseph confronting me
9    directly a few times early in my tenure.
10       Q    Okay.  What about third parties,
11   others?  Do you recall?
12       A    I recall -- I do not know the time
13   frame and cannot speak to the time frame other
14   than it was during Mike Bobinski's tenure.  I do
15   remember him broaching with me that Ms. Joseph had
16   raised either a complaint or some sort of feelings
17   about me and how I conduct my work and that he had
18   spoken to her and he hoped that it could be
19   resolved.  And on one other occasion, I remember
20   Lee Hendrickson indicating that I should not work
21   with Coach Joseph primarily for at least a period
22   of time.
23       Q    Do you recall when that conversation
24   was with Lee Hendrickson?
25       A    I believe it was following notification

148

1    that Theresa Wenzel was leaving Georgia Tech.
2        Q    And Lee Hendrickson, is that a woman?
3        A    No -- yes.  Excuse me.
4        Q    Okay.  And what did Ms. Hendrickson say
5    to you about why she was making that suggestion?
6        A    To the best I can remember, I believe I
7    had placed a phone call to Ms. Joseph earlier that
8    morning, and unbeknownst to me, it was immediately
9    preceding a meeting either which she was notified,
10   or others and she was present, that Ms. Wenzel was
11   leaving and that she was very upset that I had
12   called her at that time.  I believe that was the
13   impetus for Ms. Hendrickson contacting me.
14       Q    And are you friends with
15   Ms. Hendrickson outside of work?
16       A    No, I am not.
17       Q    Are you friendly with her inside of
18   work?
19       A    I was at the time.
20       Q    Okay.
21       A    Well, I was -- let me clarify.  I was
22   early, maybe, in our crossover tenure, but that
23   dissipated at some point during our tenure.  We
24   always worked well as colleagues, but we had
25   become less friendly.

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

149

1    Q   Is there a reason for that?
2    A   I am not aware of the reason.
3    Q   You mentioned Theresa Wenzel.  Prior to
4  you arriving, Theresa Wenzel handled Title IX
5  matters; is that right?
6    A   I am not sure if that was a formal
7  designation, but I -- that's my understanding,
8  yes.
9    Q   And do you have any understanding as to
10  why that responsibility was transferred to you
11  when you were hired?
12    A   It was not transferred to me when I was
13  hired.
14    Q   Well, you became the deputy Title IX
15  coordinator, correct?
16    A   I became the deputy Title IX
17  coordinator in the spring of 2015, yes.
18    Q   I see, okay.  And up until that time,
19  Theresa Wenzel continued to serve in that role?
20    A   That's my understanding.  Again, I'm
21  not aware whether it was a formal designation or
22  not, but that's my understanding.
23    Q   And what is your understanding as to
24  why the responsibilities were transferred to you
25  in 2015?

150

1    A   I was contacted -- I'm not totally sure
2  by who -- that there had been some changes at the
3  Institute level to Title IX.  There had previously
4  not been a devoted Title IX office, and they
5  were -- the Institute hired its first full-time
6  Title IX coordinator and was building out an
7  office.  And I was told that the president wanted
8  to appoint me as deputy Title IX coordinator for
9  athletics.
10    Q   Was there any discussion with you about
11  whether you wanted to do that or felt equipped or
12  qualified to do that?
13    A   To the best I can remember, it was
14  presented as the president would like to appoint
15  you and are you comfortable.  And I accepted that
16  appointment.
17    Q   Okay.  Did you ever have any
18  conversations with Theresa Wenzel about those
19  duties and responsibilities?
20    A   Following my appointment or at any time
21  prior?
22    Q   Well, following your appointment, let's
23  start there, in terms of transferring those duties
24  and responsibilities over to you.
25    A   I would say yes, we had some

151

1  conversations.
2    Q   What sorts of conversations?
3    A   From what I can remember, I believe I
4  met with her and wanted to understand some
5  historical context of where Georgia Tech had been
6  from a Title IX and gender equity perspective, and
7  both pieces of Title IX, the athletics equity and
8  also sexual misconduct, as that was becoming a
9  stronger focus for institutions.  So I believe
10  that was the context of those meetings.  I don't
11  recall if it was one or more than one.
12    Q   Okay.  And did anyone ever convey to
13  you why President Peterson wanted you to serve in
14  that role?
15    A   No.
16    Q   Earlier we talked about the e-mail you
17  received from Coach Joseph in 2018 that put you on
18  notice that she had concerns about this conflict
19  of interest issue.  Do you recall whether, prior
20  to receiving that e-mail, Mark Rountree ever
21  raised those concerns with you?
22    A   I do not recall.  No.
23    Q   Is it possible and you are just not
24  recalling, or are you fairly confident that that
25  never happened?

152

1    A   It's possible, but I'm -- from what I
2  can remember, that e-mail was the first time I
3  really understood that Ms. Joseph had that
4  concern.  Again, it's possible and I might not
5  remember, but that's when I first remember that
6  concern.
7    Q   Do you understand, prior to receiving
8  that e-mail, that there were more generalized
9  complaints by Coach Joseph about your treatment of
10  her and Mr. Lewis's treatment of her and her
11  program?
12    A   The concerns I mentioned a few moments
13  ago that were addressed to me by Mr. Bobinski and
14  Ms. Hendrickson I'm aware of.  I'm not aware of
15  any additional complaints that I can remember.
16    Q   Okay.  Did Todd Stansbury ever raise
17  issues with you about MaChelle Joseph or your
18  relationship with her prior to receiving that
19  e-mail in 2018?
20    A   I am not positive one way or the other
21  of whether he had raised concerns to me prior to
22  that.
23    Q   Okay.  So by 2017, how would you
24  describe your relationship with Coach Joseph?
25    A   In 2017?

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

153

1    Q   Yes.  By 2017, how would you describe
2   your relationship with Coach Joseph?
3    A   I would describe it as strained
4   interpersonally but certainly professional in the
5   context that we were both trying to do our jobs to
6   the best of our ability.
7    Q   Okay.  And as time went on, did you
8   believe that your relationship became more
9   strained or more tense?
10    A   Yes.
11    Q   Do you feel like it was strained or
12   tense from the beginning of your employment or was
13   it something that sort of gradually increased?
14    A   I would characterize it as fairly early
15   in my employment at Georgia Tech it became
16   strained.
17    Q   And to what do you attribute that
18   strain?
19    A   I don't know.  I am not sure of the
20   root.  I think there were some challenging
21   interpersonal interactions between Ms. Joseph and
22   I early in my tenure, and, again, I'm unsure of
23   why they became tense.  But that over time seemed
24   to build and we never developed a close working
25   relationship, but, again, I think we both were

154

1   pursuing our professional duties to the best of
2   our ability.
3    Q   Okay.  So back to 2017.  In or around
4   February of 2017, do you recall that Assistant
5   Coach Malikah Willis filed a complaint that Coach
6   Joseph had thrown a clipboard at her?
7    A   I do recall that time period.  I'm not
8   sure of exactly when I became aware of an actual
9   complaint.
10    Q   Okay.  Were you involved in the
11   investigation of this issue?
12    A   No, I was not.
13    Q   Did you have any role whatsoever, or
14   did your office have any role whatsoever?
15    A   No.  At some point, I believe, as the
16   investigation concluded, a member of the legal
17   affairs team called and asked me to provide a
18   record of any violations that Ms. Willis had been
19   involved in, and that was my sole involvement in
20   that investigation.
21    Q   Do you know why that request was made
22   of you?
23    A   I do not.
24    Q   Did you provide any information?
25    A   I believe I provided what information

155

1   was available.  I don't specifically remember what
2   was contained.
3    Q   Okay.  Did you know Ms. Willis at all?
4    A   Yes.  I mean, I knew her in the context
5   of her assistant coach role at Georgia Tech.
6    Q   And did you have occasion to speak with
7   her from time to time?
8    A   From time to time, yes.
9    Q   And did Ms. Willis ever raise concerns
10   to you directly about Coach Joseph?
11    A   No.
12    Q   And so did you in any way direct or
13   encourage her to file a complaint against Coach
14   Joseph?
15    A   No.
16    Q   Do you know if anybody else did?
17    A   I have no knowledge.
18    Q   Did you at any point tell players or
19   staff that if they had any concerns about Coach
20   Joseph they should come to you?
21    A   I don't know that I specifically noted
22   Coach Joseph.  I always included in meetings with
23   teams and staff members that if they had any
24   concerns about anything or anyone, they were
25   always welcome to report them and that was

156

1   predominantly in the NCAA compliance context.
2    Q   Okay.  And would it also have been in
3   the Title IX compliance area -- or Title IX area?
4    A   Yes.  As I mentioned earlier, whenever
5   speaking about reporting, I always made it clear
6   that student athletes and staff, anyone involved
7   in our programs, could go directly to the Title IX
8   office, that it was not required that things get
9   reported to me but that I was one avenue or
10   resource that they could report things to.
11    Q   Do you have any recollection of --
12   outside of the sort of standard or typical
13   meetings with teams where you go over processes
14   and procedures, do you have any recollection of
15   specifically talking to or about the women's
16   basketball players and telling them specifically
17   that they should come to you if they have concerns
18   about Coach Joseph?
19    A   Not that I recall specifically, no.
20    Q   Is that something you would recall if
21   you did something like that?
22    A   I believe yes, if I made a specific
23   notification like that, I believe I would
24   remember.
25    Q   Okay.  And do you have any knowledge

157

1  about whether anybody else on your behalf made
2  that suggestion or recommendation to the women's
3  basketball players?
4      A  I do not know.
5      Q  At any point in your employment, were
6  you told to develop documentation or to develop
7  any actions that would help justify ending Coach
8  Joseph's employment?
9      A  No, I was not.
10     Q  Okay.  So it's your testimony, then,
11 that at no point did anyone at Georgia Tech
12 indicate to you that they would like to have
13 information that would support a decision to end
14 Coach Joseph's employment?
15     A  Correct.
16     Q  Okay.  At some point in 2017 or 2018,
17 did you become aware that it had been alleged that
18 someone with the women's basketball program paid
19 money to recruit student athletes Elizabeth
20 Balogun and Elizabeth Dixon?
21     A  Yes.
22     Q  When did you first become aware of
23 those allegations?
24     A  I learned of those allegations -- I'm
25 not sure of the exact date, but I believe it was

158

1  in late January 2018.
2      Q  Okay.  And are those among the
3  documents that you reviewed in preparation for
4  this deposition?
5      A  No.
6      Q  Okay.  So this was first reported by
7  the NCAA to Georgia Tech through Georgia Tech's
8  counsel, correct?
9      A  Correct.
10     Q  All right.  And do you know to whom at
11 Georgia Tech it was reported?
12     A  It was reported to our counsel and then
13 I believe it was to myself and at that time it
14 would have been Pat McKenna, I believe.
15     Q  Okay.
16        MS. BANKS:  Caleb, can we bring up
17 document 19, please.
18        REMOTE TECH:  Yes.  One moment.
19        (Lewis Exhibit 7 marked for
20 identification and attached to the transcript.)
21        REMOTE TECH:  This one is Lewis 7.
22 BY MS. BANKS:
23     Q  Okay.  Take a look at this, which has
24 been marked as Exhibit 7, and tell me whether you
25 recognize this document.

159

1      A  Yes.
2      Q  Okay.  This is a document that was
3  submitted to the NCAA as part of the
4  Balogun-Dixon -- well, maybe not.
5        What is this document?  Why don't you
6  tell me that.
7      A  This is a timeline of relevant events
8  that is -- it looks to be part of the women's
9  basketball Notice of Allegations infractions case
10 noted in the top left.  I believe it is the
11 timeline associated with that case.
12     Q  So the Balogun-Dixon case?
13     A  I would not characterize it as the
14 Balogun-Dixon case.
15     Q  Okay.
16     A  It has many components to it, and so
17 I -- that was the initial piece of information
18 that prompted investigation but that's not the
19 full scope of the case.
20     Q  Were you involved in the production or
21 submission of this to the NCAA?
22     A  Yes.  I certainly reviewed it as
23 counsel drafted to submit to the NCAA.
24     Q  Okay.  So on January 29th, that's what
25 we were talking about before, "reports information

160

1  pertaining to potential rules violations involving
2  the women's basketball program to Georgia Tech
3  through its counsel."  That's what we were just
4  discussing, correct?
5      A  Yes.
6      Q  Okay.  And do you know or have any
7  knowledge about how the NCAA first got the
8  information about the Dixon-Balogun allegations?
9      A  No, I have no knowledge of how that
10 information was provided.
11     Q  Okay.  So you didn't provide it, then,
12 to the NCAA?
13     A  No, I did not.
14     Q  And you have no knowledge of who did.
15     A  No.
16     Q  Did you have any knowledge of these
17 allegations prior to January 29?
18     A  No, I did not.
19     Q  So it's your testimony that this is the
20 first time you learned of it, when you got -- on
21 January 29th when NCAA sent the information
22 through counsel to Georgia Tech?
23     A  Yes.
24        MS. BANKS:  Caleb, you can take this
25 document away.

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

161

1    Q   I might have had him take it away too
2  soon, but let's see if you remember.  On
3  February 1st, the NCAA told Georgia Tech not to
4  investigate, correct?
5    A   I believe that's what the document
6  said, and that sounds right.
7    Q   Okay.  And do you recall why or do you
8  have any knowledge as to why NCAA said not to
9  investigate?
10   A   To the best of my recollection, the
11 NCAA had a pending interview with a possible
12 witness and did not want Georgia Tech to engage in
13 any information collecting or investigation until
14 they'd conducted that interview and directed us
15 further.
16   Q   Okay.  Was it unusual to get a specific
17 direction not to investigate?
18   A   I can't speak to how usual that is.  I
19 have not been involved in a large number of major
20 violation investigations with the enforcement
21 staff so I'm not sure how common that is.
22   Q   Okay.  Were you aware that Coach Joseph
23 had brought this -- these allegations to
24 Mr. Rountree's attention initially and then had
25 conducted her own investigation about the

---

162

1  allegations?
2    A   When I learned of them on January 29th
3  I was not aware of that.
4    Q   Did you then become aware of that fact
5  that she had brought it to Rountree's attention
6  and conducted her own investigation?
7    A   Yes, I became aware of that, I believe,
8  when Mr. Stansbury and Mr. Rountree and I notified
9  Ms. Joseph that she would be interviewed by our
10 outside counsel.
11   Q   And when did you notify her of that?
12   A   I would have to look at the exact date.
13 I think it was early May of 2018.
14   Q   Okay.  In early May the NCAA provided
15 clearance for Georgia Tech to investigate,
16 correct?
17   A   Yes.
18   Q   And you said the reason you thought
19 that they told you not to investigate it is they
20 had a pending interview, but then they waited
21 three months.  And I'm just wondering, does that
22 comport with your recollection of why they told
23 you not to investigate.  Would it take three
24 months to do an interview?
25   A   I -- to the best of my recollection,

---

163

1  they had trouble securing that interview and
2  continued to -- that individual continued to
3  cancel and reschedule and cancel, and I believe
4  ultimately they moved -- they moved to clear us to
5  investigate when they could not secure that
6  interview.
7    Q   Okay.  So were you free to notify Coach
8  Joseph about the allegations or the NCAA's
9  involvement prior to May of 2018, or were you not
10 allowed to do that?
11   A   I was not permitted until after being
12 given the clear in early May.
13   Q   Not permitted by NCAA rules?
14   A   Correct.
15   Q   Okay.  So what, if anything, did you do
16 from approximately January 29th to the end of
17 April with this information about the -- about
18 Dixon and Balogun and these allegations?
19   A   At the direction of the NCAA
20 enforcement staff, nothing.
21   Q   Okay.  Did you inform or discuss the
22 allegations with Todd Stansbury or Mark Rountree
23 or Marvin Lewis or Bud Peterson, any of those
24 folks?
25   A   Myself and Pat McKenna, similar to what

---

164

1  I described earlier and per our protocol, did
2  disclose the information we received about the
3  possible allegations to the president.  I believe
4  the chief of staff, at the president's request,
5  was involved in that meeting.  Mr. Stansbury, our
6  faculty athletics representative Charles Isbell,
7  and Pat McKenna and myself were the individuals
8  that were aware beginning in January.
9    Q   Okay.  Did you inform Marvin Lewis?
10   A   No.
11   Q   Do you know if anybody else was aware
12 during this time other than those people you just
13 mentioned?
14   A   Other than what you mentioned earlier,
15 that Ms. Joseph had disclosed it prior to us
16 knowing, I believe Mr. Rountree was aware but he
17 was not aware that we were aware, if that makes
18 sense.
19   Q   He wasn't aware that the NCAA had
20 contacted you; is that right?
21   A   Correct.  And I was unaware until that
22 May notification that he had any knowledge of the
23 allegation.
24   Q   Okay.  In May, once you were authorized
25 to investigate, what did you do to proceed with

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

165

1  the investigation?
2      A   We consulted with outside counsel, who
3  was in touch with the NCAA enforcement staff on
4  the preliminary plan to collect information. I
5  believe we identified the relevant individuals,
6  and the first two individuals that we set to
7  interview were Ms. Joseph and an assistant coach
8  at the time, Jonneshia Pineda. And so that was
9  the plan, to speak with the coaches first and
10 understand where we were before proceeding with
11 any additional interviews.
12     Q   Okay. Did the investigation occur
13 jointly with the NCAA?
14     A   Georgia Tech led the investigation.
15 Those preliminary interviews, I do not believe the
16 NCAA sat in on, but they were aware of each step
17 of the investigation and I believe were either
18 made aware or specifically requested what types of
19 documentation at some point to collect.
20     Q   And were you involved in the selection
21 of whom to interview and the interviews
22 themselves?
23     A   Yes. I was certainly involved
24 collaboratively with Pat and our outside counsel
25 team on determining who was going to be

166

1  interviewed.
2      Q   Okay. And do you recall that Felicia
3  Tucker was interviewed as part of this
4  investigation?
5      A   I do recall that Felicia was
6  investigated at some point. I don't -- I'd have
7  to look at records to remember or understand
8  exactly when she was interviewed. I don't
9  specifically remember.
10     Q   Okay. And just to be clear, she was
11 interviewed, not investigated, right? I think you
12 used the wrong word a couple of minutes ago.
13     A   Oh, apologies. Yes, she was
14 interviewed.
15     Q   Okay. And can you tell me why she was
16 selected to be interviewed as part of this
17 investigation?
18     A   I don't specifically recall. Again, I
19 would have to review those investigation records
20 to determine why she was added as an interviewee.
21     Q   Were you aware that Felicia Tucker was
22 not involved in any way in the recruiting of Liz
23 Balogun or Liz Dixon?
24     A   I don't know that I was specifically
25 aware of that at that time. I'm not sure.

167

1      Q   Do you have any knowledge of whether
2  Felicia Tucker was making any particular
3  allegations of her own against MaChelle Joseph
4  during that time related to Balogun and Dixon?
5      A   Can you repeat that question?
6      Q   Do you have any knowledge whether
7  Felicia Tucker was making allegations about Coach
8  Joseph's relationship to the recruiting of Balogun
9  and Dixon that had not been previously made?
10     A   Yes. I remember there being a
11 conversation between Felicia and I. I don't know
12 that there were specific allegations, but she was
13 uncomfortable is how she characterized it, and I
14 believe I provided, Here are the avenues and
15 resources you have if you need to explore
16 reporting something. And certainly I reminded her
17 if there's specific NCAA-related information, that
18 she has an obligation to report it and that here
19 are the -- again, here are the resources she could
20 report. I had also been forwarded or communicated
21 via a third-party that there were concerns that
22 Ms. Tucker had.
23     Q   NCAA-related concerns?
24     A   Yes, I believe so. They were related
25 to camps and clinics in some sort of way and

168

1  payment related to camps and clinics.
2      Q   And who brought those concerns to your
3  attention, Ms. Tucker or somebody else?
4      A   Those specific concerns I believe were
5  brought to me by Ms. Akin, Joeleen Akin.
6      Q   And do you have any knowledge as to how
7  Joeleen Akin came to know those concerns?
8      A   I don't specifically know.
9      Q   And when Ms. Akin brought it to your
10 attention, did she ask you to do anything
11 specifically with or about that information?
12     A   From what I remember, she felt like
13 there could be relevant NCAA information, and I
14 believe she framed it as this might be important
15 for you to know. I believe in the time period I'm
16 thinking of, it had become more known or at least
17 Ms. Akin was aware that there was an NCAA
18 investigation going on into the women's basketball
19 program.
20     Q   And Felicia Tucker had come to her with
21 information that Ms. Akin thought you should know?
22 That's how you understand it?
23     A   That's how I understand it.
24     Q   Okay. And did Ms. Tucker ever share
25 with you an allegation or belief that Coach Joseph

169

1  herself paid Balogun or Dixon to come to Georgia
2  Tech?
3      A  I don't recall if she shared that
4  specific concern with me.
5      Q  Is it possible that she did?
6      A  It's certainly possible, yes.
7      Q  Are you aware that Felicia Tucker held
8  that view?
9      A  I am not certain what view she held.
10     Q  Okay.  And do you know what contact, if
11 any, Felicia Tucker had with the NCAA directly
12 about that allegation or about any issues related
13 to Balogun and Dixon or this investigation?
14     A  My only knowledge is the interview or
15 interviews -- I'm not sure if she participated in
16 one or more -- that Georgia Tech and the NCAA
17 enforcement staff were engaged in.
18     Q  Okay.  And you would agree that it
19 would be unusual for somebody to have knowledge
20 about an incident where they were not present or
21 employed in a capacity to be involved?
22     A  Can you repeat that or elaborate on
23 what you mean?
24     Q  Yeah, I mean, if -- so it would be
25 unusual to have Felicia Tucker as a witness when

170

1  she was not part of the staff involved in
2  recruiting Balogun and Dixon, would have no
3  firsthand knowledge of this.  So my question is
4  why would she be interviewed?  It would be unusual
5  to interview somebody with no firsthand knowledge
6  of the events at issue.
7      A  Got it.  Thank you for clarifying.
8         No, it's not entirely unusual for
9  individuals to be interviewed that are staff
10 members with an involved sport, for example, that
11 have regular interaction with student athletes,
12 coaches and other members of that staff.  And the
13 scope of investigations can evolve and change
14 throughout, and so I don't think it's unusual at
15 all for additional individuals that may not have
16 participated or would not have been in a place to
17 participate in the actual violation allegation to
18 be interviewed, no.
19     Q  All right.  Now, was it your
20 recollection that Coach Joseph fully cooperated
21 with the investigation?
22     A  It's my recollection that Coach Joseph
23 participated fully in the first set of interviews,
24 and, to my knowledge, she cooperated with the
25 investigation.

171

1      Q  Okay.  In July of 2018, did you
2  approach Liz Balogun in the weight room and tell
3  her you needed her to speak with you and the NCAA
4  in a different room?
5      A  I'm not sure on the exact time frame.
6  That sounds like the right time.  I did meet her
7  at the Zelnak Practice Facility weight room and
8  had a conversation with her, yes.
9      Q  Okay.  And did you tell her at that
10 time that she couldn't talk to her coaches or her
11 parents before she had that interview?
12     A  Yes, I did.
13     Q  Is that consistent with NCAA policy?
14     A  Yes, it is.
15     Q  And was it also consistent with policy
16 that you wouldn't notify Coach Joseph first that
17 you were going to talk to one of her players or
18 bring her out for an interview?
19     A  Yes.
20     Q  Do you recall that when you got to the
21 interview room or wherever you were going to have
22 this interview with the NCAA that the NCAA didn't
23 show up?
24     A  I don't recall.  I believe there were
25 two sets of interviews with Elizabeth Balogun, and

172

1  I would have to go look at the records.  I do not
2  recall a situation where the NCAA was supposed to
3  be present where they then were not.  I don't have
4  that recollection.
5      Q  Okay.  Do you know when the NCAA and/or
6  Georgia Tech completed the investigation into the
7  women's basketball program on these issues?
8      A  The -- if you're referring to the
9  initial investigation regarding Elizabeth Balogun
10 and Elizabeth Dixon, I believe it was February of
11 2019.
12     Q  Okay.
13        MS. BANKS:  Caleb, can you bring up
14 Tab 23.
15        REMOTE TECH:  Yes.  One moment.
16        (Lewis Exhibit 8 marked for
17 identification and attached to the transcript.)
18        MS. BANKS:  All right.  If you could
19 give her control over the document.
20     Q  Ms. Lewis, I'm actually not going to go
21 through this document with you or ask you any
22 questions about it.  I just want you to identify
23 this as your notes.  As I understand it, these are
24 your notes from the NCAA investigation, and so if
25 you can confirm that this is your handwriting and

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

173

1  these are your notes?
2      A   Yes, it is my handwriting and these
3  appear to be my notes.
4      Q   Okay.
5          MS. BANKS:  Caleb, you can take it
6  down.
7      Q   So the NCAA concluded, based on the
8  investigation, not to pursue any allegations
9  against women's basketball on this matter,
10 correct?
11     A   Yes.
12     Q   And do you know when the NCAA first
13 notified Georgia Tech of that decision?
14     A   I'm unsure of the exact date, but I
15 believe it was in February of 2019.
16     Q   Okay.
17         MS. BANKS:  Let's pull up document 58.
18     Q   While we're waiting for this come up,
19 can you tell me, if there had been a notice of
20 allegation brought or -- the allegations that were
21 at issue, were those level 1 or level 2
22 violations?
23     A   I am unsure of what the violations
24 would have been leveled -- how they would have
25 been leveled.  It would have depended on, likely,

174

1  the amount of money and amount of premeditation.
2  So I can't speak to what the leveling would have
3  been.
4      Q   Okay.  So even though it's an alleged
5  payment, which I guess is an impermissible
6  benefit, that doesn't automatically result in a
7  level 1 or level 2 violation, it depends on other
8  factors?
9      A   Yeah, I'd have to look.  There's an
10 extensive library in the NCAA bylaws, and then
11 also the charging guidelines of the enforcement
12 staff and committee on infractions.  I would have
13 to look -- defer to those --
14     Q   Okay.
15     A   -- if there is a strict determination.
16     Q   Is it fair to say it would not be a
17 level 3 violation?
18     A   Yes, that is fair.
19     Q   Okay.  So let's take a look at the
20 document we just put up.
21         MS. BANKS:  If you could give her
22 control over that and maybe make it a little
23 bigger.
24         (Lewis Exhibit 9 marked for
25 identification and attached to the transcript.)

175

1      Q   Do you recognize this document?
2      A   Yes.
3      Q   Okay.  And this is the notification
4  from your counsel about what the NCAA had
5  determined to do?
6      A   Yes.
7      Q   Okay.  And in the second paragraph,
8  "Mike and I spoke after the call, and Mike
9  confirmed that he plans to go forward with the NOA
10 as planned (sometime next week) and there will be
11 no Women's Basketball allegation included."
12         Is "Mike" Mike Zonder of the NCAA?
13     A   Yes.
14     Q   And "NOA" is a notice of allegation?
15     A   Yes.
16     Q   Okay.  So this is February 8th.  Was
17 this the first time you learned that as to the
18 women's basketball program there would be no
19 notice of allegation?
20     A   Yes.
21     Q   Do you have any knowledge as to whether
22 Aisha Oliver-Staley or anyone else had this
23 information prior to February 8th?
24     A   I do not have knowledge of that.
25     Q   Okay.  So nobody told you prior to

176

1  February 8th that this was coming down the pike?
2      A   Correct.
3      Q   They are going forward with a notice of
4  allegation against the men's basketball program at
5  this time, correct?
6      A   Correct.
7      Q   And do you know whether those were
8  level 1 or level 2 or level 3 violations?
9      A   I believe it was a combination of
10 level 1 and level 2.
11     Q   Okay.  And did you notify Coach Pastner
12 at this time that the NCAA was moving forward with
13 a notice of allegation against his program?
14     A   I do not specifically remember how or
15 when Coach Pastner was notified.
16     Q   Did you have any involvement in
17 notifying him?
18     A   I honestly do not recall.
19     Q   Okay.  Would it typically be your duty
20 or responsibility to notify a head coach of an
21 NCAA decision about a notice of allegation?
22     A   It would be the group that I mentioned
23 earlier.  The president, the faculty athletics
24 representative, the director of athletics, myself
25 and the general counsel would confer to make that

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

177

1 determination how notification would occur. In
2 this case, Mr. Pastner also had personal counsel,
3 and so I am unsure if the NCAA notified his
4 personal counsel that was on record that the
5 notice of allegations was going forward.
6     Q   But in your role in compliance, you had
7 no role in notifying either Coach Pastner or Coach
8 Joseph about the result of this investigation?
9     A   I will repeat what I said before. It
10 would be a conferral between the president, the
11 director of athletics, faculty athletics
12 representative, general counsel and myself to
13 determine who was best positioned and how any
14 notification concerning major violations and
15 notice of allegations would occur.
16    Q   Okay. So do you specifically recall
17 having that conference with those people about
18 this e-mail and deciding how you were going to
19 proceed about notification?
20    A   I don't have a specific recollection.
21    Q   But you're confident that such a
22 meeting would have occurred to determine how to
23 notify these coaches?
24    A   I'm confident that there was some sort
25 of a call or meeting or discussion, yes, but I don't

178

1 specifically recall in this instance.
2     Q   And you don't recall specifically
3 whether it was you or not you who notified Coach
4 Pastner?
5     A   Correct.
6     Q   Okay. And did you notify Marvin Lewis
7 that this was the decision by NCAA?
8     A   Again, I don't specifically recall. As
9 the sport administrator, he likely was looped in
10 to that notification, similarly to the
11 communications team once we understood that it was
12 going to be issued.
13    Q   Do you recall talking to him about this
14 informally in any event, not just as part of
15 whatever communication chain was established?
16    A   I don't remember having informal
17 conversations about it, no.
18    Q   You would agree that this is sort of a
19 big deal, right, a level 1 and level 2 violation
20 being -- the notice of allegation against men's
21 basketball?
22    A   Yes.
23    Q   And, similarly, a big deal for women's
24 basketball that they were not going to pursue
25 allegations on these issues, correct?

179

1     A   Yes.
2     Q   And you would agree for women's
3 basketball this was good news?
4     A   Yes.
5     Q   Do you recall, after receiving this on
6 February 8th, did you tell Coach Joseph or her
7 agent or her lawyers or anyone about this good
8 news, either on the 8th or the 9th or the 10th?
9     A   I believe -- and I can't speak to the
10 exact time frame, but I believe I contacted our
11 outside counsel following receipt of this
12 information, because similar to Coach Pastner,
13 Ms. Joseph had personal counsel that had been
14 representing her in the investigation. And I
15 inquired as to whether the institution or --
16 should inform her directly or the NCAA enforcement
17 staff, because they had been communicating about
18 the case via counsel, should notify Ms. Joseph
19 through her counsel.
20    Q   And was that -- you contacted -- was
21 that John Long who you contacted?
22    A   It would have been John Long and/or
23 Paul Kelly.
24    Q   Okay. And was that phone call made
25 after you conferred with the leadership team that

180

1 you discussed before?
2     A   I do not recall.
3     Q   Because you indicated that before any
4 notification would happen, would you have to meet
5 and confer about how best to do that?
6     A   Yes. But I am unsure whether I asked
7 that question prior to meeting with that team so I
8 could provide that information or whether that
9 question came out of a meeting with that team. I
10 am not sure. I don't recall.
11    Q   Okay. But -- and you would agree that
12 it was important for both Coach Pastner and Coach
13 Joseph to receive the information as soon as
14 possible to understand what the NCAA had decided,
15 correct?
16    A   Yes.
17    Q   Do you have any knowledge about when
18 Coach Joseph was notified or how she was notified
19 of the fact that the NCAA was not planning to
20 pursue a notice of allegation?
21    A   I believe, following my question, the
22 enforcement staff ultimately notified our outside
23 counsel that they would notify Coach Joseph's
24 counsel and that would be the proper notification.
25 I am unsure of when that notification occurred.

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

**181**

1    Q   Okay.  And do you have any knowledge
2  about when the notification occurred or how it
3  occurred for Coach Pastner?
4    A   Again, I do not recall.
5    Q   And you would agree that it would
6  likely have been or should have been on or around
7  the same time period?
8    A   I cannot speak to that only because we
9  have this question out.  So I would say yes, it
10  should have been, but I'm unsure if it was.
11    Q   Okay.  Was there any reason why Georgia
12  Tech could not notify Coach Joseph or Coach
13  Pastner about this issue directly?
14    A   Similar to what I stated -- excuse me?
15    Q   Well, I was just going to clarify my
16  question.  Was there some sort of rule prohibiting
17  it, some sort of NCAA rule or internal Georgia
18  Tech policy that prohibited Georgia Tech officials
19  from notifying either Coach Pastner or Coach
20  Joseph directly?
21    A   There was not a Georgia Tech rule that
22  I'm aware of.  But, again, the question was asked
23  because of the NCAA enforcement internal operating
24  procedures, and that's why we asked the question,
25  does counsel need to be communicated with directly

---

**182**

1  because all of the communication concerning
2  Ms. Joseph at this point in the investigation was
3  through her counsel, and we inquired because we
4  wanted to be mindful of their operating procedures
5  and to ensure that we were following them
6  correctly.
7    Q   The NCAA procedures?
8    A   Yes.
9    Q   Okay.  And did the NCAA indicate to
10  you, or anyone else, to your knowledge, that they
11  would prefer you not tell Coach Joseph directly
12  about their determination?
13    A   My recollection -- and, now, I did not
14  speak with the NCAA enforcement staff directly.
15  My recollection, through our outside counsel, was
16  that the enforcement staff indicated they
17  preferred to communicate through her counsel.
18  That's my understanding.
19    Q   Okay.
20    MS. BANKS:  Okay.  If we could take
21  this down and put up document 54, please.
22    (Lewis Exhibit 10 marked for
23  identification and attached to the transcript.)
24    Q   Okay.  Take a look at this and tell me
25  whether you recognize this text message exchange.

---

**183**

1    A   This looks to me like the notification
2  or status update to Todd relative to the women's
3  basketball NCAA investigation.
4    Q   Okay.  But this is a text message
5  exchange between you and Todd Stansbury, correct?
6    A   That's what it appears to me to be,
7  yes.
8    Q   Okay.  If you go on to BOR 19922,
9  please, to that page.
10    MR. ABBOUD:  Sorry to cut in here.
11  Caleb, there is another version of this document.
12  This is actually an incomplete version of the
13  document.
14    REMOTE TECH:  Sorry about that.  I
15  clicked the wrong one.  Let me change that real
16  quick.
17  BY MS. BANKS:
18    Q   Okay.  Take another look, scroll
19  through, tell me, still your text message exchange
20  with Todd Stansbury, correct?
21    A   Appears to be, yes.
22    Q   Okay.
23    MS. BANKS:  Now I would like you to go
24  to 19922, please.
25    Q   Okay.  So on February 15th, 2019, you

---

**184**

1  text Todd Stansbury that "Got the NCAA info.  Will
2  give Marvin and Josh a heads-up and plan to meet
3  in detail next week."  This is a week after
4  receiving the e-mail from John Long about the NCAA
5  decision.
6    Are you referencing giving Marvin and
7  Josh Pastner a heads-up on that determination?
8    A   I believe this was the date the actual
9  notice of allegations was received by Georgia
10  Tech.
11    Q   Okay.  And you were bringing that
12  information directly to Marvin and Josh?
13    A   According to this text, it seems I was
14  giving them a heads-up.  I don't know if I
15  provided the information in detail.  I'm unsure of
16  when I did that.
17    Q   Well, when you say "a heads-up," you
18  mean a heads-up on the NCAA info which you just
19  referenced, correct?
20    A   Yes, that we had received a notice of
21  allegation.
22    Q   Okay.  So certainly by February 15th,
23  Coach Pastner was aware that there would be a
24  notice of allegation?
25    A   Yes.

---

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

185

1    Q   And do you know whether he knew prior
2  to February 15th that there was going to be one
3  and then learned on February 15th or thereabouts
4  that it had been received?
5    A   I do not know.  I would have to look
6  through records to make that determination.
7    Q   Okay.  And do you recall actually
8  giving Marvin and Josh the heads-up that you had
9  received the notice of allegation?
10   A   I don't specifically recall that.
11   Q   Okay.  But here you're indicating
12  you're planning to do that, correct?
13   A   Yes.
14   Q   All right.  So you don't recall any
15  conversation with Coach Pastner about the notice
16  of allegation?
17   A   I don't recall specifically in this
18  time frame.  Again, I would have to go back
19  through notes or meetings, calendars, to piece
20  that together.  I don't specifically recall that
21  conversation.
22   Q   Okay.  So this was not a memorable
23  conversation for you?
24   A   Not specifically.  This investigation
25  had been lengthy, and we spoke about the matters

186

1  frequently.
2    Q   Okay.  And do you recall giving Marvin
3  the heads-up that the notice of allegation had
4  arrived?
5    A   Not specifically.
6    Q   At any point in your discussions with
7  the leadership team that we've talked about, were
8  you told not to inform Coach Joseph about the NCAA
9  decision?
10   A   Not that I recall.
11   Q   Is it possible that you got such an
12  instruction and just don't recall?
13   A   I would say it's possible but unlikely.
14  I just don't remember being instructed by anyone
15  at Georgia Tech not to disclose that information.
16   Q   Okay.  Did you get a sense that -- from
17  anyone at Georgia Tech that they felt that they
18  wanted to wait before revealing this information
19  to Coach Joseph?
20   A   No.
21   Q   Did you have any conversations -- after
22  receiving the information from John Long on
23  February 8th, do you recall having any discussions
24  with any Georgia Tech officials, including
25  Stansbury, Akin, Staley, Peterson or anyone else,

187

1  regarding women's basketball being cleared?
2    A   I believe I would have touched base
3  definitely with Aisha Oliver-Staley.  She was
4  copied on that same correspondence.  And, as I
5  mentioned, receiving notification that there would
6  be a men's basketball allegation forthcoming --
7  notice of allegations forthcoming in the quick
8  time period and that there would be no allegations
9  in the women's basketball program, I would imagine
10  I met with that team I mentioned earlier, the
11  president, the faculty athletics representative,
12  the athletics director and the general counsel,
13  either met or corresponded with to make sure
14  everyone was aware.
15   Q   Okay.  And to your knowledge, were any
16  of these individuals on the team you just
17  mentioned -- did any of them express any
18  disappointment in this result related to women's
19  basketball?
20   A   Not that I recall.
21   Q   Do you recall any discussions among
22  anyone in that team or elsewhere at Georgia Tech?
23  Do you recall any discussions where there was a
24  hope or expectation that this NCAA investigation
25  would be used as a way to move Coach Joseph out of

188

1  Georgia Tech?
2    A   No.
3    Q   You have no such recollection of any
4  conversations about that or desire to do that?
5    A   I do not recall any conversations about
6  that.
7    Q   Okay.  Do you recall any reactions by
8  Georgia Tech officials, outside of the team that
9  you just noted, to the news that women's
10  basketball would be cleared, for example, Lynn
11  Durham or Bud Peterson or Marvin Lewis or Felicia
12  Tucker or anybody else?
13   A   No, I don't specifically remember
14  reactions to that news, no.
15   Q   Okay.
16      I don't know if I've asked you this
17  already, but do you have any recollection at this
18  point when Coach Joseph was notified of the news?
19   A   No.  I'm unsure of that timeline.
20   Q   Okay.  All right.  So I want to shift
21  now and talk to you a little bit about other
22  things that were going on in the 2018 time period
23  while this NCAA investigation was happening into
24  women's basketball.
25      MS. BANKS:  We can take down this

Case 1:20-cv-00502-TCB   Document 210   Filed 12/30/21   Page 49 of 77
Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

48 (189 to 192)

189

1 document, Caleb.
2        Actually, I'm sorry, Caleb. Can you
3 bring that one back up for a minute.
4        Oh, good, that was fast.
5        Can you go to BOR 19919, please.
6    Q   This is dated February 7th, 2019, from
7 you to Todd Stansbury. "Got your e-mail. Please
8 do not share with anyone until we connect. I will
9 follow up with the appropriate folks on next steps
10 and we can connect in the morning."
11        Do you recall what this was about?
12   A   No, I do not.
13   Q   This was the day before you got the
14 letter from the NCAA or from your counsel about
15 the notice of allegations, correct?
16   A   It appears to be, yes.
17   Q   And just again, do you have any reason
18 to believe that perhaps you had the information or
19 Todd Stansbury had the information as of
20 February 7th?
21   A   No, I do not.
22   Q   Do you have any knowledge as to why you
23 would be telling Todd Stansbury not to share with
24 anyone the e-mail?
25   A   It depends on what that e-mail was.

190

1 There are certain contexts, and this is certainly
2 Title IX related information that I would instruct
3 him not to share more broadly until it is shared
4 with the appropriate people.
5    Q   So is it your view this is unrelated to
6 the NCAA investigation and notice of allegations?
7    A   Yes, it appears to be unrelated to me.
8    Q   Why does it appear to you to be
9 unrelated?
10   A   Because I don't recall any specific
11 information being received prior to February 8th,
12 as you noted. And from my other text messages, I
13 was providing updates and names of individuals and
14 specifically referencing women's basketball, and
15 here I don't reference any of that.
16   Q   Okay. All right.
17        MS. BANKS: We can take that down.
18   Q   All right. So, as I said, I want to
19 just walk through some things that were happening
20 during 2018 at the same time this investigation is
21 happening.
22        On May 31st, 2018, do you recall
23 attending a staff audit meeting where Coach Joseph
24 had a PowerPoint presentation on the women's
25 basketball program?

191

1    A   Yes, I do recall being present.
2    Q   Okay.
3        MS. BANKS: Can you bring up document
4 24, please, Caleb.
5        (Lewis Exhibit 11 marked for
6 identification and attached to the transcript.)
7    Q   All right. So this document is an
8 e-mail from MaChelle Joseph to a number of people,
9 including yourself and Marvin Lewis, transmitting
10 a PowerPoint for this meeting, correct?
11   A   That's what it looks like, yes.
12   Q   And you have no reason to believe you
13 didn't receive this e-mail?
14   A   No.
15   Q   Okay.
16        MS. BANKS: Okay. Take this down and
17 put up 25, please.
18        (Lewis Exhibit 12 marked for
19 identification and attached to the transcript.)
20        MS. BANKS: Okay. Can I have control
21 over the document, please.
22   Q   Do you recognize this PowerPoint
23 presentation?
24   A   Yes. It looks like the presentation.
25 I don't recall all of it, but, yes.

192

1    Q   And do you recall during that
2 presentation Coach Joseph raising concerns about
3 problems with or inequities in her program?
4    A   I don't specifically recall whether
5 inequities were discussed.
6    Q   Okay. I want to take -- what is SWOT,
7 S-W-O-T; do you know?
8    A   Strengths, weaknesses, opportunities
9 and threats.
10   Q   Okay.
11        MS. BANKS: So can you make this a
12 little bigger, please. Thank you.
13   Q   She is providing an overview of
14 strengths and weaknesses, opportunities and
15 threats here. Among weaknesses, she talks about
16 marketing and ticket sales, staffing budget,
17 travel budget and other things. Also, among
18 threats, she says, "Attendance," "Athletic
19 Facilities," "Academic Facilities."
20        So she is raising issues related to
21 resources and funding, correct?
22   A   It appears so, yes.
23   Q   Was that, to your recollection, the
24 first time you had heard that from her, or was
25 this something that she had raised previously?

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

193

1  A   I do not recall.  I would say this is
2  maybe one of the more formal opportunities I had
3  heard Coach Joseph present on her budget or her
4  facilities.  But I can't recall if this was the
5  first time she had put forward, you know, requests
6  for additional resources.
7  Q   Okay.  But you had heard Coach
8  Joseph -- you had heard that she had raised
9  complaints about lack of resources before,
10 correct?
11 A   I would say generally, yes.
12 Q   Okay.  And Mr. Lewis, to your
13 knowledge, was also aware that she had made
14 similar complaints as he oversaw the budgeting for
15 these issues; is that right?
16 A   I can't speak for him.  I would imagine
17 that's correct, but I can't speak with certainty.
18 Q   Do you recall what your reaction was to
19 this presentation at the time?
20 A   I don't specifically remember what
21 reaction I have.  I believe I may have taken a
22 couple of notes with some questions or follow-up
23 items, but I have no recollection of any reaction.
24 Q   Is this presentation typical of the
25 presentations done at these audit meetings?

194

1  A   I would have to go back and review.  We
2  had a pretty vast range of different
3  presentations.  I think this one may have been
4  more extensive than many others, but there were
5  also other detailed presentations.  So, again, I
6  can't speak with certainty.
7  Q   Do you remember during the meeting
8  making negative comments to or about -- to
9  Ms. Joseph or about this presentation?
10 A   No, I do not.
11 Q   Do you remember whether you and Marvin
12 Lewis acted in a way that was dismissive of this
13 presentation?
14 A   No, I do not.
15 Q   Do you recall whether you had feelings
16 about this presentation that it was sort of over
17 the top and MaChelle Joseph doing what MaChelle
18 Joseph does about these complaints?
19 A   I do not recall having that sentiment,
20 but I don't recall any feelings I may have had
21 during this meeting.
22 Q   Okay.  Is it possible that that is the
23 way you responded to this presentation?
24 A   I don't think so.  I remember, as I
25 mentioned, I think I took a couple notes and

195

1  wanted to follow up with some questions and data,
2  but I don't think I would have been dismissive of
3  this type of presentation that had so much data
4  and information in it.
5  Q   Okay.  Did you sort of feel that Coach
6  Joseph by this time in raising these issues was
7  annoying?
8  A   No.  But I would ask, what issues
9  specifically are you referring to?
10 Q   Lack of funding, all of the issues that
11 are raised as weaknesses in this analysis,
12 weaknesses or threats.  Lack of funding, lack of
13 budgeting, basically the inequitable treatment of
14 women's basketball.
15 A   So I would say I don't find it annoying
16 for people to advocate on behalf of their
17 programs.  I do not remember this presentation,
18 you know, being focused on inequity, rather,
19 gaining more resources.
20 Q   Well, isn't the desire or need for more
21 resources the flip side of saying I don't have
22 enough?
23 A   Yes, it's the flip side of saying I
24 don't have enough, but I don't -- I don't
25 specifically recall that it was framed in a

196

1  comparison of equity with other Georgia Tech or
2  other programs.  I just -- I don't remember it
3  being framed that way.  I remember -- and based on
4  what you have shown me, that it was a push for
5  more resources for the women's basketball program.
6  Q   You see here that under "Threats" she
7  has "Athletic Facilities"?
8  A   Yes.
9  Q   Do you recall that she was advocating
10 for better athletic facilities for her team?
11 A   Yes, I believe so.
12 Q   And do you recall that she was
13 comparing her athletic facilities to those of the
14 men's basketball team?
15 A   I do not specifically remember that.
16 Q   When she was presenting this, did you
17 pay attention?
18 A   Yes, I believe so.
19 Q   So whatever information she presented,
20 you would have seen?
21 A   Yes.
22 Q   Did you have any reason to believe,
23 after seeing this presentation, that she was
24 raising issues related to Title IX concerns?
25 A   I don't think in a specific context I

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

197

1 understood these to be Title IX complaints. I
2 believe that she was advocating for better
3 resources for her program, which I understand and
4 applaud.
5     Q   But you had no knowledge that she was
6 advocating for those additional resources in
7 comparison with what the men's team received or
8 had?
9     A   Aside from the references I see on the
10 document you have on the screen, not specifically.
11 I don't recall that being the framework of the
12 presentation.
13    Q   And -- but outside of this
14 presentation, did you understand that she had
15 concerns about her program relative to the men's
16 program?
17    A   I believe I mentioned earlier I did
18 not -- I do not recall any specific conversations
19 with Ms. Joseph where she brought those concerns
20 to me or communicated them directly to me. I
21 think I had, again, via third parties -- and I
22 can't even tell you who those third parties are --
23 heard that she had either made comments or was
24 advocating for better resources.
25    Q   Have you ever had occasion to be in the

198

1 women's basketball locker room?
2     A   I have been in the women's basketball
3 locker room, yes.
4     Q   And have you been in the men's
5 basketball locker room?
6     A   Yes. I'm not sure I've been in every
7 part of it, but I have been in the locker room.
8     Q   Okay. And was it your impression,
9 after being present in both those locker rooms,
10 that the men's locker room was better appointed
11 than the women's?
12    A   My impression was that it seemed to
13 have been refreshed or renovated more recently.
14 But, to my recollection, the availability of
15 showers and lockers seemed comparable. Again, the
16 men's locker room had newer equipment.
17    Q   Okay. And the men's locker room had
18 actual rooms that the women's didn't, correct,
19 like it had a game room?
20    A   I can't recall specifically the floor
21 plan, but I do believe there were -- the two
22 locker rooms were spaced differently, but I don't
23 know exactly the breakdown of that space.
24    Q   After seeing both locker rooms, did you
25 have any concerns about an inequity between the

199

1 facilities in those locker rooms?
2     A   Generally speaking, I believe that,
3 similar to the men's locker room, the women's
4 locker room at some point should be renovated and
5 have updated facilities, but I was not overly
6 concerned that there was a huge disadvantage
7 between the two.
8     Q   Okay.
9         MS. BANKS:  You can take this document
10 down.
11    Q   So you acknowledge that she was
12 advocating for better resources for her team in
13 this presentation. Do you know whether or do you
14 have any knowledge about whether Mr. Lewis took
15 Coach Joseph's concerns seriously or took any
16 action on them?
17    A   I do not have knowledge of that.
18    Q   Do you recall whether you and he
19 discussed her presentation or her request for
20 additional resources?
21    A   I do not recall any specific discussion
22 outside of that huddle.
23    Q   What huddle?  The meeting?
24    A   Yes.
25    Q   Okay.

200

1         MS. BANKS:  Let's pull up tab 28,
2 please.
3         (Lewis Exhibit 13 marked for
4 identification and attached to the transcript.)
5     Q   Okay. Will you take a look at this
6 document and tell me whether you recognize it.
7     A   It appears to be an e-mail exchange
8 from Coach Joseph at the time to me.
9     Q   Okay. And this is on July 9th, 2018.
10 This e-mail is redacted because we received it
11 through the Open Records Act, but it is my
12 understanding that this e-mail is about Liz
13 Balogun and her need to travel home for visa
14 issues. Do you recall that issue?
15    A   Yes, I do.
16    Q   Okay. And in this e-mail Coach Joseph
17 notes that you had requested to meet with
18 Ms. Balogun before she traveled home as part of
19 the process for getting her visa, correct?
20    A   Yes.
21    Q   She raises a concern about that,
22 claiming you had never done that before and she
23 believes it's unusual for compliance to ask to
24 meet with the player. Is that accurate? Was it
25 unusual and had you done this before?

Case 1:20-cv-00502-TCB   Document 210   Filed 12/30/21   Page 52 of 77
Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021                                    51 (201 to 204)

201

1    A   I would say it's not unusual for the
2 compliance staff, especially in situations where
3 we're navigating or facilitating payment of
4 transportation costs for those trips home.  And I
5 don't recall the funding source in this exact
6 situation, but it's not unusual for us to meet
7 with student athletes prior to international
8 travel, no, I would say, across the entire scope
9 of athletics programs.
10    Q   Why were you -- so why would you need
11 to meet with the student about international
12 travel as opposed to, say, the coach or the sport
13 administrator or somebody else with the program?
14    A   For a variety of different reasons.
15 We've met with students to discuss what we're
16 permitted to pay for, what we're not, to answer
17 any questions, to make sure they request or get
18 the proper documentation.  And certainly if there
19 are any other matters that we're working with that
20 student on before they leave the country, it would
21 be normal for us to meet with them.
22    Q   Okay.  But you don't do it every time a
23 student needs to travel internationally, correct?
24    A   No, it is not an automatic meeting.
25    Q   Okay.  And so it's when you determine

202

1 in your own discretion that it's necessary to talk
2 with the student directly?
3    A   Yes.
4    Q   And do you recall what the reason was
5 as to why you thought you needed to speak with
6 Ms. Balogun directly?
7    A   I do not recall the exact reason.
8    Q   Okay.  The first line of this from
9 MaChelle Joseph says, "I tried to reach you
10 several times via text and voice mail."  So then
11 she sends you this e-mail.
12        Is there any reason or can you recall
13 why you wouldn't have responded to several of her
14 texts or voice mails?
15    A   I don't recall a specific reason.  I
16 vaguely remember, and I might be incorrect, but I
17 believe Ms. Joseph was traveling internationally
18 around this time.  So I know there were some time
19 difference issues with some of our communication.
20 I'm not sure if that impacted this specific case.
21    Q   Okay.  She also indicates towards the
22 bottom of this e-mail that she thinks it's a
23 professional courtesy to contact a head coach and
24 let the coach know when you want to meet with a
25 student athlete.  Would you agree with that

203

1 statement?
2    A   I would say it depends on the context
3 of why we need to meet with that student.  There
4 are certainly lots of matters that, based on
5 investigation protocol and best practices or
6 athletics compliances best practices, that we
7 would not automatically notify a head coach if
8 we're speaking with a student athlete or a member
9 of their staff.
10    Q   Okay.  But in this situation, it
11 appears that they ran all of this through
12 compliance initially.  So can you recall any
13 reason why you wouldn't have notified Coach Joseph
14 that you were going to be talking with her student
15 athlete?
16    A   As I mentioned before, if there were
17 other factors not related to travel that were also
18 present during this time period, there may have
19 been a different reason for contacting that
20 student unrelated to travel but important to
21 communicate prior to her leaving the country.
22    Q   Okay.  And do you recall, sitting here
23 today, what those reasons were with respect to
24 Ms. Balogun?
25    A   I don't recall the specific reasons,

204

1 no.
2    Q   This is, however, in the midst of the
3 NCAA investigation, correct?
4    A   Yes.
5    Q   Okay.
6        MS. BANKS:  We can take that one down.
7        Let's take a look at document 29,
8 please.
9        (Lewis Exhibit 14 marked for
10 identification and attached to the transcript.)
11        MS. BANKS:  Can I have control and
12 could you make it a little bigger, please.
13    Q   I want you to take a look at this
14 document from August of 2018, with the subject
15 line, "Support staff evaluations 2018."  Have you
16 ever seen this document before?
17    A   I don't believe so.
18    Q   Okay.  Do you know that coaches provide
19 support staff evaluations each year?
20    A   I'm not sure I knew that was formalized
21 or specific, but I think generally that makes
22 sense.
23    Q   Okay.  On page 2 of this document, I
24 want to show something to you.  She says -- this
25 one is about you.  It says you have become hard to

205

1  contact, "she doesn't know how to treat women or
2  specifically female head coaches."
3       Did anyone report that back to you,
4  that this was a concern that she had?
5       A  Not that I recall.
6       Q  Okay.  She also says, "Marvin is the
7  CFO which directly oversees the finances and our
8  budgets.  Shoshanna is overseeing Title IX/gender
9  equity and compliance.  They can't be impartial
10 with their professional responsibilities to GT and
11 GTAA."
12      Did anyone raise that issue with you
13 that she raised?
14      A  Not that I recall.
15      Q  Okay.  On page 3 she talks about
16 equipment services, which is similar to what we
17 looked at in the PowerPoint.  She complains here
18 that women's basketball has less in terms of
19 equipment services, sports information efforts,
20 marketing, et cetera.  So she says, "We only have
21 one washer and one dryer in our locker room (men's
22 basketball has three dryers and three washers)."
23      Did anybody raise these issues with you
24 about an inequity with respect to women's
25 basketball versus men's basketball?

206

1       A  I have not seen this specific
2  information, no.
3       Q  But nobody brought this information to
4  your attention at this time that she had raised in
5  this e-mail?
6       A  No, not that I recall.
7       Q  And would you agree and characterize
8  this as a complaint of either discriminatory
9  treatment or inequitable resources between women's
10 basketball and men's basketball?
11      A  I would read this as, from the
12 perspective of Ms. Joseph, yes, that she believed
13 there was an inequity between those two programs.
14      Q  Okay.  To your knowledge, did Georgia
15 Tech start any sort of investigation or review in
16 response to this August 2018 document?
17      A  I don't have any knowledge of that.
18      MS. BANKS:  Okay.  If you could take
19 this one down, please.  And if you could bring up
20 document 30, please.
21      (Lewis Exhibit 15 marked for
22 identification and attached to the transcript.)
23      Q  Take a look at this e-mail and --
24      MS. BANKS:  If I can have control,
25 please.

207

1       Q  Take a look at this e-mail down here at
2  the bottom.  Do you recognize this e-mail?
3       A  Yes.  I believe this is the e-mail I
4  was referencing earlier.  I do recognize this
5  e-mail.
6       Q  Okay.  So this e-mail references an
7  August 31st meeting in which you discuss the
8  compliance investigation into whether women's
9  basketball committed a rules violation when a
10 player, Martine Fortune, allowed players from her
11 old high school team to shoot around on the court,
12 correct?
13      A  Correct.
14      Q  Okay.  And do you recall having this
15 meeting and conversation with Coach Joseph on
16 August 31st?
17      A  I remember having a meeting, and it
18 seems as though it was on August 31st.
19      Q  Okay.  And do you recall that she
20 complained about a double standard because, in her
21 view, men's basketball was allowed to use --
22 allowed men's AAU teams to use the facilities for
23 practice and other purposes.
24      A  I certainly see that in the e-mail.  I
25 don't specifically recall us discussing that in

208

1  detail during that meeting, but we may have.
2       Q  Okay.  Do you recall at all how you
3  responded either to the discussion at the meeting
4  or to this e-mail?
5       A  I believe there is an e-mail response
6  from me, and I can't recall the exact language,
7  but I certainly -- I believe I requested that if
8  she has any detailed information, please report it
9  so we can properly investigate it.
10      Q  And do you think that's how you
11 responded, in writing?
12      A  I believe so, but I would have to look
13 at my e-mail response to confirm that.
14      Q  Okay.  Well, if you could do that.
15 And, also, to the extent you have such a response
16 and haven't provided it, you should.
17      MS. POOLE:  Ms. Banks, we have provided
18 that response, and if you would like to take a
19 break, I can find it for you.
20      MS. BANKS:  Okay.  We might do that.  I
21 just want to make sure that whatever she has, has
22 been provided.
23      MS. POOLE:  Sure.
24 BY MS. BANKS:
25      Q  As you can see up here -- so this was

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

209

1  sent to you, Mark Rountree, Todd Stansbury and
2  Joeleen Akin, and then it appears that Joeleen
3  Akin forwards it to Lynn Durham, correct?
4      A  Yes, that's what I see.
5      Q  Okay.  Do you recall discussing this
6  matter with Ms. Akin?
7      A  I don't specifically recall whether we
8  had a conversation after receiving the
9  information.  I believe I replied to the entire
10  group on my written response.
11      Q  Okay.  But you don't recall
12  specifically having a conversation with Ms. Akin
13  about this?
14      A  Not specifically, no.
15      Q  Do you have any knowledge as to why she
16  forwarded this on to the Office of the President?
17      A  No, I do not.
18      Q  Okay?
19      MS. BANKS:  If we could take this down
20  and bring up document 31, please.
21      (Lewis Exhibit 16 marked for
22  identification and attached to the transcript.)
23      Q  Okay.  Take a look at this document.
24  You forwarded her e-mail to James Newsome, right?
25      A  Yes.

210

1      Q  Who goes by Burns?
2      A  Yes.
3      Q  Okay.  Why did you forward it to him?
4      A  I believe I forwarded it to him because
5  she had raised a concern about my ability to -- or
6  her ability to report Title IX or equity-related
7  issues to me, and I wanted him to be aware that I
8  believe in my response I provided his information,
9  and that in case he received any complaint or
10  additional information, that that's the context.
11  I think I was just notifying him, as my e-mail
12  indicates.
13      Q  Okay.
14      MS. BANKS:  And if I can have control
15  over the document, please.
16      Q  It appears that you also forwarded it
17  to Paul Kelly, John Long, who are your outside
18  counsel, correct?
19      A  Yes.
20      Q  And Aisha Oliver-Staley.
21      Why did you do that?
22      A  It was very routine.  During the course
23  of investigations, especially level 1 and level 2
24  investigations that involved the NCAA and/or
25  outside counsel, that we reviewed all possible

211

1  level 3 violations and made sure that we
2  appropriately reported them via counsel to the
3  enforcement staff.  And they would give us
4  direction whether we should report them through
5  the software system I mentioned at the beginning
6  of our day, which is the standard reporting
7  mechanism, or whether they would be folded into
8  the existing investigation.
9      So I was keeping our outside counsel
10  apprised of all women's-basketball-related
11  violations.
12      Q  But you're not really advising them of
13  the violations so much as MaChelle Joseph's email
14  to you.  The violations were first discussed on
15  Friday, August 31st.  This e-mail to the attorneys
16  and to Aisha Oliver-Staley is September 10th.
17      So wouldn't you be forwarding some
18  other kind of document related to the alleged
19  violation --
20      A  I may -- sorry.
21      Q  This doesn't seem to be the document
22  you would forward to say, hey, should we bring
23  this to the NCAA's attention because it's Coach
24  Joseph's e-mail.
25      A  I would say it summarizes what was

212

1  occurring in the violation and also the
2  environment and relationship with the compliance
3  staff, which I believe I felt was relevant for our
4  outside counsel to be tracking on.
5      Q  And what about the relationship did you
6  think was relevant?
7      A  That it continued to be strained,
8  especially between Ms. Joseph specifically and
9  myself, and that it was challenging to conduct
10  normal athletics compliance-related activities,
11  and, of course, there was a specific violation
12  captured.  I do not recall if we had had other
13  conversations and whether someone requested I
14  forward that or I did that independently.
15      Q  And did you have any knowledge around
16  this time whether men's basketball did, in fact,
17  allow teams to practice or use the facilities?
18      A  Any time information was reported to
19  myself or a member of our staff, we definitely
20  would follow up on it just like we would in any
21  situation.  So if those scenarios were brought to
22  our attention with respect to men's basketball,
23  yes, at times they were, and we followed up on
24  them.
25      Q  And do you recall whether you followed

Case 1:20-cv-00502-TCB   Document 210   Filed 12/30/21   Page 55 of 77
Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021                              54 (213 to 216)

213

1  up on this one?
2      A   I believe I responded directly to
3  Ms. Joseph and asked if she had more specific
4  information, because a comment that this happens
5  all the time, without any details to follow up on,
6  didn't present credible information to follow up
7  on, so I requested more details.
8      Q   Do you recall whether she provided more
9  details?
10     A   I do not believe she followed up with
11 any details, but I don't specifically recall.
12     Q   Okay.  And without additional details,
13 you weren't going to pursue that part of the
14 inquiry further?
15     A   No.
16     Q   And you didn't approach Coach Pastner
17 or anybody on his staff and ask if that was
18 accurate about their use of the practice
19 facilities?
20     A   I am not positive.  I would have to go
21 back and look through records, and if there were
22 any notes to determine whether I followed up
23 generally with that program.
24     Q   Okay.  But sitting here today, you have
25 no recollection of doing so?

214

1      A   I don't recall.
2      Q   You don't recall doing so?
3      A   No.
4      Q   Okay.  Do you recall why you forwarded
5  this to Aisha Oliver-Staley?
6      A   I believe, from what I can remember,
7  that similarly to outside counsel in Title IX, I
8  wanted her to be aware, knowing we were in the
9  midst of an NCAA investigation and that the
10 relationship between the women's basketball
11 program and the compliance office and specifically
12 Ms. Joseph and myself was strained, that I wanted
13 to keep her abreast of what communication was
14 happening and that it was something she should be
15 aware of.
16     Q   Okay.  And to your knowledge, did your
17 office or anyone at Georgia Tech conduct any sort
18 of Title IX inquiry into these allegations that
19 she raised?
20     A   I am not aware.  And my office does not
21 and has not conducted Title IX-related
22 investigations, but I am not aware of anyone at
23 the -- I am not aware whether anyone conducted an
24 investigation.
25     Q   Okay.  But you have no knowledge about

215

1  at least following up, if not conducting an
2  investigation?
3      A   No.
4      Q   Okay.
5          MS. BANKS:  Can we take a five-minute
6  break?
7          MS. POOLE:  Actually, I'm going to need
8  a little bit of a longer break at some point in
9  the afternoon.  We can take it now or -- well,
10 probably just to just take it now so that we can
11 then maybe power through.
12         MS. BANKS:  Okay.  How long do you
13 need?
14         MS. POOLE:  Probably about 20, 25
15 minutes.
16         MS. BANKS:  Okay.  So why don't we come
17 back at ten minutes to 4:00.
18         MS. POOLE:  Okay.
19         MS. BANKS:  Am I doing that right?
20 Yeah, I think I did the math right.  All right.
21 So let's come back at 10 minutes to 4:00.
22         MS. POOLE:  Okay.
23         MS. BANKS:  Thanks.
24         (A recess was taken.)
25         MS. POOLE:  Real quick, Ms. Banks,

216

1  before you get started, I wanted to let you know
2  about the e-mail you and Ms. Lewis were just
3  discussing.  I have not pinpointed it in our
4  production, but there are several copies of that
5  e-mail in plaintiff's production back to us, and I
6  think you can find that at PLAINTIFF 7256 is one
7  such instance.
8          MS. BANKS:  Okay.  Thank you.
9          Okay.  Can we bring up document 33,
10 please.
11         (Lewis Exhibit 17 marked for
12 identification and attached to the transcript.)
13     Q   Do you recognize this e-mail?
14     A   After reviewing it, it looks like I was
15 copied on it, yes.
16     Q   Okay.  And do you recall something
17 related to the Stringer bus or a party bus?  Do
18 you remember that issue?
19     A   Yes.
20     Q   Okay.  And you recall that -- do you
21 recall what it was about?
22     A   I believe that there was an
23 impermissible vehicle utilized during an official
24 visit with the program around the time of this
25 e-mail or that was discovered from previously.

217

1 I'm not sure of exactly when the violation
2 occurred.
3    Q    The violation, to my knowledge,
4 happened in 2016.  Does that sound accurate?
5    A    I would have to look at the records.
6    Q    Okay.  It was reported to the NCAA
7 around this time, however, right, September 2018?
8    A    Based on this information, that seems
9 correct, but I would have to look at the report to
10 determine exactly when it was reported.
11    Q    Okay.  Is there a reason, if this did
12 happen in 2016, is there a reason why it would
13 just be submitted to the NCAA two years later in
14 2018?
15    A    I don't recall specifically in this
16 case, but if we did not discover or learn about it
17 until later, that could explain the delay in
18 reporting it.
19    Q    Okay.  And how would you come to learn
20 of a violation that happened two years prior?
21    A    I'm not sure.  Again, I would have to
22 go back and look at the records to understand how
23 this was discovered.
24    Q    And was it Lance Markos who did this
25 investigation?

218

1    A    Again, I would have to look at the
2 records.  I'm unsure of exactly who coordinated.
3    Q    Okay.
4    MS. BANKS:  Okay.  You can take this
5 down.  If we could bring up document 36, please.
6    (Lewis Exhibit 18 marked for
7 identification and attached to the transcript.)
8    MS. BANKS:  Can I take control, please.
9    Q    Do you recognize this e-mail from
10 October 23rd, 2018?
11    A    Yes.
12    Q    And it appears that Coach Joseph was
13 asking you why you had asked her athletic trainer,
14 Rachel Matthews, about the practice schedule,
15 correct?
16    A    Yes.
17    Q    You then forward this e-mail to Mark
18 Rountree, it appears.  I think it's the next day.
19 You were concerned that the trainer had reported
20 your inquiry to Coach Joseph, correct?
21    A    Yes.
22    Q    And did you tell the trainer to keep
23 your request a secret?
24    A    No, not specifically that I recall.
25    Q    And is there any reason that you can

219

1 think of that -- why she would think that you had
2 expected her to keep it a secret?
3    A    Not that I can think of, but, again, I
4 don't recall the specific conversation we had.
5    Q    And it was not a violation of any
6 Georgia Tech or NCAA rule for Ms. Matthews to tell
7 Coach Joseph about your request, was it?
8    A    No, it was not a violation of a rule.
9    Q    And was it typical of you to make a
10 request of a staff member of an athletic program
11 to ask about their practice schedule?
12    A    I think it would depend on the
13 situation.  It's certainly not out of the ordinary
14 to inquire when folks are practicing with someone
15 engaged or involved with the program.
16    Q    And to your knowledge, why were you
17 asking, or do you recall why you were asking
18 around this time about the practice schedule for
19 women's basketball?
20    A    Yes.  I believe I was inquiring to get
21 a sense of whether the information in the
22 scheduling -- I believe the software was Teamworks
23 at the time -- whether that was accurate because I
24 was trying to work on logistical issues related to
25 interviews and scheduling and logistics as part of

220

1 the investigation.  I believe I happened to be in
2 the athletic training room, and so I inquired with
3 Ms. Matthews because she works with the program.
4    Q    So it was about logistics for
5 scheduling interviews and things of that nature?
6    A    To the best of my recollection, it was
7 related to that and the investigation.
8    Q    Okay.  And what about the
9 investigation?  Just the scheduling or something
10 more substantive?
11    A    I don't specifically recall if it was
12 more substantive than scheduling and logistics.
13    Q    Was there an effort at or around this
14 time to try to uncover NCAA violations against the
15 women's basketball program?
16    A    Can you please elaborate on what you
17 mean by "effort to uncover a violation"?
18    Q    Was there an effort by you or anybody
19 else in the senior leadership team to try to dig
20 and find out if there were any potential NCAA
21 violations that could be brought to the attention
22 of the NCAA?
23    A    I made no such effort, and I'm not
24 aware of any effort from anyone else.
25    Q    Okay.  So your message to Mr. Rountree

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

221

1 indicates that you were concerned that there was a
2 directive to report all contacts with you and
3 other members of the compliance staff, correct?
4     A   Yes.
5     Q   And to the extent there was such a
6 directive, would that violate any rules or
7 policies of Georgia Tech or the NCAA?
8     A   I'm not sure that there is a specific
9 rule I could point to, but I do believe that it
10 would compromise the ability of Georgia Tech to
11 conduct best practices related to athletics
12 compliance and, certainly, from an NCAA
13 perspective does not uphold, from my
14 understanding, the values and, again, best
15 practices that are necessary to conduct an
16 effective compliance program.
17     Q   Well, you would agree, though, that a
18 request that her -- that MaChelle Joseph's staff
19 report communications from compliance is not the
20 same thing as an attempt to thwart compliance's
21 efforts, correct?
22     A   I would agree those are not the same
23 things, no.
24     Q   Okay.  So is there anything inherently
25 wrong with Coach Joseph wanting to know whether

222

1 compliance is asking questions of her staff?
2     A   I don't know that I would characterize
3 it as right or wrong, but I can explain that in
4 the normal conduct of business, in terms of
5 conducting specifically compliance investigations,
6 there are best practices that prohibit
7 notification of other parties that you've spoken
8 to the compliance office or the NCAA enforcement
9 staff, et cetera.  I know we spoke about that a
10 bit earlier.  And, also, a general concern that
11 individuals were directed, you know, to report
12 even casual contact with myself or members of the
13 compliance staff was concerning to me that that
14 created a perception or a division instead of a
15 good working relationship.
16     Q   Well, and similarly, though, if you had
17 an expectation that her staff would not share with
18 her these casual contacts or somehow keep it a
19 secret, that doesn't foster good relationships or
20 communications either, does it?
21     A   No.  And that was certainly not a
22 directive from me or any member of my staff.
23     Q   But you would agree that it's not, sort
24 of, unusual or concerning that her athletic
25 trainer would mention to Coach Joseph that you

223

1 were asking about the schedule?
2     A   I am not sure if that was normal or
3 usual.  I found it unusual that a comment in
4 passing solicited this type of e-mail from
5 Ms. Joseph to myself.  That -- that was not usual
6 for me.
7     Q   Okay.  But this report by the athletic
8 trainer was not indicative of any directive to
9 report all contact, was it?
10     A   I do not know because I'm unaware of
11 whether there was or was not a directive at that
12 time.
13     Q   Okay.  Did anybody from Coach Joseph's
14 staff ever indicate to you that they wouldn't talk
15 to you or --
16     A   I know I received a report from one of
17 my staff members -- I believe it was Lance
18 Markos -- in which -- and I don't recall
19 specifically which staff member it was, but they
20 had asked him if it was safe to talk to him and
21 that if anyone asked, they never spoke, and he
22 reported that concern to me.
23         And I -- I can think of other instances
24 in which it was reported that there was a
25 directive, but I believe that occurred after this

224

1 date.
2     Q   And given what your department does,
3 compliance and other types of inquiries of that
4 nature, have you had occasion where staff members
5 or students were concerned about bringing matters
6 forward to you or were nervous or scared to do so?
7     A   Are you speaking specifically at
8 Georgia Tech or generally over the course of my
9 career?
10     Q   Well, both.  So at Georgia Tech, given
11 what your office handled and the issues that you
12 dealt with, there would be other instances, would
13 there not, where people who would come to you
14 would be nervous or concerned about bringing
15 information forward?
16     A   Yes, I think that's possible.
17     Q   And generally speaking in your career,
18 has that been your experience, that when people
19 bring issues forward about a staff member or a
20 coach or other issues related to the institution,
21 they can be nervous about ramifications or what it
22 means to bring that information forward?
23     A   Sometimes, yes.
24     Q   Okay.
25         MS. BANKS:  Okay.  We can take this

225

1 down now. If we can bring up document 42.
2        (Lewis Exhibit 19 marked for
3 identification and attached to the transcript.)
4        MS. BANKS: Okay. And I'll take
5 control, please.
6    Q   Do you recognize and recall this e-mail
7 exchange?
8    A   Yes.
9    Q   And Coach Joseph e-mailed you about
10 changing her Georgia Tech cell phone number,
11 correct, and keeping the old one as her personal
12 number?
13   A   Yes.
14   Q   And you denied this request?
15   A   I believe I consulted with additional
16 folks and ultimately the request was denied.
17   Q   And then you send this or forward this
18 to Aisha Oliver-Staley about navigating the
19 request. Do you see that?
20   A   Yes.
21   Q   And what do you mean by "navigating"?
22 Were there other issues at play other than whether
23 to give her a new phone or not?
24   A   I believe the context, in looking at
25 the date, is this was during the course of the

226

1 NCAA investigation, and that investigation did
2 entail a very broad or large review of telephone
3 records, et cetera. And so I believe "navigate"
4 meant evaluating whether to okay the request or to
5 deny the request.
6    Q   Okay. And at this point when you were
7 e-mailing Aisha Oliver-Staley, had you already
8 decided to deny the request or alerted or notified
9 Coach Joseph that you had denied the request.
10   A   Based on the e-mail and time frame and
11 my language, I don't think I had made any
12 determination. I was forwarding it so that we
13 could review it and I could seek her counsel on
14 how to respond.
15   Q   All right. And you notice you included
16 in here that you had approved this previously for
17 Coach Hart, correct?
18   A   No. I became aware that Ms. Hart had
19 changed her number after the fact. There was not
20 an approval or notification process in place. And
21 I believe my language there indicates that when I
22 learned she changed her number, that did not raise
23 a particular red flag to me.
24   Q   Okay. Who is Coach Hart?
25   A   She is the head coach of the men's and

227

1 women's swimming and diving program at Georgia
2 Tech.
3    Q   Okay. And so she changed her number
4 but didn't get prior approval?
5    A   Not from -- I'm not sure how that
6 process went down, but there was not approval from
7 my office.
8    Q   Okay. So you also note here that there
9 is no process in place to review or approve such
10 requests; is that right?
11   A   Yes.
12   Q   So this was a matter of discretion for
13 you and anyone else you conferred with, correct?
14   A   At this time, there was no formal
15 policy. I'm not aware, other than Coach Hart
16 changing her number or making that request, that
17 it had ever come up. So no, there was no formal
18 approval process in place.
19   Q   Okay.
20       MS. BANKS: Okay. We can take this one
21 down. And could you bring up document 43, please.
22       (Lewis Exhibit 20 marked for
23 identification and attached to the transcript.)
24   Q   Okay. Hold on one second.
25       Do you recall ever seeing this e-mail?

228

1    A   No, I have never seen this.
2    Q   Okay. This was a November 7th e-mail
3 from Garry Rosenfield, who is MaChelle Joseph's
4 sports agent. Are you familiar with him or his
5 relationship to Coach Joseph?
6    A   I believe I've heard his name before,
7 but I'm not aware of him generally.
8    Q   Okay. And were you ever made aware of
9 the substance of this e-mail?
10   A   No.
11   Q   Okay. And nobody tried to interview
12 you or question you about the allegations
13 Mr. Rosenfield raises in the e-mail?
14   A   No.
15   Q   To your knowledge, did Georgia Tech
16 ever investigate this complaint against you at any
17 time?
18   A   I have no knowledge of this complaint
19 or whether or not there was any action taken.
20   Q   Okay.
21       MS. BANKS: You can take that down.
22 And if you could bring up tab or document 37,
23 please.
24       (Lewis Exhibit 21 marked for
25 identification and attached to the transcript.)

229

1    Q   Do you recognize this as a text message
2  exchange between you and Aisha Oliver-Staley?
3    A   I don't see specifically her name or
4  phone number, but I think that's possible, yes.
5    Q   Okay.  I'm going to turn to this
6  exchange here Monday, January 28th, 2019.
7  Ms. Oliver-Staley asked you for "a copy of the
8  last report where coach Joe was investigated."  Do
9  you recall that?
10   A   No, not specifically, just what I see
11 on the screen.
12   Q   Well, as of Monday, January 28th, 2019,
13 the last report where Coach Jo was investigated
14 would have been the Malikah Willis report in 2017,
15 correct?
16   A   If you say so.  I would have to look at
17 records.  I wasn't involved in those
18 investigations.
19   Q   Okay.  You wrote and said, "I have
20 never received a copy of the HR report," which is
21 consistent with what we talked about earlier,
22 right, which is that you were not involved in
23 those investigations?
24   A   Yes.
25   Q   Okay.  You also said, on this next

230

1  page, "I can ask over here too," "Waiting for Todd
2  to wrap up.  I am standing outside his office."
3  She replies, "Don't."  You reply, "Roger that."
4  And she says, "Don't ask and do not mention that I
5  asked."  And you wrote, "Of course not."
6        Do you recall that exchange with her?
7    A   No.
8    Q   You don't find that exchange memorable
9  in any way?
10   A   I don't recall it specifically so I
11 don't know what it was about.
12   Q   Okay.  And you have no knowledge about
13 why Ms. Oliver-Staley asked you not to ask and not
14 to mention that she asked?
15   A   No, I do not.
16   Q   Do you recall whether you had an
17 understanding of that at the time?
18   A   I do not recall.
19   Q   Okay.  Based on the way you responded
20 "Of course not," do you believe that you had such
21 an understanding at the time?
22   A   Based on that message and response, it
23 seems as I was affirming her request.  But I --
24 again, I do not recall what this was about and I
25 don't specifically recall this exchange.

231

1    Q   Do you have any knowledge, sitting here
2  today, as to why Ms. Oliver-Staley might want to
3  see a copy of a previous investigation report,
4  particularly one that's two years old, about Coach
5  Joseph around this time?
6    A   I do not.
7    Q   And why did you agree not to mention
8  that she asked, essentially to hide this
9  information?
10   A   I don't know that I was hiding
11 information.  She made a request of me, and I
12 affirmed that I would honor that request.
13   Q   Okay.  And were you aware at this time
14 that Ms. Oliver-Staley was in contact with women's
15 basketball players about Coach Joseph?
16   A   No, I was not.
17   Q   Okay.  So you didn't know at this time
18 she was meeting with and interviewing various
19 women's basketball players?
20   A   No, I was not.
21   Q   Okay.  Were you aware or did you ever
22 become aware that she met four women's basketball
23 players at an off-campus coffee shop on
24 January 26th to discuss their concerns about Coach
25 Joseph?

232

1    A   I was not aware of that at the time,
2  no.
3    Q   When did you become aware of it?
4    A   I don't specifically recall, but I
5  believe it was following her termination from
6  Georgia Tech.
7    Q   And how did you come to learn of that
8  after her termination?
9    A   I do not specifically recall.  I
10 suspect it may have been in collecting
11 documentation or someone may have mentioned it to
12 me, but I do not specifically recall when or how I
13 became aware.
14   Q   Okay.  Were you aware whether
15 Ms. Oliver-Staley was working with Felicia Tucker
16 at the time in order to investigate potential
17 violations by Coach Joseph?
18   A   At the time, no.  And if I may -- as I
19 think through this, I believe I do know when I
20 became aware, if we can go back to the last
21 question.
22   Q   Sure.
23   A   I believe that it was in the course of
24 the NCAA infractions case, when text messages were
25 provided from the litigation production to the

233

1  NCAA record, I believe that's when I became aware
2  of Ms. Oliver-Staley meeting with women's
3  basketball players.
4      Q   Okay.
5          MS. BANKS:  Caleb, you can take this
6  down.
7      Q   So were you aware whether
8  Ms. Oliver-Staley was working with Felicia Tucker
9  and the women's basketball players to try to
10 uncover potential NCAA rules violations by Coach
11 Joseph?
12     A   No, I was not.
13     Q   And given your role as the head of NCAA
14 compliance issues, if she was doing such a thing,
15 would you have expected her to include you in that
16 or at least apprise you of those efforts?
17     A   Not necessarily.  As someone that was a
18 report, someone I reported at least in a dotted
19 line capacity to, I would trust her to make that
20 judgment based on the circumstances if that was
21 occurring.
22     Q   Okay.  Have you had any experiences
23 where Ms. Staley conducted NCAA investigations
24 without your knowledge?
25     A   Not to my knowledge.

234

1      Q   And that is not part of her job duties
2  or responsibilities, correct?
3      A   I'm not sure what was in her full job
4  description, but as I mentioned, she did have
5  oversight, at least in a dotted line capacity to
6  the NCAA compliance unit.
7      Q   Okay.
8          MS. BANKS:  If we could bring up
9  document 51, please.
10         (Lewis Exhibit 22 marked for
11 identification and attached to the transcript.)
12     Q   Do you recognize and recall this
13 e-mail?
14     A   Yes.
15     Q   Okay.  And this is a January 29th, 2019
16 e-mail to Mark Rountree, who was Coach Joseph's
17 supervisor, and you copied Mr. Stansbury and
18 Ms. Oliver-Staley, correct?
19     A   Yes.
20     Q   And you are raising various concerns
21 about an expense report women's basketball
22 submitted a month earlier, correct?
23     A   Yes.
24     Q   And you note down here that you
25 consulted Aisha Oliver-Staley about the potential

235

1  conflict of interest issues raised by the expense
2  report, correct?
3      A   Yes.
4      Q   Did you consult with Aisha
5  Oliver-Staley every time had you a concern about
6  an expense report submitted by an athletic
7  program?
8      A   I can't speak to that necessarily.  I
9  think I would escalate concern with Pat McKenna
10 and Ms. Oliver-Staley both if I felt like there
11 was a potential conflict or something that I
12 needed guidance on how to proceed.
13     Q   Okay.  And why did you need guidance on
14 how to proceed on an expense report issue?
15     A   I believe I outlined some of the
16 concerns and the abnormalities with this specific
17 expense report, and because of that and my
18 uncertainty with how to proceed, I consulted with
19 Ms. Oliver-Staley who at the time was, I believe,
20 the interim vice-president and oversaw ethics and
21 compliance at the Institute.
22     Q   Okay.  Had you ever addressed, for any
23 athletic program, an issue of an expense report
24 problem or concern?
25     A   I'm sure I have, yes.

236

1      Q   And in those instances can you recall
2  at any time including Aisha Oliver-Staley in that
3  resolution or discussion?
4      A   I do not recall.
5      Q   You don't recall including her?
6      A   Yeah, I don't recall whether or not she
7  was consulted or included on every or any instance
8  that we followed up on an expense report.
9      Q   Okay.  But sitting here today, you have
10 no recollection of having done so?
11     A   Not specifically, no.
12     Q   What about Todd Stansbury?  You've
13 copied him on this e-mail too about an expense
14 report.  It doesn't seem to be quite within his
15 pay grade either.  Is there a reason why you
16 included Todd Stansbury on this e-mail?
17     A   I don't specifically know.  I could
18 surmise that he was the director of athletics, we
19 have an active and open investigation into the
20 women's basketball program, and there was an item
21 of concern.  So I imagine I wanted to document and
22 make sure he was aware.
23     Q   Okay.  So you understood that both Todd
24 Stansbury and Aisha Oliver Stanley would want to
25 know of any issues related to women's basketball;

237

1  is that correct?
2      A   I don't know that I would say "any
3  issues," but certainly issues of concern in the
4  area of compliance or things that crossed over
5  into conflicts of interest.
6      Q   And was it your understanding at around
7  this time that Mr. Stansbury and Ms. Oliver-Staley
8  were actively looking for instances of misconduct
9  by Coach Joseph?
10     A   I have no knowledge of that.
11     Q   But you did feel that it was important
12  to share with them issues of violations that you
13  were coming across, such as this expense report?
14     A   Yes.
15         MS. BANKS:  We can take this down.  And
16  if you could pull up document 37, please.
17         REMOTE TECH:  I believe it's already
18  marked as an exhibit.  It was 21.
19  BY MS. BANKS:
20     Q   Okay.  So we have looked at these
21  previously.  These are text messages between you
22  and Ms. Oliver-Staley, correct?
23     A   Yes.
24     Q   Okay.  So if we take a look at the text
25  messages that begin on Monday, February 4, 2019,

238

1  you ask for Ms. Staley's input on how to respond
2  to the NCAA, correct?
3      A   That's what it seems, yes.
4      Q   Okay.  "And the NCAA wants to hear from
5  us today."  Do you recall what was happening with
6  respect to the NCAA at this time and why they
7  wanted to hear from you on this day?
8      A   I do not.
9      Q   Okay.  Did you understand at this
10  point, February 4th, that the NCAA was poised to
11  issue its decision related to men's and women's
12  basketball?
13     A   I'm not sure if on February 4th I knew
14  what their timeline to issue that decision was.  I
15  do not know.
16     Q   But it's possible that you did know
17  what the timeline was?
18     A   I have no idea.
19     Q   Okay.  Well, it appears that you're in
20  contact with the NCAA here about their desire to
21  hear from you that day, February 4th, correct?
22     A   Yes.  I was either in touch with the
23  NCAA or perhaps outside counsel.
24     Q   Okay.  And were you during this process
25  in touch with the NCAA or counsel about, sort of,

239

1  status and what was happening in the timeline?
2      A   I do not know.  I would have to refer
3  to my records and calendar.
4      Q   You don't have any recollection,
5  sitting here today, whether you were in
6  conversations with your outside counsel or with
7  the NCAA directly about the status of this
8  investigation?
9      A   We certainly were in ongoing and
10  regular contact during this time frame, yes.
11     Q   Okay.  Let's take a look at this text
12  exchange here.  On February 5th you write, "Mark
13  declined and deferred to Todd, FYI.  So I will
14  make sure he knows and is comfortable backing me
15  if I contact the student.  The NCAA expects to
16  have info today."
17         Do you recall what this is in reference
18  to?
19     A   I do not.
20     Q   Do you recall what student you are
21  referring to here?
22     A   No, I do not.
23     Q   Do you know if it's in reference to a
24  women's basketball player?
25     A   I do not know.

240

1      Q   Do you recall what Mark was declining
2  or why Mark was declining?
3      A   I do not recall.
4      Q   Okay.  And "The NCAA expects to have
5  info today," what does that mean?
6      A   I do not know because I don't recall
7  specifically what this was concerning.
8      Q   Okay.  Is it possible that this was an
9  effort for you to provide the NCAA with additional
10  information prior to their decision?
11     A   I have no idea.  I'd say it's possible.
12  It could be a lot of different things, and I do
13  not recall what it was in reference to.
14     Q   Do you recall, towards the end of the
15  investigation and prior to receiving notice from
16  the NCAA, any effort by yourself or others to
17  provide them with additional information or
18  evidence late in the process, close to when they
19  provided you with their determination?
20     A   No.
21     Q   You don't know whether you did or you
22  specifically recall not doing so.
23     A   No, I specifically recall not doing so.
24     Q   And how is it that you have such a
25  specific recollection about that, but you don't

241

1 have any recollection about this very odd text
2 message exchange?
3     A   My recollection is related to the
4 investigation and where it was winding down.  I
5 believe at that point in the investigation we were
6 awaiting a final phone interview, and I
7 specifically remember awaiting the results and
8 information gleaned from that phone interview but
9 not providing nor making any effort to provide
10 additional information that had not been
11 previously provided during the course of the
12 investigation.
13     Q   So, basically, at this time prior to
14 getting the communication from the NCAA, things
15 were relatively quiet and you were just sort of
16 waiting to hear when you would hear?
17     A   I don't know that things were quiet.  I
18 would have to go back and look at records.  But I
19 don't remember it being an active period of
20 collecting documentation.
21     Q   And any record that you would go back
22 and consult about this, you would have turned over
23 in discovery, correct?
24     A   I don't know.  Discovery in this case?
25     MS. POOLE:  Yeah, I'm going to object

242

1 to that question.  Just -- Ms. Lewis doesn't
2 necessarily have the full scope of efforts
3 undertaken to collect documents for production in
4 this case.
5     Q   Well, do you have information or
6 documentation relative or that relate to the NCAA
7 investigation of Coach Joseph around this time
8 that you did not produce?
9     MS. POOLE:  Ms. Banks, Ms. Lewis does
10 not know necessarily everything that has or has
11 not been produced or everything that has or has
12 not been pulled.  And a lot of what was exchanged
13 with the NCAA went through counsel and may be sort
14 of wrapped up in communications with counsel.
15     MS. BANKS:  Okay.
16     MS. POOLE:  We're entering a bit of a
17 sticky area here, if you're going to start
18 questioning her about what documents were or were
19 not selected and turned over because a lot of
20 those decisions --
21     MS. BANKS:  That's not my question.  I
22 just want to ensure that Ms. Lewis is not
23 withholding information that would be important to
24 informing her recollection about what they did and
25 did not do relative to this investigation.

243

1     MS. POOLE:  I'm saying that Ms. Lewis
2 may not have made the call.
3     MS. BANKS:  What I'm saying is, did she
4 make the call to turn it over to you.
5     MS. POOLE:  I'm saying she may not even
6 know that.
7     MS. BANKS:  Okay.
8     Q   Okay.  So your testimony here today is
9 you have no recollection whatsoever what this is
10 about in terms of having Todd back you or Mark
11 decline?
12     A   Correct.  I do not recall what this was
13 in reference to.
14     Q   Okay.  And do you recall whether you or
15 anyone else from Georgia Tech provided the NCAA
16 with any additional information related to any
17 other students on or around February 4th?
18     A   I am not at this moment aware.  Again,
19 I would have to go back and look at records to
20 answer that fully.
21     Q   Okay.  But sitting here today, you have
22 no recollection of doing so?
23     A   No.
24     Q   Okay.
25     MS. BANKS:  Okay.  If we can take this

244

1 down and pull up document -- hold on one sec.
2     Can you pull up document 68, please.
3     (Lewis Exhibit 23 marked for
4 identification and attached to the transcript.)
5     MS. BANKS:  Actually, no.  Strike that.
6     Okay, yeah, bring up 68, please.
7     Q   Do you recognize this -- what appears
8 to be a text message exchange between you and
9 Marvin Lewis?
10     A   Yes.
11     Q   And do you see that it references the
12 off-campus housing policy?
13     A   Yes.
14     Q   Do you recall there being an issue
15 about a request made by Coach Joseph about
16 off-campus housing for her players?
17     A   Yes, I do.
18     Q   If we scroll down to the bottom of this
19 exchange, Mr. Lewis says, "She has a right to be
20 upset.  Joeleen told her it was department policy,
21 which is not true.  We have to be better."
22     "Yep."
23     So there was no actual policy related
24 to off-campus housing at this time, correct?
25     A   I'm not totally sure if there was an

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

245

1  absence of policy altogether or whether there was
2  an absence of policy dealing with this particular
3  issue.  That, I'm not certain of.
4      Q   The issue being off-campus housing?
5      A   Off-campus housing generally, yes, I
6  believe there was a different population that
7  Ms. Joseph wanted on her team to live off campus
8  that traditionally did not.
9      Q   Right.  But my question for you is that
10 there was no departmental policy on this
11 specifically, correct?
12     A   I don't believe so, no.  Right.
13     Q   And certainly Mr. Lewis, in this text
14 message to you, seems to believe that there is no
15 policy; is that correct?
16     A   Correct, yes.
17     Q   Okay.
18         MS. BANKS:  We can take that down.
19     Q   At some point did you come to learn
20 that Georgia Tech had hired an outside law firm,
21 Littler Mendelson, to conduct an investigation
22 into complaints -- alleged complaints made by
23 students?
24     A   Yes.
25     Q   Okay.  And how did you come to learn of

246

1  that?
2      A   I came to learn of that, I believe,
3  when it was announced publicly.  The details we
4  shared, I believe I learned that when it was
5  announced publicly.
6      Q   So at the time the report became
7  public?
8      A   I believe there was notification that
9  an investigation was being conducted.  So I'm not
10 sure whether I knew that was Littler Mendelson at
11 that time or whether I learned it was Littler
12 Mendelson when the report became public.  I'm not
13 sure between those two.
14     Q   Okay.  But when did you become aware
15 that an outside law firm had been hired to
16 investigate these complaints made by students?
17     A   I believe the morning that Ms. Joseph
18 was put on leave, I received a phone call from
19 Mark Rountree notifying me that that meeting was
20 going to occur or that she was going to be put on
21 leave.
22     Q   Okay.  And that's the first you knew of
23 this investigation?
24     A   Yes.
25     Q   Okay.  So you were not otherwise

247

1  involved in the investigation or talk and you
2  didn't talk to the attorney leading it, Eric
3  Hoffman?
4      A   No, I did not.
5      Q   Okay.  Did anyone at Georgia Tech ever
6  tell you -- either before, during or after the
7  investigation -- that it was the hope or intention
8  that this investigation would lead to Coach
9  Joseph's departure?
10     A   No.
11     Q   And as you mentioned, she was put on
12 administrative leave on February 27th, 2019,
13 correct?
14     A   I'm not sure on the exact date, but
15 that sounds correct.
16     Q   Okay.  And to your knowledge, who made
17 that decision to put her on leave?
18     A   I am not sure who made that decision.
19     Q   Okay.  You were not involved in the
20 decision, correct?
21     A   No, I was not.
22     Q   Okay.  But you were asked to draft an
23 e-mail notification to the trustees about Coach
24 Joseph being put on leave, correct?
25     A   I am not sure.  I would have to go

248

1  through my records, but it is possible since I
2  handled board communication.
3      Q   Okay.  And if you wrote such a memo,
4  it's because you handle board communications?
5      A   Correct.
6      Q   Okay.  Do you recall Mr. Rountree or
7  Todd Stansbury or anybody asking you to draft such
8  a memo?
9      A   I don't specifically recall that but it
10 is possible.
11     Q   Okay.  Do you recall, around this time
12 that she was placed on leave, whether there was
13 any discussion about terminating Coach Joseph
14 instead of putting her on leave?
15     A   I have no idea about that type of
16 communication.  I was not engaged in any such
17 communication.
18     Q   Okay.
19         MS. BANKS:  Let's bring up document 73,
20 please.
21         (Lewis Exhibit 24 marked for
22 identification and attached to the transcript.)
23     Q   Okay.  So do you recognize these
24 e-mails that relate, as far as I can see, to Open
25 Records Act requests?

249

1    A   Yes.
2    Q   Litigation holds?
3    A   Yes.
4    Q   Okay.  And part of your job
5  responsibilities was overseeing the Athletic
6  Department's responses to Open Records Act
7  requests, correct?
8    A   Correct.
9    Q   Okay.  And after Coach Joseph was put
10 on leave and then was terminated, Georgia Tech
11 received numerous Open Record Act requests from
12 attorneys as well as others, such as the media,
13 correct?
14   A   Correct.
15   Q   Okay.  In this e-mail thread you're
16 communicating with Stacey Hood and Kate Wasch,
17 among others, about how to approach the litigation
18 hold, need to preserve documents and how you will
19 go about responding to the request; is that
20 correct?
21   A   That's what it appears, yes.
22   Q   Okay.  So on page 6281, in this e-mail
23 from Kate Wasch to you and Aisha Oliver-Staley and
24 Lynn Durham, she says, "Note that we can probably
25 delay the production for 90 days if we choose to

250

1  do so," and some documents "will be exempt from
2  production."  Is the 90 days under the ORA you can
3  delay production or you can wait 90 days to
4  produce documents, correct?
5    A   Yes.  There is a provision -- I believe
6  it's specific to athletics-related documents.
7    Q   That allows you to wait 90 days?
8    A   Yes.
9    Q   Okay.  With some limited exceptions; is
10 that right?
11   A   Yes.
12   Q   And for these requests that were coming
13 in on behalf of Coach Joseph and related to Coach
14 Joseph, do you recall whether you generally chose
15 to wait those 90 days or took advantage of those
16 90 days?
17   A   I don't recall specifically in this
18 instance when the production was made.
19   Q   Okay.
20     MS. BANKS:  Let's close this and bring
21 up document 86, please.
22     (Lewis Exhibit 25 marked for
23 identification and attached to the transcript.)
24   Q   Okay.  Do you recall this e-mail
25 request for the Littler report from FOX 5 News?

251

1    A   I don't specifically recall it, but
2  obviously I can read and see what was enclosed.
3    Q   Okay.  You'll see here that, let's see,
4  it was requested March 27, 2019, at 11:05 a.m.
5  Mike Flynn forwards it to you.  Who is Mike Flynn,
6  by the way?
7    A   Mike Flynn is -- I believe his title is
8  assistant athletic director for communications and
9  PR.  He oversees athletics communications.
10   Q   Okay.  He forwards it to you, and you
11 write to Joy Lupo.  Who is Joy Lupo?
12   A   She was a paralegal in the Office of
13 Legal Affairs, and at that time was the main Open
14 Records Act liaison or contact within legal
15 affairs.
16   Q   Okay.  And you indicated to Joy,
17 "Please provide immediately."  And that's 11:11.
18 So six minutes after FOX 5 requests it, you
19 authorize its production.  Is there any reason why
20 this report was produced to FOX 5 within minutes?
21   A   If I recall, I was provided the report
22 and perhaps instruction to respond to all requests
23 promptly.
24   Q   Related to the report?
25   A   Yes.

252

1    Q   Okay.  And who gave you that direction?
2    A   I believe I received the report from
3  Lynn Durham, and I -- or Kate Wasch.  I'm actually
4  not sure between the two of them, but I think it
5  was one of them.  And I am not sure whether the
6  instruction was from them or the communications
7  team.
8    Q   But the instruction was to provide the
9  report immediately if asked by anybody?
10   A   Yes, I believe so.
11   Q   And do you have any understanding as to
12 why Ms. Durham or Ms. Wasch would take such a
13 position about this report?
14   A   No, I do not.
15   Q   Do you recall that Georgia Tech
16 received other similar Open Records Act requests
17 from the press and you similarly instructed
18 Ms. Lupo to release immediately?  Do you recall
19 that?
20   A   I believe that is accurate, but I'd
21 have to go back and look at records to confirm.
22   Q   Okay.  So let's just look at one more.
23     MS. BANKS:  Pull up document 87,
24 please.  You can close this and pull up 87.
25

Case 1:20-cv-00502-TCB   Document 210   Filed 12/30/21   Page 65 of 77
Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021                                    64 (253 to 256)

253

1        (Lewis Exhibit 26 marked for
2   identification and attached to the transcript.)
3        Q   You see here this is a request from Ken
4   Sugiura at the Atlanta Journal-Constitution asking
5   for a copy of it?
6        A   Yes.
7        Q   And Mr. Sugiura provided a very long,
8   detailed explanation about why he should get it
9   and get it soon, correct?
10       A   Yes.  That is his standard Open Records
11  Act request language.
12       Q   Okay.  And, again, you indicate, "This
13  can be released immediately."
14       A   Yes.
15       Q   And you excluded Appendix A; is that
16  right?
17       A   Correct.
18       Q   Do you recall having any concerns about
19  releasing this report so quickly to the press,
20  given the nature of the allegations contained in
21  it?
22       A   I don't remember having any specific
23  personal concerns.
24       Q   Okay.  Did you understand that the
25  contents of that report would be potentially

254

1   devastating to Coach Joseph professionally and
2   reputationally?
3        A   I can't speak to how Ms. Joseph would
4   react, but I understood the contents of the report
5   to be very serious.
6        Q   Okay.  And I wasn't asking about what
7   you thought the impact was on Ms. Joseph, but,
8   rather, did you understand that the contents could
9   be devastating to somebody personally and
10  professionally, given the allegations and the
11  accusations contained within them?
12       A   Sure.  I think that's a fair
13  assessment.
14       MS. BANKS:  Okay.  We can take this
15  down.  And you can bring up tab 81, please.
16       (Lewis Exhibit 27 marked for
17  identification and attached to the transcript.)
18       Q   Do you recognize and recall this
19  document?
20       A   In viewing it, I see what it contains,
21  yes.
22       Q   It's dated March 22nd, 2019.  Do you
23  recall why you and Mr. Long wanted to speak with
24  Mr. Zonder at the NCAA about women's basketball?
25       A   I'm not specifically sure, but I

255

1   suspect it had to do with new allegations that we
2   had been notified of.
3        Q   Are these the new NCAA allegations that
4   were self-reported by Georgia Tech around this
5   time?
6        A   I wouldn't say violations were
7   self-reported.  I believe we notified the NCAA
8   that possible allegations that we had not yet
9   investigated had come forward and that we wanted
10  to make them aware, given that we had just closed
11  an investigation.
12       Q   Okay.  And was it your practice to
13  investigate those allegations before reporting
14  them to the NCAA?
15       A   As we discussed earlier, it would
16  depend on the specific facts and circumstances of
17  each matter.
18       Q   Do you recall whether you had the
19  opportunity to investigate the allegations you
20  reported to Mr. Zonder on March 22nd?
21       A   When we contacted Mr. Zonder, we had
22  not yet investigated those allegations.
23       Q   Okay.  And why is that?
24       A   To the best of my recollection, outside
25  counsel and Georgia Tech, including myself, wanted

256

1   to navigate the follow-up and any necessary
2   investigation very carefully, and I believe the
3   two allegations that had been investigated were
4   also put forward in the information we received,
5   and so we wanted to notify the NCAA and to defer
6   to them on whether they wanted to conduct the
7   investigation or if we were free to move forward
8   with a preliminary investigation.
9        Q   Do you recall whether you spoke to
10  Coach Joseph about these allegations before
11  submitting them to the NCAA?
12       A   In the time period of March 2019?
13       Q   Yes.
14       A   I do not believe I spoke with Coach
15  Joseph at all about these matters.
16       Q   In terms of investigating the
17  allegations or determining whether it was
18  appropriate to provide it to the NCAA, would you
19  typically -- I know this was an unusual
20  circumstance, but would you typically ask a coach
21  about the allegations and say -- you know, give
22  them an opportunity to respond?
23       A   That would certainly depend on the
24  nature of information received, the possible level
25  and implication of those allegations, and we

257

1  certainly would, as I mentioned earlier, follow
2  our investigation protocol and the best practices
3  in terms of notification.
4       So it would be unusual to notify anyone
5  of a potential violation before the onset of an
6  appropriate investigation.
7       MS. BANKS:  Can we take this down and
8  pull up document 79.
9       (Lewis Exhibit 28 marked for
10 identification and attached to the transcript.)
11    Q   These are interrogatory responses
12 provided to us by Board of Regents and I believe
13 verified by you, correct?
14    A   Yes.
15    Q   Okay.
16       So here it says, "After the Littler
17 Investigation Report was issued on March 20th,
18 2019, and as required by NCAA bylaws, Georgia Tech
19 self-reported additional alleged violations of
20 impermissible benefits to the NCAA based on
21 interview statements identified in Appendix A of
22 the Littler Report.  Georgia Tech conducted an
23 investigation into these alleged violations before
24 self-reporting to the NCAA."
25       So these issues that you contacted

258

1  Mr. Zonder about on the 22nd, is that what this is
2  referring to --
3     A   I believe so.
4     Q    -- the interviews -- the impermissible
5  benefits identified in Appendix A of the Littler
6  report?
7     A   I believe so, yes.
8     Q   And it says, "Georgia Tech conducted an
9  investigation before self-reporting to the NCAA."
10       So do you believe now that an
11 investigation did, in fact, occur?
12    A   Yes.  An investigation -- I always
13 believed an investigation occurred.  Once we
14 received that additional information, an
15 investigation was conducted.
16    Q   Okay.  So you received that information
17 that is part of Appendix A on March 20th, 2019,
18 and produced it to Georgia -- or, sorry, the NCAA.
19 You reported it to the NCAA two days later on
20 March 22nd.  So you conducted your investigation
21 in two days?
22    A   No.  We communicated -- on March 22nd
23 or whenever that call occurred, we communicated
24 what the new allegations were and our intent to
25 conduct an investigation.

259

1     Q   I'm just confused because it says it
2  conducted an investigation before self-reporting
3  to the NCAA.
4     A   We -- so the order was that we
5  self-reported the additional allegations and then
6  commenced with an interview -- excuse me, with an
7  investigation.  And once we determined that some
8  of those allegations were substantiated, we then
9  provided a written self-report with those
10 conclusions to the NCAA.
11    Q   So you don't consider alerting Mike
12 Zonder and the NCAA to these allegations to be
13 self-reporting?
14    A   It was a self-report of allegations
15 versus a self-report of violations.
16    Q   I see.  Okay.
17       MS. BANKS:  We can take that down.
18    Q   So as of March 22nd, had you read the
19 Littler report, including Appendix A?
20    A   I would have to look at the exact
21 dates, but I believe when I received -- and I only
22 received a redacted copy.  I believe I read the
23 report then, and I read Appendix A when it was
24 provided to me.
25    Q   Okay.  And when you received the

260

1  report, did you discuss it with anyone, do you
2  recall?
3     A   Not that I recall, no.
4     Q   Did you discuss it -- you don't
5  recall -- did you discuss it with Mr. Stansbury?
6     A   I believe I discussed Appendix A with
7  Mr. Stansbury, but I did not discuss the content
8  of the report generally, no.
9     Q   Okay.  And you had discussed Appendix A
10 because that was within your purview, correct?
11    A   Correct.
12    Q   Okay.  Do you recall discussing it with
13 Mr. Lewis, the report itself?
14    A   I don't specifically recall discussing
15 details within the report.  I believe we
16 acknowledged -- and I'm not even sure if we
17 discussed whether either or both of us had read
18 it.
19    Q   So you're not sure whether you ever
20 discussed the report with Mr. Lewis?
21    A   I am not sure whether we discussed it
22 in detail or the contents of it, no.  I am not
23 positive on that.
24    Q   Okay.  You think possibly you did not?
25    A   I think it's possible we didn't discuss

261

1  it in detail. I do recall or think it is very
2  possible, I'd say, that we acknowledged it had
3  been released, but, again, I don't recall
4  specifically discussing any of the content in any
5  specific conversation.
6      Q   Okay. What about Joeleen Akin or Aisha
7  Oliver-Staley? Do you recall talking with them
8  about the report?
9      A   I don't recall specifically having
10 discussions with them about the report, no.
11     Q   Did you have any conversations with
12 Mr. Stansbury about Coach Joseph providing any
13 sort of response to the report or rebuttal to the
14 report?
15     A   No, I did not.
16     Q   Okay. And were you even aware that
17 Coach Joseph was provided the opportunity to
18 submit a rebuttal?
19     A   No, I was not.
20     Q   Okay. If you had known that, would you
21 have wanted to get her responses to Exhibit A?
22 Would that have been important to you?
23     A   I don't know that I can really answer
24 that question because I view the information in
25 Exhibit A as somewhat separate and distinct from

262

1  the report itself because it would entail
2  following the protocol I've outlined earlier in
3  our discussions that there is an investigation
4  protocol. And so certainly, as part of that
5  investigation protocol, it would be appropriate to
6  interview Ms. Joseph and collect documentation as
7  necessary.
8      Q   But you didn't believe that it was
9  necessary or important to talk to Coach Joseph
10 before self-reporting the allegations to the NCAA?
11     A   We made that determination collectively
12 that our first step was to acknowledge receipt of
13 the allegations prior to investigating them.
14     Q   And by "acknowledge receipt," meaning
15 sending them to the NCAA?
16     A   I believe the reason we set up a phone
17 call is we verbally relayed generally what they
18 entailed, but I do not believe we produced a
19 written copy of Appendix A at that time.
20     Q   Okay. But, again, you didn't find that
21 it was important or necessary to speak to Coach
22 Joseph about those allegations before alerting
23 Mike Zonder to them?
24     A   We made that decision collectively that
25 the most prudent step was to notify Mike Zonder at

263

1  that time.
2      Q   Okay. And who made that decision
3  collectively?
4      A   I believe it was our outside counsel,
5  Paul Kelly, John Long, myself, and, I believe,
6  Aisha Oliver-Staley.
7      Q   Was Todd Stansbury involved in
8  that decision?
9      A   I am not sure.
10     Q   Is it possible?
11     A   It's certainly possible.
12     Q   Okay. Do you know whether President
13 Peterson was involved in that decision?
14     A   I do not.
15     Q   Okay. Did you say Lynn Durham was
16 involved? I forget.
17     A   No, I did not.
18     Q   Okay. Was she involved in that
19 decision?
20     A   Not that I recall.
21     Q   Okay.
22         Were you aware whether the allegations
23 that you reported to Mike Zonder were made by
24 players or staff?
25     A   I don't specifically recall. I don't

264

1  believe that was shared as part of the information
2  I received.
3      Q   Would that have mattered to you, to
4  know whether it came from staff or from players?
5      A   Only in the context of being able to
6  follow up with anyone who offered specific
7  information, but my understanding was that there
8  was no -- that was part of the report or the
9  confidentiality, that we would not receive
10 information on who made specific allegations.
11     Q   Okay.
12         So then you did go ahead and conduct an
13 investigation after the fact?
14     A   After acknowledging receipt of the
15 allegations, yes, we conducted -- commenced and
16 conducted an investigation.
17     Q   And did you notify Coach Joseph at any
18 point that you were conducting an investigation
19 into these allegations?
20     A   I did not personal notify Ms. Joseph,
21 no.
22     Q   Do you know if anybody else did?
23     A   I believe it would have been
24 communicated with via her counsel that was on
25 record in the previous investigation, but I'm not

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

265

1  certain.
2     Q   Okay.  And that would have happened at
3  the beginning of the investigation?
4     A   Not necessarily.  I think that would
5  have happened when either our outside counsel or
6  the NCAA enforcement staff felt it was appropriate
7  to notify.
8     Q   Okay.  Do you know whether anyone from
9  Georgia Tech ever interviewed Coach Joseph as part
10 of the -- of this NCAA investigation?
11    A   I believe there was an interview with
12 the NCAA enforcement staff and that our outside
13 counsel and a representative of the Office of the
14 General Counsel attended that interview, but I am
15 not certain -- I can't recall who exactly that was
16 at this time.
17    Q   Okay.
18        So you are aware that Coach Joseph was
19 terminated by Mr. Stansbury on March 26th, 2019?
20    A   Yes.
21    Q   Did you know that Mr. Stansbury was
22 going to terminate Coach Joseph prior to
23 March 26th?
24    A   No, I did not.
25    Q   How did you come to learn that she was

---

266

1  terminated?
2     A   I do not remember if it was
3  specifically Todd -- I believe it was Todd --
4  indicated to me that that was happening because I
5  may need to create a correspondence to call a
6  special session or conference call with the board
7  of trustees.
8     Q   Okay.  And he told you that after he
9  had already terminated her or before?
10    A   I do not know.
11    Q   You don't recall?
12    A   I do not know whether it was prior to
13 or after that termination meeting.  I'm not sure.
14    Q   Okay.  Do you know when the decision
15 was made to terminate her?
16    A   I do not.
17    Q   Did Mr. Stansbury share with you the
18 reasons for the decision?
19    A   No.
20        MS. BANKS:  If we could bring up
21 document 54, please.
22    Q   Again, we've looked at these before.
23 These are your text messages with Mr. Stansbury,
24 correct?
25    A   It appears so, yes.

---

267

1     Q   Okay.  This text exchange right here,
2  "Also Joeleen had conversation with Liz B about
3  team issues due to Appendix A.  She said MJ gave
4  to JP to dad.  Wouldn't interference in pending
5  NCAA investigation grounds for show cause?"
6        What do you understand Liz B to be?
7  Elizabeth Balogun?
8     A   Yes.
9     Q   Okay.  And MJ is MaChelle Joseph.  And
10 who is JP?
11    A   I believe that's reference to Jonneshia
12 Pineda.
13    Q   Okay.  Do you know what he is referring
14 to here when he talks about "team issues due to
15 Appendix A"?
16    A   I vaguely remember in the course of the
17 investigation learning that there had been some
18 team meetings or discussions once this appendix
19 became or was obtained by members of the team and
20 that there was either tension or something of the
21 like between Elizabeth Balogun and other members
22 of the team.
23    Q   And what was that tension about, do you
24 know?
25    A   I don't specifically recall.  I believe

---

268

1  it's contained in some of the transcripts of the
2  NCAA interviews.
3     Q   Okay.  Did you understand at the time
4  what those issues were due to Appendix A?
5     A   I'm not sure from this text message
6  exchange.
7     Q   Okay.  So Joeleen apparently told Todd
8  Stansbury that MaChelle gave to Joe L to dad.
9  What does that mean, if you know?
10    A   I read that as Appendix A was provided
11 from Ms. Joseph to Jonneshia Pineda who then got
12 it somehow to Elizabeth Balogun's father.
13    Q   I see.  And was that something that was
14 a problem for some reason?
15    A   I think it would depend.  I can't see
16 the bottom of my response.  It would depend
17 because that could be considered interference with
18 the NCAA investigation.  I am not sure what, if
19 any, direction was given to anyone who had
20 possession of Appendix A, besides myself, on
21 whether it was confidential or not.
22    Q   And -- so you don't know whether it was
23 confidential.  And do you have any knowledge
24 whether, in April of 2019, Coach Joseph was even
25 aware that there was an NCAA investigation?

---

269

1    A   I do not know specifically what
2  correspondence or the dates right now sitting here
3  of when Ms. Joseph became aware of a formal
4  investigation.
5    Q   Okay.  So you don't know whether she
6  was told to keep it confidential and you don't
7  know whether she even knew there was an NCAA
8  investigation.  But it appears that Todd Stansbury
9  is concerned about it and you spoke about it with
10  Joeleen and also alerted the NCAA; is that right?
11    A   It appears from this text, yes.
12    Q   And why would you notify the NCAA if
13  you weren't sure whether she was told to keep it
14  confidential or whether she even understood that
15  there was an investigation?
16    A   My best guess is to make sure they were
17  aware that we understood it's possible that
18  individuals they had not yet interviewed had been
19  made aware of the contents of that appendix or
20  what the possible allegations were.  So we felt it
21  pertinent that they know, going into those
22  interviews, that there may already be knowledge.
23    Q   And you wrote, "Thanks for the
24  follow-up.  Several issues sharing info and even
25  acknowledging previous investigation to staff and

271

1    Q   But an investigation that has been
2  concluded and a program is cleared, you're not
3  supposed to even acknowledge that such an
4  investigation occurred?
5    A   I think that depends.  And, again, I
6  can't speak to exactly what this text message is
7  referring to.  And, to me, it just indicates that
8  there was information shared that I found
9  unexpected.
10    Q   Todd Stansbury responds, "Going out of
11  your way to purposely F with team is pretty sad."
12       Did he share with you at any other time
13  that he thought MaChelle Joseph was trying to F
14  with the team?
15    A   Not that I recall, no.
16    Q   Did you view these issues as her trying
17  to F with her team?
18    A   I don't know that I would characterize
19  my thoughts or feelings that way.  I believe at
20  this time I was really focused on getting the
21  information, protecting our student athletes
22  throughout the NCAA investigation and moving
23  forward as best we could.  I was not concerned
24  with external parties.
25    Q   Okay.  Up above he says, "Wouldn't

270

1  team."  What did you mean by that?
2    A   I'm not sure what I specifically meant
3  by that.
4    Q   Do you recall that there were issues
5  related to MaChelle Joseph sharing information?
6    A   I'm not sure that this is specific to
7  Ms. Joseph, but I vaguely recall in this second
8  investigation that if individuals had knowledge
9  that they otherwise shouldn't have, someone would
10  have had to have shared it with them that
11  participated in the first investigation.
12    Q   Which first investigation are you
13  referring to?
14    A   The initial investigation that we spoke
15  about earlier regarding Elizabeth Balogun and
16  Elizabeth Dixon.
17    Q   And is there any reason that that
18  investigation should not be acknowledged to staff
19  and team?
20    A   I believe I mentioned it earlier, but
21  one of the principles that the NCAA enforces with
22  all participants is that an investigation is
23  considered confidential and they are not to share
24  it with anyone outside of the room during which
25  they are participating in that interview.

272

1  interference in pending NCAA investigation grounds
2  for show cause," and you say "Yes."  Had Todd
3  advocated seeking some sort of show cause against
4  MaChelle previously, or was this the first time?
5    A   No.  And I believe, to clarify, my
6  "yes" was an acknowledgment of the text message.
7  There are many different things that go into a
8  show cause penalty, and I don't recall Todd
9  specifically advocating for a show cause at any
10  other point.
11    Q   And a show cause penalty is a serious
12  one, correct?
13    A   Yes.
14    Q   And you say that this "Yes" is not an
15  answer to his question immediately previous to it?
16    A   I don't believe so, no.
17    Q   A show cause penalty means you can't
18  coach again, correct?
19    A   No, it doesn't mean that exactly.
20    Q   Does it mean that inexactly?
21    A   Would you like me to explain?
22    Q   Yes, please do.
23    A   Okay.  A show cause penalty essentially
24  means that as a result of an NCAA infraction, the
25  committee on infractions can impose a show cause

273

1 penalty of various lengths on an individual, and
2 it means that to continue in their capacity or
3 to -- if a new institution wants to hire them,
4 that institution must appear in front of the
5 committee on infractions to show cause why that
6 individual should be able to work in that
7 capacity.
8     Q   Okay.  Here you say, "Put a call in
9 yesterday to push to get answer.  I'm hopeful we
10 will have that and can move quickly to interview
11 players and former staff.  If anyone wants to
12 coach again, they need to be truthful."
13     You're referring to the show cause idea
14 that he had, correct?
15     A   I believe so, yes.
16     Q   Here, Mr. Stansbury suggests that "you
17 can get immunity" and "maybe we can get the info
18 we need."  Is that he wanted to seek immunity for
19 the players so that they would talk?
20     A   I believe that we had already conferred
21 with outside counsel and put in that request, but
22 yes, the general idea was that with limited
23 immunity, that student athletes who may have
24 participated in or benefited from a violation,
25 their eligibility would not be compromised if they

274

1 provided accurate and truthful information.
2     Q   Okay.  And what info did you need that
3 you might only get if the players had immunity?
4     A   Information specific to individual
5 student athletes and what benefits they may have
6 received or other violations that they may have
7 witnessed with other student athletes, coaches or
8 staff.
9     MS. BANKS:  All right.  We can take
10 this one down.  If we can bring up document 19,
11 please.
12     MR. ABBOUD:  That's already been marked
13 as Exhibit 7, Caleb.
14 BY MS. BANKS:
15     Q   This is the timeline that we talked
16 about earlier that you helped prepare.
17 "October 3rd, 2017:  Georgia Tech initiates
18 investigation into potential rules violations
19 involving the men's basketball program."
20     Were you also involved in the NCAA
21 allegations and investigation related to the men's
22 basketball program?
23     A   Yes.
24     MS. BANKS:  Caleb, you can take this
25 down.

275

1     Q   So an investigation here was started in
2 October of 2017; is that correct?
3     A   Yes.
4     Q   Okay.  Do you recall what those
5 potential rules violations were?
6     A   Yes.  I believe we received
7 information -- I received a direct call from Josh
8 Pastner about possible violations related to a
9 friend or former friend of his that may have
10 provided impermissible benefits to members of the
11 men's basketball team.
12     Q   Okay.  Was there also -- and that was
13 Ron Bell, correct?
14     A   Correct.
15     Q   And was there also an allegation about
16 impermissible benefits provided by an assistant
17 coach, Darryl LaBarrie?
18     A   Not at that time.  On October 3rd we
19 were not yet aware of that allegation.
20     Q   Okay.  But when that was brought to
21 your attention or when that came to your
22 attention, were you involved in investigating that
23 as well?
24     A   Yes.
25     Q   Okay.  Did Coach Pastner bring that one

276

1 to your attention as well?
2     A   No, he did not.
3     Q   Who did?
4     A   The NCAA.
5     Q   Okay.  And what did you do when you
6 learned about each of these allegations?
7     A   In the scenario involving the
8 individual you mentioned, Ron Bell, I set out to
9 collect information.  I met with two student
10 athletes and then broadened that scope further.
11 As I learned more information and met with many
12 members of the team, I asked them to provide
13 documentation.
14     I will say I consulted with Pat McKenna
15 prior to initiating that investigation.  I
16 mentioned, I believe at the onset of our meeting
17 today, that we have a specific investigation
18 protocol that covers all types of violations but
19 also matters of student athlete eligibility and
20 possible withholding from games.  So that was all
21 part of the investigation plan.
22     That was occurring beginning around
23 October 3rd, and then I believe October 16th --
24 I'd have to verify on that timeline -- the NCAA
25 enforcement staff called me with additional

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

277

1  potential allegations related -- unrelated to the
2  Ron Bell matter.
3      Q   And the NCAA contacted you about the
4  Darryl LaBarrie allegations, correct?
5      A   Yes.
6      Q   Okay.  And when you received those
7  allegations, did you discuss them with Coach
8  Pastner?
9      A   No, I did not.
10     Q   Did you discuss them with Mr. Lewis?
11     A   No, I did not.
12     Q   And that's because that's contrary to
13 the rules, correct?
14     A   Correct.
15     Q   Did you investigate the Darryl LaBarrie
16 allegations as well?
17     A   I participated in the investigation
18 that the NCAA led.
19     Q   Okay.
20         In terms of the Ron Bell matter, did
21 you -- so Coach Pastner reported it to you, is
22 that right, and then you reported it to the NCAA?
23     A   Coach Pastner reported it to me, I
24 began to investigate, and once violations were
25 substantiated and even in the midst before we had

278

1  all information substantiated, I did notify the
2  NCAA enforcement staff.
3      Q   Okay.  And did you notify them of the
4  violations or did you notify them of the
5  allegations?
6      A   I notified them of the allegations --
7  initially, I notified them of the allegations and
8  that if they happened to see social media activity
9  by this individual, Ron Bell, that we were already
10 in the midst of an investigation and, hopefully,
11 we would have more solidified information shortly
12 thereafter.  I'm not sure of the exact date.  I
13 contacted the student athlete reinstatement staff
14 with the NCAA to inform them that I would be
15 filing a reinstatement request.
16         In between those two notifications I
17 believe is when the NCAA enforcement staff
18 contacted me about the allegations involving
19 Darryl LaBarrie, and I notified them immediately
20 of the ongoing institutional investigation into
21 Ron Bell.
22     Q   Okay.  So how long after Coach Pastner
23 reported the Ron Bell issue to you did you notify
24 the NCAA of the allegations?
25     A   I believe it was within about a week,

279

1  but I would have to check records to confirm.
2      Q   Okay.
3          You recall that at some point along the
4  way allegations of sexual assault were also made
5  against Coach Pastner.  Did you investigate those
6  allegations?
7      A   I am aware that allegations were made,
8  and I did not personally investigate those
9  allegations, no.
10     Q   Okay.  Do you know whether anybody at
11 Georgia Tech investigated those?
12     A   Yes.  I believe a third party was
13 commissioned to investigate those allegations.
14     Q   Okay.  And were those allegations
15 similarly reported to or investigated by the NCAA?
16     A   No, I do not believe so.  Matters of
17 sexual misconduct do not fall under the purview of
18 the NCAA.
19     Q   Okay.
20     MS. BANKS:  Let's pull up document 104,
21 please.
22         (Lewis Exhibit 29 marked for
23 identification and attached to the transcript.)
24     Q   Do you recognize this document?
25     A   Not specifically.  I'm not sure that I

280

1  have seen this document.
2      Q   Okay.  Do you recall a -- an internal
3  investigation being conducted in the June 2019
4  time period related to allegations of gender
5  discrimination at Georgia Tech and GTAA?
6      A   Yes.  I do recall that there was an
7  investigation.
8      Q   And you participated in that?
9      A   I believe I was asked to provide pieces
10 of documentation, and to the best of my
11 recollection, that was most of my participation.
12 I do not remember any additional participation.
13     Q   Okay.
14     MS. BANKS:  Let's see.  Can we make
15 this a little bigger, please.
16         There we go.
17     Q   Do you recall providing information
18 about coaches' coaching styles -- various coaches'
19 coaching styles?
20     A   I don't specifically remember, but it's
21 certainly possible.
22     Q   Do you recall sharing -- do you recall
23 being interviewed for this investigation?
24     A   I recall being interviewed.  I'm not
25 sure -- I believe there were a couple of different

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

281

1  reviews, and I'm not sure which one is which.  So
2  I do recall being interviewed about matters.  I
3  just don't specifically recall Nelson Mullins
4  versus another.
5      Q   But it appears from this document that
6  you were, in fact, interviewed for this?
7      A   Yes, it seems that way.
8      Q   Okay.  And do you recall being
9  interviewed about different coaches at Georgia
10 Tech and their styles of coaching?
11     A   I vaguely remember.
12     Q   Okay.
13         It says here, "The only coach that
14 stood out in Engel's mind as one that may have
15 gotten into a student's face is Employee Four.
16 The distinction for Engel was that Employee Four
17 only yelled when a student athlete missed a
18 technical assignment."
19         Do you recall saying that and about
20 whom you said it?
21     A   I don't specifically recall saying it,
22 and I'm unsure of who it was with respect to.
23     Q   Would it have been the football coach,
24 Coach Johnson?
25     A   It could have been, but I don't

---

282

1  specifically recall.
2      Q   Do you recall having an opinion similar
3  to this about Paul Johnson?
4      A   It's possible that I have that opinion.
5      Q   Well, let's see.  You appear to say in
6  the investigation.  So who among the coaches
7  around this time at Georgia Tech would you say
8  would have been somebody who might have gotten
9  into the face of one of the student athletes?
10     A   I think it's fair to say I may have
11 been speaking about Paul Johnson, but I can't be
12 certain.
13     Q   Is there anybody else -- is there any
14 other coach, other than Coach Joseph or Coach
15 Johnson, that you're aware of that you believe
16 might have gotten into an athlete's face when the
17 athlete missed a technical assignment?
18     A   Not specifically, no.
19     Q   So is it fair to say you're talking
20 about Paul Johnson?
21     A   It's fair to say I may have been
22 talking about Paul Johnson.  Again, I don't
23 specifically recall who Employee Four was.
24     Q   I don't expect you to recall the
25 numbers.  I do expect you to recall who you were

---

283

1  talking about when you said this coach would get
2  into student athletes' faces when they missed a
3  technical assignment.  That's a very specific
4  allegation that was made, and that was made two
5  years ago.
6          Is it your testimony you have no
7  recollection about who you were speaking about in
8  this interview?
9      A   I believe I may have been speaking
10 about Coach Johnson -- Paul Johnson, but I can't
11 say that with absolute certainty.
12     Q   Is it your recollection, sitting here
13 today, that Coach Johnson's coaching style would
14 be one in which he might get into a student
15 athlete's face?
16     A   Yes.
17     Q   Okay.  And do you know what you might
18 have meant here by "missed a technical
19 assignment"?
20     A   I imagine I may have meant when they
21 performed a play wrong or missed what they were
22 supposed to be doing on the field.
23     Q   You also describe Employee Four as
24 otherwise mellow.  Is that consistent with your
25 opinion today of Paul Johnson?

---

284

1      A   Yes.
2      Q   Okay.
3          You talked about the fact that he would
4  get into an employee's -- I'm sorry, I keep saying
5  employee -- athlete's face, but only when that
6  athlete missed a technical assignment.  But you
7  would really have no way of knowing each time
8  Coach Johnson or, frankly, any other coach, yelled
9  at a player or the reason he did so, would you?
10     A   No, I would not.
11     Q   And you don't attend football
12 practices, I would imagine, at least not
13 regularly?
14     A   Not every day, no.
15     Q   Have you had occasion to attend
16 football practices?
17     A   Yes.
18     Q   And how frequently do you think you
19 attend them?
20     A   It depends on what else is going on at
21 any given time, but I'd say each season I tried to
22 attend at least a handful of practices.
23     Q   Okay.  But it's not every day or even
24 once a week that you would attend these practices,
25 correct?

---

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

---

285

1    A   No, not necessarily.
2    Q   And you're not in the halftime meetings
3 at football games, are you?
4    A   No.
5    Q   How often do you attend Georgia Tech
6 football games?
7    A   I attend most home football games,
8 unless I have a conflict that has me out of town,
9 and, you know, a handful of away games.
10   Q   How often did you go to women's
11 basketball practices?
12   A   Occasionally.  It was not a regular
13 occurrence.  Similarly, I'd say each year I try to
14 stop by a handful of practices.
15   Q   Okay.  And what about women's
16 basketball games?
17   A   I don't know the exact percentage, but
18 I make an effort to attend as many home basketball
19 games as I can.  And, similarly, I think typically
20 I would travel to one or two away games per
21 season, probably closer to one.
22   Q   And how often were you in the women's
23 basketball locker room?
24   A   During games?
25   Q   Yes.

---

286

1    A   I was not.
2    Q   Okay.  Here you state to the
3 investigator that "Coach Joseph's style was unique
4 among Georgia Tech coaches" and she was "always
5 aggressive."
6        When did you first form the opinion
7 that she was uniquely aggressive in her coaching
8 style?
9    A   I am not sure when I first formed that
10 opinion.
11   Q   Okay.  But you were never so concerned
12 about this style of hers that you reported her at
13 any point, did you?
14   A   I did not report her at any point, no.
15   Q   And if you thought she was being
16 abusive in any way to the student athletes, you
17 would have reported her, correct?
18   A   If I observed behavior individually
19 that I felt was abusive, I would like to believe I
20 would have reported her, yes.
21   Q   Okay.  And during your tenure, at least
22 one football player did report Coach Johnson as
23 being abusive, correct?
24   A   I believe so, yes.
25       MS. BANKS:  Let's bring up tab -- or

---

287

1 document 13, please.
2        (Lewis Exhibit 30 marked for
3 identification and attached to the transcript.)
4    Q   Okay.  Do you recognize this document?
5    A   Yes.
6    Q   This is a March 7th, 2016 EthicsPoint
7 complaint filed by former football player, Micheal
8 Summers against Coach Johnson and Assistant Coach
9 Preston, correct?
10   A   Correct.
11   Q   And you were associate athletic
12 director of compliance when this was submitted,
13 correct?
14   A   Correct.
15   Q   Did this come to you?
16   A   Yes.  I received it as one of the
17 EthicsPoint contacts, as I mentioned earlier.
18   Q   Okay.  And are you familiar with
19 Mr. Summers' allegations and his complaint at this
20 time?
21   A   Generally, yes.  I have not looked at
22 the details recently.
23   Q   Mr. Summers complained of
24 manipulative -- in this document itself --
25 manipulative treatment, emotional abuse, poor

---

288

1 communication, a fear-based environment and
2 regular use of public embarrassment and
3 humiliation of athletes by Coach Johnson.
4        Do you recall that?
5    A   Yes, if that's what's contained in the
6 report, that's consistent with what I remember.
7    Q   And do you recall whether you conducted
8 any sort of investigation related to this
9 EthicsPoint complaint?
10   A   I recall that I met as quickly as
11 possible with Lee Hendrickson, the human resources
12 business partner.  She was the other EthicsPoint
13 contact for athletics matters.  And I provided
14 context that Mr. Summers had filed a financial aid
15 appeal, which I believe is referenced in this
16 report.  And I provided a summary of that and that
17 I did not see any additional NCAA violations.  And
18 I believe at that time she indicated this was an
19 employee relations matter, and so she took the
20 lead on following up with the allegations.
21   Q   So Lee Hendrickson followed up with
22 allegations of personnel issues?
23   A   Yes.
24   Q   Do you know whether she conducted any
25 sort of an investigation?

---

289

1      A   I am not sure.  I do remember that she
2  reached out via the system -- the EthicsPoint
3  system to the complainant, and I am unsure -- I
4  don't believe a formal investigation was
5  conducted, but I'm not positive.
6      Q   Okay.
7          There was an issue regarding
8  Mr. Summers and his scholarship and whether he was
9  allowed to keep his scholarship, correct, after he
10 said he wanted to quit the team?
11     A   Yes.
12         MS. BANKS:  Can we pull up document 10,
13 please.
14         (Lewis Exhibit 31 marked for
15 identification and attached to the transcript.)
16         MS. POOLE:  While we do that, Madam
17 Court Reporter, can we get -- have you been
18 keeping track of the time?
19         REMOTE TECH:  This is the tech.  We're
20 about at, like, 6 hours and 50 minutes.
21         MS. POOLE:  Okay.  Thank you.
22         REMOTE TECH:  You're welcome.
23         MS. BANKS:  Can I get control, please.
24     Q   Do you recognize and recall this
25 document?

290

1      A   Yes, I recognize it.  I have not
2  recently read it.
3      Q   Okay.  This is a recommendation that
4  Mr. Summers not be allowed to keep his
5  scholarship, correct?
6      A   I believe this letter was provided to
7  the financial aid appeals committee supporting the
8  athletic association's recommendation to terminate
9  his aid.  So it wasn't the -- the aid had already
10 been terminated, and Mr. Summers was notified and
11 he appealed that decision.  This is the supporting
12 information.
13     Q   Okay.  And this is the information that
14 you submitted saying -- supporting the original
15 decision to cancel his aid?
16     A   Correct.
17     Q   Okay.  And you outlined the issues he
18 had about the -- about Coach Johnson, correct?
19     A   Which issues about Coach Johnson?
20     Q   What we mentioned before, that -- you
21 know, he had the issues of manipulative treatment,
22 emotional abuse, poor communication, a fear-based
23 environment, and regular use of public
24 embarrassment and humiliation, right?  That's what
25 Micheal Summers had accused Paul Johnson of?

291

1      A   He did in that EthicsPoint complaint.
2  Before or prior to receiving that EthicsPoint
3  complaint, I do not believe I was aware he had
4  made those allegations.
5      Q   Well, and here you say right here,
6  "Micheal cited playing time and a disagreement
7  with coaching decisions as a reason for quitting
8  the team."  It's a little bit different than
9  what's contained in his EthicsPoint complaint,
10 isn't it?
11     A   Yes.  That is the information that was
12 provided to us by Paul Johnson.
13     Q   And this is -- okay.  So your
14 recommendation was rejected once the appeals
15 committee saw his actual complaint; is that right?
16     A   After the hearing, yes, the appeal was
17 granted, and he retained his financial aid.
18     Q   Okay.  And, again, you didn't
19 investigate Mr. Summers' complaints because it was
20 determined to be a personnel action so
21 Ms. Hendrickson took over that investigation or at
22 least whether to investigate that?
23     A   Correct.
24     Q   To your knowledge, did Coach Johnson
25 suffer any repercussions related to the

292

1  allegations made by Mr. Summers?
2      A   I am not aware.
3      Q   Okay.  You're not aware of any
4  repercussions that he may have suffered?
5      A   Correct.
6          MS. BANKS:  Okay.  I am going to take a
7  break now, Courtney.  We can get rid of this
8  document.  And I'll probably come back and have
9  some -- maybe a few loose ends to tie up.  But
10 then I should be close to being done.  But I'd
11 like to take about 10 minutes, okay?
12         MS. POOLE:  Okay.
13         MS. BANKS:  All right.
14         (A recess was taken.)
15 BY MS. BANKS:
16     Q   Ms. Lewis, can you describe for me your
17 relationship with Lynn Durham?  Are you friends or
18 are you friendly?
19     A   Yes, I would say we're both friendly
20 and friends.
21     Q   Okay.  So you -- do you socialize
22 outside of work, have meals together, things like
23 that?
24     A   On occasion.
25     Q   During the investigation that spanned

293

1  from, like, May 2018 to February '19 -- 2019, were
2  you talking with Coach Joseph and her staff
3  around -- during that time and keeping them
4  updated or apprised of what was happening, or was
5  that not something that was typically done or
6  allowed?
7      A   I don't believe so.  Typically, we
8  would not provide status updates of that nature.
9      Q   Okay.  So you wouldn't be sort of
10 regularly communicating with Coach Joseph or her
11 staff about the investigation during the time of
12 the investigation?
13     A   No, not outside of interview requests
14 or requests for information, no.
15     Q   Okay.  When the men's basketball
16 investigation began in October of 2017, did you
17 engage outside counsel?
18     A   Yes.
19     Q   What law firm was that?
20     A   Jackson Lewis.
21     Q   And did you seek immunity for men's
22 basketball players as part of that NCAA
23 investigation?
24     A   No.
25         MS. BANKS:  Okay.  I think that's all I

294

1  have.
2          MS. POOLE:  I believe that we only have
3  about three minutes left of the seven hours.
4  Ms. Banks, would it be all right for us to just
5  reserve our right, if we need to clarify anything,
6  to do so by way of written statement?
7          MS. BANKS:  I'm happy to stay right now
8  and let you do any follow-ups you want to do.
9          MS. POOLE:  All right.  I have got just
10 a few questions then.
11         MS. BANKS:  Okay.
12 EXAMINATION BY COUNSEL FOR THE DEFENDANTS
13 BY MS. POOLE:
14     Q   Ms. Engel, when we talk about your
15 position as the -- within the compliance
16 department, is that predominantly NCAA compliance?
17     A   Yes.
18     Q   The compliance department within the
19 Athletic Department is not responsible for
20 compliance with Institute policies and procedures;
21 is that correct?
22     A   Correct.
23     Q   And you're not responsible for
24 compliance with human resources policies and
25 procedures?

295

1      A   Correct.
2      Q   Okay.  It's a more limited role,
3  correct?
4      A   Yes.
5      Q   Okay.
6          I believe earlier today you were asked
7  if you were made aware of the allegation that was
8  sort of wrapped up in the Ginger Sanford
9  complaint, investigation and response from
10 Ms. Joseph that Joeleen Akin and Paul Griffin were
11 treating Ms. Joseph differently than they were
12 treating male coaches.  Do you remember that?
13     A   I remember discussing that earlier,
14 yes.
15     Q   And you were asked if you investigated
16 that as a Title IX issue, correct?
17     A   Yes.
18     Q   And you did not investigate that as a
19 Title IX issue, right?
20     A   Correct.
21     Q   Can you tell us why?
22     A   I don't believe a statement that an
23 individual believes they are being treated
24 unfairly constituted information that would be a
25 specific allegation to be escalated or

296

1  investigated.
2      Q   We talked a little bit today about the
3  various types of NCAA violations, right?  And
4  there's a level 1, level 2 and level 3.  Is that
5  correct?
6      A   Yes.
7      Q   Level 3 are considered more minor.  I
8  think you called them routine violations, correct?
9      A   Yes.
10     Q   As part of your duties in the
11 compliance office, you keep track of those type of
12 violations, right?
13     A   Yes.
14     Q   So if we wanted to learn more about any
15 specific violation, we could refer to your
16 documentation on that, right?
17     A   Yes.
18     Q   I think there were just a handful of
19 incidents you were asked about today that you
20 didn't recall specifics, but there may be other
21 documentation about it that we can go find, right?
22     A   Yes.
23     Q   And then here most recently, you were
24 asked about Mr. Summers and the sort of situation
25 with his complaints about Paul Johnson and his

297

1  financial aid appeal.
2       MS. POOLE:  Can you just -- can we see
3  that document again, the -- I think it was the
4  last one that we had up.
5       Okay.  Thank you.
6    Q   So this appears to be a letter from you
7  to the appeals committee members, right?
8    A   Yes.
9    Q   When you sent this letter, were you
10 aware of what, if anything, Mr. Summers had said
11 or submitted to the appeals committee?
12   A   No, I do not believe so.
13   Q   Is this letter -- in sending this
14 letter, were you recommending that Mr. Summers
15 lose his aid?
16   A   No.  That recommendation had already
17 been made.
18   Q   And is this more of an explanation of
19 how that recommendation came about?
20   A   It is supporting documentation that the
21 decision was made in accordance with NCAA
22 legislation.
23   Q   And you had no say in the appeals
24 committee's decision; is that correct?
25   A   Correct.

298

1       MS. POOLE:  Okay.  I think that that is
2  all that I have, and we would like to read and
3  sign.
4       MS. BANKS:  I have just one more
5  follow-up based on your questions.
6    EXAMINATION BY COUNSEL FOR THE PLAINTIFF
7  BY MS. BANKS:
8    Q   Ms. Engel, when you talked about the
9  Sanford investigation and allegations of unfair
10 treatment or being treated unfairly, you just
11 testified that this was not necessarily a reason
12 to investigate something, correct?
13   A   Yes.
14   Q   Okay.  But you would agree that claims
15 that someone makes that they are treated unfairly
16 on the basis of gender could raise potential
17 Title IX issues, right?
18   A   They could raise those issues, yes.
19   Q   Okay.  And a claim that a women's
20 athletic program is being treated less favorably
21 than a men's athletic program potentially raises
22 Title IX issues, correct?
23   A   Yes.
24       MS. BANKS:  That's all.
25       MS. POOLE:  Okay.

299

1       MS. BANKS:  All right.  I guess we're
2  done.  Thanks, everyone.
3       (Time noted 6:10 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

300

1           ACKNOWLEDGMENT OF DEPONENT
2
3       I, SHOSHANNA ENGEL LEWIS, do hereby
4  acknowledge that I have read and examined the
5  foregoing testimony, and the same is a true,
6  correct and complete transcription of the
7  testimony given by me and any corrections appear
8  on the attached Errata sheet signed by me.
9
10 _____    _____
11    (Date)              (Signature)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Transcript of Shoshanna Engel Lewis
Conducted on June 2, 2021

301

1        CERTIFICATE OF REPORTER - NOTARY PUBLIC
2           I, ADRIENNE MIGNANO, the officer before
3   whom the foregoing deposition was taken, do hereby
4   certify that the foregoing transcript is a true
5   and correct record of the testimony given; that
6   said testimony was taken by me and thereafter
7   reduced to typewriting under my direction; that
8   reading and signing was requested; and that I am
9   neither counsel for, related to, nor employed by
10  any of the parties to this case and have no
11  interest, financial or otherwise, in its outcome.
12          IN WITNESS WHEREOF, I have hereunto set
13  my hand and affixed my notarial seal this 16th day
14  of June, 2021.
15
16
17  _____
18  My Commission Expires: June 2022.
19
20
21
22
23
24
25