

# REPORT OF INTERNAL INVESTIGATION

## Allegations of Gender Discrimination at the Georgia Institute of Technology and the Georgia Tech Athletic Association

June 7, 2019

Michelle W. Johnson, Esq.
Nekia Hackworth Jones, Esq.
Amy B. Cheng, Esq.
Nelson Mullins Riley & Scarborough LLP
201 17th Street, N.W.
Suite 1700
Atlanta, Georgia 30363



Exhibit #

Lewis 29

6/02/21 - CW

CONFIDENTIAL & SENSITIVE | SUBJECT TO ATTORNEY-CLIENT PRIVILEGE | ATTORNEY WORK PRODUCT

BOR-0016440



# REPORT OF INTERNAL INVESTIGATION

Allegations of Gender Discrimination at the
Georgia Institute of Technology
and the
Georgia Tech Athletic Association

June 7, 2019

## TABLE OF CONTENTS

**Introduction**......................................................................................1

**Section One: Relevant Background & Allegations**............................4

**Section Two: The Investigative Process**...........................................4

**Section Three: Summaries of Interviews**.........................................5

    I.   Decision to Terminate Coach Joseph's Employment..................5
    II.  Comparators...........................................................................11

**Section Four: Investigative Findings**..............................................17

CONFIDENTIAL & SENSITIVE | SUBJECT TO ATTORNEY-CLIENT PRIVILEGE | ATTORNEY WORK PRODUCT



# REPORT OF INTERNAL INVESTIGATION

**Allegations of Gender Discrimination at the
Georgia Institute of Technology
and the
Georgia Tech Athletic Association**

**June 7, 2019**

## INTRODUCTION

The Georgia Tech Athletic Association ("GTAA") retained Nelson Mullins Riley & Scarborough LLP ("NMRS") to conduct an internal investigation after former women's basketball Head Coach MaChelle Joseph appealed[1] Athletic Director ("AD") Todd Stansbury's decision to terminate her employment, alleging gender discrimination.

*Relevant Background*

On or about February 25, 2019, GTAA retained Littler Mendelson P.C. ("Littler") to conduct an investigation into Coach Joseph's alleged mistreatment of student athletes and staff. The Littler investigation concluded that Coach Joseph's actions more likely than not fell outside of acceptable behavior, under the University System of Georgia ("USG") Ethics Policy (Policy No. 8.2.18.1). On March 20, 2019, Littler issued an Internal Review Investigation Report (the "Littler Report") to the Georgia Institute of Technology ("Georgia Tech"), describing its findings. Georgia Tech, in turn, shared the report with Coach Joseph. On March 25, 2019, Coach Joseph sent Stansbury her response to the Littler Report.

On March 26, 2019, Stansbury terminated Coach Joseph's employment for "good cause,"[2] as defined in Article VII of her October 20, 2014 employment contract, as well as for violating the USG Ethics Policy.[3] On April 1, 2019, Coach Joseph appealed Stansbury's termination decision, alleging, *inter alia*, that GTAA had discriminated against her on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.

---

[1] On May 24, 2019, Coach Joseph withdrew her appeal. Nonetheless, GTAA asked NMRS to complete its investigation into Coach Joseph's Title VII allegations.

[2] Stansbury noted in the March 26, 2019 termination letter from GTAA that Coach Joseph violated the following subsections in Article VII of her 2014 contract: "(2) Involvement in conduct that the Athletic Association, in its sole discretion, reasonably considers injurious to the reputation of the Association or the Institute; (7) Serious or repeated misconduct; (8) [Behavior and/or action] adequate to justify the termination of any other non-classified Institute employee."

[3] Stansbury noted in the March 26, 2019 termination letter from Georgia Tech that Coach Joseph violated the USG Ethics Policy stating, "Treat fellow employees, students, and the public with dignity and respect."

**CONFIDENTIAL & SENSITIVE | SUBJECT TO ATTORNEY-CLIENT PRIVILEGE | ATTORNEY WORK PRODUCT**

*Investigative Scope and Methodology*

Per our agreement with GTAA, we were charged with two specific areas of inquiry:

**Investigative Area 1**: Whether Coach Joseph's employment was terminated because of her gender.

**Investigative Area 2**: Whether Georgia Tech or GTAA treated similarly-situated male employees more favorably than Coach Joseph.

NMRS attorneys reviewed and analyzed the following documents:

- Coach Joseph's central and local Human Resources ("HR") files;
- Relevant Georgia Tech and USG policies;
- Previous investigative reports relating to allegations of misconduct against Coach Joseph, and Coach Joseph's responses to those reports;
- The Littler Report, and Coach Joseph's response to the Littler Report;
- Letter from Attorney Lisa Banks, on behalf of Coach Joseph, to Ling-Ling Nie, General Counsel and Vice President for Ethics and Compliance, dated March 25, 2019;
- Termination letters from Georgia Tech and GTAA to Coach Joseph, both dated March 26, 2019; and
- Letter from Coach Joseph to Georgia Tech President Dr. George "Bud" Peterson, dated April 1, 2019, appealing Stansbury's termination of her employment.

The investigators conducted eight in-person interviews in May 2019 with the following Georgia Tech employees:

- Todd Stansbury, AD for GTAA;
- Lynn Durham, Associate Vice President and Chief of Staff to President Peterson;
- Aisha Oliver-Staley, Esq., Executive Director, Affiliated Organizations at Georgia Tech;
- Kim Harrington, Associate Vice President and Chief Human Resources Officer;
- Joeleen Akin, Associate AD for Student-Athlete Development and Senior Woman Administrator ("SWA");
- Mark Rountree, Deputy Director of Athletics for GTAA;
- John Stein, Vice President for Student Life and Brandt-Fritz Dean of Students Chair; and
- Shoshanna Engel, Associate AD for Compliance and Deputy Title IX Coordinator.

2

Each interview covered the following topics:

- The witness' roles and responsibilities at Georgia Tech, GTAA, and other universities;
- Involvement in and/or knowledge of the Littler investigation and the related report;
- Involvement in and/or knowledge of Georgia Tech/GTAA's decision to terminate Coach Joseph's employment; and
- Information regarding complaints at Georgia Tech, GTAA, or other universities involving allegations of student or staff mistreatment against coaches, faculty, or staff.

The investigators also contacted Attorney Banks via telephone and e-mail to schedule an interview with Coach Joseph, but these efforts were unsuccessful. The investigators also contacted, or attempted to contact, former GTAA ADs Mike Bobinski, Dan Radakovich, and Paul Griffin. The ADs either declined to be interviewed, could not be located, or were not available as of the date of this report.

*Investigative Findings*

The documents reviewed and witness interviews indicate that Georgia Tech and GTAA did not terminate Coach Joseph because of her gender. The decision maker, Stansbury, and other individuals who participated in the decision-making process, all stated that Stansbury decided to terminate Coach Joseph based on the findings contained in the Littler Report. The interviewees stated that they do not believe Coach Joseph's gender played a role in Stansbury's termination decision. Additionally, while the investigators found no direct comparators, the closest comparators showed that Georgia Tech and GTAA have terminated employees of both genders for misconduct involving the well-being of students.

. . . . . . . .

3

## SECTION ONE:
## RELEVANT BACKGROUND & ALLEGATIONS

**I.   Factual Background**

Coach Joseph was the head coach for Georgia Tech's women's basketball team from 2003 to 2019. In approximately February 2019, Georgia Tech/GTAA received letters from parents and relatives of players on the women's basketball team stating that Coach Joseph mistreated her student athletes, including by verbal abuse.

On or about February 25, 2019, Georgia Tech retained Littler to investigate these allegations. The Littler investigator found it more likely than not that Coach Joseph's actions fell outside acceptable behavior under the USG Ethics Policy (Policy No. 8.2.18.1).

On March 20, 2019, Georgia Tech received the Littler Report. Georgia Tech, in turn, shared the report with Coach Joseph. On March 25, 2019, Coach Joseph sent Stansbury her response to the Littler Report. On March 26, 2019, Stansbury terminated Coach Joseph's employment.

**II.  The Internal Investigation**

   A. <u>Coach Joseph's Appeal</u>

On April 1, 2019, Coach Joseph sent a letter to President Peterson, appealing Stansbury's termination decision and alleging that members of the GTAA discriminated against her on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. Pursuant to Georgia Tech Policy Number 7.3 (Impartial Board of Review Appeal Policy),[4] in April 2019, GTAA retained NMRS to conduct an internal investigation of Coach Joseph's allegation that she was terminated based on her gender. While the internal investigation was underway, on May 24, 2019, Coach Joseph withdrew her appeal. Nonetheless, GTAA asked NMRS to complete its investigation.

   B. <u>The Internal Investigation</u>

The scope of the investigation was to evaluate allegations raised by Coach Joseph in her April 1, 2019 appeal letter. The internal investigation focused on two areas: (1) whether Coach Joseph was terminated because of her gender; and (2) whether Georgia Tech or GTAA treated similarly-situated male employees more favorably than Coach Joseph.

## SECTION TWO:
## THE INVESTIGATIVE PROCESS

The NMRS investigators for this matter were Michelle W. Johnson, Nekia Hackworth Jones, and Amy B. Cheng.

The investigators reviewed documents (listed below), and interviewed eight witnesses.

---

[4] Georgia Tech Policy Number 7.3 states, in relevant part, "[s]hould the grievant allege any form of race, age, sex, color, nation origin, sexual orientation, or disability discrimination as a basis for the grievance[,]" the case will be referred to an investigator for review.

4

I.  **Document Review**

- Georgia Tech Policy Documents
    - Policy Number 1.7 (Anti-Harassment Policy)
    - Policy Number 1.11 (Equal Opportunity Complaint Policy)
    - Policy Number 7.3 (Impartial Board of Review Appeal Policy)

- University System of Georgia Ethics Policy Number 8.2.18.1.4 (Code of Conduct)

- Coach Joseph's Central and Local HR Files, including:
    - Coach Joseph's contracts with GTAA;
    - Performance evaluations; and
    - Reprimand letters from former ADs Dan Radakovich and Mike Bobinski.

- The Littler Report

- Previous investigative reports relating to allegations of misconduct against Coach Joseph, together with Coach Joseph's responses to those reports;

- Termination letters from Georgia Tech and GTAA to Coach Joseph, both dated March 26, 2019; and

- Communications from Coach Joseph to Georgia Tech and GTAA, including:
    - Response to the Littler Report, dated March 25, 2019;
    - Letter from Attorney Banks, on behalf of Coach Joseph, to Ling-Ling Nie, General Counsel and Vice President for Ethics and Compliance, dated March 25, 2019; and
    - Letter to Georgia Tech President Peterson, dated April 1, 2019, appealing Stansbury's termination of her employment.

II.  **Witness Interviews**

The investigators identified and interviewed eight current Georgia Tech employees. The interviews took place in May 2019 at Georgia Tech in Atlanta, Georgia.

## SECTION THREE:
## SUMMARIES OF INTERVIEWS

Below are the summaries of the witness interviews.[5]

I.  **Decision to Terminate Coach Joseph's Employment**

A.  Todd Stansbury

Stansbury has been the AD for GTAA since November 2016. Stansbury is generally aware of Georgia Tech's policies stating that students and staff should be treated with fairness and given due process rights.

---

[5] As a general matter, the investigators found the witnesses to be credible.

5

BOR-0016446

Stansbury first became aware of student mistreatment allegations against Coach Joseph from Oliver-Staley, who was then Georgia Tech's Interim Vice President for Ethics, Compliance, and Risk Management. Oliver-Staley notified Stansbury about letters she received from concerned parents regarding the well-being of student athletes on the women's basketball team. Stansbury then met with some of the players on the team, who shared with him that Coach Joseph had created a toxic environment and mentally abused the students by singling them out and pitting players against each other. This was the first time Stansbury was made aware of such allegations against Coach Joseph.[6] Based on the seriousness of the allegations, he decided that an outside firm, Littler, was needed to investigate the matter.

Shortly thereafter, Stansbury learned that the team physician had determined that two student athletes were unable to play. At that point, Stansbury met with Oliver-Staley, Harrington, and President Peterson regarding the allegations against Coach Joseph. At that meeting, Stansbury decided to put Coach Joseph on administrative leave pending the outcome of the Littler investigation.

On or about March 20, 2019, Stansbury reviewed the Littler Report. He remembered being "shocked" by the report because: 1) he had never seen or heard of a coach using that kind of language towards a student athlete; 2) the "manipulation" exhibited by Coach Joseph, as described in the report, appeared to be deliberate in nature; and 3) the singling out of players and pitting them against each other was "cruel." Stansbury stated that his impressions of the Littler Report were consistent with what he heard from the student athletes. That same day, he provided Coach Joseph with a copy of the Littler Report and gave her an opportunity to respond within five days.

On March 25, 2019, Stansbury received Coach Joseph's response to the Littler Report. Stansbury stated that, after he reviewed Coach Joseph's response, he did not find her explanations "plausible" and viewed her response as a "manipulation of words." He also advised that he found the findings in the Littler Report to be credible, particularly given that Coach Joseph's entire team corroborated the allegations of student mistreatment.

Stansbury stated that he relied only on the Littler Report and Coach Joseph's March 25, 2019 response in making the termination decision.[7] Once he made the decision, he met with President Peterson, Georgia Tech's legal team, Harrington, and Durham to discuss next steps. He decided to terminate Coach Joseph's employment for "good cause" based on the "egregious" nature of the abuse to the student athletes.

B. Lynn Durham

Durham is the Associate Vice President and Chief of Staff to President Peterson. Her duties and responsibilities include "operationalizing President Peterson's vision" and dealing with issues and conflicts before they escalate to or require President Peterson's involvement. She also acts as President Peterson's liaison with GTAA and, as such, she works with Stansbury and his senior staff on a number of issues related to GTAA.

---

[6] Stansbury is not aware of any other player mistreatment allegations against a GTAA coach.

[7] Stansbury stated that the previous investigations regarding Coach Joseph had no impact on his decision to terminate Coach Joseph for "good cause."

6

BOR-0016447

According to Durham, Coach Joseph is known to have a temper, is described as a yeller, and can be "hot or cold" with people. Durham believed the Littler investigation began after the players "finally had enough" of Coach Joseph's "mental abuse." She recalled that some of the student athletes from the women's basketball team met with a Georgia Tech official to discuss Coach Joseph's "mental abuse" and their anguish about continuing to play for her. Durham advised that, to her knowledge, no formal complaints were filed against Coach Joseph at that time. Shortly thereafter, two parents sent Oliver-Staley letters regarding Coach Joseph's mistreatment of their children.

After reviewing the letters from the student athletes' parents, Stansbury decided to put Coach Joseph on administrative leave with pay. Over the following two weeks, the Littler investigator met with every member of the team, Coach Joseph's staff, and individuals that Coach Joseph asked to be included in the investigation. On March 20, 2019, Littler provided a copy of its findings to Oliver-Staley, who forwarded the Littler Report to Durham, Stansbury, Kate Wasch at Legal Affairs, and President Peterson. Based on Durham's review of the Littler Report, she believed the report affirmed the allegations against Coach Joseph that she mistreated her students and staff.

Durham recalled that her first impression of the Littler Report was "how manipulative and devious" Coach Joseph had been with the student athletes. Durham noted that Coach Joseph tried to isolate and pit the student athletes against each other, which she believed to be detrimental to their mental health. The Littler Report seemed consistent with what Durham had seen and heard about Coach Joseph. Durham stated that, while Coach Joseph may believe that her style of coaching is "tough love," it is not.

Coach Joseph had the opportunity to respond to the Littler Report by March 25, 2019, at 5:00 P.M. On March 25, Coach Joseph emailed her response to Stansbury. Durham believed that, around the same time, Coach Joseph's attorney sent a different but similar response to Wasch. Durham recalled that she met with Stansbury, Oliver-Staley, Akin, and Wasch in Oliver-Staley's office. By that time, Durham had reviewed Coach Joseph's response, but not Attorney Banks' letter. Durham remembered Stansbury coming to the meeting "shocked" by the findings in the Littler Report because he did not realize the extent of the student mistreatment by Coach Joseph. Durham stated that Stansbury appeared "incredulous" to Coach Joseph's response. Based on the findings in the Littler Report, and having reviewed Coach Joseph's response, Stansbury told the group that he wanted to terminate Coach Joseph because he believed that irreparable harm had been done, and the players would never play for Coach Joseph again.

After Stansbury decided to terminate Coach Joseph's employment, the group reviewed her contract and discussed whether to terminate her for "good cause." Stansbury decided to terminate Coach Joseph for "good cause" because he felt that, if Coach Joseph had been terminated without cause, it would signal to the community that she did nothing wrong, and he believed she had mistreated the student athletes. After that meeting, Durham spoke to President Peterson about Stansbury's decision to terminate Coach Joseph for cause, and President Peterson agreed with that decision.

C.    <u>Aisha Oliver-Staley</u>

As Georgia Tech's Executive Director, Affiliated Organizations, Oliver-Staley manages the sixteen nonprofit organizations that support Georgia Tech. While she has no formal HR responsibilities, she becomes involved if allegations of misconduct are brought to her attention.

7

In August 2018, while Oliver-Staley served as Interim Vice President for Ethics, Georgia Tech sent an email to students and staff making them aware that Oliver-Staley and her team were resources for reporting ethics violations. For a period thereafter, staff members mentioned to Oliver-Staley that there may be issues with Coach Joseph's treatment of students and that Coach Joseph purposefully recruited vulnerable students so that she could exercise her dominance over them. However, none of the staff wanted to file a formal complaint against Coach Joseph.

Sometime thereafter, several students from the women's basketball team met with a Georgia Tech official regarding allegations that Coach Joseph mistreated the team's student athletes. The students did not want to file a formal complaint against Coach Joseph. In early 2019, while Oliver-Staley was out of the office, Durham received letters from some of the student athletes' parents documenting their concerns about Coach Joseph's coaching style. Once Durham and President Peterson reviewed the parents' letters, Oliver-Staley believed the matter was escalated, and the decision was made to put Coach Joseph on leave with pay immediately.

Oliver-Staley recalled that Georgia Tech retained Littler to conduct an independent internal investigation regarding the allegations of student mistreatment against Coach Joseph. During the investigation, Oliver-Staley liaised between Littler and President Peterson's office, as needed.

Oliver-Staley believed the findings in the Littler Report were consistent with what the students relayed to Georgia Tech officials and others' general impressions of Coach Joseph. According to Oliver-Staley, Stansbury made the decision to terminate Coach Joseph's employment because he believed the damage was irreparable. Because the student athletes no longer wanted to play for Coach Joseph, it would not be feasible to let her contract expire.

Oliver-Staley recalled being a proponent of termination for "good cause" because of the seriousness of the allegations and USG's strong position against paying out employees who have done something wrong to "avoid a lawsuit." Ultimately, Stansbury decided to terminate Coach Joseph for "good cause," and President Peterson approved Stansbury's termination decision.

D.  Kim Harrington

Harrington is Associate Vice President and Chief HR Officer for Georgia Tech. Harrington believes one of her team members worked with Stansbury to engage Littler to conduct the most recent investigation involving Coach Joseph. She became aware of the students' allegations against Coach Joseph shortly before receiving a copy of the Littler Report. She recalled attending a meeting with Durham, Oliver-Staley, and Stansbury to discuss the allegations of student mistreatment against Coach Joseph, the status of the Littler investigation, and the contents of Coach Joseph's HR file.

Harrington recounted that she read the Littler Report a few times, believed the students and staff to be credible, and "wondered about the previous students who may have had to endure the same type of toxic environment." The group wanted to share the Littler Report with Coach Joseph and give her an opportunity to respond. Harrington stated that Stansbury emailed a copy of the Littler Report to Coach Joseph. He extended her time to respond until March 25, 2019, when he realized Coach Joseph was traveling.

8

On March 25, Harrington dialed into a meeting with Wasch, Nie, and Stansbury where they discussed Coach Joseph's response letter to see if she presented facts that would dispel or mitigate the findings in the Littler Report. Harrington recalled thinking that Coach Joseph's response was well written, but she did not find the arguments to be compelling because none of them negated what the student athletes shared with the Littler investigator.

Harrington stated that Stansbury made the decision to terminate Coach Joseph because she created a toxic environment for the student athletes and caused the students psychological damage. In addition, Stansbury thought the Littler Report was credible because of his knowledge of Coach Joseph's history with other staff members, which seemed consistent with the findings in the Littler Report. Harrington, Wasch, Nie, and Stansbury discussed whether Coach Joseph should be terminated for "good cause." Upon reviewing Coach Joseph's contract, Harrington said that she found it difficult to terminate Coach Joseph "without cause" given the significance of Littler's findings. Ultimately, Stansbury decided to terminate Coach Joseph for "good cause," and President Peterson approved Stansbury's decision.

E.   Joeleen Akin

In her role as Associate AD of Student-Athlete Development and SWA, Akin is in charge of student athlete development. She also supervises the women's basketball, men's and women's tennis, softball, and volleyball teams.

Akin recalled first learning about the allegations of student mistreatment against Coach Joseph after Stansbury[8] returned from a meeting with President Peterson. Stansbury instructed Akin to keep a "close eye" on Coach Joseph and the women's basketball team while an outside investigator conducted an inquiry into the truthfulness of the student mistreatment allegations. Akin decided that doing so required traveling with the team, and she asked Coach Joseph if she could travel with the women's basketball team to get "re-acclimated". Coach Joseph agreed, and Akin met the team in Virginia.

Akin recalled that the team lost to Virginia. The next day, unbeknownst to Akin, one of Coach Joseph's staff members asked one of the star basketball players to have lunch. When they parked at the restaurant, the staff member informed the student athlete that Coach Joseph was waiting for her inside. Akin believed Coach Joseph kept the student athlete for four hours trying to manipulate her and turn her against another female student athlete. Shortly thereafter, the team physician determined that a few of the student athletes could no longer play, and their parents and relatives wrote letters to Georgia Tech documenting their concerns regarding Coach Joseph's treatment of student athletes. At that time, Akin recommended to Stansbury that Coach Joseph be placed on administrative leave during the investigation so the students and staff could feel more comfortable discussing Coach Joseph.

While Akin had no involvement in Coach Joseph's termination, Akin believed Stansbury made the decision with the approval of President Peterson. Stansbury told Akin that he decided to terminate Coach Joseph because he did not believe her environment was conducive to Georgia Tech's mission of "develop[ing] young people who will change the world." Stansbury

---

[8] According to Akin, Stansbury learned that some members of the women's basketball team had reached out to a Georgia Tech official regarding allegations of student mistreatment.

BOR-0016450

also told Akin that the majority of the women's basketball team refused to return if Coach Joseph continued as Head Coach.[9]

Akin elaborated that Coach Joseph's termination was unrelated to her gender because a male coach would have been terminated immediately for speaking to his female athletes the way that Coach Joseph spoke to hers. She believed Stansbury reached out to Attorney Banks to see if Coach Joseph would agree to a buy out of her contract, but Coach Joseph did not agree.

F.  Mark Rountree

Rountree became GTAA's Deputy Director of Athletics in 2017. Part of his responsibilities include overseeing sports teams such as baseball and football, as well as supervising the Associate AD for Facilities and Operations, the Director of Strength and Performance, the Director of Sports Medicine, Ticket Operations, Video Operations, and other external operations.

During the time that Rountree supervised the women's basketball team, he met with Coach Joseph several times to discuss her use of profanity in general and towards specific student athletes. He reminded Coach Joseph a few times that she needed to keep her composure in front of student athletes so that her students would be able to absorb her teachings. Since Rountree heard that Coach Joseph did not receive negative feedback well, he never put his concerns in writing; instead, he delivered his feedback to Coach Joseph as "advice" through discussions and meetings. Rountree said that it became apparent to him that "Coach Joseph is the type of person that never accepted any blame because she always had an excuse." By way of example, Rountree has heard Coach Joseph say that the reason her team did not perform well or lost a game was because the official was against her or her team was not up to par.

Rountree learned about the student athletes' allegations of student mistreatment and subsequent Littler investigation through Stansbury. Rountree did not have any involvement in the investigation, and no student came to him directly. Stansbury provided Rountree a copy of the Littler Report and Coach Joseph's response after Stansbury terminated Coach Joseph's employment. He could not recall much about the report or response letter, but his general impressions after reviewing both documents were as follows: 1) the findings in the Littler Report seemed credible because thirteen student athletes essentially stated to the Littler investigator that they cannot be the best versions of themselves with Coach Joseph; and 2) he knew from personal experience that Coach Joseph always made herself out to be the "victim in every situation," so nothing in her response letter surprised him.

Rountree said that he does not believe Coach Joseph was terminated because of her gender because a male coach who spoke to his students the way that Coach Joseph spoke to hers would also have been terminated.

---

[9] Akin believes the decision to terminate Coach Joseph's employment was based on the findings in the Littler Report.

10

y

### G. Shoshanna Engel

Georgia Tech hired Engel in 2013 as the Associate AD for Compliance. In Spring 2015, President Peterson designated Engel as Georgia Tech's Deputy Title IX Coordinator, as well as supervisor over the Drug Testing/Alcohol Program.

Engel became aware of the Littler investigation when Stansbury informed her that he intended to place Coach Joseph on administrative leave. She reviewed the Littler Report around the same time Georgia Tech provided a copy of the report to the public. While she was not privy to the complaints against Coach Joseph, she was not surprised with the findings in the Littler Report with respect to Coach Joseph's language. Additionally, nothing in the Littler Report struck her as inconsistent with her prior impressions of Coach Joseph.

Engel does not believe Coach Joseph's termination was gender-based because Stansbury's public comments about the termination indicated to her that gender never played a role. She said that, if similar complaints had been made about male coaches, they would have also been terminated. While Georgia Tech does not have a specific policy governing student athlete treatment, there is an expectation that members of the community will treat students and staff with dignity.

### H. John Stein

In 2006, Stein became Assistant Vice President for Student Life and Dean of Students. In 2015, Georgia Tech promoted Stein to his current role of Vice President for Student Life and Dean of Students. In his role, Stein may receive or become aware of student mistreatment allegations through parents, staff, or students.

Stein became aware of Littler's investigation when President Peterson and Durham mentioned to him that Georgia Tech had hired an outside investigator to probe student mistreatment allegations against Coach Joseph. Stein believes the President's office wanted him to be informed, should his office receive calls about the allegations. Stein had no other involvement with the Littler investigation.

Stein does not believe Coach Joseph was terminated because of her gender; rather, he believes it was because she directed profane language at the student athletes that publicly humiliated them. According to Stein, any faculty or coach crosses the line and exhibits inappropriate behavior when he/she publicly shames students, as opposed to having a private one-on-one discussion with them to find out why they may not be performing optimally.

## II. Comparators

The investigators asked the witnesses, based on their experiences at Georgia Tech/GTAA and at other academic institutions, about other instances in which coaches, faculty, or staff had been accused of student mistreatment.

### A. Todd Stansbury

*i. Georgia Tech*

Stansbury described Coach Joseph as a "tough" and "demanding" coach because "she wears her intensity on her sleeve" and is known to yell and scream at her student athletes.

11

BOR-0016452

Generally, Stansbury said that none of the other head coaches at Georgia Tech exhibited the same coaching style as Coach Joseph. According to Stansbury, Coach Joseph has an "intense" coaching style that is considered "old school." To Stansbury, a coach's style becomes inappropriate if it causes student athletes to complain. If there is no indication of a problem with the student athletes, he will not interfere because an intense coaching style can sometimes be effective.

Stansbury recalled terminating Employee One (male coach) "for cause" in 2017 after an investigation revealed that Employee One violated a serious NCAA rule.

When asked if other Georgia Tech coaches had similar coaching styles to Coach Joseph, Stansbury named Employee Two (female coach), Employee Three (female coach), and Employee Four (male coach). Employee Two and Employee Three were described as having high expectations and "tough." However, according to Stansbury, these coaches do not yell at their teams, and Stansbury is not aware of any student or staff mistreatment allegations against them. Stansbury stated that, while Employee Four had high expectations for his players and did not hesitate to let his student athletes know when they were not performing well, Employee Four's student athletes and staff never made allegations of mistreatment against him (unlike Coach Joseph).

Stansbury described Employee Five (male coach) as the complete opposite of Coach Joseph. While Employee Five also yells during games, Stansbury described him as a "fairly easy going guy," whereas Coach Joseph is "intense at all times (on and off the basketball court)."

Although he was not AD during their tenures at Georgia Tech, Stansbury stated that he is not aware of allegations of student or staff mistreatment against Employee Six (male coach) and Employee Seven (male coach). Additionally, based on what Stansbury has heard, he believes both men were well liked and were only terminated due to team performance.

Stansbury believes the other head coaches at GTAA are fairly laid back. Although the head coaches can all be demanding, their deliveries to the student athletes are different than Coach Joseph's because they "do not get in the players' face[s]."

    *ii.*  *Other Universities*

From 2012 to 2015, Stansbury was the AD for the University of Central Florida ("UCF"). Stansbury recalled an assistant coach making an allegation against Employee Eight (male coach). Ultimately, Stansbury believes the assistant coach filed a lawsuit against Employee Eight. Stansbury notified UCF's HR and Legal departments about the allegations immediately, but he could not further elaborate on why UCF did not terminate Employee Eight. Stansbury could not provide additional details regarding the outcome of the lawsuit, due to his transition to another university.

From 2003 to 2012, Stansbury was Oregon State University's Executive Associate AD. As a member of the executive team, Stansbury assisted the AD on various HR matters, including advising on hiring, firing, and disciplinary actions. Stansbury elaborated on an incident in 2010, where several student athletes from the women's basketball team alleged mistreatment by the women's head basketball coach, Employee Nine (female coach). Oregon State hired an outside investigator, and the investigator's findings corroborated the students' allegations that Employee Nine created an abusive environment. Based on the findings of the outside

12

investigator, the AD decided to terminate the head coach, but did not do so "for cause" and paid out her contract. As Stansbury explained to the investigators, the allegations against Employee Nine were different from the allegations against Coach Joseph because of the personal nature of the abuse and the "premeditation" by Coach Joseph in her "manipulation" of student athletes.

### B. Lynn Durham

During her tenure as Chief of Staff, Durham is not aware of any other student mistreatment allegations against coaches or other Georgia Tech employees.

Within GTAA, she has been advised of the terminations of two coaches – Employee Six and Employee Seven. She recalled that both coaches were terminated due to team performance. To her knowledge, there have never been any complaints by students against Employee Four, Employee Six, or Employee Seven.

Durham also works with President Peterson on disciplinary actions and terminations of cabinet members and senior leadership. When she first became the Chief of Staff, she recalled that President Peterson allowed Employee Ten (male employee) to resign in lieu of termination, due to his incompatibility with President Peterson and his treatment of staff members and media. Specifically, there were allegations by staff that Employee Ten was rude, arrogant, demeaning, and generally difficult to work with.

Approximately five years ago, allegations were made against Employee Eleven (male employee) that he was intoxicated at donor events and that he sexually harassed another employee. President Peterson told Employee Eleven in his formal evaluation that he should refrain from drinking at donor events so as to not reflect poorly on Georgia Tech. Additionally, HR conducted an investigation regarding the allegations of sexual harassment against Employee Eleven. After the investigation concluded, instead of termination,[10] President Peterson gave Employee Eleven a disciplinary letter (letter of reprimand), asked him to attend executive coaching, and asked Employee Eleven's staff to complete a climate survey (i.e., an anonymous survey inviting them to speak with an investigator) within one year to see if Employee Eleven demonstrated any improvements.

Recently, allegations of racial bias and use of inappropriate language have been made against Employee Twelve (male employee). Durham stated that she believed an outside investigator was conducting an investigation and Employee Twelve had been suspended with pay pending the outcome of the investigation.

### C. Kim Harrington

With the exception of Coach Joseph, Harrington is not aware of any student mistreatment allegations relating to other coaches or Georgia Tech employees.

Harrington recalled that GTAA declined to renew the contracts of Employee Six and Employee Seven due to performance issues. She also recalled allegations against Employee Five that he may have acted inappropriately with a donor's spouse in late 2017 to early 2018. HR conducted an investigation and the investigative findings exonerated Employee Five, concluding that he had not acted inappropriately.

---

[10] Durham stated that, in an era of the #MeToo movement, if the same allegations regarding sexual harassment were raised today, President Peterson would likely have terminated this employee.

13

BOR-0016454

Harrington described other incidents where Georgia Tech terminated male employees "for cause" after determining that the employees mistreated students. In May 2019, Employee Thirteen took a student drinking on a golf cart. The student fell out of the golf cart and was injured. As a result, HR terminated the employee. Sometime in 2015 or 2016, Employee Fourteen allegedly stole a student's Buzz Card and used it to purchase food. HR conducted an internal investigation, and the investigative findings supported the allegation against Employee Fourteen. As a result, HR terminated him. Generally, Harrington stated that acts of theft and endangering a student's safety and well-being are considered "major violations" and terminable offenses.

D. Joeleen Akin

   *i.*  *Georgia Tech*

During her three years at Georgia Tech, Akin has not been made aware of student mistreatment allegations about other coaches. In Akin's view, none of the other coaches with whom she has worked used profanity towards their student athletes in the same way as Coach Joseph. According to Akin, Coach Joseph used profane words "to cut her student athletes down." For Akin, the distinction between "tough" coaching and inappropriate coaching behavior is cursing or yelling to the whole team versus targeting the profanity or yelling at one particular student to publicly shame them in front of others.

While Akin only supervises certain teams, she is not aware of any other Georgia Tech coaches treating student athletes as Coach Joseph was alleged to have done. She attended a field trip with Employee Seven, and she has never seen him use profanity towards any of his student athletes. When describing Employee Four, she said that, while he may have yelled at his student athletes, he generally had a laid back demeanor.

   *ii.*  *Other Universities*

While serving as AD for Agnes Scott College from 2003 to 2015, Akin had HR responsibilities that included hiring and firing coaches. In her twelve years at Agnes Scott, she was not aware of any allegations similar to those against Coach Joseph.

Akin did recall terminating one male coach in 2011 or 2012, for making inappropriate comments to his female student athletes. Akin met with him to discuss his comments. After the meeting, he apologized to his team, but the situation did not improve. After Akin saw that the program was not improving and the team had lost trust in the coach, she decided to not renew his contract.

E. Mark Rountree

   *i.*  *Georgia Tech*

Rountree stated that the majority of the complaints he receives involve students complaining about facilities, gear, the equipment room, and food options at the dining hall. However, he terminated Employee Fifteen (female coach) between 2017 and 2018, after a student revealed that she had made inappropriate comments about female dancer-athletes' bodies. Rountree believes a coach should never demean or demoralize a student athlete. As such, he terminated Employee Fifteen and alerted Stansbury of his termination decision.

14

Rountree said that Coach Joseph's relationship with her student athletes seemed "very confrontational" because she typically directed the conversation and the students were not allowed to respond. He believes that a coach can be intense, but is no longer effective if the student ceases to absorb the information presented to them. Rountree said that he saw this happen with Coach Joseph's students, but he did not perceive this issue with the other teams. He stated that Employee Four may have been an intense coach, but the difference between Employee Four and Coach Joseph was that Employee Four never lost his ability to connect with his team and continued to "inspire" his student athletes.

### ii.   Other Universities

As Portland State University's AD from 2015 to 2016, Rountree's role involved the hiring and firing of coaches. Shortly after he started, the women's basketball team skipped practice and came to his office to tell him that they would no longer play for Employee Sixteen (female coach) because she was allegedly verbally abusive[11] to them, and they did not believe she could lead on the court anymore. After an employee corroborated the students' allegations, Rountree assured the team that he would address their concerns and asked them if they would finish out the season. The team agreed, and Rountree escorted the team back to practice. Employee Sixteen refused to continue unless Rountree promised to keep her on as the head coach for another year.[12] Rountree gave her half an hour to rethink her decision and, when she refused to change her position, he terminated her immediately and paid out her contract.

In Rountree's one year as Deputy AD at Miami University (Ohio), from 2013 to 2014, he did not have responsibility for hiring and firing coaches. However, he did recall that senior student athletes from the team came to him and the AD to say they had lost faith in Employee Seventeen (male coach). The AD decided to terminate Employee Seventeen and Miami (Ohio) paid out his contract.

### F.   Shoshanna Engel

Between approximately 2013 and 2016, Engel received a call from the mother of a student athlete on the women's basketball team. The mother told Engel she was concerned about Coach Joseph's "plantation mentality" coaching style, and also that SWA Theresa Wenzel knew about these issues and protected Coach Joseph. Engel alerted Bobinski of the mother's concerns. Ultimately, the student athlete wanted to transfer from Georgia Tech and not pursue any disciplinary actions against Coach Joseph. Engel does not know if an investigation into the allegations was conducted because that decision rested with Bobinski.

Engel stated that Coach Joseph's style was unique among Georgia Tech coaches. For example, Engel told the investigators that Employee Five gets loud and yells, but he does not use profanity and does not "get into a student's face." The only coach that stood out in Engel's mind as one that may have gotten into a student athlete's face is Employee Four. The distinction for Engel was that Employee Four only yelled when a student athlete missed a technical assignment. Generally, Engel described Employee Four as "mellow," whereas she described Coach Joseph as "always aggressive" to her student athletes. She could not remember Employee Six's coaching style and never worked with Employee Seven.

---

[11] Allegedly, Employee Sixteen used profanity with the students and stated to the students, "You guys are f***ing horrible."

[12] According to Rountree, this was the last year of her contract, and her contract was up for renewal.

15

G. <u>John Stein</u>

Shortly after becoming Dean of Students, in approximately 2006 or 2007, Stein received a call from a student athlete's mother who alleged Coach Joseph's mistreatment of her daughter was "off the charts." Specifically, the mother alleged that Coach Joseph was abusive, demoralizing, and vulgar with her language. The student athlete's mother also stated that her daughter could no longer tolerate the abuse from Coach Joseph and wanted to step away from basketball.

Stein asked the mother to have the student athlete reach out to him so that he could further discuss the allegations with her. Stein recalled that, the next day, the student's mother showed up at his office with her daughter, and he escorted both women to GTAA to meet with Radakovich and Wenzel.[13] During the meeting, the mother relayed the same allegations against Coach Joseph and asked for her child to be released from the team and allowed to transfer. Radakovich released her from the team and told the family that he would investigate the allegations.

Stein said that he believed the student's allegations to be credible because he knew Coach Joseph had a reputation for being intense with her players. Although he never followed up, Stein believes that the matter was investigated and that appropriate action was taken because Radakovich told the student athlete and her mother that he would do so.

Stein also recalled a few examples of student mistreatment involving Georgia Tech male faculty members. One instance involved Employee Eighteen. This professor stamped a profane word on students' work product when it contained mistakes. According to Stein, he followed up with the chair of the department to make him/her aware of the student's allegation, and said that the faculty member's behavior needed to stop immediately because of the negative impact it had on students. He does not know what discipline, if any, the faculty member received.

A second example involved Employee Nineteen. A female student relayed her concerns about the faculty member's behavior towards her.[14] The student asked Stein to delay contacting the department chair until after grades were finalized, for fear of retaliation by the faculty member. Ultimately, Stein alerted the department chair to the situation, and the chair spoke to the faculty member.

A third example involved a male engineering faculty member who "threatened to mess with" the visas of certain international students if the international students did not pay him money. Georgia Tech terminated the faculty member.

---

[13] Stein did not alert Durham because this incident occurred prior to the appointment of President Peterson as President of Georgia Tech, and Durham had not yet assumed her role as his Chief of Staff.

[14] Stein recalled that the female student perceived the male faculty member's behavior and attitude as demoralizing, although he did not speak in a derogatory way.

16

## SECTION FOUR:
## INVESTIGATIVE FINDINGS

I.  **Decision to Terminate Coach Joseph's Employment**

Based on the documents reviewed and witness interviews, the investigators did not find evidence that Georgia Tech and GTAA terminated Coach Joseph's employment because of her gender. The decision maker, Stansbury, and other individuals who participated in the decision-making process, all stated that Stansbury decided to terminate Coach Joseph based on the findings contained in the Littler Report. Specifically, Stansbury, Durham, Oliver-Staley, and Harrington all stated that Stansbury terminated Coach Joseph for "good cause" because of: (1) the seriousness of the student mistreatment allegations; (2) USG's strong position against paying out employees who have done something wrong to "avoid a lawsuit;" and (3) Stansbury's belief that, if Coach Joseph were terminated without cause, it would wrongly signal to the community that her conduct was acceptable.

II. **Comparators**[15]

A. <u>Georgia Tech</u>

The investigators did not find any direct comparators at Georgia Tech or GTAA. Neither the witnesses nor the documents identified other Georgia Tech or GTAA coaches, staff, or faculty who were accused of serious and sustained verbal abuse or mistreatment of student athletes.

We note that Rountree terminated Employee Fifteen after students alleged that she made inappropriate comments about female dancer-athletes' bodies. While this coach is not a direct comparator, this termination does show that GTAA's executive staff takes student mistreatment allegations seriously.

> i.   *Close Comparators – Male Coach Engaged in Major NCAA Violation and Male Employees Accused of Student Mistreatment*

Although not identical to the student mistreatment allegations against Coach Joseph, in the following instances, the underlying conduct involved students and was considered to be sufficiently serious to warrant termination.

The closest comparator at GTAA involved Employee One, who allegedly violated NCAA rules. Stansbury considered the coach's offense to be a major violation and stated that he terminated Employee One "for cause."

Other close comparators at Georgia Tech involved male employees who allegedly committed "major" violations under Georgia Tech's policies. As referenced in Harrington's interview, Employee Thirteen was terminated after he took a student drinking on a golf cart, and the student fell out of the golf cart and was injured. Another termination involved Employee Fourteen who allegedly stole a student's Buzz Card and used it to purchase food.

---

[15] NMRS investigators did not independently confirm the information provided by witnesses regarding comparators.

17

        *ii.*       *Other Allegations of Student Mistreatment against Male Employees, But Differing in Kind and Degree from Those Against Coach Joseph*

As referenced in Stein's interview, there were three incidents involving male Georgia Tech faculty members who allegedly engaged in student mistreatment, but the allegations differ in kind and degree from those against Coach Joseph.

B. <u>Other Universities</u>

Stansbury's, Rountree's, and Akin's previous experiences as ADs at other universities reflected that head coaches have been terminated when the evidence corroborated the student athletes' allegations of student mistreatment.

· · · · · · · End of Report · · · · · · ·

18

BOR-0016459