# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| MACHELLE JOSEPH, *Plaintiff*, v. BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA and GEORGIA TECH ATHLETIC ASSOCIATION, *Defendants*. | Civil Action File No. 1:20-cv-00502-TCB |

### DEFENDANT GEORGIA TECH ATHLETIC ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT

Defendant Georgia Tech Athletic Association ("GTAA" or the "Association"), pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Local Rule 56.1, moves for the entry of summary judgment in its favor on all remaining claims asserted against it, as GTAA is entitled to judgment as a matter of law on those claims. GTAA incorporates into this motion all arguments made in Sections III. a-c of Defendant Board of Regents of the University System of Georgia's Brief in Support of its Motion for Summary Judgment ("BOR's Motion") (ECF No. 212) and sets forth additional arguments below in support of this Motion.

As set forth in BOR's Motion, Defendants are entitled to summary judgment

1

on Plaintiff's Title IX and Title VII claims.[1]  GTAA is also entitled to summary judgment on those claims for an additional reason:  As a threshold matter, GTAA is not an appropriate defendant for those claims.  *First*, GTAA is a nonprofit corporation that operates under the control of The Georgia Institute of Technology ("Georgia Tech" or the "Institute") for the purpose of serving the Institute's interests.  It neither receives the kind of federal funding nor enjoys the kind of authority that might subject it to liability under Title IX.  *Second*, GTAA is not subject to Title VII liability because it did not employ Plaintiff, or anyone else, during the time period relevant to this action.  That GTAA is charged with maintaining the Institute's athletics program does not make GTAA an employer under Title VII.

The only separate claim against GTAA—Plaintiff's breach of contract claim—fails because, as BOR's Motion makes clear, *see* BOR's Motion at 13-18, there is no genuine dispute of material fact as to whether there was good cause to terminate Plaintiff's contract with GTAA after an external investigation substantiated claims by multiple student athletes that she had repeatedly subjected them to mistreatment.

---

[1] The remaining claims against GTAA are: discrimination on the basis of sex in violation of Title VII (Count 3), discrimination on the basis of sex and association with a protected class in violation of Title VII (Count 4); retaliation in violation of Title IX (Count 9); retaliation in violation of Title VII (Count 10); retaliatory hostile work environment in violation of Title IX (Count 12); retaliatory hostile work environment in violation of Title VII (Count 13); breach of contract (Count 14); and a claim to recover the expenses of litigation under O.C.G.A. § 13-6-11 (Count 16).

I.  **FACTUAL BACKGROUND**

The Institute has numerous Affiliated Organizations—legally separate nonprofit corporations created for the purpose of assisting the Institute in achieving its strategic goals and priorities.[2]  GTAA is an Affiliated Organization tasked with operating the Institute's athletics program on behalf of the Institute and consistent with Institute policies.  *See* Steward Dep. Ex. 3; Steward Dep. Ex. 7; GTAA-001880.  GTAA's Operating Agreement and Board of Trustees Bylaws, which give the Institute's President power to supervise GTAA and appoint Board members, make clear that the Institute retains authority over athletics.  GTAA-001880; Steward Dep. Ex. 3.  That authority is consistent with the University System of Georgia Policy Manual, under which the President has "ultimate responsibility and authority for the operation, fiscal integrity, and personnel of the institution's athletics program."[3]

GTAA does not receive Title IX funds from the U.S. government.  From 2015 to 2019, GTAA earned the vast majority of its revenue from external sources, with less than 3.2% of its annual revenue in each of those years attributable to support from the Institute.  *See* GTAA's Resp. to Pl.'s Second Set of Interrog. ("GTAA's

---

[2] *See* Affiliated Organizations, Georgia Tech Office of the General Counsel, https://generalcounsel.gatech.edu/affiliated-organizations.

[3] *See* Board of Regents Policy Manual, Official Policies of the University System of Georgia, Policy 4.5.3, https://www.usg.edu/policymanual/section4/C331/#p4.5.8_funding_of_intercollegiate_athletic_programs; *see also* Policy 6.17, https://www.usg.edu/policymanual/section6/C2690.

Interrog. Resp.") at 9-11. This limited support was counted on GTAA's books for accounting purposes, but GTAA did not receive any money directly from the Institute. *Id.* at 7-8; Lewis Dep., 55:16-19.

All individuals in the Athletics Department are Institute employees. GTAA has no employees and has not carried anyone on its payroll since January 1, 2008. *See* GTAA's Interrog. Resp. at 5-6; Lewis Dep., 48:2-11, 281:8-13. GTAA enters into contracts with certain individuals employed by the Institute (i.e., coaches and the Athletic Director), as it did with Plaintiff. *See* GTAA's Interrog. Resp. at 5-6. That contract, and Plaintiff's offer letter from the Institute, state that the Institute was her employer and that the Institute would provide her salary and a comprehensive benefits package. Stansbury Dep. Ex. 7. GTAA had no authority to terminate the employment of Plaintiff or any Institute employee, nor did it have independent discipline or other human resource policies. *See* Lewis Dep., 65:2-11; Steward Dep., 35:21-36:14.

Plaintiff's contract with GTAA could be terminated if the Institute terminated her employment and if good cause existed for that termination. Stansbury Dep. Ex. 7. The Institute terminated Plaintiff's employment based on the Littler Report, after which good cause was found to terminate her contract with GTAA. *See* Stansbury Dep., 229:15-232:15, 237:24-238:16; Peterson Dep. 217:1-25.

4

## II. STANDARD OF REVIEW

Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A mere "scintilla of evidence in support of [a] plaintiff's position [is] insufficient" to create a genuine dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rather, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

## III. ARGUMENT

In addition to the arguments set forth below, in an effort to avoid burdening the Court with unnecessary repetition, GTAA fully incorporates into this brief Sections III. a-c of BOR's Motion. The arguments in those sections apply equally to GTAA and support its argument that summary judgment should be granted to Defendants on Plaintiff's remaining Title VII and Title IX claims.

### A. Plaintiff's Title IX Claims Against GTAA Fail Because GTAA Is Not A Funding Recipient Subject To Title IX Coverage

As this court has found, "Title IX coverage extends only to entities that receive federal funds." Order (May 8, 2020), ECF No. 64 at 11 (citing 20 U.S.C. § 1681(a); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999)). The Eleventh Circuit has stated that for a Title IX claim against a private entity to survive a motion to dismiss, a plaintiff must plead that a federal funding recipient has "provided

extensive funding" *and* "has ceded control over one of its programs" to the private entity. *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007). Although Plaintiff's Title IX claims survived GTAA's motion to dismiss, they must fail at summary judgment. As an initial matter, no court in this Circuit has addressed whether evidence that a funding recipient has "ceded control" over its programs to a private entity is sufficient to subject that entity to Title IX.[4] And here, the record is clear that the Institute neither provided "extensive funding" to GTAA nor "ceded control" over its athletics program to GTAA.

> i. *GTAA did not receive "extensive funding" from the Institute.*

The indirect support GTAA received from the Institute during the time period relevant to Plaintiff's claims was extremely limited and does not amount to the kind of "extensive funding" that might subject a private entity to Title IX. *See Williams*, 477 F.3d at 1294; *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp.

---

[4] The Supreme Court in *Smith* expressly declined to address the theory that private entities are subject to Title IX if federal funding recipients cede control over certain functions to them. *Smith*, 525 U.S. at 469-70. The Eleventh Circuit, acknowledging that the Supreme Court has not resolved that issue, determined that "we leave for the discovery process and the district court to determine whether to treat [the University of Georgia Athletic Association] like a funding recipient." *Williams*, 477 F.3d at 1294. Other courts in this Circuit have expressed skepticism as to whether athletic conferences are subject to Title IX under the "ceding control" theory. *Barrs v. Southern Conference*, 2010 WL 11613799, at *2 (N.D. Al. May 13, 2010) ("the contrary holding in *Smith* and the subsequent lack of acceptance of the control theory by the lower courts cast heavy doubt, at this juncture, on the likelihood that plaintiffs will succeed on the merits").

2d 729, 732 (W.D. Mich. 2000) (athletic association was "neither a direct nor indirect recipient of federal funds" where it "receives the bulk of its funding from gate receipts"). GTAA's annual operating revenues averaged over $82.5 million between 2015 and 2019. *See* GTAA's Interrog. Resp. at 9-11. The vast majority of this revenue—from sources including ticket sales, media rights, NCAA distributions, and royalties—did not come from the Institute or otherwise derive from federal funds. *See id*. In each of those years, less than 3.2% of GTAA's revenue was attributed to support from the Institute. *Id.* This limited support fell into three categories: tuition waivers for out-of-state student athletes, reductions in utility bills that GTAA paid to the Institute, and a portion of the Athletic Director's salary, which the Institute paid directly to the Athletic Director. *Id.* at 7-8; Lewis Dep., 55:21-56:14. For accounting purposes, GTAA counted these funds as revenue, but received no money directly from the Institute. *See* GTAA's Interrog. Resp. at 7-8; Lewis Dep., 55:16-19.

Moreover, there is no evidence that these limited funds included federal dollars. In *Williams*, 477 F.3d at 1294, the Eleventh Circuit cited *Alston v. Virginia High School League, Inc.*, where a high school athletic league was deemed "not subject to liability under Title IX solely by virtue of the fact that it receives membership dues from the high schools that do receive federal funds" because the plaintiff failed to allege that member schools "pay their dues with federal funds

7

earmarked for that purpose." 144 F. Supp. 2d 526, 531 (W.D. Va. 1999). Nothing in the record suggests that the limited indirect support GTAA received from the Institute derived from the types of "federal financial assistance" outlined in relevant regulations. *See* 34 C.F.R. § 106.2(g). To the contrary, two of the categories—the student athlete tuition waivers and reductions in utility bills—reflect payments GTAA owed to the Institute that the Institute relinquished, and thus are clearly not derived from federal funds. As for the portion of salary the Institute paid directly to the Athletic Director, there is simply no evidence to suggest that the Institute earmarked federal funds for that payment. Even if that portion of the Athletic Director's salary included federal dollars, it represents an exceedingly small fraction of GTAA's operating budget—nowhere close to an amount suggesting that GTAA should be subject to Title IX.

    ii.   *The Institute has not ceded control over Athletics to GTAA.*

Even if there were a question as to whether GTAA received "extensive" federal funding from the Institute (and there is not), the Institute has not "ceded control" of its athletics program to GTAA. While there is no clear standard in this Circuit for what it means to "cede control," an examination of each document in the record describing the formation of GTAA and the scope of its operations makes

indisputable that the Institute retains ultimate authority over its athletics program.[5]

GTAA is an Affiliated Organization created to operate the athletics program on behalf of the Institute consistent with Institute policy. The record makes clear, however, that the Institute did not relinquish its ultimate authority over that program. Peterson Dep., 99:1-101:5. The Institute's Cooperative Organization Guide Principle Memorandum of Understanding with GTAA provides that GTAA "was created *for the express purpose of serving the interests of the Institution* in carrying out its programs, activities and services" and "shall not engage in activities, programs and services that are in conflict with or inconsistent with the [Institute's] policies, mission and goals." Steward Dep. Ex. 7 (emphasis added). Under GTAA's Operating Agreement, which outlines its status as a cooperative organization "organized and operated to promote the educational program of [the Institute]," the Institute's President retains power to "appoint all or a portion of the members" of GTAA's Board. GTAA-001880. Indeed, former President George Peterson testified that he, as President, was responsible for GTAA, and that the Athletics Department and its Director reported to him. Peterson Dep., 17:14-16, 18:15-24.

The structure of the GTAA Board of Trustees and its bylaws similarly make

---

[5] In *Williams*, the Eleventh Circuit cited favorably to the decision in *Cmtys. for Equity*, 80 F. Supp. 2d at 735-38, where the court closely reviewed an athletic association's constitution and handbook to determine whether a state athletic association for high school sports had a "de facto monopoly over interscholastic sports." 477 F.3d at 1294.

9

clear that the Institute retains ultimate authority over its athletics program. The President of the Institute serves as the Chair of the Board of Trustees, and the bylaws state that he "shall supervise the affairs of the Association." Steward Dep. Ex. 3. The Institute's Executive Vice President for Administration and Finance serves as the Treasurer of the Board and is responsible for GTAA's finances. *Id.* Every other non-student member of the Board is hand-selected by the President of the Institute. *Id.* Any power afforded to GTAA through the bylaws to carry out the operations of the Institute's athletics program is thus controlled exclusively by the Institute.

This structure is consistent with the University System of Georgia (USG) Policy Manual, which provides that "[t]he President of each USG institution is assigned ultimate responsibility and authority for the operation, fiscal integrity, and personnel of the institution's athletics program."[6] Policy 4.5.3. USG Policy further requires that the relationship between any institution and cooperative organization should be maintained *only if*, inter alia, "[t]he relationship is in the best interest of the USG or the USG institution as determined by the Board of Regents and the President of the relevant institution in consultation with the Chancellor" and "[a]ctions of the USG institution's officials, faculty, staff, or employees pursuant to the relationship are consistent with policies established by the Board of Regents and the USG institution." Policy 6.17.2. Nothing in the record suggests that GTAA

---

[6] *See supra* note 3.

operates in any way contrary to the institutional agreements and state policies described above. *See* Lewis Dep., 63:11-64:01; Peterson Dep., 17:14-18:24.

There is thus no dispute that GTAA neither receives the kind of funding nor enjoys the kind of authority that might subject it to liability under Title IX. And extending Title IX coverage to private entities like GTAA that do not receive federal funds and do not have authority over state educational functions is anathema to the concept of Title IX, wherein entities receive federal funds in exchange for promising to abide by Title IX's non-discrimination requirements. *See U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605-06 (1986) (under Title VI, Title IX, and § 504 of the Rehabilitation Act of 1973, "the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision"). Title IX is designed to impose conditions on federal funding recipients, not on private entities. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640-41 (1999) ("The Government's enforcement power may only be exercised against the funding recipient, see [20 U.S.C.] § 1682, and we have not extended damages liability under Title IX to parties outside the scope of this power."). The record simply does not reflect that GTAA entered into a bargain with the federal government to be subject to Title IX and any associated liability.

**B.     GTAA Is Not Subject To Title VII Liability Because It Did Not Have An Employment Relationship With Plaintiff**

GTAA is not a qualified employer subject to Title VII. In determining

whether an entity is subject to Title VII, courts primarily look to "who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim." *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1345 (11th Cir. 1999) (en banc) (citations omitted). The "focal point of the inquiry is not which entity controlled the specific aspect of the relationship giving rise to a discrimination claim, but rather *which entity or entities controlled the fundamental and essential aspects of the employment relationship when taken as a whole*." *Peppers v. Cobb County*, 835 F.3d 1289, 1301 (11th Cir. 2016) (emphasis added). As part of that inquiry, courts consider "the degree of control an entity has over the adverse employment decision." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998). The record is clear that GTAA did not control—and was not authorized to control—the fundamental and essential aspects of the employment relationship between the Institute and employees in the Athletic Department, including Plaintiff.

GTAA has not had employees, issued W-2s, or carried anyone on its payroll since January 1, 2008. *See* GTAA's Interrog. Resp. at 5-6; Lewis Dep., 48:2-11, 281:8-13. Plaintiff's employment documents are clear that her employer was the Institute. Her contract states that "the Georgia Institute of Technology (the "Institute") employs JOSEPH as Head Women's Basketball Coach." Stansbury Dep. Ex. 7. Her offer from the Institute refers to her "employment by the Institute"

12

and makes clear that the Institute—not GTAA—would provide Plaintiff's salary and a comprehensive benefits package. *Id.*; *see also* Lewis Dep., 283:1-11.[7]

Moreover, there can be no dispute that the Institute controls all employment decisions. As stated *supra* p. 8-11, GTAA operates the athletics program on behalf of the Institute. GTAA has no independent discipline or other human resource policies. *See* Lewis Dep., 65:2-11; Steward Dep., 35:21-36:14.[8] The employment policies manual to which Plaintiff was subject was issued by the Institute. *See* Joyce Dep. Ex. 3. Those "fundamental and essential aspects of the employment relationship" were fully within the Institute's authority. *Peppers*, 835 F.3d at 1300-01; *Lyes*, 166 F.3d at 1345 (declining to find joint employer status where one

---

[7] Plaintiff's contract outlines supplemental compensation and benefits that GTAA—as an Affiliated Organization of the Institute—would provide in addition to the salary and benefits provided by the Institute. Stansbury Dep. Ex. 7. The Institute does not view this arrangement as conferring employer status on GTAA. Lewis Dep., 57:20-58:16, 65:19-66:15; Steward Dep., 36:17-37:20, 79:13-23. As President Peterson explained, Affiliated Organizations "are all viewed as part of the Georgia Tech enterprise." Peterson Dep., 99:1-3. And in the case of Plaintiff's contract, the record shows that President Peterson directed the Institute to increase GTAA's budget so that it could supplement Plaintiff's compensation. *Id.*, 101:11-104:4.

[8] Plaintiff's contract sets forth certain duties, including that Plaintiff shall abide by GTAA "rules and policies." Stansbury Dep. Ex. 7. This boilerplate language does not raise a disputed fact as to whether GTAA controlled fundamental aspects of her employment. In reality, GTAA has no rules and policies governing employees. *See* Lewis Dep., 65:2-11; Steward Dep., 35:21-36:14. Any such rules and policies—regarding human resources, discipline, and so on—were *Institute* rules and policies. Joyce Dep., 31:20-32:1, 51:22-52:1; 92:3-19, 101:2-15; Steward Dep., 36:2-14.

entity "filled nearly all of the roles traditionally filled by an employer"). Indeed, the discipline about which Plaintiff complains—including the reprimand and Final Written Warning—was administered by the Institute's Human Resources Department, not by GTAA. Akin Dep., 78:5-79:3; Akin Dep. Ex. 3.

GTAA similarly did not have authority to terminate the employment of any Institute employee. GTAA did not terminate Plaintiff's employment; it terminated its contract with Plaintiff, but the condition precedent for doing so was the Institute's termination of her employment. *See* GTAA's Interrog. Resp. at 19-20. Plaintiff's contract provides that it "will terminate if the employment of JOSEPH . . . is terminated" and if "'Good Cause' exists for such termination." Stansbury Dep. Ex. 7. Accordingly, Plaintiff's contract was terminated *after* the Institute terminated her employment. *See* Stansbury Dep., 229:15-232:15, 237:24-238:16. The termination of Plaintiff's employment is the central "adverse employment decision" at issue in this case—a decision GTAA did not control. *See Llampallas*, 163 F.3d at 1244-45; *Scott v. Sarasota Drs. Hosp., Inc.*, 688 F. App'x 878, 886-87 (11th Cir. 2017) (hospital was not a joint employer where health care provider supervised employee; was responsible for pay, benefits, insurance, and taxes; and maintained the power to terminate employees).

### C. GTAA Did Not Breach Its Contract With Plaintiff

Plaintiff's breach of contract claim must fail because there can be no dispute

that there was good cause to terminate her contract. As discussed, the contract provides that it "will terminate if the employment of JOSEPH . . . is terminated" and if "'Good Cause' exists for such termination." Stansbury Dep. Ex. 7. "Good Cause" is defined to include: "[i]nvolvement in conduct that the Athletic Association, in its sole discretion, reasonably considers injurious to the reputation of the Association or the Institute" and "[s]erious or repeated misconduct." *Id.*

As discussed on p. 13-18 of BOR's Motion, Plaintiff's employment was terminated based on the Littler Report, Stansbury Dep., 229:15-232:15, which substantiated claims by multiple student athletes that Plaintiff had subjected them to mistreatment. Mr. Stansbury thus terminated Plaintiff's contract. *Id.* at 237:24-238:16. There can be no dispute that he relied on the Report's findings to make this decision, or that the substantiated abuse outlined in the Report constituted conduct "injurious to the reputation of the Association or the Institute" and/or "serious or repeated misconduct." Stansbury Dep. Ex. 7; *see Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London*, 766 Fed. Appx. 795, 803-04 (11th Cir. 2019) (finding no genuine dispute existed as to breach of contract after reading contradictory deposition testimony "in the context of the entire record").

### IV. CONCLUSION

For the foregoing reasons, and for the reasons set forth in Sections III. a-c of BOR's Motion, GTAA is entitled to summary judgment on all remaining claims.

Respectfully submitted,

December 31, 2021            By: <u>s/ Tania Faransso</u>
Ronald C. Machen
Tania Faransso
Jamie Yood
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Tel.: (202) 663-6000
ronald.machen@wilmerhale.com
tania.faransso@wilmerhale.com
jamie.yood@wilmerhale.com

Christopher Paul Galanek
Georgia Bar No. 282390
BRYAN CAVE LEIGHTON PAISNER LLP
One Atlantic Center, 14th Floor
1201 W. Peachtree Street, NW
Atlanta, GA 30309
Tel.: (404) 572-6979
chris.galanek@bclplaw.com

*Attorneys for Georgia Tech Athletic Association*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(C) in 14-point Times New Roman type face.

This 31st day of December, 2021

s/ Tania Faransso
*Counsel for Defendant Georgia Tech Athletic Association*

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2021, I electronically filed this **DEFENDANT GEORGIA TECH ATHLETIC ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Joseph Abboud
abboud@kmblegal.com
Lisa J. Banks
banks@kmblegal.com
Kyle Brooks
kbrooks@buckleybeal.com
Edward D. Buckley
edbuckley@buckleybeal.com
Colleen E. Coveney
coveney@kmblegal.com
Matthew Sean Stiff
stiff@kmblegal.com
*Counsel for Plaintiff*

Courtney Poole
cpoole@law.ga.gov
Katherine Powers Stoff
kstoff@law.ga.com
*Counsel for Defendant Board of Regents of the University System of Georgia*

s/ Tania Faransso
*Counsel for Defendant Georgia Tech Athletic Association*