

# Transcript of Kevin Cruse

**Date:** May 26, 2021
**Case:** Joseph -v- Board of Regents of the University System of Georgia, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF GEORGIA
3              ATLANTA DIVISION
4    ---------------------------x
5    MACHELLE JOSEPH,         :
6              Plaintiff,     :
7       v.                    : Civil Action No.
8    BOARD OF REGENTS OF      : 1:20-CV-00502-TCB
9    THE UNIVERSITY SYSTEM OF :
10   GEORGIA, et al.,         :
11             Defendants.    :
12   ---------------------------x
13
14         Deposition of KEVIN CRUSE
15           Conducted Virtually
16         Wednesday, May 26, 2021
17             9:31 a.m. EST
18
19
20
21
22
23   Job No.: 372839
24   Pages: 1 - 211
25   Reported by: Marney Alena Mederos, RPR, CRR
```

**Page 2**

```
1        Deposition of KEVIN CRUSE, conducted
2    virtually.
3
4
5
6
7        Pursuant to notice, before Marney Alena
8    Mederos, Registered Professional Reporter,
9    Certified Realtime Reporter, and Notary Public
10   in and for the State of Maryland.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1        A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3        COLLEEN E. COVENEY, ESQUIRE
4        MARILYN ROBB, ESQUIRE
5        KATZ, MARSHALL & BANKS, LLP
6        1718 Connecticut Avenue, N.W.
7        Sixth Floor
8        Washington, D.C. 20009
9        (202) 299-1140
10
11   ON BEHALF OF THE DEFENDANT BOARD OF REGENTS
12     OF THE UNIVERSITY SYSTEM OF GEORGIA:
13       KATHERINE POWERS STOFF, ESQUIRE
14       OFFICE OF ATTORNEY GENERAL OF GEORGIA
15       40 Capital Square, S.W.
16       Atlanta, Georgia 30334
17       (404) 458-3600
18
19
20
21
22
23
24
25
```

**Page 4**

```
1    A P P E A R A N C E S   C O N T I N U E D
2    ON BEHALF OF THE DEFENDANT GEORGIA TECH
3      ATHLETIC ASSOCIATION:
4        JAMIE YOOD, ESQUIRE
5        WILMERHALE
6        1875 Pennsylvania Avenue, N.W.
7        Washington, D.C. 20006
8        (202) 663-6000
9
10
11   ALSO PRESENT:
12       CALEB WELSH, AV TECHNICIAN
13       MACHELLE JOSEPH, PLAINTIFF
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

C O N T E N T S

EXAMINATION OF KEVIN CRUSE:                    PAGE

By Ms. Coveney                                        8

By Mr. Yood                                          209

E X H I B I T S

(Attached to transcript)

CRUSE DEPOSITION EXHIBIT                        PAGE

Exhibit 1   E-mails,                               57
            BOR-0016272 - BOR-0016315

Exhibit 2   E-mails with attachments,             62
            BOR-0015968 - BOR-0015977

Exhibit 3   E-mails,                               65
            PLAINTIFF007700 - PLAINTIFF007705

Exhibit 4   Handwritten notes and Review          77
            of Amorous Relationship,
            BOR-0024746 - BOR-0024775

Exhibit 5   E-mail,                                82
            PLAINTIFF006901 - PLAINTIFF006902

Exhibit 6   E-mails,                               87
            BOR-004399 - BOR-004402

Exhibit 7   E-mails,                               92
            BOR-0016023 - BOR-0016026

Exhibit 8   E-mails,                               98
            BOR-004412 - BOR-004414

**Page 7**

E X H I B I T S   C O N T I N U E D

(Attached to transcript)

CRUSE DEPOSITION EXHIBIT                        PAGE

Exhibit 20   E-mail, PLAINTIFF007140        162

Exhibit 21   Littler, E. Hoffman, Working   174
             Binder,
             BOR-000583 - BOR-001103

Exhibit 22   E-mails,                       185
             BOR-005386 - BOR-005389

Exhibit 23   E-mails, BOR-001146            189

Exhibit 24   E-mails, no Bates numbers      193

Exhibit 25   E-mails,                       197
             BOR-005105 - BOR-005107

Exhibit 26   11/21/18 letter to President  200
             Peterson,
             PLAINTIFF007585 - PLAINTIFF007586

Exhibit 27   E-mail, BOR-004398             206

**Page 6**

E X H I B I T S   C O N T I N U E D

(Attached to transcript)

CRUSE DEPOSITION EXHIBIT                        PAGE

Exhibit 9    Letter,                        102
             PLAINTIFF007585 - PLAINTIFF007586

Exhibit 10   E-mails,                       114
             BOR-005132 - BOR-005133

Exhibit 11   E-mails,                       122
             BOR-004468 - BOR-004469

Exhibit 12   E-mail,                        125
             PLAINTIFF009702 - PLAINTIFF009708

Exhibit 13   E-mails,                       127
             BOR-000033 - BOR-000038

Exhibit 14   E-mails,                       130
             BOR-004465 - BOR-004467

Exhibit 15   E-mails,                       138
             BOR-004403 - BOR-004404

Exhibit 16   E-mails,                       150
             BOR-000047 - BOR-000051

Exhibit 17   E-mails,                       151
             BOR-000043 - BOR-000046

Exhibit 18   E-mails,                       154
             PLAINTIFF008451 - PLAINTIFF008454

Exhibit 19   Data Access Procedures,        156
             BOR-0024618 - BOR-0024622

**Page 8**

P R O C E E D I N G S

Whereupon,

KEVIN CRUSE

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MS. COVENEY:

Q   Okay.  Well, good morning, Mr. Cruse. Thank you for being here with us today.

As I mentioned earlier, my name is Colleen Coveney.  I'm one of Coach Joseph's lawyers, and I'll be taking your deposition today. I'm going to give you some preliminary remarks here.

So as the court reporter just told you, you are under oath, so you have an obligation to tell the truth here today.

I'm going to be asking you some questions, and the court reporter's going to be transcribing your answers, so it's important that you speak clearly and audibly, and if you -- if you have a yes or no answer, it's important to say yes or no and not just nod your head.

If you don't understand a question,

9

1  just ask me to clarify. I'd be happy to do so.
2      If you need to take a break for any
3  reason, just let me know, and we can go off the
4  record for you to do that.
5      You know, from time to time, defense
6  counsel may object to some of my questions.
7  Please just give them an opportunity to get their
8  objection on the record before you answer, and
9  then once the objection is made, then you can go
10 ahead and answer.
11     And then lastly, because we're doing
12 this remotely, I have a bunch of documents up here
13 on my screen and also on my desk, so it may look,
14 from time to time, that I'm not looking at you,
15 but -- but know that you have my undivided
16 attention today, okay?
17 **A   Sure.**
18 Q    All right. So I'm going to ask you
19 preliminary questions.
20     Have you ever been deposed before?
21 **A   Yes.**
22 Q    Okay. And when was that?
23 **A   Oh, so many years that I can't tell you**
24 **exactly. At least 20, 25 years ago.**
25 Q    Okay. And -- and what was the nature

10

1  of the deposition? Were you a party to a lawsuit
2  or a witness?
3  **A   No. It was -- I think it may have been**
4  **an EEOC charge. It was one of the companies I**
5  **worked for previously.**
6  Q    Okay. So you were not at Georgia Tech
7  at the time?
8  **A   No, no, no. Yeah, this is many years**
9  **ago with another employer.**
10 Q    All right. Is there any mental or
11 physical reason why you would not be able to give
12 accurate and truthful answers to my questions
13 today?
14 **A   No.**
15 Q    Okay. And what did you do to prepare
16 for this deposition?
17 **A   I looked over some notes that I had**
18 **that I actually had provided almost two years ago**
19 **just to sort of refresh my memory.**
20 Q    Okay. And what -- what were those
21 notes? Were those notes that you had taken while
22 Coach Joseph was still employed?
23 **A   Yes. They were specifically notes from**
24 **a couple of meetings that I facilitated with**
25 **Coach Joseph and her staff.**

11

1  Q    Okay. And how many pages of notes were
2  those?
3  **A   Oh, approximately two.**
4  Q    Two, okay.
5      And did you provide those notes to
6  Georgia Tech to produce in discovery in this case?
7  **A   I did.**
8  Q    Okay. All right. So you reviewed some
9  notes.
10     Did you review anything else?
11 **A   No. That was it. That's all I had the**
12 **time to do.**
13 Q    Okay. And did you speak with counsel?
14 **A   No, other than Attorney --**
15 Q    Yeah, and just to be clear, I don't --
16 I don't need to know or want to know what was
17 said, but just if you -- did you have meetings
18 with your counsel prior to today?
19 **A   Yeah, just -- just to prepare for**
20 **today's deposition.**
21 Q    Okay. And how many times did you meet?
22 **A   Once.**
23 Q    Okay. And did you bring any notes with
24 you today to your deposition?
25 **A   No, I did not.**

12

1  Q    Okay. And where are you right now?
2  **A   I am in my office --**
3  Q    Okay.
4  **A   -- on campus. I come in on Wednesdays,**
5  **so...**
6  Q    All right. And are you alone?
7  **A   Yes, I am.**
8  Q    Okay. And do you have your phone with
9  you?
10 **A   I have my cell phone, and there's a**
11 **desk phone.**
12 Q    Okay. And is your -- do you have any
13 programs up, like your computer running?
14 **A   No.**
15 Q    I know your computer's running, but do
16 you have any, like, other external programs
17 running?
18 **A   No, I don't.**
19 Q    Okay. All right. So I'm just going to
20 ask you not to use your phone to be communicating
21 about your testimony today with your counsel. If
22 you communicate with other people, I may ask you
23 about that, and you will need to, you know, answer
24 honestly about those communications, so --
25 **A   Sure.**

13

1       Q     -- be mindful of that.
2             Okay.  So before we get into the facts
3   of the case here, I'm just going to ask some
4   background questions about how you communicate
5   with people at Georgia Tech.
6             So do you currently -- so I guess back
7   up.
8             Are you currently a Georgia Tech
9   employee?
10      **A     Yes, I am.**
11      Q     Okay.  And do you currently have a
12  work-issued phone?
13      **A     Yes, I do.**
14      Q     And what is that phone number?
15      **A     (404) 426-1495.**
16      Q     Okay.  And who issued you this device?
17      **A     The Georgia Tech Human Resources**
18  **Department.**
19      Q     Okay.  And who pays the bill?
20      **A     Georgia Tech Human Resources**
21  **Department.**
22      Q     Okay.  And is the work-issued phone
23  that you have now the same work-issued phone you
24  had in the 2018-2019 school year?
25      **A     Yes, it is.**

14

1       Q     Okay.  And is that an iPhone?
2       **A     Yes, it is, iPhone 6.**
3       Q     Okay.  So in your role as the Human
4   Resources Business Partner at Georgia Tech, do you
5   use your work-issued phone to text message with
6   your colleagues about work-related issues?
7       **A     Very rarely.**
8       Q     Okay.  And in 2018-2019 when you were
9   the Business Partner -- the Human Resources
10  Business Partner in the Athletic Association, did
11  you use text message as a means to communicate
12  with your colleagues about work-related issues?
13      **A     On occasion between me and my**
14  **HR Coordinator, who reported to me directly.**
15      Q     And who was the HR Coordinator at that
16  time?
17      **A     Christine Ackerman for, yeah, the**
18  **majority of that period.  She actually left**
19  **towards the end of December, I believe.**
20      Q     Okay.  In December of 20 --
21      **A     2018.**
22      Q     Okay.  Okay.  So I'm going to run
23  through a list of people, and I'd like you to tell
24  me whether you recall texting them in 2018-2019 --
25  so the year that Coach Joseph was terminated --

15

1   whether you recall texting any of these people
2   about Coach Joseph or any of the issues relating
3   to the Women's Basketball Program around that
4   time, okay?
5             Do you recall texting with Joeleen
6   Akin?
7       **A     I'm going to say yes.  I can't recall**
8   **specifically, but there -- it's very possible that**
9   **I could have had a -- text exchange with**
10  **Joeleen.**
11      Q     Okay.  What about Felicia Tucker?
12      **A     I don't recall.  I really don't.**
13            **Again, very rarely would I use my cell**
14  **phone for texting other than between my direct**
15  **report, Christine Ackerman.  I could see on**
16  **occasion where I may have had a text between one**
17  **of the Sports Administrators or one of the**
18  **Associate Athletic Directors, which Joeleen was.**
19      Q     Okay.  So do you recall texting Mark
20  Rountree during the 2018-2019 school year?
21      **A     Again, it would be very rare if I did.**
22  **I'll just say it's possible.  I don't recall**
23  **specifically.**
24      Q     Okay.  What about Aisha Oliver-Staley?
25      **A     I don't think so.  She was our legal**

16

1   staff, and, you know, I didn't have that kind of
2   relationship with her to -- to text.  I would have
3   either been e-mail or phone.
4       Q     Okay.  What about Julie Joyce?
5       **A     Julie Joyce, yes, that was -- I**
6   **reported to Julie Joyce.**
7       Q     Okay.  And Kim Harrington?
8       **A     No.  She was Julie's boss, and I did**
9   **not -- I don't think I've ever texted her --**
10      Q     Okay.
11      **A     -- that I can recall.**
12      Q     What about Lynn Durham?
13      **A     I would also say no.**
14      Q     Okay.  Kate Wasch?
15      **A     No.**
16      Q     Okay.  And so do you have a personal
17  phone in addition to your work-issued device?
18      **A     I do.**
19      Q     Okay.  And what is that phone number?
20      **A     (678) 362-6992.**
21      Q     Okay.  And do you ever use your
22  personal phone to communicate with your Georgia
23  Tech colleagues about work-related issues?
24      **A     No, I don't.**
25      Q     Okay.  So I'd like to talk briefly with

17

1 you about other ways you communicated with your
2 colleagues about work-related things.
3 So we established that you texted on
4 your work-issued phone occasionally, correct?
5 **A Yes.**
6 Q Okay. And did you send messages to
7 your Georgia Tech colleagues about work-related
8 things on -- on any other messaging platforms?
9 And I'll give you some examples. So
10 WhatsApp. Do you know what WhatsApp is?
11 **A I do.**
12 Q Did you ever --
13 **A No, I don't use that.**
14 Q Okay. What about any social media
15 messages, Snapchat, Twitter, Facebook?
16 **A No. I don't use any of those mediums.**
17 Q Okay. And do you communicate with your
18 colleagues by e-mail?
19 **A Primarily.**
20 Q Okay. And when you communicate with
21 your colleagues about work-related issues by
22 e-mail, do you do that through a Georgia
23 Tech-issued e-mail address?
24 **A Yes, I do.**
25 Q Okay. And what is that e-mail address?

18

1 **A kevin.cruse@ohr.gatech.edu.**
2 Q Okay. And is that the same e-mail
3 address you had when you were the HR Business
4 Partner in the Athletic Association?
5 **A Yes.**
6 Q Okay. And do you ever use your
7 personal e-mail address to communicate about
8 work-related things?
9 **A No.**
10 Q Okay. Have you ever asked a person --
11 an employee of Georgia Tech to send you a
12 sensitive HR complaint to your personal e-mail
13 address?
14 **A No.**
15 Q Okay. Would that be an unusual thing
16 to do?
17 **A Yes, it would. Yes.**
18 Q And do you know -- do you know what
19 Teamworks is?
20 **A I do.**
21 Q And what is Teamworks?
22 **A Oh, that was a -- a medium that we used**
23 **within Georgia Tech Athletic Association to**
24 **communicate.**
25 Q And was it like a -- like an instant

19

1 message thing where you could, you know, talk back
2 and forth with people?
3 **A Yes, it was. Yes.**
4 Q Okay. And did you ever have occasion
5 to use it to communicate with people?
6 **A I can count on one hand how many times**
7 **I've used it.**
8 Q Okay. And when did you use it and why?
9 **A When I was being trained on it in a**
10 **training session. I didn't use it.**
11 Q Okay. Did other people in the Athletic
12 Department use it?
13 **A Yeah, yeah. Quite a few.**
14 Q And what -- what would they use it to
15 do? Was it to, like, schedule meetings, or was it
16 to talk about substantive issues?
17 **A I think all -- all -- all of the above.**
18 **It was a -- it was a communication medium that was**
19 **primarily utilized to communicate in a more**
20 **instant fashion versus through, you know, e-mail.**
21 **It was used primarily for scheduling.**
22 **So I would say, you know, it was used**
23 **for a wide variety of reasons.**
24 Q Okay. And did the students also have
25 access to Teamworks?

20

1 **A Yes, they did.**
2 Q Okay. So now I'd like to talk a little
3 bit about your note-taking practices.
4 So you work in the HR Department at
5 Georgia Tech, correct?
6 **A Yes.**
7 Q Okay. And in your role as an
8 HR professional, do you -- do you have a habit of
9 taking notes of --
10 **A Yes. In my role, I did.**
11 Q Okay. And did you typically take them
12 by hand?
13 **A Yes.**
14 Q Okay. So it's my understanding that
15 you participated in several meetings and
16 conversations related to Coach Joseph and the
17 events that ultimately led to her termination.
18 Do you recall taking notes of -- of any
19 of those meetings?
20 **A No. And I can count on one hand how**
21 **many meetings I participated in. But I would tell**
22 **you no, other than anything that I was asked to do**
23 **in terms of, you know, pulling a record or**
24 **something to that degree, you know, I would jot**
25 **that down, but no copious notes.**

21

1    Q   Okay.  Okay.  And so -- all right.
2  Well, okay.
3        Are you familiar with the term a
4  litigation hold letter?
5    A   I am.
6    Q   Okay.  And what is your understanding
7  of a litigation hold letter?
8    A   Excuse me if I get this all wrong, but
9  my interpretation of it was that any record, you
10  know, letter, report, et cetera, that's material
11  to, as for an example, this case, that you
12  basically had to sit on it.
13    Q   Okay.  And do you recall receiving a
14  Litigation Hold Letter in this case?
15    A   I do.
16    Q   Okay.  And do you remember who that
17  came from?
18    A   It was one of our campus attorneys -- I
19  can't recall which one -- or it may have -- it
20  actually may have been a legal assistant or
21  coordinator in the Legal Department.
22    Q   Okay.  And was it sent to you by
23  e-mail?
24    A   It was an e-mail.
25    Q   Okay.  And do you -- do you recall

22

1  approximately when you received it?
2        Was it before or after Coach Joseph was
3  terminated?
4    A   Well, I -- I can tell you it was early
5  June, some- -- in the June -- like first week of
6  June or so, or June 10th, 11th, somewhere around
7  there.
8    Q   Of 2019?
9    A   2019.
10    Q   Okay.  And did you take steps to
11  preserve evidence related to this case?
12    A   I did.
13    Q   Okay.  What --
14    A   I did.
15    Q   What did you do when you received that
16  Litigation Hold Letter?
17    A   I just -- I started to go through my
18  files and look for, you know, records, things of
19  that nature that I -- you know, I understood would
20  be perhaps material to this case and just to make
21  sure that, first of all, I could put my hands on
22  them, and -- and actually, that was also prior to
23  receiving specific requests to pull some
24  documents.
25    Q   Okay.  And did you take any steps to

23

1  preserve text messages on your phone?
2    A   I did.
3    Q   Okay.  And --
4    A   I mean -- well, when I say I did, I
5  didn't do anything.  You know, I didn't even look
6  for them or whatever, other than for sharing
7  whatever I was requested to submit.
8        But, yeah, it wasn't like I went
9  through to get rid of anything.
10    Q   Okay.  But did anyone specifically ask
11  you to preserve your text messages that you
12  recall?
13    A   I don't remember that specifically,
14  other than whatever was in the letter that I
15  received or the e-mail.
16        I -- I do recall there were very
17  specific things, you know, as for an example, you
18  know, reports, notes, records, but there were a
19  litany of items that were listed.
20    Q   Okay.  And you -- you recall the
21  day that you received the Litigation Hold pretty
22  precisely.
23        How do you remember that date?
24    A   Because I kept a copy of that e-mail.
25    Q   Okay.  And did you review that before

24

1  today?
2    A   It was a while ago.  I mean, I -- you
3  know, it's -- it was a while ago.  Just until --
4  just within the past week or so that I went back
5  to -- I kept a folder, and I just wanted to
6  refresh my memory of certain things that I
7  anticipated I might be asked about.
8    Q   Okay.  And when you were asked to
9  provide documents, do you recall what you were
10  asked to provide?
11        MS. STOFF:  I'm just going to object to
12  the extent it goes into our attorney work product
13  and attorney-client privileged communications
14  between our office and at our direction related to
15  discovery.
16        MS. COVENEY:  Sure.  Well, I can
17  rephrase.
18  BY MS. COVENEY:
19    Q   Mr. Cruse, when you provided documents
20  to Georgia Tech, what -- what did you provide
21  them?
22    A   Just basically a personnel file.
23    Q   Coach Joseph's personnel file?
24    A   Yes.
25    Q   Is that it?

25

1     A     Pretty much. Just the contents of
2  Coach Joseph's personnel file.
3     Q     Okay. Okay. So now we're going to
4  talk a little bit about your employment background
5  and your experience.
6           So you are a current Georgia Tech
7  employee, correct?
8     A     Yes.
9     Q     Okay. And when did you first start
10 working at Georgia Tech?
11    A     I was hired February 15th, 2015.
12    Q     Okay. And what position did you hold
13 first?
14    A     The current position, Human Resources
15 Business Partner.
16    Q     And what department were you in?
17    A     The Scheller College of Business.
18    Q     Okay. And at some point, you were --
19 you were transferred to the Athletic Association;
20 is that right?
21    A     Correct.
22    Q     Okay. And when did that happen?
23    A     June of 2017.
24    Q     Okay. And why were you transferred to
25 the Athletic Association?

26

1     A     My colleague at the time who held the
2  position of HR Business Partner had resigned, and
3  so it created an opening, and I was interested in
4  the opportunity to work for the Athletic
5  Association.
6     Q     Okay. So in your role as the Human
7  Resources Business Partner for -- did you say the
8  College of Business? Is that what --
9     A     Yes, Scheller College of Business.
10    Q     So what are your -- what are your
11 primary duties in that role?
12    A     I'm basically the HR support to the
13 college. I provide all HR services and support
14 with regards to staffing, Employee Relations, you
15 know, all of the ancillary HR-related activities
16 that fall under the umbrella of HR management.
17    Q     Okay. And when you were the
18 HR Business Partner for the Athletic Association,
19 what were your primary duties?
20    A     Same, yeah.
21    Q     Okay.
22    A     It was basically the same.
23    Q     Okay. And so then at some point, you
24 went back to the College of Business, correct,
25 because --

27

1     A     Yes.
2     Q     -- that's where you are right now,
3  right?
4     A     Uh-huh.
5     Q     Why did you leave the Athletic
6  Association?
7     A     My colleague who was supporting
8  Scheller College of Business at the time was
9  interested in leaving Scheller, and -- and right
10 around the same time, I had an interest to come
11 back to Scheller. So we brokered a -- the
12 opportunity that was presented to us to swap, if
13 you will.
14    Q     Okay. And -- did you not like
15 working in the Athletic Association?
16    A     Actually, I loved working in the
17 Athletic Association, but, you know, I -- I felt
18 that I didn't have the adequate staff support that
19 I needed to do the job fully and effectively, and
20 so, you know, that -- that was -- also led into my
21 decision to take the opportunity to go back to
22 Scheller College.
23    Q     Okay. And what staffing did you think
24 you needed in the Athletic Association?
25    A     I actually -- I was hoping to get

28

1  another full-time staff person and a part-time
2  student assistant or temporary person to help out
3  with the load, and financially, it just couldn't
4  be done. I understood that, but at the same time,
5  I just felt more comfortable to -- with regards to
6  returning to Scheller College.
7     Q     Okay. And in your role as the
8  HR Business Partner for the Athletic Association,
9  who did you report to?
10    A     I'm sorry, can you repeat that
11 question?
12    Q     Of course.
13          In your role as the HR Business Partner
14 for the Athletic Association, who did you report
15 to?
16    A     I had a dotted-line reporting
17 relationship to Stodd (ph) -- to, excuse me, Todd
18 Stansbury, and I had a solid-line reporting
19 relationship to Julie Joyce at GTHR.
20    Q     Okay. And so -- and Julie Joyce
21 was the -- was -- in 2018-2019 was the Senior
22 Director of Human Resources --
23    A     Yes.
24    Q     -- is that correct?
25    A     Yes.

29

1    Q    Okay.  You reported directly to her --
2    A    **Yes.**
3    Q    -- correct?
4         Okay.  And so did she -- did she
5    oversee your work?
6    A    **Very loosely.  The e-mail was a**
7    **solid-line reporting relationship.  Day in and day**
8    **out, I interfaced with Todd and his staff at the**
9    **Association.**
10   Q    Okay.  And so was Ms. Joyce technically
11   supposed to be reviewing your work or supervising
12   your work?
13   A    **Well, yeah, she did from a distance.**
14   **We'd have, you know, regular check-ins, as she did**
15   **for all of the other HR Business Partners around**
16   **campus, but on a day-in-and-day-out basis, I**
17   **pretty much, you know, reported to Todd Stansbury.**
18   Q    Okay.  And what did you understand
19   Ms. Joyce's role to entail, her role as the Senior
20   Director of HR?
21   A    **Well, she had -- she had direct**
22   **responsibility for my work.  She managed me as**
23   **well as the other Business Partners around campus**
24   **in more of an advisory capacity.**
25        **She was there for us if we needed**

30

1    **assistance to work through any issues.  She kept**
2    **tabs on, you know, what we were doing.  You know,**
3    **it was that type of a working relationship, if you**
4    **will.**
5    Q    Okay.  And -- and what about Kim
6    Harrington?  Did you have any sort of working
7    relationship with her when you were in the
8    Athletic Association?
9    A    **Very little.**
10   Q    Okay.
11   A    **Very little.  You know, just from, you**
12   **know, when I would attend GTHR staff meetings that**
13   **were facilitated by her, you know, I might answer**
14   **a question or I might have some small talk with**
15   **her before or after a meeting, but nothing in any**
16   **real, you know, official capacity as far as my**
17   **day-to-day work at the Athletic Association.**
18   Q    Okay.  And then you said you also had a
19   dotted-line reporting to Todd Stansbury; is that
20   right?
21   A    **Correct.**
22   Q    Okay.  And who is Todd Stansbury?
23   A    **Todd Stansbury is the Athletic**
24   **Association Director.**
25   Q    Okay.  And so did you meet with him

31

1    regularly to check in about your work in the
2    Athletic Association?
3    A    **I met with him as part of his immediate**
4    **staff on a weekly basis, standing meeting.**
5    Q    Okay.
6    A    **Yeah.**
7    Q    And what about Marvin Lewis?  Did
8    Marvin Lewis have any supervisory authority over
9    you?
10   A    **No, he didn't.**
11   Q    Did he play any role in Human Resources
12   in the Athletic Association?
13   A    **We worked closely together, because he**
14   **was over Finance.  He was the Finance Director**
15   **basically for the Athletic Association, so HR and**
16   **Finance, you know, worked very closely together**
17   **particularly, for an example, with contracts and**
18   **things of that nature.**
19   Q    Okay.  So, I mean, did -- did you
20   update him on various things that were going on in
21   Human Resources and the Athletic Association?
22   A    **Primarily if they related to, you know,**
23   **a contract, a coach's contract.**
24   Q    Okay.  Okay.  And so earlier we talked
25   about the fact you had a work-issued phone when

32

1    you were in the Athletic Association.
2         Did you just have -- did you just have
3    one phone, one work-issued device?
4    A    **Yes.**
5    Q    Okay.  And you just had that
6    one e-mail address, that e-mail address that you
7    still have today --
8    A    **Correct.**
9    Q    -- kevin.cruse@ohr?
10   A    **Yes.**
11   Q    Okay.  And in your role as an
12   HR Business Partner for the Athletic Association,
13   were you paid separately by Georgia Tech and the
14   Athletic Association, or did you just get one
15   lump-sum check from Georgia Tech?
16   A    **Yeah, I was paid through campus,**
17   **Georgia Tech.**
18   Q    Okay.  Okay.  So it's my understanding
19   that Ms. Joyce oversaw the HR Business Partners at
20   Georgia Tech and that she also oversaw a group of
21   Employee Relations Specialists?
22   A    **That's correct, yes.**
23   Q    Okay.  And what's the difference
24   between a Business Partner and an Employee
25   Relations Specialist?

33

1      A     The Employee Relations Consultant was
2   primarily charged with managing Employee Relations
3   issues.  The staff was -- they were divvied up in
4   terms of the number of business units around
5   campus that they had that charge for, whereas the
6   HR Business Partner was an HR Generalist, if you
7   will, assigned to a specific business unit that
8   would provide HR management services and support
9   to that unit.
10     Q     Okay.  And so was there overlap between
11  what you as the HR Business Partner did for
12  athletics and what the Employee Relations
13  Specialist handled?
14     A     To some degree.  It was actually -- we
15  would work together, "we" being the HR Business
16  Partner and the Employee Relations Consultant, on
17  any particular Employee Relations issue.
18         As for an example, if I had an ER issue
19  at the Athletic Association or here at Scheller,
20  typically, I would handle it at its initial
21  onslaught, if you will.
22         If it became an issue that I felt
23  required additional bandwidth to manage, then I
24  would reach out to my Employee Relations
25  Consultant to assist me with that matter or

34

1   perhaps maybe even turn it over to the Employee
2   Relations Consultant to -- to handle.
3      Q     Okay.  And the Employee Relations
4   issue, when you say that, to what are you
5   referring?
6          Like, what are the types of Employee
7   Relations issues that you typically would try to
8   handle on your own in the first instance?
9      A     Sure.  If there's any sort of grievance
10  or, you know, if -- as for an example, if a staff
11  member came to me or my department and said that
12  they had an issue with another staff member or
13  perhaps their supervisor, whatever the case may
14  be, I would take the time to listen to what that
15  issue was and then determine, you know, what or if
16  any further action needed to be taken on it.
17     Q     Okay.  What about staff complaints
18  alleging discrimination?
19     A     That would almost immediately inspire
20  me to reach out to my Employee Relations
21  Consultant just to make them aware of it.
22         I would probably in that case do the
23  initial investigation with the -- with the
24  complainant, and -- and then from there determine
25  whether I needed to engage my Employee Relations

35

1   Consultant.
2      Q     Okay.  And what about a staff complaint
3   of retaliation?
4      A     Oh, same thing.  Almost immediate.
5      Q     Okay.  And these were the practices you
6   would -- that you employed when you were in the
7   Athletic Association too --
8      A     Yes.
9      Q     -- correct?  Okay.
10         Okay.  So when you say that -- that
11  the first -- that you would first try to handle
12  the Employee Relations issue on your own, what did
13  that typically look like?  What would you do to
14  try to resolve the Employee Relations issue?
15     A     Well, upon understanding what the
16  complaint is and determining who the other parties
17  were involved in it, I would typically then
18  determine or surmise what I felt was the
19  appropriate action to take beyond that point, and
20  I would typically share with the complainant, you
21  know, where I thought things stood.
22         And if I thought that I needed to
23  engage the other party, I would let them know that
24  up front and also ask them -- well, actually, let
25  me back up.

36

1          I would typically ask the employee,
2   too, what would you like me or how would you like
3   me to handle this matter going forward, just to
4   hear, you know, what they had in mind, what they
5   felt comfortable with, that kind of thing.
6          Depending on the level of -- of, you
7   know, that particular circumstance, I might, you
8   know, go along with whatever it is, but if it were
9   an issue that I felt was serious enough, I would
10  just let them know up front that, you know, I have
11  a responsibility to do X, Y, Z moving forward
12  based on what you've shared with me.
13     Q     Okay.  And so you mentioned that you'd
14  meet -- so you'd meet with the complainant, you
15  would gather some facts to understand what the
16  issue is; is that right?
17     A     Yes.
18     Q     And then you said either you might
19  engage the other party.
20         And by "the other party," do you mean
21  the respondent, the person against whom the
22  complaint was filed?
23     A     Yes.
24     Q     Okay.  And so when would -- when would
25  you notify the other party that this complaint had

**37**

1 been filed against them?
2    A   Well, again, depending on the level of
3 severity, almost immediately.
4    Q   Okay. So if it was a severe complaint
5 or a serious complaint that had been brought to
6 your attention, you would almost immediately
7 notify the respondent of the complaint; is that
8 right?
9    A   That's correct.
10    Q   Okay. And what would the purpose of
11 notifying the respondent of the complaint be?
12    A   Well, to just serve them notice that I
13 received the complaint, it involves them, and more
14 importantly, that I need to schedule an
15 appointment to sit down and discuss the matter.
16    Q   Okay. And so then would you schedule
17 an appointment with the respondent to get his or
18 her side of the story?
19    A   Yes.
20    Q   Okay. And -- and then what would you
21 do after that?
22       After you have both sides of the story,
23 then what do you do?
24    A   Well, depending on the outcome,
25 depending on what I learned, it would determine

**38**

1 whether any further action was -- was necessary,
2 and I would determine what that action would be,
3 or if I felt that it was something that could be
4 reconciled at that particular point between, you
5 know, the employee in this case and the other
6 staff person or the supervisor, I would offer a
7 suggestion on how we could amicably or how they
8 could amicably -- amicably, excuse me, move
9 forward.
10    Q   And so would that -- would that be your
11 first step typically, to try to resolve it
12 informally first to see if you could broker a
13 mediated resolution?
14    A   Yes.
15    Q   Okay. And then -- so if informal
16 resolution was not possible, then what would you
17 do?
18    A   Well, typically at that point, then, I
19 am going to most likely engage my Employee
20 Relations Consultant Representative.
21    Q   Okay. And then the Employee Relations
22 Consultant, would it be him or her who would
23 decide whether to open up an investigation, or
24 would you work together to do that?
25    A   We'd work together, but at that point

**39**

1 in time, you know, when- -- whenever the Employee
2 Relations Consultant is brought into an issue
3 because it's, you know, significant enough or
4 warranted for them to be brought into it, they
5 will typically then take the lead, you know, on
6 other actions that are necessary.
7    Q   Okay. And so in 2018-2019, who was the
8 Employee Relations Specialist that you would
9 report an Athletic Association employee dispute
10 to?
11    A   Sure. There were a number of staff
12 changes around that time. I know I ended up -- I
13 know I ended up being supported by a consultant by
14 the name of Lori Douglas.
15    Q   Okay.
16    A   I don't know if Lori was the ER support
17 person for the Athletic Association when I started
18 in 2017, and one of the reasons why I can't
19 remember who that might have been is because I
20 didn't really have any issues during the early
21 part of my tenure at the Athletic Association. It
22 was only on the latter part as I -- you know, the
23 last year or maybe months before I actually left.
24    Q   And when was it that you left
25 the Athletic Association?

**40**

1    A   I left in May of 2019.
2    Q   Okay. Okay. So -- so you have an
3 employee dispute, you try to resolve it
4 informally. If no informal resolution's possible,
5 you would notify the Employee Relations Specialist
6 to get -- to talk to them about next steps.
7       The two of you would talk about next
8 steps, and then -- and then the Employee Relations
9 Specialist would typically take the lead on
10 handling any investigation that happened after
11 that; is that right?
12    A   That is correct.
13    Q   Okay. And would the Employee Relations
14 Specialist typically keep you in the loop along
15 the way of that investigation?
16    A   Yes.
17    Q   All right. And then -- so they have an
18 investigation, and then once the investigation is
19 over, would the two of you -- you and the Employee
20 Relations Specialist, would you meet to talk about
21 the findings of the investigation and the
22 appropriate next steps?
23    A   Yes, if warranted, and when I say
24 warranted, meaning that if there were some action
25 steps that were required as a result of that

41

1  conflict, that, you know, perhaps maybe there
2  needed to be some adjustments made within the
3  unit, then, absolutely, the Employee Relations
4  Consultant and myself would discuss, you know,
5  what those actions were.
6      Q    Okay.  And did you ever -- did you ever
7  lead any investigations in the Athletic
8  Association of Employee Relations issues?
9      A    I'm going to say no in the context that
10 when you -- and I may ask you to just clarify
11 further your question with regards to leading.
12     Q    Yeah.  So were there any instances
13 where you did an investigation of an Employee
14 Relations issue primarily on your own?
15     A    Yes, it was -- and I'll give you an
16 example, where an employee came to me and they had
17 a grievance or, you know, something was bothering
18 them or whatever.
19          I met with them to discuss it.  We, you
20 know, reached a decision on what needed to be
21 done, and whatever that was, it was completed,
22 done, matter over.
23          That would be the extent of me leading,
24 you know, an issue, an Employee Relations issue.
25     Q    Okay.  And prior to Georgia Tech, can

42

1  you give me just a brief rundown of your
2  employment history prior to Georgia Tech?
3      A    Sure.  It was primarily Human Resources
4  management.  I worked primarily for large
5  corporations, Fortune 500 organizations.  I worked
6  for a Big 6 professional services firm.
7          You know, I've held positions from
8  HR Representative to Vice President of Human
9  Resources.
10     Q    Okay.  And so how many -- how many
11 years of HR experience did you have before coming
12 to Georgia Tech?
13     A    Oh, 25-plus.
14     Q    And do you have any certifications in
15 HR related to --
16     A    I do, yeah.
17     Q    What certifications do you have?
18     A    The SHRM Senior Professional
19 Certification.  Also the Human
20 Resources Certification Institute Professional
21 Certification.  I also have certifications in
22 mediation and coaching.
23     Q    Okay.  And the SHRM, is that the
24 Society for --
25     A    Society of Human Resources Management.

43

1      Q    All right.  And what is that
2  certification for?
3      A    It's called SPHR, Senior Professional
4  in Human Resources.
5      Q    Okay.  Okay.  And are you familiar with
6  EthicsPoint?
7      A    Yes.
8      Q    Okay.  Can you tell me a little bit
9  about what is EthicsPoint?
10     A    It's basically a forum for staff to
11 submit what I would categorize, you know, a
12 significant complaint or issue that they're
13 having, and I -- I haven't had much experience
14 with them.  I -- you know, over here at Scheller,
15 I might have had two, and, actually, they were
16 prior to me returning to Scheller from the
17 Athletic Association.
18          But from what I understand, the
19 protocol is they get submitted, and they go
20 directly to our Legal unit on campus.
21     Q    Okay.  And you say that it's the
22 mechanism used to report a serious complaint; is
23 that right?
24     A    Well, that's my own wording.  I -- you
25 know, anything that -- that's considered an ethics

44

1  complaint is something that's deemed pretty
2  serious, although I know a number of them do
3  get -- or have in the past get submitted, and they
4  were probably issues or cases that could have been
5  easily, you know, reconciled, if you will, at the
6  unit level.
7      Q    Okay.  So did you ever receive or
8  review EthicsPoint complaints?
9      A    I've never seen one.
10     Q    Oh, okay.
11     A    I've never -- no, I've never -- I've
12 never read one.
13     Q    Okay.  Okay.  So I'm going to switch
14 gears a little bit and talk about some people in
15 the Athletic Department.
16          So do you -- do you know who Paul
17 Johnson is?
18     A    I do.
19     Q    And who is Paul Johnson?
20     A    He was the head football coach.
21     Q    At Georgia Tech?
22     A    Georgia Tech.  I'm sorry.
23     Q    And did you ever observe Coach Johnson
24 at football games?
25     A    Yes, just other than watching a game,

---

45

1  you know.  Primarily on TV, and when I did have
2  tickets one season.
3     Q    Do you know what his reputation was as
4  a coach?
5     A    Yes.  I mean, I -- he -- he -- the
6  reputation that I know of personally is that he
7  was a just, you know, old-school coach, you know,
8  fundamentals, you know, he -- he was -- I mean,
9  that's -- that's the extent of what I -- I know
10 about his style, if that's the question.
11    Q    Okay.  And to your knowledge, did any
12 student ever complain about Coach Johnson's
13 coaching practices?
14    A    No, not to me.
15    Q    Not to you?
16    A    And I'm not aware of any complaints
17 from student athletes.
18    Q    Okay.  So you're not -- okay.  So when
19 you took over as the HR Business Partner for the
20 Athletic Association, did anyone either in the
21 Athletics Department or in the HR Department ask
22 you to monitor for trends in Coach Johnson's
23 program?
24    A    No.
25    Q    Okay.  So you're not aware that in

---

46

1  March of 2016, a football player filed an
2  EthicsPoint complaint against Coach Johnson
3  alleging moral and emotional abuse?
4     A    I was not aware of that, and, actually,
5  I wasn't aware of that until you just shared that
6  with me right now.
7     Q    Okay.  All right.
8          Okay.  So -- so earlier we talked a
9  little bit about Marvin Lewis, and Marvin Lewis,
10 he was the Associate Athletic Director of
11 Administration & Finance; is that right?
12    A    Correct.
13    Q    Okay.  And he -- and tell me a little
14 bit more about the role that he played in Human
15 Resources in the Athletics Department.
16    A    Sure, absolutely.
17          So Marvin basically had a dual
18 relationship.  He was also a Sports Administrator,
19 meaning that he managed a couple programs.  He
20 managed the Men's Basketball Program.  He also
21 managed Track and Field.  So that was all of the
22 sports-related responsibilities that he was
23 charged with.
24          And then his administrative
25 responsibilities was that of the -- basically the

---

47

1  finance leader for the Athletic Association.
2          Finance and HR worked rather closely in
3  terms of, you know, compensation, in particular.
4  Marvin was responsible for contracts -- all
5  contracts, coaches' contracts, and a few of the
6  administrative staff that also had agreements or
7  contracts.
8          Where he and I worked closest was in
9  and around contracts.  He basically was -- was the
10 overseer of them, and I was the executor of them.
11 And what I mean by that is, as for an example, if
12 a contract was coming up for renewal, he would do
13 all of the prep work, he would provide all of the
14 details, if there were going to be any, you know,
15 changes in that contract in terms of its
16 extension, the -- the -- the -- the finances as
17 far as the -- whatever increase there may be, he
18 would manage all of that, make sure it was in
19 place, and then my responsibility was just making
20 sure that it would get executed.
21    Q    Okay.  So we have a document that's
22 been produced in this case that notes that
23 someone -- and it may have been you, I'm not
24 sure -- alleged that Marvin Lewis may have been
25 de facto over the Athletic Association's Human

---

48

1  Resources Department.
2          Have you ever made a statement like
3  that?
4     A    No, not me personally, and I don't know
5  who, but I do know that that was a sentiment that
6  was -- some felt that he was the overseer of Human
7  Resources.
8     Q    Okay.  And Human Resources generally --
9     A    For the Athletic --
10         (The Reporter clarified the record.)
11 BY MS. COVENEY:
12    Q    So he was -- there was a sentiment
13 within the Athletic Association that Marvin Lewis
14 was de facto over HR in the Athletic Association?
15    A    I'm aware that there were a few people
16 within the Athletic Association who had that
17 perception, I'll say.
18    Q    Okay.  And who was it that had that
19 perception?
20    A    I -- I -- I honestly can't tell you who
21 specifically, because I don't know.  It was just
22 one of those general things that, you know, I
23 would hear in passing, you know, that, you know,
24 some folks would just -- I won't say out of
25 ignorance but just not knowing any better, they

---

---

**49**

1  might think just from, you know, looking on the
2  surface that he did hold responsibility over HR
3  because of, you know, again, the proximity of --
4  of the two departments working in tandem with
5  contracts and a couple of other benefits-related
6  type things. There were just some who may have
7  felt just even how Marvin Lewis and I interacted
8  that perhaps maybe that, you know, he was my boss.
9       I would have -- I had a standing
10 meeting with -- with Marvin, you know, which --
11 which I welcomed, because we just had so much
12 activity, so much administrative details between
13 the two units that he and I had to meet routinely
14 just to make sure that we were on point with, you
15 know, certain paperwork getting executed and
16 executed on time.
17    Q    And how frequently were your standing
18 meetings with Mr. Lewis?
19    A    Marvin and I met, I would say,
20 biweekly, every other week.
21    Q    All right. And in those -- those
22 meetings, did you ever talk to Mr. Lewis about
23 HR complaints that had been filed in the Athletic
24 Association?
25    A    No.

---

**50**

1    Q    Okay. So Mr. Lewis was in charge of
2  administration or the business office in the
3  Athletic Association, correct?
4    A    Correct.
5    Q    Okay. And he also -- and he oversaw
6  finances in the Athletic Association, correct?
7    A    Correct.
8    Q    Okay. And in his role overseeing
9  finances, was it your understanding that he helped
10 set the budget for the various athletic programs
11 at Georgia Tech?
12    A    Yes, that's my understanding.
13    Q    Okay. So that would include the
14 Women's Basketball Program, correct?
15    A    Yes, yes.
16    Q    Okay. And then he was -- Mr. Lewis
17 was, and I think still is, the Sports
18 Administrator for the Men's Basketball Program; is
19 that right?
20    A    As I understand, he still is.
21    Q    Okay. And he was as of 2018-2019,
22 correct?
23    A    Yes.
24    Q    Okay. So when you were working as the
25 Human Resource Business Partner for the Athletic

---

**51**

1  Association, were you aware that Coach Joseph had
2  concerns about how much money Mr. Lewis was
3  allocating to her program, to the Women's
4  Basketball Program relative to that which he was
5  giving to the Men's Basketball Program?
6    A    I was -- I think I was made aware of
7  that by Coach Joseph herself.
8    Q    Okay. And when did Coach Joseph make
9  you aware of that?
10    A    I would say either at the tail end of
11 2018 or the beginning of 2019 when she and I
12 started to have more frequent, you know, contact.
13    Q    Okay. And what did she tell you
14 about -- about that issue? How did she articulate
15 her concerns?
16    A    I don't think it was anything any
17 deeper than what you just phrased.
18    Q    Okay. Okay. And did you ever do
19 anything to investigate this claim that Mr. Lewis
20 was giving less money to her program relative to
21 the Men's Program?
22    A    No, I did not.
23    Q    Did you tell anyone about this
24 complaint?
25    A    I don't believe I did, no, that I can

---

**52**

1  recall.
2    Q    And -- and why not?
3    A    Well, first of all, I think, from what
4  I recall, it was just a -- you know, a blanket
5  statement and nothing I believed that was shared
6  with me -- or I wasn't asked to do anything with
7  it. It was just information that was shared with
8  me.
9       So I can't recall specifically why -- I
10 don't even think I thought about, you know -- I
11 don't think it was in my purview to try to do
12 anything about that.
13    Q    Okay. Okay. And did Mr. Lewis ever
14 talk to you about Coach Joseph's complaints about
15 how he was allocating money to her program?
16    A    No, I don't recall. I will tell you
17 this: Marvin Lewis, as well as I did, we
18 respected boundaries, and that was one boundary
19 I -- I think that would have been something that
20 he would have been somewhat guarded in terms of
21 sharing with me.
22       So I -- no, I don't -- I don't recall
23 him ever sharing anything specifically about
24 Coach Joseph or any other coach, other than the
25 coaches that he had responsibility for, and that

---

53

1 was Coach Pastner as well as the two Track and
2 Field head coaches.
3    Q    Okay.  All right.  And are you familiar
4 with Title IX of the Education Amendments Act of
5 1972?
6    A    Yes.  I'm not an expert on it, but
7 yeah.
8    Q    Okay.  So what's your -- what's your
9 general understanding about what Title IX
10 prohibits?
11    A    Discrimination.
12    Q    Okay.  Do you understand it prohibits
13 discrimination on the basis of sex?
14    A    Sex, yeah.
15    Q    Okay.  And that -- and that -- do you
16 understand that it extends to schools' athletic
17 programs, that it prohibits discrimination in
18 athletic programs as well?
19    A    Yes, that's my understanding.
20    Q    Okay.  And in 2018-2019, who was in
21 charge of ensuring that the Athletic Department
22 complied with Title IX?
23    A    Shoshanna Engel.
24    Q    Okay.  Okay.  So we have -- we have
25 Mr. Lewis who's setting the budgets for the

54

1 athletic programs and the Athletic Association,
2 correct?
3    A    Correct.
4    Q    Okay.  And then we have Ms. Engel who's
5 in charge of Title IX compliance, correct, in the
6 Athletic Association?
7    A    Correct.
8    Q    All right.  And are you aware that
9 Mr. Lewis and Ms. Engel are and were for some time
10 before now romantically involved?
11    A    Yes, I was aware of that.
12    Q    Okay.  And do you think that
13 relationship presented potential problems or
14 conflicts of interest with respect to how they are
15 carrying out their job duties in the Athletic
16 Association?
17    A    The only way I could answer that
18 question is to tell you that I saw no evidence of
19 that, so I -- you know, I'm ignorant to, you know,
20 any collusion or anything of that nature based on
21 my role, my interface with -- with the two of
22 them.
23    Q    Okay.  Can you understand how someone
24 might have concerns about their relationship and
25 the impact it may have on their objectivity with

55

1 respect to their job duties?
2    A    Oh, sure, I could, yes.
3    Q    Okay.  And are you aware that
4 Coach Joseph had a specific concern about their
5 relationship, about the relationship between
6 Mr. Lewis and Ms. Engel?
7    A    I was aware of that.
8    Q    Okay.  And were you aware -- well, what
9 did you understand her concern to be?
10    A    Well, the term that I just referenced,
11 collusion, if you will, you know, I believe
12 Coach Joseph shared with me, again, really towards
13 the end of my tenure at Georgia Tech and prior to
14 her leaving the Athletic Association, she -- she
15 did mention to me that she had a concern with
16 respect to their roles and -- and -- as well as
17 their relationship.
18    Q    Okay.  And -- and -- I mean, do you
19 understand -- do you understand why she had these
20 concerns?  She -- she believed -- we just talked
21 about how Coach Joseph had concerns that Mr. Lewis
22 may be giving her program less money than the
23 Men's Program, correct?
24    A    Yes.
25    Q    Okay.  And then we have Ms. Engel --

56

1 and that -- that could be a potential Title IX
2 violation if he was giving less money to the
3 Women's Program based on the sex of either
4 Coach Joseph or her athletes?
5        MS. STOFF:  I'm going to object to the
6 form of the question.  I think it misstates the
7 law.
8 BY MS. COVENEY:
9    Q    Okay.  And -- so to the extent
10 Coach Joseph was raising -- was complaining that
11 Mr. Lewis was violating Title IX, can you
12 understand why she may have felt uncomfortable
13 raising that concern with Ms. Engel?
14    A    I guess I would have to say yes, I
15 would certainly, you know, have that concern.
16    Q    Okay.  And so at some point in
17 2018-2019, it's my understanding that a woman
18 named Bing Wang started an investigation into
19 whether Mr. Lewis' and Ms. Engel's relationship
20 presented conflict of interest issues.
21        Do you recall Ms. Wang looking into
22 Mr. Lewis and Ms. Engel's relationship?
23    A    I really don't.  I -- I may have heard
24 through hearsay that it was going to be looked
25 into, but I never knew that conclusively, and I

57

1  certainly didn't know Ms. Wang or anybody else was
2  actually conducting a kind of investigation into
3  that.
4      Q   Okay.  Okay.  So let's --
5          MS. COVENEY:  Caleb, can we get
6  Exhibit 17, BOR-0016272?
7          AV TECHNICIAN:  What was the file name
8  one more time?
9          MS. COVENEY:  It was Document 17,
10 BOR-0016272.
11         (Cruse Exhibit 1 was marked for
12 identification by the AV Technician and is
13 attached to the transcript.)
14         MS. COVENEY:  May I have control,
15 Caleb, please?
16         AV TECHNICIAN:  (Technician complies.)
17 BY MS. COVENEY:
18     Q   Okay.  Mr. Cruse, this is a very long
19 e-mail thread.  I'm going to scroll to a certain
20 page.
21     A   Okay.
22     Q   Okay.  So -- so right here, we have an
23 e-mail from Bing Wang to you on January 9th.
24     A   Okay.
25         MS. COVENEY:  And then, Caleb, can you

58

1  give Mr. Cruse control of this document?
2          AV TECHNICIAN:  (Technician complies.)
3  BY MS. COVENEY:
4      Q   And then, Mr. Cruse, can you just read
5  this -- this one particular e-mail, and let me
6  know when you're done?
7      A   Sure.
8          Do I have control?
9      Q   You should soon.
10         Do you -- do you now?
11     A   Okay.  Yeah, I do now.  Okay.  Thanks.
12     Q   All right.
13     A   I do recall this now.
14     Q   Okay.
15     A   I'm not -- I'm not done reading it.
16     Q   Oh, I'm sorry.
17     A   I just -- just the very first paragraph
18 jogged my memory.
19     Q   Okay.
20     A   Okay.  I've read it completely.
21     Q   So -- so you do -- you recall
22 now that Ms. Wang looked into this -- Mr. Lewis
23 and Ms. Engel's relationship?
24     A   My -- my memory is refreshed now,
25 absolutely.

59

1      Q   Okay.  Great.
2          All right.  And so who is Ms. Wang, do
3  you recall?
4      A   Well, I don't know if she was actually
5  on our staff at the time, because we had a change
6  in -- in leadership within our Legal Department.
7  So I'm not sure if she was a contracted attorney
8  looking into this or whether she was actually on
9  our staff or not, and I'm careful not to confuse
10 her with our current person over Legal.
11         I think -- no, it's not, so...
12     Q   Okay.  All right.  And so is this -- so
13 the complaint that's alleged here, an amorous
14 relationship -- a potential violation of an
15 amorous relationship policy, is that something
16 that -- that Human Resources could handle?
17     A   Well, it would certainly fall within
18 HR's responsibility to look into it.  Absolutely.
19     Q   Okay.  All right.
20         MS. COVENEY:  Okay.  So, Caleb, can I
21 have control of this document, please?
22         AV TECHNICIAN:  Sorry, I cut out.  What
23 was that?
24         MS. COVENEY:  Can you give me control
25 of the document --

60

1          AV TECHNICIAN:  Yes.
2          MS. COVENEY:  -- please?  Thank you.
3          AV TECHNICIAN:  (Technician complies.)
4  BY MS. COVENEY:
5      Q   Okay.  So Ms. Wang sends you this
6  e-mail on January 9th and asks for your help to
7  gather some documents, and -- okay.
8          So then the next day, January 10th, you
9  respond to her and say, "Hello Bing, I was
10 expecting to hear from Aisha, or someone from
11 Legal Affairs regarding the matter.  I will
12 provide you with the information you requested by,
13 or before, Monday, January 14th."
14         When you say "Aisha," are you referring
15 to Aisha Oliver-Staley?
16     A   Cor- --- yes, I am.
17     Q   Okay.  Okay.  So had she -- had Aisha
18 Oliver-Staley told you about this investigation
19 before?
20     A   You know, I was just thinking about
21 that.  I don't -- I don't recall that she did
22 and, actually, what I initially thought when I
23 read that was that perhaps somebody had to make me
24 aware that that was forthcoming, and I
25 initially thought maybe it was Julie Joyce,

61

1 but I -- I don't -- I can't tell you specifically,
2 because I just don't recall.
3 Q   Okay.  So do you recall any of the
4 details as to how -- why Ms. Wang started
5 investigating this in the first place?
6 A   Yes.
7 Q   Who -- who --
8 A   I'm sorry.
9 Q   Who wanted her to investigate this?
10 A   You know, I'm not so sure.  I think it
11 could have been a number of -- of people, you
12 know, based on speculation.  I -- I -- I don't
13 know specifically who would have initiated that.
14 Q   Okay.  Okay.  And so do you recall
15 Ms. Wang interviewing you as part of this
16 investigation?
17 A   I think she did.  I believe she did.
18 Q   And do you recall anything about that
19 interview?
20 A   Well, she was just asking me very --
21 you know, questions specifically about my
22 involvement with -- with both parties, both
23 individually and together.  That was the line of
24 questioning.
25 Q   Okay.

62

1 A   I think it was basically to find out
2 from me if I ever, you know, saw anything that I
3 felt was inappropriate with regards to, you know,
4 their handling --
5 Q   Okay.
6 A   -- of -- of matters.
7 Q   And do you -- did you take notes of
8 this meeting, do you know?
9 A   I did not.  I believe that was over the
10 telephone.  I don't think that was in person or
11 anything, and I did not.
12 Q   Okay.
13 A   If I can add, that's one of the reasons
14 why I could not recall this meeting until you put
15 this document up.
16 Q   Okay.
17 A   I don't believe I even had a copy of
18 it -- the e-mail saved.
19 Q   Okay.
20     MS. COVENEY:  Okay.  So let's -- Caleb,
21 can we see Document 18, BOR-0015968?
22     (Cruse Exhibit 2 was marked for
23 identification by the AV Technician and is
24 attached to the transcript.)
25     MS. COVENEY:  Okay.  And can I have

63

1 control of this, please?
2     AV TECHNICIAN:  (Technician complies.)
3 BY MS. COVENEY:
4 Q   Okay.  Mr. Cruse, so this is a draft
5 memo summarizing some of Ms. Wang's findings from
6 her investigation.
7     Have you ever seen this document
8 before?
9 A   I have not.
10 Q   Okay.  All right.  If you could just
11 read Section 3 right here, and let me know when
12 you're done.
13 A   Okay.  There's something that's
14 blocking that very first paragraph.  I think --
15 okay.  It's gone now.
16 Q   Okay.
17 A   Okay.  I've read it.
18 Q   Okay.  So it says, "Six out of eight AA
19 Executive Leadership Team members expressed
20 concerns about the impact of the amorous
21 relationship."
22     So, first, what is the Executive
23 Leadership Team?
24 A   Those were all of the immediate direct
25 reports to -- to Todd Stansbury.  So those would

64

1 be Marvin Lewis and -- and Joeleen Akin and all of
2 the other Associate Athletic Directors.
3 Q   Okay.  So were you one of those people?
4 A   I -- I'm going to say yes and no.  I --
5 I reported on a dotted-line reporting relationship
6 to Todd, but I wasn't really -- I wasn't really
7 considered a member of the Executive Leadership
8 Team, and that was the Executive Leadership Team.
9 Q   Okay.  And so these bullet points
10 under -- so we have bullet 1, "Impact on the AA
11 Executive Leadership Team meetings," and then some
12 sub-bullets.
13     Did you tell -- did you make any of
14 these remarks?  Are any of these things that you
15 told Ms. Wang?
16 A   Maybe a couple of them.
17 Q   Which ones?
18 A   Let's see.  If you don't mind, can I
19 read them again?
20 Q   Sure, of course.
21 A   I don't recall if I mentioned or stated
22 any of these to Ms. Wang in my interview, but I
23 will tell you that I understand why the comment
24 was made, because, you know, in participating in
25 these meetings, there were a couple of these

65

1 things.
2        For example, the very last bullet, and
3 I would say the second bullet are consistent with
4 my experience participating in those meetings.
5    Q    Okay.
6        MS. COVENEY: Okay. Caleb, can we --
7 can you take down this document and pull up
8 Exhibit 9, PLAINTIFF007700?
9        (Cruse Exhibit 3 was marked for
10 identification by the AV Technician and is
11 attached to the transcript.)
12        MS. COVENEY:  And can you give
13 Mr. Cruse control of this document, please?
14        AV TECHNICIAN:  (Technician complies.)
15 BY MS. COVENEY:
16    Q    And, Mr. Cruse, if you could just read
17 this, and then let me know when you're done.
18    A    I'm done.
19    Q    Oh, sorry, it's kind of a long e-mail,
20 so I would start at the bottom and then work your
21 way -- your way up.
22    A    Oh, okay.  I do have control?
23    Q    You should have control.
24    A    Oh, okay.  I'm sorry.
25        Okay.  I've read it.

66

1    Q    All right.
2        MS. COVENEY:  And, Caleb, can I have
3 control of this, please?
4        AV TECHNICIAN:  (Technician complies.)
5 BY MS. COVENEY:
6    Q    Okay.  So in the first e-mail in here,
7 we have Rob Norris sending a resignation e-mail to
8 Coach Joseph, and he said, "Historically speaking,
9 you have enjoyed more success then almost any
10 other coach at GT.  I found though the environment
11 at GT very difficult due to the constant turnover
12 and lack of leadership within the administration.
13 During my tenor it also seemed that Women's
14 basketball was being targeted by various
15 departments.  Quite frankly, the program did not
16 get the attention it deserved, which made the job
17 more difficult and less full-filling."
18        Okay.  So do you -- do you know who Rob
19 Norris is?
20    A    Yeah.  He was a former assistant coach.
21    Q    An assistant coach of the
22 Women's Basketball Program?
23    A    Of the Women's Basketball Program.
24    Q    Okay.  And do you know what he's
25 referring to here about the "Women's basketball

67

1 program was being targeted by various
2 departments"?
3    A    I think I -- I'm just going to tell you
4 I don't know conclusively, but I -- my
5 interpretation of that is he may have been
6 referencing the Shoshanna -- Shoshanna Engel's
7 department.
8    Q    Okay.  And so was there -- was there a
9 rumor that there was tension between Shoshanna
10 Engel's department and the Women's Basketball
11 Program?
12    A    It was rumored that -- you know, that
13 the Basketball Program felt that they were
14 unfairly, you know, on the receiving end of -- of
15 overburdensome, if you will, rules and regulations
16 from Shoshanna Engel's department.
17    Q    Okay.  And she was over Compliance,
18 Shoshanna Engel?
19    A    Compliance, yeah, uh-huh.
20    Q    Okay.  And do you recall who -- who
21 told you about this alleged tension?
22    A    I don't.  That was -- well, actually,
23 no.  Let me take that back.  I -- I think
24 Coach Joseph may have even mentioned to me that
25 she felt that, you know, her department, her

68

1 program was obsessively on the receiving end of,
2 you know, the rules and regulations from
3 Compliance.
4    Q    Okay.  So -- so then later that day --
5 so Mr. Norris resigns, he copies Mark Rountree in.
6 Mr. Rountree responds, and then they have an
7 exchange back and forth, and then Mr. Rountree
8 forwards this whole exchange to and said that
9 "Rob Norris has resigned effective immediately."
10    A    Uh-huh.
11    Q    And so is this some- -- do you deal
12 with employee resignations in the Athletic
13 Association, or did you when you were there?
14    A    Yes.  All resignations, I have to be
15 made aware of them so that I can effectively have
16 the staff person terminated in the system at the
17 appropriate time and also to stick their
18 resignation letter in their personnel file.
19    Q    Okay.  And who is Christine Ackerman?
20    A    Christine Ackerman was my direct
21 report.  She's an HR Coordinator.
22    Q    Okay.  And then you -- you forward the
23 entire thread to Marvin and say, "Per our
24 conversation...confidentially."
25        Okay.  So do you -- what is this

69

1  about --
2      A    The only thing I --
3      Q    -- do you know?
4      A    Yeah.  When I read that, I immediately
5  went back to why I had forwarded that over to him,
6  and I believe we -- I don't recall succinctly, but
7  I believe Marvin had questioned the resignation.
8          I don't know if it was earlier that day
9  or the day before or whatever, but I know that
10 there was probably an exchange between he and I,
11 and then I was following up to forward him the
12 details of that resignation.
13     Q    Okay.  And -- and why -- why did -- why
14 do you believe Mr. Lewis was questioning the
15 resignation of Mr. Norris?
16     A    You know, I just don't know why.  Let
17 me just think about it a little bit more.  I --
18 I -- nothing came to mind as to why, but --
19     Q    So around this time, an investigation
20 had been opened into Coach Joseph's program
21 looking into whether she or any of her assistant
22 coaches had paid money for a player.  So there was
23 this NCAA inquiry into the Women's Basketball
24 Program around this time.
25         Could that -- does that help jog your

70

1  memory about why Mr. Lewis --
2      A    No, it doesn't, because I wasn't aware
3  of that investigation.
4      Q    Okay.  And so -- so you forward
5  this to Mr. Lewis, and did Mr. Lewis, did he have
6  any -- did he play any role in effectuating
7  resignations?
8      A    No.  Just, you know, for -- from a
9  standpoint when any coach or administrative staff
10 person with an agreement, you know, with a
11 contract, if you will, that, yeah, he -- he would
12 be involved, because then we would have to take a
13 look at the contract and determine if there are
14 any payouts and things of that nature.
15         So to that degree, yes, he would.
16 Beyond that, I don't -- I can't think of any other
17 reason.
18     Q    Okay.  But it sounds like maybe you all
19 had been talking about more than just effectuating
20 a res- -- the resignation.
21         Could the resignation be something you
22 wanted to keep confidential?
23     A    Oh, absolutely, yes, because it was not
24 announced.  You know, that's just protocol.  Until
25 there's a formal announcement that someone has

71

1  tendered their resignation, you know, it would,
2  you know, come from either their supervisor or
3  whomever, perhaps maybe even the Sports
4  Administrator, yeah, that -- that would be kept
5  under wraps until it was formally acknowledged.
6      Q    All right.  So Mr. Lewis says,
7  "Kevin - Thanks for forwarding.  Interesting to
8  read Rob's resignation and Mark's response," and
9  then you said, "I thought so as well."
10         So what did you think was interesting
11 about Rob's resignation?
12     A    Well, for me personally, it was
13 probably, you know, just from rereading that, his
14 concerns with management.
15         I don't know if that was what Marvin
16 interpreted as -- as -- as interesting, but that's
17 what resonated with me, that there were concerns
18 with the administrative staff, and I would say
19 very specifically I think what he was referencing
20 as far as his concerns with management was perhaps
21 maybe the Compliance Department.
22     Q    Okay.  And you're saying that's
23 interesting -- that's what you find interesting
24 today, or that's what you found interesting then?
25     A    Well, that's what I felt was

72

1  interesting when I read it.  If I were to go back
2  and reflect on it, I would still find that that
3  was probably the most interesting thing that was
4  mentioned in his resignation letter.
5      Q    Okay.  And -- and why -- why is that
6  interesting?
7      A    Because I think there were some other
8  opinions.  You know, it was -- it was hearsay that
9  perhaps the Compliance Department, you know, was
10 perhaps maybe a little over the top, if you will,
11 in performing their responsibilities.
12     Q    And what were the other opinions?
13     A    I -- I think they would resonate to
14 what I just said in terms of that department, you
15 know, feeling like there was overreach, if you
16 will, by that -- that business unit.
17     Q    That the Women's Basketball Program
18 thought that Shoshanna's business unit was
19 overreaching; is that what you're saying?
20     A    Yes.
21     Q    Okay.  Okay.  So -- so by the end of
22 the 2017-2018 school year, you had worked in the
23 Athletic Association's HR Department for about a
24 year; is that right?
25     A    Correct.

73

1    Q    Okay.  And in that time, you had fairly
2  regular interactions with Mr. Lewis; is that
3  right?
4    A    Yes.
5    Q    And Mr. Stansbury, correct?
6    A    Correct.
7    Q    And what about -- did you have occasion
8  to interact with Mr. Rountree during that first
9  year?
10    A    Excuse me.  Just on -- on -- on an
11  occasion.  Very rarely.
12        You know, my contact or direct contact
13  with Mark Rountree was basically in our weekly
14  staff meeting, and there was no real exchange
15  between he and I personally other than, you know,
16  the -- what was the work that was being conducted
17  in those staff meetings.
18    Q    Okay.  And what about Joeleen Akin?
19  Did you interact with her much during that first
20  year?
21    A    No, not that much at all.  You know,
22  same thing I would say about my relationship with
23  Mark Rountree.  It was -- you know, they would
24  occasionally come to me, you know, for
25  administrative matters, you know, something that

74

1  needed to be facilitated, something that needed to
2  be administered, you know, HR-related type
3  activity.
4        But outside of that, my main contact
5  with them was, you know, weekly, biweekly in
6  our -- in Todd's staff meetings.
7    Q    Okay.  So by the end of that first
8  year, the end of the 2017-2018 school year, had
9  anyone in the Athletic Association talked to you
10  about their feelings about Coach Joseph?  Had
11  anyone expressed any -- any sentiments about her
12  to you?
13    A    Perhaps mid to late 2018.
14    Q    And -- and what were those sentiments
15  that were expressed?
16    A    There were a couple of staff members.
17  Not -- not, you know, simultaneously.  One at one
18  period, and another one at another period
19  complained that, you know, they felt that their
20  treatment by the coach was -- was a little harsh.
21    Q    And who were those staff members?
22    A    Brittni -- I'm sorry, I'm drawing a
23  blank on her last name.  First name Brittni.
24    Q    Brittni Oliver and Felicia --
25    A    Oliver --

75

1    Q    -- Tucker?
2    A    -- yes --
3    Q    Okay.
4    A    -- and Felicia Tucker.
5    Q    Okay.  And we'll -- yeah, we'll get to
6  that conflict a little bit later.
7        So aside from them, did anyone else
8  share any opinions with you about Coach Joseph?
9    A    No, I don't believe so.
10    Q    Okay.
11    A    I don't recall.
12    Q    And had you had an occasion to work
13  with Coach Joseph during that first year, in
14  2017-2018?
15    A    Just, you know, on a -- on a rare
16  occasion, you know, to talk about contract
17  renewals and things of that nature.
18        I think -- if there were any
19  staffing-type changes, I think there -- there was
20  an administrative staff person that we may have
21  needed to onboard or hire, you know, to that
22  extent, you know, hiring a student assistant maybe
23  for -- for the Women's Basketball Program, those
24  kinds of, you know, exchanges, if you will.
25        MS. COVENEY:  All right.  Well, I think

76

1  I'm about to jump to a different topic, but this
2  may be a good time just to take a quick break for
3  everyone.
4        How about we come back at 11:10?
5        MS. STOFF:  That works for me.  Thanks.
6        MS. COVENEY:  Okay.
7        (A recess was taken.)
8  BY MS. COVENEY:
9    Q    Okay.  So, Mr. Cruse, I have a few
10  follow-up questions from things we just talked
11  about.  Then we'll move on to some other issues.
12        So with respect to Shoshanna and
13  Marvin's relationship, when did you become aware
14  that they were in a relationship?
15    A    I was made aware of that actually when
16  I came on board, when I succeeded my -- my
17  colleague.
18    Q    And remind me, when was that again?
19    A    That was in June of 2017.
20    Q    Okay.  And how did you become aware of
21  it?
22    A    My -- my predecessor, she -- she
23  basically shared that with me.
24    Q    Okay.  And your predecessor, was that
25  Lee Hendrickson?

77

1    A    Lee Hendrickson.
2    Q    Okay.  And what did she share about
3  that issue?
4    A    She just basically shared that it was a
5  known relationship, and that I should just be
6  aware of it, and that was pretty much it.
7    Q    Did she say that anyone had problems
8  with it?
9    A    I don't recall her saying that anybody
10  had problems with it.  It was just a -- you know,
11  just something that should be known to me.
12    Q    So had -- had HR approved the
13  relationship?
14    A    I don't know.
15    Q    Okay.  And was Todd Stansbury aware?
16    A    I believe he was.
17    Q    Okay.
18        MS. COVENEY:  Okay.  Caleb, can we get
19  Document 19, BOR-0024746?
20        (Cruse Exhibit 4 was marked for
21  identification by the AV Technician and is
22  attached to the transcript.)
23        MS. COVENEY:  And can I have control of
24  this, please?
25        AV TECHNICIAN:  (Technician complies.)

78

1  BY MS. COVENEY:
2    Q    Okay.  Mr. Cruse, so this is the
3  final -- it looks like the final memo on the
4  review of Ms. Engel and Mr. Lewis' relationship,
5  and it was submitted on May 28th, 2019.
6        Were you still with the Athletic
7  Association then?
8    A    That's right around the time that I
9  returned to College -- Scheller College of
10  Business.
11    Q    Okay.  But could you have still been
12  with the Athletic Association?
13    A    I think by that time -- I think it was
14  around the last week of May or so that I actually
15  physically went back over to the college.  Now, I
16  had some, you know, back and forth with my
17  colleague, who -- who swapped with me, but it
18  certainly wasn't on anything related to this.
19    Q    Okay.  So did anyone show you this
20  memo?
21    A    I don't recall seeing this --
22    Q    Okay.
23    A    -- this memo.
24    Q    Okay.  And so Recommendations right
25  here, number 1, "Engagement with GT Human

79

1  Resources to confirm agreement with this
2  assessment as well as to discuss best practices
3  and secure guidance on the appropriate workplace
4  management of this relationship."
5        Did anyone ask you to confirm agreement
6  with the assessment in this memo?
7    A    No.
8    Q    Okay.  All right.  And then -- all
9  right.  So in your interview with Ms. Wang, do you
10  recall her asking you to rate on a scale of 1 to
11  10 your concern level with Ms. Engel and
12  Mr. Lewis' relationship?
13    A    I don't remember that specifically.  I
14  don't remember being asked that.  She may have,
15  but I just don't recall.
16    Q    Okay.  Sorry, I'm going to try to
17  rotate this.
18        Okay.  So here -- here is a chart
19  rating people's feelings on the relationship
20  between Shoshanna Engel and Marvin Lewis.  You,
21  right here, are listed as among the people who
22  were interviewed, and right here it says that you
23  rated your concern as a 6 on a scale of 1 to 10,
24  10 being extremely concerned.
25        So it sounds like you were somewhat

80

1  concerned about this relationship, the
2  relationship between Shoshanna Engel and Marvin
3  Lewis; is that fair to say?
4    A    Yes.
5    Q    Okay.  And -- and what were your
6  concerns about the relationship?
7    A    The optics.
8    Q    The -- and -- and tell me more about
9  that.
10    A    Just the appearance on the surface,
11  what -- you know, because it just -- it would
12  yield anybody party to the department, staff
13  or -- or -- or somebody that wasn't a staff but
14  very familiar, it could easily -- there could
15  easily be a perception created with regards to
16  perhaps, you know, the relationship.
17        Again, that's what I meant by optics.
18    Q    Okay.  Okay.  And -- all right.
19        So in one of the last documents we
20  looked at before the break, it was the e-mail from
21  Rob -- Rob Norris to Coach Joseph resigning and
22  then you and Mr. Lewis talking about that
23  resignation.
24        Do you recall that e-mail?
25    A    Yes.

81

1     Q    Okay.  And in the -- in your last
2   e-mail to Mr. Lewis, you had mentioned that you
3   were going to get Mr. Norris to do an exit survey.
4         Did you ever get Mr. Norris to complete
5   an exit survey?
6     **A    So there are -- there -- there's the**
7   **formal campus exit survey that -- that I'm**
8   **obligated to make all departing staff aware of,**
9   **and so I know that I presented that to him as my**
10  **standard protocol in an exit interview.**
11        **I don't -- and then I had sort of an**
12  **ad hoc seven to ten questions that I would**
13  **typically ask staff that were leaving with regards**
14  **to what their experience was, and I don't know if**
15  **I did one for Rob, because Rob I had to catch up**
16  **with.**
17        **He -- he actually had left prior to --**
18  **his -- his wasn't a formal -- like an employee**
19  **tenders their resignation, and then you schedule**
20  **an appointment to sit down with them.  He was**
21  **already out of the office, and I -- I do remember**
22  **or recall that it was probably a couple of weeks**
23  **before I even caught up with him, so...**
24    Q    But it was your practice for exiting
25  employees -- it was your practice to get them to

82

1   do exit surveys; is that right?
2     **A    Well, to -- to let them know that it**
3   **was there and just ask them if they wanted to**
4   **complete one.  That was my responsibility, yes.**
5     Q    And -- and those -- those exit surveys,
6   did you transmit them by e-mail?
7     **A    Well, the exit survey that I'm**
8   **referencing is -- it's it's a campus-level survey that**
9   **he would have gone on-line to complete.**
10    Q    Okay.  I see.
11        Okay.  So now I'm going to switch gears
12  a little bit and move into the September 28 time
13  frame.
14        MS. COVENEY:  Caleb, can we see
15  Exhibit 183, PLAINTIFF006901?
16        (Cruse Exhibit 5 was marked for
17  identification by the AV Technician and is
18  attached to the transcript.)
19        MS. COVENEY:  Okay.  Caleb, can you
20  please give Mr. Cruse control of this?
21        AV TECHNICIAN:  (Technician complies.)
22  BY MS. COVENEY:
23    Q    And, Mr. Cruse, if you could just a
24  look at this, and then let me know when you're
25  done.

83

1     A    Okay.
2         **Okay.  I've read it.**
3         MS. COVENEY:  Caleb, can I have
4   control, please?
5         AV TECHNICIAN:  (Technician complies.)
6   BY MS. COVENEY:
7     Q    Have you ever seen this document,
8   Mr. Cruse?
9     **A    No.**
10    Q    Okay.  So I just want to review a
11  couple things with you once I get control.
12        Okay.  All right.  So we have on
13  September 6, 2018, Coach Joseph e-mails Shoshanna
14  Engel, Lance Markos, Mark Rountree, Todd
15  Stansbury, and Joeleen Akin, and in the first two
16  paragraphs right here, she's complaining that
17  Ms. Engel is treating her team differently than
18  the Men's Basketball team.
19        Do you see that?
20    **A    Yes.**
21    Q    Okay.  And then at the bottom,
22  Coach Joseph says, "Candidly, I am not sure how to
23  properly raise these concerns as you have
24  oversight of gender equity and Title IX issues,
25  which seems in this instance to be a conflict of

84

1   interest."
2         Okay.  So earlier we talked about
3   Mr. Lewis and Ms. Engel's relationship, correct?
4   Do you remember that?
5     **A    Yes.**
6     Q    Okay.  And -- and, you know, the fact
7   that Coach Joseph had concerns that Ms. Engel by
8   product of her relationship with Mr. Lewis was
9   biased in favor of Mr. Lewis and decisions that he
10  was making.
11        Can you -- can you understand how that
12  may have been happening, why Coach Joseph was
13  concerned about this?
14    **A    Yes.**
15    Q    Okay.  And are any of the issues that
16  are raised here in this e-mail, are these issues
17  that -- that you in your capacity as the Human
18  Resources Business Partner for the Athletic
19  Association would typically handle?
20    **A    No, it's not.**
21    Q    Okay.  And why is that?
22    **A    We -- we did not -- "we" being whomever**
23  **was sitting in that seat, my predecessor, the**
24  **person who's currently there, we did not -- we**
25  **were not engaged, first and foremost.**

---

85

1      You asked me if I had seen this
2  document, and I hadn't because it wasn't shared
3  with me.  We did not get into matters particularly
4  as they involved student athletes, because that
5  was completely out of our wheelhouse to -- to
6  engage ourselves into any student athlete concerns
7  or matters.
8      So I would just have to say -- answer
9  the question by saying no.  I mean, I really -- I
10  certainly understand reading it now why Coach Jo
11  was -- had a concern, but I wouldn't have known
12  about it because this wasn't even shared with me.
13     Q    Well, if she -- so if Coach Joseph --
14  yes, Coach Joseph is complaining about a
15  student athlete issue, but she also is complaining
16  that Ms. Engel is subjecting her program to
17  differential treatment than the Men's Program.
18         She says here, There appears to be a
19  double standard between the Men's and Women's
20  Basketball Programs.  The Men's Basketball Program
21  is allowed -- allows AAU teams to use Georgia Tech
22  facilities for practices and purposes without --
23  without getting reprimanded.  On the other hand,
24  the Compliance Department is apparently now
25  investigating the Women's Program.

---

86

1          Is this not an issue that Human
2  Resources could -- could get involved with and
3  handle, this con- -- this complaint of
4  differential treatment?
5      A    Possibly if it were -- were brought to
6  our attention.  I'm not so sure it would rest or
7  stay with, you know, campus HR Department.
8      I -- I, quite honestly, don't know how
9  that would have been handled.  Beyond if it were
10  brought to my attention, I -- I would have kicked
11  it upstairs.  I would have gone to my immediate
12  supervisor, who was Julie Joyce, to get some kind
13  of directive on -- on what needs to be done.
14     Q    Okay.  And so when people in the
15  Athletic Association became aware of employee
16  disputes, either an employee grievance or an
17  employee complaint of discrimination, what were
18  they supposed to do with that complaint?  Were
19  they supposed to refer it to HR typically?
20     A    Yes.  Yeah, typically.  Yes --
21     Q    All right.
22     A    -- Human Resources.
23         MS. COVENEY:  Okay.  Caleb, can you
24  take this document down and pull up Document 11,
25  BOR-004399?

---

87

1          (Cruse Exhibit 6 was marked for
2  identification by the AV Technician and is
3  attached to the transcript.)
4          MS. COVENEY:  And can you give -- can
5  you give Mr. Cruse control of this document,
6  please?
7          AV TECHNICIAN:  (Technician complies.)
8  BY MS. COVENEY:
9      Q    And, Mr. Cruse, can you take a look at
10  this, and let me know when you're done?  It's four
11  pages, and the first e-mail is actually at the
12  bottom of the chain.
13     A    Oh, okay.  I'll start from the bottom,
14  then.
15     Q    Okay.
16         MS. COVENEY:  Actually, for our
17  purposes, Caleb, can I have control of this real
18  quick, please?
19         Caleb, who has control, me or
20  Mr. Cruse?
21         THE WITNESS:  I have control.  I'm
22  moving the document right now.
23         MS. COVENEY:  Okay.  Let me -- Caleb,
24  can I have control of this, please?
25         AV TECHNICIAN:  (Technician complies.)

---

88

1  BY MS. COVENEY:
2      Q    Okay.  All right.  So why don't we
3  start right here.
4          On October 29th, 2018, Ms. LaBaw
5  e-mails you -- you this (indicating).  So take a
6  look at this, and let me know when you're done,
7  this e-mail.
8      A    Okay.
9          Okay.
10     Q    So do you recall this dust-up between
11  Amanda Brown and Coach Joseph?
12     A    Yes, I do.
13     Q    Okay.  So on October 29th, Phyllis
14  LaBaw e-mails you and asks for your guidance as an
15  HR expert to help deal with this.
16         So this dispute between Coach Joseph
17  and Amanda Brown, would this fall into a category
18  of like an employee grievance, employee dispute?
19     A    Sure.  Yes.
20     Q    And this is -- is this a complaint that
21  you and your office would typically handle?
22     A    Yes.
23     Q    Okay.  So then you -- you -- right
24  here -- sorry.  You thank her for the insight --
25  oh, wait.  Sorry.

**89**

1      Okay. You thank her for bringing it to
2 your attention. You say, "In light of the
3 comments shared at last week's ELT meeting, I'm
4 eager to address" --
5      (The Reporter clarified the record.)
6 BY MS. COVENEY:
7     Q   So it says, "Thank you for bringing
8 this to my attention. In light of the comments
9 shared at last week's ELT meeting, I'm eager to
10 address when these issues surface."
11      So what -- what was brought up at the
12 ELT meeting around this time?
13     **A   I don't think it was anything specific**
14 **to this matter, but I think, generally speaking,**
15 **there was some conversation I recall at one of the**
16 **staff meetings with regards to, you know, issues**
17 **that surfaced, how they should be handled.**
18      **I think there might have been some**
19 **confusion or -- or just unawareness, if you will,**
20 **by some of our leaders that, you know, when issues**
21 **like, in this example, surface, how they should be**
22 **handled.**
23     Q   Okay. And -- and what was the
24 direction given about how they should be handled?
25     **A   I probably would have told the -- the**

**90**

1 **staff or leadership team that when, you know, an**
2 **employee has a complaint or an issue, you know, it**
3 **should be brought to the attention -- it should be**
4 **brought to my attention as your HR Representative.**
5     Q   Okay. All right. So let's see.
6      Okay. So you say here, "Sounds like it
7 might be an opportunity for me to employ my
8 mediation skills if both are willing to
9 participate in a facilitated discussion."
10      So it sounds from this that your first
11 step here was to try to resolve this dispute
12 informally; is that right?
13     **A   Correct.**
14     Q   And is that consistent with -- with
15 your practice of handling employee disputes like
16 this?
17     **A   Yes, it is.**
18     Q   Okay. And what's a facilitated
19 discussion?
20     **A   We don't have formal mediation sessions**
21 **here at the institute, so something very similar**
22 **to it is referenced as a facilitated discussion,**
23 **you know, whereas I would informally mediate**
24 **between two disparate staff members, and I would**
25 **utilize mediation skills, but we just don't**

**91**

1 reference it as a formal mediation.
2     Q   Okay. And do you remember whatever
3 came of this? Did you do a facilitated discussion
4 with Ms. Brown and Coach Joseph?
5     **A   No, that never came to fruition. I met**
6 **with Amanda, and we had some conversation. She**
7 **was somewhat reluctant to -- to pushing the**
8 **envelope, to be quite honestly with you.**
9      **She had her meeting with -- with**
10 **Phyllis LaBaw. Phyllis actually had to coax her**
11 **to -- to even come and talk to me about it. We**
12 **talked about it. There was some reluctancy, she**
13 **thought about it some more, and she did not want**
14 **to engage in any kind of facilitated or mediated**
15 **conversation. She eventually sort of got over it,**
16 **if you will, and -- just moved on from it.**
17     Q   Okay. And up here at the top -- sorry.
18      So this entire exchange was in late
19 October. And then we have on November 29th, so a
20 month later, Phyllis LaBaw forwards you this
21 entire thread and said, "First incident and
22 documentation thereof."
23      Do you recall why Ms. LaBaw was sending
24 this to you a month later?
25     **A   I think she was sending it to me just**

**92**

1 **for the record, just to make sure I had it and --**
2 **you know, had a record of it.**
3      MS. COVENEY: Caleb, can you pull up
4 Document 12, BOR-0016023?
5      (Cruse Exhibit 7 was marked for
6 identification by the AV Technician and is
7 attached to the transcript.)
8      MS. COVENEY: Okay. And can you give
9 Mr. Cruse control of this, please?
10      AV TECHNICIAN: (Technician complies.)
11 BY MS. COVENEY:
12     Q   And, Mr. Cruse, can you take a look at
13 this, and let me know when you're done?
14     **A   Sure.**
15      **Okay. I've completed.**
16     Q   Okay.
17      MS. COVENEY: Caleb, can I now have
18 control of this, please?
19      AV TECHNICIAN: (Technician complies.)
20 BY MS. COVENEY:
21     Q   Okay. Mr. Cruse, do you recognize this
22 e-mail? Have you seen this before?
23     **A   Yes. Vaguely, I recall it or remember.**
24     Q   All right. So we have here on
25 November 7th, Coach Joseph's agent, Garry

**93**

1  Rosenfield, e-mails Mr. Stansbury and Mr. Rountree
2  to request a telephone conference to address
3  growing concerns over Shoshanna Engel and her
4  repeated attempts to undermine Coach Joseph both
5  as it relates to her day-to-day oversight as well
6  as the current NCAA investigation.
7      Okay.  So this issue described right
8  here, is this -- is this an employee dispute that
9  you would typically handle in your capacity as the
10 HR Business Partner?
11     A   I'm struggling to answer whether it's
12 yes or no or if I land on a fence between the two.
13     Outside of -- I'll say yes.
14     Q   Okay.  Okay.  So -- so he sends --
15 Garry sends this e-mail -- sorry, I'm now trying
16 to move this document.
17     MS. COVENEY:  Caleb, do I still have --
18 okay.
19 BY MS. COVENEY:
20     Q   Okay.  So then Mr. Rountree forwards it
21 to you to -- to provide advice, it looks like, on
22 the appropriate response.  And then you -- you
23 loop in Adrienne Richardson and Julie Joyce.
24     So who is Adrienne Richardson?
25     A   So Adrienne Richardson was the person I

**94**

1  couldn't recall very early on in our -- our
2  discussion.  She was the first Employee Relations
3  Consultant that -- that was supporting me when I
4  took over as the HR Business Partner at the
5  Athletic Association.
6      Q   Okay.  All right.  So you touch base
7  with her, and then you copy in Julie Joyce because
8  she has some historical context that she can share
9  regarding Coach MaChelle Joseph.
10     A   Yes.
11     Q   What historical context did you think
12 Ms. Joyce could share here?
13     A   Well, she -- she had -- I knew that
14 she -- from my predecessor, you know, who also
15 reported to Julie Joyce, I knew that she knew that
16 there was some history or concerns, if you will,
17 you know, between the basketball program and --
18 and other departments like Shoshanna -- Shoshanna
19 Engel's department.
20     So that was what that reference was,
21 to -- for Adrienne, who also reported to Julie
22 Joyce, to, you know, engage some conversation with
23 her regarding the matter.
24     Q   Okay.  So you say Lee Hendrickson gave
25 you this background; is that right?

**95**

1      A   Yes.
2      Q   Okay.  Was that at the time that she
3  was transitioning you into this new role, the
4  HR Business Partner for the Athletic Association?
5      A   That is correct.  Yeah, when I took
6  over, there was -- we -- there was like a week,
7  maybe almost two weeks of an overlap where I came
8  over to the Athletic Department, and I was
9  actually going back and forth between Scheller
10 and -- and -- and Athletics before Lee Hendrickson
11 left just to -- you know, for hand-offs and also
12 to get some training from Lee before she actually
13 departed.
14     Q   And did -- did Lee brief you on all of
15 the coaches in the Athletic Department during that
16 transition conversation?
17     A   She went over every unit, I believe,
18 yeah, just to -- you know, kind of went over the
19 org chart so I would understand who was who.  You
20 know, she explained what each department's charge
21 was to help facilitate my understanding of -- of
22 what each unit did.  You know, those kinds of
23 things.  Very customary, kind of a hand-off, if
24 you will, between one person succeeding another.
25     Q   Okay.  And when -- when you say "unit,"

**96**

1  do you mean the athletic program?
2      A   I'm sorry, no.  I meant -- I meant the
3  actual department.
4      Q   Okay.  So did -- I mean, did she say,
5  you know, we have Coach Pastner and he does X, Y,
6  and Z, and his issues are whatever they are?
7      I mean, did he go through each coach --
8  did she go through each coach with you during this
9  transition conference?
10     A   Not through each department, but it
11 wasn't a -- it wasn't a hand-off of any issues,
12 per se.  It was more or less, you know, this
13 person is responsible for this, that, this
14 department, that kind of thing.
15     Q   Okay.
16     A   It wasn't -- it wasn't to go into, you
17 know, a whole lot of detail with regards to any
18 Employee Relations issues.
19     Q   Okay.  And so -- and she -- when she
20 was speaking about Coach Joseph, she said -- she
21 said what?  What historical context did
22 Ms. Hendrickson provide you about Coach Joseph?
23     A   To be quite honest with you, I don't
24 think anything specific to Coach Joseph.
25     I do recall that there was a staff

97

1  member on the -- in the Women's Program that there
2  was some issues with, and I don't even know if --
3  I don't recall whether it even involved
4  Coach Joseph herself.
5       I remember the staff member's last name
6  was Greene, she either left right before I
7  arrived or she left shortly thereafter, and I
8  don't even recall the specifics as to, but there
9  was -- it was an Employee Relations issue, and she
10 eventually left.
11    Q   Okay.
12    A   So that's what I recall from my
13 conversation with Lee Hendrickson when we were
14 having our sit-down to go over, you know, where
15 she was basically passing the baton over to me.
16    Q   Okay.  So the historical context
17 that -- that you thought Ms. Joyce could share on
18 Coach Joseph was what exactly?
19    A   I -- I don't recall to be honest with
20 you.  I just knew that there was -- she would
21 know -- she would possibly know something about,
22 you know, that matter.  I think that was really my
23 only reason to refer Adrienne over to Julie.
24    Q   Okay.  And by "that matter," do you
25 mean this conflict between Coach Joseph and

98

1  Shoshanna Engel?
2     A   Yes.
3     Q   Okay.  And do you recall if you and
4  Ms. Joyce and Ms. Richardson met to talk about
5  this November 7th e-mail from Garry Rosenfield?
6     A   We did not.
7     Q   And why is that?
8     A   I'll be honest with you, I don't know.
9  I think I had some further conversation with --
10 with Adrienne, but that was the last of it.  There
11 was -- you know, if there was anything done with
12 it, I wasn't further engaged in that particular
13 matter.
14    Q   Okay.  I have one more document to
15 share on this.  Maybe it will help you -- maybe it
16 will help refresh your recollection.
17    A   Okay.
18        MS. COVENEY:  So let's see.  Caleb, can
19 you bring up Document 13, BOR-004412?
20        (Cruse Exhibit 8 was marked for
21 identification by the AV Technician and is
22 attached to the transcript.)
23        MS. COVENEY:  Okay.  And can I have
24 control of this, Caleb, please?
25        AV TECHNICIAN:  (Technician complies.)

99

1        MS. COVENEY:  Thank you.
2  BY MS. COVENEY:
3     Q   Okay.  So, Mr. Cruse, this is the same
4  e-mail that we just looked at, this November 7th
5  e-mail from Garry Rosenfield.
6     A   Uh-huh.
7     Q   And then -- and then it looks like no
8  one responded to Garry, so on November 19th, he
9  followed up with Todd and Mark and asked for a
10 response.
11        And then Mark Rountree forwards this to
12 you and asks for the response, and here you say,
13 "Mark, I was advised to refer all
14 inquiries/requests regarding this request to Aisha
15 Oliver-Staley."
16        So who advised you to refer all
17 inquiries regarding this request to
18 Ms. Oliver-Staley?
19    A   I don't recall who specifically, but it
20 was -- well, I -- I don't know.  I don't know who
21 did, but someone did, but I don't know exactly
22 who.  You know, I --
23    Q   Okay.  So there's another e-mail
24 that --
25        MS. COVENEY:  You know, Katie and

100

1  Jamie, for reference, BOR-004453.
2  BY MS. COVENEY:
3     Q   And in this e-mail, you reach out to
4  Ms. Oliver-Staley and you say you told Rountree
5  and Stansbury that you would discuss it with HR
6  and Legal, but you've since learned that Aisha is
7  handling the matter via Kate Wasch and Shoshanna.
8        Does that -- do you recall Kate Wasch
9  and Shoshanna Engel telling you to refer this
10 matter to Aisha Oliver-Staley?
11    A   Certainly not Sho, but I think it's --
12 it's quite, yeah, plausible that it would have
13 been Kate Wasch.
14    Q   And who was Kate Wasch?
15    A   Kate was a member of our Legal staff
16 here on campus.
17    Q   And when would you consult with
18 Ms. Wasch?
19    A   I -- I imagine it would have been on or
20 around this particular time frame.
21    Q   But, I mean, what -- did you typically
22 consult with Ms. Wasch on HR matters?
23    A   No, no.
24    Q   Okay.  And so why -- why in this
25 instance did you go to Ms. Wasch about this?

101

1    A    I think I may have been directed to
2  her --
3    Q    Okay.
4    A    -- to the Legal Department.
5    Q    And do you know who directed you?
6    A    Most likely it would have been Julie
7  Joyce or perhaps maybe Adrienne Richardson, but
8  I -- I would say first probably Julie Joyce.
9    Q    Okay.  And -- and Aisha Oliver-Staley,
10 at the time -- so in the 2018-2019 time frame,
11 what was Ms. Oliver-Staley's role, do you
12 remember?
13   A    I think she was in an interim role,
14 sort of the de facto, perhaps, leader, because
15 the -- I think it was around that time frame that
16 the head of Legal had left Georgia Tech, and so I
17 think she stepped up to take more of a leadership
18 role, if you will, and so --
19   Q    And -- and did Aisha Oliver-Staley --
20 did you ask her to handle any other employee
21 disputes in the Athletic Association?
22   A    No, no.
23   Q    And you said -- and so there's an
24 e-mail that suggests that Kate -- that Shoshanna
25 also directed you to Ms. Oliver-Staley.

102

1        Do you -- do you recall Ms. Engel
2  directing you to Ms. Oliver-Staley about this?
3    A    I don't, and I'm trying to think about
4  in what context would she have done that, but I
5  don't.
6    Q    Okay.  Would that have been unusual for
7  her to have done, for her to -- why would she even
8  be involved in this?  This complaint is about her.
9        MS. STOFF:  Object to the form of the
10 question, because he won't know why she was
11 involved in anything.  He can testify as to his
12 personal knowledge.
13 BY MS. COVENEY:
14   Q    You can answer, Mr. Cruse.
15   A    That is my answer.  I don't know.
16   Q    Okay.  If a complaint is filed against
17 someone, did you typically go to the person
18 against whom the complaint was filed and say, hey,
19 where do you want me to direct this complaint
20 against you?
21   A    No.
22   Q    Okay.
23       MS. COVENEY:  Caleb, can we take that
24 down and pull up Exhibit 192, PLAINTIFF007585?
25       (Cruse Exhibit 9 was marked for

103

1  identification by the AV Technician and is
2  attached to the transcript.)
3        MS. COVENEY:  And can you give
4  Mr. Cruse control of this document?
5        AV TECHNICIAN:  (Technician complies.)
6  BY MS. COVENEY:
7    Q    Mr. Cruse, can you just skim this, and
8  let me know if you've ever seen this document
9  before.
10   A    I -- I don't recall ever receiving a
11 copy of this.  For whatever reason, the -- some of
12 it looks familiar to me, but I know that I did not
13 receive this, and the only -- you know, so I'd
14 have to say that I don't recall receiving this.
15   Q    Okay.  But have -- have you seen it
16 before somewhere?
17   A    I'm -- I may have in -- and let me just
18 explain further.
19       So in pulling all of the documents and
20 everything that was related to this together,
21 files and folders, personnel file, et cetera,
22 et cetera, I saw a lot of stuff, just assembling
23 it so that I could get it over to -- to folks that
24 requested it, like an outside firm that was
25 investigating and things of that nature.  So I may

104

1  be confusing it with something else.
2        I know I didn't have a copy of this, so
3  that's why I said it looks like it may have been
4  something I maybe could have seen, but I certainly
5  didn't receive it.
6    Q    Okay.  And this -- the gathering of
7  documents, who were you gathering documents for?
8    A    There was an -- a contracted legal firm
9  or whatever that was pulling together the
10 documents, so I had to -- I was asked to pull them
11 all in, make them available.
12       I was also pulling those same documents
13 and all together for -- and I guess actually it
14 was probably through our Legal Department that I
15 was pulling those together for perhaps maybe this
16 other outside entity.
17   Q    And was the outside entity the law firm
18 of Lightfoot?
19   A    I think so, yes.
20   Q    Okay.  And in -- in the process of
21 gathering those documents, there is -- there is
22 some e-mail traffic where you're looking for a
23 hard-copy file on Coach Joseph that Todd Stansbury
24 kept in his office.
25       Do you recall that?

105

1    A    I do.
2    Q    Okay.  So who asked you to look for
3  that -- that hard-copy file in Todd Stansbury's
4  office?
5    A    I don't recall.  I'm -- I'm going to
6  assume that maybe it was even Todd.
7    Q    Okay.  And did you find that -- that
8  hard-copy file?
9    A    I did.
10    Q    And what was in that?
11        Well, first, how -- how thick was it?
12    A    It was a rather thick file.
13    Q    Like a three-inch binder?
14    A    Yeah.
15    Q    Thick?
16    A    Yeah, I would say that.
17    Q    Okay.  And what do you recall was in
18  this file?
19    A    Just documents of -- you know, I have
20  to tell you this:  I didn't sit down -- I didn't
21  have the time to sit down and read through all of
22  that stuff.  My charge was to assemble it, put it
23  together, and get it to the Legal Department.  So
24  what I saw, I actually did not necessarily retain.
25    Q    Okay.  And did you make a copy of the

106

1  full binder or the full file?
2    A    I did.
3    Q    Okay.  And what did you do with that,
4  the copy of that file?
5    A    That was what was made available or
6  given or handed off, if you will, to Legal.
7    Q    Okay.  And was it scanned in somewhere
8  and like e-mailed off?
9    A    No.  I think that was a hard copy.
10    Q    Okay.
11    A    I -- I had to go through the -- the
12  laborious task of copying all of that and -- and,
13  you know, presenting it as a hard copy.
14    Q    Okay.  And in this file, do you
15  remember if there were any handwritten notes?
16    A    I don't recall specifically.
17    Q    Okay.  And do you know if Todd kept
18  files like this on all the coaches in the Athletic
19  Department?
20    A    I don't know.
21    Q    Okay.
22    A    Because I was never asked -- I was
23  never asked to pull anybody else's records or
24  files from his office.
25    Q    Okay.  Okay.  Well, we'll go back --

107

1  there's some e-mails I want to go over with you
2  about that, but we'll do that a little bit later
3  today, okay?
4        Okay.  And I want to talk a little bit
5  about Dr. Harrington.
6        So Dr. Harrington, what was her role at
7  Georgia Tech when you were there in the 2018-2019
8  school year?
9    A    She was the Chief Human Resources
10  Officer for Georgia Tech.
11    Q    Okay.  And what role did she play in
12  Employee Relations?
13    A    I -- I gather that if there were any
14  significant issues that our employees relations
15  team was working on, you know, Julie Joyce was
16  responsible for that unit, and I'm sure Julie
17  Joyce would, you know, certainly, you know,
18  provide information, updates, et cetera, on
19  whatever cases were being worked on with
20  Dr. Harrington.
21    Q    Okay.  So was it your understanding
22  that Ms. Joyce was to take the lead on Employee
23  Relations issues --
24    A    Well --
25    Q    -- like investigations?

108

1    A    -- Employee Relations reported to her,
2  so she had ultimate responsibility for all
3  Employee Relations, you know, investigations,
4  matters, et cetera.
5    Q    Okay.  And then she would keep
6  Dr. Harrington updated on those?
7    A    Oh, I'm sure she did.
8    Q    Okay.
9    A    Yeah.
10    Q    All right.  Okay.  So I want to talk
11  now a little bit about the -- the staff complaints
12  you had referenced earlier today that were brought
13  by Felicia Tucker and Brittni Oliver.
14        Do you recall --
15    A    Yes.
16    Q    -- those two complaints?
17        Okay.  So tell me -- tell me what you
18  recall about Ms. Tucker and Ms. Oliver's
19  complaints against Coach Joseph.
20    A    Well, they were similar in nature.
21  Both complained of, you know -- certainly, there
22  were some nuances that separated their complaints,
23  but generally speaking, they were -- they
24  basically complained of the same -- they had the
25  same concerns with regards to how they were

109

1 treated or handled by Coach Joseph.
2 Q Okay. And so did Brittni Oliver and
3 Felicia Tucker come and report their concerns to
4 you?
5 A Reluctantly and over a period of time.
6 Q Okay. Okay. So I'm going to walk
7 through a timeline to see if we can piece this
8 together a little bit.
9 So there was a staff meeting on
10 January 24th, a Women's Basketball staff meeting
11 on January 24th, in which there appears to have
12 been a conflict between Coach Joseph, Felicia
13 Tucker, and Brittni Oliver, and one of them or
14 both of them stormed out and said they're going to
15 HR to report what had happened.
16 Did -- did one or both of them come to
17 you after that January 24th meeting and report
18 what had happened?
19 A I believe they came, yes, probably
20 following that particular meeting.
21 Q Okay. And did they come together?
22 A No.
23 Q Okay. So who came first?
24 A I think it was probably Felicia Burton
25 [sic].

110

1 Q Felicia Tucker?
2 A Excuse me, I'm sorry, Felicia Tucker.
3 I apologize.
4 Q Okay. And when she came to you, do
5 you -- do you recall what she -- she said
6 initially?
7 A I recall that, first of all, she was
8 very emotional. She was very upset, you know,
9 shaken. And I believe -- if my memory serves me
10 correct, at the time she came down, I think I was
11 on a call, a meeting, a conference call or
12 something, and I asked her if -- if she could
13 allow me to, you know, complete that or whatever,
14 and then I would reach out to her and ask her to
15 come down, and I believe that's what happened, and
16 she did.
17 But she -- she was very upset, very
18 emotional, and she just basically described, you
19 know, basically what had occurred, I guess, in the
20 meeting. She described -- and I can't -- I don't
21 remember all of the details, but she just
22 basically shared with me, I guess, the exchange
23 that she had.
24 Q Okay. And did you take notes of
25 that -- that meeting?

111

1 A I don't think -- nothing -- you know, I
2 think I may have jotted something down or
3 whatever, but it wasn't, you know, a whole lot of
4 detail.
5 I think she and I just talked quite a
6 bit. I wanted to just kind of listen to her and
7 find out, you know, exactly what -- what had
8 occurred.
9 Q Okay. And then that same day, did --
10 did Brittni Oliver also come report concerns to
11 you?
12 A I don't think so.
13 Q Okay.
14 A Brittni was very -- very hesitant to --
15 you know, I -- I knew -- I had heard more or less
16 about that she -- you know, that she was upset or
17 whatever, but she was somewhat reluctant. I don't
18 think she was -- you know, she didn't come to see
19 me right away, but eventually she did. And even
20 then, when she did or whatever, it was -- it took
21 a little while to get something out of her.
22 Q Okay. And are you -- are you certain
23 that it was Felicia who came to you first and not
24 Brittni?
25 A I am not certain. It could be the

112

1 other way around. I just don't know for sure.
2 Q Okay. Let's see.
3 Okay. So we have -- we have Brittni
4 and Felicia complaining about -- about
5 Coach Joseph? Were their complaints about
6 Coach Joseph?
7 A Primarily, but also, just generally,
8 speaking, I think there was also this -- they felt
9 a faction, if you will, between those two as
10 administrative staff compared to the coaching
11 staff. They felt that there was some indifferent
12 treatment, if you will, by Coach towards them
13 versus the -- the assistant coaches, and also not
14 just the assistant coaches, but I think also -- I
15 can't recall what their specific titles were, but
16 they were like graduate assistants --
17 Q Okay.
18 A -- that -- that were staffed in the
19 program.
20 Q Okay. And -- and what was
21 Coach Joseph's response to all of this? Did she
22 have an explanation, or did she have feelings
23 about how Felicia and Brittni had behaved?
24 A Oh, certainly. Yes.
25 Q Okay. And what was her perspective on

---

113

1  all of this?
2  **A   Well, I believe, if my memory serves me**
3  **correct, she was concerned, and at the same time,**
4  **she felt that there was also some level of**
5  **disrespect particularly coming from Felicia**
6  **Tucker.**
7  Q   Okay.  Okay.  So you have -- you have
8  staff members saying that Coach Joseph, you know,
9  had treated them poorly, and then you have
10 Coach Joseph saying the staff members had acted
11 disrespectfully, correct?
12 **A   Yes.**
13 Q   Okay.  And was this type of dispute, in
14 your -- in your experience, was it uncommon for
15 there to be employee conflicts like this on a --
16 on a team?
17 **A   Well, it's not encountered day in and**
18 **day out, but it does happen.**
19 Q   Okay.
20 **A   I've had other similar fallouts, you**
21 **know, between team members in different**
22 **departments over the years.**
23 Q   Okay.  And so -- so it's my
24 understanding that you first tried to resolve this
25 conflict informally; is that right?

114

1  **A   Correct.**
2  Q   Okay.  And -- okay.  And so how did
3  you -- how did you go about doing that?
4  **A   Well, eventually, you know, I -- you**
5  **know, Coach Joseph and I discussed the matter, and**
6  **you know, in our conversation, it was mutually**
7  **agreed to that, you know, we would hold a meeting**
8  **and try to iron it out by sitting down with the**
9  **staff members, with those two, and have a mediated**
10 **conversation -- or a facilitated conversation,**
11 **excuse me, that -- that -- you know, that I would**
12 **facilitate.**
13 Q   Okay.  And I'm going to pull up one
14 document real quick.
15     MS. COVENEY:  Caleb, can we get
16 Exhibit 29, BOR-005132?
17     (Cruse Exhibit 10 was marked for
18 identification by the AV Technician and is
19 attached to the transcript.)
20 BY MS. COVENEY:
21 Q   Okay.  Mr. Cruse --
22     MS. COVENEY:  Can you give Mr. Cruse
23 control of this, please, Caleb?
24     AV TECHNICIAN:  (Technician complies.)
25 BY MS. COVENEY:

---

115

1  Q   And, Mr. Cruse, if you can just look at
2  this, and let me know when you're done.
3  **A   Okay.**
4      **Okay.**
5  Q   Okay.  So I'm going to focus on this --
6  this e-mail in the middle on January 28th from you
7  to Coach Joseph.  And earlier you said that one
8  of -- either Brittni or Felicia was reluctant to
9  come forward, and the other one was open to coming
10 forward, but you didn't -- you weren't sure which
11 one.
12 **A   Uh-huh.**
13 Q   Here, it says that you met with Brittni
14 mid-Friday afternoon.  She would like to
15 participate in a facilitated meeting.  "Per our
16 conversation I felt she genuinely wants to have
17 the discussion to repair the fractured
18 relationship with you."
19     Does this refresh your recollection
20 about whether it was Brittni or Felicia who was --
21 who was open to talking about this with you
22 initially?
23 **A   Well, I still recall, you know, just a**
24 **little bit of a struggle, because I think prior to**
25 **that meeting that I had with Brittni mid-Friday**

116

1  **afternoon, I think there -- there may have been**
2  **some attempts to try to talk to her before then,**
3  **and I think prior to that time frame, I may have**
4  **had a conversation with Felicia.  I mean, that's**
5  **kind of what I recall.**
6  Q   Okay.  And then way at the bottom, it
7  says, "I unfortunately did not have the
8  opportunity to catch up with Felecia however
9  hoping to have the opportunity tomorrow."
10 **A   I think that was related specifically**
11 **to, you know, scheduling this meeting to -- you**
12 **know, this facilitated meeting.  I think that's**
13 **what it was in reference to.**
14 Q   Okay.  All right.  So before you
15 scheduled the facilitated meeting with the whole
16 staff, you said you -- you met and spoke with
17 Coach Joseph about all of this first; is that
18 right?
19 **A   I don't recall whether we met in**
20 **person, but we certainly had some conversation --**
21 Q   Okay.  And was --
22 **A   -- some exchanges.**
23 Q   And was Coach Joseph open to this idea
24 of a facilitated discussion?
25 **A   Yes.**

117

1    Q    Okay.  So you -- you hold this
2  facilitated discussion, the documents indicate
3  that it was on February 1st, and -- and who -- do
4  you recall who participated in this -- this
5  facilitated discussion?
6    A    Yes.  Coach Joseph; her immediate
7  coaching staff or all of her assistant coaches; I
8  think a couple of GRAs, the graduate assistants
9  were in attendance; myself, of course; and Mark
10  Rountree also participated.
11    Q    Okay.  And whose idea was it to have
12  Mr. Rountree participate?
13    A    I think I encouraged him to -- to
14  attend.  I -- I believe -- I believe Coach also
15  wanted him to attend.
16    Q    And at that time, Mr. Rountree was
17  Coach Joseph's direct supervisor, correct?
18    A    Yes.  He was the Sports Administrator
19  over the Women's Basketball Program.
20    Q    Okay.  So you thought he would have
21  perspective on -- on what, Coach Joseph's
22  management and these issues that were coming to a
23  head?
24    A    Well, it was -- you know, it was a
25  considerable concern of what was going on, and,

118

1  you know, he was aware of it, and I felt
2  personally that, you know, he -- he should
3  participate in the discussion so that we could
4  just get everything on the table and that he also,
5  as the Sports Administrator, would have an
6  understanding of, you know, what took place or
7  what was taking place.
8    Q    Okay.  And so how did that February 1st
9  facilitated discussion go?
10    A    It started off as a disaster, and I say
11  that because we were there to talk and to get
12  things on the table, and everybody was reluctant
13  to say anything.
14    I mean, that went on -- I mean, it was
15  just real small talk for about the first
16  45 minutes.  It was excruciating.  And for me as
17  the facilitator, it was especially, because I
18  couldn't -- I just maybe wasn't on my game to get
19  people to start talking, and then eventually the
20  lid was let off, and, you know, then a whole lot
21  of conversation took place.  It went from sort of
22  one extreme to the other.
23    Q    Okay.  And after that February 1st
24  meeting, did you -- did you have plans to hold
25  another meeting with the team to try to follow up

119

1  on what had happened that day?
2    A    That may have been an intention of
3  mine, but it did not pan out.
4    Q    Okay.  So -- so at the end of the
5  February 1st meeting, while the meeting had been a
6  disaster, is it fair to say that you thought you
7  could still informally resolve this conflict?
8    A    I thought so, and I'd like to clarify
9  my -- my comment about it being a disaster.
10    I actually mentioned -- or I thought I
11  stated that it was a disaster to begin with.  It
12  actually ended up -- I thought it was a
13  value-added session, if you will, at the time --
14  you know, when it ended, because we were able to
15  get some discussion and folks, you know, putting
16  it out on the table, and that's what we were there
17  to -- to accomplish.
18    Q    Okay.  Okay.  So after -- after the
19  February 1st meeting, do you recall Coach Joseph
20  forwarding you and Mark Rountree statements from
21  her assistant coaches about their perspective on
22  what happened at that meeting?
23    A    Yes, I do.
24    Q    And what do you recall the
25  general takeaway from those statements to be?

120

1    A    It was just really more added context
2  to -- based on what they heard in the meeting and
3  their own personal perception of -- of -- you
4  know, of Brittni and -- and -- and -- and Meme,
5  Felicia, in particular, as far as what things were
6  said, what things were done previously.  They just
7  gave a further account.
8    It was almost as if they were placing a
9  period at the end of the sentence.  The sentence
10  was the meeting that we had, and they wanted to
11  just kind of finalize it with their closing
12  remarks, if you will.
13    Q    Okay.  And did the coaching staff and
14  Coach Joseph report to you that they felt that
15  Felicia Tucker had been insubordinate or
16  disrespectful?
17    A    I would say the latter, more
18  disrespectful.
19    Q    Okay.  And -- and do you think that she
20  had been disrespectful?
21    A    There were a couple of things that she
22  said, and I knew it was out of emotion, that I --
23  I thought that she probably shouldn't have said.
24    Q    Okay.  And -- okay.  So shortly after
25  this February 1st all-staff meeting, Mark Rountree

121

1  stepped down as the Women's Basketball Sports
2  Administrator.
3      Do you recall that?
4      A   Yes.
5      Q   And did Mr. Rountree talk to you about
6  that before or after he resigned?
7      A   No.  I think the conversation was more
8  after he, you know, stepped down.
9      Q   And did he tell you why he stepped
10 down?
11     A   I don't remember specifically, other
12 than the fact that I think he felt that -- you
13 know, I think he was frustrated, and I think he
14 felt that, you know, feeling that way would -- you
15 know, it would serve him no purpose in continuing
16 to -- to be the Sports Administrator over that
17 program.
18     Q   Okay.  And -- and do you know why --
19 did he express to you why he was frustrated?  Did
20 it have anything to do with these statements that
21 Coach Joseph had forwarded him from this
22 February 1st meeting?
23     A   I think it did.
24     Q   Okay.  Okay.  And then who -- who
25 stepped in to Mr. Rountree's shoes?

122

1      A   That would have been Ms. Akin.
2      Q   Okay.  And -- and did you -- were you
3  part of the discussions about replacing her in
4  that -- putting her into that role?
5      A   I'm sorry, can you repeat?
6      Q   Did you make the decision to -- to have
7  Ms. Akin replace Mr. Rountree?
8      A   Oh, no.  That was -- that decision was
9  made well over my pay grade.
10     Q   Okay.  Do you know who made that
11 decision?
12     A   I believe it was Todd Stansbury.
13     Q   Okay.  Okay.  So we're going to look at
14 a few documents.
15         MS. COVENEY:  Caleb, can you pull up
16 Document 40, BOR-004468?
17         (Cruse Exhibit 11 was marked for
18 identification by the AV Technician and is
19 attached to the transcript.)
20         MS. COVENEY:  Okay.  And, Caleb, can
21 you give me control of that, please?
22         AV TECHNICIAN:  (Technician complies.)
23 BY MS. COVENEY:
24     Q   Okay.  So the all-staff meeting was on
25 February 1st, and then here on February 3rd, we

123

1  have Coach Joseph e-mailing you about the HR
2  meeting, and she says it's left my staff -- "my
3  staff and myself in a very unsettled and unhealthy
4  situation."
5      And then you respond here on
6  February 5th, and you say, "I want you to know
7  that I'm meeting with our Campus Employee
8  Relations Consultant today to discuss your staff
9  situation."  I'm taking this step because I need
10 assistance with all I have on my plate.
11     Okay.  So -- so after the February 1st
12 meeting, you decide to consult with Employee
13 Relations; is that right?
14     A   Correct.
15     Q   And who was it that you pulled into
16 this?
17     A   That -- that's when, I believe, there
18 was the change from Adrienne Richardson over to
19 Lori Douglas.
20     Q   Okay.  And so you say, "I still feel
21 strongly that we should conduct a follow up
22 meeting to step through the exercise.  I think it
23 could be very helpful towards setting the team on
24 a better path moving forward."
25     Okay.  So by February 5th, you were

124

1  still of the mind that this conflict between
2  Felicia and Brittni and Coach Joseph could be
3  resolved through informal means; is that fair to
4  say?
5      A   Yes.
6      Q   Okay.  All right.  And then you also
7  say that you plan to discuss this matter with Todd
8  during a scheduled meeting tomorrow.
9      Did you ever talk about this conflict
10 with -- with Todd Stansbury?
11     A   I don't actually re- -- if I did, I
12 mean, it was just to give him an account of the
13 meeting, because I -- you know, knowing that Mark
14 was there, I knew that Mark probably had some
15 conversation or discussion with Todd with regards
16 to the meeting.
17     I don't remember any vivid details --
18 detailed conversation between me and Todd
19 regarding the meeting.
20     Q   Okay.  Okay.  And so -- so you pull
21 Ms. Douglas in, and -- and what were you and
22 Ms. Douglas planning to do as the next step here?
23     A   I'm not so sure that Lori and I
24 formulated any next step.  I know that I did
25 have -- you know, I certainly had conversation

125

1 with her about the matter and where things were.
2    Q   Okay.
3    A   Yeah.
4    Q   Okay.
5        MS. COVENEY:  Caleb, can you pull up
6 Document 45, PLAINTIFF009702?
7        (Cruse Exhibit 12 was marked for
8 identification by the AV Technician and is
9 attached to the transcript.)
10       MS. COVENEY:  Okay.  And can I have
11 control of this, please?
12       AV TECHNICIAN:  (Technician complies.)
13 BY MS. COVENEY:
14   Q   And, Mr. Cruse, can you review this
15 document, and let me know when you're done?
16   A   Sure.
17       Okay.
18   Q   All right.  So -- so you sent this on
19 February 7th, which is after the all-staff meeting
20 and after you -- you tell Coach Joseph you're
21 planning to pull in someone from Employee
22 Relations to help with this.
23       So it sounds like you and Ms. Douglas
24 met at some point to talk about next steps.
25       Do you recall that meeting?

126

1    A   Not specifically, but that's -- I'm
2 sure that's what happened.  I don't know if we met
3 in person.  It may have been a conversation over
4 the phone.
5    Q   Okay.  All right.  And then in this
6 last sentence you say, "I will look for the other
7 'historical' data that I referenced in our meeting
8 last week.  I'll forward that to you asap."
9        What historical data are you
10 referencing here?
11   A   It would have pertained to --
12 specifically to Brittni and -- and -- and
13 Felicia's complaint.  I -- I can't think of
14 anything else, you know, that I was referencing
15 other than just giving her more background, more
16 backdrop, history as to the two individuals and
17 what they had shared with me.
18   Q   All right.
19   A   I may have also been referencing the
20 actual meeting, the larger meeting that took place
21 as well.
22   Q   Okay.  Okay.  So this is February 7th,
23 and then on February 8th, so the next day, do you
24 recall -- do you recall Coach Joseph filing an
25 internal complaint of discrimination, retaliation

127

1 of conflict of interest?
2    A   I knew that Coach, you know, executed
3 that action.  I -- I don't recall whether it was
4 the following day or not, but I do recall that she
5 did.
6    Q   Okay.  And do you recall who first
7 notified you of the complaint?
8    A   I don't.  I don't recall who.
9    Q   Okay.  And when you were notified of
10 the complaint, did someone ask you to investigate
11 it?
12   A   No.  I don't recall me being asked to
13 investigate it, no.
14   Q   Okay.  Do you recall -- did you -- did
15 you review the complaint that she submitted?
16   A   If you share it with me, I could
17 possibly recall.  I just don't remember off the
18 top of my head.
19   Q   Okay, yeah, let's take a look at it.
20       MS. COVENEY:  Caleb, can you pull up
21 Document 195, BOR-000033?
22       (Cruse Exhibit 13 was marked for
23 identification by the AV Technician and is
24 attached to the transcript.)
25       MS. COVENEY:  And can you give

128

1 Mr. Cruse control of the document, please?
2        AV TECHNICIAN:  (Technician complies.)
3 BY MS. COVENEY:
4    Q   And then, Mr. Cruse, the complaint is
5 on -- it starts on 00035, so -- okay.
6    A   Okay.
7    Q   Okay.  So take a look at this, and let
8 me know when you're done, please.
9    A   Okay.
10       Okay.  I'm done.
11   Q   Okay.  So do you -- did you ever
12 receive a copy of this complaint?
13   A   I don't think I received it, but I --
14 it was shared with me, but I don't have a copy of
15 it.
16   Q   Okay.
17   A   I believe because there are many parts
18 of it that just look too familiar to me.
19   Q   Okay.
20   A   And I think this is an example of
21 something that I saw, you know, in the waning days
22 or moments, you know, into 2019, you know, that I
23 was able to see.
24   Q   Okay.  Okay.  So in this complaint, we
25 have Coach Joseph alleging that -- she has

129

1 concerns that Georgia Tech's allocating her less
2 resources for her program than the Men's Program,
3 correct?
4    **A   Yes --**
5    Q   Do you see that?
6    **A   -- that's what I recall.**
7    Q   Okay.  And she says -- she's trying to
8 address the inequities with a bunch of people and
9 has hit a roadblock and is facing retaliation,
10 essentially.
11       Did you read that?
12   **A   I did, I read that.**
13   Q   All right.  So are the allegations in
14 here, are they, in your mind, serious?
15   **A   Well, yes, serious, absolutely.**
16   Q   Okay.  And so complaints of --
17 typically when Human Resources investigate
18 employee complaints alleging sex discrimination?
19   **A   I'm sorry, was that a question?**
20   Q   Yeah.
21       So would -- sorry.
22       Would the Office of Human Resources at
23 Georgia Tech, would they typically be the office
24 charged with investigating a complaint alleging
25 sex discrimination and employment?

130

1    **A   Oh, absolutely, yes.**
2    Q   Okay.  And what about retaliation?
3 Would the Office of Human Resources at Georgia
4 Tech typically be tasked with investigating an
5 employee complaint of retaliation?
6    **A   Yes.**
7    Q   Okay.  And what about employee
8 complaints of harassment?  Would Georgia Tech's
9 Office of Human Resources typically be tasked with
10 investigating an employee complaint of harassment?
11   **A   Yes.**
12   Q   Okay.  And what about conflict of
13 interest?  Would Georgia Tech's Office of Human
14 Resources typically be tasked with investigating a
15 complaint alleging a conflict of interest?
16   **A   Yes, as well as the Legal Department --**
17   Q   Okay.
18   **A   -- regarding conflict of interest.**
19       MS. COVENEY:  Okay.  So let's look
20 at -- can we see Exhibit 53, BOR-004465?
21       (Cruse Exhibit 14 was marked for
22 identification by the AV Technician and is
23 attached to the transcript.)
24       MS. COVENEY:  And, Caleb, can you give
25 Mr. Cruse control of this document, please?

131

1       AV TECHNICIAN:  (Technician complies.)
2 BY MS. COVENEY:
3    Q   Mr. Cruse, if you can take a look at
4 this, and let me know when you're done, please.
5    **A   Uh-huh.**
6       **Okay.  I'm done.**
7       MS. COVENEY:  Okay.  And, Caleb, can I
8 have control of this, please?
9       AV TECHNICIAN:  (Technician complies.)
10 BY MS. COVENEY:
11   Q   So do you recognize this e-mail thread?
12   **A   It does look familiar --**
13   Q   Okay.
14   **A   -- yes.**
15   Q   All right.  So we have -- on
16 February 8th is when Coach Joseph files this
17 complaint with Todd Stansbury, Joeleen Akin, Aisha
18 Oliver-Staley, Burns Newsome, and Mark Rountree,
19 which is -- it's a -- so February 8th is a Friday.
20       And then Monday morning, Todd Stansbury
21 forwards the complaint to Lynn Durham, Kim
22 Harrington, Aisha Oliver-Staley, Burns Newsome,
23 and you saying that we received an official
24 complaint regarding MaChelle Joseph.
25       So had anyone reached out to you over

132

1 the weekend about this complaint?
2    **A   I don't think so, no.**
3    Q   Okay.  All right.  And Lynn Durham, who
4 is Lynn Durham?
5    **A   Lynn also is on the -- well, no, I'm**
6 **sorry.  Lynn was -- oh, God.  She left early this**
7 **year, I believe.  I'm trying to think what her**
8 **title was.**
9    Q   Does she work in the Office of the
10 President?
11   **A   I believe so, yes.**
12   Q   Okay.  And typically -- in your
13 experience at Georgia Tech, is Lynn Durham
14 typically looped into HR complaints alleging
15 employment discrimination or retaliation?
16   **A   Not that I got copied on e-mails of**
17 **this magnitude too often, but I -- yeah, I would**
18 **think that that would be a rare occasion that she**
19 **would be copied, unless it was something that rose**
20 **to the level of the Office of the President.**
21   Q   Okay.  And what do you mean?  What type
22 of --
23   **A   Well, if it was something just that**
24 **serious, I mean, and I'm only -- I'm sorry, I**
25 **don't -- I don't want to speculate at all, but I**

133

1  think the only reason I can think of that she
2  would be copied on it was because it was something
3  of -- of great importance.
4      Q    Okay.  But prior to this, had -- had
5  anyone ever copied Lynn Durham on any
6  communications with you about an HR complaint?
7      A    No, no.  Not that I'm aware of, no.
8      Q    Okay.  Okay.  So then -- so you're
9  copied into this, and you forward this e-mail
10 thread to Julie Joyce and Lori Douglas.
11         And why -- why did you do this?  Why
12 did you loop Julie Joyce and Lori Douglas into
13 this?
14     A    Because I had engaged Lori earlier on
15 the -- the meetings that I had with Brittni and
16 Felicia and actually the -- the entire Women's
17 Program staff, which I reference in my e-mail to
18 Julie.
19         I -- I wanted to -- you know, I wanted
20 Julie to be aware of it since that's who I
21 reported to, as I was accustomed to doing.
22 Whenever there was something that was significant
23 going on, if she wasn't copied on it, I would
24 always make sure that she was made aware of it so
25 she wasn't caught off guard if anyone, you know,

134

1  asked her about it.
2      Q    Okay.  And was it -- so Coach Joseph's
3  complaint is alleging employment discrimination
4  and employment retaliation, among other things,
5  which is that -- are those issues that fall --
6  that you understood fell within Julie Joyce's
7  purview?
8      A    Yeah, they're -- they're -- they're --
9  they're HR concerns or matters, yeah.
10     Q    Okay.  And they're Employee Relations
11 matters, correct?
12     A    Uh-huh.  Yes.
13     Q    Okay.  So did you expect that Julie
14 Joyce would play a role in handling these issues,
15 this -- this complaint of MaChelle's?
16     A    Actually, I didn't.  I mean, I -- I
17 just didn't give any thought to that.  I didn't
18 know how that was going to be handled, quite --
19 quite honestly.
20     Q    Okay.
21     A    Yeah.
22     Q    Okay.  So you -- you forward this to
23 Julie, and then Julie provides some context.
24         Okay.  So she says -- she talks about a
25 complaint by her administrative assistant and

135

1  assistant coach and now other support staff and a
2  verbal warning in 2015.
3         Prior to this e-mail from Ms. Joyce,
4  had -- had you been aware of these other
5  complaints against Coach Joseph?
6      A    No.
7      Q    Okay.  Okay.  So then -- then you say,
8  Are you asking who she -- who she addressed her
9  Title IX complaints to back in 2015, and you say,
10 "she mentioned addressing her Title IX concerns
11 back in 2015 with Mike Bobinski (former AD),
12 Marvin Lewis and Shoshanna Engel." This occurred
13 during their budget decisions.
14         How were you aware of this information?
15     A    I believe Coach shared that with me.
16     Q    Okay.  Okay.  So then we have, "The
17 matter I addressed recently related to complaints
18 from MaChelle's administrative staff regarding an
19 incident taking place at a staff meeting
20 three weeks ago."
21         Okay.  So is this a reference to the
22 Felicia Tucker/Brittni Oliver conflict?
23     A    Yes, it -- yes.
24     Q    Okay.  So you're saying -- so as of
25 February 11th at 11:36 a.m., you say, I'm

136

1  continuing to address this matter until it's
2  resolved, correct?
3      A    Yeah.
4      Q    So your plan was still, at this point
5  in time, to try to resolve this conflict
6  informally; is that right?
7      A    Yes.
8      Q    Okay.  And then you say, I expect Aisha
9  will respond to this latest complaint and manage
10 it forward.
11         Okay.  So why -- when you say "Aisha,"
12 are you referring to Aisha Oliver-Staley?
13     A    Aisha, yeah, Staley.
14     Q    Okay.  And why did you expect that she
15 would handle this latest complaint?
16     A    Because she was engaged already.
17 She -- she was involved in it, and so I -- that's
18 why I added that -- that comment.
19     Q    And what do you mean --
20     A    I assumed that -- I assumed that she
21 would -- you know, because everything was being
22 referred to her, so I thought perhaps she would --
23 you know, she was the one managing everything
24 moving forward.
25     Q    And when you say "everything was being

137

1  referred to her," you mean the other issues
2  relating to Coach Joseph?
3     A   Yes.
4     Q   Okay.  And at this time, had -- had you
5  been referring any other HR employee-related
6  matters that you were working on in the Athletic
7  Association, had you been referring those to
8  Aisha?
9     A   No, because I wasn't working on any
10 other Employee Relations issues.
11    Q   Okay.  So other than this issue with
12 Coach Joseph, the issues with Coach Joseph that
13 we've been talking about, I mean, were there
14 other -- any other issues -- Employee Relations
15 issues in the Athletic Department?
16    A   No.  Not at that particular point in
17 time, no.
18    Q   Okay.  And who -- who had been telling
19 you to refer all this stuff related to
20 Coach Joseph to Aisha Oliver-Staley?  Do you
21 recall?
22    A   I do not remember.  I wanted to say
23 Julie Joyce, but I -- I don't -- that's -- that
24 would be purely guessing.  I'm not sure.
25    Q   Okay.

138

1        MS. COVENEY:  Caleb, can we see
2  Exhibit 51, BOR-004403?
3        (Cruse Exhibit 15 was marked for
4  identification by the AV Technician and is
5  attached to the transcript.)
6        MS. COVENEY:  Okay.  Can I have control
7  of this, please, Caleb?
8        AV TECHNICIAN:  (Technician complies.)
9        MS. COVENEY:  Okay.  Can you give
10 Mr. Cruse control of this, please?
11       AV TECHNICIAN:  (Technician complies.)
12 BY MS. COVENEY:
13    Q   And, Mr. Cruse, if you can just take a
14 look at this, and let me know when you're done.
15    A   Sure.
16        Okay.  I'm done.
17    Q   Okay.  So we have here on this top
18 e-mail on February 11th at 11:38 p.m. [sic], so
19 this is -- this is right around the time that you
20 are having e-mail exchanges about Coach Joseph's
21 February 8th complaint, you e-mail Lori Douglas
22 and you say, "Another matter was brought to my
23 attention a short while ago that I need to discuss
24 with you (involving a Women's Basketball
25 administrative staff member)."

139

1        Okay.  What matter was brought to your
2  attention to February 11th?
3     A   I immediately started thinking about
4  who I was referencing, and I'm still trying to
5  back into what that was in reference to.
6     Q   So this may help jog your memory.
7     A   Okay.
8     Q   So about, I think, a minute before you
9  send this e-mail to Ms. Douglas --
10    A   Uh-huh.
11    Q   -- Felicia Tucker reaches out to Julie
12 Joyce to request a meeting with her to talk about
13 Coach Joseph.
14        Was it Felicia Tucker who -- who
15 contacted you, or was it someone else?
16    A   I don't recall.  I'm trying to think of
17 someone else perhaps.  And I don't know if this
18 was -- was it or not.
19        There -- there was -- one of the
20 graduate assistants in the program, I know, had
21 come to me, and I -- this is where it's -- I'm not
22 so sure if this is it, because I don't know -- I
23 can't -- I don't know the specific time frame, but
24 I do recall being visited by one of the graduate
25 assistants, and -- and I don't recall her name,

140

1  but I know she had a concern.  It had nothing to
2  do with Coach MaChelle -- with Coach.
3     Q   Was that JP?
4     A   No, it wasn't JP, because JP is an
5  assistant coach.
6     Q   Okay.
7     A   I -- I'm -- if -- I'm thinking that it
8  may -- it could have been this graduate assistant
9  that I'm referring to, and I'm just trying to
10 recall what -- what her concern was, and it may
11 have been -- she may have -- I recall her coming
12 to me with regards to her comments -- her
13 commentary with regards to the larger meeting that
14 we had, and I -- I think it may have been in
15 reference to that, but, again, I don't know if it
16 was that specific time frame that we're talking
17 about.
18    Q   Okay.  All right.  Well, so around --
19 around this same exact time, Felicia Tucker
20 e-mails Julie Joyce and asks for a meeting to
21 talk -- to lodge some complaints, and she and
22 Brittni Oliver meet with Julie Joyce later that
23 day on February 11th.
24        Were you aware that -- that that
25 happened, that Felicia Tucker met with Julie

141

1  Joyce --
2      A   Yes.
3      Q   -- to talk --
4      A   Yes, after the fact.
5      Q   Okay.  And Felicia Tucker had been
6  involved in the February 1st meeting, correct?
7      A   Correct.
8      Q   And so had Brittni Oliver, correct?
9      A   Yes.
10     Q   And they were aware that you were
11 trying to handle this -- you were trying to
12 remediate this conflict between Felicia and
13 Brittni and Coach Joseph, correct?
14     A   Yes.
15     Q   They were aware of that, okay.
16         So then -- I mean, does it seem strange
17 to you that you're -- you're spending all of this
18 time trying to resolve this conflict between
19 Felicia and Brittni and MaChelle, and Felicia all
20 of a sudden just decides to file a complaint with
21 someone else in HR to deal with the matter.
22         Does that strike you as strange?
23     A   Well, I won't say it strikes me as
24 strange.  What it strikes me as is that I gather
25 that they were not happy that things weren't

142

1  getting -- you know, coming to a resolution fast
2  enough.
3      Q   Had they --
4      A   So --
5      Q   Had they expressed that to you before?
6      A   I don't recall ever.
7      Q   Okay.
8      A   No.
9      Q   And -- and so -- so they just went over
10 you and directly to Ms. Joyce?
11     A   That's what it appeared to me to -- to
12 have happened, yes.
13     Q   Okay.  Okay.  So -- so they file this
14 complaint with Ms. Joyce, and then who -- who
15 informs you that Felicia Tucker and Brittni Oliver
16 had filed this complaint?
17     A   Oh, I'm sure -- I'm sure it was Julie
18 herself.
19     Q   Okay.  And -- and even after they file
20 this complaint with Julie, were you -- was your
21 plan still to try to resolve the conflict
22 informally?
23     A   Yeah, I was still on course for that.
24     Q   Okay.
25     A   I think at that particular point in

143

1  time, I was.
2      Q   Okay.
3         Okay.  And do you -- okay.  So -- so
4  after Felicia Tucker and Brittni Oliver had filed
5  a complaint with HR, you initially had still
6  planned to try to resolve the conflict informally;
7  is that accurate?
8      A   Yes.
9      Q   Okay.  And what were -- what were your
10 plans for doing that?
11     A   Well, I was still holding on to the
12 hope that we could have a follow-up meeting to the
13 first meeting that we -- we had.  It was an
14 exercise that I really wanted to engage that,
15 really, I had intended -- hoping -- hoping to have
16 enough time in the very first meeting to -- to
17 engage this particular exercise, and -- but we --
18 we ran out of time.
19         And so it was my hopes primarily for
20 the second meeting, that was my objective, was to
21 engage this exercise where we would identify very
22 specific things that, you know, the opposing
23 parties -- I wanted them to -- to basically put on
24 the table, you know, the things that they wanted
25 to stop occurring, start occurring, and to

144

1  continue to occur, and -- but we never had that
2  opportunity.
3      Q   Okay.  And why didn't you have that
4  opportunity?
5      A   I think we just -- we -- we ran out of
6  time.  I -- I was -- I think in one of the
7  documents that you showed earlier, there was a --
8  one of my e-mails that I was reaching out, I think
9  it was to -- to Adrienne Richardson, and I was
10 asking for assistance, because I was just totally
11 swamped.
12         Not only did I have this matter, which
13 was -- was huge, it was significant, it was taking
14 a lot of my time, you know, I also had just a
15 number of day-to-day administrative
16 responsibilities.
17         It was a time when there were, you
18 know, a number of contract renewals in play, I was
19 down in staff, I -- I think I might have had a
20 temporary person working for me at the time, I'm
21 not sure, but I was just totally completely
22 overwhelmed with work, and so -- as you can see in
23 some of the documents where I make apologies for a
24 couple of days gone by to get back to folks.
25     Q   Uh-huh.

145

1      A    So to answer your question, it just
2  never happened, ran out of time before it was
3  possible to -- to hold the meeting.
4      Q    Okay.  Well, at some point, someone
5  made the decision to retain an outside law firm to
6  investigate Felicia Tucker and Brittni Oliver's
7  complaints against Coach Joseph.
8          Are you aware of that?
9      A    Vaguely, and -- and, you know, again,
10 after the fact.
11     Q    Okay.  So no one -- no one consulted
12 you before retaining an investigator to
13 investigate this?
14     A    No.  That -- I was not a part of that
15 decision.  Nobody asked me for my opinion or, you
16 know, anything about it.  That was just done.
17     Q    Okay.  And who -- who informed you that
18 that had been done?
19     A    I don't remember.  I don't recall.
20     Q    And who made the -- do you know who
21 made the decision to do that, to take -- to take
22 this conflict that you were trying to resolve
23 informally out of your hands and give it to an
24 outside entity?
25     A    Yeah, I don't.  I just don't know.

146

1      Q    Okay.
2          MS. COVENEY:  Okay.  So this may be a
3  good stopping point for lunch.
4          Mr. Cruse, I don't -- I think I have
5  maybe an hour or two more left of questions.  I
6  don't think this will go all day, but I do think
7  it will go past lunchtime.
8          So do you all want to take a quick
9  lunch break, and then come back maybe at 1:30 just
10 to keep things moving?  Does that work?
11         MS. STOFF:  Mr. Cruse, does that work
12 for you?
13         THE WITNESS:  Oh, I'm sorry.  I'm just
14 figuring I'm at the mercy of you guys.  Whatever
15 you say.
16         MS. STOFF:  It works for me.
17         THE WITNESS:  I mean, I have the time
18 to do it.  I don't think I have -- or I may have
19 had another meeting, but that's okay.  If I did,
20 this is more important to get this taken care of.
21 So, yeah, I'm good.
22         MS. COVENEY:  Okay.  All right.  So why
23 don't we plan on that.  Let's plan on reconvening
24 at 1:30.
25         THE WITNESS:  Okay.

147

1          MS. COVENEY:  Okay.
2          (A recess was taken.)
3  BY MS. COVENEY:
4      Q    Okay.  So in discovery, Georgia Tech
5  has produced some documents to us that say that
6  Dr. Peterson held meetings with the members of the
7  Athletic Department staff about Coach Joseph at
8  various points throughout January and February.
9          Did you ever participate in any meeting
10 with President Peterson and the Athletic
11 Department staff about Coach Joseph?
12     A    No.
13     Q    Okay.  Okay.  So before the break, we
14 were talking about -- about the various complaints
15 that Coach Joseph and Felicia Tucker had filed
16 with HR in early to mid-February.
17         Do you recall that around that same
18 time Coach Joseph submitted a request to Delvin
19 Jones for some phone records?
20     A    I do.
21     Q    Okay.  And who is Delvin Jones?
22     A    Delvin Jones was a member of the
23 Finance staff.
24     Q    Okay.  So what department is he in?
25     A    Well, Accounting, Accounting/Finance.

148

1      Q    For like the entire institute, or is he
2  in the Athletic --
3      A    Oh, no, I'm sorry.  For the Athletic
4  Association.
5      Q    Okay.  And his office, do they control
6  the phone records?
7      A    I -- you know, I don't know.  I don't
8  recall exactly how that worked, but I do know that
9  he had some responsibility for that.
10     Q    Okay.
11     A    I'm not -- I'm not so sure how, you
12 know, he was the point person for it, but he was.
13     Q    Okay.  So -- okay.  So Coach Joseph
14 submits the request to Delvin Jones, she asks for
15 the phone records.  Delvin Jones says, okay, I'll
16 look into that, and then at some point, someone
17 tells Coach Joseph, no, you can't have those phone
18 records.
19         Did Delvin Jones come to you and tell
20 you about Coach Joseph's request?
21     A    I believe he did, yes.
22     Q    Okay.  And -- and why -- when did he
23 come to you?
24     A    Oh, I don't recall exactly when, but I
25 do recall him bringing it to my attention.  I

149

1  believe he did, yes.
2      Q    Okay.  And what did he say when he
3  brought it to your attention?
4      A    Merely that he received a request to
5  pull the phone records.
6      Q    Okay.  And was that -- was that
7  standard procedure, to come to you about this
8  request?
9      A    Not necessarily, but when he did come
10 to me, I knew -- I know that we have a policy
11 that, you know, we don't just randomly pull
12 telephone records.  So --
13     Q    Okay.  So --
14     A    -- I --
15     Q    Sorry.  Go ahead.
16     A    No, so I was going to say that I -- I
17 recall that I basically ran that up the flagpole
18 to -- with -- with IT to see how that's handled.
19     Q    Okay.  And -- okay.  So Delvin Jones
20 comes to you, he tells you about this request, and
21 did anyone notify Felicia Tucker and Brittni
22 Oliver of the request?  Did you?
23     A    Not that I -- not that I recall.
24     Q    Okay.  So let's --
25          MS. COVENEY:  Caleb, can we look at

150

1  Document 71, BOR-47?
2          AV TECHNICIAN:  Sorry, I cut out.  What
3  was the file name?
4          MS. COVENEY:  It was BOR-000047,
5  Document 71.
6          (Cruse Exhibit 16 was marked for
7  identification by the AV Technician and is
8  attached to the transcript.)
9          MS. COVENEY:  And can I have control of
10 this, Caleb, please?
11         AV TECHNICIAN:  (Technician complies.)
12 BY MS. COVENEY:
13     Q    Okay.  So here we have -- Coach Joseph,
14 on February 18th, e-mails Delvin Jones, Hey, can I
15 please pick up those phone records I requested,
16 and then Delvin Jones forwards this to you,
17 Mr. Cruse, and copies Marvin Lewis, and says,
18 "Kevin, Good morning.  Has this been discussed?
19 Or has something changed and I have not been
20 notified?"
21     Okay.  So first, what is Marvin Lewis
22 doing in this exchange?  What role does he play
23 with phone records?
24     A    Well, Delvin -- so Delvin is under
25 Marvin.  He's not a direct report to Marvin.  His

151

1  boss, who he reported to, reports to Marvin.
2          I don't know why he felt it was
3  necessary to copy Marvin.
4      Q    Okay.  So it sounds like the two of you
5  had discussed this before; is that right?
6          You and -- you and Delvin had discussed
7  the phone records request before?
8      A    I think he may have -- yeah, I think he
9  may have called me --
10     Q    Okay.
11     A    -- about the request.
12     Q    Okay.  So we're going to toggle back
13 and forth between two documents.
14          MS. COVENEY:  Caleb, can you bring up
15 Exhibit 73?  It's BOR-000043.
16          (Cruse Exhibit 17 was marked for
17 identification by the AV Technician and is
18 attached to the transcript.)
19          MS. COVENEY:  And can I have control of
20 this too?
21          AV TECHNICIAN:  (Technician complies.)
22 BY MS. COVENEY:
23     Q    Okay.  All right.  So Coach Joseph
24 e-mails Delvin, Delvin e-mails you, and then you
25 e-mail Coach Joseph.  It says, Delvin made me

152

1  aware of your request to see phone records for one
2  or more of your staff.  I can't remember if it was
3  Brittni or Felicia or both.  "However, Delvin was
4  vaguely aware of a policy that requests must come
5  through HR (he was correct)."
6          Okay.  And I can tell you when MaChelle
7  first asked for these records on February 9th,
8  Delvin's response to her was, No problem.  I
9  should be able to pull these from our filing
10 cabinets on Monday.  Let me know if you need
11 anything else.
12         So it sounds like Delvin was ready and
13 willing to give Coach Joseph the phone records.
14         Was it that Delvin was aware of a
15 policy that records go through HR, or someone told
16 him that?
17     A    I think I may have informed him when we
18 spoke that there was a process that had to be
19 followed --
20     Q    Okay.
21     A    -- with relinquishing phone records.
22     Q    And had you ever -- had you ever had to
23 fulfill a request for phone records before?
24     A    Yes.
25     Q    Okay.  And how many times previously

153

1  did you do that?
2  **A    Maybe once or twice over at Scheller.**
3  Q    Okay.  And did you go through this
4  process?
5  **A    Yes.**
6  Q    Okay.  Was it before or after
7  Coach Joseph requested these?
8  **A    Prior to.**
9  Q    Okay.  Okay.  So let me go back to 71.
10  All right.  So right here we have you
11  e-mailing Coach Joseph at 9:39 a.m., and then at
12  9:41 a.m., you e-mail Lori Douglas and say, "I
13  just blind copied you on an email regarding a
14  requests for phone records.  Can you advise me of
15  the formal process involved so that I can share it
16  with the requestor?"
17  Okay.  So -- well, first of all, why
18  are you blind copying Lori Douglas on this e-mail
19  exchange?
20  **A    Well, she's my Employee Relations**
21  **Consultant, and she's aware of, you know,**
22  **everything that's been going on.  So it's just a**
23  **way of me keeping her in the loop.**
24  Q    Okay.  And then you say, "Can you
25  advise me of the formal process involved so that I

154

1  can share it with the requestor?"
2  So it sounds like you actually were not
3  aware of this formal process for getting phone
4  records.
5  **A    Well, actually, I -- I -- I knew that**
6  **there was a formal process, and I knew it involved**
7  **OIT.  I just wasn't -- I couldn't recall what the**
8  **specific details were.**
9  Q    Okay.  Okay.  So then it looks like you
10  and Lori try to connect by phone.
11  Okay.  And then February 20th, you get
12  back to -- to Coach Joseph, and you said you were
13  told the records must go through OIT.
14  And OIT is, what, Office of Information
15  Technology?
16  **A    Office of In- -- of, yes, Information**
17  **Technology.**
18  Q    Okay.  So then you say that this --
19  this Data Access Policy is the policy that governs
20  the requests for phone records?
21  **A    Correct.**
22  Q    Okay.  And so then -- okay.
23  MS. COVENEY:  Caleb, can you pull up
24  Exhibit 78, PLAINTIFF008451?
25  (Cruse Exhibit 18 was marked for

155

1  identification by the AV Technician and is
2  attached to the transcript.)
3  MS. COVENEY:  Can I have control of
4  this, please?
5  AV TECHNICIAN:  (Technician complies.)
6  BY MS. COVENEY:
7  Q    Okay.  So then after sending MaChelle
8  the Data Access Policy, you e-mail her on
9  February 20th at 3:52 p.m. saying you received
10  further clarification on the process from your
11  GTHR boss this morning.
12  And was that boss Julie Joyce?
13  **A    Yes.**
14  Q    Okay.  And so you say, "I just need you
15  to send me an email requesting the phone records
16  and reason for needing to review them.  I will
17  then forward your request to GTHR where a
18  committee will review and approve the request."
19  Okay.  So is this the policy?
20  **A    I believe that was part of the Data**
21  **Access Policy.**
22  Q    Okay.  And is that -- so this was
23  written somewhere?
24  **A    Yes.**
25  Q    Okay.

156

1  **A    I think it was in the link that was in**
2  **the previous document that you had that was shared**
3  **with me.**
4  Q    Okay.  So there's actually -- so
5  there's the Data Access Policy, and then there's
6  Data Access Procedures about requesting records?
7  MS. COVENEY:  So, Caleb, can you pull
8  up Exhibit 74?
9  (Cruse Exhibit 19 was marked for
10  identification by the AV Technician and is
11  attached to the transcript.)
12  MS. COVENEY:  Okay.  May I have control
13  of this, please?
14  AV TECHNICIAN:  (Technician complies.)
15  BY MS. COVENEY:
16  Q    Mr. Cruse, does this policy, does this
17  look familiar to you?
18  **A    To be honest with you, it doesn't,**
19  **but --**
20  Q    Okay.
21  **A    I mean, it just looks like many of our,**
22  **you know --**
23  Q    So it's your understanding that
24  whatever policy you linked -- you linked in that
25  e-mail to MaChelle, that was the policy that set

157

1   forth this complaint -- or this phone record
2   request --
3       A   Correct.
4       Q   -- procedure?
5           Okay.  So here on February 20th toward
6   the end of the day, you say, "Hi Joeleen, Just
7   keeping you in the loop.  I had a conference call
8   with Julie and Lori this morning to discuss
9   MaChelle's request...Earlier this morning I
10  forwarded the Data Access policy to Coach.
11  However there's a process involved that is not
12  published.  A committee made up of 2-3 HR leaders
13  and IT policy owner convene to review requests to
14  access data records.  The committee determines
15  contingent.  Per the policy, I am one of the
16  'Data Stewards' the request has to come through."
17  Once I review I will forward on to Julie Joyce for
18  the committee review.
19          Okay.  So it sounds like there's a part
20  of this process that actually is not published; is
21  that right?
22      A   I -- perhaps so, yeah.
23      Q   Okay.  And do you know -- and so who
24  told you about this -- this unpublished policy?
25      A   I don't recall.  I think it may have

158

1   been Julie Joyce.
2       Q   Okay.  And who was the -- do you know
3   who the committee was, who was the review --
4       A   No.  All I know -- no, I don't know
5   specifically who the members are of that
6   committee, but I do know it was made up of, you
7   know, folks from HR as well as, I think, IT.
8       Q   Okay.  And -- and so in the request
9   that you have processed since this -- since
10  MaChelle's request, the request for phone records,
11  have you sent the request to this HR committee?
12      A   I didn't.  I didn't send it to them,
13  per se.
14      Q   Okay.
15      A   Well, I don't recall.  I don't
16  remember.  You know, if they received it, they
17  could have received it from me, but I think
18  probably it was handed off perhaps maybe to -- to
19  Julie --
20      Q   Okay.
21      A   -- and then forwarded on to the
22  committee.
23      Q   Okay.  And so why are you e-mailing
24  Joeleen Akin this update?
25      A   I think -- and I was thinking about

159

1   that.  I think Joeleen was made aware of it.
2   She's the Sports -- at this point in time, she's
3   the Sports Administrator over the Women's
4   Basketball Program, so I believe I was either
5   following up or just keeping her in the loop, as I
6   started out in -- in the e-mail.
7       Q   Okay.  And so then February 28th,
8   around that same time, Lori Douglas e-mails Eric
9   Hoffman, See below from HRBP Kevin Cruse.  "I can
10  explain in more detail when we meet on Monday."
11          Okay.  So Eric Hoffman is the lawyer
12  who Georgia Tech retained to investigate
13  Coach Joseph, correct?
14      A   Yes.
15      Q   Okay.  So by this point in time, were
16  you aware that he had been engaged, that Georgia
17  Tech had engaged him?
18      A   I'm not sure when I came into that
19  understanding.  You know, I -- whenever I
20  started -- whenever I got the request to start
21  pulling records, that's when I learned of Eric
22  Hoffman's involvement.
23      Q   Okay.  And who came to you to ask that
24  you start pulling records?
25      A   Oh, that probably came from -- I'm

160

1   going to -- I don't know exactly.  I would be
2   making an assumption, but I think it would be an
3   accurate one to say that that probably came from
4   Julie.
5       Q   Okay.  And -- and what do you recall --
6   and what were you -- what were you told about Eric
7   Hoffman and his investigation?
8       A   That he's performing an independent
9   investigation.
10      Q   Were you told what he was
11  investigating?
12      A   I do, but I don't remember exactly what
13  it was.  I don't think it was -- I -- well, I want
14  to say that it might be related to some of the
15  staff -- administrative staff complaints.
16      Q   Uh-huh.
17      A   I just don't recall specifically.
18      Q   Okay.  But the first request that came
19  to you about -- related to the Littler
20  investigation was a request for you to start
21  pulling documents; is that right?
22      A   Correct.
23      Q   And were you told what documents to
24  pull?
25      A   I think I was just given like a

161

1  general, like, list of things. You know, like it
2  wasn't exactly, you know, pull X, Y, Z, because
3  they know that they -- that existed. I think it
4  was, you know, more or less the documents in -- in
5  Coach Jo's personnel file.
6      Q   Okay. And did someone send you this
7  request by e-mail?
8      A   I think I got an e-mail, and it may
9  have even come from Legal.
10     Q   Okay. Okay. So -- so around this
11 time, around the February 19th-20th time frame, do
12 you recall Coach Joseph coming to see you to talk
13 about this phone record issue, among other things?
14     A   I think -- I think Coach Jo may have.
15     Q   Okay. And what do you recall about
16 that meeting?
17     A   I don't remember any specific details
18 as to what she said, but, you know, it was related
19 to her request, and I'm sure she was just trying
20 to follow up as to what, you know, may -- may be
21 the delay, but that's -- you know, I don't
22 remember specifically what she -- she said about
23 it.
24         MS. COVENEY: Caleb, can you bring up
25 Exhibit 199? It's PLAINTIFF007140.

162

1          (Cruse Exhibit 20 was marked for
2  identification by the AV Technician and is
3  attached to the transcript.)
4          MS. COVENEY: And can you give
5  Mr. Cruse control of this document, please?
6          AV TECHNICIAN: (Technician complies.)
7  BY MS. COVENEY:
8      Q   Mr. Cruse, if you could just read this,
9  and then let me know when you're done.
10     A   Sure.
11     Okay.
12     Q   Okay. So this is an e-mail from
13 Coach Joseph to two of her friends summarizing a
14 conversation she said she had with her mark")m
15 February 19th around 10:00 a.m., and I'm just
16 going to go through some of this with you.
17     So -- all right. So the first thing
18 that she says, she went to HR to check in on JP's
19 complaint to HR about Compliance calling her a
20 liar.
21     All right. So JP is one of -- was one
22 of Coach Joseph's assistant coaches, correct?
23     A   Yes.
24     Q   And do you recall her coming to you to
25 complain about Compliance calling her a liar?

163

1      A   Yes, I do.
2      Q   Okay. And had she filed a complaint
3  with your office about that?
4      A   I won't say file a complaint. She made
5  me aware of it.
6      Q   Okay. And had she asked you to look
7  into it?
8      A   I believe so.
9      Q   Okay. And -- and when did she file
10 this complaint? Was it around the time that all
11 these other complaints were being filed?
12     A   It probably was. I'm sure -- yeah, it
13 had to have been.
14     Q   Okay. And do you recall Coach Joseph
15 coming to talk to you about JP's complaint?
16     A   Yes.
17     Q   Okay. And did you do anything to
18 investigate this complaint, JP's complaint?
19     A   I recall reaching out to JP.
20     Q   Okay. And what -- what was the outcome
21 of that investigation?
22     A   You know, JP, I think, and I -- first
23 of all, it was intermittent, hit or miss in trying
24 to link up with her, but we did talk.
25         You know, she shared her side of the

164

1  story. I don't recall all of the vivid details of
2  it, but we did discuss it. I'll be quite honest
3  with you, I don't know where that was left. I --
4  I may have reached out probably to -- to Lori
5  Douglas to add, you know, to -- to things that she
6  was helping me out with, but I do recall reaching
7  out to JP to find out -- find out from her
8  various -- you know, from her personally as to
9  what occurred.
10     Q   All right. So then here in the second
11 paragraph it says, "I also said that I felt that
12 mark 'quitting' as my sport administrator was
13 retaliation for the letters my staff wrote about
14 the meeting we had with her and mark."
15     Do you recall Coach Joseph telling you
16 that she -- she believed or felt that Mark
17 quitting was retaliatory?
18     A   I don't remember that -- specifically
19 that statement, you know, but, you know, I recall
20 Coach feeling a certain way about Mark just kind
21 of, you know, bowing out of being the Sports
22 Administrator. I knew that she held that
23 sentiment. She -- she -- she had some concerns
24 with it.
25     Q   Okay. And -- and you asked, Did Mark

165

1  not tell you why -- "did mark tell you why he is
2  not working with you?"
3     A   I did ask that question. I'm sorry.
4     Q   Okay. And -- and remind me again
5  why -- why had Mark decided to step down?
6     A   He was frustrated. There were, you
7  know, accusations with regards to him having
8  conversations unbeknown to Coach Joseph with her
9  staff. I remember that pretty specifically,
10 because he had voiced that frustration or that
11 concern with that held notion, and -- and then
12 everything leading up to, you know, that was going
13 on.
14        I think he just felt -- he felt he was
15 being a punching bag or something. I -- you know,
16 I -- he was very frustrated and just couldn't take
17 it anymore, and that was his reason.
18    Q   Okay. And do you recall saying to
19 Coach Joseph, "I wish mark would've met with you
20 and told you why" he was stepping down?
21    A   Yes, I do. I did say that.
22    Q   Okay. And then you said -- and then
23 she -- these notes reflect that you said, "coach
24 why do they all think you are going to sue them"?
25        Do you recall saying that or something

166

1  along those lines?
2     A   Yeah, something along those lines.
3     Q   Okay.
4     A   I -- I can't say verbatim, but yeah. I
5  was asking -- I -- as you can see in -- in the
6  document here, I was asking a lot of questions,
7  because I was trying to find out, you know, where
8  communication was lying, with -- you know, who's
9  talking to who.
10        And, again, going back to the question
11 to Coach Jo whether Mark had shared with her, I --
12 you know, I asked that question purposely, because
13 I wanted to find out if he had reached out to her.
14        I think I may have even had a
15 conversation with Mark about talking to Coach Jo,
16 and -- and it just seemed like those conversations
17 never took place.
18    Q   And -- and did you think that -- why
19 did you think Mark needed to tell Coach Joseph why
20 he was stepping down? Just like she thought she
21 had a right to know that, understand that?
22    A   Yeah. I -- I -- I operate in the realm
23 of transparency, and I was looking for that or was
24 hoping for that.
25    Q   And -- and when you said why do you

167

1  think they're all -- "why do they all think you
2  are going to sue them," who are you referring to
3  here? Who thought she was going to sue them?
4     A   Well, that -- I was asking Coach Jo why
5  she felt that way.
6     Q   But you said, "coach, why do
7  they" -- "do they all think you're going to sue
8  them?"
9         It sounds like somebody thought that
10 MaChelle was going to sue Georgia Tech.
11    A   Right.
12    Q   Do you remember a conver--- do you
13 remember anyone in the Athletic Department making
14 a remark?
15    A   No, I don't, but that was just a sense
16 of my own. That was my own perception.
17    Q   Okay. And who -- when you say "they,"
18 who are you referring to?
19    A   Leadership.
20    Q   So Todd Stansbury?
21    A   The Athletic Association leadership.
22    Q   And did that -- I mean, I'm just trying
23 to clarify who that -- who that includes.
24        Does it include Todd --
25    A   That would be -- that would be Todd and

168

1  his direct reports, or more specifically, Mark.
2     Q   Mark Rountree?
3     A   Mark Rountree is who was --
4     Q   Would Joeleen Akin be in that circle?
5     A   Yes. Yeah.
6     Q   Okay. What about Marvin Lewis and
7  Shoshanna?
8     A   They were part of the Executive
9  Leadership Team.
10    Q   Okay. All right. And then -- okay.
11 So -- so then she says -- these notes reflect that
12 Coach Joseph said, "it feels like Shoshanna is
13 throwing darts and trying to get something to
14 stick."
15        "I have been harassed for 3 years and I
16 just want to coach my team."
17        "I'm not sure who is allowing her to
18 target me and my staff and players but it is
19 exhausting."
20        Do you recall Coach Joseph expressing
21 these concerns to you?
22    A   Again, I'll say not verbatim. You
23 know, I don't recall that specific statement being
24 shared with me, but in context, yeah, I -- I do
25 recall hearing that from Coach Jo.

169

1    Q    That sentiment?
2    **A    That sentiment, absolutely.  Yeah,**
3  **that's what I meant.**
4    Q    Okay.  And then it says, He told me he
5  was -- "He told me is was bringing in an outside
6  person to help with employee relations."
7         So was this -- was this Lori Douglas
8  that you were bringing in to help with the
9  Brittni/Felicia stuff?
10   **A    Correct.**
11   Q    Okay.  And then -- then the two of you
12  talk about the phone records.
13        Okay.  And whatever happened with the
14  phone records issue?
15   **A    To be honest with you, I don't**
16  **remember.  That was kicked upstairs to -- again,**
17  **to GTHR and OIT, and I'm not so sure what the**
18  **final outcome was.**
19   Q    Okay.  So did you -- did you send them
20  an e-mail saying this is why Coach Joseph wants
21  these records, and then --
22   **A    I think along the way, I did clarify**
23  **once I understood why she was requesting them,**
24  **yes.**
25   Q    Okay.  All right.  So now I'm going to

170

1  talk a little bit about the Littler investigation.
2         So prior to Eric Hoffman's
3  investigation of Coach Joseph, had you ever worked
4  with Eric Hoffman before?
5    **A    No.**
6    Q    Okay.  What about Littler?  Have you
7  ever -- had you ever partnered with them on an
8  external investigation?
9    **A    No.  My only involvement with Littler**
10  **is, you know, I attended -- I think I -- at that**
11  **time, I may have attended a -- a workshop at their**
12  **law firm.**
13        **They -- like on a quarterly basis, they**
14  **have a -- an HR-related topic, and the**
15  **HR community is invited to it, mostly their**
16  **clients.  And so I had -- but it had nothing to do**
17  **with this, and I don't know any of those Littler**
18  **attorneys.**
19        **Actually, I knew someone who was a**
20  **church member of mine who was an attorney for**
21  **them some years ago, but it had nothing to do --**
22  **and I had not worked with Littler on any cases at**
23  **Georgia Tech.**
24   Q    Okay.  So we talked about the fact that
25  Georgia Tech retained Littler to investigate the

171

1  staff complaints against Coach Joseph.
2         At some point, were you made aware that
3  there were student complaints that had been filed
4  against Coach Joseph?
5    **A    I had heard that, yeah.**
6    Q    Okay.  And -- and who -- who told --
7  who first told you about those student complaints?
8    **A    I don't know.  When I say that I heard**
9  **it, it was -- I -- I literally mean it was**
10  **hearsay.**
11   Q    Okay.  So, I mean, was it told to you
12  in the context of the Littler investigation
13  that --
14   **A    No, no, no.  Nothing to do with**
15  **Littler.  I just heard that generally, that there**
16  **were some complaints that were levied against**
17  **Coach by some student athletes.**
18   Q    Okay.  And so it was more like gossip?
19  It wasn't you need to do something about this?
20   **A    You could call it that, gossip,**
21  **hearsay, you know.**
22   Q    Okay.  And were you ever told of -- or
23  shown letters from parents of -- of students about
24  Coach Joseph?
25   **A    No.**

172

1    Q    Okay.  And earlier you had mentioned --
2  a lot earlier in the deposition, you had made a
3  comment to the effect of student complaints was
4  not within our wheelhouse.
5         Do you remember saying that?
6    **A    Yes.**
7    Q    Okay.  And what did -- what do you mean
8  by that?
9    **A    Well, I had no official capacity to**
10  **look into or investigate any complaint from a**
11  **student.  In fact, no student had ever come to me**
12  **to complain about anything, but if they had, that**
13  **would be something that I would immediately have**
14  **to advise, you know, Todd or -- or -- or Joeleen**
15  **Akin, you know, because it just -- that was not**
16  **part of my responsibility.**
17   Q    Okay.  And by "your responsibility,"
18  you mean your responsibility in HR?
19   **A    Exactly.**
20   Q    Okay.
21   **A    My -- my charge -- my -- my**
22  **responsibility was to administer, you know, and**
23  **support administrative staff.**
24   Q    Okay.  And who -- was there an office
25  at Georgia Tech that was designated to handle

173

1   student complaints?
2       A   Well, there's The Office of Student
3   Services.  There's, you know, the Title IX folks,
4   Burns Newsome.
5           I think there's another entity on
6   campus, but, yeah, there are -- students know
7   where they need to go when they have complaints,
8   but I'm sure they're not advised or told to come
9   to the -- you know, the only time a student would
10  come to me or any HR administrator on campus is if
11  it's relating to employment, because we do employ
12  a number of student assistants.
13      Q   Okay.
14      A   But that's -- that's the only -- you
15  know, we don't get involved with anything that
16  would be relations-related.
17      Q   Okay.  And when you say -- when you say
18  relation employment, you mean the employment --
19  like if the student is a student and also an
20  employee of the university?
21      A   Exactly, yes.
22      Q   Okay.  So documents produced to us in
23  discovery show that on February 25th, Eric Hoffman
24  had a meeting with Julie Joyce and Lori Douglas
25  and it appears that you also attended at least

174

1   part of that meeting.
2           Do you recall having a meeting with
3   Eric Hoffman at the start of his investigation?
4       A   Perhaps.
5       Q   Okay.  And do you recall who attended
6   that meeting?
7       A   It probably would have been just the
8   party that you mentioned, Lori Douglas, Julie
9   Joyce, and myself.
10      Q   Okay.  And in Eric Hoffman's final
11  report, there's a footnote.  Footnote 1 says that
12  he participated in a meeting with Associate
13  Athletic Director Joeleen Akin and Human Resources
14  Business Partner Kevin Cruse before the start of
15  the investigation to obtain background information
16  regarding the Athletic Department and the Women's
17  Basketball Program.
18          Do you recall that meeting?
19      A   Not specifically, but it -- I'm sure
20  that's what happened.
21          MS. COVENEY:  Okay.  So let's look
22  at -- Caleb, can you pull up Exhibit 100,
23  BOR-000583?
24          (Cruse Exhibit 21 was marked for
25  identification by the AV Technician and is

175

1   attached to the transcript.)
2           MS. COVENEY:  Okay.  And can I have
3   control of this, please?
4           AV TECHNICIAN:  (Technician complies.)
5   BY MS. COVENEY:
6       Q   So, Mr. Cruse, this is a compilation of
7   notes that Eric Hoffman produced to us from his
8   investigation into Coach Joseph and the Women's
9   Basketball Program.  I'm just going to review a
10  few with you.
11          So at the top of this, it says there
12  was a meeting on February 25th, 2019, and why
13  don't you take a look at this, and see if any of
14  this refreshes your recollection about what you
15  may have discussed with Mr. Hoffman on
16  February 25th.
17      A   I'm sorry, can I ask a question?
18      Q   Sure.
19      A   The initial "MJ," is that --
20      Q   Yeah.  My guess is that's MaChelle
21  Joseph.
22      A   Oh, geez.  Okay.  Sorry about that.
23      Q   Of course.
24      A   Do I have control of this?
25      Q   No, I still have --

176

1       A   Okay.  All right.
2           Okay.  I'm -- I'm done.
3       Q   Okay.  Does any of that jog your memory
4   about what you discussed?
5       A   I don't -- no, it doesn't.  This is all
6   very related to, you know, I guess the basketball
7   operations or whatever.
8           No, I don't recall.  I think my -- I
9   would have just told the investigator that I don't
10  know.
11      Q   Do you recall Joeleen Akin being very
12  nervous?
13      A   About?
14      Q   Just throughout -- I mean, throughout
15  the course of the Littler investigation, do you
16  recall if she seemed nervous?
17      A   Not particularly.  I mean -- no, I just
18  have to answer --
19      Q   Okay.
20      A   -- no, I don't.
21      Q   Okay.  So then we have these
22  notes that say Kevin Kruse [sic].
23          Why don't you take a look at these, and
24  let me know if you recall saying any of this to
25  Mr. Hoffman.

---

**177**

1    A    Yes, I'm done, and, yeah, I recall.
2    Q    Okay.  So -- so you recall giving
3 Mr. Hoffman kind of a general overview of the
4 Brittni/Felicia issue --
5    A    Yes.
6    Q    -- is that right?  Okay.
7         And then at the top, it says Joeleen
8 Akin, and why don't you take a look at these, and
9 let me know if you recall a discussion about any
10 of these issues.
11    A    Okay.  I'm done.
12    Q    Okay.  And do you -- do you recall any
13 of this being discussed?
14    A    The only thing I ever recall Joeleen
15 sharing with me was that there were some
16 students -- student athletes that were reluctant
17 to say anything.
18         I don't recall -- I'm looking at these
19 different bullets.  I don't recall having any
20 conversation with her about any of these things
21 specifically.
22    Q    Okay.
23    A    So...
24    Q    So you recall Ms. Akin saying there are
25 some students who are reluctant to say anything

---

**178**

1 about Coach Joseph?
2    A    Yeah, kind of -- I -- I -- I -- I think
3 it may have come from her.
4         There's one other bullet on here
5 towards the bottom.  I don't think it came from
6 Joeleen, per se, but the audio recording at
7 halftime, the derogatory comment or whatever, I
8 had heard that, but I don't know who or how I
9 heard that, who I heard that from.
10    Q    But you --
11    A    It could have been Joeleen, but I -- I
12 just recall generally hearing about that.
13    Q    Okay.  And did -- did someone play the
14 recording for you?
15    A    No.  I don't believe so, no.
16    Q    Okay.  Okay.  Why don't you take a look
17 at this, Mr. Cruse, and let me know if you recall
18 any of this being discussed.
19    A    I don't, but I -- I have a question.  I
20 mean, in what context?  Was this a conver- -- was
21 this --
22    Q    This -- it's unclear when this
23 conversation occurred.  I'm curious if you recall
24 on February 25th when you met with the
25 investigator whether any of this was discussed.

---

**179**

1         But if any of this sounds --
2    A    No.
3    Q    -- familiar -- I mean, do --
4    A    No, it doesn't, no.
5    Q    Does any of this -- I mean, did you
6 talk about any of these issues at some other point
7 in time?
8    A    I don't think so.
9    Q    Okay.
10    A    No.
11    Q    Okay.  And these appear to be a list of
12 areas to cover.
13         Do you recall when you met with
14 Mr. Hoffman whether you all discussed the scope of
15 his investigation?
16    A    No.
17    Q    You don't recall that?
18    A    I don't.
19    Q    Okay.
20    A    I don't.
21    Q    Okay.  So now we have, "HRBP Kevin
22 Kruse [sic], Talk to AD, Mark Rountree - Deputy
23 AD."
24         Take a look at these, and let me know
25 if you talked to Mr. Hoffman about any of these

---

**180**

1 issues.
2    A    I would say that very top one,
3 "2 members of administrative staff -
4 Bullying/Harassing/Retaliating."
5    Q    Okay.  That's -- that's something that
6 you told him about?
7    A    Yeah, I would have -- I would have
8 briefed him on that.
9    Q    Okay.  What about the "2 student
10 complaints through parents"?
11    A    No.
12    Q    Okay.  What about, "She is
13 building - running interference on retaliation on
14 EE complaints"?
15    A    No, I actually don't even know what
16 that -- what that means.
17    Q    Okay.  What about, "Big finding in
18 California - Title IX case not same treatment by
19 men's coach"?
20         Do you recall there being a discussion
21 about --
22    A    No.  I engaged no one, including
23 Mr. Hoffman, on cases or anything.
24    Q    Okay.  Then Witnesses/Interviewees, did
25 you ever -- do you recall recommending to

---

181

1 Mr. Hoffman that he should interview Mr. Rountree?
2    A    I don't recall specifically, but if he
3 asked me that question, I would have made that
4 recommendation.
5    Q    Okay.  So you thought it would be a
6 good idea for him to interview Mark Rountree?
7    A    Uh-huh.
8    Q    Okay.  And then we have, "Talk to me
9 about Kevin Cruse [sic]."
10         Was that a conversation with you, or
11 was he maybe asking someone else to get background
12 on you?
13    A    I don't recall him asking me to
14 summarize me or my background or anything, but --
15    Q    Okay.
16    A    -- that might have been to someone
17 else.
18    Q    Okay.  Okay.  Was there ever talk of an
19 investigation planned for this investigation?
20    A    Not with me.  I wasn't -- I was not
21 privy to, you know, plans or anything related to
22 the investigation.
23    Q    Okay.  So -- so you have this meeting
24 with -- with Mr. Hoffman on February 25th, and
25 then what role did you play in the Littler

182

1 investigation?
2    A    Record-pulling.
3    Q    Okay.
4    A    Get the records.
5    Q    And that was -- that was it?
6    A    That was it.
7    Q    Okay.
8    A    I -- I -- I provided all of the labor.
9    Q    Okay.  Okay.  So do you recall that
10 shortly after Mr. Hoffman began his investigation
11 that Coach Joseph was placed on some sort of
12 leave?  Like she was suspended or placed on
13 administrative leave?
14    A    Yes, I was aware of Coach Joseph's --
15 Coach Joseph's leave.  However, the time frame,
16 I'm not sure, you know, how or when that coincided
17 with -- with Mr. Hoffman's investigation.
18    Q    Okay.  And were you consulted about the
19 decision to place Coach Joseph on leave?
20    A    No.
21    Q    Okay.  So someone came to you and said
22 we've decided to put her on leave, draft a letter,
23 or something to that effect?
24    A    Exactly.
25    Q    Okay.  And who -- who first informed

183

1 you that a decision had been made to place
2 Coach Joseph on leave?
3    A    I believe it was Todd, Todd Stansbury.
4    Q    Okay.  And did some -- did Todd or
5 anyone ask you to do anything with respect to
6 facilitating this leave, like draft a letter,
7 attend a meeting, tell Coach Joseph?
8    A    Well, it certainly wasn't the latter,
9 to tell Coach Joseph, but I did have to play a
10 part in -- in the execution of it, and I don't
11 believe -- no, I know I did not draft, you know,
12 the memorandum or anything like that, but, again,
13 I was just part of that nucleus of folks that, you
14 know, would -- would participate in the actual
15 execution of it.
16    Q    Okay.  And were you told why
17 Coach Joseph was being placed on leave?
18    A    I'm sure I was, but I -- I don't recall
19 specifically what that was, other than the fact
20 that I -- I think it may have had something to do
21 with the student athletes, you know, the record
22 that you -- you shared with me, the -- the -- the
23 derogatory comment that was heard.
24         I think it was along those lines, those
25 kind of things.  It had to do with

184

1 student athletes.
2    Q    Okay.  But you can't recall
3 specifically?
4    A    No, none other than what I just shared
5 with you that it was -- you know, it was related
6 to, I guess, the handling of student athletes.
7    Q    Okay.  And have you ever placed someone
8 on administrative leave other than Coach Joseph --
9    A    Yes.
10    Q    -- or been in- -- been involved in
11 that?
12    A    Oh, yeah.
13    Q    How many -- how many other times?
14    A    Oh, you know, a half a dozen times or
15 so.
16    Q    Okay.  And this leave that Coach Joseph
17 was put on, what -- what kind of leave was this,
18 do you know?
19    A    All I recall is that I believe it was
20 just a -- it was a paid leave of absence.
21    Q    Okay.  Okay.  And in the other
22 instances where you placed Georgia Tech employees
23 on leave, what role did you play in that -- in
24 those decisions?  Were you consulted in those
25 decisions typically?

185

1    A    I was -- I'm trying to think.  It was
2  probably only -- when I answered that question,
3  I'm sorry, it wasn't necessarily at Georgia Tech.
4    Q    Oh, okay.
5    A    I've worked for a number of
6  corporations, and I've had to do quite a bit more
7  of that than I've ever done at Georgia Tech in the
8  prior companies I've worked for, and typically I
9  would be consulted, because I would typically be
10 involved as the HR leader.
11   Q    Okay.  And in your professional
12 experience placing people on leave, did you
13 typically tell the employee why they were being
14 placed on leave?
15   A    Yes.
16   Q    Okay.
17        MS. COVENEY:  Okay.  Caleb, can you
18 bring up Exhibit 133?  It's BOR-005386.
19        (Cruse Exhibit 22 was marked for
20 identification by the AV Technician and is
21 attached to the transcript.)
22        MS. COVENEY:  And can I have control of
23 this, please?
24        AV TECHNICIAN:  (Technician complies.)
25 BY MS. COVENEY:

186

1    Q    Okay.  Mr. Cruse, can you -- can you
2  take a look at this statement right here, and let
3  me know when you're done?
4    A    Sure.  Is there any way that you can
5  enlarge that just a little bit?
6    Q    Sure.  Yeah.  Of course.
7    A    Okay.  That's good.
8         Okay.
9    Q    Okay.  Have you ever seen this
10 statement before?
11   A    Yeah.  I actually read it in the
12 newspaper.
13   Q    Okay.  But did anyone at Georgia Tech
14 show it to you?
15   A    I don't think so.  I don't think I saw
16 this -- this release.
17   Q    Okay.  Okay.  So, let's see.  In the
18 second sentence there, it says, "Given that the
19 school has failed to provide any explanation to
20 Coach Joseph, her agent, or her lawyers, despite
21 repeated requests, we are left to conclude that
22 this is the latest, and most serious, action in a
23 string of ongoing retaliation that she has
24 suffered for raising concerns about gender equity
25 issues in the Athletic Department."

187

1         Okay.  So in reading that sentence,
2  what do you understand Coach Joseph through her
3  lawyer to be saying?
4    A    That she was summarily dismissed
5  without any -- without any reason provided, any,
6  you know --
7    Q    I mean, do you -- do you understand her
8  to be saying that what's happening to her is
9  retaliatory?
10   A    Well, I can read that.  I -- I -- I see
11 that.
12   Q    Okay.  So -- and so is this -- as an
13 employee complaining of retaliation, is that the
14 type of claim that Georgia Tech Human Resources
15 would typically investigate?
16   A    Yeah, any -- any allegation of -- of
17 retaliation, I think, would be taken a look at,
18 looked at seriously.
19   Q    Okay.  And do you know if anyone --
20 well, I guess I should back up.
21        So this statement was released on
22 February 28th, so this was the day after
23 Coach Joseph was suspended.  So she's
24 complaining -- she has not yet been terminated.
25        So here she's saying what's happening

188

1  right now, the suspension, that's retaliatory.
2         Do you think it would be important for
3  Georgia Tech to investigate that claim before
4  deciding whether or not to terminate her
5  employment?
6    A    Well, I'm going to say yes and no, and
7  not to be ambivalent, but I'll explain myself
8  further.
9         Yes, because any allegation of -- of
10 retaliation should be considered serious and
11 looked into.
12        I would say no in that the -- the
13 reason for placing Coach Joseph on -- on the
14 administrative leave was -- I always thought was
15 because there was a pending investigation, and
16 there were some serious allegations that were
17 raised, and they felt it was in the best interest
18 of the student athletes to remove her from her
19 duties while that investigation was continuing.
20   Q    Okay.  And, you know, so there's the
21 student athletes' side of the story, and then
22 there's also Coach Joseph's side of the story, the
23 explanation as to what the students were saying.
24        Do you think it would be important to
25 understand what Coach Joseph would say in response

**189**

1 to the student allegations in order to assess the
2 truth of those allegations?
3    A    Yes.
4    Q    Okay.  So around this time, you know,
5 February 28th, so before Coach Joseph is
6 terminated, do you recall anyone in the Athletic
7 Association talking about the prospect that
8 Coach Joseph might sue Georgia Tech?
9    A    No.  No.
10    Q    You don't recall that?
11    A    It's not that I don't recall.  I --
12 I -- I just know flat out that --
13    Q    Okay.
14    A    -- no one engaged me in any
15 conversation about that.
16    Q    Okay.
17    MS. COVENEY:  Okay.  Can we pull up
18 Exhibit 136, BOR-001146?
19    (Cruse Exhibit 23 was marked for
20 identification by the AV Technician and is
21 attached to the transcript.)
22 BY MS. COVENEY:
23    Q    Okay.  So can you read -- Mr. Cruse,
24 can you read this e-mail down here at the bottom,
25 and let me know when you're done.

**190**

1    A    Sure.
2        Okay.
3    Q    So on February 28th, Aisha
4 Oliver-Staley e-mails Julie Joyce and Kate Wasch
5 and says that, "We need to accelerate the Women's
6 Basketball investigation and bring it to a
7 conclusion as quickly as possible."
8        And then she asks that a call be set up
9 with Jeff, who she later clarifies to be Eric
10 Hoffman.  She wants to schedule a call with him to
11 talk about this, and she says that maybe you
12 should be on the call.
13        Do you recall participating in a
14 telephone conversation?
15    A    In a conference call?
16    Q    Yes.
17    A    I don't.  The meetings, you know, that
18 I was typically en-- -- well, I shouldn't say
19 typically.  The meetings that I was engaged in or
20 invited to participate in were mainly in person.
21    Q    And what meetings were those?
22    A    I just recall -- I don't know the time
23 frame, but I was summoned to a meeting at the
24 Legal Department in their office off of Spring
25 Street, where, you know, again, it was more or

**191**

1 less to collect information, answer questions,
2 that kind of thing, and I think that meeting was
3 led by Kate Wasch, if I'm not mistaken.
4    Q    Now, was that before or after
5 Coach Joseph was fired?
6    A    I think that was after.
7    Q    Okay.  And what -- what documents was
8 she asking you to collect?
9    A    Well, it wasn't, per se, that we
10 were -- that, you know, documents were being
11 collected.  It was just basically to come together
12 and, you know, answer questions and -- and, you
13 know, make sure information was accurately noted,
14 that kind of a meeting.
15    Q    Okay.  And who else was at that
16 meeting?
17    A    Oh, let's see.  Well, myself, I believe
18 Julie Joyce, Kate Wasch, of course.  She
19 facilitated it.  I think there might have been one
20 or two other members of the Legal Department that
21 were there.  I think Joeleen Akin, Todd Stansbury.
22        It seemed like there were about maybe
23 seven or eight individuals there.  I -- I can't
24 recall everyone that was there, but certainly
25 those individuals were there.

**192**

1    Q    Okay.  And did you take notes of that
2 meeting?
3    A    I don't think so, no.  This was -- it
4 wasn't -- it wasn't really a note-taking type
5 session.  It was just more conversation,
6 clarification, that kind of thing.
7    Q    Okay.  Does the name Antonia Peresson
8 sound familiar to you?  She would go -- she went
9 by AT?
10    A    Yes, I think she was one of our
11 graduate assistants, I think.
12    Q    Yes.
13        She worked with the Women's
14 Basketball -- she's a former Women's Basketball
15 player.
16    A    Yes.
17    Q    She was --
18    A    I remember her, yeah.
19    Q    She was a graduate assistant, maybe an
20 assistant coach for the 2018-2019 team.
21        Okay.  And do you recall that Ms. Akin
22 terminated AT during the Littler investigation?
23    A    I do recall that she was terminated.
24    Q    Okay.  And -- and what was your
25 understanding as to why she was terminated?

193

1     A   I anticipated that you were going to
2 ask me that question, and I don't recall
3 specifically.
4       It was some sort of infraction that
5 Antonia committed, and I don't remember exactly
6 what it was, but it was -- it was something that I
7 guess Joeleen lost confidence in her. It was
8 something that she shouldn't have done, and I
9 don't -- I cannot recall exactly what it was.
10    Q   Was it that -- that Ms. Akin believed
11 AT had been talking to some of the women
12 basketball players about the Littler
13 investigation?
14    A   That vaguely sounds -- you know, it
15 might be something sort of related to that.
16    Q   Okay. And -- and do you recall why
17 that was a terminable offense?
18    A   I don't.
19    Q   Okay.
20       MS. COVENEY: Caleb, can we see
21 Exhibit 201?
22       (Cruse Exhibit 24 was marked for
23 identification by the AV Technician and is
24 attached to the transcript.)
25       MS. COVENEY: Katie and Jamie, this is

194

1 from documents that were given to us in the Open
2 Records Act. The request -- it has not been
3 produced, but I'll produce a copy after this
4 deposition.
5       Okay. Caleb, can you please give
6 Mr. Cruse control of this document?
7       AV TECHNICIAN: (Technician complies.)
8 BY MS. COVENEY:
9    Q   Mr. Cruse, would you take a look at
10 this, and let me know when you're done --
11    A   Okay.
12    Q   -- please? Thanks.
13    A   Okay.
14    Q   Okay. So -- so on February 25th, you
15 reach out to people in the Athletics Department,
16 it looks like, to check in with them about the --
17 their performance reviews, and then Brittni Oliver
18 forwards this to you and basically asks what you
19 should do with MaChelle's review.
20       Do you know if -- if anyone completed
21 Coach Joseph's performance review for this year?
22    A   I don't. But let me tell you, I
23 interpreted this differently --
24    Q   Okay.
25    A   -- and I probably interpreted it

195

1 incorrectly.
2       I thought that Brittni was perhaps
3 reaching out to me with regards to her performance
4 review, because she's saying in that second
5 sentence, "We gave Coach Jo our initial
6 self-reflection form." As far as the actual
7 performance summary, which would have been
8 completed by Coach Jo -- she didn't say that, I
9 was just saying that -- "I am not sure if those
10 were completed."
11    Q   Okay. So you think that Brittni is
12 asking about her own performance review?
13    A   Yes.
14    Q   Okay.
15    A   The way I read this, she is, because
16 she's saying that there's two pieces to it.
17 There's the self-reflection form which the staff
18 member completes, and then there's the performance
19 appraisal that the manager completes, and she's
20 saying in this e-mail that she's -- she's, I
21 guess, completed hers, and I'm assuming she
22 submitted it, but she hasn't heard anything about
23 the actual appraisal that would have been
24 completed by Coach Jo.
25    Q   Okay. And why -- why would -- why

196

1 would Joeleen Akin -- why would Brittni copy
2 Joeleen Akin on here? Wasn't Joeleen Coach Jo's
3 supervisor?
4    A   Yes, yes.
5    Q   But would -- would Joeleen even have
6 input into Brittni Oliver's self-reflection -- or
7 performance review?
8    A   No. I think she just copied just to
9 make her aware of it.
10    Q   Okay. Well, do you know if -- if
11 Joeleen ever completed a performance appraisal of
12 Coach Joseph for the 2018-2019 year?
13       It sounds like they were due before
14 MaChelle was fired.
15    A   Yeah, and I -- I don't think that
16 took place. And, actually, what would have
17 happened is, because Joeleen was just coming into
18 that role, that responsibility would have fell to
19 Mark Rountree to actually complete the appraisal.
20    Q   Okay. And do you know if Mark Rountree
21 completed one?
22    A   I -- I don't recall. I don't remember.
23    Q   Okay.
24       MS. COVENEY: Okay. Caleb, can you
25 please pull up Exhibit 152, BOR-005105?

197

1      (Cruse Exhibit 25 was marked for
2 identification by the AV Technician and is
3 attached to the transcript.)
4      MS. COVENEY: Okay. Can I have control
5 of this, Caleb, please?
6      AV TECHNICIAN: (Technician complies.)
7 BY MS. COVENEY:
8    Q   Okay. Mr. Cruse, could you take a look
9 at this bottom e-mail, and let me know when you're
10 done?
11   **A   Sure.**
12     **Okay.**
13   Q   So earlier in the deposition we talked
14 about this file in Todd Stansbury's office that
15 you had been asked to find.
16     And is this -- are you talking about
17 that same file in this e-mail?
18   **A   Yes.**
19   Q   Okay. And so someone asked you to get
20 this file on March 12th -- on or around
21 March 12th, it appears.
22     Who -- who was asking that you get this
23 file?
24   **A   Okay. So something just came back to**
25 **me in -- in memory.**

198

1     **Shoshanna was also tasked to assemble**
2 **documents sort of like a point person, I guess. I**
3 **know she was working with Todd, as well as, I'm**
4 **assuming, somebody from Legal.**
5     **And so I know she had reached out to me**
6 **to inquire about certain documents, to locate**
7 **them, to make them available, I guess, to either**
8 **Legal or to the outside investigator.**
9     **Yeah, so that's what I recall.**
10   Q   All right. And does that sound like a
11 good idea to you, to have Ms. Engel, who
12 Coach Joseph has just accused of retaliating
13 against her, to be --
14   **A   No, it's not.**
15   Q   No, it's not a good idea?
16   **A   No.**
17   Q   Okay. Okay. So a couple things about
18 this file.
19     First, you -- I think you mentioned
20 that you copied this file from Todd's office in
21 its entirety; is that right?
22   **A   Correct.**
23   Q   Okay. And did you copy it just like as
24 it was kept in the normal course? Like, you just
25 took the file and made a copy of it?

199

1   **A   I did, but I was careful to copy it and**
2 **basically reassemble it as -- as I, you know, took**
3 **the contents out so that everything was in the**
4 **same exact order as I found it.**
5   Q   Okay. Great.
6     Okay. So I just want to ask a few
7 questions about some of these documents.
8     So in the second paragraph here it says
9 that you found a complaint from a
10 student athlete's parent to Todd regarding
11 MaChelle.
12     Do you recall anything about that --
13 that student athlete parent's complaint?
14   **A   I don't -- I don't recall what it was**
15 **specific in terms of what -- you know, what the**
16 **parent was accusing Coach Joseph of doing. I**
17 **don't remember exactly what it was.**
18     **All I recall, you know, from just**
19 **reading this was that it was -- it was a complaint**
20 **that was kept in that file.**
21   Q   Okay. Okay. And so you had a copy of
22 a letter from MaChelle's attorney to
23 President Peterson and a couple of miscellaneous
24 e-mails between Todd and MaChelle, Mark, and Lynn
25 Durham.

200

1     How many e-mails are we talking about
2 here?
3   **A   Well, I couldn't give you an exact**
4 **number --**
5   Q   Like --
6   **A   -- but --**
7   Q   Like five or 20?
8   **A   Yeah, I would just say several.**
9   Q   Okay. And was it e-mails between the
10 four of these people or like some e-mails between
11 Todd and Lynn and some e-mails between Todd and
12 Mark?
13   **A   Oh, I'm sorry, I don't remember that**
14 **level of detail.**
15   Q   Not that level of detail?
16   **A   No.**
17   Q   Okay. Okay. And the -- let's see.
18     So you say in there -- in this --
19 whoops -- in this file that there was a letter
20 from MaChelle's attorney to President Peterson.
21     MS. COVENEY: Caleb, can you bring up
22 Exhibit 192, please?
23     (Cruse Exhibit 26 was marked for
24 identification by the AV Technician and is
25 attached to the transcript.)

201

1  BY MS. COVENEY:
2     Q    Was this the letter from MaChelle's
3  attorneys to President Peterson that was in that
4  file?
5     A    I can't really say that it was.  I --
6  I -- I'm trying to think if there was like an
7  older document, an older letter or something to --
8  but I don't recall any other President documents,
9  letters, or anything that I found in there, so I
10 would assume maybe it was this.
11    Q    Okay.  Okay.  And then -- so then we
12 have e-mails around the same time.  Lee
13 Hendrickson starts to forward you a bunch of
14 e-mails about MaChelle.
15         Do you recall reaching out to Lee
16 Hendrickson?
17    A    I did -- do, rather, uh-huh.
18    Q    And why did you do that?
19    A    Because I was being asked for very
20 specific -- you know, had I -- was I able to pull
21 or see known incidents, if you will, and I wasn't
22 finding them.  I didn't see them or whatever upon
23 request, and so I reached out to -- to Lee
24 Hendrickson to see if, you know, she was aware of
25 whatever it was that I was being requested to --

202

1  to find.
2     Q    Okay.  At any point in time during the
3  Littler investigation, did Eric Hoffman or anyone
4  else from Georgia Tech ask you to provide Eric
5  Hoffman Coach Joseph's employment contract?
6     A    I don't remember that specifically.
7     Q    Okay.  But they could have?
8     A    I -- you know, I think any -- any
9  request that I would receive for a contract
10 related to this or any other matter would have
11 come from Marvin Lewis.
12    Q    Any request to get documents related to
13 this matter would have come from Marvin Lewis?
14    A    Related to a contract specifically.
15    Q    Oh, related to a contract?
16    A    Yeah, yeah.
17    Q    Okay.  So during Eric Hoffman's
18 investigation into Coach Joseph's program, were
19 you given any updates about the status of that
20 investigation?
21    A    No.  Our Employee Relations, I think,
22 Department, Lori Douglas, I think Lori was, or
23 perhaps maybe even Julie Joyce, I think they had
24 direct -- I believe they had direct, you know,
25 contact with -- with -- with Eric Hoffman, and I

203

1  also think he may have talked to Aisha or somebody
2  in Legal directly as well.
3     Q    Okay.
4     A    But I recall -- I -- I -- I -- I recall
5  on occasion Lori Douglas referencing -- reaching
6  out to -- to Eric.
7     Q    Okay.  And did you ever see any draft
8  reports of Eric's?
9     A    No.  That was not -- that detail was
10 not shared with me.
11    Q    Okay.  And were you shared -- did
12 anyone share Eric Hoffman's findings with you?
13    A    I think eventually.  Like, you know,
14 when it was all over with.
15    Q    So after MaChelle was fired?
16    A    Yeah, it would have been probably at
17 that point in time.
18    Q    Okay.  So no one consulted you about
19 the findings of the investigation or the
20 appropriate next steps?
21    A    No, not -- not next steps or anything.
22 I mean, I was asked questions along the way, as
23 you very well know, from Eric, but, no, once it
24 got beyond -- you know, to that certain point
25 close to the end, my service was -- my services

204

1  were no longer needed at that point in time.
2     Q    Okay.  And -- and would you have
3  expected that Julie Joyce would have been updated
4  about --
5     A    Yes.
6     Q    -- the investigation?
7     A    Yes, yes.
8     Q    And that she would have played a -- a
9  role in -- in the investigation?
10         MS. STOFF:  I'm going to object to the
11 form of the question about whether he has personal
12 knowledge of that.
13         MS. COVENEY:  I just said whether you
14 would expect that to happen.
15         MS. STOFF:  Okay.  I'm sorry, I thought
16 you said whether "she would have."
17         MS. COVENEY:  No, sorry.
18 BY MS. COVENEY:
19    Q    Would you expect, based on Ms. Joyce's
20 role as the head of -- the Senior Director of HR
21 and overseeing Employee Relations, that she would
22 have played a significant role in this
23 investigation?
24    A    Yes.  I would assume that, yes.
25    Q    When -- when an employee in your

205

1  department, so either in the Athletic Association
2  or now in the College of Business, is disciplined,
3  are you typically consulted about that?
4      **A    Oh, yes.**
5      Q    Okay.  What about if an employee is
6  terminated, are you typically consulted about
7  that?
8      **A    Yes.**
9      Q    Okay.  So it's my understanding that on
10 the day that Coach Joseph was terminated, the rest
11 of her coaching staff was also terminated.
12          Is that your recollection as well?
13     **A    Yes.**
14     Q    Okay.  Was Felicia Tucker also
15 terminated?
16     **A    No, no.**
17     Q    Okay.  And so did Felicia Tucker remain
18 employed at Georgia Tech for a period of time
19 after Coach Joseph was fired?
20     **A    She did.**
21     Q    Okay.  And do you know what role she
22 held?
23     **A    I know in the immediate, it was, you**
24 **know, basically what -- what she had been**
25 **performing all along.**

206

1      **I don't know once -- you know, once I**
2  **left in May, I'm not sure if that changed or not.**
3  **In fact, I'm not even so sure how long she stayed**
4  **on board.  In fact, I -- I believe she -- she did**
5  **leave at some point.**
6      Q    Okay.  And do you know who made the
7  decision to terminate all the assistant coaches?
8      **A    I'm going to assume that it was Todd.**
9      Q    Okay.  Do you know who made the
10 decision to keep Felicia Tucker on board?
11     **A    I would say Todd with -- with counsel**
12 **from, you know, others on the leadership team.  In**
13 **this case, particularly, probably Joeleen Akin.**
14     **And I'm sure -- I'm sorry, I'm going to**
15 **just add one other thing.**
16     **I'm sure also with -- well, no, I --**
17 **I -- I take that back.  I was going to also**
18 **include perhaps maybe GTHR, but I don't think so.**
19 **That was -- that would be a Todd Stansbury call.**
20     MS. COVENEY:  Caleb, can we see
21 Exhibit 167, BOR-004398?
22     (Cruse Exhibit 27 was marked for
23 identification by the AV Technician and is
24 attached to the transcript.)
25 BY MS. COVENEY:

207

1      Q    Okay.  Mr. Cruse, just take a look at
2  this e-mail, and let me know when you're done.
3      **A    Okay.**
4      **I'm sorry, someone is knocking on my**
5  **door.**
6      Q    Sure.  Just go on mute and --
7      **A    Okay.**
8      **I apologize for that.**
9      Q    No problem.
10     **A    Okay.  Let me -- let me just read this**
11 **real quick again.**
12     Q    Okay.
13     **A    Okay.  I'm done.**
14     Q    So it looks -- here, it looks like
15 you're gathering some documents like you said you
16 were doing.
17     **A    Yeah.**
18     Q    Did you ever find these two binders
19 that are referenced here?
20     **A    I think I did.**
21     Q    Okay.  And did you make a copy of
22 those?
23     **A    I did.**
24     Q    Okay.
25         MS. COVENEY:  Okay.  I think -- I may

208

1  have a few more questions.  Let me look at my
2  outline, but I think I'm close to done.
3      So can we take a five-minute --
4  seven-minute break, come back at 3:10?
5      Does that work for you, Mr. Cruse?
6      THE WITNESS:  Yes.  I'm sorry, it does.
7      MS. COVENEY:  Okay.  All right.
8      (A recess was taken.)
9  BY MS. COVENEY:
10     Q    Okay.  So when Coach Joseph was placed
11 on administrative leave, were you ever told that
12 Georgia Tech was considering different options?
13     So place her on leave or something
14 else?  Do you recall discussions around that?
15     Mr. Cruse, you're -- you're muted.
16     **A    Sorry about that.**
17     **What I was going on to say was that I**
18 **recall the reference to some different**
19 **considerations, but I was never privy to any**
20 **conversation in terms of, you know, what other**
21 **alternative method there would be to, you know --**
22 **while the investigation was going on in lieu of**
23 **the administrative leave.**
24     Q    Okay.  So you don't -- so you -- you
25 recall a conversation about multiple options

209

1 happening, correct?
2    A   Well, not necessarily happening. I
3 just -- I -- I just recall that there was a
4 reference made to -- you know, there was a
5 decision to be made in terms of what was going to
6 happen.
7        I knew that an administrative leave was
8 the primary option, but I -- I don't know -- I was
9 not engaged in any conversations to discuss what
10 other alternative there was to the administrative
11 leave.
12    Q   Okay. So you don't know what the other
13 options were?
14    A   Right. No, I don't.
15        MS. COVENEY: Okay. I think that that
16 is all for me, Mr. Cruse. Thank you very much for
17 your time. Katie and Jamie may have questions.
18 I'm not sure.
19        THE WITNESS: Okay.
20        MR. YOOD: Yeah, I just have one
21 question, so I'll be brief.
22        EXAMINATION BY COUNSEL FOR
23 DEFENDANT GEORGIA TECH ATHLETIC ASSOCIATION
24 BY MR. YOOD:
25    Q   Mr. Cruse, when you served as the Human

210

1 Resources Business Partner for Athletics, were you
2 an employee of the Georgia Institute of Technology
3 or of the Georgia Tech Athletic Association?
4    A   I was an employee of the Georgia
5 Institute of Technology.
6        MR. YOOD: Okay. That's all I have.
7 Thank you.
8        MS. STOFF: I don't have any questions.
9 Thank you.
10        THE REPORTER: So are we all done?
11        MS. COVENEY: We're all done, yeah.
12        THE REPORTER: Okay. First of all,
13 before I go through all the spellings, Colleen, do
14 you need regular delivery or expedite?
15        MS. COVENEY: Regular's fine.
16        THE REPORTER: And, Katie, do you need
17 a copy of the transcript?
18        You're on mute.
19        MS. STOFF: Yes, please.
20        THE REPORTER: Okay. And Jamie?
21        MR. YOOD: No, thank you.
22        THE REPORTER: Okay.
23        (Off the record at 3:17 p.m.)
24
25

211

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2        I, Marney Alena Mederos, the officer
3 before whom the foregoing deposition was taken, do
4 hereby certify that the foregoing transcript is a
5 true and correct record of the testimony given;
6 that said testimony was taken by me
7 stenographically and thereafter reduced to
8 typewriting under my direction; that reading and
9 signing was not requested; and that I am neither
10 counsel for, related to, nor employed by any of
11 the parties to this case and have no interest,
12 financial or otherwise, in its outcome.
13        IN WITNESS WHEREOF, I have hereunto set
14 my hand and affixed my notarial seal this 5th day
15 of June 2021.
16 My commission expires November 23, 2020
17 (Extended until 30 days after
18 State of Emergency has been lifted)
19
20
21 _____
22 NOTARY PUBLIC IN AND FOR
23 THE STATE OF MARYLAND
24
25

| A |
|---|

**aa**
63:18, 64:10
**aau**
85:21
**able**
10:11, 119:14,
128:23, 152:9,
201:20
**above**
19:17
**absence**
184:20
**absolutely**
41:3, 46:16,
58:25, 59:18,
70:23, 129:15,
130:1, 169:2
**abuse**
46:3
**accelerate**
190:5
**access**
6:24, 19:25,
154:19, 155:8,
155:21, 156:5,
156:6, 157:10,
157:14
**accomplish**
119:17
**account**
120:7, 124:12
**accounting**
147:25
**accurate**
10:12, 143:7,
160:3
**accurately**
191:13
**accusations**
165:7
**accused**
198:12
**accusing**
199:16
**accustomed**
133:21

**ackerman**
14:17, 15:15,
68:19, 68:20
**acknowledged**
71:5
**act**
53:4, 194:2
**acted**
113:10
**action**
1:7, 34:16,
35:19, 38:1,
38:2, 40:24,
127:3, 186:22
**actions**
39:6, 41:5
**activities**
26:15
**activity**
49:12, 74:3
**actual**
96:3, 126:20,
183:14, 195:6,
195:23
**actually**
10:18, 14:18,
21:20, 22:22,
27:16, 27:25,
33:14, 35:24,
39:23, 43:15,
46:4, 57:2,
59:4, 59:8,
60:22, 67:22,
76:15, 78:14,
81:17, 87:11,
87:16, 91:10,
95:9, 95:12,
104:13, 105:24,
119:10, 119:12,
124:11, 133:16,
134:16, 154:2,
154:5, 156:4,
157:20, 170:19,
180:15, 186:11,
196:16, 196:19
**ad**
81:12, 135:11,
179:22, 179:23

**add**
62:13, 164:5,
206:15
**added**
120:1, 136:18
**addition**
16:17
**additional**
33:23
**address**
17:23, 17:25,
18:3, 18:7,
18:13, 32:6,
89:4, 89:10,
93:2, 129:8,
136:1
**addressed**
135:8, 135:17
**addressing**
135:10
**adequate**
27:18
**adjustments**
41:2
**administer**
172:22
**administered**
74:2
**administration**
46:11, 50:2,
66:12
**administrative**
46:24, 47:6,
49:12, 70:9,
71:18, 73:25,
75:20, 112:10,
134:25, 135:18,
138:25, 144:15,
160:15, 172:23,
180:3, 182:13,
184:8, 188:14,
208:11, 208:23,
209:7, 209:10
**administrator**
46:18, 50:18,
71:4, 117:18,
118:5, 121:2,
121:16, 159:3,

164:12, 164:22,
173:10
**administrators**
15:17
**adrienne**
93:23, 93:24,
93:25, 94:21,
97:23, 98:10,
101:7, 123:18,
144:9
**advice**
93:21
**advise**
153:14, 153:25,
172:14
**advised**
99:13, 99:16,
173:8
**advisory**
29:24
**affairs**
60:11
**affirmed**
8:4
**affixed**
211:14
**after**
22:2, 30:15,
37:21, 37:22,
40:10, 109:17,
118:23, 119:18,
120:24, 121:6,
121:8, 123:11,
125:19, 125:20,
141:4, 142:19,
143:4, 145:10,
153:6, 155:7,
182:10, 187:22,
191:4, 191:6,
194:3, 203:15,
205:19, 211:17
**afternoon**
115:14, 116:1
**again**
15:13, 15:21,
37:2, 49:3,
55:12, 64:19,
76:18, 80:17,

140:15, 145:9,
165:4, 166:10,
168:22, 169:16,
183:12, 190:25,
207:11

**against**
36:21, 37:1,
46:2, 102:16,
102:18, 102:20,
108:19, 135:5,
145:7, 171:1,
171:4, 171:16,
198:13

**agent**
92:25, 186:20

**ago**
9:24, 10:9,
10:18, 24:2,
24:3, 135:20,
138:23, 170:21

**agreed**
114:7

**agreement**
70:10, 79:1,
79:5

**agreements**
47:6

**ahead**
9:10, 149:15

**aisha**
15:24, 60:10,
60:14, 60:15,
60:17, 99:14,
100:6, 100:10,
101:9, 101:19,
131:17, 131:22,
136:8, 136:11,
136:12, 136:13,
137:8, 137:20,
190:3, 203:1

**akin**
15:6, 64:1,
73:18, 83:15,
122:1, 122:7,
131:17, 158:24,
168:4, 172:15,
174:13, 176:11,
177:8, 177:24,

191:21, 192:21,
193:10, 196:1,
196:2, 206:13

**al**
1:10

**alena**
1:25, 2:7,
211:2

**all-staff**
120:25, 122:24,
125:19

**allegation**
187:16, 188:9

**allegations**
129:13, 188:16,
189:1, 189:2

**alleged**
47:24, 59:13,
67:21

**alleging**
34:18, 46:3,
128:25, 129:18,
129:24, 130:15,
132:14, 134:3

**allocating**
51:3, 52:15,
129:1

**allow**
110:13

**allowed**
85:21

**allowing**
168:17

**allows**
85:21

**almost**
10:18, 34:19,
35:4, 37:3,
37:6, 66:9,
95:7, 120:8

**alone**
12:6

**along**
36:8, 40:14,
166:1, 166:2,
169:22, 183:24,
203:22, 205:25

**already**
81:21, 136:16

**also**
4:11, 9:13,
16:13, 19:24,
22:22, 27:20,
30:18, 32:20,
35:24, 42:19,
42:21, 46:18,
46:20, 47:6,
50:5, 66:13,
68:17, 85:15,
94:14, 94:21,
95:11, 101:25,
104:12, 111:10,
112:7, 112:8,
112:13, 112:14,
113:4, 117:10,
117:14, 118:4,
124:6, 126:19,
132:5, 144:14,
164:11, 173:19,
173:25, 188:22,
198:1, 203:1,
205:11, 205:14,
206:16, 206:17

**alternative**
208:21, 209:10

**although**
44:2

**always**
133:24, 188:14

**amanda**
88:11, 88:17,
91:6

**ambivalent**
188:7

**amendments**
53:4

**amicably**
38:7, 38:8

**among**
79:21, 134:4,
161:13

**amorous**
5:16, 59:13,
59:15, 63:20

**ancillary**
26:15

**announced**
70:24

**announcement**
70:25

**another**
10:9, 28:1,
34:12, 74:18,
95:24, 99:23,
118:25, 138:22,
146:19, 173:5

**answer**
8:23, 9:8,
9:10, 12:23,
30:13, 54:17,
85:8, 93:11,
102:14, 102:15,
145:1, 176:18,
191:1, 191:12

**answered**
185:2

**answers**
8:21, 10:12

**anticipated**
24:7, 193:1

**antonia**
192:7, 193:5

**any**
9:2, 10:10,
11:23, 12:12,
12:16, 15:1,
15:2, 17:8,
17:14, 17:16,
20:18, 21:9,
22:25, 30:1,
30:6, 30:15,
31:8, 31:11,
33:17, 34:9,
34:16, 38:1,
39:20, 40:10,
41:7, 41:12,
42:14, 45:11,
45:16, 47:14,
48:25, 51:16,
52:24, 54:20,
61:3, 64:13,
64:14, 64:22,
66:9, 69:21,
70:6, 70:9,
70:14, 70:16,
74:11, 75:8,

75:18, 84:15,
85:6, 91:14,
96:11, 96:17,
101:20, 106:15,
107:13, 124:17,
124:24, 133:5,
134:17, 137:5,
137:9, 137:14,
147:9, 161:17,
170:17, 170:22,
172:10, 173:10,
175:13, 176:3,
176:24, 177:9,
177:12, 177:19,
177:20, 178:18,
178:25, 179:1,
179:5, 179:6,
179:25, 186:4,
186:19, 187:5,
187:16, 188:9,
189:14, 201:8,
202:2, 202:8,
202:10, 202:12,
202:19, 203:7,
208:19, 209:9,
210:8, 211:10
**anybody**
57:1, 77:9,
80:12, 106:23
**anymore**
165:17
**anyone**
23:10, 45:20,
51:23, 74:9,
74:11, 75:7,
77:7, 78:19,
79:5, 131:25,
133:5, 133:25,
149:21, 167:13,
183:5, 186:13,
187:19, 189:6,
194:20, 202:3,
203:12
**anything**
11:10, 20:22,
23:5, 23:9,
43:25, 51:16,
51:19, 52:6,

52:12, 52:23,
54:20, 61:18,
62:2, 62:11,
78:18, 89:13,
96:24, 98:11,
102:11, 118:13,
121:20, 126:14,
145:16, 152:11,
163:17, 172:12,
173:15, 177:17,
177:25, 180:23,
181:14, 181:21,
183:5, 183:12,
195:22, 199:12,
201:9, 203:21
**apologies**
144:23
**apologize**
110:3, 207:8
**apparently**
85:24
**appear**
179:11
**appearance**
80:10
**appeared**
142:11
**appears**
85:18, 109:11,
173:25, 197:21
**appointment**
37:15, 37:17,
81:20
**appraisal**
195:19, 195:23,
196:11, 196:19
**appropriate**
35:19, 40:22,
68:17, 79:3,
93:22, 203:20
**approve**
155:18
**approved**
77:12
**approximately**
11:3, 22:1
**areas**
179:12

**around**
15:3, 22:6,
27:10, 29:15,
29:23, 33:4,
39:12, 47:9,
69:19, 69:24,
78:8, 78:14,
89:12, 100:20,
101:15, 112:1,
138:19, 140:18,
140:19, 147:17,
159:8, 161:10,
161:11, 162:15,
163:10, 189:4,
197:20, 201:12,
208:14
**arrived**
97:7
**articulate**
51:14
**asap**
126:8
**aside**
75:7
**asked**
18:10, 20:22,
24:7, 24:8,
24:10, 52:6,
79:14, 85:1,
99:9, 104:10,
105:2, 106:22,
106:23, 110:12,
127:12, 134:1,
145:15, 152:7,
163:6, 164:25,
166:12, 181:3,
197:15, 197:19,
201:19, 203:22
**asking**
8:19, 61:20,
79:10, 135:8,
144:10, 166:5,
166:6, 167:4,
181:11, 181:13,
191:8, 195:12,
197:22
**asks**
60:6, 88:14,

99:12, 140:20,
148:14, 190:8,
194:18
**assemble**
105:22, 198:1
**assembling**
103:22
**assess**
189:1
**assessment**
79:2, 79:6
**assigned**
33:7
**assist**
33:25
**assistance**
30:1, 123:10,
144:10
**assistant**
21:20, 28:2,
66:20, 66:21,
69:21, 75:22,
112:13, 112:14,
117:7, 119:21,
134:25, 135:1,
140:5, 140:8,
162:22, 192:19,
192:20, 206:7
**assistants**
112:16, 117:8,
139:20, 139:25,
173:12, 192:11
**associate**
15:18, 46:10,
64:2, 174:12
**association**
4:3, 14:10,
18:4, 18:23,
25:19, 25:25,
26:5, 26:18,
27:6, 27:15,
27:17, 27:24,
28:8, 28:14,
29:9, 30:8,
30:17, 30:24,
31:2, 31:12,
31:15, 31:21,
32:1, 32:12,

32:14, 33:19,
35:7, 39:9,
39:17, 39:21,
39:25, 41:8,
43:17, 45:20,
47:1, 48:13,
48:14, 48:16,
49:24, 50:3,
50:6, 51:1,
54:1, 54:6,
54:16, 55:14,
68:13, 74:9,
78:7, 78:12,
84:19, 86:15,
94:5, 95:4,
101:21, 137:7,
148:4, 167:21,
189:7, 205:1,
209:23, 210:3

**association's**
47:25, 72:23

**assume**
105:6, 201:10,
204:24, 206:8

**assumed**
136:20

**assuming**
195:21, 198:4

**assumption**
160:2

**athlete**
85:6, 85:15,
199:13

**athlete's**
199:10

**athletes**
45:17, 56:4,
85:4, 171:17,
177:16, 183:21,
184:1, 184:6,
188:18, 188:21

**athletic**
4:3, 14:10,
15:18, 18:4,
18:23, 19:11,
25:19, 25:25,
26:4, 26:18,
27:5, 27:15,

27:17, 27:24,
28:8, 28:14,
30:8, 30:17,
30:23, 31:2,
31:12, 31:15,
31:21, 32:1,
32:12, 32:14,
33:19, 35:7,
39:9, 39:17,
39:21, 39:25,
41:7, 43:17,
44:15, 45:20,
46:10, 47:1,
47:25, 48:9,
48:13, 48:14,
48:16, 49:23,
50:3, 50:6,
50:10, 50:25,
53:16, 53:18,
53:21, 54:1,
54:6, 54:15,
55:14, 64:2,
68:12, 72:23,
74:9, 78:6,
78:12, 84:18,
86:15, 94:5,
95:4, 95:8,
95:15, 96:1,
101:21, 106:18,
137:6, 137:15,
147:7, 147:10,
148:2, 148:3,
167:13, 167:21,
174:13, 174:16,
186:25, 189:6,
205:1, 209:23,
210:3

**athletics**
33:12, 45:21,
46:15, 95:10,
194:15, 210:1

**atlanta**
1:3, 3:16

**attached**
5:7, 6:2, 7:2,
57:13, 62:24,
65:11, 77:22,
82:18, 87:3,

92:7, 98:22,
103:2, 114:19,
122:19, 125:9,
127:24, 130:23,
138:5, 150:8,
151:18, 155:2,
156:11, 162:3,
175:1, 185:21,
189:21, 193:24,
197:3, 200:25,
206:24

**attachments**
5:11

**attempts**
93:4, 116:2

**attend**
30:12, 117:14,
117:15, 183:7

**attendance**
117:9

**attended**
170:10, 170:11,
173:25, 174:5

**attention**
9:16, 37:6,
66:16, 86:6,
86:10, 89:2,
89:8, 90:3,
90:4, 138:23,
139:2, 148:25,
149:3

**attorney**
3:14, 11:14,
24:12, 59:7,
170:20, 199:22,
200:20

**attorney-client**
24:13

**attorneys**
21:18, 170:18,
201:3

**audibly**
8:22

**audio**
178:6

**authority**
31:8

**automatically**
60:25

**av**
4:12, 57:7,
57:12, 57:16,
58:2, 59:22,
60:1, 60:3,
62:23, 63:2,
65:10, 65:14,
66:4, 77:21,
77:25, 82:17,
82:21, 83:5,
87:2, 87:7,
87:25, 92:6,
92:10, 92:19,
98:21, 98:25,
103:1, 103:5,
114:18, 114:24,
122:18, 122:22,
125:8, 125:12,
127:23, 128:2,
130:22, 131:1,
131:9, 138:4,
138:8, 138:11,
150:2, 150:7,
150:11, 151:17,
151:21, 155:1,
155:5, 156:10,
156:14, 162:2,
162:6, 174:25,
175:4, 185:20,
185:24, 189:20,
193:23, 194:7,
197:2, 197:6,
200:24, 206:23

**available**
104:11, 106:5,
198:7

**avenue**
3:6, 4:6

**aware**
34:21, 45:16,
45:25, 46:4,
46:5, 48:15,
51:1, 51:6,
51:9, 54:8,
54:11, 55:3,
55:7, 55:8,
60:24, 68:15,
70:2, 76:13,

76:15, 76:20,
77:6, 77:15,
81:8, 86:15,
118:1, 133:7,
133:20, 133:24,
135:4, 135:14,
140:24, 141:10,
141:15, 145:8,
152:1, 152:4,
152:14, 153:21,
154:3, 159:1,
159:16, 163:5,
171:2, 182:14,
196:9, 201:24
**away**
111:19

**B**

**back**
13:6, 19:1,
24:4, 26:24,
27:11, 27:21,
35:25, 67:23,
68:7, 69:5,
72:1, 76:4,
78:15, 78:16,
95:9, 106:25,
135:9, 135:11,
139:5, 144:24,
146:9, 151:12,
153:9, 154:12,
166:10, 187:20,
197:24, 206:17,
208:4
**backdrop**
126:16
**background**
13:4, 25:4,
94:25, 126:15,
174:15, 181:11,
181:14
**bag**
165:15
**bandwidth**
33:23
**banks**
3:5
**base**
94:6

**based**
36:12, 54:20,
56:3, 61:12,
120:2, 204:19
**basically**
21:12, 24:22,
26:12, 26:22,
31:15, 43:10,
46:17, 46:25,
47:9, 62:1,
73:13, 76:23,
77:4, 97:15,
108:24, 110:18,
110:19, 110:22,
143:23, 149:17,
191:11, 194:18,
199:2, 205:24
**basis**
29:16, 31:4,
53:13, 170:13
**basketball**
15:3, 46:20,
50:14, 50:18,
51:4, 51:5,
66:14, 66:22,
66:23, 66:25,
67:10, 67:13,
69:23, 72:17,
75:23, 83:18,
85:20, 94:17,
109:10, 117:19,
121:1, 138:24,
159:4, 174:17,
175:9, 176:6,
190:6, 192:14,
193:12
**bates**
7:11
**baton**
97:15
**became**
33:22, 86:15
**because**
9:11, 23:24,
26:25, 31:13,
39:3, 39:19,
48:21, 49:3,
49:11, 59:5,

61:2, 64:24,
70:2, 70:12,
70:23, 72:7,
80:11, 81:15,
85:2, 85:4,
85:12, 94:7,
101:14, 102:10,
106:22, 115:24,
118:11, 118:17,
119:14, 123:9,
124:13, 128:17,
133:2, 133:14,
136:16, 136:21,
137:9, 139:22,
140:4, 144:10,
161:2, 165:10,
166:7, 166:12,
172:15, 173:11,
185:9, 188:9,
188:15, 195:4,
195:15, 196:17,
201:19
**become**
76:13, 76:20
**been**
9:20, 10:3,
16:3, 21:20,
37:1, 37:5,
39:19, 44:4,
47:22, 47:23,
47:24, 49:23,
52:19, 52:20,
61:11, 67:5,
69:20, 70:19,
78:11, 84:12,
86:9, 89:18,
100:13, 100:19,
101:1, 101:6,
102:6, 104:3,
109:12, 116:1,
119:2, 119:5,
120:15, 120:20,
122:1, 126:3,
126:19, 135:4,
137:5, 137:7,
137:13, 137:18,
140:8, 140:11,
140:14, 141:5,

145:18, 150:18,
150:19, 153:22,
158:1, 159:16,
163:13, 168:15,
171:3, 174:7,
178:11, 181:16,
183:1, 184:10,
187:24, 191:19,
193:11, 194:2,
195:7, 195:23,
197:15, 203:16,
204:3, 205:24,
211:18
**before**
2:7, 9:8, 9:20,
13:2, 22:2,
23:25, 30:15,
39:23, 42:11,
54:10, 60:13,
60:19, 63:8,
69:9, 80:20,
81:23, 92:22,
95:10, 95:12,
97:6, 103:9,
103:16, 116:2,
116:14, 121:6,
139:8, 142:5,
145:2, 145:12,
147:13, 151:5,
151:7, 152:23,
153:6, 170:4,
174:14, 186:10,
188:3, 189:5,
191:4, 196:13,
210:13, 211:3
**began**
182:10
**begin**
119:11
**beginning**
51:11
**behalf**
3:2, 3:11, 4:2
**behaved**
112:23
**being**
8:4, 8:10,
19:9, 33:15,

39:13, 66:14,
67:1, 73:16,
79:14, 79:24,
84:22, 107:19,
119:9, 127:12,
136:21, 136:25,
139:24, 163:11,
164:21, 165:15,
168:23, 176:11,
177:13, 178:18,
180:20, 183:17,
185:13, 191:10,
201:19, 201:25

**believe**
14:19, 51:25,
55:11, 61:17,
62:9, 62:17,
69:6, 69:7,
69:14, 75:9,
77:16, 95:17,
109:19, 110:9,
110:15, 113:2,
117:14, 122:12,
123:17, 128:17,
132:7, 132:11,
135:15, 148:21,
149:1, 155:20,
159:4, 163:8,
178:15, 183:3,
183:11, 184:19,
191:17, 202:24,
206:4

**believed**
52:5, 55:20,
164:16, 193:10

**below**
159:9

**benefits-related**
49:5

**best**
79:2, 188:17

**better**
48:25, 123:24

**between**
14:13, 15:14,
15:16, 24:14,
32:24, 33:10,
38:4, 49:12,

55:5, 67:9,
69:10, 73:15,
79:20, 80:2,
85:19, 88:10,
88:16, 90:24,
93:12, 94:17,
95:9, 95:24,
97:25, 109:12,
112:9, 113:21,
124:1, 124:18,
141:12, 141:18,
151:13, 199:24,
200:9, 200:10,
200:11

**beyond**
35:19, 70:16,
86:9, 203:24

**biased**
84:9

**big**
42:6, 180:17

**bill**
13:19

**binder**
7:6, 105:13,
106:1

**binders**
207:18

**bing**
56:18, 57:23,
60:9

**bit**
20:3, 25:4,
43:8, 44:14,
46:9, 46:14,
69:17, 75:6,
82:12, 107:2,
107:4, 108:11,
109:8, 111:6,
115:24, 170:1,
185:6, 186:5

**biweekly**
49:20, 74:5

**blank**
74:23

**blanket**
52:4

**blind**
153:13, 153:18

**blocking**
63:14

**board**
1:8, 3:11,
76:16, 206:4,
206:10

**bobinski**
135:11

**bor**
5:10, 5:12,
5:17, 5:21,
5:23, 5:25, 6:7,
6:9, 6:13, 6:15,
6:17, 6:19,
6:21, 6:25, 7:7,
7:9, 7:10, 7:13,
7:17, 57:6,
57:10, 62:21,
77:19, 86:25,
92:4, 98:19,
100:1, 114:16,
122:16, 127:21,
130:20, 138:2,
150:1, 150:4,
151:15, 174:23,
185:18, 189:18,
196:25, 206:21

**boss**
16:8, 49:8,
151:1, 155:11,
155:12

**both**
37:22, 61:22,
90:8, 93:4,
108:21, 109:14,
109:16, 152:3

**bothering**
41:17

**bottom**
65:20, 83:21,
87:12, 87:13,
116:6, 178:5,
189:24, 197:9

**boundaries**
52:18

**boundary**
52:18

**bowing**
164:21

**break**
9:2, 76:2,
80:20, 146:9,
147:13, 208:4

**brief**
42:1, 95:14,
209:21

**briefed**
180:8

**briefly**
16:25

**bring**
11:23, 98:19,
151:14, 161:24,
185:18, 190:6,
200:21

**bringing**
89:1, 89:7,
148:25, 169:5,
169:8

**brittni**
74:22, 74:23,
74:24, 108:13,
109:2, 109:13,
111:10, 111:14,
111:24, 112:3,
112:23, 115:8,
115:13, 115:20,
115:25, 120:4,
124:2, 126:12,
133:15, 135:22,
140:22, 141:8,
141:13, 141:19,
142:15, 143:4,
145:6, 149:21,
152:3, 169:9,
177:4, 194:17,
195:2, 195:11,
196:1, 196:6

**broker**
38:12

**brokered**
27:11

**brought**
37:5, 39:2,
39:4, 86:5,
86:10, 89:11,
90:3, 90:4,

108:12, 138:22,
139:1, 149:3
**brown**
88:11, 88:17,
91:4
**budget**
50:10, 135:13
**budgets**
53:25
**building**
180:13
**bullet**
64:9, 64:10,
65:2, 65:3,
178:4
**bullets**
177:19
**bullying**
180:4
**bunch**
9:12, 129:8,
201:13
**burns**
131:18, 131:22,
173:4
**burton**
109:24
**business**
14:4, 14:9,
14:10, 18:3,
25:15, 25:17,
26:2, 26:7,
26:8, 26:9,
26:18, 26:24,
27:8, 28:8,
28:13, 29:15,
29:23, 32:12,
32:19, 32:24,
33:4, 33:6,
33:7, 33:11,
33:15, 45:19,
50:2, 50:25,
72:16, 72:18,
78:10, 84:18,
93:10, 94:4,
95:4, 174:14,
205:2, 210:1

**C**

**cabinets**
152:10

**caleb**
4:12, 57:5,
57:15, 57:25,
59:20, 62:20,
65:6, 66:2,
77:18, 82:14,
82:19, 83:3,
86:23, 87:17,
87:19, 87:23,
92:3, 92:17,
93:17, 98:18,
98:24, 102:23,
114:15, 114:23,
122:15, 122:20,
125:5, 127:20,
130:24, 131:7,
138:1, 138:7,
149:25, 150:10,
151:14, 154:23,
156:7, 161:24,
174:22, 185:17,
193:20, 194:5,
196:24, 197:5,
200:21, 206:20
**california**
180:18
**call**
110:11, 157:7,
171:20, 190:8,
190:10, 190:12,
190:15, 206:19
**called**
43:3, 151:9
**calling**
162:19, 162:25
**came**
21:17, 34:11,
41:16, 69:18,
76:16, 91:3,
91:5, 95:7,
109:19, 109:23,
110:4, 110:10,
111:23, 159:18,
159:23, 159:25,
160:3, 160:18,
178:5, 182:21,
197:24
**campus**
12:4, 21:18,

29:16, 29:23,
32:16, 33:5,
43:20, 81:7,
86:7, 100:16,
123:7, 173:6,
173:10
**campus-level**
82:8
**can't**
9:23, 15:7,
21:19, 39:18,
48:20, 52:9,
61:1, 70:16,
110:20, 112:15,
126:13, 139:23,
148:17, 152:2,
166:4, 184:2,
191:23, 201:5
**candidly**
83:22
**cannot**
193:9
**capacity**
29:24, 30:16,
84:17, 93:9,
172:9
**capital**
3:15
**care**
146:20
**careful**
59:9, 199:1
**carrying**
54:15
**case**
11:6, 13:3,
21:11, 21:14,
22:11, 22:20,
34:13, 34:22,
38:5, 47:22,
180:18, 206:13,
211:11
**cases**
44:4, 107:19,
170:22, 180:23
**catch**
81:15, 116:8
**categorize**
43:11

**category**
88:17
**caught**
81:23, 133:25
**cell**
12:10, 15:13
**certain**
24:6, 49:15,
57:19, 111:22,
111:25, 164:20,
198:6, 203:24
**certainly**
56:15, 57:1,
59:17, 78:18,
85:10, 100:11,
104:4, 107:17,
108:21, 112:24,
116:20, 124:25,
183:8, 191:24
**certificate**
211:1
**certification**
42:19, 42:20,
42:21, 43:2
**certifications**
42:14, 42:17,
42:21
**certified**
2:9
**certify**
211:4
**cetera**
21:10, 103:21,
103:22, 107:18,
108:4
**chain**
87:12
**change**
59:5, 123:18
**changed**
150:19, 206:2
**changes**
39:12, 47:15,
75:19
**charge**
10:4, 33:5,
50:1, 53:21,
54:5, 95:20,

105:22, 172:21
**charged**
33:2, 46:23,
129:24
**chart**
79:18, 95:19
**check**
31:1, 32:15,
162:18, 194:16
**check-ins**
29:14
**chief**
107:9
**christine**
14:17, 15:15,
68:19, 68:20
**church**
170:20
**circle**
168:4
**circumstance**
36:7
**civil**
1:7
**claim**
51:19, 187:14,
188:3
**clarification**
155:10, 192:6
**clarified**
48:10, 89:5
**clarifies**
190:9
**clarify**
9:1, 41:10,
119:8, 167:23,
169:22
**clear**
11:15
**clearly**
8:22
**clients**
170:16
**close**
203:25, 208:2
**closely**
31:13, 31:16,
47:2

**closest**
47:8
**closing**
120:11
**coach's**
31:23
**coaches**
47:5, 52:25,
53:2, 69:22,
95:15, 106:18,
112:13, 112:14,
117:7, 119:21,
162:22, 206:7
**coaching**
42:22, 45:13,
112:10, 117:7,
120:13, 205:11
**coax**
91:10
**coincided**
182:16
**colleague**
26:1, 27:7,
76:17, 78:17
**colleagues**
14:6, 14:12,
16:23, 17:2,
17:7, 17:18,
17:21
**collect**
191:1, 191:8
**collected**
191:11
**colleen**
3:3, 8:12,
210:13
**college**
25:17, 26:8,
26:9, 26:13,
26:24, 27:8,
27:22, 28:6,
78:9, 78:15,
205:2
**collusion**
54:20, 55:11
**come**
12:4, 27:10,
71:2, 73:24,

76:4, 91:11,
109:3, 109:16,
109:21, 110:15,
111:10, 111:18,
115:9, 139:21,
146:9, 148:19,
148:23, 149:7,
149:9, 152:4,
157:16, 161:9,
172:11, 173:8,
173:10, 178:3,
191:11, 202:11,
202:13, 208:4
**comes**
149:20
**comfortable**
28:5, 36:5
**coming**
42:11, 47:12,
113:5, 115:9,
117:22, 140:11,
142:1, 161:12,
162:24, 163:15,
196:17
**comment**
64:23, 119:9,
136:18, 172:3,
178:7, 183:23
**commentary**
140:13
**comments**
89:3, 89:8,
140:12
**commission**
211:16
**committed**
193:5
**committee**
155:18, 157:12,
157:14, 157:18,
158:3, 158:6,
158:11, 158:22
**communicate**
12:22, 13:4,
14:11, 16:22,
17:17, 17:20,
18:7, 18:24,
19:5, 19:19

**communicated**
17:1
**communicating**
12:20
**communication**
19:18, 166:8
**communications**
12:24, 24:13,
133:6
**community**
170:15
**companies**
10:4, 185:8
**compared**
112:10
**compensation**
47:3
**compilation**
175:6
**complain**
45:12, 162:25,
172:12
**complainant**
34:24, 35:20,
36:14
**complained**
74:19, 108:21,
108:24
**complaining**
56:10, 83:16,
85:14, 85:15,
112:4, 187:13,
187:24
**complaint**
18:12, 35:2,
35:16, 36:22,
36:25, 37:4,
37:5, 37:7,
37:11, 37:13,
43:12, 43:22,
44:1, 46:2,
51:24, 59:13,
86:3, 86:17,
86:18, 88:20,
90:2, 102:8,
102:16, 102:18,
102:19, 126:13,
126:25, 127:7,

127:10, 127:15,
128:4, 128:12,
128:24, 129:24,
130:5, 130:10,
130:15, 131:17,
131:21, 131:24,
132:1, 133:6,
134:3, 134:15,
134:25, 136:9,
136:15, 138:21,
141:20, 142:14,
142:16, 142:20,
143:5, 157:1,
162:19, 163:2,
163:4, 163:10,
163:15, 163:18,
172:10, 199:9,
199:13, 199:19

**complaints**
34:17, 44:8,
45:16, 49:23,
52:14, 108:11,
108:16, 108:19,
108:22, 112:5,
129:16, 129:18,
130:8, 132:14,
135:5, 135:9,
135:17, 140:21,
145:7, 147:14,
160:15, 163:11,
171:1, 171:3,
171:7, 171:16,
172:3, 173:1,
173:7, 180:10,
180:14

**complete**
81:4, 82:4,
82:9, 110:13,
196:19

**completed**
41:21, 92:15,
194:20, 195:8,
195:10, 195:21,
195:24, 196:11,
196:21

**completely**
58:20, 85:5,
144:21

**completes**
195:18, 195:19

**compliance**
54:5, 67:17,
67:19, 68:3,
71:21, 72:9,
85:24, 162:19,
162:25

**complied**
53:22

**complies**
57:16, 58:2,
60:3, 63:2,
65:14, 66:4,
77:25, 82:21,
83:5, 87:7,
87:25, 92:10,
92:19, 98:25,
103:5, 114:24,
122:22, 125:12,
128:2, 131:1,
131:9, 138:8,
138:11, 150:11,
151:21, 155:5,
156:14, 162:6,
175:4, 185:24,
194:7, 197:6

**computer**
12:13

**computer's**
12:15

**con**
86:3

**concern**
55:4, 55:9,
55:15, 56:13,
56:15, 79:11,
79:23, 85:11,
117:25, 140:1,
140:10, 165:11

**concerned**
79:24, 80:1,
84:13, 113:3

**concerns**
51:2, 51:15,
54:24, 55:20,
55:21, 63:20,
71:14, 71:17,

71:20, 80:6,
83:23, 84:7,
85:6, 93:3,
94:16, 108:25,
109:3, 111:10,
129:1, 134:9,
135:10, 164:23,
168:21, 186:24

**conclude**
186:21

**conclusion**
190:7

**conclusively**
56:25, 67:4

**conduct**
123:21

**conducted**
1:15, 2:1,
73:16

**conducting**
57:2

**conference**
93:2, 96:9,
110:11, 157:7,
190:15

**confidence**
193:7

**confidential**
70:22

**confidentially**
68:24

**confirm**
79:1, 79:5

**conflict**
41:1, 56:20,
75:6, 83:25,
97:25, 109:12,
113:25, 119:7,
124:1, 124:9,
127:1, 130:12,
130:15, 130:18,
135:22, 136:5,
141:12, 141:18,
142:21, 143:6,
145:22

**conflicts**
54:14, 113:15

**confuse**
59:9

**confusing**
104:1

**confusion**
89:19

**connect**
154:10

**connecticut**
3:6

**considerable**
117:25

**considerations**
208:19

**considered**
43:25, 64:7,
188:10

**considering**
208:12

**consistent**
65:3, 90:14

**constant**
66:11

**consult**
100:17, 100:22,
123:12

**consultant**
33:1, 33:16,
33:25, 34:2,
34:21, 35:1,
38:20, 38:22,
39:2, 39:13,
41:4, 94:3,
123:8, 153:21

**consulted**
145:11, 182:18,
184:24, 185:9,
203:18, 205:3,
205:6

**contact**
51:12, 73:12,
74:4, 202:25

**contacted**
139:15

**contents**
25:1, 199:3

**context**
41:9, 94:8,
94:11, 96:21,
97:16, 102:4,

120:1, 134:23,
168:24, 171:12,
178:20
**contingent**
157:15
**continue**
144:1
**continuing**
121:15, 136:1,
188:19
**contract**
31:23, 47:12,
47:15, 70:11,
70:13, 75:16,
144:18, 202:5,
202:9, 202:14,
202:15
**contracted**
59:7, 104:8
**contracts**
31:17, 47:4,
47:5, 47:7,
47:9, 49:5
**control**
57:14, 58:1,
58:8, 59:21,
59:24, 63:1,
65:13, 65:22,
65:23, 66:3,
77:23, 82:20,
83:4, 83:11,
87:5, 87:17,
87:19, 87:21,
87:24, 92:9,
92:18, 98:24,
103:4, 114:23,
122:21, 125:11,
128:1, 130:25,
131:8, 138:6,
138:10, 148:5,
150:9, 151:19,
155:3, 156:12,
162:5, 175:3,
175:24, 185:22,
194:6, 197:4
**convene**
157:13
**conver**
167:12, 178:20

**conversation**
68:24, 89:15,
91:6, 91:15,
94:22, 95:16,
97:13, 98:9,
114:6, 114:10,
115:16, 116:4,
116:20, 118:21,
121:7, 124:15,
124:18, 124:25,
126:3, 162:14,
166:15, 177:20,
178:23, 181:10,
189:15, 190:14,
192:5, 208:20,
208:25
**conversations**
20:16, 165:8,
166:16, 209:9
**coordinator**
14:14, 14:15,
21:21, 68:21
**copied**
132:16, 132:19,
133:2, 133:5,
133:9, 133:23,
153:13, 196:8,
198:20
**copies**
68:5, 150:17
**copious**
20:25
**copy**
23:24, 62:17,
94:7, 103:11,
104:2, 105:25,
106:4, 106:9,
106:13, 128:12,
128:14, 151:3,
194:3, 196:1,
198:23, 198:25,
199:1, 199:21,
207:21, 210:17
**copying**
106:12, 153:18
**cor**
60:16
**corporations**
42:5, 185:6

**correct**
17:4, 20:5,
25:7, 25:21,
26:24, 28:24,
29:3, 30:21,
32:8, 32:22,
35:9, 37:9,
40:12, 46:12,
50:3, 50:4,
50:6, 50:7,
50:14, 50:22,
54:2, 54:3,
54:5, 54:7,
55:23, 72:25,
73:5, 73:6,
84:3, 90:13,
95:5, 110:10,
113:3, 113:11,
114:1, 117:17,
123:14, 129:3,
134:11, 136:2,
141:6, 141:7,
141:8, 141:13,
152:5, 154:21,
157:3, 159:13,
160:22, 162:22,
169:10, 198:22,
209:1, 211:5
**could**
15:9, 15:15,
19:1, 22:21,
38:3, 38:7,
38:8, 38:12,
44:4, 54:17,
55:2, 56:1,
59:16, 61:11,
62:14, 63:10,
65:16, 69:25,
78:11, 80:14,
82:23, 86:2,
94:12, 97:17,
103:23, 104:4,
110:12, 111:25,
118:3, 119:7,
123:23, 124:2,
127:16, 140:8,
143:12, 158:17,
162:8, 171:20,

178:11, 197:8,
202:7
**couldn't**
28:3, 94:1,
118:18, 154:7,
165:16, 200:3
**counsel**
8:7, 9:6,
11:13, 11:18,
12:21, 206:11,
209:22, 211:10
**count**
19:6, 20:20
**couple**
10:24, 46:19,
49:5, 64:16,
64:25, 74:16,
81:22, 83:11,
117:8, 120:21,
144:24, 198:17,
199:23
**course**
28:12, 64:20,
117:9, 142:23,
175:23, 176:15,
186:6, 191:18,
198:24
**court**
1:1, 8:16, 8:20
**cover**
179:12
**created**
26:3, 80:15
**crr**
1:25
**cruse**
1:14, 2:1, 5:2,
5:8, 6:3, 7:3,
8:3, 8:9, 24:19,
57:11, 57:18,
58:1, 58:4,
62:22, 63:4,
65:9, 65:13,
65:16, 76:9,
77:20, 78:2,
82:16, 82:20,
82:23, 83:8,
87:1, 87:5,

87:9, 87:20,
92:5, 92:9,
92:12, 92:21,
98:20, 99:3,
102:14, 102:25,
103:4, 103:7,
114:17, 114:21,
114:22, 115:1,
122:17, 125:7,
125:14, 127:22,
128:1, 128:4,
130:21, 130:25,
131:3, 138:3,
138:10, 138:13,
146:4, 146:11,
150:6, 150:17,
151:16, 154:25,
156:9, 156:16,
159:9, 162:1,
162:5, 162:8,
174:14, 174:24,
175:6, 178:17,
185:19, 186:1,
189:19, 189:23,
193:22, 194:6,
194:9, 197:1,
197:8, 200:23,
206:22, 207:1,
208:5, 208:15,
209:16, 209:25
**cruse@ohr**
18:1, 32:9
**curious**
178:23
**current**
25:6, 25:14,
59:10, 93:6
**currently**
13:6, 13:8,
13:11, 84:24
**customary**
95:23
**cut**
59:22, 150:2

**D**

**darts**
168:13

**data**
6:24, 126:7,
126:9, 154:19,
155:8, 155:20,
156:5, 156:6,
157:10, 157:14,
157:16
**date**
23:23
**day**
23:21, 29:7,
60:8, 68:4,
69:8, 69:9,
111:9, 113:17,
113:18, 119:1,
126:23, 127:4,
140:23, 146:6,
157:6, 187:22,
205:10, 211:14
**day-in-and-day-o-
ut**
29:16
**day-to-day**
30:17, 93:5,
144:15
**days**
128:21, 144:24,
211:17
**de**
47:25, 48:14,
101:14
**deal**
68:11, 88:15,
141:21
**december**
14:19, 14:20
**decide**
38:23, 123:12
**decided**
165:5, 182:22
**decides**
141:20
**deciding**
188:4
**decision**
27:21, 41:20,
122:6, 122:8,
122:11, 145:5,

145:15, 145:21,
182:19, 183:1,
206:7, 206:10,
209:5
**decisions**
84:9, 135:13,
184:24, 184:25
**deemed**
44:1
**deeper**
51:17
**defendant**
3:11, 4:2,
209:23
**defendants**
1:11
**defense**
9:5
**degree**
20:24, 33:14,
70:15
**delay**
161:21
**delivery**
210:14
**delvin**
147:18, 147:21,
147:22, 148:14,
148:15, 148:19,
149:19, 150:14,
150:16, 150:24,
151:6, 151:24,
151:25, 152:3,
152:12, 152:14
**delvin's**
152:8
**departed**
95:13
**departing**
81:8
**department**
13:18, 13:21,
19:12, 20:4,
21:21, 25:16,
34:11, 44:15,
45:21, 46:15,
48:1, 53:21,
59:6, 67:7,

67:10, 67:16,
67:25, 71:21,
72:9, 72:14,
72:23, 80:12,
85:24, 86:7,
94:19, 95:8,
95:15, 96:3,
96:10, 96:14,
101:4, 104:14,
105:23, 106:19,
130:16, 137:15,
147:7, 147:11,
147:24, 167:13,
174:16, 186:25,
190:24, 191:20,
194:15, 202:22,
205:1
**department's**
95:20
**departments**
49:4, 66:15,
67:2, 94:18,
113:22
**depending**
36:6, 37:2,
37:24, 37:25
**deposed**
9:20
**deposition**
1:14, 2:1, 5:8,
6:3, 7:3, 8:13,
10:1, 10:16,
11:20, 11:24,
172:2, 194:4,
197:13, 211:3
**deputy**
179:22
**derogatory**
178:7, 183:23
**described**
93:7, 110:18,
110:20
**deserved**
66:16
**designated**
172:25
**desk**
9:13, 12:11

despite
186:20
detail
96:17, 111:4,
159:10, 200:14,
200:15, 203:9
detailed
124:18
details
47:14, 49:12,
61:4, 69:12,
110:21, 124:17,
154:8, 161:17,
164:1
determine
34:15, 34:24,
35:18, 37:25,
38:2, 70:13
determines
157:14
determining
35:16
device
13:16, 16:17,
32:3
difference
32:23
different
76:1, 113:21,
177:19, 208:12,
208:18
differential
85:17, 86:4
differently
83:17, 194:23
difficult
66:11, 66:17
direct
15:14, 29:21,
63:24, 68:20,
73:12, 102:19,
117:17, 150:25,
168:1, 202:24
directed
101:1, 101:5,
101:25
directing
102:2

direction
24:14, 89:24,
211:8
directive
86:13
directly
14:14, 29:1,
43:20, 142:10,
203:2
director
28:22, 29:20,
30:24, 31:14,
46:10, 174:13,
204:20
directors
15:18, 64:2
disaster
118:10, 119:6,
119:9, 119:11
disciplined
205:2
discovery
11:6, 24:15,
147:4, 173:23
discrimination
34:18, 53:11,
53:13, 53:17,
86:17, 126:25,
129:18, 129:25,
132:15, 134:3
discuss
37:15, 41:4,
41:19, 79:2,
100:5, 123:8,
124:7, 138:23,
157:8, 164:2,
209:9
discussed
114:5, 150:18,
151:5, 151:6,
175:15, 176:4,
177:13, 178:18,
178:25, 179:14
discussion
90:9, 90:19,
90:22, 91:3,
94:2, 115:17,
116:24, 117:2,

117:5, 118:3,
118:9, 119:15,
124:15, 177:9,
180:20
discussions
122:3, 208:14
dismissed
187:4
disparate
90:24
dispute
39:9, 40:3,
88:16, 88:18,
90:11, 93:8,
113:13
disputes
86:16, 90:15,
101:21
disrespect
113:5
disrespectful
120:16, 120:18,
120:20
disrespectfully
113:11
distance
29:13
district
1:1, 1:2
division
1:3
divvied
33:3
document
47:21, 57:9,
58:1, 59:21,
59:25, 62:15,
62:21, 63:7,
65:7, 65:13,
77:19, 83:7,
85:2, 86:24,
87:5, 87:22,
92:4, 93:16,
98:14, 98:19,
103:4, 103:8,
114:14, 122:16,
125:6, 125:15,
127:21, 128:1,

130:25, 150:1,
150:5, 156:2,
162:5, 166:6,
194:6, 201:7
documentation
91:22
documents
9:12, 22:24,
24:9, 24:19,
60:7, 80:19,
103:19, 104:7,
104:10, 104:12,
104:21, 105:19,
117:2, 122:14,
144:7, 144:23,
147:5, 151:13,
160:21, 160:23,
161:4, 173:22,
191:7, 191:10,
194:1, 198:2,
198:6, 199:7,
201:8, 202:12,
207:15
doing
9:11, 30:2,
114:3, 133:21,
143:10, 150:22,
199:16, 207:16
done
28:4, 41:21,
41:22, 58:6,
58:15, 63:12,
65:17, 65:18,
82:25, 86:13,
87:10, 88:6,
92:13, 98:11,
102:4, 102:7,
115:2, 120:6,
125:15, 128:8,
128:10, 131:4,
131:6, 138:14,
138:16, 145:16,
145:18, 162:9,
176:2, 177:1,
177:11, 185:7,
186:3, 189:25,
193:8, 194:10,
197:10, 207:2,

207:13, 208:2,
210:10, 210:11
**door**
207:5
**dotted-line**
28:16, 30:19,
64:5
**double**
85:19
**douglas**
39:14, 123:19,
124:21, 124:22,
125:23, 133:10,
133:12, 138:21,
139:9, 153:12,
153:18, 159:8,
164:5, 169:7,
173:24, 174:8,
202:22, 203:5
**down**
20:25, 37:15,
65:7, 81:20,
86:24, 102:24,
105:20, 105:21,
110:10, 110:15,
111:2, 114:8,
121:1, 121:8,
121:10, 144:19,
165:5, 165:20,
166:20, 189:24
**dozen**
184:14
**dr**
107:5, 107:6,
107:20, 108:6,
147:6
**draft**
63:4, 182:22,
183:6, 183:11,
203:7
**drawing**
74:22
**dual**
46:17
**due**
66:11, 196:13
**duly**
8:4

**durham**
16:12, 131:21,
132:3, 132:4,
132:13, 133:5,
199:25
**during**
15:20, 39:20,
66:13, 73:8,
73:19, 75:13,
95:15, 96:8,
124:8, 135:13,
192:22, 202:2,
202:17
**dust-up**
88:10
**duties**
26:11, 26:19,
54:15, 55:1,
188:19

**E**

**e-mail**
5:18, 6:10,
7:4, 7:17, 16:3,
17:18, 17:22,
17:23, 17:25,
18:2, 18:7,
18:12, 19:20,
21:23, 21:24,
23:15, 23:24,
29:6, 32:6,
57:19, 57:23,
58:5, 60:6,
62:18, 65:19,
66:6, 66:7,
80:20, 80:24,
81:2, 82:6,
84:16, 87:11,
88:7, 92:22,
93:15, 98:5,
99:4, 99:5,
99:23, 100:3,
101:24, 104:22,
115:6, 131:11,
133:9, 133:17,
135:3, 138:18,
138:20, 138:21,
139:9, 151:25,

153:12, 153:18,
155:8, 156:25,
159:6, 161:7,
161:8, 162:12,
169:20, 189:24,
195:20, 197:9,
197:17, 207:2
**e-mailed**
106:8
**e-mailing**
123:1, 153:11,
158:23
**e-mails**
5:9, 5:11,
5:13, 5:20,
5:22, 5:24, 6:6,
6:8, 6:12, 6:14,
6:16, 6:18,
6:20, 6:22, 7:8,
7:10, 7:11,
7:12, 83:13,
88:5, 88:14,
93:1, 107:1,
132:16, 140:20,
144:8, 150:14,
151:24, 159:8,
190:4, 199:24,
200:1, 200:9,
200:10, 200:11,
201:12, 201:14
**each**
95:20, 95:22,
96:7, 96:8,
96:10
**eager**
89:4, 89:9
**earlier**
8:11, 31:24,
46:8, 69:8,
84:2, 108:12,
115:7, 133:14,
144:7, 157:9,
172:1, 172:2,
197:13
**early**
22:4, 39:20,
94:1, 132:6,
147:16

**easily**
44:5, 80:14,
80:15
**edu**
18:1
**education**
53:4
**ee**
180:14
**eeoc**
10:4
**effect**
172:3, 182:23
**effective**
68:9
**effectively**
27:19, 68:15
**effectuating**
70:6, 70:19
**eight**
63:18, 191:23
**either**
16:3, 36:18,
45:20, 51:10,
56:3, 71:2,
86:16, 97:6,
115:8, 159:4,
198:7, 205:1
**else**
11:10, 57:1,
75:7, 104:1,
126:14, 139:15,
139:17, 141:21,
152:11, 181:11,
181:17, 191:15,
202:4, 208:14
**else's**
106:23
**elt**
89:3, 89:9,
89:12
**email**
153:13, 155:15
**emergency**
211:18
**emotion**
120:22
**emotional**
46:3, 110:8,

110:18
**employ**
90:7, 173:11
**employed**
10:22, 35:6,
205:18, 211:10
**employee**
13:9, 18:11,
25:7, 26:14,
32:21, 32:24,
33:1, 33:2,
33:12, 33:16,
33:17, 33:24,
34:1, 34:3,
34:6, 34:20,
34:25, 35:12,
35:14, 36:1,
38:5, 38:19,
38:21, 39:1,
39:8, 39:9,
40:3, 40:5,
40:8, 40:13,
40:19, 41:3,
41:8, 41:13,
41:16, 41:24,
68:12, 81:18,
86:15, 86:16,
86:17, 88:18,
90:2, 90:15,
93:8, 94:2,
96:18, 97:9,
101:20, 107:12,
107:22, 108:1,
108:3, 113:15,
123:7, 123:12,
125:21, 129:18,
130:5, 130:7,
130:10, 134:10,
137:10, 137:14,
153:20, 169:6,
173:20, 185:13,
187:13, 202:21,
204:21, 204:25,
205:5, 210:2,
210:4
**employee-related**
137:5
**employees**
81:25, 107:14,

184:22
**employer**
10:9
**employment**
25:4, 42:2,
129:25, 132:15,
134:3, 134:4,
173:11, 173:18,
188:5, 202:5
**en**
190:18
**encountered**
113:17
**encouraged**
117:13
**end**
14:19, 51:10,
55:13, 67:14,
68:1, 72:21,
74:7, 74:8,
119:4, 120:9,
157:6, 203:25
**ended**
39:12, 39:13,
119:12, 119:14
**engage**
34:25, 35:23,
36:19, 38:19,
85:6, 91:14,
94:22, 143:14,
143:17, 143:21
**engaged**
84:25, 98:12,
133:14, 136:16,
159:16, 159:17,
180:22, 189:14,
190:19, 209:9
**engagement**
78:25
**engel**
53:23, 54:4,
54:9, 55:6,
55:25, 56:13,
67:18, 78:4,
79:11, 79:20,
80:2, 83:14,
83:17, 84:7,
85:16, 93:3,

98:1, 100:9,
102:1, 135:12,
198:11
**engel's**
56:19, 56:22,
58:23, 67:6,
67:10, 67:16,
84:3, 94:19
**enjoyed**
66:9
**enlarge**
186:5
**enough**
36:9, 39:3,
142:2, 143:16
**ensuring**
53:21
**entail**
29:19
**entire**
68:23, 91:18,
91:21, 133:16,
148:1
**entirety**
198:21
**entity**
104:16, 104:17,
145:24, 173:5
**envelope**
91:8
**environment**
66:10
**equity**
83:24, 186:24
**er**
33:18, 39:16
**eric**
159:8, 159:11,
159:21, 160:6,
170:2, 170:4,
173:23, 174:3,
174:10, 175:7,
190:9, 202:3,
202:4, 202:17,
202:25, 203:6,
203:12, 203:23
**eric's**
203:8

**especially**
118:17
**esquire**
3:3, 3:4, 3:13,
4:4
**essentially**
129:10
**est**
1:17
**established**
17:3
**et**
1:10, 21:10,
103:21, 103:22,
107:18, 108:4
**ethics**
43:25
**ethicspoint**
43:6, 43:9,
44:8, 46:2
**even**
23:5, 34:1,
49:7, 52:10,
62:17, 67:24,
71:3, 81:23,
85:12, 91:11,
97:2, 97:3,
97:8, 102:7,
105:6, 111:19,
142:19, 161:9,
166:14, 180:15,
196:5, 202:23,
206:3
**events**
20:17
**eventually**
91:15, 97:10,
111:19, 114:4,
118:19, 203:13
**ever**
9:20, 16:9,
16:21, 17:12,
18:6, 18:10,
19:4, 41:6,
44:7, 44:23,
45:12, 48:2,
49:22, 51:18,
52:13, 52:23,

62:2, 63:7,
81:4, 83:7,
103:8, 103:10,
124:9, 128:11,
133:5, 142:6,
147:9, 152:22,
170:3, 170:7,
171:22, 172:11,
177:14, 180:25,
181:18, 184:7,
185:7, 186:9,
196:11, 203:7,
207:18, 208:11
**every**
49:20, 95:17
**everybody**
118:12
**everyone**
76:3, 191:24
**everything**
103:20, 118:4,
136:21, 136:23,
136:25, 153:22,
165:12, 199:3
**evidence**
22:11, 54:18
**exact**
140:19, 199:4,
200:3
**exactly**
9:24, 97:18,
99:21, 111:7,
148:8, 148:24,
160:1, 160:12,
161:2, 172:19,
173:21, 182:24,
193:5, 193:9,
199:17
**examination**
5:2, 8:7,
209:22
**examined**
8:6
**example**
21:11, 23:17,
31:17, 33:18,
34:10, 41:16,
47:11, 65:2,

89:21, 128:20
**examples**
17:9
**exchange**
15:9, 68:7,
68:8, 69:10,
73:14, 91:18,
110:22, 150:22,
153:19
**exchanges**
75:24, 116:22,
138:20
**excruciating**
118:16
**excuse**
21:8, 28:17,
38:8, 73:10,
110:2, 114:11
**executed**
47:20, 49:15,
49:16, 127:2
**execution**
183:10, 183:15
**executive**
63:19, 63:22,
64:7, 64:8,
64:11, 168:8
**executor**
47:10
**exercise**
123:22, 143:14,
143:17, 143:21
**exhausting**
168:19
**exhibit**
5:8, 5:9, 5:11,
5:13, 5:15,
5:18, 5:20,
5:22, 5:24, 6:3,
6:4, 6:6, 6:8,
6:10, 6:12,
6:14, 6:16,
6:18, 6:20,
6:22, 6:24, 7:3,
7:4, 7:5, 7:8,
7:10, 7:11,
7:12, 7:14,
7:17, 57:6,

57:11, 62:22,
65:8, 65:9,
77:20, 82:15,
82:16, 87:1,
92:5, 98:20,
102:24, 102:25,
114:16, 114:17,
122:17, 125:7,
127:22, 130:20,
130:21, 138:2,
138:3, 150:6,
151:15, 151:16,
154:24, 154:25,
156:8, 156:9,
161:25, 162:1,
174:22, 174:24,
185:18, 185:19,
189:18, 189:19,
193:21, 193:22,
196:25, 197:1,
200:22, 200:23,
206:21, 206:22
**existed**
161:3
**exit**
81:3, 81:5,
81:7, 81:10,
82:1, 82:5, 82:7
**exiting**
81:24
**expect**
134:13, 136:8,
136:14, 204:14,
204:19
**expected**
204:3
**expecting**
60:10
**expedite**
210:14
**experience**
25:5, 42:11,
43:13, 65:4,
81:14, 113:14,
132:13, 185:12
**expert**
53:6, 88:15
**expires**
211:16

**explain**
103:18, 159:10,
188:7
**explained**
95:20
**explanation**
112:22, 186:19,
188:23
**express**
121:19
**expressed**
63:19, 74:11,
74:15, 142:5
**expressing**
168:20
**extended**
211:17
**extends**
53:16
**extension**
47:16
**extent**
24:12, 41:23,
45:9, 56:9,
75:22
**external**
12:16, 170:8
**extreme**
118:22
**extremely**
79:24

**F**

**facebook**
17:15
**facilitate**
95:21, 114:12
**facilitated**
10:24, 30:13,
74:1, 90:9,
90:18, 90:22,
91:3, 91:14,
114:10, 115:15,
116:12, 116:15,
116:24, 117:2,
117:5, 118:9,
191:19
**facilitating**
183:6

facilitator
118:17
facilities
85:22
facing
129:9
fact
31:25, 84:6,
121:12, 141:4,
145:10, 170:24,
172:11, 183:19,
206:3, 206:4
faction
112:9
facto
47:25, 48:14,
101:14
facts
13:2, 36:15
failed
186:19
fair
80:3, 119:6,
124:3
fairly
73:1
fall
26:16, 59:17,
88:17, 134:5
fallouts
113:20
familiar
21:3, 43:5,
53:3, 80:14,
103:12, 128:18,
131:12, 156:17,
179:3, 192:8
far
30:16, 47:17,
71:20, 120:5,
195:6
fashion
19:20
fast
142:1
favor
84:9
february
25:11, 117:3,

118:8, 118:23,
119:5, 119:19,
120:25, 121:22,
122:25, 123:6,
123:11, 123:25,
125:19, 126:22,
126:23, 131:16,
131:19, 135:25,
138:18, 138:21,
139:2, 140:23,
141:6, 147:8,
150:14, 152:7,
154:11, 155:9,
157:5, 159:7,
161:11, 162:15,
173:23, 175:12,
175:16, 178:24,
181:24, 187:22,
189:5, 190:3,
194:14
feel
123:20
feeling
72:15, 121:14,
164:20
feelings
74:10, 79:19,
112:22
feels
168:12
felecia
116:8
felicia
15:11, 74:24,
75:4, 108:13,
109:3, 109:12,
109:24, 110:1,
110:2, 111:23,
112:4, 112:23,
113:5, 115:8,
115:20, 116:4,
120:5, 120:15,
124:2, 133:16,
135:22, 139:11,
139:14, 140:19,
140:25, 141:5,
141:12, 141:19,
142:15, 143:4,

145:6, 147:15,
149:21, 152:3,
169:9, 177:4,
205:14, 205:17,
206:10
felicia's
126:13
fell
134:6, 196:18
felt
27:17, 28:5,
33:22, 35:18,
36:5, 36:9,
38:3, 48:6,
49:7, 56:12,
62:3, 67:13,
67:25, 71:25,
74:19, 112:8,
112:11, 113:4,
115:16, 118:1,
120:14, 121:12,
121:14, 151:2,
164:11, 164:16,
165:14, 167:5,
188:17
fence
93:12
few
19:13, 47:5,
48:15, 76:9,
122:14, 175:10,
199:6, 208:1
field
46:21, 53:2
figuring
146:14
file
24:22, 24:23,
25:2, 57:7,
68:18, 103:21,
104:23, 105:3,
105:8, 105:12,
105:18, 106:1,
106:4, 106:14,
141:20, 142:13,
142:19, 150:3,
161:5, 163:4,
163:9, 197:14,

197:17, 197:20,
197:23, 198:18,
198:20, 198:25,
199:20, 200:19,
201:4
filed
36:22, 37:1,
46:1, 49:23,
102:16, 102:18,
142:16, 143:4,
147:15, 163:2,
163:11, 171:3
files
22:18, 103:21,
106:18, 106:24,
131:16
filing
126:24, 152:9
final
78:3, 169:18,
174:10
finalize
120:11
finance
31:14, 31:16,
46:11, 47:1,
47:2, 147:23,
147:25
finances
47:16, 50:6,
50:9
financial
211:12
financially
28:3
find
62:1, 71:23,
72:2, 105:7,
111:7, 164:7,
166:7, 166:13,
197:15, 202:1,
207:18
finding
180:17, 201:22
findings
40:21, 63:5,
203:12, 203:19
fine
210:15

fired
191:5, 196:14,
203:15, 205:19
firm
42:6, 103:24,
104:8, 104:17,
145:5, 170:12
first
8:4, 22:5,
22:21, 25:9,
25:13, 34:8,
35:11, 38:11,
38:12, 52:3,
58:17, 61:5,
63:14, 63:22,
66:6, 73:8,
73:19, 74:7,
74:23, 75:13,
83:15, 84:25,
87:11, 90:10,
91:21, 94:2,
101:8, 105:11,
109:23, 110:7,
111:23, 113:24,
116:17, 118:15,
127:6, 143:13,
143:16, 150:21,
152:7, 153:17,
160:18, 162:17,
163:22, 171:7,
182:25, 198:19,
210:12
five
200:7
five-minute
208:3
flagpole
149:17
flat
189:12
floor
3:7
focus
115:5
folder
24:5
folders
103:21

folks
48:24, 103:23,
119:15, 144:24,
158:7, 173:3,
183:13
follow
118:25, 123:21,
161:20
follow-up
76:10, 143:12
followed
99:9, 152:19
following
69:11, 109:20,
127:4, 159:5
follows
8:6
football
44:20, 44:24,
46:1
footnote
174:11
foregoing
211:3, 211:4
foremost
84:25
form
56:6, 102:9,
195:6, 195:17,
204:11
formal
70:25, 81:7,
81:18, 90:20,
91:1, 153:15,
153:25, 154:3,
154:6
formally
71:5
former
66:20, 135:11,
192:14
formulated
124:24
forth
19:2, 68:7,
78:16, 95:9,
151:13, 157:1
forthcoming
60:24

fortune
42:5
forum
43:10
forward
36:3, 36:11,
38:9, 68:22,
69:11, 70:4,
115:9, 115:10,
123:24, 126:8,
133:9, 134:22,
136:10, 136:24,
155:17, 157:17,
201:13
forwarded
69:5, 121:21,
157:10, 158:21
forwarding
71:7, 119:20
forwards
68:8, 91:20,
93:20, 99:11,
131:21, 150:16,
194:18
found
66:10, 71:24,
199:4, 199:9,
201:9
four
87:10, 200:10
fractured
115:17
frame
82:13, 100:20,
101:10, 101:15,
116:3, 139:23,
140:16, 161:11,
182:15, 190:23
frankly
66:15
frequent
51:12
frequently
49:17
friday
131:19
friends
162:13

front
35:24, 36:10
fruition
91:5
frustrated
121:13, 121:19,
165:6, 165:16
frustration
165:10
fulfill
152:23
full
106:1
full-filling
66:17
full-time
28:1
fully
27:19
fundamentals
45:8
further
34:16, 38:1,
41:11, 98:9,
98:12, 103:18,
120:7, 155:10,
188:8

G

game
44:25, 118:18
games
44:24
garry
92:25, 93:15,
98:5, 99:5, 99:8
gatech
18:1
gather
36:15, 60:7,
107:13, 141:24
gathering
104:6, 104:7,
104:21, 207:15
gave
94:24, 120:7,
195:5
gears
44:14, 82:11

geez
175:22
gender
83:24, 186:24
general
3:14, 48:22,
53:9, 119:25,
161:1, 177:3
generalist
33:6
generally
48:8, 89:14,
108:23, 112:7,
171:15, 178:12
genuinely
115:16
georgia
1:2, 1:10,
3:12, 3:14,
3:16, 4:2, 10:6,
11:6, 13:5,
13:8, 13:17,
13:20, 14:4,
16:22, 17:7,
17:22, 18:11,
18:23, 20:5,
24:20, 25:6,
25:10, 32:13,
32:15, 32:17,
32:20, 41:25,
42:2, 42:12,
44:21, 44:22,
50:11, 55:13,
85:21, 101:16,
107:7, 107:10,
129:1, 129:23,
130:3, 130:8,
130:13, 132:13,
147:4, 159:12,
159:16, 167:10,
170:23, 170:25,
172:25, 184:22,
185:3, 185:7,
186:13, 187:14,
188:3, 189:8,
202:4, 205:18,
208:12, 209:23,
210:2, 210:3,

210:4
getting
49:15, 85:23,
142:1, 154:3
give
8:14, 9:7,
10:11, 17:9,
41:15, 42:1,
58:1, 59:24,
65:12, 82:20,
87:4, 87:5,
92:8, 103:3,
114:22, 122:21,
124:12, 127:25,
130:24, 134:17,
138:9, 145:23,
152:13, 162:4,
194:5, 200:3
given
89:24, 106:6,
160:25, 186:18,
194:1, 202:19,
211:5
giving
51:5, 51:20,
55:22, 56:2,
126:15, 177:2
go
9:3, 9:9,
22:17, 27:21,
36:8, 43:19,
72:1, 96:7,
96:8, 96:16,
97:14, 100:25,
102:17, 106:11,
106:25, 107:1,
114:3, 118:9,
146:6, 146:7,
149:15, 152:15,
153:3, 153:9,
154:13, 162:16,
173:7, 192:8,
207:6, 210:13
god
132:6
goes
24:12
going
8:14, 8:19,

8:20, 9:18,
12:19, 13:3,
14:22, 15:7,
24:11, 25:3,
31:20, 36:3,
38:19, 41:9,
44:13, 47:14,
56:5, 56:24,
57:19, 64:4,
67:3, 79:16,
81:3, 82:11,
95:9, 105:5,
109:6, 109:14,
114:13, 115:5,
117:25, 122:13,
133:23, 134:18,
149:16, 151:12,
153:22, 160:1,
162:16, 165:12,
165:24, 166:10,
167:2, 167:3,
167:7, 167:10,
169:25, 175:9,
188:6, 193:1,
204:10, 206:8,
206:14, 206:17,
208:17, 208:22,
209:5
gone
63:15, 82:9,
86:11, 144:24
good
8:9, 76:2,
146:3, 146:21,
150:18, 181:6,
186:7, 198:11,
198:15
gossip
171:18, 171:20
governs
154:19
grade
122:9
graduate
112:16, 117:8,
139:20, 139:24,
140:8, 192:11,
192:19

gras
117:8
great
59:1, 133:3,
199:5
greene
97:6
grievance
34:9, 41:17,
86:16, 88:18
group
32:20
growing
93:3
gt
66:10, 66:11,
78:25
gthr
28:19, 30:12,
155:11, 155:17,
169:17, 206:18
guard
133:25
guarded
52:20
guess
13:6, 56:14,
104:13, 110:19,
110:22, 175:20,
176:6, 184:6,
187:20, 193:7,
195:21, 198:2,
198:7
guessing
137:24
guidance
79:3, 88:14
guys
146:14

H

habit
20:8
half
184:14
halftime
178:7
hand
19:6, 20:12,

| | | | |
|---|---|---|---|
| 20:20, 85:23, 211:14 | **harassing** 180:4 | **helped** 50:9 | **hey** 102:18, 150:14 |
| **hand-off** 95:23, 96:11 | **harassment** 130:8, 130:10 | **helpful** 123:23 | **hi** 157:6 |
| **hand-offs** 95:11 | **hard** 106:9, 106:13 | **helping** 164:6 | **hire** 75:21 |
| **handed** 106:6, 158:18 | **hard-copy** 104:23, 105:3, 105:8 | **hendrickson** 76:25, 77:1, 94:24, 95:10, | **hired** 25:11 |
| **handle** 33:20, 34:2, 34:8, 35:11, | **harrington** 16:7, 30:6, 107:5, 107:6, | 96:22, 97:13, 201:13, 201:16, 201:24 | **hiring** 75:22 **historical** |
| 36:3, 59:16, 84:19, 86:3, 88:21, 93:9, | 107:20, 108:6, 131:22 | **here** 8:10, 8:15, | 94:8, 94:11, 96:21, 97:16, 126:7, 126:9 |
| 101:20, 136:15, 141:11, 172:25 | **harsh** 74:20 | 8:18, 9:12, 13:3, 33:19, | **historically** 66:8 |
| **handled** 33:13, 86:9, | **head** 8:24, 44:20, 53:2, 101:16, | 43:14, 57:22, 59:13, 63:11, | **history** 42:2, 94:16, |
| 89:17, 89:22, 89:24, 109:1, | 117:23, 127:18, 204:20 | 66:6, 66:25, 78:25, 79:18, | 126:16 **hit** |
| 134:18, 149:18 | **hear** 36:4, 48:23, | 79:21, 79:22, 83:16, 84:16, | 129:9, 163:23 **hoc** |
| **handling** 40:10, 62:4, | 60:10 | 85:18, 88:3, 88:24, 90:6, | 81:12 **hoffman** |
| 90:15, 100:7, 134:14, 184:6 | **heard** 56:23, 111:15, | 90:11, 90:21, 91:17, 92:24, | 7:5, 159:9, 159:11, 160:7, |
| **hands** 22:21, 145:23 | 120:2, 171:5, 171:8, 171:15, | 93:8, 94:12, 99:12, 100:16, | 170:4, 173:23, 174:3, 175:7, |
| **handwritten** 5:15, 106:15 | 178:8, 178:9, 183:23, 195:22 | 115:13, 122:25, 123:5, 124:22, | 175:15, 176:25, 177:3, 179:14, |
| **happen** 25:22, 113:18, | **hearing** 168:25, 178:12 | 126:10, 129:14, 138:17, 150:13, | 179:25, 180:23, 181:1, 181:24, |
| 204:14, 209:6 | **hearsay** 56:24, 72:8, | 153:10, 157:5, 164:10, 166:6, | 182:10, 190:10, 202:3, 202:5, |
| **happened** 40:10, 109:15, | 171:10, 171:21 | 167:3, 178:4, 186:2, 187:25, | 202:25 |
| 109:18, 110:15, 119:1, 119:22, | **held** 26:1, 42:7, | 189:24, 196:2, 199:8, 200:2, | **hoffman's** 159:22, 170:2, |
| 126:2, 140:25, 142:12, 145:2, | 147:6, 164:22, 165:11, 205:22 | 207:14, 207:19 | 174:10, 182:17, 202:17, 203:12 |
| 169:13, 174:20, 196:17 | **hello** 60:9 | **hereby** 211:4 | **hold** 21:4, 21:7, |
| **happening** 84:12, 187:8, | **help** 28:2, 60:6, | **hereunto** 211:13 | 21:14, 22:16, 23:21, 25:12, |
| 187:25, 209:1, 209:2 | 69:25, 88:15, 95:21, 98:15, | **herself** 51:7, 97:4, | 49:2, 114:7, 117:1, 118:24, |
| **happy** 9:1, 141:25 | 98:16, 125:22, 139:6, 169:6, | 142:18 | 145:3 |
| **harassed** 168:15 | 169:8 | **hesitant** 111:14 | **holding** 143:11 |

honest
96:23, 97:19,
98:8, 156:18,
164:2, 169:15
honestly
12:24, 48:20,
86:8, 91:8,
134:19
hope
143:12
hopes
143:19
hoping
27:25, 116:9,
143:15, 166:24
hour
146:5
however
116:8, 152:3,
157:11, 182:15
hr
14:14, 14:15,
18:3, 18:12,
20:4, 20:8,
26:2, 26:12,
26:13, 26:16,
26:18, 28:8,
28:13, 29:15,
29:20, 31:15,
32:12, 32:19,
33:6, 33:8,
33:11, 33:15,
42:8, 42:11,
42:15, 45:19,
45:21, 47:2,
48:14, 49:2,
49:23, 68:21,
72:23, 77:12,
86:7, 86:19,
88:15, 90:4,
93:10, 94:4,
95:4, 100:5,
100:22, 109:15,
123:1, 132:14,
133:6, 134:9,
137:5, 141:21,
143:5, 147:16,
152:5, 152:15,

157:12, 158:7,
158:11, 162:18,
162:19, 164:14,
170:15, 172:18,
173:10, 185:10,
204:20
hr's
59:18
hr-related
26:15, 74:2,
170:14
hrbp
159:9, 179:21
huge
144:13
human
13:17, 13:20,
14:3, 14:9,
25:14, 26:6,
28:22, 31:11,
31:21, 42:3,
42:8, 42:19,
42:25, 43:4,
46:14, 47:25,
48:6, 48:8,
50:25, 59:16,
78:25, 84:17,
86:1, 86:22,
107:9, 129:17,
129:22, 130:3,
130:9, 130:13,
174:13, 187:14,
209:25

**I**

idea
116:23, 117:11,
181:6, 198:11,
198:15
identification
57:12, 62:23,
65:10, 77:21,
82:17, 87:2,
92:6, 98:21,
103:1, 114:18,
122:18, 125:8,
127:23, 130:22,
138:4, 150:7,

151:17, 155:1,
156:10, 162:2,
174:25, 185:20,
189:20, 193:23,
197:2, 200:24,
206:23
identify
143:21
ignorance
48:25
ignorant
54:19
imagine
100:19
immediate
31:3, 35:4,
63:24, 86:11,
117:6, 205:23
immediately
34:19, 37:3,
37:6, 68:9,
69:4, 139:3,
172:13
impact
54:25, 63:20,
64:10
importance
133:3
important
8:21, 8:23,
146:20, 188:2,
188:24
importantly
37:14
inappropriate
62:3
incident
91:21, 135:19
incidents
201:21
include
50:13, 167:24,
206:18
includes
167:23
including
180:22
incorrectly
195:1

increase
47:17
independent
160:8
indicate
117:2
indicating
88:5
indifferent
112:11
individually
61:23
individuals
126:16, 191:23,
191:25
inequities
129:8
informal
38:15, 40:4,
124:3
informally
38:12, 40:4,
90:12, 90:23,
113:25, 119:7,
136:6, 142:22,
143:6, 145:23
information
52:7, 60:12,
107:18, 135:14,
154:14, 154:16,
174:15, 191:1,
191:13
informed
145:17, 152:17,
182:25
informs
142:15
infraction
193:4
initial
33:20, 34:23,
175:19, 195:5
initially
60:22, 110:6,
115:22, 143:5
initiated
61:13
input
196:6

inquire
198:6
inquiries
99:14, 99:17
inquiry
69:23
insight
88:24
inspire
34:19
instance
34:8, 83:25,
100:25
instances
41:12, 184:22
instant
18:25, 19:20
institute
42:20, 90:21,
148:1, 210:2,
210:5
insubordinate
120:15
intended
143:15
intention
119:2
interact
73:8, 73:19
interacted
49:7
interactions
73:2
interest
27:10, 54:14,
56:20, 84:1,
127:1, 130:13,
130:15, 130:18,
188:17, 211:11
interested
26:3, 27:9
interesting
71:7, 71:10,
71:16, 71:23,
71:24, 72:1,
72:3, 72:6
interface
54:21

interfaced
29:8
interference
180:13
interim
101:13
intermittent
163:23
internal
126:25
interpretation
21:9, 67:5
interpreted
71:16, 194:23,
194:25
interview
61:19, 64:22,
79:9, 81:10,
181:1, 181:6
interviewed
79:22
interviewees
180:24
interviewing
61:15
investigate
51:19, 61:9,
127:10, 127:13,
129:17, 145:6,
145:13, 159:12,
163:18, 170:25,
172:10, 187:15,
188:3
investigating
61:5, 85:25,
103:25, 129:24,
130:4, 130:10,
130:14, 160:11
investigation
34:23, 38:23,
40:10, 40:15,
40:18, 40:21,
41:13, 56:18,
57:2, 60:18,
61:16, 63:6,
69:19, 70:3,
93:6, 160:7,
160:9, 160:20,

163:21, 170:1,
170:3, 170:8,
171:12, 174:3,
174:15, 175:8,
176:15, 179:15,
181:19, 181:22,
182:1, 182:10,
182:17, 188:15,
188:19, 190:6,
192:22, 193:13,
202:3, 202:18,
202:20, 203:19,
204:6, 204:9,
204:23, 208:22
investigations
41:7, 107:25,
108:3
investigator
145:12, 176:9,
178:25, 198:8
invited
170:15, 190:20
involved
35:17, 54:10,
70:12, 85:4,
86:2, 97:3,
102:8, 102:11,
136:17, 141:6,
153:15, 153:25,
154:6, 157:11,
173:15, 184:10,
185:10
involvement
61:22, 159:22,
170:9
involves
37:13
involving
138:24
iphone
14:1, 14:2
iron
114:8
issue
33:17, 33:18,
33:22, 34:4,
34:12, 34:15,
35:12, 35:14,

36:9, 36:16,
39:2, 41:14,
41:24, 43:12,
51:14, 77:3,
85:15, 86:1,
90:2, 93:7,
97:9, 137:11,
161:13, 169:14,
177:4
issued
13:16
issues
14:6, 14:12,
15:2, 16:23,
17:21, 19:16,
30:1, 33:3,
34:7, 39:20,
41:8, 44:4,
56:20, 76:11,
83:24, 84:15,
84:16, 89:10,
89:16, 89:20,
96:6, 96:11,
96:18, 97:2,
107:14, 107:23,
117:22, 134:5,
134:14, 137:1,
137:10, 137:12,
137:14, 137:15,
177:10, 179:6,
180:1, 186:25
items
23:19
ix
53:4, 53:9,
53:22, 54:5,
56:1, 56:11,
83:24, 135:9,
135:10, 173:3,
180:18

_____
J
_____

jamie
4:4, 100:1,
193:25, 209:17,
210:20
january
57:23, 60:6,

60:8, 60:13,
109:10, 109:11,
109:17, 115:6,
147:8
**jeff**
190:9
**jo**
85:10, 161:14,
166:11, 166:15,
167:4, 168:25,
195:5, 195:8,
195:24
**jo's**
161:5, 196:2
**job**
1:23, 27:19,
54:15, 55:1,
66:16
**joeleen**
15:5, 15:10,
15:18, 64:1,
73:18, 83:15,
131:17, 157:6,
158:24, 159:1,
168:4, 172:14,
174:13, 176:11,
177:7, 177:14,
178:6, 178:11,
191:21, 193:7,
196:1, 196:2,
196:5, 196:11,
196:17, 206:13
**jog**
69:25, 139:6,
176:3
**jogged**
58:18
**johnson**
44:17, 44:19,
44:23, 46:2
**johnson's**
45:12, 45:22
**jones**
147:19, 147:21,
147:22, 148:14,
148:15, 148:19,
149:19, 150:14,
150:16

**joseph's**
8:12, 24:23,
25:2, 52:14,
69:20, 92:25,
112:21, 117:17,
117:21, 134:2,
138:20, 148:20,
162:22, 182:14,
182:15, 188:22,
194:21, 202:5,
202:18
**jot**
20:24
**jotted**
111:2
**joyce**
16:4, 16:5,
16:6, 28:19,
28:20, 29:10,
32:19, 60:25,
86:12, 93:23,
94:7, 94:12,
94:15, 94:22,
97:17, 98:4,
101:7, 101:8,
107:15, 107:17,
107:22, 133:10,
133:12, 134:14,
135:3, 137:23,
139:12, 140:20,
140:22, 141:1,
142:10, 142:14,
155:12, 157:17,
158:1, 173:24,
174:9, 190:4,
191:18, 202:23,
204:3
**joyce's**
29:19, 134:6,
204:19
**jp**
140:3, 140:4,
162:21, 163:19,
163:22, 164:7
**jp's**
162:18, 163:15,
163:18
**julie**
16:4, 16:5,

16:6, 28:19,
28:20, 60:25,
86:12, 93:23,
94:7, 94:15,
94:21, 97:23,
101:6, 101:8,
107:15, 107:16,
133:10, 133:12,
133:18, 133:20,
134:6, 134:13,
134:23, 137:23,
139:11, 140:20,
140:22, 140:25,
142:17, 142:20,
155:12, 157:8,
157:17, 158:1,
158:19, 160:4,
173:24, 174:8,
190:4, 191:18,
202:23, 204:3
**julie's**
16:8
**jump**
76:1
**june**
22:5, 22:6,
25:23, 76:19,
211:15

**K**

**kate**
16:14, 100:7,
100:8, 100:13,
100:14, 100:15,
101:24, 190:4,
191:3, 191:18
**katherine**
3:13
**katie**
99:25, 193:25,
209:17, 210:16
**katz**
3:5
**keep**
40:14, 70:22,
108:5, 146:10,
206:10
**keeping**
153:23, 157:7,

159:5
**kept**
23:24, 24:5,
30:1, 71:4,
104:24, 106:17,
198:24, 199:20
**kevin**
1:14, 2:1, 5:2,
8:3, 18:1, 32:9,
71:7, 150:18,
159:9, 174:14,
176:22, 179:21,
181:9
**kicked**
86:10, 169:16
**kim**
16:7, 30:5,
131:21
**kind**
16:1, 36:5,
57:2, 65:19,
86:12, 91:14,
95:18, 95:23,
96:14, 111:6,
116:5, 120:11,
164:20, 177:3,
178:2, 183:25,
184:17, 191:2,
191:14, 192:6
**kinds**
75:24, 95:22
**knew**
56:25, 94:13,
94:15, 97:20,
111:15, 120:22,
124:14, 127:2,
149:10, 154:5,
154:6, 164:22,
170:19, 209:7
**knocking**
207:4
**knowing**
48:25, 124:13
**knowledge**
45:11, 102:12,
204:12
**known**
77:5, 77:11,

85:11, 201:21
**kruse**
176:22, 179:22,
181:9

**L**

**labaw**
88:4, 88:14,
91:10, 91:20,
91:23
**labor**
182:8
**laborious**
106:12
**lack**
66:12
**lance**
83:14
**land**
93:12
**large**
42:4
**larger**
126:20, 140:13
**last**
39:23, 65:2,
74:23, 78:14,
80:19, 81:1,
89:3, 89:9,
97:5, 98:10,
126:6, 126:8
**lastly**
9:11
**late**
74:13, 91:18
**later**
68:4, 75:6,
91:20, 91:24,
107:2, 140:22,
190:9
**latest**
136:9, 136:15,
186:22
**latter**
39:22, 120:17,
183:8
**law**
56:7, 104:17,

145:5, 170:12
**lawsuit**
10:1
**lawyer**
159:11, 187:3
**lawyers**
8:13, 186:20
**lead**
39:5, 40:9,
41:7, 107:22
**leader**
47:1, 101:14,
185:10
**leaders**
89:20, 157:12
**leadership**
59:6, 63:19,
63:23, 64:7,
64:8, 64:11,
66:12, 90:1,
101:17, 167:19,
167:21, 168:9,
206:12
**leading**
41:11, 41:23,
165:12
**learned**
37:25, 100:6,
159:21
**least**
9:24, 173:25
**leave**
27:5, 182:12,
182:13, 182:15,
182:19, 182:22,
183:2, 183:6,
183:17, 184:8,
184:16, 184:17,
184:20, 184:23,
185:12, 185:14,
188:14, 206:5,
208:11, 208:13,
208:23, 209:7,
209:11
**leaving**
27:9, 55:14,
81:13
**led**
20:17, 27:20,

191:3
**lee**
76:25, 77:1,
94:24, 95:10,
95:12, 95:14,
97:13, 201:12,
201:15, 201:23
**left**
14:18, 39:23,
39:24, 40:1,
81:17, 95:11,
97:6, 97:7,
97:10, 101:16,
123:2, 132:6,
146:5, 164:3,
186:21, 206:2
**legal**
15:25, 21:20,
21:21, 43:20,
59:6, 59:10,
60:11, 100:6,
100:15, 101:4,
101:16, 104:8,
104:14, 105:23,
106:6, 130:16,
161:9, 190:24,
191:20, 198:4,
198:8, 203:2
**less**
51:20, 55:22,
56:2, 66:17,
96:12, 111:15,
129:1, 161:4,
191:1
**let's**
57:4, 62:20,
64:18, 90:5,
98:18, 112:2,
127:19, 130:19,
146:23, 149:24,
174:21, 186:17,
191:17, 200:17
**letter**
6:4, 7:14,
21:4, 21:7,
21:10, 21:14,
22:16, 23:14,
68:18, 72:4,

182:22, 183:6,
199:22, 200:19,
201:2, 201:7
**letters**
164:13, 171:23,
201:9
**level**
36:6, 37:2,
44:6, 79:11,
113:4, 132:20,
200:14, 200:15
**levied**
171:16
**lewis**
31:7, 31:8,
46:9, 47:24,
48:13, 49:7,
49:18, 49:22,
50:1, 50:16,
51:2, 51:19,
52:13, 52:17,
53:25, 54:9,
55:6, 55:21,
56:11, 56:19,
56:22, 58:22,
64:1, 69:14,
70:1, 70:5,
71:6, 73:2,
78:4, 79:12,
79:20, 80:3,
80:22, 81:2,
84:3, 84:8,
84:9, 135:12,
150:17, 150:21,
168:6, 202:11,
202:13
**liar**
162:20, 162:25
**lid**
118:20
**lieu**
208:22
**lifted**
211:18
**light**
89:2, 89:8
**lightfoot**
104:18

likely
38:19, 101:6
line
61:23
lines
166:1, 166:2,
183:24
link
156:1, 163:24
linked
156:24
list
14:23, 161:1,
179:11
listed
23:19, 79:21
listen
34:14, 111:6
litany
23:19
literally
171:9
litigation
21:4, 21:7,
21:14, 22:16,
23:21
little
20:2, 25:4,
30:9, 30:11,
43:8, 44:14,
46:9, 46:13,
69:17, 72:10,
74:20, 75:6,
82:12, 107:2,
107:4, 108:11,
109:8, 111:21,
115:24, 170:1,
186:5
littler
7:5, 160:19,
170:1, 170:6,
170:9, 170:17,
170:22, 170:25,
171:12, 171:15,
176:15, 181:25,
192:22, 193:12,
202:3
llp
3:5

load
28:3
locate
198:6
lodge
140:21
long
57:18, 65:19,
206:3
longer
204:1
look
9:13, 22:18,
23:5, 35:13,
59:18, 70:13,
82:24, 87:9,
88:6, 92:12,
105:2, 115:1,
122:13, 126:6,
127:19, 128:7,
128:18, 130:19,
131:3, 131:12,
138:14, 148:16,
149:25, 156:17,
163:6, 172:10,
174:21, 175:13,
176:23, 177:8,
178:16, 179:24,
186:2, 187:17,
194:9, 197:8,
207:1, 208:1
looked
10:17, 56:24,
58:22, 80:20,
99:4, 187:18,
188:11
looking
9:14, 49:1,
56:21, 59:8,
69:21, 104:22,
166:23, 177:18
looks
78:3, 93:21,
99:7, 103:12,
104:3, 154:9,
156:21, 194:16,
207:14
loop
40:14, 93:23,

133:12, 153:23,
157:7, 159:5
looped
132:14
loosely
29:6
lori
39:14, 39:16,
123:19, 124:23,
133:10, 133:12,
133:14, 138:21,
153:12, 153:18,
154:10, 157:8,
159:8, 164:4,
169:7, 173:24,
174:8, 202:22,
203:5
lost
193:7
lot
96:17, 103:22,
111:3, 118:20,
144:14, 166:6,
172:2
loved
27:16
lump-sum
32:15
lunch
146:3, 146:9
lunchtime
146:7
lying
166:8
lynn
16:12, 131:21,
132:3, 132:4,
132:5, 132:6,
132:13, 133:5,
199:24, 200:11

## M

machelle
1:5, 4:13,
94:9, 131:24,
140:2, 141:19,
152:6, 155:7,
156:25, 167:10,

175:20, 196:14,
199:11, 199:24,
201:14, 203:15
machelle's
134:15, 135:18,
157:9, 158:10,
194:19, 199:22,
200:20, 201:2
made
9:9, 41:2,
48:2, 51:6,
64:24, 66:16,
68:15, 76:15,
106:5, 122:9,
122:10, 133:24,
145:5, 145:20,
145:21, 151:25,
157:12, 158:6,
159:1, 163:4,
171:2, 172:2,
181:3, 183:1,
198:25, 206:6,
206:9, 209:4,
209:5
magnitude
132:17
main
74:4
mainly
190:20
majority
14:18
make
22:20, 34:21,
47:18, 49:14,
51:8, 60:23,
64:13, 81:8,
92:1, 104:11,
105:25, 122:6,
133:24, 144:23,
191:13, 196:9,
198:7, 207:21
making
47:19, 84:10,
160:2, 167:13
manage
33:23, 47:18,
136:9

**managed**
29:22, 46:19,
46:20, 46:21
**management**
26:16, 33:8,
42:4, 42:25,
71:14, 71:20,
79:4, 117:22
**manager**
195:19
**managing**
33:2, 136:23
**many**
9:23, 10:8,
11:1, 11:21,
19:6, 20:21,
42:10, 128:17,
152:25, 156:21,
184:13, 200:1
**march**
46:1, 197:20,
197:21
**marilyn**
3:4
**mark**
15:19, 68:5,
73:13, 73:23,
83:14, 99:9,
99:11, 99:13,
117:9, 119:20,
120:25, 124:13,
124:14, 131:18,
164:12, 164:14,
164:16, 164:20,
164:25, 165:1,
165:5, 165:19,
166:11, 166:15,
166:19, 168:1,
168:2, 168:3,
179:22, 181:6,
196:19, 196:20,
199:24, 200:12
**mark's**
71:8
**marked**
57:11, 62:22,
65:9, 77:20,
82:16, 87:1,

92:5, 98:20,
102:25, 114:17,
122:17, 125:7,
127:22, 130:21,
138:3, 150:6,
151:16, 154:25,
156:9, 162:1,
174:24, 185:19,
189:19, 193:22,
197:1, 200:23,
206:22
**markos**
83:14
**marney**
1:25, 2:7,
211:2
**marshall**
3:5
**marvin**
31:7, 31:8,
46:9, 46:17,
47:4, 47:24,
48:13, 49:7,
49:10, 49:19,
52:17, 64:1,
68:23, 69:7,
71:15, 79:20,
80:2, 135:12,
150:17, 150:21,
150:25, 151:1,
151:3, 168:6,
202:11, 202:13
**marvin's**
76:13
**maryland**
2:10, 211:23
**material**
21:10, 22:20
**matter**
33:25, 36:3,
37:15, 41:22,
60:11, 89:14,
94:23, 97:22,
97:24, 98:13,
100:7, 100:10,
114:5, 124:7,
125:1, 135:17,
136:1, 138:22,

139:1, 141:21,
144:12, 202:10,
202:13
**matters**
62:6, 73:25,
85:3, 85:7,
100:22, 108:4,
134:9, 134:11,
137:6
**maybe**
34:1, 39:23,
41:1, 49:8,
60:25, 64:16,
70:18, 71:3,
71:21, 72:10,
75:22, 95:7,
98:15, 101:7,
104:4, 104:15,
105:6, 118:18,
146:5, 146:9,
153:2, 158:18,
181:11, 190:11,
191:22, 192:19,
201:10, 202:23,
206:18
**mean**
23:4, 24:2,
31:19, 36:20,
45:5, 45:8,
47:11, 55:18,
85:9, 96:1,
96:4, 96:7,
97:25, 100:21,
116:4, 118:14,
124:12, 132:21,
132:24, 134:16,
136:19, 137:1,
137:13, 141:16,
146:17, 156:21,
167:22, 171:9,
171:11, 172:7,
172:18, 173:18,
176:14, 176:17,
178:20, 179:3,
179:5, 187:7,
203:22
**meaning**
40:24, 46:19

**means**
14:11, 124:3,
180:16
**meant**
80:17, 96:2,
169:3
**mechanism**
43:22
**mederos**
1:25, 2:8,
211:2
**media**
17:14
**mediate**
90:23
**mediated**
38:13, 91:14,
114:9
**mediation**
42:22, 90:8,
90:20, 90:25,
91:1
**medium**
18:22, 19:18
**mediums**
17:16
**meet**
11:21, 30:25,
36:14, 40:20,
49:13, 140:22,
159:10
**meeting**
30:15, 31:4,
49:10, 62:8,
62:14, 73:14,
89:3, 89:9,
89:12, 91:9,
109:9, 109:10,
109:17, 109:20,
110:11, 110:20,
110:25, 114:7,
115:15, 115:25,
116:11, 116:12,
116:15, 118:24,
118:25, 119:5,
119:19, 119:22,
120:2, 120:10,
120:25, 121:22,

122:24, 123:2,
123:7, 123:12,
123:22, 124:8,
124:13, 124:16,
124:19, 125:19,
125:25, 126:7,
126:20, 135:19,
139:12, 140:13,
140:20, 141:6,
143:12, 143:13,
143:16, 143:20,
145:3, 146:19,
147:9, 161:16,
164:14, 173:24,
174:1, 174:2,
174:6, 174:12,
174:18, 175:12,
181:23, 183:7,
190:23, 191:2,
191:14, 191:16,
192:2

**meetings**
10:24, 11:17,
19:15, 20:15,
20:19, 20:21,
30:12, 49:18,
49:22, 64:11,
64:25, 65:4,
73:17, 74:6,
89:16, 133:15,
147:6, 190:17,
190:19, 190:21

**member**
34:11, 34:12,
64:7, 97:1,
100:15, 138:25,
147:22, 170:20,
195:18

**member's**
97:5

**members**
63:19, 74:16,
74:21, 90:24,
113:8, 113:10,
113:21, 114:9,
147:6, 158:5,
180:3, 191:20

**meme**
120:4

**memo**
63:5, 78:3,
78:20, 78:23,
79:6

**memorandum**
183:12

**memory**
10:19, 24:6,
58:18, 58:24,
70:1, 110:9,
113:2, 139:6,
176:3, 197:25

**men's**
46:20, 50:18,
51:5, 51:21,
55:23, 83:18,
85:17, 85:19,
85:20, 129:2,
180:19

**mental**
10:10

**mention**
55:15

**mentioned**
8:11, 36:13,
64:21, 67:24,
72:4, 81:2,
119:10, 135:10,
172:1, 174:8,
198:19

**mercy**
146:14

**merely**
149:4

**message**
14:5, 14:11,
19:1

**messages**
17:6, 17:15,
23:1, 23:11

**messaging**
17:8

**met**
31:3, 41:19,
49:19, 91:5,
98:4, 115:13,
116:16, 116:19,
125:24, 126:2,

140:25, 165:19,
178:24, 179:13

**method**
208:21

**mid**
74:13

**mid-february**
147:16

**mid-friday**
115:14, 115:25

**middle**
115:6

**might**
24:7, 30:13,
30:14, 36:7,
36:18, 39:19,
43:15, 49:1,
54:24, 89:18,
90:7, 144:19,
160:14, 181:16,
189:8, 191:19,
193:15

**mike**
135:11

**mind**
36:4, 64:18,
69:18, 124:1,
129:14

**mindful**
13:1

**mine**
119:3, 170:20

**minute**
139:8

**minutes**
118:16

**miscellaneous**
199:23

**miss**
163:23

**misstates**
56:6

**mistaken**
191:3

**mj**
175:19

**moments**
128:22

**monday**
60:13, 131:20,
152:10, 159:10

**money**
51:2, 51:20,
52:15, 55:22,
56:2, 69:22

**monitor**
45:22

**month**
91:20, 91:24

**months**
39:23

**moral**
46:3

**more**
19:19, 28:5,
29:24, 37:13,
46:14, 51:12,
57:8, 66:9,
66:17, 69:17,
70:19, 80:8,
91:13, 96:12,
98:14, 101:17,
111:15, 120:1,
120:17, 121:7,
126:15, 146:5,
146:20, 152:2,
159:10, 161:4,
168:1, 171:18,
185:6, 190:25,
192:5, 208:1

**morning**
8:9, 131:20,
150:18, 155:11,
157:8, 157:9

**most**
38:19, 72:3,
101:6, 186:22

**mostly**
170:15

**move**
38:8, 76:11,
82:12, 93:16

**moved**
91:16

**moving**
36:11, 87:22,

123:24, 136:24,
146:10
**much**
25:1, 29:17,
43:13, 49:11,
49:12, 51:2,
73:19, 73:21,
77:6, 209:16
**multiple**
208:25
**must**
152:4, 154:13
**mute**
207:6, 210:18
**muted**
208:15
**mutually**
114:6
**myself**
41:4, 117:9,
123:3, 174:9,
188:7, 191:17

**N**

**name**
8:11, 39:14,
57:7, 74:23,
97:5, 139:25,
150:3, 192:7
**named**
56:18
**nature**
9:25, 22:19,
31:18, 54:20,
70:14, 75:17,
103:25, 108:20
**ncaa**
69:23, 93:6
**necessarily**
105:24, 149:9,
185:3, 209:2
**necessary**
38:1, 39:6,
151:3
**need**
9:2, 11:16,
12:23, 37:14,
123:9, 138:23,

152:10, 155:14,
171:19, 173:7,
190:5, 210:14,
210:16
**needed**
27:19, 27:24,
29:25, 34:16,
34:25, 35:22,
41:2, 41:20,
74:1, 75:21,
166:19, 204:1
**needing**
155:16
**needs**
86:13
**neither**
211:9
**nervous**
176:12, 176:16
**never**
44:9, 44:11,
44:12, 56:25,
91:5, 106:22,
106:23, 144:1,
145:2, 166:17,
208:19
**new**
95:3
**newsome**
131:18, 131:22,
173:4
**newspaper**
186:12
**next**
40:6, 40:7,
40:22, 60:8,
124:22, 124:24,
125:24, 126:23,
203:20, 203:21
**nobody**
145:15
**nod**
8:24
**none**
184:4
**normal**
198:24
**norris**
66:7, 66:19,

68:5, 68:9,
69:15, 80:21,
81:3, 81:4
**northern**
1:2
**notarial**
211:14
**notary**
2:9, 211:1,
211:22
**note-taking**
20:3, 192:4
**noted**
191:13
**notes**
5:15, 10:17,
10:21, 10:23,
11:1, 11:5,
11:9, 11:23,
20:9, 20:18,
20:25, 23:18,
47:22, 62:7,
106:15, 110:24,
165:23, 168:11,
175:7, 176:22,
192:1
**nothing**
8:5, 30:15,
52:5, 69:18,
111:1, 140:1,
170:16, 170:21,
171:14
**notice**
2:7, 37:12
**notified**
127:7, 127:9,
150:20
**notify**
36:25, 37:7,
40:5, 149:21
**notifying**
37:11
**notion**
165:11
**november**
91:19, 92:25,
98:5, 99:4,
99:8, 211:16

**nuances**
108:22
**nucleus**
183:13
**number**
13:14, 16:19,
33:4, 39:11,
44:2, 61:11,
78:25, 144:15,
144:18, 173:12,
185:5, 200:4
**numbers**
7:11

**O**

**oath**
8:17
**object**
9:6, 24:11,
56:5, 102:9,
204:10
**objection**
9:8, 9:9
**objective**
143:20
**objectivity**
54:25
**obligated**
81:8
**obligation**
8:17
**observe**
44:23
**obsessively**
68:1
**obtain**
174:15
**occasion**
14:13, 15:16,
19:4, 73:7,
73:11, 75:12,
75:16, 132:18,
203:5
**occasionally**
17:4, 73:24
**occur**
144:1
**occurred**
110:19, 111:8,

135:12, 164:9,
178:23
**occurring**
143:25
**october**
88:4, 88:13,
91:19
**offense**
193:17
**offer**
38:6
**office**
3:14, 12:2,
24:14, 50:2,
81:21, 88:21,
104:24, 105:4,
106:24, 129:22,
129:23, 130:3,
130:9, 130:13,
132:9, 132:20,
148:5, 154:14,
154:16, 163:3,
172:24, 173:2,
190:24, 197:14,
198:20
**officer**
107:10, 211:2
**official**
30:16, 131:23,
172:9
**often**
132:17
**oh**
9:23, 11:3,
18:22, 35:4,
42:13, 44:10,
55:2, 58:16,
65:19, 65:22,
65:24, 70:23,
87:13, 88:25,
108:7, 112:24,
122:8, 130:1,
132:6, 142:17,
146:13, 148:3,
148:24, 159:25,
175:22, 184:12,
184:14, 185:4,
191:17, 200:13,

**oit**
154:7, 154:13,
154:14, 169:17
**old-school**
45:7
**older**
201:7
**oliver**
74:24, 74:25,
108:13, 109:2,
109:13, 111:10,
135:22, 140:22,
141:8, 142:15,
143:4, 149:22,
194:17
**oliver's**
108:13, 145:6,
196:6
**oliver-staley**
15:24, 60:15,
60:18, 99:15,
99:18, 100:4,
100:10, 101:9,
101:19, 101:25,
102:2, 131:18,
131:22, 136:12,
137:20, 190:4
**oliver-staley's**
101:11
**on-line**
82:9
**onboard**
75:21
**once**
9:9, 11:22,
40:18, 83:11,
153:2, 157:17,
169:23, 203:23,
206:1
**one**
8:12, 10:4,
15:16, 15:17,
19:6, 20:20,
21:18, 21:19,
32:3, 32:6,
32:14, 39:18,
44:9, 44:12,

45:2, 48:22,
52:18, 57:8,
58:5, 62:13,
64:3, 74:17,
74:18, 80:19,
81:15, 82:4,
89:15, 95:24,
98:14, 99:8,
109:13, 109:16,
114:13, 115:7,
115:9, 115:11,
118:22, 136:23,
139:19, 139:24,
144:6, 144:8,
145:11, 152:1,
157:15, 160:3,
162:21, 178:4,
180:2, 180:22,
189:14, 191:19,
192:10, 196:21,
203:18, 206:15,
209:20
**ones**
64:17
**ongoing**
186:23
**only**
39:22, 54:17,
69:2, 97:23,
103:13, 132:24,
133:1, 144:12,
170:9, 173:9,
173:14, 177:14,
185:2
**onslaught**
33:21
**open**
38:23, 115:9,
115:21, 116:23,
194:1
**opened**
69:20
**opening**
26:3
**operate**
166:22
**operations**
176:7

**opinion**
145:15
**opinions**
72:8, 72:12,
75:8
**opportunity**
9:7, 26:4,
27:12, 27:21,
90:7, 116:8,
116:9, 144:2,
144:4
**opposing**
143:22
**optics**
80:7, 80:17
**option**
209:8
**options**
208:12, 208:25,
209:13
**order**
189:1, 199:4
**org**
95:19
**organizations**
42:5
**other**
11:14, 12:16,
12:22, 15:14,
17:1, 17:8,
19:11, 20:22,
23:6, 23:14,
29:15, 29:23,
35:16, 35:23,
36:19, 36:20,
36:25, 38:5,
39:6, 44:25,
49:5, 49:20,
52:24, 64:2,
66:10, 70:16,
72:7, 72:12,
73:15, 76:11,
85:23, 94:18,
101:20, 104:16,
112:1, 113:20,
115:9, 118:22,
121:11, 126:6,
126:15, 134:4,

135:1, 135:4,
137:1, 137:5,
137:10, 137:11,
137:14, 161:13,
163:11, 178:4,
179:6, 183:19,
184:4, 184:8,
184:13, 184:21,
191:20, 201:8,
202:10, 206:15,
208:20, 209:10,
209:12
**others**
206:12
**otherwise**
211:12
**ourselves**
85:6
**out**
28:2, 29:8,
33:24, 34:20,
48:24, 54:15,
59:22, 62:1,
63:18, 81:21,
85:5, 100:3,
109:14, 110:14,
111:7, 111:21,
113:18, 114:8,
119:3, 119:16,
120:22, 131:25,
139:11, 143:18,
144:5, 144:8,
145:2, 145:23,
150:2, 159:6,
163:19, 164:4,
164:6, 164:7,
164:21, 166:7,
166:13, 189:12,
194:15, 195:3,
198:5, 199:3,
201:15, 201:23,
203:6
**outcome**
37:24, 163:20,
169:18, 211:12
**outline**
208:2
**outside**
74:4, 93:13,

103:24, 104:16,
104:17, 145:5,
145:24, 169:5,
198:8
**over**
10:17, 31:8,
31:14, 34:1,
40:19, 41:22,
43:14, 45:19,
47:25, 48:14,
49:2, 59:10,
62:9, 67:17,
69:5, 72:10,
78:15, 91:15,
93:3, 94:4,
95:6, 95:8,
95:17, 95:18,
97:14, 97:15,
97:23, 103:23,
107:1, 109:5,
113:22, 117:19,
121:16, 122:9,
123:18, 126:3,
131:25, 142:9,
153:2, 159:3,
203:14
**overburdensome**
67:15
**overlap**
33:10, 95:7
**overreach**
72:15
**overreaching**
72:19
**oversaw**
32:19, 32:20,
50:5
**oversee**
29:5
**overseeing**
50:8, 204:21
**overseer**
47:10, 48:6
**oversight**
83:24, 93:5
**overview**
177:3
**overwhelmed**
144:22

**own**
34:8, 35:12,
41:14, 43:24,
120:3, 167:16,
195:12
**owner**
157:13

## P

**page**
5:2, 5:8, 6:3,
7:3, 57:20
**pages**
1:24, 11:1,
87:11
**paid**
32:13, 32:16,
69:22, 184:20
**pan**
119:3
**paperwork**
49:15
**paragraph**
58:17, 63:14,
164:11, 199:8
**paragraphs**
83:16
**parent**
199:10, 199:16
**parent's**
199:13
**parents**
171:23, 180:10
**part**
31:3, 39:21,
39:22, 61:15,
122:3, 145:14,
155:20, 157:19,
168:8, 172:16,
174:1, 183:10,
183:13
**part-time**
28:1
**participate**
90:9, 115:15,
117:12, 118:3,
147:9, 183:14,
190:20

**participated**
20:15, 20:21,
117:4, 117:10,
174:12
**participating**
64:24, 65:4,
190:13
**particular**
33:17, 36:7,
38:4, 47:3,
58:5, 98:12,
100:20, 109:20,
120:5, 137:16,
142:25, 143:17
**particularly**
31:17, 85:3,
113:5, 176:17,
206:13
**parties**
35:16, 61:22,
143:23, 211:11
**partner**
14:4, 14:9,
14:10, 18:4,
25:15, 26:2,
26:7, 26:18,
28:8, 28:13,
32:12, 32:24,
33:6, 33:11,
33:16, 45:19,
50:25, 84:18,
93:10, 94:4,
95:4, 174:14,
210:1
**partnered**
170:7
**partners**
29:15, 29:23,
32:19
**parts**
128:17
**party**
10:1, 35:23,
36:19, 36:20,
36:25, 80:12,
174:8
**passing**
48:23, 97:15

past
24:4, 44:3,
146:7
pastner
53:1, 96:5
path
123:24
paul
44:16, 44:19
pay
122:9
payouts
70:14
pays
13:19
pending
188:15
pennsylvania
4:6
people
12:22, 13:5,
14:23, 15:1,
19:2, 19:5,
19:11, 44:14,
48:15, 61:11,
64:3, 79:21,
86:14, 118:19,
129:8, 185:12,
194:15, 200:10
people's
79:19
perception
48:17, 48:19,
80:15, 120:3,
167:16
peresson
192:7
performance
194:17, 194:21,
195:3, 195:7,
195:12, 195:18,
196:7, 196:11
performing
72:11, 160:8,
205:25
perhaps
22:20, 34:1,
34:13, 41:1,

49:8, 60:23,
71:3, 71:20,
72:9, 72:10,
74:13, 80:16,
101:7, 101:14,
104:15, 136:22,
139:17, 157:22,
158:18, 174:4,
195:2, 202:23,
206:18
period
14:18, 74:18,
109:5, 120:9,
205:18
person
18:10, 28:1,
28:2, 36:21,
38:6, 39:17,
59:10, 62:10,
68:16, 70:10,
75:20, 84:24,
93:25, 95:24,
96:13, 102:17,
116:20, 126:3,
144:20, 148:12,
169:6, 190:20,
198:2
personal
16:16, 16:22,
18:7, 18:12,
102:12, 120:3,
204:11
personally
45:6, 48:4,
71:12, 73:15,
118:2, 164:8
personnel
24:22, 24:23,
25:2, 68:18,
103:21, 161:5
perspective
112:25, 117:21,
119:21
pertained
126:11
peterson
7:15, 147:6,
147:10, 199:23,

200:20, 201:3
ph
28:17
phone
12:8, 12:10,
12:11, 12:20,
13:12, 13:14,
13:22, 13:23,
14:5, 15:14,
16:3, 16:17,
16:19, 16:22,
17:4, 23:1,
31:25, 32:3,
126:4, 147:19,
148:6, 148:15,
148:17, 149:5,
150:15, 150:23,
151:7, 152:1,
152:13, 152:21,
152:23, 153:14,
154:3, 154:10,
154:20, 155:15,
157:1, 158:10,
161:13, 169:12,
169:14
phrased
51:17
phyllis
88:13, 91:10,
91:20
physical
10:11
physically
78:15
pick
150:15
piece
109:7
pieces
195:16
place
47:19, 61:5,
118:6, 118:7,
118:21, 126:20,
135:19, 166:17,
182:19, 183:1,
196:16, 208:13
placed
182:11, 182:12,

183:17, 184:7,
184:22, 185:14,
208:10
placing
120:8, 185:12,
188:13
plaintiff
1:6, 3:2, 4:13,
5:14, 5:19, 6:5,
6:11, 6:23, 7:4,
7:16, 8:7, 65:8,
82:15, 102:24,
125:6, 154:24,
161:25
plan
124:7, 136:4,
142:21, 146:23
planned
143:6, 181:19
planning
124:22, 125:21
plans
118:24, 143:10,
181:21
plate
123:10
platforms
17:8
plausible
100:12
play
31:11, 70:6,
107:11, 134:14,
144:18, 150:22,
178:13, 181:25,
183:9, 184:23
played
46:14, 204:8,
204:22
player
46:1, 69:22,
192:15
players
168:18, 193:12
please
9:7, 57:15,
59:21, 60:2,
63:1, 65:13,

66:3, 77:24,
82:20, 83:4,
87:6, 87:18,
87:24, 92:9,
92:18, 98:24,
114:23, 122:21,
125:11, 128:1,
128:8, 130:25,
131:4, 131:8,
138:7, 138:10,
150:10, 150:15,
155:4, 156:13,
162:5, 175:3,
185:23, 194:5,
194:12, 196:25,
197:5, 200:22,
210:19
**plus**
42:13
**point**
25:18, 26:23,
35:19, 38:4,
38:18, 38:25,
49:14, 56:16,
125:24, 136:4,
137:16, 142:25,
145:4, 146:3,
148:12, 148:16,
159:2, 159:15,
171:2, 179:6,
198:2, 202:2,
203:17, 203:24,
204:1, 206:5
**points**
64:9, 147:8
**policy**
59:15, 149:10,
152:4, 152:15,
154:19, 155:8,
155:19, 155:21,
156:5, 156:16,
156:24, 156:25,
157:10, 157:13,
157:15, 157:24
**poorly**
113:9
**position**
25:12, 25:14,

26:2
**positions**
42:7
**possible**
15:8, 15:22,
38:16, 40:4,
145:3, 190:7
**possibly**
86:5, 97:21,
127:17
**potential**
54:13, 56:1,
59:14
**powers**
3:13
**practice**
81:24, 81:25,
90:15
**practices**
20:3, 35:5,
45:13, 79:2,
85:22
**precisely**
23:22
**predecessor**
76:22, 76:24,
84:23, 94:14
**preliminary**
8:14, 9:19
**prep**
47:13
**prepare**
10:15, 11:19
**present**
4:11
**presented**
27:12, 54:13,
56:20, 81:9
**presenting**
106:13
**preserve**
22:11, 23:1,
23:11
**president**
7:14, 42:8,
132:10, 132:20,
147:10, 199:23,
200:20, 201:3,

201:8
**pretty**
23:21, 25:1,
29:17, 44:1,
77:6, 165:9
**previous**
156:2
**previously**
10:5, 120:6,
152:25
**primarily**
17:19, 19:19,
19:21, 31:22,
33:2, 41:14,
42:3, 42:4,
45:1, 112:7,
143:19
**primary**
26:11, 26:19,
209:8
**prior**
11:18, 22:22,
41:25, 42:2,
43:16, 55:13,
81:17, 115:24,
116:3, 133:4,
135:3, 153:8,
170:2, 185:8
**privileged**
24:13
**privy**
181:21, 208:19
**probably**
34:22, 44:4,
69:10, 71:13,
72:3, 81:22,
89:25, 101:8,
104:14, 109:19,
109:24, 120:23,
124:14, 158:18,
159:25, 160:3,
163:12, 164:4,
174:7, 185:2,
194:25, 203:16,
206:13
**problem**
152:8, 207:9
**problems**
54:13, 77:7,

77:10
**procedure**
149:7, 157:4
**procedures**
6:24, 156:6
**process**
104:20, 152:18,
153:4, 153:15,
153:25, 154:3,
154:6, 155:10,
157:11, 157:20
**processed**
158:9
**produce**
11:6, 194:3
**produced**
47:22, 147:5,
173:22, 175:7,
194:3
**product**
24:12, 84:8
**professional**
2:8, 20:8,
42:6, 42:18,
42:20, 43:3,
185:11
**program**
15:3, 45:23,
46:20, 50:14,
50:18, 51:3,
51:4, 51:5,
51:20, 51:21,
52:15, 55:22,
55:23, 56:3,
66:15, 66:22,
66:23, 67:1,
67:11, 67:13,
68:1, 69:20,
69:24, 72:17,
75:23, 85:16,
85:17, 85:20,
85:25, 94:17,
96:1, 97:1,
112:19, 117:19,
121:17, 129:2,
133:17, 139:20,
159:4, 174:17,
175:9, 202:18

programs
12:13, 12:16,
46:19, 50:10,
53:17, 53:18,
54:1, 85:20
prohibits
53:10, 53:12,
53:17
properly
83:23
prospect
189:7
protocol
43:19, 70:24,
81:10
provide
11:5, 24:9,
24:10, 24:20,
26:13, 33:8,
47:13, 60:12,
93:21, 96:22,
107:18, 186:19,
202:4
provided
10:18, 24:19,
182:8, 187:5
provides
134:23
proximity
49:3
public
2:9, 211:1,
211:22
published
157:12, 157:20
pull
22:23, 65:7,
86:24, 92:3,
102:24, 104:10,
106:23, 114:13,
122:15, 124:20,
125:5, 125:21,
127:20, 149:5,
149:11, 152:9,
154:23, 156:7,
160:24, 161:2,
174:22, 189:17,
196:25, 201:20

pulled
123:15
pulling
20:23, 103:19,
104:9, 104:12,
104:15, 159:21,
159:24, 160:21
punching
165:15
purely
137:24
purpose
37:10, 121:15
purposely
166:12
purposes
85:22, 87:17
pursuant
2:7
purview
52:11, 134:7
pushing
91:7
put
22:21, 62:14,
105:22, 143:23,
182:22, 184:17
putting
119:15, 122:4

**Q**

quarterly
170:13
question
8:25, 28:11,
30:14, 41:11,
45:10, 54:18,
56:6, 85:9,
102:10, 129:19,
145:1, 165:3,
166:10, 166:12,
175:17, 178:19,
181:3, 185:2,
193:2, 204:11,
209:21
questioned
69:7
questioning
61:24, 69:14

questions
8:20, 9:6,
9:19, 10:12,
13:4, 61:21,
76:10, 81:12,
146:5, 166:6,
191:1, 191:12,
199:7, 203:22,
208:1, 209:17,
210:8
quick
76:2, 87:18,
114:14, 146:8,
207:11
quickly
190:7
quite
19:13, 66:15,
86:8, 91:8,
96:23, 100:12,
111:5, 134:18,
134:19, 164:2,
185:6
quitting
164:12, 164:17

**R**

raise
83:23
raised
84:16, 188:17
raising
56:10, 56:13,
186:24
ran
143:18, 144:5,
145:2, 149:17
randomly
149:11
rare
15:21, 75:15,
132:18
rarely
14:7, 15:13,
73:11
rate
79:10
rated
79:23

rather
47:2, 105:12,
201:17
rating
79:19
reach
33:24, 34:20,
100:3, 110:14,
194:15
reached
41:20, 131:25,
164:4, 166:13,
198:5, 201:23
reaches
139:11
reaching
144:8, 163:19,
164:6, 195:3,
201:15, 203:5
read
44:12, 58:4,
58:20, 60:23,
63:11, 63:17,
64:19, 65:16,
65:25, 69:4,
71:8, 72:1,
83:2, 105:21,
129:11, 129:12,
162:8, 186:11,
187:10, 189:23,
189:24, 195:15,
207:10
reading
58:15, 85:10,
187:1, 199:19,
211:8
ready
152:12
real
30:16, 73:14,
87:17, 114:14,
118:15, 207:11
really
15:12, 39:20,
55:12, 56:23,
64:6, 85:9,
97:22, 120:1,
143:14, 143:15,

192:4, 201:5
**realm**
166:22
**realtime**
2:9
**reason**
9:3, 10:11,
70:17, 97:23,
103:11, 133:1,
155:16, 165:17,
187:5, 188:13
**reasons**
19:23, 39:18,
62:13
**reassemble**
199:2
**receive**
44:7, 103:13,
104:5, 128:12,
202:9
**received**
22:1, 22:15,
23:15, 23:21,
37:13, 128:13,
131:23, 149:4,
155:9, 158:16,
158:17
**receiving**
21:13, 22:23,
67:14, 68:1,
103:10, 103:14
**recently**
135:17
**recess**
76:7, 147:2,
208:8
**recognize**
92:21, 131:11
**recollection**
98:16, 115:19,
175:14, 205:12
**recommendation**
181:4
**recommendations**
78:24
**recommending**
180:25
**reconciled**
38:4, 44:5

**reconvening**
146:23
**record**
9:4, 9:8,
20:23, 21:9,
48:10, 89:5,
92:1, 92:2,
157:1, 161:13,
183:21, 210:23,
211:5
**record-pulling**
182:2
**recording**
178:6, 178:14
**records**
22:18, 23:18,
106:23, 147:19,
148:6, 148:15,
148:18, 149:5,
149:12, 150:15,
150:23, 151:7,
152:1, 152:7,
152:13, 152:15,
152:21, 152:23,
153:14, 154:4,
154:13, 154:20,
155:15, 156:6,
157:14, 158:10,
159:21, 159:24,
169:12, 169:14,
169:21, 182:4,
194:2
**reduced**
211:7
**refer**
86:19, 97:23,
99:13, 99:16,
100:9, 137:19
**reference**
91:1, 94:20,
100:1, 116:13,
133:17, 135:21,
139:5, 140:15,
208:18, 209:4
**referenced**
55:10, 90:22,
108:12, 126:7,
207:19

**referencing**
67:6, 71:19,
82:8, 126:10,
126:14, 126:19,
139:4, 203:5
**referred**
136:22, 137:1
**referring**
34:5, 60:14,
66:25, 136:12,
137:5, 137:7,
140:9, 167:2,
167:18
**reflect**
72:2, 165:23,
168:11
**refresh**
10:19, 24:6,
98:16, 115:19
**refreshed**
58:24
**refreshes**
175:14
**regarding**
60:11, 94:9,
94:23, 99:14,
99:17, 124:19,
130:18, 131:24,
135:18, 153:13,
174:16, 199:10
**regards**
26:14, 28:5,
41:11, 62:3,
80:15, 81:13,
89:16, 96:17,
108:25, 124:15,
140:12, 140:13,
165:7, 195:3
**regents**
1:8, 3:11
**registered**
2:8
**regular**
29:14, 73:2,
210:14
**regular's**
210:15
**regularly**
31:1

**regulations**
67:15, 68:2
**related**
20:16, 22:11,
24:14, 31:22,
42:15, 78:18,
103:20, 116:10,
135:17, 137:19,
160:14, 160:19,
161:18, 176:6,
181:21, 184:5,
193:15, 202:10,
202:12, 202:14,
202:15, 211:10
**relates**
93:5
**relating**
15:2, 137:2,
173:11
**relation**
173:18
**relations**
26:14, 32:21,
32:25, 33:1,
33:2, 33:12,
33:16, 33:17,
33:24, 34:2,
34:3, 34:7,
34:20, 34:25,
35:12, 35:14,
38:20, 38:21,
39:2, 39:8,
40:5, 40:8,
40:13, 40:20,
41:3, 41:8,
41:14, 41:24,
94:2, 96:18,
97:9, 107:12,
107:14, 107:23,
108:1, 108:3,
123:8, 123:13,
125:22, 134:10,
137:10, 137:14,
153:20, 169:6,
202:21, 204:21
**relations-related**
173:16
**relationship**
5:16, 16:2,

28:17, 28:19,
29:7, 30:3,
30:7, 46:18,
54:13, 54:24,
55:5, 55:17,
56:19, 56:22,
58:23, 59:14,
59:15, 63:21,
64:5, 73:22,
76:13, 76:14,
77:5, 77:13,
78:4, 79:4,
79:12, 79:19,
80:1, 80:2,
80:6, 80:16,
84:3, 84:8,
115:18
**relative**
51:4, 51:20
**release**
186:16
**released**
187:21
**relinquishing**
152:21
**reluctancy**
91:12
**reluctant**
91:7, 111:17,
115:8, 118:12,
177:16, 177:25
**reluctantly**
109:5
**remain**
205:17
**remark**
167:14
**remarks**
8:14, 64:14,
120:12
**remediate**
141:12
**remember**
21:16, 23:13,
23:23, 39:19,
79:13, 79:14,
81:21, 84:4,
91:2, 92:23,

97:5, 101:12,
106:15, 110:21,
121:11, 124:17,
127:17, 137:22,
145:19, 152:2,
158:16, 160:12,
161:17, 161:22,
164:18, 165:9,
167:12, 167:13,
169:16, 172:5,
192:18, 193:5,
196:22, 199:17,
200:13, 202:6
**remind**
76:18, 165:4
**remotely**
9:12
**remove**
188:18
**renewal**
47:12
**renewals**
75:17, 144:18
**repair**
115:17
**repeat**
28:10, 122:5
**repeated**
93:4, 186:21
**rephrase**
24:17
**replace**
122:7
**replacing**
122:3
**report**
15:15, 21:10,
28:9, 28:14,
39:9, 43:22,
68:21, 109:3,
109:15, 109:17,
111:10, 120:14,
150:25, 174:11
**reported**
1:25, 14:14,
16:6, 29:1,
29:17, 64:5,
94:15, 94:21,

108:1, 133:21,
151:1
**reporter**
2:8, 2:9, 8:16,
48:10, 89:5,
210:10, 210:12,
210:16, 210:20,
210:22, 211:1
**reporter's**
8:20
**reporting**
28:16, 28:18,
29:7, 30:19,
64:5
**reports**
23:18, 63:25,
151:1, 168:1,
203:8
**representative**
38:20, 42:8,
90:4
**reprimanded**
85:23
**reputation**
45:3, 45:6
**request**
93:2, 99:14,
99:17, 139:12,
147:18, 148:14,
148:20, 149:4,
149:8, 149:20,
149:22, 151:7,
151:11, 152:1,
152:23, 155:17,
155:18, 157:2,
157:9, 157:16,
158:8, 158:10,
158:11, 159:20,
160:18, 160:20,
161:7, 161:19,
194:2, 201:23,
202:9, 202:12
**requested**
23:7, 60:12,
103:24, 150:15,
153:7, 201:25,
211:9
**requesting**
155:15, 156:6,

169:23
**requestor**
153:16, 154:1
**requests**
22:23, 99:14,
152:4, 153:14,
154:20, 157:13,
186:21
**required**
33:23, 40:25
**rereading**
71:13
**res**
70:20
**resignation**
66:7, 68:18,
69:7, 69:12,
69:15, 70:20,
70:21, 71:1,
71:8, 71:11,
72:4, 80:23,
81:19
**resignations**
68:12, 68:14,
70:7
**resigned**
26:2, 68:9,
121:6
**resigning**
80:21
**resigns**
68:5
**resolution**
38:13, 38:16,
142:1
**resolution's**
40:4
**resolve**
35:14, 38:11,
40:3, 90:11,
113:24, 119:7,
136:5, 141:18,
142:21, 143:6,
145:22
**resolved**
124:3, 136:2
**resonate**
72:13

resonated
71:17
resource
50:25
resources
13:17, 13:20,
14:4, 14:9,
25:14, 26:7,
28:22, 31:11,
31:21, 42:3,
42:9, 42:20,
42:25, 43:4,
46:15, 48:1,
48:7, 48:8,
59:16, 79:1,
84:18, 86:2,
86:22, 107:9,
129:2, 129:17,
129:22, 130:3,
130:9, 130:14,
174:16, 187:14,
210:1
respect
54:14, 55:1,
55:16, 76:12,
183:5
respected
52:18
respond
60:9, 123:5,
136:9
responded
99:8
respondent
36:21, 37:7,
37:11, 37:17
responds
68:6
response
71:8, 93:22,
99:10, 99:12,
112:21, 152:8,
188:25
responsibilities
46:22, 46:25,
72:11, 144:16
responsibility
29:22, 36:11,

47:19, 49:2,
52:25, 59:18,
82:4, 108:2,
148:9, 172:16,
172:17, 172:18,
172:22, 196:18
responsible
47:4, 96:13,
107:16
rest
86:6, 205:10
result
40:25
retain
105:24, 145:5
retained
159:12, 170:25
retaining
145:12
retaliating
180:4, 198:12
retaliation
35:3, 126:25,
129:9, 130:2,
130:5, 132:15,
134:4, 164:13,
180:13, 186:23,
187:13, 187:17,
188:10
retaliatory
164:17, 187:9,
188:1
returned
78:9
returning
28:6, 43:16
review
5:15, 11:10,
23:25, 44:8,
78:4, 83:10,
125:14, 127:15,
155:16, 155:18,
157:13, 157:17,
157:18, 158:3,
175:9, 194:19,
194:21, 195:4,
195:12, 196:7
reviewed
11:8

reviewing
29:11
reviews
194:17
richardson
93:23, 93:24,
93:25, 98:4,
101:7, 123:18,
144:9
rid
23:9
right
9:18, 10:10,
11:8, 12:1,
12:6, 12:19,
21:1, 25:20,
27:2, 27:3,
27:9, 30:20,
36:16, 37:8,
40:11, 40:17,
43:1, 43:23,
46:6, 46:7,
46:11, 49:21,
50:19, 53:3,
54:8, 57:22,
58:12, 59:2,
59:12, 59:19,
63:10, 63:11,
66:1, 71:6,
72:24, 73:3,
75:25, 78:8,
78:24, 79:8,
79:9, 79:21,
79:22, 80:18,
82:1, 83:12,
83:16, 86:21,
87:22, 88:2,
88:3, 88:23,
90:5, 90:12,
92:24, 93:7,
94:6, 94:25,
97:6, 108:10,
111:19, 113:25,
116:14, 116:18,
123:13, 124:6,
125:18, 126:5,
126:18, 129:13,
131:15, 132:3,

136:6, 138:19,
140:18, 146:22,
151:5, 151:23,
153:10, 157:21,
160:21, 162:17,
162:21, 164:10,
166:21, 167:11,
168:10, 169:25,
176:1, 177:6,
186:2, 188:1,
198:10, 198:21,
208:7, 209:14
roadblock
129:9
rob
66:7, 66:18,
68:9, 80:21,
81:15
rob's
71:8, 71:11
robb
3:4
role
14:3, 20:7,
20:10, 26:6,
26:11, 28:7,
28:13, 29:19,
31:11, 32:11,
46:14, 50:8,
54:21, 70:6,
95:3, 101:11,
101:13, 101:18,
107:6, 107:11,
122:4, 134:14,
150:22, 181:25,
184:23, 196:18,
204:9, 204:20,
204:22, 205:21
roles
55:16
romantically
54:10
rose
132:19
rosenfield
93:1, 98:5,
99:5
rotate
79:17

**rountree**
15:20, 68:5,
68:6, 68:7,
73:8, 73:13,
73:23, 83:14,
93:1, 93:20,
99:11, 100:4,
117:10, 117:12,
117:16, 119:20,
120:25, 121:5,
122:7, 131:18,
168:2, 168:3,
179:22, 181:1,
181:6, 196:19,
196:20

**rountree's**
121:25

**routinely**
49:13

**rpr**
1:25

**rules**
67:15, 68:2

**rumor**
67:9

**rumored**
67:12

**run**
14:22

**rundown**
42:1

**running**
12:13, 12:15,
12:17, 180:13

**S**

**said**
11:17, 30:18,
34:11, 36:18,
66:8, 68:8,
71:9, 72:14,
91:21, 96:20,
96:21, 101:23,
104:3, 109:14,
110:5, 115:7,
116:16, 120:6,
120:22, 120:23,
154:12, 161:18,

161:22, 162:14,
164:11, 165:22,
165:23, 166:25,
167:6, 168:12,
182:21, 204:13,
204:16, 207:15,
211:6

**same**
13:23, 18:2,
26:20, 26:22,
27:10, 28:4,
35:4, 73:22,
99:3, 104:12,
108:24, 108:25,
111:9, 113:3,
140:19, 147:17,
159:8, 180:18,
197:17, 199:4,
201:12

**saved**
62:18

**saw**
54:18, 62:2,
103:22, 105:24,
128:21, 186:15

**say**
8:23, 15:7,
15:22, 16:13,
19:22, 23:4,
26:7, 34:4,
35:10, 40:23,
41:9, 43:21,
48:17, 48:24,
49:19, 51:10,
56:14, 60:9,
60:14, 64:4,
65:3, 68:23,
71:18, 73:22,
77:7, 80:3,
85:8, 89:2,
90:6, 93:13,
94:24, 95:25,
96:4, 99:12,
100:4, 101:8,
102:18, 103:14,
105:16, 118:10,
118:13, 119:6,
120:17, 123:6,

123:20, 124:4,
124:7, 126:6,
135:7, 135:9,
135:25, 136:8,
136:11, 136:25,
137:22, 138:22,
141:23, 146:15,
147:5, 149:2,
149:16, 153:12,
153:24, 154:18,
155:14, 157:6,
160:3, 160:14,
163:4, 165:21,
166:4, 167:17,
168:22, 171:8,
173:17, 176:22,
177:17, 177:25,
180:2, 188:6,
188:12, 188:25,
190:18, 195:8,
200:8, 200:18,
201:5, 206:11,
208:17

**saying**
71:22, 72:19,
77:9, 85:9,
113:8, 113:10,
131:23, 135:24,
155:9, 165:18,
165:25, 169:20,
172:5, 176:24,
177:24, 187:3,
187:8, 187:25,
188:23, 195:4,
195:9, 195:16,
195:20

**says**
63:18, 71:6,
79:22, 83:22,
85:18, 89:7,
115:13, 116:7,
123:2, 129:7,
134:24, 148:15,
150:17, 151:25,
162:18, 164:11,
168:11, 169:4,
174:11, 175:11,
177:7, 186:18,

190:5, 190:11,
199:8

**scale**
79:10, 79:23

**scanned**
106:7

**schedule**
19:15, 37:14,
37:16, 81:19,
190:10

**scheduled**
116:15, 124:8

**scheduling**
19:21, 116:11

**scheller**
25:17, 26:9,
27:8, 27:9,
27:11, 27:22,
28:6, 33:19,
43:14, 43:16,
78:9, 95:9,
153:2

**school**
13:24, 15:20,
72:22, 74:8,
107:8, 186:19

**schools**
53:16

**scope**
179:14

**screen**
9:13

**scroll**
57:19

**se**
96:12, 158:13,
178:6, 191:9

**seal**
211:14

**season**
45:2

**seat**
84:23

**second**
65:3, 143:20,
164:10, 186:18,
195:4, 199:8

**section**
63:11

secure
79:3
see
15:15, 38:12,
62:21, 64:18,
82:10, 82:14,
83:19, 90:5,
98:18, 109:7,
111:18, 112:2,
128:23, 129:5,
130:20, 138:1,
144:22, 149:18,
152:1, 159:9,
161:12, 166:5,
175:13, 186:17,
187:10, 191:17,
193:20, 200:17,
201:21, 201:22,
201:24, 203:7,
206:20
seeing
78:21
seem
141:16
seemed
66:13, 166:16,
176:16, 191:22
seems
83:25
seen
44:9, 63:7,
83:7, 85:1,
92:22, 103:8,
103:15, 104:4,
186:9
self-reflection
195:6, 195:17,
196:6
send
17:6, 18:11,
139:9, 155:15,
158:12, 161:6,
169:19
sending
66:7, 91:23,
91:25, 155:7
sends
60:5, 93:14,

93:15
senior
28:21, 29:19,
42:18, 43:3,
204:20
sense
167:15
sensitive
18:12
sent
21:22, 125:18,
158:11
sentence
120:9, 126:6,
186:18, 187:1,
195:5
sentiment
48:5, 48:12,
164:23, 169:1,
169:2
sentiments
74:11, 74:14
separated
108:22
separately
32:13
september
82:12, 83:13
serious
36:9, 37:5,
43:22, 44:2,
129:14, 129:15,
132:24, 186:22,
188:10, 188:16
seriously
187:18
serve
37:12, 121:15
served
209:25
serves
110:9, 113:2
service
203:25
services
26:13, 33:8,
42:6, 173:3,
203:25

session
19:10, 119:13,
192:5
sessions
90:20
set
50:10, 156:25,
190:8, 211:13
setting
53:25, 123:23
seven
81:12, 191:23
seven-minute
208:4
several
20:15, 200:8
severe
37:4
severity
37:3
sex
53:13, 53:14,
56:3, 129:18,
129:25
shaken
110:9
share
35:20, 75:8,
77:2, 94:8,
94:12, 97:17,
98:15, 127:16,
153:15, 154:1,
203:12
shared
36:12, 46:5,
52:5, 52:7,
55:12, 76:23,
77:4, 85:2,
85:12, 89:3,
89:9, 110:22,
126:17, 128:14,
135:15, 156:2,
163:25, 166:11,
168:24, 183:22,
184:4, 203:10,
203:11
sharing
23:6, 52:21,

session
52:23, 177:15
sho
100:11
shoes
121:25
short
138:23
shorthand
211:1
shortly
97:7, 120:24,
182:10
shoshanna
53:23, 67:6,
67:9, 67:16,
67:18, 76:12,
79:20, 80:2,
83:13, 93:3,
94:18, 98:1,
100:7, 100:9,
101:24, 135:12,
168:7, 168:12,
198:1
shoshanna's
72:18
should
58:9, 65:23,
77:5, 77:11,
89:17, 89:21,
89:24, 90:3,
118:2, 123:21,
152:9, 181:1,
187:20, 188:10,
190:12, 194:19
shouldn't
120:23, 190:18,
193:8
show
78:19, 173:23,
186:14
showed
144:7
shown
171:23
shrm
42:18, 42:23
sic
109:25, 138:18,

176:22, 179:22,
181:9
**side**
37:18, 163:25,
188:21, 188:22
**sides**
37:22
**signature-oso**
211:20
**significant**
39:3, 43:12,
107:14, 133:22,
144:13, 204:22
**signing**
211:9
**similar**
90:21, 108:20,
113:20
**simultaneously**
74:17
**since**
100:6, 133:20,
158:9
**sit**
21:12, 37:15,
81:20, 105:20,
105:21
**sit-down**
97:14
**sitting**
84:23, 114:8
**situation**
123:4, 123:9
**six**
63:18
**sixth**
3:7
**skills**
90:8, 90:25
**skim**
103:7
**small**
30:14, 118:15
**snapchat**
17:15
**social**
17:14
**society**
42:24, 42:25

**solid-line**
28:18, 29:7
**some**
8:14, 8:19,
9:6, 10:17,
11:8, 13:3,
17:9, 22:5,
22:23, 25:18,
26:23, 30:14,
33:14, 36:15,
40:24, 41:2,
44:14, 48:6,
48:24, 49:6,
54:9, 56:16,
60:7, 63:5,
64:11, 68:11,
72:7, 76:11,
78:16, 86:12,
89:15, 89:18,
89:20, 91:6,
91:12, 91:13,
94:8, 94:16,
94:22, 95:12,
97:2, 98:9,
103:11, 104:22,
107:1, 108:22,
112:11, 113:4,
116:2, 116:20,
116:22, 119:15,
124:14, 125:24,
134:23, 140:21,
144:23, 145:4,
147:5, 147:19,
148:9, 148:16,
160:14, 162:16,
164:23, 170:21,
171:2, 171:16,
171:17, 177:15,
177:25, 179:6,
182:11, 183:4,
188:16, 193:4,
193:11, 199:7,
200:10, 200:11,
206:5, 207:15,
208:18
**somebody**
60:23, 80:13,
167:9, 198:4,

203:1
**someone**
47:23, 54:23,
60:10, 70:25,
99:21, 102:17,
125:21, 127:10,
139:15, 139:17,
141:21, 145:4,
148:16, 152:15,
161:6, 170:19,
178:13, 181:11,
181:16, 182:21,
184:7, 197:19,
207:4
**something**
20:24, 38:3,
41:17, 44:1,
52:19, 59:15,
63:13, 70:21,
73:25, 74:1,
77:11, 90:21,
97:21, 104:1,
104:4, 110:12,
111:2, 111:21,
128:21, 132:19,
132:23, 133:2,
133:22, 150:19,
165:15, 165:25,
166:2, 168:13,
171:19, 172:13,
180:5, 182:23,
183:20, 193:6,
193:8, 193:15,
197:24, 201:7,
208:13
**somewhat**
52:20, 79:25,
91:7, 111:17
**somewhere**
22:6, 103:16,
106:7, 155:23
**soon**
58:9
**sorry**
28:10, 44:22,
58:16, 59:22,
61:8, 65:19,
65:24, 74:22,

79:16, 88:24,
88:25, 91:17,
93:15, 96:2,
110:2, 122:5,
129:19, 129:21,
132:6, 132:24,
146:13, 148:3,
149:15, 150:2,
165:3, 175:17,
175:22, 185:3,
200:13, 204:15,
204:17, 206:14,
207:4, 208:6,
208:16
**sort**
10:19, 30:6,
34:9, 81:11,
91:15, 101:14,
118:21, 182:11,
193:4, 193:15,
198:2
**sound**
192:8, 198:10
**sounds**
70:18, 79:25,
90:6, 90:10,
125:23, 151:4,
152:12, 154:2,
157:19, 167:9,
179:1, 193:14,
196:13
**speak**
8:22, 11:13
**speaking**
66:8, 89:14,
96:20, 108:23,
112:8
**specialist**
32:25, 33:13,
39:8, 40:5,
40:9, 40:14,
40:20
**specialists**
32:21
**specific**
22:23, 23:17,
33:7, 55:4,
89:13, 96:24,

112:15, 139:23,
140:16, 143:22,
154:8, 161:17,
168:23, 199:15,
201:20
**specifically**
10:23, 15:8,
15:23, 23:10,
23:13, 48:21,
52:9, 52:23,
61:1, 61:13,
61:21, 71:19,
79:13, 99:19,
106:16, 116:10,
121:11, 126:1,
126:12, 158:5,
160:17, 161:22,
164:18, 165:9,
168:1, 174:19,
177:21, 181:2,
183:19, 184:3,
193:3, 202:6,
202:14
**specifics**
97:8
**speculate**
132:25
**speculation**
61:12
**spellings**
210:13
**spending**
141:17
**sphr**
43:3
**spoke**
116:16, 152:18
**sport**
164:12
**sports**
15:17, 46:18,
50:17, 71:3,
117:18, 118:5,
121:1, 121:16,
159:2, 159:3,
164:21
**sports-related**
46:22

**spring**
190:24
**square**
3:15
**staff**
10:25, 16:1,
27:18, 28:1,
29:8, 30:12,
31:4, 33:3,
34:10, 34:12,
34:17, 35:2,
38:6, 39:11,
43:10, 47:6,
59:5, 59:9,
68:16, 70:9,
71:18, 73:14,
73:17, 74:6,
74:16, 74:21,
75:20, 80:12,
80:13, 81:8,
81:13, 89:16,
90:1, 90:24,
96:25, 97:5,
100:15, 108:11,
109:9, 109:10,
112:10, 112:11,
113:8, 113:10,
114:9, 116:16,
117:7, 120:13,
123:2, 123:3,
123:8, 133:17,
135:1, 135:18,
135:19, 138:25,
144:19, 147:7,
147:11, 147:23,
152:2, 160:15,
164:13, 165:9,
168:18, 171:1,
172:23, 180:3,
195:17, 205:11
**staffed**
112:18
**staffing**
26:14, 27:23
**staffing-type**
75:19
**staley**
136:13

**standard**
81:10, 85:19,
149:7
**standing**
31:4, 49:9,
49:17
**standpoint**
70:9
**stansbury**
28:18, 29:17,
30:19, 30:22,
30:23, 63:25,
73:5, 77:15,
83:15, 93:1,
100:5, 104:23,
122:12, 124:10,
131:17, 131:20,
167:20, 183:3,
191:21, 206:19
**stansbury's**
105:3, 197:14
**start**
25:9, 65:20,
87:13, 88:3,
118:19, 143:25,
159:20, 159:24,
160:20, 174:3,
174:14
**started**
22:17, 39:17,
51:12, 56:18,
61:4, 118:10,
139:3, 159:6,
159:20
**starts**
128:5, 201:13
**state**
2:10, 211:18,
211:23
**stated**
64:21, 119:11
**statement**
48:2, 52:5,
164:19, 168:23,
186:2, 186:10,
187:21
**statements**
119:20, 119:25,

**states**
121:20
**states**
1:1
**status**
202:19
**stay**
86:7
**stayed**
206:3
**stenographically**
211:7
**step**
38:11, 90:11,
123:9, 123:22,
124:22, 124:24,
165:5
**stepped**
101:17, 121:1,
121:8, 121:9,
121:25
**stepping**
165:20, 166:20
**steps**
22:10, 22:25,
40:6, 40:8,
40:22, 40:25,
125:24, 203:20,
203:21
**stewards**
157:16
**stick**
68:17, 168:14
**still**
10:22, 32:7,
50:17, 50:20,
72:2, 78:6,
78:11, 93:17,
115:23, 119:7,
123:20, 124:1,
136:4, 139:4,
142:21, 142:23,
143:5, 143:11,
175:25
**stodd**
28:17
**stoff**
3:13, 24:11,
56:5, 76:5,

102:9, 146:11,
146:16, 204:10,
204:15, 210:8,
210:19
**stood**
35:21
**stop**
143:25
**stopping**
146:3
**stormed**
109:14
**story**
37:18, 37:22,
164:1, 188:21,
188:22
**strange**
141:16, 141:22,
141:24
**street**
190:25
**strike**
141:22
**strikes**
141:23, 141:24
**string**
186:23
**strongly**
123:21
**struggle**
115:24
**struggling**
93:11
**student**
28:2, 45:12,
45:17, 75:22,
85:4, 85:6,
85:15, 171:3,
171:7, 171:17,
172:3, 172:11,
173:1, 173:2,
173:9, 173:12,
173:19, 177:16,
180:9, 183:21,
184:1, 184:6,
188:18, 188:21,
189:1, 199:10,
199:13

**students**
19:24, 171:23,
173:6, 177:16,
177:25, 188:23
**stuff**
103:22, 105:22,
137:19, 169:9
**style**
45:10
**sub-bullets**
64:12
**subjecting**
85:16
**submit**
23:7, 43:11
**submits**
148:14
**submitted**
43:19, 44:3,
78:5, 127:15,
147:18, 195:22
**substantive**
19:16
**succeeded**
76:16
**succeeding**
95:24
**success**
66:9
**succinctly**
69:6
**sudden**
141:20
**sue**
165:24, 167:2,
167:3, 167:7,
167:10, 189:8
**suffered**
186:24
**suggestion**
38:7
**suggests**
101:24
**summarily**
187:4
**summarize**
181:14
**summarizing**
63:5, 162:13

**summary**
195:7
**summonsed**
190:23
**supervising**
29:11
**supervisor**
34:13, 38:6,
71:2, 86:12,
117:17, 196:3
**supervisory**
31:8
**support**
26:12, 26:13,
27:18, 33:8,
39:16, 135:1,
172:23
**supported**
39:13
**supporting**
27:7, 94:3
**supposed**
29:11, 86:18,
86:19
**sure**
9:17, 12:25,
22:21, 24:16,
34:9, 39:11,
42:3, 46:16,
47:18, 47:20,
47:24, 49:14,
55:2, 58:7,
59:7, 61:10,
64:20, 83:22,
86:6, 88:19,
92:1, 92:14,
107:16, 108:7,
112:1, 115:10,
124:23, 125:16,
126:2, 133:24,
137:24, 138:15,
139:22, 142:17,
144:21, 148:11,
159:18, 161:19,
162:10, 163:12,
168:17, 169:17,
173:8, 174:19,
175:18, 182:16,

183:18, 186:4,
186:6, 190:1,
191:13, 195:9,
197:11, 206:2,
206:3, 206:14,
206:16, 207:6,
209:18
**surface**
49:2, 80:10,
89:10, 89:21
**surfaced**
89:17
**surmise**
35:18
**survey**
81:3, 81:5,
81:7, 82:7, 82:8
**surveys**
82:1, 82:5
**suspended**
182:12, 187:23
**suspension**
188:1
**swamped**
144:11
**swap**
27:12
**swapped**
78:17
**switch**
44:13, 82:11
**sworn**
8:4
**system**
1:9, 3:12,
68:16

|   T   |
| --- |

**table**
118:4, 118:12,
119:16, 143:24
**tabs**
30:2
**tail**
51:10
**take**
9:2, 20:11,
22:10, 22:25,

27:21, 34:14,
35:19, 39:5,
40:9, 62:7,
65:7, 67:23,
70:12, 76:2,
86:24, 87:9,
88:5, 92:12,
101:17, 102:23,
107:22, 110:24,
127:19, 128:7,
131:3, 138:13,
145:21, 146:8,
165:16, 175:13,
176:23, 177:8,
178:16, 179:24,
186:2, 192:1,
194:9, 197:8,
206:17, 207:1,
208:3

**takeaway**
119:25

**taken**
10:21, 34:16,
76:7, 146:20,
147:2, 187:17,
208:8, 211:3,
211:6

**taking**
8:13, 20:9,
20:18, 118:7,
123:9, 135:19,
144:13

**talk**
16:25, 19:1,
19:16, 20:2,
25:4, 30:14,
40:6, 40:7,
40:20, 44:14,
49:22, 52:14,
75:16, 91:11,
98:4, 107:4,
108:10, 116:2,
118:11, 118:15,
121:5, 124:9,
125:24, 139:12,
140:21, 141:3,
161:12, 163:15,
163:24, 169:12,

170:1, 179:6,
179:22, 181:8,
181:18, 190:11

**talked**
31:24, 46:8,
55:20, 74:9,
76:10, 84:2,
91:12, 111:5,
170:24, 179:25,
197:13, 203:1

**talking**
70:19, 80:22,
115:21, 118:19,
137:13, 140:16,
147:14, 166:9,
166:15, 189:7,
193:11, 197:16,
200:1

**talks**
134:24

**tandem**
49:4

**target**
168:18

**targeted**
66:14, 67:1

**task**
106:12

**tasked**
130:4, 130:9,
130:14, 198:1

**team**
63:19, 63:23,
64:8, 64:11,
83:17, 83:18,
90:1, 107:15,
113:16, 113:21,
118:25, 123:23,
168:9, 168:16,
192:20, 206:12

**teams**
85:21

**teamworks**
18:19, 18:21,
19:25

**tech**
4:2, 10:6,
11:6, 13:5,

13:8, 13:17,
13:20, 14:4,
16:23, 17:7,
18:11, 18:23,
20:5, 24:20,
25:6, 25:10,
32:13, 32:15,
32:17, 32:20,
41:25, 42:2,
42:12, 44:21,
44:22, 50:11,
55:13, 85:21,
101:16, 107:7,
107:10, 129:23,
130:4, 132:13,
147:4, 159:12,
159:17, 167:10,
170:23, 170:25,
172:25, 184:22,
185:3, 185:7,
186:13, 187:14,
188:3, 189:8,
202:4, 205:18,
208:12, 209:23,
210:3

**tech's**
129:1, 130:8,
130:13

**tech-issued**
17:23

**technically**
29:10

**technician**
4:12, 57:7,
57:12, 57:16,
58:2, 59:22,
60:1, 60:3,
62:23, 63:2,
65:10, 65:14,
66:4, 77:21,
77:25, 82:17,
82:21, 83:5,
87:2, 87:7,
87:25, 92:6,
92:10, 92:19,
98:21, 98:25,
103:1, 103:5,
114:18, 114:24,

122:18, 122:22,
125:8, 125:12,
127:23, 128:2,
130:22, 131:1,
131:9, 138:4,
138:8, 138:11,
150:2, 150:7,
150:11, 151:17,
151:21, 155:1,
155:5, 156:10,
156:14, 162:2,
162:6, 174:25,
175:4, 185:20,
185:24, 189:20,
193:23, 194:7,
197:2, 197:6,
200:24, 206:23

**technology**
154:15, 154:17,
210:2, 210:5

**telephone**
62:10, 93:2,
149:12, 190:14

**tell**
8:18, 9:23,
14:23, 20:21,
22:4, 43:8,
46:13, 48:20,
51:13, 51:23,
52:16, 54:18,
61:1, 64:13,
64:23, 67:3,
80:8, 105:20,
108:17, 121:9,
125:20, 148:19,
152:6, 165:1,
166:19, 183:7,
183:9, 185:13,
194:22

**telling**
100:9, 137:18,
164:15

**tells**
148:17, 149:20

**temporary**
28:2, 144:20

**ten**
81:12

**tendered**
71:1
**tenders**
81:19
**tenor**
66:13
**tension**
67:9, 67:21
**tenure**
39:21, 55:13
**term**
21:3, 55:10
**terminable**
193:17
**terminate**
188:4, 206:7
**terminated**
14:25, 22:3,
68:16, 187:24,
189:6, 192:22,
192:23, 192:25,
205:6, 205:10,
205:11, 205:15
**termination**
20:17
**terms**
20:23, 33:4,
47:3, 47:15,
52:20, 72:14,
199:15, 208:20,
209:5
**testified**
8:6
**testify**
8:4, 102:11
**testimony**
12:21, 211:5,
211:6
**text**
14:5, 14:11,
15:9, 15:16,
16:2, 23:1,
23:11
**texted**
16:9, 17:3
**texting**
14:24, 15:1,
15:5, 15:14,

15:19
**th**
22:6, 25:11,
60:8, 60:13,
78:5, 88:4,
88:13, 91:19,
99:8, 109:10,
109:11, 109:17,
115:6, 135:25,
138:18, 139:2,
140:23, 150:14,
154:11, 155:9,
157:5, 159:7,
162:15, 173:23,
175:12, 175:16,
178:24, 181:24,
187:22, 189:5,
190:3, 194:14,
197:20, 197:21
**th-th**
161:11
**thank**
8:10, 60:2,
88:24, 89:1,
89:7, 99:1,
209:16, 210:7,
210:9, 210:21
**thanks**
58:11, 71:7,
76:5, 194:12
**thereafter**
97:7, 211:7
**thereof**
91:22
**thick**
105:11, 105:12,
105:15
**thing**
18:15, 19:1,
35:4, 36:5,
69:2, 72:3,
73:22, 96:14,
162:17, 177:14,
191:2, 192:6,
206:15
**things**
17:2, 17:8,
18:8, 22:18,

23:17, 24:6,
31:18, 31:20,
35:21, 48:22,
49:6, 64:14,
65:1, 70:14,
75:17, 76:10,
83:11, 95:23,
103:25, 118:12,
120:5, 120:6,
120:21, 125:1,
134:4, 141:25,
143:22, 143:24,
146:10, 161:1,
161:13, 164:5,
177:20, 183:25,
198:17
**thinking**
60:20, 139:3,
140:7, 158:25
**thought**
35:21, 35:22,
52:10, 60:22,
60:25, 71:9,
72:18, 91:13,
97:17, 117:20,
119:6, 119:8,
119:10, 119:12,
120:23, 134:17,
136:22, 166:20,
167:3, 167:9,
181:5, 188:14,
195:2, 204:15
**thread**
57:19, 68:23,
91:21, 131:11,
133:10
**three**
135:20
**three-inch**
105:13
**through**
14:23, 17:22,
19:20, 22:17,
23:9, 30:1,
32:16, 56:24,
96:7, 96:8,
96:10, 104:14,
105:21, 106:11,

109:7, 123:22,
124:3, 152:5,
152:15, 153:3,
154:13, 157:16,
162:16, 180:10,
187:2, 210:13
**throughout**
147:8, 176:14
**throwing**
168:13
**tickets**
45:2
**time**
9:5, 9:14,
10:7, 11:12,
14:16, 15:4,
26:1, 27:8,
27:10, 28:4,
34:14, 39:1,
39:12, 49:16,
54:9, 57:8,
59:5, 68:17,
69:19, 69:24,
73:1, 76:2,
78:8, 78:13,
82:12, 89:12,
95:2, 100:20,
101:10, 101:15,
105:21, 109:5,
110:10, 113:3,
116:3, 117:16,
119:13, 136:5,
137:4, 137:17,
138:19, 139:23,
140:16, 140:19,
141:18, 143:1,
143:16, 143:18,
144:6, 144:14,
144:17, 144:20,
145:2, 146:17,
147:18, 159:2,
159:8, 159:15,
161:11, 163:10,
170:11, 173:9,
179:7, 182:15,
189:4, 190:22,
201:12, 202:2,
203:17, 204:1,

**timeline**
109:7
**times**
11:21, 19:6,
152:25, 184:13,
184:14
**title**
53:4, 53:9,
53:22, 54:5,
56:1, 56:11,
83:24, 132:8,
135:9, 135:10,
173:3, 180:18
**titles**
112:15
**today**
8:10, 8:13,
8:18, 9:16,
10:13, 11:18,
11:24, 12:21,
24:1, 32:7,
71:24, 107:3,
108:12, 123:8
**today's**
11:20
**todd**
28:17, 29:8,
29:17, 30:19,
30:22, 30:23,
63:25, 64:6,
77:15, 83:14,
99:9, 104:23,
105:3, 105:6,
106:17, 122:12,
124:7, 124:10,
124:15, 124:18,
131:17, 131:20,
167:20, 167:24,
167:25, 172:14,
183:3, 183:4,
191:21, 197:14,
198:3, 199:10,
199:24, 200:11,
206:8, 206:11,
206:19
**todd's**
74:6, 198:20

**together**
31:13, 31:16,
33:15, 38:24,
38:25, 61:23,
103:20, 104:9,
104:13, 104:15,
105:23, 109:8,
109:21, 191:11
**toggle**
151:12
**told**
8:16, 60:18,
64:15, 67:21,
89:25, 100:4,
152:15, 154:13,
157:24, 160:6,
160:10, 160:23,
165:20, 169:4,
169:5, 171:6,
171:7, 171:11,
171:22, 173:8,
176:9, 180:6,
183:16, 208:11
**tomorrow**
116:9, 124:8
**took**
45:19, 94:4,
95:5, 111:20,
118:6, 118:21,
126:20, 166:17,
196:16, 198:25,
199:2
**top**
72:10, 91:17,
127:18, 138:17,
175:11, 177:7,
180:2
**topic**
76:1, 170:14
**totally**
144:10, 144:21
**touch**
94:6
**toward**
157:5
**towards**
14:19, 55:12,
112:12, 123:23,

178:5
**track**
46:21, 53:1
**traffic**
104:22
**trained**
19:9
**training**
19:10, 95:12
**transcribing**
8:21
**transcript**
5:7, 6:2, 7:2,
57:13, 62:24,
65:11, 77:22,
82:18, 87:3,
92:7, 98:22,
103:2, 114:19,
122:19, 125:9,
127:24, 130:23,
138:5, 150:8,
151:18, 155:2,
156:11, 162:3,
175:1, 185:21,
189:21, 193:24,
197:3, 200:25,
206:24, 210:17,
211:4
**transferred**
25:19, 25:24
**transition**
95:16, 96:9
**transitioning**
95:3
**transmit**
82:6
**transparency**
166:23
**treated**
109:1, 113:9
**treating**
83:17
**treatment**
74:20, 85:17,
86:4, 112:12,
180:18
**trends**
45:22

**tried**
113:24
**true**
211:5
**truth**
8:5, 8:6, 8:18,
189:2
**truthful**
10:12
**try**
34:7, 35:11,
35:14, 38:11,
40:3, 52:11,
79:16, 90:11,
114:8, 116:2,
118:25, 136:5,
142:21, 143:6,
154:10
**trying**
93:15, 102:3,
129:7, 132:7,
139:4, 139:16,
140:9, 141:11,
141:18, 145:22,
161:19, 163:23,
166:7, 167:22,
168:13, 185:1,
201:6
**tucker**
15:11, 75:1,
75:4, 108:13,
108:18, 109:3,
109:13, 110:1,
110:2, 113:6,
120:15, 135:22,
139:11, 139:14,
140:19, 140:25,
141:5, 142:15,
143:4, 145:6,
147:15, 149:21,
205:14, 205:17,
206:10
**turn**
34:1
**turnover**
66:11
**tv**
45:1

twice
153:2
twitter
17:15
two
10:18, 11:3,
11:4, 40:7,
40:19, 43:15,
49:4, 49:13,
53:1, 54:21,
83:15, 90:24,
93:12, 95:7,
108:16, 112:9,
114:9, 126:16,
146:5, 151:4,
151:13, 162:13,
169:11, 191:20,
195:16, 207:18
type
30:3, 49:6,
74:2, 113:13,
132:21, 187:14,
192:4
types
34:6
typewriting
211:8
typically
20:11, 33:20,
34:7, 35:13,
35:17, 35:20,
36:1, 38:11,
38:18, 39:5,
40:9, 40:14,
81:13, 84:19,
86:19, 86:20,
88:21, 93:9,
100:21, 102:17,
129:17, 129:23,
130:4, 130:9,
130:14, 132:12,
132:14, 184:25,
185:8, 185:9,
185:13, 187:15,
190:18, 190:19,
205:3, 205:6

**U**

uh-huh
27:4, 67:19,

68:10, 99:6,
115:12, 131:5,
134:12, 139:10,
144:25, 160:16,
181:7, 201:17
ultimate
108:2
ultimately
20:17
umbrella
26:16
unawareness
89:19
unbeknown
165:8
unclear
178:22
uncomfortable
56:12
uncommon
113:14
under
8:17, 26:16,
64:10, 71:5,
150:24, 211:8
undermine
93:4
understand
8:25, 29:18,
36:15, 43:18,
50:20, 53:12,
53:16, 54:23,
55:9, 55:19,
56:12, 64:23,
84:11, 85:10,
95:19, 166:21,
187:2, 187:7,
188:25
understanding
20:14, 21:6,
32:18, 35:15,
50:9, 50:12,
53:9, 53:19,
56:17, 95:21,
107:21, 113:24,
118:6, 156:23,
159:19, 192:25,
205:9

understood
22:19, 28:4,
134:6, 169:23
undivided
9:15
unfairly
67:14
unfortunately
116:7
unhealthy
123:3
unit
33:7, 33:9,
41:3, 43:20,
44:6, 72:16,
72:18, 95:17,
95:22, 95:25,
107:16
united
1:1
units
33:4, 49:13
university
1:9, 3:12,
173:20
unless
132:19
unpublished
157:24
unsettled
123:3
until
24:3, 46:5,
62:14, 70:24,
71:5, 136:1,
211:17
unusual
18:15, 102:6
update
31:20, 158:24
updated
108:6, 204:3
updates
107:18, 202:19
upset
110:8, 110:17,
111:16
upstairs
86:11, 169:16

understood
22:19, 28:4,
134:6, 169:23
undivided

use
12:20, 14:5,
14:11, 15:13,
16:21, 17:13,
17:16, 18:6,
19:5, 19:8,
19:10, 19:12,
19:14, 85:21
utilize
90:25
utilized
19:19

**V**

vaguely
92:23, 145:9,
152:4, 193:14
value-added
119:13
variety
19:23
various
31:20, 50:10,
66:14, 67:1,
147:8, 147:14,
164:8
verbal
135:2
verbatim
166:4, 168:22
versus
19:20, 112:13
via
100:7
vice
42:8
violating
56:11
violation
56:2, 59:14
virtually
1:15, 2:2
visited
139:24
vivid
124:17, 164:1
voiced
165:10

| W |
| --- |

**wait**
88:25
**walk**
109:6
**wang**
56:18, 56:21,
57:1, 57:23,
58:22, 59:2,
60:5, 61:4,
61:15, 64:15,
64:22, 79:9
**wang's**
63:5
**waning**
128:21
**want**
11:16, 83:10,
91:13, 102:19,
107:1, 107:4,
108:10, 123:6,
132:25, 146:8,
160:13, 168:16,
199:6
**wanted**
24:5, 61:9,
70:22, 82:3,
111:6, 117:15,
120:10, 133:19,
137:22, 143:14,
143:23, 143:24,
166:13
**wants**
115:16, 169:20,
190:10
**warning**
135:2
**warranted**
39:4, 40:23,
40:24
**wasch**
16:14, 100:7,
100:8, 100:13,
100:14, 100:18,
100:22, 100:25,
190:4, 191:3,
191:18

**washington**
3:8, 4:7
**watching**
44:25
**way**
40:15, 54:17,
65:21, 112:1,
116:6, 121:14,
153:23, 164:20,
167:5, 169:22,
186:4, 195:15,
203:22
**ways**
17:1
**we'll**
75:5, 76:11,
106:25, 107:2
**we're**
9:11, 25:3,
122:13, 140:16,
151:12, 210:11
**we've**
137:13, 182:22
**wednesday**
1:16
**wednesdays**
12:4
**week**
22:5, 24:4,
49:20, 78:14,
95:6, 126:8
**week's**
89:3, 89:9
**weekend**
132:1
**weekly**
31:4, 73:13,
74:5
**weeks**
81:22, 95:7,
135:20
**welcomed**
49:11
**welsh**
4:12
**went**
23:8, 24:4,
26:24, 69:5,

78:15, 95:17,
95:18, 118:14,
118:21, 142:9,
162:18, 192:8
**weren't**
115:10, 141:25
**whatever**
23:6, 23:7,
23:14, 34:13,
36:8, 41:18,
41:21, 47:17,
69:9, 91:2,
96:6, 103:11,
104:9, 107:19,
110:13, 111:3,
111:17, 111:20,
146:14, 156:24,
169:13, 176:7,
178:7, 201:22,
201:25
**whatsapp**
17:10
**wheelhouse**
85:5, 172:4
**whenever**
39:1, 133:22,
159:19, 159:20
**whereas**
33:5, 90:23
**whereof**
211:13
**whereupon**
8:2
**whether**
14:24, 15:1,
34:25, 38:1,
38:23, 56:19,
59:8, 69:21,
93:11, 97:3,
115:20, 116:19,
127:3, 166:11,
178:25, 179:14,
188:4, 204:11,
204:13, 204:16
**whole**
8:5, 68:8,
96:17, 111:3,
116:15, 118:20

**whomever**
71:3, 84:22
**whoops**
200:19
**wide**
19:23
**willing**
90:8, 152:13
**wilmerhale**
4:5
**wish**
165:19
**within**
18:23, 24:4,
41:2, 48:13,
48:16, 59:6,
59:17, 66:12,
134:6, 172:4
**without**
85:22, 85:23,
187:5
**witness**
10:2, 87:21,
146:13, 146:17,
146:25, 208:6,
209:19, 211:13
**witnesses**
180:24
**woman**
56:17
**women**
193:11
**women's**
15:3, 50:14,
51:3, 56:3,
66:13, 66:22,
66:23, 66:25,
67:10, 69:23,
72:17, 75:23,
85:19, 85:25,
97:1, 109:10,
117:19, 121:1,
133:16, 138:24,
159:3, 174:16,
175:8, 190:5,
192:13, 192:14
**wording**
43:24

**work**
20:4, 24:12,
26:4, 29:5,
29:11, 29:12,
29:22, 30:1,
30:17, 31:1,
33:15, 38:24,
38:25, 47:13,
65:20, 73:16,
75:12, 132:9,
144:22, 146:10,
146:11, 208:5
**work-issued**
13:12, 13:22,
13:23, 14:5,
16:17, 17:4,
31:25, 32:3
**work-related**
14:6, 14:12,
16:23, 17:2,
17:7, 17:21,
18:8
**worked**
10:5, 31:13,
31:16, 42:4,
42:5, 47:2,
47:8, 72:22,
107:19, 148:8,
170:3, 170:22,
185:5, 185:8,
192:13
**working**
7:5, 25:10,
27:15, 27:16,
30:3, 30:6,
49:4, 50:24,
107:15, 137:6,
137:9, 144:20,
165:2, 198:3
**workplace**
79:3
**works**
76:5, 146:16
**workshop**
170:11
**would've**
165:19
**wouldn't**
85:11

**wraps**
71:5
**written**
155:23
**wrong**
21:8
**wrote**
164:13

---
**Y**
---

**yeah**
10:8, 11:15,
11:19, 14:17,
19:13, 23:8,
26:20, 29:13,
31:6, 32:16,
41:12, 42:16,
53:7, 53:14,
58:11, 66:20,
67:19, 69:4,
70:11, 71:4,
75:5, 86:20,
95:5, 95:18,
100:12, 105:14,
105:16, 108:9,
125:3, 127:19,
129:20, 132:17,
134:8, 134:9,
134:21, 136:3,
136:13, 142:23,
145:25, 146:21,
151:8, 157:22,
163:12, 166:2,
166:4, 166:22,
168:5, 168:24,
169:2, 171:5,
173:6, 175:20,
177:1, 178:2,
180:7, 184:12,
186:6, 186:11,
187:16, 192:18,
196:15, 198:9,
200:8, 202:16,
203:16, 207:17,
209:20, 210:11
**year**
13:24, 14:25,
15:20, 39:23,

72:22, 72:24,
73:9, 73:20,
74:8, 75:13,
107:8, 132:7,
194:21, 196:12
**years**
9:23, 9:24,
10:8, 10:18,
42:11, 113:22,
168:15, 170:21
**yield**
80:12
**yood**
4:4, 5:4,
209:20, 209:24,
210:6, 210:21

---
**0**
---

**00**
162:15
**000033**
6:13, 127:21
**000038**
6:13
**000043**
6:21, 151:15
**000046**
6:21
**000047**
6:19, 150:4
**000051**
6:19
**00035**
128:5
**000583**
7:7, 174:23
**001103**
7:7
**001146**
7:10, 189:18
**0015968**
5:12, 62:21
**0015977**
5:12
**0016023**
5:23, 92:4
**0016026**
5:23

**0016272**
5:10, 57:6,
57:10
**0016315**
5:10
**0024618**
6:25
**0024622**
6:25
**0024746**
5:17, 77:19
**0024775**
5:17
**004398**
7:17, 206:21
**004399**
5:21, 86:25
**004402**
5:21
**004403**
6:17, 138:2
**004404**
6:17
**004412**
5:25, 98:19
**004414**
5:25
**004453**
100:1
**004465**
6:15, 130:20
**004467**
6:15
**004468**
6:9, 122:16
**004469**
6:9
**00502**
1:8
**005105**
7:13, 196:25
**005107**
7:13
**005132**
6:7, 114:16
**005133**
6:7
**005386**
7:9, 185:18

**005389**
7:9
**006901**
5:19, 82:15
**006902**
5:19
**007140**
7:4, 161:25
**007585**
6:5, 7:16,
102:24
**007586**
6:5, 7:16
**007700**
5:14, 65:8
**007705**
5:14
**008451**
6:23, 154:24
**008454**
6:23
**009702**
6:11, 125:6
**009708**
6:11

---
**1**
---

**1**
146:9, 146:24
**10**
6:6, 22:6,
60:8, 76:4,
79:11, 79:23,
79:24, 114:17,
162:15, 208:4
**100**
174:22
**102**
6:4
**11**
6:8, 7:14,
22:6, 76:4,
86:24, 122:17,
135:25, 138:18,
139:2, 140:23
**114**
6:6
**1140**
3:9

**12**
6:10, 92:4,
125:7, 197:20,
197:21
**122**
6:8
**125**
6:10
**127**
6:12
**13**
6:12, 98:19,
127:22
**130**
6:14
**133**
185:18
**136**
189:18
**138**
6:16
**14**
6:14, 60:13,
130:21
**1495**
13:15
**15**
6:16, 25:11,
138:3
**150**
6:18
**151**
6:20
**152**
196:25
**154**
6:22
**156**
6:24
**16**
6:18, 150:6
**162**
7:4
**167**
206:21
**17**
6:20, 57:6,
57:9, 151:16,

210:23
**1718**
3:6
**174**
7:5
**18**
6:22, 7:14,
62:21, 150:14,
154:25
**183**
82:15
**185**
7:8
**1875**
4:6
**189**
7:10
**19**
6:24, 77:19,
99:8, 156:9,
161:11, 162:15
**192**
102:24, 200:22
**193**
7:11
**195**
127:21
**197**
7:12
**1972**
53:5
**199**
161:25
**1:-cv--tcb**
1:8
**1st**
117:3, 118:8,
118:23, 119:5,
119:19, 120:25,
121:22, 122:25,
123:11, 141:6

---
**2**
---

**2**
180:3, 180:9
**2-3**
157:12
**20**
1:8, 7:4, 9:24,

**14:20, 25:11,**
154:11, 155:9,
157:5, 161:11,
162:1, 200:7
**200**
7:14
**20006**
4:7
**20009**
3:8
**201**
193:21
**2015**
25:11, 135:2,
135:9, 135:11
**2016**
46:1
**2017**
25:23, 39:18,
72:22, 74:8,
75:14, 76:19
**2018**
13:24, 14:8,
14:21, 14:24,
15:20, 28:21,
39:7, 50:21,
51:11, 53:20,
56:17, 72:22,
74:8, 74:13,
75:14, 83:13,
88:4, 101:10,
107:7, 192:20,
196:12
**2019**
13:24, 14:8,
14:24, 15:20,
22:8, 22:9,
28:21, 39:7,
40:1, 50:21,
51:11, 53:20,
56:17, 78:5,
101:10, 107:7,
128:22, 175:12,
192:20, 196:12
**202**
3:9, 4:8
**2020**
211:16

**2021**
1:16, 211:15
**206**
7:17
**209**
5:4
**21**
7:5, 7:14,
174:24
**211**
1:24
**22**
7:8, 185:19
**23**
7:10, 189:19,
211:16
**24**
7:11, 109:10,
109:11, 109:17,
193:22
**25**
7:12, 9:24,
42:13, 173:23,
175:12, 175:16,
178:24, 181:24,
194:14, 197:1
**26**
1:16, 7:14,
200:23
**27**
7:17, 206:22
**28**
78:5, 82:12,
115:6, 159:7,
187:22, 189:5,
190:3
**29**
88:4, 88:13,
91:19, 114:16
**299**
3:9

**3**

**3**
155:9, 208:4,
210:23
**30**
146:9, 146:24,

211:17
**30334**
3:16
**31**
1:17
**36**
135:25
**3600**
3:17
**362**
16:20
**372839**
1:23
**38**
138:18
**39**
153:11
**3rd**
122:25

**4**

**40**
3:15, 122:16
**404**
3:17, 13:15
**41**
153:12
**426**
13:15
**45**
118:16, 125:6
**458**
3:17
**47**
150:1

**5**

**500**
42:5
**51**
138:2
**52**
155:9
**53**
130:20
**57**
5:9
**5th**
123:6, 123:25,

211:14

**6**

**6000**
4:8
**62**
5:11
**65**
5:13
**663**
4:8
**678**
16:20
**6992**
16:20

**7**

**71**
150:1, 150:5,
153:9
**73**
151:15
**74**
156:8, 211:20
**77**
5:15
**78**
154:24
**7th**
92:25, 98:5,
99:4, 125:19,
126:22

**8**

**82**
5:18
**87**
5:20
**8th**
126:23, 131:16,
131:19, 138:21

**9**

**9**
1:17, 153:11,
153:12
**92**
5:22

**98**
5:24
**9th**
57:23, 60:6,
152:7