## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| MACHELLE JOSEPH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | 1:20-cv-00502-VMC |
| BOARD OF REGENTS OF THE | ) | |
| UNIV. SYSTEM OF GEORIGA, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF'S BRIEF IN SUPPORT OF HER MOTION FOR RECONSIDERATION OF ORDERS ENTERED ON NOVEMBER 22, 2021, ECF Nos. 203 AND 204

## I.   INTRODUCTION

On September 20, 2022, Plaintiff MaChelle Joseph ("Joseph") learned that the judge who had presided over her case from approximately July 2019 to April 2022, the Honorable Timothy Batten, had close personal connections to both Defendants in this action. Specifically, Joseph learned that while presiding over her case, Judge Batten had a paid employment relationship with Defendant Board of Regents of the University System of Georgia ("BOR");[1] that two of his daughters worked as interns for Defendant the Georgia Tech Athletic Association ("GTAA") at different points in time from 2014 to 2019; and that from 2019 to 2021, Judge Batten maintained a close personal relationship with a long-standing, high-level BOR employee working within GTAA whose life work was to raise money for some of the resources Joseph has alleged in this lawsuit were doled out to her in a discriminatory manner, who Joseph has identified as a comparator in the case, and who, from 2018 to 2021, worked as the Special Assistant to the alleged discriminating official in this case, former GT Athletic Director Todd Stansbury.

As outlined below, the scope of connections that Judge Batten had with the Defendants in this action were sufficient to cause an objective observer to entertain

---

[1] Judge Batten's employment was with the University of Georgia, a member institution of the University System of Georgia that is governed, controlled, and managed by BOR.

serious doubts about his ability to remain impartial in this case and required that he disqualify himself under 28 U.S.C. § 455(a) ("Section 455(a)"). Though this case was recently reassigned to the Honorable Victoria Calvert, Judge Batten issued two discretionary rulings on the parties' cross-motions for sanctions for spoliation of evidence that could impact the trajectory of this case at summary judgment and trial. Joseph files this Motion for Reconsideration pursuant to Federal Rule of Civil Procedure 54(b) and requests that the Court vacate the Sanctions Orders as a remedy for the violation of Section 455(a) detailed herein and to prevent manifest injustice.

## II.   RELEVANT BACKGROUND

### A. Relevant Factual and Procedural Background

Joseph is the former head coach of the women's basketball ("WBB") team at the Georgia Institute of Technology ("GT"). GT, a member institution of the University System of Georgia, is governed by Defendant BOR. O.C.G.A. § 20-3-51. The sub-unit of GT in which Joseph worked, the GT Athletic Department, is operated by Defendant GTAA. GTAA is the equivalent of the GT Athletic Department. Ex. 1, Doc. 213, Steward Dep. 19:14-20:4, 23:3-6.[2]

---

[2] Joseph has alleged that GT and GTAA are a single integrated enterprise/joint employer and are thus referred to herein as "GT/GTAA."

Throughout her tenure at GT, Joseph believed that GT/GTAA gave her and the WBB team inferior resources for facilities, marketing, travel, and assistant coach salaries relative to their male counterparts. She believed this disparate allocation of resources was based on sex and that multiple senior members of the GT Athletic Department subjected her to retaliatory harassment because of her repeated complaints about this discrimination. On March 26, 2019, shortly after Joseph had escalated concerns about this discrimination and retaliation to GT's President and Athletic Director, Todd Stansbury, and filed an internal complaint with Stansbury and others, Stansbury terminated Joseph's employment.

On July 23, 2019, Joseph sued GT (named as BOR), the GT Athletic Department (named as GTAA), and several members of the GT Athletic Department, including Stansbury, in the U.S. District Court for the Northern District of Georgia. 1:19-cv-03347-TCB (*Joseph I*). *Joseph I* was assigned to Judge Batten. On October 23, 2019, Joseph voluntarily dismissed her complaint. *Id.* at Doc. 29. On December 23, 2019, Joseph re-filed her complaint in the Superior Court of Fulton County. 2019-cv-331019 (*Joseph II*). On February 3, 2020, the Defendants removed *Joseph II* to the U.S. District Court for the Northern District of Georgia. 1:20-cv-00502-TCB. *Joseph II* was also assigned to Judge Batten.

3

### B. Judge Batten

Judge Batten is an Atlanta native who graduated from GT in 1981. While *Joseph I* and *Joseph II* were before him, Judge Batten had ties with BOR generally, as well as with GT and GTAA specifically. More broadly, from 2019 to 2021, Judge Batten worked as a professor for another BOR institution, the University of Georgia, receiving $25,000 annually in 2019, 2020, and 2021 for this work. Ex. 2. More specifically, Judge Batten has had longstanding, close ties to GT and GTAA.

In particular, Judge Batten and two of his daughters attended GT, and his son is currently enrolled at GT. One of Judge Batten's daughters was "Ms. GT," the female representative of the undergraduate student body, from 2014 to 2015. Ex. 3. When a photo of this daughter and Judge Batten on the football field at a GT homecoming game was posted on social media, Bill Todd, who is listed as a professor at GT,[3] commented on the post: "GT judge. And new faculty colleague soon." Ex. 4. Another commenter called Judge Batten "[t]he most hard-core Tech fan I know." *Id.* Additionally, two of Judge Batten's daughters worked as interns for GTAA at different points in time from August 2014 through November 2019.[4] Exs.

---

[3] *See Bill Todd, Scheller College of Business*, GA. TECH, https://www.scheller.gatech.edu/directory/faculty/todd/index.html.

[4] Judge Batten was presiding over *Joseph I* for approximately three months while one of his daughters was working at GTAA. *See* Exhibit 5 and 1:19-cv-03347-TCB.

3, 5. While working at GTAA, at least one of Judge Batten's daughters reported to a senior, longstanding employee of GTAA, Jack Thompson. Ex. 3.

From approximately 1998 to 2018, Thompson worked as the Senior Associate Athletic Director for Development in the GT Athletics Department. Ex. 6. In this role, Thompson worked for the Alexander-Tharpe fund, the development arm of the GT Athletic Department. *Id.* Thompson was instrumental in raising funds for the construction and renovation of every GT athletics facility. *Id.* One of Thompson's last fundraising projects was AI 2020. Ex. 7. Thompson also created and served as executive producer of the syndicated television show for GT's Head Football Coach and, later, for the Head Men's Basketball Coach and Director of Athletics. Ex. 6.

Facilities and marketing are two of the resources that Joseph has alleged in this lawsuit that GT/GTAA doled out to her in a discriminatory fashion. Doc. 1-2, ¶¶ 52-78; Doc. 220-2, ¶¶ 28-82; Doc. 220 at 25-33; Doc. 236 at 4-5. AI 2020 has figured into Joseph's lawsuit as a fundraising campaign that was supposed to help support the construction of the WBB locker room. Doc. 212-2, ¶ 25. Joseph has pointed to the television shows that Thompson produced for men's basketball as evidence of the discriminatory allocation of marketing resources to Joseph and the WBB team. Doc. 220-2, ¶¶ 59-66; Doc. 220-1 at 27-28.

5

During Joseph's employment, and while Thompson was working as the Senior Associate Athletic Director for Development, Joseph was investigated and harshly disciplined for asking her executive assistant to perform personal tasks. Doc. 220-2 at 37 ¶¶ 174, 185-87. Joseph complained that the investigation was discriminatory, claiming that males in the Athletic Department had their executive assistants perform personal tasks without consequence. Doc. 220-24, BOR-001271 at 79, n.7. Thompson was identified as such a person. Ex. 8, BOR-010693. Whether Thompson had his executive assistant perform personal tasks became part of the investigation into Joseph. Ex. 9, BOR-004715; BOR-004711. GT continued to look into Thompson's use of his executive assistant to perform personal tasks after the investigation into Joseph was closed. Ex. 10, BOR-004804; BOR-004725. Joseph identified Thompson as a comparator in her lawsuit. Doc. 220 at 9-10, 46; Doc. 220-2 ¶¶ 189-193; Doc. 212-1 at 51; Doc. 212-14 (BOR App'x 11).[5]

In or around 2018, Thompson transitioned out of his role as the Senior Associate Athletic Director for Development into the role of Special Assistant to Stansbury, previously a named individual defendant in *Joseph I* and *Joseph II* and the person identified as the alleged discriminating official in this case.[6]  In this role,

---

[5] Jack Thompson was identified by name in the parties' summary judgment filings.
[6] Judge Batten dismissed Stansbury as an individual defendant on May 8, 2020. 1:20-cv-00502-TCB, Doc. 64.

Thompson, who had known Stansbury since the 1980s, worked directly with Stansbury on program priorities within GTAA. Ex. 6-7. After assuming this role, Thompson thereafter developed a close personal friendship with Judge Batten. Specifically, according to a social media post by his daughter, from approximately 2019 to 2021, Judge Batten and Thompson became "precious friends" who, from 2020-21, "did not go one week without having lunch together." Ex. 11. Judge Batten's daughter described Thompson as "family" whom she "loved" with all of her heart. *Id.* In or around July 2021, Thompson passed away. Shortly before his passing, Judge Batten married Thompson and his wife. *Id.* After Thompson passed away, Judge Batten was one of five people who spoke at Thompson's funeral. Ex. 12.

Judge Batten never disclosed to the parties any of these connections. Instead, Joseph came to learn of these facts recently by happenstance. Specifically, on September 20, 2022, while having dinner in Atlanta with a friend and former GT/GTAA colleague, Joseph and her friend talked about when they could see each other next. When Joseph said she would be back in Atlanta in late October, Joseph's friend said she had jury duty but hoped to get out of it because the judge was a "GT guy" or words to that effect. When Joseph asked who the judge was, her friend said Judge Batten. Joseph expressed surprise. Joseph's friend then revealed that two of

Judge Batten's daughters had worked for GTAA, and Judge Batten was close friends with Thompson.[7] Ex. 13. Upon further investigation, the above connections were discovered.

### C. The Sanctions Orders

On August 31, 2021, Judge Batten was asked to consider cross-motions for sanctions for spoliation of evidence filed by Joseph against BOR (Doc. 168-1) and by BOR against Joseph (Doc. 171), collectively "the Sanctions Motions." The Sanctions Motions called upon Judge Batten to determine whether BOR engaged in sanctionable conduct by failing to preserve text messages on the phones of three relevant witnesses from a critical time period in the case that Joseph contended would have shown that the investigation that led to Joseph's termination was a sham and whether Joseph had deleted text messages with a friend, Theresa Wenzel, that BOR speculated would have shown that she did not have a good faith belief that GT/GTAA had discriminated or retaliated against her and the WBB team.

On November 22, 2021, Judge Batten denied Joseph's Sanctions Motion (Doc. 203) and granted BOR's Sanctions Motion (Doc. 204). The Sanctions Orders, as discussed more fully below, are discretionary rulings that make repeated

---

[7] The undersigned have not contacted this witness given her status as a senior level employee of a represented party.

assumptions in favor of BOR and GTAA and against Joseph and apply different standards to the same issue to reach different results. In light of what is now known about Judge Batten's connections with Defendants at the time he issued these orders, justice requires that the Court grant Joseph's Motion for Reconsideration.

## III.   LEGAL FRAMEWORK AND ARGUMENT

Federal courts enjoy the sole power to interpret the law and apply it to individual cases. To maintain the integrity of the judicial system, the public must trust that the judiciary will exercise this power in a fair and impartial way. When a judge presides over a case in which he has a bias – actual or perceived – the public's confidence in the integrity of the judiciary erodes. It is for that reason that Congress enacted 28 U.S.C. § 455(a) which requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

Though Section 455(a) typically applies prospectively, it can, in the proper case, be applied retroactively "to rectify an oversight." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 861 (1988); *United States v. Cerceda*, 172 F.3d 806, 811 (11th Cir. 1999). Of relevance here, where a judge issued an order at a time when he had connections to a party that might lead an objective observer to question his impartiality, a court may reconsider and vacate that order as a remedy for violation of Section 455(a). *Liljeberg*, 486 U.S. at 863-70 (vacating final judgment

ten months after judgment entered when conflict that created appearance of impropriety in violation of 455(a) came to light).

A party who believes Section 455(a) has been violated may file a motion seeking relief within a "reasonable time after the grounds for the motion are ascertained." *Summers v. Singletary*, 119 F.3d 917, 921 (11th Cir. 1997); *see also Stansell v. Revolutionary Armed Forces of Columbia (FARC)*, No. 8:09-cv-2308, 2011 WL 13176221, at *4 (M.D. Fla. Dec. 5, 2011). In determining retroactively whether a judge failed to disqualify himself in violation of Section 455(a), courts look at whether an objective observer, fully informed of the facts surrounding the judge's connections to the case, would have questioned the judge's impartiality in presiding over the case. *Liljeberg*, 486 U.S. at 861. "Neither actual partiality, nor knowledge of the disqualifying circumstances on the part of the judge during the affected proceedings, are prerequisites for disqualification under this section." *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989).

### A. Violation of 28 U.S.C. § 455(a)[8]

#### 1) This motion is timely.

---

[8] To the extent the Court believes that it needs additional facts about Judge Batten's conflict before determining whether a violation of 455(a) has occurred, Joseph requests that an evidentiary hearing be held. *See, e.g.*, *Easley v. Univ. of Mich. Bd. of Regents*, 853 F.2d 1351, 1358 (6th Cir. 1988) (remanding case for evidentiary hearing to determine whether a violation of 455 had occurred).

Joseph's motion seeking relief for a violation of Section 455(a) is timely because it is being brought within a reasonable time after grounds for the motion were ascertained. *Singletary*, 119 F.3d at 921. Specifically, after Joseph first learned of Judge Batten's connections with the Defendants on September 20, she notified her counsel, who investigated the issue. After determining that a violation of Section 455(a) may have occurred, Joseph, through counsel, promptly contacted counsel for Defendants to schedule a call to discuss the matter, and thereafter, reached out to the Court on October 4, 2022, to schedule a call with the Court to request leave to file this motion. The time between Joseph's discovery of the conflict and her counsel's outreach to the Court was two weeks. This motion is thus being brought within a reasonable time after the grounds for it were ascertained.

The suggestion at the parties' October 11 hearing that Joseph should not be able to bring this motion because information about Judge Batten's employment with BOR is a matter of public knowledge is misplaced.[9] Section 455(a) is directed at the judge, rather than the parties, and is intended to be self-enforcing. *See Kelly*, 888 F.2d at 744 (noting that a judge has "an affirmative, self-enforcing obligation to

---

[9] While a lay person could find that Judge Batten is an instructor in residence at UGA law if they searched the internet, determining when he held this role and what, if anything, he was paid requires digging through open.ga.gov. Moreover, none of Judge Batten's other connections detailed herein are a matter of public knowledge.

recuse himself *sua sponte* whenever the proper grounds exist"). It does not place an independent obligation on the parties to scour the internet about a judge's potential conflicts. *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995) (requiring counsel to investigate impartiality of the judge before whom they appear would undermine confidence in the judiciary). Penalizing a party for not proactively investigating a judge's potential conflicts of interest would subvert the purpose of Section 455(a) and create perverse incentives. *Id.*

### 2) An objective observer would entertain serious doubts as to Judge Batten's impartiality in this case.

An objective observer fully informed of what this case is about and Judge Batten's connections to the Defendants while presiding over it would entertain serious doubts as to Judge Batten's ability to remain impartial. While being an alumnus of a party or friends with a potential witness is typically not enough to warrant disqualification under Section 455(a), courts are clear that there comes a point where the scope of a judge's connections with a party may threaten the perceived impartiality of the judiciary that Section 455(a) was designed to protect.

Maintaining an employment relationship with a party is among the connections that courts have repeatedly found threatens the perceived impartiality of the judiciary. *Pepsico Inc. v. McMillen*, 764 F.2d 458, 460-61 (7th Cir. 1985) (recusal required under 455(a) when a headhunter contacted judge about going to

12

work for the law firms representing the parties when he retired noting a "judge cannot have a prospective financial relationship with one side yet persuade the other that he can judge fairly in the case."); *see also Clark as Tr. for Matthew Wortley Tr. v. Kapila, Tr. for Trafford Distrib. Ctr., Inc.*, 612 B.R. 808, 816-17 (S.D. Fla. 2019) (recusal required under 455(a) where law firm representing a party hired judge's fiancé while case was before him, finding an objective observer may question a judge's impartiality where counsel for one of the parties could affect the judge's household income).

Likewise, maintaining close personal connections to a party, either directly or indirectly, of such scope that an objective observer would question whether the judge may be more inclined to favor one party over the other, even unconsciously, is also considered to threaten the perceived impartiality of the judiciary. For instance, in *United States v. Moskovits*, the judge recused himself from presiding over a criminal case where the accused was a former student of the University of Pennsylvania ("UPenn") and had been charged with certain drug-related offenses while a student at UPenn, and the judge and his wife had former and current employment relationships with UPenn. 866 F. Supp. 178, 181-82 (E.D. Pa. 1994). Though UPenn was not named as a defendant in the action, the judge disqualified himself under Section 455(a) in recognition that an objective observer may perceive his

longstanding, close associations with the university as "a factor that could influence" him, "even if unconsciously," to favor a result that would serve the university's purpose. *Id.* at 182.

Similarly, in *Campbell v. Temple University of Commonwealth System of Higher Education*, the judge recused himself from presiding over a case against Temple University where he had earned two degrees from the university and had served as an adjunct professor for 15 years, reasoning that his "gratifying relationship" with the university presented a "legitimate opportunity" for an objective observer to question his impartiality presiding over a case against the university. No. 95-4355, 1996 WL 4115, at *2 (E.D. Pa. Jan. 2, 1996).

Additionally, in *In re Apollo*, the Third Circuit held that recusal was required under Section 455(a) where the judge was a member of a board that received money from one of the parties, and who, by function of the fact that she sat on the board, had previously come into contact with potential witnesses in the case. 535 F. App'x 169, 174 (3d Cir. 2013). Even though the judge had taken a temporary leave from the board while presiding over the case, and even though there was no suggestion that the judge had ever discussed the case with the witnesses or gleaned any extra judicial information about the case while sitting on the board, the Third Circuit nevertheless held that recusal was required because, considered together, the scope

14

of the judge's involvement with those involved in the litigation might cause a reasonable observer to question her impartiality.[10] *Id.*

As in these cases, the scope of Judge Batten's involvement with the parties here threatens the perceived impartiality of the judiciary that Section 455(a) is intended to guard against. Judge Batten did not just have remote connections to BOR and GTAA while presiding over this case. Rather, he had a paid employment relationship with BOR and deep personal connections with GT *and* GTAA. Specifically, he and two of his children were alumni of GT; one of his children was "Ms. GT"; and two of his children worked for GTAA. Through this work, he and his family developed a close personal relationship with a senior level GT employee working specifically within GTAA whose job was to raise money for some of the very resources Joseph has alleged were doled out in a discriminatory manner, who Joseph had previously implicated in one of her complaints of discrimination, and who, in the last three years of his life, worked directly for the alleged discriminating official in this case. Moreover, it appears that through these connections, Judge Batten became known in the GT community: at least one GT professor referred to

---

[10] *See also, e.g.*, *Kelly*, 888 F.2d at 738, 745; *United States v. Murphy*, 768 F.2d 1518, 1538 (7th Cir. 1985); *Home Placement Servs., Inc. v. Providence J. Co.*, 739 F.2d 671, 676 (1st Cir. 1984); *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1110-12 (5th Cir. 1980).

him as the "GT Judge" and just last month a senior level GT/GTAA employee thought Judge Batten may relieve her from jury duty because he was a "GT guy."

Viewed cumulatively, it is not difficult to imagine how an objective observer might question Judge Batten's ability to remain impartial presiding over this case. An impartial observer might entertain serious doubts as to whether Judge Batten's deep connections with GT and GTAA may have made him more inclined, even unconsciously, to question Joseph's credibility and allegations of discrimination and retaliation, allegations that implicated the life's work of a good friend and that friend's boss. Similarly, an impartial observer may also entertain serious doubts about whether Judge Batten was less inclined to believe that the senior leaders in the GT Athletic Department would have engaged in the kind of misconduct alleged in this case and Joseph's Sanctions Motion, particularly where Joseph's motion called upon Judge Batten to question the integrity and competency of people within GT/GTAA, institutions that are integral to his life, and BOR, his employer.

The specter of impartiality is made worse by the fact that, at the time that Judge Batten considered the Sanctions Motions, he had spent every week of the prior year having lunch with Thompson.[11] Indeed, an average person aware of these facts

---

[11] The fact that Thompson passed away in July 2021, before Judge Batten issued the Sanctions Orders, does not curtail the potential taint of bias here. Joseph and BOR

may very well question whether Judge Batten and Thompson ever discussed this case over their weekly lunches. This prospect is heightened by the high-profile, controversial nature of the case and the fact that Joseph and her lawsuit directly implicated Thompson in more ways than one. *In re Sch. Asbestos Litig.*, 977 F.2d 764, 782 (3rd Cir. 1992) (noting that in high-profile cases, suspicions about the integrity of judges are "especially likely and untoward").

While each of the above facts, standing alone, may not have been enough to cause an objective observer to question Judge Batten's impartiality in this case, all of them together, when viewed within the specific context of this case and the issues Judge Batten was asked to decide, certainly are. Judge Batten should have disqualified himself from this case pursuant to Section 455(a), and by failing to do so he violated Section 455(a).

## B. Remedy for Violation of 28 U.S.C. § 455(a)

If the Court finds that Section 455(a) was violated, it must then fashion a remedy. *Liljeberg*, 486 U.S. at 862. Vacatur has been held to be an appropriate remedy. *Id.* at 863-64. This Court can reconsider and vacate an order adjudicating

---

filed their Sanctions Motions in August 2021, only one month after Thompson's passing, and Judge Batten issued the Sanctions Orders in November 2021. A reasonable observer would not presume that Judge Batten's feelings of friendship toward Thompson, and, more relevant here, the appearance of bias that stemmed from that relationship, would meaningfully subside in a few short months.

fewer than all claims at any time before final judgment pursuant to Fed. R. Civ. P. 54(b) to prevent manifest injustice.[12] *Brogdon ex. rel. Cline v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1338 (N.D. Ga. 2000); *Howell v. Phoenix Life Ins. Co.*, No. 1:07-cv-14, 2008 WL 11336272, at *3 (N.D. Ga. Dec. 12, 2008).[13] When deciding whether to grant a motion for reconsideration seeking to vacate an order to remedy a violation of Section 455(a) and prevent injustice, courts consider three factors:  (1) the risk of injustice to the parties, (2) the risk that denial of relief will produce injustice in other cases, and (3) the risk of undermining the public's confidence in the judiciary.  *Liljeberg*, 486 U.S. at 863.

The balance of the *Liljeberg* factors supports vacatur of the Sanctions Orders. The risk of injustice to Joseph if the Sanctions Orders stand is significant.  In ruling on the parties' cross-motion for sanctions, Judge Batten was able to exercise significant discretion.  *In re Delta/Air Tran Baggage Fee Antitrust Litig.*, 770 F.

---

[12] An order granting or denying a discovery motion for sanctions is an interlocutory order, *Carpenter v. Mohawk Indus., Inc.*, 541 F.3d 1048, 1052 (11th Cir. 2008), *aff'd*, 558 U.S. 100 (2009), and are thus subject to reconsideration under Rule 54(b).
[13] While Local Rule 7.2(E) provides that a motion for reconsideration should be brought within 28 days of the entry of order, the Court has discretion to consider untimely motions under Local Rule 7.1(F).  As Joseph did not ascertain the grounds for this motion until recently, good cause exists to consider this motion at this time. *See, e.g.*, *Weeks v. Grady*, No. 1:18-cv-01373, 2021 WL 5564252, at *1 & n.5, *2 (N.D. Ga. Nov. 29, 2021) (granting motion for reconsideration out of time where basis for motion (change in law) was not ascertained until six months after order).

Supp. 2d 1299, 1305 (N.D. Ga. 2011) (district courts "are afforded broad discretion in determining whether to award spoliation sanctions"); *United States v. Orr*, 969 F.3d 732, 741 (7th Cir. 2020) (finding risk to party from "discretionary calls" as to "circumstantial evidence and credibility determinations" made by judge who was in violation of Section 455(a) weighed in favor of vacatur).

While Joseph makes no conclusions about whether Judge Batten's potential bias actually infected the Sanctions Orders, an objective observer who reviewed the orders side-by-side might very well entertain serious doubts about whether it did.  In both motions, the parties asked the Court to determine whether each party deleted text messages that were relevant to their claims or defenses.  In both motions, the parties speculated to a certain extent as to what these messages said: Joseph speculated that BOR destroyed messages that would show the investigation that ended her employment was started for pretextual reasons; BOR speculated that Joseph destroyed messages that would show that Joseph knew her complaints of discrimination were not valid.

However, Joseph, unlike BOR, pointed to actual evidence rooting her belief that the messages lost contained the crucial information she purported they contained:  namely, evidence showing that the witnesses whose messages were destroyed exchanged texts bearing on the legitimacy of the start of the investigation

that ended her employment.  Doc. 168-1 at 6-17. By contrast, BOR did not point to any evidence rooting its belief that the messages it lost contained crucial information about Joseph's protected activity, such as a text from Joseph to Wenzel showing that she used text to communicate with Wenzel about her complaints of discrimination and retaliation.[14]  Rather, BOR's argument that Joseph deleted crucial evidence was based on speculation that such texts existed since Joseph and Wenzel were close friends who spoke about Joseph's concerns in the workplace, Joseph was an avid texter, and there were not many text messages between Joseph and Wenzel.

Even though Joseph's argument that crucial messages existed and were lost was much more tethered to the evidence than BOR's argument, the Court nevertheless found that BOR had shown that crucial evidence was deleted, but Joseph had not.  Notably, in reaching this determination, the Court did not look at what evidence existed to suggest that the crucial messages the parties claimed to have existed did in fact exist and were lost.  *In re Delta*, 770 F Supp. 2d at 1309-10 (burden is to show that crucial evidence existed and was deleted; not just evidence that was part of the puzzle); *Garcia v. City of Grantville, Ga.*, No. 3:17-cv-00169-TCB, 2020 WL 10142254, at *8-10 (N.D. Ga. Nov. 16, 2020).

---

[14] Instead, the text messages between Joseph and Wenzel that were produced show that when they did text, their text messages were typically not substantive. *See, e.g.*, Doc. 171-18.

Instead, drawing all inferences in BOR's favor, the Court made repeated findings of fact regarding the evidence, which it then used to guide its ruling. For instance, in its analysis of whether Joseph had shown that critical evidence had been destroyed, the Court did not focus on the fact that the evidence showed that the witnesses whose messages were destroyed exchanged texts bearing on the legitimacy of the start of the investigation that ended her employment – evidence which suggests that other similar messages relating to the start of the investigation had been lost.  Rather, the Court spent pages assessing whether certain pieces of evidence supported an inference of pretext, and then after adopting BOR's interpretation of the disputed facts (*i.e.* that the evidence did not support an inference of pretext), the Court found that Joseph failed to show that the missing messages were of critical importance to her case because she only speculated that they contained evidence of pretext.  Doc. 203 at 8-17.

Likewise, in its analysis of whether BOR had shown that it was prejudiced by the purported deletion of the texts, the Court spent pages assessing whether BOR's evidence showed that Joseph subjectively believed she was facing discrimination. Doc. 204 at 16-19. Again after adopting BOR's interpretation of the disputed facts (*i.e.* that the evidence compelled the question of whether Joseph subjectively believed she was facing discrimination), the Court summarily concluded that Joseph

21

must have exchanged more texts with Wenzel that would have "probative information" about Joseph's concerns in the workplace because of their "close relationship" and "Wenzel's involvement with Joseph's complaints." Doc. 204 at 20-21.

However, whether the Court found there were facts indicating that the investigation that ended Joseph's employment was legitimate or a sham, or that Joseph did or did not subjectively believe she was facing discrimination, is not proof that critical text messages supporting these conclusions ever existed or were destroyed in bad faith.[15] Given this, an objective observer may very well find that the fact findings present in the Sanctions Orders were not relevant to determining whether critical evidence existed and was destroyed in bad faith, and that the

---

[15] For instance, whether the Court was persuaded that the evidence in the record suggested that the investigation was a sham has little bearing on whether the witnesses may have exchanged text messages showing that it was. Rather, as Joseph pointed out, the witnesses whose messages were destroyed all sent text messages bearing on the legitimacy of the start of the investigation that ended Joseph's employment, which is a basis to believe that more such text messages existed but were destroyed.  While the Court may ultimately find on summary judgment that the evidence produced does not support an inference of pretext, that finding should be reserved for summary judgment, not a sanctions motion for spoliation of evidence, the purpose of which is to seek relief for the destruction of evidence that could be used at summary judgment or trial to support its theory.

gratuitous inferences that were drawn in BOR's favor skewed the proper analysis of these claims.[16]

In light of the above, the risk of injustice to Joseph if the Sanctions Orders stand is significant. *See Liljeberg*, 486 U.S. at 868 (scrutinizing the lower court judge's "analysis of the merits" and concluding that the risk of unfairness in upholding the judgment was greater than allowing a new judge to "take a fresh look at the issues").[17] Waiting to appeal these orders after final judgment would be of little utility as these discretionary orders will only be subject to deferential review. *Rohrbach v. AT & T Nassau Metals Corp.*, 915 F. Supp. 712, 717 (M.D. Pa. 1996) (heightened risk of injustice with respect to "largely discretionary discovery decisions [that are] subject only to deferential review").

---

[16] For instance, the fact that Joseph and Wenzel were close friends who talked about Joseph's workplace struggles is not proof that they exchanged "probative information" about that issue via text message.  Relatedly, even if there had been proof that Joseph and Wenzel had exchanged "probative information," the fact that some relevant texts may have been destroyed is not proof that critical evidence was deleted in bad faith or that a party has been prejudiced.  To the contrary, as Joseph argued, BOR's bad faith argument was nonsensical, and any prejudice that may have resulted from any lost texts with Wenzel was cured by the volume of discovery produced on Joseph's protected activity, including over hundreds of email communications between them on the topic.

[17] The Supreme Court in *Liljeberg* took particular issue with the conflicted judge's factual determinations and inferences in favor of one party.  *Liljeberg*, 486 U.S. at 855 & n.5.

In the meantime, substantial harm could be done to Joseph. The factual determinations that the Court made in the orders could influence this Court's review of material facts on summary judgment.[18] And, if the case makes it to trial, BOR will be equipped with highly inflammatory impeachment evidence[19] – the ability to argue to a jury that Joseph deleted messages with her friend that would have shown, essentially, that she was lying about facing discrimination. This presentation will be unduly prejudicial and is not justified.

While vacating the Sanctions Orders will cause delay in the proceedings and create additional work for the parties and the Court, this burden will be slight relative

---

[18] In addition to the fact findings, the Court also adopted BOR's legal argument that statements by nondecisionmakers do not satisfy a plaintiff's burden to show pretext. Doc. 203 at 18. This conclusion, upon which BOR is relying at summary judgment, is based on Justice O'Connor's concurrence in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) that does not stand for this proposition. Statements by non-decisionmakers may be relevant and may be used to show pretext if the non-decisionmaker was sufficiently involved in the decisionmaking process leading up to the adverse action. *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1093-94 (1st Cir. 1995); *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800-01 (11th Cir. 2005) (citing favorably *Woodman*).

[19] Factual disputes about a plaintiff's subjective belief are usually issues of fact reserved for the jury. *Taylor v. Cardiovascular Specialists, P.C.*, No. 1:11-CV-4521-TCB-RGV, 2013 WL 12310269, at *18 (N.D. Ga. Dec. 11, 2013), *R. and R. adopted*, 4 F. Supp. 3d 1374 (noting that in dispute over subjective belief, the court was not entitled to assess the credibility of competing accounts, and holding employee's subjective belief is "fit for resolution by a jury"). Accordingly, any text messages that may have existed between Joseph and Wenzel regarding Joseph's protected activity would at most be impeachment evidence, not the lynchpin of BOR's case.

to the risks of injustice to Joseph and the public if they remain in place.[20]   The orders

dealt with a discrete discovery issue and will not require unwinding this entire case.

Moreover, the parties have already invested the time in briefing the issue, and the

work needed for the parties to move again for sanctions should they so choose will

be minimal. *Clark as Tr. for Matthew Wortley Tr.*, 612 B.R. at 819-20; *Orr*, 969 F.3d

at 741-742; *In re Apollo*, 535 F. App'x at 175. On balance, justice requires that the

Sanctions Orders be vacated.[21]

Respectfully submitted this 25th day of October 2022,


                   */s/Colleen E. Coveney*
                   Lisa J. Banks (admitted *pro hac vice*)
                   banks@kmblegal.com
                   Colleen E. Coveney (Ga. Bar No. 686460)

---

[20] In addition to the risk of injustice to the parties in a case, *Liljeberg* also instructs courts to consider the risk of injustice in other cases and the risk of undermining the public's confidence in the judicial process.  486 U.S. at 864.  Both additional factors weigh in favor of vacatur.  Here, vacating the Sanctions Orders will encourage judges "to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered," *id.* at 868, and, as a result, will safeguard the public's trust and confidence in the judiciary, *Clark as Tr. for Matthew Wortley Tr.*, 612 B.R. at 820.

[21] Joseph believes that vacatur is the most appropriate remedy given the extent of Judge Batten's connections with the Defendants in the case and the improper fact findings present in these discretionary orders, however, the Court also has the discretion to conduct a *de novo* review if it determines vacatur is not warranted.  *See* Fed. R. Civ. P. 54(b) (allowing a court to "revise[] at any time" "any order . . . that adjudicates fewer than all the claims" in the action); *see also Rohrbach*, 915 F. Supp. at 718 (conducting *de novo* review of discovery orders issued by conflicted judge to avoid "the risk of injustice to the plaintiffs").

coveney@kmblegal.com
**Katz Banks Kumin LLP**
11 DuPont Circle, NW, Ste 600
Washington, DC 20034
Phone:        (202) 299-1140
Fax:          (202) 299-1148

Edward D. Buckley (Ga. Bar No. 092750)
edbuckley@buckleybeal.com
J. Kyle Brooks (Ga. Bar No. 773561)
kbrooks@buckleybeal.com
**Buckley Beal LLP**
600 Peachtree Street NE, Suite 3900
Atlanta, GA 30308
Phone:        (404) 781-1100
Fax:          (404) 781-1101

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(C) in 14-point Times New Roman type face.

This 25th day of October 2022,

*/s/ Colleen E. Coveney*
Colleen E. Coveney
GA Bar No. 686460

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 25, 2022, I electronically filed the above **PLAINTIFF'S MOTION FOR RECONSIDERATION OF ORDERS ENTERED ON NOVEMBER 22, 2021, ECF 203 AND 204,** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

      Courtney Poole (cpoole@law.ga.gov)
      Katherine Powers Stoff (kstoff@law.ga.gov)
      Christopher Paul Galanek (chris.galanek@bclplaw.com)
      Tania Christine Faransso (tania.faransso@wilmerhale.com)
      Jamie Yood (Jamie.yood@wilmerhale.com)

                      By: */s/ Colleen E. Coveney*
                          Colleen E. Coveney
                          GA Bar No. 686460

                          *Counsel for Plaintiff*