**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

MACHELLE JOSEPH,

      Plaintiff,

v.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
and GEORGIA TECH ATHLETIC
ASSOCIATION,

      Defendants.

Civil Action No.
1:20-cv-00502-VMC

**OPINION AND ORDER**

TABLE OF CONTENTS

Table of Contents ........................................................................... 1

Introduction ................................................................................... 2

Procedural History ........................................................................ 3

Discussion ...................................................................................... 6

   I.   Motion for Reconsideration .................................................. 6

      A.   Motion for Reconsideration Legal Standard .................... 6

      B.   Joseph Sanctions Order..................................................... 8

      C.   BOR Sanctions Order ..................................................... 12

      D.   Conclusion for Motion for Reconsideration ................... 19

   II.   Motions for Summary Judgment ......................................... 20

      A.   Summary Judgment Legal Standard ............................... 20

      B.   Notice of Objection......................................................... 22

      C.   Background for Motions for Summary Judgment........... 25

         1.   Structure of BOR and GTAA ..................................... 25

         2.   Plaintiff's Employment at GT...................................... 29

3.   Events Leading to Plaintiff's Termination as Head Coach ......... 34

4.   Plaintiff's Allegations of Discrimination and Retaliation ........... 48

D.   Discussion of Motion for Summary Judgment ............................... 76

1.   Ms. Joseph's Claims Arising from Her Termination ................... 79

2.   Ms. Joseph's Claims Arising from Disparate Resources ............. 87

3.   Ms. Joseph's Claims Arising from a Retaliatory Hostile Work
     Environment ...................................................................................... 91

4.   Other Claims ...................................................................................... 95

Conclusion ............................................................................................................. 96

## Introduction

This matter is before the Court on the following motions:

- The Motion of Defendant Board of Regents of the University System of Georgia ("BOR") for Summary Judgment ("BOR MSJ," Doc. 212);

- The Motion of Defendant Georgia Tech Athletic Association ("GTAA") for Summary Judgment ("GTAA MSJ," Doc. 214); and

- The Motion of Plaintiff MaChelle Joseph for Reconsideration ("Motion for Reconsideration" or "MFR," Doc. 265).

Ms. Joseph filed responses to the BOR MSJ ("Resp. to BOR MSJ", Doc. 220)[1]

and to the GTAA MSJ ("Resp. to GTAA MSJ," Doc. 219). BOR and GTAA filed

replies respectively ("Reply BOR MSJ," Doc. 228; "Reply GTAA MSJ," Doc. 214).

The BOR filed a Notice of Objections to evidence submitted in support of the Resp.

---

[1] The Court grants Ms. Joseph's Motion for Leave to Amend certain filings submitted in connection with her Response in Opposition to BOR's Motion for Summary Judgment. (Doc. 241).

2

to BOR MSJ (Doc. 230). Ms. Joseph filed a Response to the Notice of Objections (Doc. 240).

The Motion for Reconsideration seeks reconsideration of two orders entered by the Court (Batten, C.J.) prior to the reassignment of this case to the undersigned: the Court's November 22, 2021 Order Denying Plaintiff's Motion for Sanctions ("Joseph Sanctions Order," Doc. 203); and the November 22, 2021 Order Granting Defendant BOR's Motion for Sanctions ("BOR Sanctions Order," Doc. 204). The Motion for Reconsideration asserts that reconsideration is warranted based on Chief Judge Batten's failure to recuse himself from hearing this case under 28 U.S.C. § 455(a).

The Court first begins with the undisputed facts and procedural background in this case common to all the motions. Next, the Court turns to the Motion for Reconsideration. Lastly, the Court will address the BOR MSJ and the GTAA MSJ, which will include a more detailed discussion of the factual bases of Ms. Joseph's causes of action.

### Procedural History[2]

From 2003 to 2019, MaChelle Joseph served as the head coach of the women's basketball team ("WBB") at the Georgia Institute of Technology ("GT").

---

[2] A more detailed factual background of this case is found in Section II.C of the Discussion section of this Order.

(Def. BOR's Statement of Material Facts ("SMF BOR") ¶ 1, Doc. 212-2; Pl.'s Response to SMF BOR ("RSMF BOR") ¶ 1, Doc. 220-1). GT is a member institution of the University System of Georgia. (Compl. ¶ 17, Doc. 1-2; Def. BOR's Answ. ¶ 17, Doc. 2.). Pursuant to O.C.G.A. § 20-3-51, Defendant BOR is vested with the government, control, and management of the University System of Georgia and all of its institutions, including GT. (Compl. ¶ 17; Def. BOR's Answ. ¶ 17).

Ms. Joseph's employment was terminated on March 26, 2019. (Def.'s SMF BOR ¶ 92; Pl.'s RSMF BOR ¶ 92). On April 16, 2019, Ms. Joseph filed a Charge of Discrimination with the United States Equal Opportunity Commission ("EEOC") against Defendant BOR. (Compl. ¶ 23; Def. BOR's Answ. ¶ 23). On May 13, 2019, Ms. Joseph filed an Amended EEOC Charge adding Defendant GTAA as an employer. (Compl. ¶ 23, Def. BOR's Answ. ¶ 23; Def. GTAA's Answ. ¶ 23, Doc. 7). On November 25, 2019, Ms. Joseph received a Right to Sue Notice from the EEOC as to both charges. (Compl. ¶ 24, Def. BOR's Answ. ¶ 24; Def. GTAA's Answ. ¶ 24).

Ms. Joseph commenced the instant civil action by filing a Complaint in the Fulton County Superior Court on December 23, 2019. (Doc. 1-2).[3] BOR removed the action to this Court on February 3, 2020. (Doc. 1).

---

[3] Ms. Joseph first filed suit in district court on July 23, 2019, commencing Case No. 1:19-cv-003347-TCB. Following Defendants' motions to dismiss, she voluntarily dismissed that action.

Defendants filed Motions to Dismiss and a Motion for Partial Judgment on the Pleadings. (Docs. 3, 4, 6, 29). In an Order, the Court dismissed Ms. Joseph's claims against certain individual defendants and narrowed her remaining claims against the remaining Defendants. ("MTD Order," Doc. 64).

Following the MTD Order, the following counts remain pending against both BOR and GTAA: Count Three for sex discrimination in violation of Title VII; Count Four for sex discrimination based on Ms. Joseph's association with the WBB athletes in violation of Title VII; Count Nine for retaliation in violation of Title IX; Count Ten for retaliation in violation of Title VII; Count Eleven for retaliation in violation of the Georgia Whistleblower Act; Count Twelve for retaliatory hostile work environment in violation of Title IX; Count Thirteen for retaliatory hostile work environment in violation of Title VII; Count Fifteen for violation of the Georgia Open Records Act; and Count Sixteen for litigation expenses. As against the GTAA, the same claims remain pending plus Count Fourteen for breach of contract.

This case was reassigned from Chief Judge Batten to the undersigned district judge on April 11, 2022, because of the undersigned's appointment. Chief Judge Batten did not exercise his discretion to decline the transfer.

**Discussion**

## I.    Motion for Reconsideration

Ms. Joseph seeks reconsideration of the Joseph Sanctions Order and the BOR

Sanctions Order on the grounds that Chief Judge Batten should have recused

himself from hearing this case under  28 U.S.C. § 455(a). Ms. Joseph alleges that

> Judge Batten had ties with BOR generally, as well as with GT and GTAA specifically. More broadly, from 2019 to 2021, Judge Batten worked as a professor for another BOR institution, the University of Georgia, receiving $25,000 annually in 2019, 2020, and 2021 for this work. Ex. 2. More specifically, Judge Batten has had longstanding, close ties to GT and GTAA.
>
> In particular, Judge Batten and two of his daughters attended GT, and his son is currently enrolled at GT.

(Pl.'s Br. Supp. MFR at 4, Doc. 265-1). In the Motion for Reconsideration, Ms.

Joseph discusses these connections to BOR in further depth and asserts that as a

result of these alleged conflicts of interests, Chief Judge Batten's impartiality might

reasonably be questioned, requiring recusal under Section 455(a).

### A.    Motion for Reconsideration Legal Standard

In *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 867 (1988), the

Supreme Court held that "vacatur was an appropriate remedy" for a violation of

Section 455 in some, but not all cases. "[T]he Supreme Court applied a three-factor

test to determine whether a judicial action taken in violation of section 455(a)

should be remedied by vacatur pursuant to Fed.R.Civ.P. 60(b)." *United States v.*

6

*Cerceda*, 172 F.3d 806, 812 (11th Cir. 1999) (citing *Liljeberg*, 486 U.S. at 864). "This test requires a court to consider: '[1] the risk of injustice to the parties in the particular case, [2] the risk that the denial of relief will produce injustice in other cases, and [3] the risk of undermining the public's confidence in the judicial process.'" *Id.* (quoting *Liljeberg*, 486 U.S. at 864 and citing *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1526 (11th Cir. 1988)).

The Parties agree that regardless of whether Chief Judge Batten should have recused, if the undersigned were to conduct a de novo review of the challenged orders and reach the same conclusions, it would cure any recusal issues. (Pls.' Br. Supp. MTR at 25 n. 21 ("Joseph believes that vacatur is the most appropriate remedy given the extent of Judge Batten's connections with the Defendants in the case and the improper fact findings present in these discretionary orders, however, the Court also has the discretion to conduct a de novo review if it determines vacatur is not warranted.") (citing Fed. R. Civ. P. 54(b)); (Def. BOR's Resp. to MTR at 23 n. 17 ("In the event this Court does see fit to conduct a de novo review, Defendants submit that the Court would be entitled to award the BOR the relief it originally sought with respect to both motions."). In light of the Parties' agreement on this matter, the most logical first step in the analysis is determining whether, under a de novo review, the Court would reaffirm the challenged orders.

### B.     Joseph Sanctions Order

In the Joseph Sanctions Order, Ms. Joseph sought discovery sanctions against Defendant BOR for failing to preserve the following communications:

- Messages convening the meeting between Akin and the four complaining student-athletes to ask if they had provided documentation;

- Tucker's texts with the student-athletes from January 2019 through Joseph's termination;

- Possible texts between Tucker and Akin about the January 26 meeting;

- Texts between Tucker and Akin or with student-athletes between September 1, 2018 and February 18, 2019 (with none produced through April 1);

- Texts between Tucker and Akin with the doctor to whom Tucker referred two student-athletes;

- Texts between Durham and Peterson, Stansbury, Mark Rountree, and Kim Harrington about Joseph in 2018 and 2019;

- Texts between Tucker and student-athletes during the relevant time period, and between Akin and student-athletes before February 18, 2019; and

- Texts between Durham and Peterson and Harrington in 2018 and 2019 about Joseph.

(Joseph Sanctions Order at 9–10). Joseph contended that the texts messages were "critical to demonstrating whether the investigation against her, the results of which formed the putative basis of her termination, was commenced in good faith," or as a pretext to justify the investigation into her. (*Id.* at 2–4).

8

The Court (Batten, C.J.) denied Ms. Joseph's sanctions motion for three reasons. First, because Ms. Joseph did "not provide evidence to justify an inference that the missing messages would have demonstrated that the investigation was commenced for pretextual reasons." (*Id.* at 8–9). Second, because "the individuals whose messages were deleted were not decisionmakers," (*id.* at 8–9) and therefore the deleted statements would not satisfy her burden of showing pretext. (*Id.* at 18) (citing *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)), *superseded by statute on other grounds as recognized by Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1017 (2020). Third, because she failed to show the messages were deleted in bad faith or with the intent to deprive her of evidence. (*Id.* at 21). The Court focuses on the first of these reasons.

In her Motion for Reconsideration, Ms. Joseph asserts that in the Court's "analysis of whether Joseph had shown that critical evidence had been destroyed," it failed to "focus on the fact that the evidence showed that the witnesses whose messages were destroyed exchanged texts bearing on the legitimacy of the start of the investigation that ended her employment – evidence which suggests that other similar messages relating to the start of the investigation had been lost." (Pl.'s Br. Supp. MFR at 21, Doc. 265-1). Instead, she asserts that

> the Court spent pages assessing whether certain pieces of
> evidence supported an inference of pretext, and then

> after adopting BOR's interpretation of the disputed facts
> (i.e. that the evidence did not support an inference of
> pretext), the Court found that Joseph failed to show that
> the missing messages were of critical importance to her
> case because she only speculated that they contained
> evidence of pretext.

(*Id.*). She further argues that "whether the Court was persuaded that the evidence
in the record suggested that the investigation was a sham has little bearing on
whether the witnesses may have exchanged text messages showing that it was."
(*Id.* at 22 n.15). "Rather, as Joseph pointed out, the witnesses whose messages were
destroyed all sent text messages bearing on the legitimacy of the start of the
investigation that ended Joseph's employment, which is a basis to believe that
more such text messages existed but were destroyed." (*Id.*).

The Court disagrees with this proposition. Absent direct evidence of the
contents of destroyed communications, the Court can only infer their contents
based on the record as a whole. In Ms. Joseph's original sanctions motion, she
focused on statements by persons involved with the investigation expressing
concern that the statements that had been gathered "were too broad and
unsubstantiated to warrant an investigation on their own." (Pl.'s Mot. for
Sanctions at 8–9, Doc. 161-1). The Joseph Sanctions Order addressed this
argument. Concern about the viability of the investigation and efforts to shore it
up does not "show that the investigation was launched for pretextual reasons, and
it certainly does not show that the missing messages likely would have contained

evidence of pretext." (Joseph Sanctions Order at 15). Instead, "[t]he evidence to which Joseph points demonstrates that Georgia Tech correctly sensed that Joseph would make for a formidable adversary in any conflict that might arise." (*Id.*).

Ms. Joseph's logic is essentially that, absent some ulterior motive, the people involved with the investigation would have dropped it at the beginning rather than attempt to develop it further. But that is a huge leap in logic, particularly when the Court previously found that students from Ms. Joseph's basketball team began complaining to Ms. Tucker in the fall of 2018 about how Ms. Joseph treated them, that Ms. Tucker already had concerns about how Ms. Joseph treated her players, and that the students in the January 2019 meeting appeared to have "genuine terror." (*Id.* at 10). Ms. Joseph does not contend that these findings of fact were erroneous, she only challenges the Court's conclusions drawn from them.

Ultimately, it is Ms. Joseph's burden to establish that the deleted messages contained information of substance to her case. But nothing she points to "indicate[s] why any individuals wanted the investigation to occur or why they wanted Ms. Joseph to leave Georgia Tech. The messages produced do not demonstrate that it is likely that GTAA launched the investigation or fired Joseph for a pretextual reason." (*Id.*).

The Court, having reviewed the Joseph Sanctions Order de novo, adopts the findings and conclusions in that Order as to Ms. Joseph's failure to meet her

burden of showing prejudice. The Court therefore need not reconsider the other aspects of the Order.

### C.   BOR Sanctions Order

In the BOR Sanctions Order, the BOR sought sanctions against Ms. Joseph for failure to produce text messages between Ms. Joseph and "Theresa Wenzel, a former Georgia Tech employee who served as the associate dean, director of Title IX compliance, and senior women's administrator . . . [and] Joseph's supervisor." (BOR Sanctions Order at 2). After Wenzel left Georgia Tech in 2018, she became a professional change management consultant; Joseph was one of her first clients. (*Id.* at 2–3) (footnote omitted). According to the BOR Sanctions Order, "[t]he two were close friends, and Wenzel was helping Joseph prepare for this lawsuit." (*Id.* at 3). As found by the Court in the BOR Sanctions Order:

> [t]he only text messages produced between just Joseph and Wenzel (as opposed to exchanges within a larger group message) for a period of over three years were (1) a single iMessage chain with eight messages, and (2) a single WhatsApp chain also containing eight messages. Indeed, no messages from Joseph to Wenzel from July 28, 2018 through late February 2019 were produced. During this time, Joseph was actively preparing for this lawsuit, was discussing her workplace complaints with Wenzel, and had become Wenzel's client.

(*Id.* at 3–4). BOR contended that "Joseph purposely deleted messages with Wenzel that were relevant to the issues in this case and that Joseph knew or should have known she had a duty to preserve those messages." (*Id.* at 4).

The Court (Batten, C.J.), found that "Joseph's deposition testimony with respect to [the frequency of] her texting habits with Wenzel was somewhat equivocal and contradictory." (*Id.* at 10). The Court also found that "Wenzel's testimony was similarly equivocal," writing that

> Initially, she testified that the two had exchanged both text and WhatsApp messages, probably using WhatsApp "a little bit more" than text. [173] at 25:1-10. Later, she stated that she "generally communicated with [Joseph] on text message" rather than WhatsApp and used WhatsApp for her "other clients, not MaChelle." Id. at 169:14-19.

(*Id.* at 13).

Based on the "equivocal" nature of Ms. Joseph and Ms. Wenzel about their texting habits, the "extent and depth of the individuals' relationship," and "Joseph's texting habits"—Joseph sent or received over 67,000 text messages in 2018—the Court found that the two had "exchanged far more text messages than Joseph produced." (*Id.* at 13–14). The Court explained that

> [a] review of the text messages produced between the two individuals after Joseph's termination—approximately thirty-five messages between February 27 and March 31, 2019—indicates that the two were indeed close friends who exchanged regular texts. It is simply not plausible that the type of messages exchanged were preceded by years of virtual text silence.

(*Id.* at 15).

13

Having concluded that text messages existed and were deleted, the BOR Sanctions Order next held that BOR was prejudiced by their loss. The Court focused on Ms. Joseph's burden of alleging retaliation claims under Title VII and Title IX, which require demonstrating "(1) that she genuinely believed she and the basketball team were being discriminated against, and (2) that her beliefs were reasonable in the light of the law at the time." (*Id.* at 16–17) (citing *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)). Because the complaints at issue were primarily conveyed verbally, BOR argued, and the Court agreed, "that contemporaneous communications about the substance of Joseph's complaints with Joseph's trusted friend, confidant, and former supervisor—with whom Joseph is known to have communicated about her workplace problems—are irreplaceable." (*Id.* at 17–18).

Finally, the BOR Sanctions Order found that Ms. Joseph's deletion of the messages was in bad faith. At the beginning of the Order, the Court noted that

> Joseph's privilege log indicates that she began applying attorney-client privilege and work-product protections to documents in May and June 2018. Work-product protection applies only to documents that are prepared in anticipation of litigation. Fed. R. Civ. P. 26(b)(3)(A). Therefore, Joseph was anticipating litigation and was under a duty to preserve no later than June 2018.

(*Id.* 8–9). The Court thus found that "[t]he evidence demonstrates that Joseph had been planning to file this lawsuit for years—long before Georgia Tech had taken

14

any adverse action before her. She had hired attorneys, begun compiling documents and timelines, and spent months conferring with friends and drafting her internal complaint." (*Id.* at 22). In light of this substantial preparation, and the fact that Ms. Joseph testified "that her phone is not set to automatically delete messages [but did] . . . not provide any alternative explanation for the deletion," the Court concluded that "the only possibility is that Joseph actively deleted these messages." (*Id.*).

In her Motion for Reconsideration, Ms. Joseph does not dispute the underlying facts, but challenges the conclusions drawn from them in the BOR Sanctions Order. For example, she argues that "the fact that Joseph and Wenzel were close friends who talked about Joseph's workplace struggles is not proof that they exchanged "probative information" about that issue via text message. (Pl.'s Br. Supp. MTR at 23 n.16, Doc. 265-1). The Court disagrees. As the Court explained earlier in this Order, absent direct proof of the contents of the deleted text messages, the Court can only infer their contents from the record. And, having reviewed the record, the undersigned reaches the same conclusion today: there was ample evidence to support a reasonable inference that Ms. Joseph and Ms. Wenzel discussed Ms. Joseph's subjective beliefs about her complaints to GT by text message, and the testimony the two gave about their text messaging habits was too equivocal to rebut this inference. Therefore, BOR met its burden of

showing that it is more likely than not that probative text messages existed and were deleted.

One might question why the Court is willing to infer that Ms. Joseph's texts contained probative information, but not those of the BOR employees, when both sides produced evidence of concern about the viability of their respective complaints against each other. (*Compare* Pl.'s Mot. for Sanctions at 8–9, Doc. 161-1 (noting that persons involved with the investigation expressed concern that the statements that had been gathered "were too broad and unsubstantiated to warrant an investigation on their own"), *with* (BOR Sanctions Order at 18) (pointing to "an email from Kathy Betty . . . in which Betty suggests that Joseph 'beef up the harassment a little' in her internal complaint.")).

First, in a vacuum, establishing doubt about the viability of a proposed adverse employment action does not in and of itself establish pretext. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1050 (11th Cir. 2000) (Birch, J., concurring) (citing *Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) ("The reason why we have the general rule requiring an employment discrimination plaintiff to dispute each proffered reason is that, where at least one independent justification for the challenged employment action remains unscathed after the plaintiff attempts to establish pretext, a jury could not presume by the failure of another independent justification that the real motivation was discriminatory animus.")). On the other

16

hand, a plaintiff's doubts about whether given activity is protected is potentially dispositive of her retaliation claim. *Cf. Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (finding claim of good faith belief implausible where employee "never voiced his concern . . . to a supervisor or management-level employee . . . and reported the comment for the first time in a team meeting held approximately eight months after the remark was made.")

Moreover, the Court is not operating in a vacuum. The volume of evidence showing that Ms. Joseph and Ms. Wenzel discussed her claims against BOR is substantial, even setting aside the email from Ms. Bates about "beefing up" her complaint. Having concluded that BOR met its burden of showing that text messages were deleted, it is not a stretch to conclude that those messages contained probative evidence of Ms. Joseph's subjective thoughts about her verbal complaints to GT. It does not similarly follow that a smoking gun email about ginning up an investigation to get rid of Ms. Joseph for her purported protective activity would exist based on the discussions by BOR employees about the origin of their investigation.[4]

---

[4] Ms. Joseph argues that "any prejudice that may have resulted from any lost texts with Wenzel was cured by the volume of discovery produced on Joseph's protected activity, including over hundreds of email communications between them on the topic." (Pl.'s Br. Supp. MTR at 23 n.16, Doc. 265-1). The Court disagrees. The testimony about Ms. Joseph and Ms. Wenzel's friendship and professional relationship and Ms. Wenzel's role in assisting her preparation of this

The last question is whether Ms. Joseph deleted the text messages with bad faith or intent to deprive BOR of their use. Ms. Joseph, in her Motion for Reconsideration, argues that "even if there had been proof that Joseph and Wenzel had exchanged 'probative information' the fact that some relevant texts may have been destroyed is not proof that critical evidence was deleted in bad faith." (Br. Supp. MTR at 23 n.16). But this misstates the basis for the bad faith finding in the BOR Sanctions Order. The BOR Sanctions Order referenced the absence of any testimony for an alternative cause for the deletion and the ample evidence that Ms. Joseph had been anticipating this litigation for years. (BOR Sanctions Order at 22). Moreover, the BOR Sanctions Order notes that Ms. Joseph failed to produce evidence in response to earlier discovery requests and the fact that Ms. Wenzel's contact information was saved in her phone as "Theresa Eckler," a name that Ms. Wenzel testified had no meaning to her. (*Id.* at 23). Lastly, the Order references Ms. Joseph's retention of her devices after her termination in the face of a demand to return them as further evidence of her attempts to conceal information. (*Id.* at 24).

In the BOR Sanctions Order, the Court (Batten, C.J.) made comments in passing about Ms. Joseph's overall credibility, but the Court today does not reach the issue. (*E.g. id.* at 22) ("[T]he only possibility is that Joseph actively deleted these

---

case indicates a high likelihood that highly probative information existed in the messages that cannot be replaced by another source.

messages. And the fact that she testifies otherwise is—at a minimum—a source of concern for the Court."). It suffices to say that the evidence above was sufficient to meet BOR's burden of establishing bad faith and intent to deprive.

Moreover, the BOR Sanctions Order does not determine contested issues or even allow an adverse inference instruction. It simply permits the jury to hear the evidence about the deleted messages and to make its own decision. This sanction, though by no means modest, was tailored to the circumstances because it preserved Ms. Joseph's ability to argue to the jury that she did not engage in intentional wrongdoing. Accordingly, having reconsidered the order de novo, the Court adopts the findings and conclusions of the BOR Sanctions Order.

### D.  Conclusion for Motion for Reconsideration

Having conducted a de novo review of the challenged orders and having adopted their rulings, the Court briefly returns to Ms. Joseph's overarching request that the Court find that Judge Batten's recusal was warranted under 28 U.S.C. § 455. The standard under § 455, "any proceeding in which [a judge's] impartiality might reasonably be questioned," is exceptionally broad, which means there are bound to be cases where facts and standards are interpreted differently, as is the case here. Though the Court's approach may be unsatisfying to some, it neither sustains Ms. Joseph's objections to Chief Judge Batten having heard the case nor addresses "any inaccuracies in" her Motion for Reconsideration

regarding such alleged conflicts. (Pl.'s Reply MFR at 1 n.1 (citing Cedra Mayfield, *Litigant Alleges Georgia Judge Has "Close Personal Relationship" With Defendants*, FULTON CNT'Y DAILY REP, Oct. 31, 2022)). "[T]he cardinal principle of judicial restraint" is "if it is not necessary to decide more, it is necessary not to decide more." *PDK Lab'ys Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring). Considering that Chief Judge Batten is no longer assigned to this case, any purported failure by him to recuse himself is legally harmless. *Liljeberg*, 486 U.S. at 862-64. Therefore, the Court will now turn its attention to the Motions for Summary Judgment.

## II.    Motions for Summary Judgment

Both GTAA and BOR move for summary judgment. The Court first addresses the legal standard governing the motions, then distills the undisputed, material facts common to the motions, and lastly addresses each motion in turn.

### A.    Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive

law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex*, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact

to find for the nonmoving party, there is no genuine dispute for trial. *Fitzpatrick*, 2 F.3d at 1115 (citations omitted).

## B.   Notice of Objections

On March 28, 2022, Defendant BOR filed a Notice of Objections to the materials Ms. Joseph submitted in support of her Response to the BOR MSJ. (Doc. 230). BOR specifically objected to Ms. Joseph's 80-page declaration (Doc. 220-4, "Declaration") and her 547-paragraph Statement of Additional Material Facts (Doc. 220-2, "SAMF BOR"), much of which is supported by the Declaration.

BOR raises several grounds for excluding the Declaration and related statements of facts, specifically "because it purports to proffer evidence not previously produced or identified in discovery, contradicts her earlier sworn testimony, relies on inadmissible hearsay, consists of conclusory statements with no objective facts to support her assertions, and is otherwise duplicative of other evidence in the record and therefore needlessly cumulative." (Notice of Objections at 3–4).

As to the argument that Ms. Joseph's declaration proffered new evidence not disclosed in discovery, BOR points to its Interrogatory's No. 5 which requested the following information:

> Please describe in detail every action taken by the BOR or any of its agents/employees which you contend negatively impacted the compensation, terms, conditions, or privileges of your employment, including

> an explanation of how the action negatively impacted the
> compensation, terms, conditions, or privileges of your
> employment.

BOR MSJ App'x 2, Doc. 212-5). Ms. Joseph originally responded by incorporating

a number of prior responses, citing dozens of documents, and providing a nearly

two-page narrative answer. Upon BOR's demand that Ms. Joseph supplement the

response, she complied with a nearly 14-page response.

BOR specifically take issue with Paragraph 120 of the Declaration that states:

> Between 2015 and my termination, I tried to recruit a
> number of potential assistant coaches that did not accept
> my employment offer because they were offered more
> money to work for another school. Some of my assistant
> coaches, such as Gene Hill, Sam Purcell, Sytia Messer,
> and Catherine Green, all left GT during my coaching
> tenure to coach for schools that offered them a higher
> salary. They all told me that one of the reasons they left
> was because of the money.

This assertion is clearly responsive to BOR's interrogatory about all actions taken

by BOR which negatively impacted the conditions of her employment, but no

mention is made in Ms. Joseph's interrogatory responses. Moreover, as BOR

explains in its Notice of Objections, it contradicts Ms. Joseph's deposition

testimony. (See Notice of Objections at 8-9). For example, she was asked "[i]n the

last five years of your employment at Georgia Tech, can you name any person that

you were trying to hire as an assistant coach that ultimately you were not able to

hire because of salary?" She did not name any person specifically and responded

only that "[t]here were certain people I just didn't even pursue because I knew I couldn't afford what they were making at other schools based on what my salary pool was. So I felt like I was limited in who I could recruit based on what my salary pool was." (Deposition of MaChelle Joseph dated June 17, 2021 (I) ("Joseph Dep. I") at 180:3–13).

Suffice it to say, the foregoing is characteristic of much of Ms. Joseph's Declaration and Statement of Additional Material Facts.[5] Therefore, the Court largely sustains the Notice of Objections on the grounds raised by BOR.[6] In the following background section, except as to statements which were undisputed by BOR, the Court excludes assertions made in Ms. Joseph's Statements of Additional Material Facts which are solely supported by paragraphs in the Declaration and to which BOR objected on the grounds they contradict Ms. Joseph's interrogatory responses or deposition.

---

[5] BOR also argues that Ms. Joseph's SAMF BOR in response to its BOR MSJ is "categorically unreasonable," because it is not concise and full of hundreds and hundreds of immaterial and cumulative assertions. The Court largely agrees but does not strike the SAMF because it would require giving Ms. Joseph an opportunity to amend it and the record in this case is already long enough.

[6] The Notice of Objections also seeks to strike certain assertions by Ms. Joseph that Mr. Stansbury lied under oath. The Court deals with these assertions below.

### C.   Background for Motions for Summary Judgment

#### 1.   Structure of BOR and GTAA

GT is an institution of higher education that receives federal financial assistance to fund its education programs and activities. (Pl.'s Statement of Additional Material Facts in Response to GTAA's MSJ ("SAMF GTAA") ¶ 1, Doc. 219-2; Def. GTAA's Resp. to SAMF GTAA ("RSAMF GTAA") ¶ 1, Doc. 232).  GT is a member institution of the University System of Georgia. (Compl. ¶ 17, Doc. 1-2; Def. BOR's Answ. ¶ 17, Doc. 2.). Pursuant to O.C.G.A. § 20-3-51, Defendant BOR is vested with the government, control, and management of the University System of Georgia and all of its institutions, including GT. (Compl. ¶ 17; Def. BOR's Answ. ¶ 17).

GTAA is an "Affiliated Organization" of GT. (Def. GTAA's Statement of Material Facts ("SMF GTAA") ¶ 2, Doc. 214-2; Pl.'s Response to SMF GTAA ("RSMF GTAA") ¶ 2, Doc. 219-1). GTAA was created for the express purpose of administering the athletic programs of GT. (Pl.'s SAMF GTAA ¶ 9; Def.'s RSAMF GTAA ¶ 9). GTAA's Operating Agreement, dated July 1, 2015, states that GTAA is a "non-profit corporation established as a cooperative organization of [GT] that is organized and operated to promote the educational program of [GT] by affording facilities for and encouraging participating by the student body in the intercollegiate athletic program of [GT]." (Def.'s SMF GTAA ¶ 5; Pl.'s RSMF GTAA

¶ 5). As relevant to this case, GTAA runs GT's WBB program. (Pl.'s SAMF GTAA ¶ 17; Def.'s RSAMF GTAA ¶ 17).

Some of the institutional support that GT provides to GTAA is used for the purposes of administering GT's intercollegiate athletic programs. (Pl.'s SAMF GTAA ¶ 3; Def.'s RSAMF GTAA ¶ 3). GT provided GTAA more than $2 million in direct institutional support each year from 2015 to 2019. (Pl.'s SAMF GTAA ¶ 6; Def.'s RSAMF GTAA ¶ 6). GT also collects athletic fees from students and gives this money directly to GTAA for its own use. (Pl.'s SAMF GTAA ¶ 7; Def.'s RSAMF GTAA ¶ 7). GT provided GTAA more than $5 million in student fees each year from 2015 to 2019. (Pl.'s SAMF GTAA ¶ 8; Def.'s RSAMF GTAA ¶ 8).

The President of GT also serves as the Chair of the GTAA Board. (Pl.'s SAMF GTAA ¶ 22; Def.'s RSAMF GTAA ¶ 22). Every GTAA officer is a GT employee. Under the GTAA Bylaws, the GT President is the Chair of the GTAA Board, the Vice Chair and Secretary must be GT employees, and the GT's Executive Vice President for Administration and Finance is the GTAA Treasurer. (Pl.'s SAMF GTAA ¶ 24; Def.'s RSAMF GTAA ¶ 24). Ten out of seventeen voting members of the GTAA Board are GT employees. The remaining members are three active students and four former students. (Pl.'s SAMF GTAA ¶ 25; Def.'s RSAMF GTAA ¶ 25).

The Athletic Director is responsible to the GTAA Board for the proper conduct of intercollegiate athletics, for the maintenance and the efficient use of GTAA's physical plant, "and for the general administration of the affairs of the Association according to the directions and regulations of the Board." (Pl.'s SAMF GTAA ¶ 14; Def.'s RSAMF GTAA ¶ 14). As of the filing of this case, Todd Stansbury was the GT Athletic Director. (Pl.'s SAMF GTAA ¶ 26; Def.'s RSAMF GTAA ¶ 26). Mr. Stansbury reported to the GTAA Board and the GT President. (Pl.'s SAMF GTAA ¶ 28, 29; Def.'s RSAMF GTAA ¶ 28, 29). Mr. Stansbury was also an officer of the GTAA Board. (Pl.'s SAMF GTAA ¶ 30; Def.'s RSAMF GTAA ¶ 30).

The GTAA Board of Trustees approves the annual budget each fiscal year following the detailed review by the GTAA Administration & Finance Committee. (Pl.'s SAMF GTAA ¶ 16; Def.'s RSAMF GTAA ¶ 16). The GTAA does not issue W-2s, and persons who work in the athletic department are paid through GT's payroll system. (Def.'s SMF GTAA ¶ 17; Pl.'s RSMF GTAA ¶ 17). Specifically, "employees are paid on a monthly basis via [GT's] payroll process, and the Athletic Association is invoiced after payroll is processed for reimbursement. So the Athletic Association reimburses the Institute for payroll and fringe benefit costs." (Deposition of Marvin Lewis dated June 10, 2021 ("Lewis Dep.") at 48:18–23, Doc. 193). However, the salary of the Director of Athletics (i.e., Mr. Stansbury) is

covered by GT and is not reimbursed by GTAA. (*Id.* at 49:6–10). The GTAA also reimburses GT for other facility and project management expenses, such as utilities and maintenance for their offices and for athletic facilities. (*Id.* at 49:18–50:15).

The GTAA board must approve compensation packages for the head coaches of men's basketball, women's basketball, and football. (Pl.'s SAMF GTAA ¶ 21; Def.'s RSAMF GTAA ¶ 21). GT cannot hire the Athletic Director or the head coaches of men's basketball, women's basketball, and football without approval from the GTAA Board. (Pl.'s SAMF GTAA ¶ 47; Def.'s RSAMF GTAA ¶ 47).

The GTAA utilizes a zero-based budgeting process whereby each year, the head coach of each sport composes a budget proposal based on the program's anticipated needs for the upcoming fiscal year. (Def.'s SMF BOR ¶ 9; Pl.'s RSMF BOR ¶ 9). Head coaches and sport administrators meet with the Chief Financial Officer (CFO) to discuss the budget proposals and needs of the program. (Def.'s SMF BOR ¶ 10).[7] From 2014 until the time of Ms. Joseph's termination, Marvin Lewis was the CFO for the GTAA. (Def.'s SMF BOR ¶ 11; Pl.'s RSMF BOR ¶ 11).

The department's fiscal year runs from July 1 to June 30 and budgets were typically set by July 1 each calendar year. (Def.'s SMF BOR ¶ 12; Pl.'s RSMF BOR

---

[7] Ms. Joseph's objection to Defendant BOR's SMF ¶ 10 is overruled, as there is ample support for the assertion in the record. (BOR SMF ¶ 11; BOR RSMF ¶ 11; Joseph Dep. I at 96:20–21).

¶ 12). Each year, the GTAA Board is required to approve the annual budget. (Def.'s
SMF BOR ¶ 14; Pl.'s RSMF BOR ¶ 14). The CFO has discretionary authority to
reallocate funds within each program's individual budget, but he does not have
the authority to unilaterally increase or decrease a program's overall budget.
(Def.'s SMF BOR ¶ 15; Pl.'s RSMF BOR ¶ 15).

### 2.  Plaintiff's Employment at GT

From 2003 to 2019, MaChelle Joseph served as the head coach of WBB at GT.
(Def.'s SMF BOR ¶ 1; Pl.'s RSMF BOR ¶ 1). On October 10, 2014, Michael Bobinski,
then the Director of Athletics for GT, sent a letter to Ms. Joseph which offered to
renew her employment and set forth the terms and conditions of her employment.
(Letter from Michael Bobinski to MaChelle Joseph dated October 10, 2014 ("Offer
Letter"), Deposition of Michael Todd Stansbury dated June 29, 2021 ("Stansbury
Dep."), Ex. 7, Doc. 182-7 at 14–17). Exhibit A to the Offer Letter provided the
following Duties and Responsibilities of the Head Women's Basketball Coach:

> 1.  Report to the Senior Woman Administrator and
>     plan, develop, administer, and evaluate the
>     basketball program.
>
> 2.  Abide by all applicable law, rules and regulations,
>     including NCAA and ACC rules, Board of Regents
>     policies, and Institute policies.
>
> 3.  Advise the basketball staff and team of all
>     applicable Institute and NCAA rules and policies,
>     and ensure that the basketball staff and team are in

compliance with such rules and policies at all times.

4. Provide administrative oversight in ensuring the academic progress of student-athletes to facilitate pursuit of a baccalaureate degree.

5. Recruit, direct, supervise and evaluate the assistant basketball coaches and all related basketball support personnel.

6. Recommend hiring, selection, compensation, discipline, and discharge of assistant basketball coaches and all related basketball support personnel.

7. Plan and supervise programs for player training, conditioning, and drug education and testing, using program development input from support sources such as the Director of Sports Medicine, Team Physician, and Strength and Conditioning Coach.

8. Develop, supervise, and conduct the recruiting program for student-athlete basketball players.

9. Direct staff and student-athlete basketball players to communicate with the appropriate Institute official for assistance regarding financial aid, academic advisement, and general student needs.

10. Provide appropriate program safety precautions by relying upon the professional advice of the head athletic trainer, risk assessment staff, and the team physician.

11. Evaluate individual and team strengths and develop strategies for skill improvement.

12. Supervise all games, scrimmages, and practices or delegate this responsibility to an appropriate staff member in JOSEPH'S absence.

13.     Discipline student-athletes for violations of team rules, Institute or Athletic Association regulations, or conduct impacting the reputation of the Institute or the Athletic Association.

14.     Oversee expending operational resources budgeted to the basketball program in a manner consistent with Institute policy to include timely submission of all paperwork required.

15.     Cooperate with the Sports Information Director in the preparation of brochures, programs, statistical reports, and press releases in support of the basketball program.

16.     Assist The Alexander Tharpe Fund, Inc., when reasonably requested, in fundraising efforts to support the basketball program.

17.     Oversee basketball staff activity relating to public relations and promotions functions for the basketball program.

18.     Represent the Institute, when reasonably requested, in organizations governing the intercollegiate basketball program, as deemed necessary by the Director of Athletics, such as NCAA, ACC, etc.

19.     Perform duties assigned by the Senior Woman Administrator customary to the position of Head Women's Basketball Coach and the operation of the basketball program.

(*Id.*).

On October 20, 2014, Ms. Joseph and GTAA executed an Employment Contract. ("Contract," Stansbury Dep., Ex. 7, Doc. 182-7 at 1–13). The Contract contained the following recitals:

31

> WHEREAS, the Georgia Institute of Technology (the 'Institute') employs JOSEPH as Head Women's Basketball Coach. As Head Women's Basketball Coach, JOSEPH is responsible for the operation of the women's intercollegiate basketball program conducted by the ASSOCIATION on behalf of the Institute; and
>
> NOW, THEREFORE, in consideration of JOSEPH's employment as Head Women's Basketball Coach, the ASSOCIATION, in furtherance of its mission of supporting the intercollegiate athletic programs of the Institute, desires to enter into this contract in order to provide additional and supplemental benefits to JOSEPH.

(*Id.* at 1).

The Contract contained a nearly identical list of Ms. Joseph's responsibilities as head coach of the GT WBB team. (Pl.'s SAMF BOR ¶ 3; BOR's Resp. to SAMF BOR ("RSAMF BOR") ¶ 3, Doc. 229). It also provided that it would "terminate if the employment of JOSEPH as the Institute's Head Women's Basketball Coach is terminated and if, in the sole discretion of the President and Chairman of the Athletic Association, 'Good Cause' exists for such termination." (Contract at 9). Good Cause is defined in the Contract as including, but not limited to:

> 1. Conviction of (or entry into pre-trial intervention as a result of) a crime involving moral turpitude or conviction of a felony;
>
> 2. Involvement in conduct that the Athletic Association, in its sole discretion, reasonably considers injurious to the reputation of the Association or the Institute;

32

3.  JOSEPH's failure to substantially perform any of her duties under this Contract;

4.  The committing of a major violation of NCAA Legislation by JOSEPH while employed by the Institute or while previously employed at another NCAA member institution, or the committing of a series or pattern of secondary violations of NCAA Legislation while employed by the Institute;

5.  The committing of a major violation of NCAA Legislation by a member of JOSEPH's staff while at the Institute of which JOSEPH had prior actual knowledge or should have had prior actual knowledge and did not report in a timely fashion in accordance with all appropriate NCAA, Association and Institute rules, policies and regulations;

6.  The committing of a major violation of NCAA Legislation by any representative of the Institute's athletics programs while JOSEPH is at the Institute and of which JOSEP[H] has actual knowledge or should have had actual knowledge, and which JOSEPH did not report in a timely fashion in accordance with all appropriate NCAA, Association and Institute rules, policies and regulations;

7.  Serious or repeated misconduct; or

8.  Any cause adequate to justify the termination of any other non-classified Institute employee.

(*Id.* at 9–10).

Ms. Joseph's Contract required her to assist in fundraising when reasonably requested. (Def.'s SMF BOR ¶ 5; Pl.'s RSMF BOR ¶ 5). At least some of the other coaches at GT, including the head coach for Men's Basketball ("MBB") and the

head coach for Football, were also contractually obligated to fundraise on behalf of their respective athletic programs.[8] (Def.'s SMF BOR ¶ 6; Pl.'s RSMF BOR ¶ 6). Each head coach at GT worked with a partner on the development staff to meet fundraising goals. (Def.'s SMF BOR ¶ 7; Pl.'s RSMF BOR ¶ 7). Joseph's development partner was Mindy Hyde. (Def.'s SMF BOR ¶ 8; Pl.'s RSMF BOR ¶ 8).

### 3. Events Leading to Plaintiff's Termination as Head Coach

#### a. First Written Warning

On or around September 14, 2015, Ms. Joseph received a written warning from then-Athletic Director Mike Bobinski. (Def.'s SMF BOR ¶ 29; Pl.'s RSMF BOR ¶ 29). More specifically, Mr. Bobinski issued Ms. Joseph a reprimand for allegedly being drunk at a GT football game. (Pl.'s SAMF BOR ¶ 141; Def.'s RSAMF BOR ¶ 141). Prior to this reprimand, Ms. Joseph faced no reprimands for any alleged misconduct other than occasional routine counseling for minor NCAA infractions. (Pl.'s SAMF BOR ¶ 142; Def.'s RSAMF BOR ¶ 142).[9]

---

[8] From April 8, 2016, up to Joseph's termination on March 26, 2019, Josh Pastner was the head coach of the GT MBB team. (Pl.'s SAMF BOR ¶ 4; Def.'s RSAMF BOR ¶ 4).

[9] As this fact would tend to prove or disprove Ms. Joseph's claims of pretext in her retaliation claims, BOR's materiality objection is overruled, although for the reasons the Court gives below, the Court does not find there to be sufficient proximity in time from her alleged protective activity and the reprimand to infer retaliation.

On September 15, 2015, Ms. Joseph emailed herself some notes related to the incident which led to the written warning. (Def.'s SMF BOR ¶ 30; Pl.'s RSMF BOR ¶ 30). On September 17, 2015, Ms. Joseph provided a written response to the written warning. (Def.'s SMF BOR ¶ 31; Pl.'s RSMF BOR ¶ 31). Mr. Bobinski responded to Ms. Joseph's September 17, 2015, email on September 18, 2015, in which he reiterated his assessment that Ms. Joseph's demeanor and behavior had been inappropriate. (Def.'s SMF BOR ¶ 32; Pl.'s RSMF BOR ¶ 32).[10] Nonetheless, Ms. Joseph believed that Mr. Bobinski's decision to issue her the 2015 reprimand was not justified, and that it was motivated by his frustration with her and Ms. Wenzel for their complaints about Mr. Lewis and gender equity issues related to the budget. (Pl.'s SAMF BOR ¶ 159; Def.'s RSAMF BOR ¶ 159).[11]

---

[10] In Paragraph 144 of her Statement of Additional Material Facts in opposition to the BOR MSJ, Ms. Joseph writes that "Joseph did not appear drunk and did not believe she had acted inappropriately at the football game." She supports this purported fact with a citation to her own Declaration. The Court finds that the self-serving hearsay quoted in the Declaration fails to create a genuine dispute of fact on the issue for the reasons that BOR gave in its response to that paragraph.

[11] BOR's objection to Paragraph 159 of Ms. Joseph's Statement of Additional Material Facts that her subjective beliefs do not defeat summary judgment is well-taken, but the Court does not consider this a basis to disregard the fact for the purpose of framing the issues.

### b.     Sanford Investigation

In August 2016, Ms. Joseph's administrative assistant, Ginger Sanford, filed

a complaint with HR, claiming that Ms. Joseph was improperly utilizing Sanford

for personal tasks and that Ms. Joseph had directed her and other WBB staff not to

speak to administrative staff, including a specific instruction not to inform Marvin

Lewis about Ms. Joseph's direction that Ms. Sanford meet with a former employee,

Ms. Wenzel, to work on the WBB budget. (Def.'s SMF BOR ¶ 33; Pl.'s RSMF BOR

¶ 33; SAMF BOR ¶ 174; Def.'s RSAMF BOR ¶ 174). Georgia Tech hired Ginger

McRae, an outside attorney, to investigate Ms. Sanford's complaint. (Def.'s SMF

BOR ¶ 34; Pl.'s RSMF BOR ¶ 34). Ms. McRae's investigation led to her issuing her

first report on September 20, 2016. (Def.'s SMF BOR ¶ 35; Pl.'s RSMF BOR ¶ 35;

"McRae Report," Def. BOR's MSJ Ex. 7, Doc. 212-10).

Prior to the issuance of the McRae Report, Ms. Joseph attended a meeting

with Ms. McRae and GT Senior Director of Human Resources Julie Joyce on

September 9, 2016. (Pl.'s SAMF BOR ¶ 171–73; Def.'s RSAMF BOR ¶ 171–73).[12]

According to the McRae Report:

> When interviewed, Joseph raised that she believed that
> had she been a male head coach, she would not have
> been questioned about having staff perform personal

---

[12] BOR's materiality objections to Paragraphs 171 through 173 of Ms. Joseph's
SAMF BOR are overruled as unnecessary. The Court considers these facts for the
purpose of contextualizing the facts giving rise to the dispute.

work for her. When asked if she had information that male or any other head coaches had staff perform personal work for him or her, Joseph said she did not want to speculate or get any one in trouble. It was emphasized that there was no intent to single Joseph out and she was invited to provide any information she has regarding similar actions by other head coaches or otherwise relevant to the investigation. Joseph, however, provided no information that other head coaches had assistants perform work related to their personal affairs.

(McRae Report at 9 n.7). During her interview with Ms. McRae, Ms. Joseph said

that she had asked Ms. Sanford not to disclose the meeting with Ms. Wenzel to Mr.

Lewis because he "has always been difficult to deal with" and because they have

"butted heads." (Pl.'s SAMF BOR ¶ 177; Def.'s RSAMF BOR ¶ 177).[13]

After the September 9, 2016, interview with Ms. McRae, Ms. Joseph told

Joeleen Akin, Associate Athletic Director and Senior Woman Administrator, that

she thought the meeting from earlier in the day was handled poorly and that she

felt a "level of harassment, inequity, and unfair treatment." (Pl.'s SAMF BOR

¶ 178; Def.'s RSAMF BOR ¶ 178; Def.'s Br. Supp. BOR MSJ at 2). She asked whether

this would have been handled in the same way if she were the MBB or football

coach. (Pl.'s SAMF BOR ¶ 178; Def.'s RSAMF BOR ¶ 178; Def.'s Br. Supp. BOR MSJ

at 2).

---

[13] The Court considers this statement for the same reasons it gave in footnote 11, *supra*.

Ms. McRae issued a supplement to her report on or around October 10, 2016. (BOR MSJ Ex. 9, Doc. 212-12).[14] Aside from some introductory matter, the substance of the supplemental report was as follows:

> Paul Johnson, head football coach, stated that he occasionally engages Teri Anton, Administrative Coordinator, to housesit and care for his pets when he travels out of town. Johnson stated that he occasionally engages Brittany McCormick, Recruiting and Marketing Coordinator, in the same capacity.
>
> Johnson stated that when this occurs, he pays Anton and McCormick for the service out of his own funds. Johnson stated that a staff member sometimes picks him up at the airport after a recruiting trip, and that this is usually, but not always, within work hours. Johnson stated that a staff member has on occasion given him a ride to pick up his car from being repaired. He stated that staff do not get involved in his personal finances, residence-related matters, bill paying, or other personal matters.
>
> Josh Pastner, head men's basketball coach, has been in this position since April 7, 2016. He stated that in May or June 2016, Elbe Cantkier was hired as Administrative Coordinator for men's basketball.
>
> Pastner stated that in his coaching career, including at Georgia Tech, he has maintained a strict practice of complete separation between his coaching duties and

---

[14] In her response to paragraph 36 of Defendant's SMF BOR, Ms. Joseph writes that "Plaintiff further disputes Defendant's assertion that the report issued on October 10, 2016, was a supplement to the findings issued on September 20, 2016, related to the allegations that had been made against Joseph by Sanford. The October 10, 2016, report related to allegations that Joseph made during the Sanford investigation that male employees in the Athletic Department had also asked their executive assistants to perform personal tasks." This unnecessary quibbling is overruled.

personal affairs. According to Pastner, GTAD staff, including Cantkier, do no personal tasks for him.

The information gathered in these interviews shows that the head coaches for football and men's basketball do not engage in use of GTAD staff for personal tasks except, in the case of Johnson, for occasional assistance in picking up his car when being repaired. Other tasks are work-related or when not work-related, are paid for by Johnson out of personal funds. In light of information that any use of staff for personal tasks not compensated out of personal funds is in the nature of voluntary assistance, minimal, and incidental, the information gathered does not support that the USG Ethics Policy has been violated.

(BOR MSJ Ex. 9, Doc. 212-12) (footnotes omitted).

Ms. McRae issued a second supplement to her report on or around November 8, 2016. (Def.'s SMF BOR ¶ 37; BOR MSJ Ex. 11, Doc. 212-14).[15]

According to that report:

This supplemental report provides additional information obtained subsequent to a report dated September 20, 2016, from interviews with Theresa Wentzel, former Associate Athletic Director and Senior Women's Administrator, Karen Sugrue, former Office Manager/Administrative Coordinator for WB, Mollie Mayfield, former Associate Athletic Director, William (Jack) Thompson, Senior Associate Athletic Director, and Holland Harris, Development Assistant.

(BOR MSJ Ex. 11, Doc. 212-14).

---

[15] Plaintiff's objection to Paragraph 37 of the BOR's Statement of Material Facts is overruled for the reasons given in footnote 14, *supra*.

After the Sanford investigation, Ms. Akin testified that she provided Ms. Joseph with a Corrective Action Plan. (Deposition of Joeleen Akin dated July 2, 2021 ("Akin Dep.") at 69:21-25, Doc. 183). She testified that she "thought a corrective action plan, outlining some steps MaChelle needed to take to be sure we're in compliance with things, was -- I used it as something to help protect MaChelle . . . ." (*Id.* at 76:8–11). Ms. Joseph was also given a document dated November 29, 2016 entitled "Final Written Warning Notice (Georgia Tech Athletics Investigation) signed by Ms. Akin. ("Final Written Warning," Akin Dep. Ex. 3, Doc. 183-4). On or around January 31, 2017, Ms. Joseph, through her attorney, provided a written response to the Sanford report and Final Written Warning. (Def.'s SMF BOR ¶ 40; Pl.'s RSMF BOR ¶ 40; BOR MSJ Ex. 12, Doc. 212-15).

The final warning and corrective action plan were issued in November, 2016, right as Mr. Stansbury was brought on as Athletic Director. (Akin Dep. Exs. 2-3; Stansbury Dep. at 31:20-25).

### c.    Willis Complaint

On February 4, 2017, Malikah Willis filed an EthicsPoint complaint against Ms. Joseph. (Def.'s SMF BOR ¶ 42; Pl.'s RSMF BOR ¶ 42). Georgia Tech hired Timothy J. O'Brien, an outside attorney, to investigate Willis's complaint. (Def.'s SMF BOR ¶ 43; Pl.'s RSMF BOR ¶ 43). Mr. O'Brien was unable to substantiate

Willis's claim that Ms. Joseph had intentionally thrown a clipboard at her. (Def.'s SMF BOR ¶ 44; Pl.'s RSMF BOR ¶ 44). No disciplinary action was taken against Ms. Joseph as a result of the Willis complaint. (Def.'s SMF BOR ¶ 45; Pl.'s RSMF BOR ¶ 45).

### d.    NCAA Investigations

On or around August 31, 2018, Ms. Joseph met with Shoshanna Engel, the GTAA Associate Athletic Director for Compliance. (Joseph Dep. I Ex 8, Doc. 176-8). As characterized by Ms. Engel, at the meeting, the two discussed the fact that "information was reported to our office about nonscholastic use of the Zelnak facility tied to Martine Fortune." (*Id.*).

In an email dated September 31, 2018, Ms. Joseph appeared to acknowledge that WBB player Martine Fortune "allow[ed] her AAU team into the facility to briefly shoot baskets (without the knowledge of any staff member of the women's program)." (*Id.*). In that same email, Ms. Joseph complained that

> [a]s I pointed [sic] during that meeting, there appears to be a double standard and inequity between the men's and women's basketball programs. As you know, the men's basketball program routinely allows men's AAU teams to use Georgia Tech's facilities for practice and other purposes. To my knowledge, the compliance department has never taken any action to address this issue with the men's program.

(*Id.*). Ms. Joseph also wrote that "[c]andidly, I am not sure how to properly raise these concerns as you have oversight of gender equity and Title IX issues, which

seems in this instance to be a conflict of interest," and requested the NCAA Rule

or Regulation that Ms. Fortune violated. (*Id.*). Ms. Engel responded by citing

NCAA bylaw 13.11.1.9:

> 13.11.1.9 Nonscholastic Practice or Competition -- Women's Basketball. An institution [including any institutional department (e.g., athletics, recreational/intramural)] shall not host, sponsor or conduct a nonscholastic basketball practice or competition in which women's basketball prospective student-athletes (see Bylaw 13.11.1.1) participate on its campus or at an off-campus facility regularly used by the institution for practice and/or competition by any of the institution's sport programs. [D] (Adopted: 1/14/12 a contract signed before 6/28/11 may be honored)

(*Id.*). Ms. Engel also stated that she was "not familiar with the routine use you

reference below," but invited Ms. Joseph to "report any details as soon as possible

so we may investigate fully." (*Id.*). Ms. Engel also invited Ms. Joseph to contact

Burns Newsome, Executive Director of Compliance Programs with any Title IX

concerns. (*Id.*). Ms. Joseph did not contact Mr. Newsome at that time. (Def.'s SMF

BOR ¶ 57; Pl.'s RSMF BOR ¶ 57).[16]

---

[16] Ms. Joseph testified that she did not contact Mr. Newsome at this time because she had already raised the issue with Pearl Alexander, who was the Title IX coordinator for most of her career at Georgia Tech. (Dep. Joseph I at 261:2-261:11). Mr. Joseph also testified that she had told Mr. Stansbury that she met with Ms. Alexander in or around July 2018, and that Mr. Stansbury yelled at her and told her that she was making him look bad by going to Ms. Alexander. (*Id.* at 262:16–20).

In late January 2018, Georgia Tech, through its outside counsel, was notified that the NCAA was investigating allegations that a member of the WBB coaching staff had provided impermissible benefits to potential student athletes to secure their commitment to GT. (Def.'s SMF BOR ¶ 59; Pl.'s RSMF BOR ¶ 59). Initially, the NCAA asked GT not to investigate the claims. (Def.'s SMF BOR ¶ 61; Pl.'s RSMF BOR ¶ 61). However, on or around May 1, 2018, the NCAA gave GT permission to continue investigating the claims internally. (Def.'s SMF BOR ¶ 62; Pl.'s RSMF BOR ¶ 62). GT, in conjunction with the NCAA, continued to investigate the claims referenced in paragraph 59 throughout 2018 and into 2019. (Def.'s SMF BOR ¶ 63; Pl.'s RSMF BOR ¶ 63). On or around February 8, 2019, GT was informed, by and through its external counsel for NCAA matters, that the NCAA would not be proceeding with the 2018 allegations related to WBB. (Def.'s SMF BOR ¶ 64; Pl.'s RSMF BOR ¶ 64).

### e.   Littler Investigation

On January 26, 2019, four WBB student athletes met with then-acting General Counsel and Vice President for Ethics and Compliance Aisha Oliver-Staley. (Def.'s SMF BOR ¶ 67).[17] The athletes complained about Ms. Joseph's treatment of them. (Def.'s SMF BOR ¶ 68; Pl.'s RSMF BOR ¶ 68).

_____

[17] Ms. Joseph disputes this fact on the ground that "the movant's cited evidence [does not] establish[] the date of the meeting." But her Statement of Additional Material Facts in response to the BOR MSJ contains an almost identical assertion

43

In her deposition, Ms. Oliver-Staley testified that she asked the athletes, "if this is so -- if this is as serious as the tenor of this meeting, why has it not come up before[?]." (Deposition of Aisha Oliver-Staley dated December 7, 2020 ("Oliver-Staley Dep.") at 153:11–13, Doc. 179). According to Ms. Oliver-Staley,

> they said because they are scared to do it. And some of them tried to suggest -- I think -- they took the position that everybody knows, everybody on the team knows, but nobody cares. And those who know and want to speak are scared to say anything, that was the position they took. They said -- and that was -- and that -- that came across to me, a layperson with no expertise watching the behavior of basketball coaches, but there seemed to be genuine terror there.
>
> Because even in asking them, are you all -- is this a formal complaint, they were unsure whether they wanted this to be a formal -- they just were scared.
>
> They -- I asked about sort of who can corroborate it, if you are not willing to step forward and say something, who can corroborate this, because it would be unfair to me, it would be unfair to Coach Joe to have unsubstantiated, uncorroborated allegations made against her that could impact her livelihood by people who were not -- not willing to come forward and say I am making these allegations. And I'm not prepared to do that.

(*Id.* at 153:15–154:13).

---

of fact. (SAMF BOR ¶ 396) ("On January 26, 2019, Ms. Pan, Ms. Fletcher, Ms. Jefferson, and Ms. Diouf met with then-interim Vice President for Compliance, Ethics and Legal Affairs Aisha Oliver-Staley and Ms. Tucker.").

Ms. Oliver-Staley testified: "I told them, if your parents have letters, if your parents are willing to send me something that says that they are corroborating what you're saying, that would be helpful." (*Id.* at 154:16–19). Kierra Fletcher, one of the athletes at the meeting, characterized Ms. Oliver-Staley's request for parent letters as follows:

> So I just started talking about the way that [Ms. Joseph] made us feel. And she said like -- she was pretty much telling us that that wasn't enough, and that we needed to be able to do something more and involved, like our parents, if we needed to, because of the allegations that we were expressing to her.

(Deposition of Kierra Fletcher dated January 25, 2021 at 189:13–18, Doc. 184). Francesca Pan testified that they "a were asked to, you know, speed up the process to ask the parents to write a letter." (Deposition of Francesca Pan dated May 22, 2020 at 304:25–305:3, Doc. 185). Shortly after that off-campus meeting, Ms. Oliver-Staley went on a planned vacation. (Oliver-Staley Dep. at 157:1-12, 289:1-10).

On February 11, 2019, between 11:00 a.m. and noon, Ms. Durham left Mr. Stansbury an envelope that contained a letter regarding Ms. Pan. (Pl.'s SAMF BOR ¶ 412; Def.'s RSAMF BOR ¶ 412).[18] That same day, at 12:00 pm, Dr. Peterson and Mr. Stansbury met and may have discussed Ms. Joseph. (Pl.'s SAMF BOR ¶ 419;

---

[18] The letter was not signed and dated, but Mr. Stansbury testified that he believed that Ms. Pan's parents wrote the letter and a family member translated it into English from Italian. (Stansbury Dep. 195:2-15).

Def.'s RSAMF BOR ¶ 419). Mr. Stansbury recommended to Dr. Peterson that GT

open an investigation into the student-athlete allegations against Ms. Joseph and

Dr. Peterson approved Mr. Stansbury's recommendation. (Pl.'s SAMF BOR ¶ 420;

Def.'s RSAMF BOR ¶ 420). Mr. Stansbury then texted Kim Harrington on February

11, 2019, at 1:00 p.m. to recommend a specific independent investigator for the

WBB investigation. (Stansbury Dep. Ex. 2 at BOR-0020026, Doc. 182-2 at 57).

According to an email from Julie Joyce, the Senior Director of Human

Resources for Business Partner/Employee Relations, she and Employee Relations

Consultant Lori Douglas met with Felicia Tucker and Brittni Oliver, both WBB

staff, that same day at 1:15 p.m. (Deposition of Julie Joyce dated May 21, 2021

("Joyce Dep.") at 149:15–150:10, Doc. 198; Joyce Dep. Ex. 28, Doc. 198-30). Ms.

Tucker and Ms. Oliver sought to lodge a complaint about Ms. Joseph. (Joyce Dep.

Ex. 28).[19]

---

[19] In his deposition, Mr. Stansbury later testified that there was a discussion about
bringing in an independent investigator on February 11, 2019, both because of the
Human Resources complaints filed by Ms. Tucker and Ms. Oliver and because of
the letter regarding Ms. Pan. (SAMF BOR ¶ 425; RSAMF BOR ¶ 425). But because
Ms. Tucker and Ms. Oliver met with Ms. Joyce *after* Mr. Stansbury met with Dr.
Peterson, Ms. Joseph contended that this testimony was false, originally
characterizing it as a "lie." (Resp. to BOR MSJ at 52, Doc. 220). BOR responded to
this characterization in its Notice of Objections, arguing that "[t]he accusation
about Stansbury goes beyond zealous advocacy and ventures into the realm of
false accusations of criminal activity." (Notice of Objections at 24, Doc. 230). This
assertion was later withdrawn by Ms. Joseph's Motion for Leave to Amend certain
filings submitted in connection with her Response in Opposition to BOR's Motion
for Summary Judgment (Doc. 241), which the Court grants today. Instead, Ms.

Ultimately, GT personnel received a total of two letters, which purported to be from the parents of Ms. Pan and Ms. Fletcher. (Def.'s SMF BOR ¶ 70; Pl.'s RSMF BOR ¶ 70). After she returned from her vacation, Ms. Oliver-Staley was pulled into a meeting and told that the letters they received were "very serious" and they "would probably need to move forward with an investigation." (Oliver-Staley Dep. at 157:8–12).

Eric Hoffman of Littler Mendelson was engaged to conduct an investigation of the WBB program (the "Littler Investigation"). (Def.'s SMF BOR ¶ 72; Pl.'s RSMF BOR ¶ 72). As part of his investigation into the WBB program, Mr. Hoffman was asked to advise whether there were any NCAA-related concerns. (Def.'s SMF BOR ¶ 77; Pl.'s RSMF BOR ¶ 77). Mr. Hoffman began his investigation on or around February 25, 2019. (Def.'s SMF BOR ¶ 73; Pl.'s RSMF BOR ¶ 73). He interviewed Ms. Fletcher and Ms. Pan on February 26, 2019. (Def.'s SMF BOR ¶ 74; Pl.'s RSMF BOR ¶ 74). On the same day, following their interviews with Mr. Hoffman, Ms. Pan and Ms. Fletcher both quit the team. (Def.'s SMF BOR ¶ 75; Pl.'s RSMF BOR ¶ 75). The next day, Ms. Joseph was placed on investigation suspension with pay. (Resp. to BOR MSJ Ex. 9, BOR Responses and Objections to Plaintiff's First Requests for Admission, No. 10 at 6, Doc. 220-12).

---

Joseph now asserts the claim that a jury reviewing the evidence could disbelieve Mr. Stansbury's testimony. (*Id.* at 7). Accordingly, this aspect of the Notice of Objections is now moot.

Mr. Hoffman issued a final report from his investigation on March 20, 2019 (the "Littler Report"). (Def.'s SMF BOR ¶ 89; Pl.'s RSMF BOR ¶ 89). In response to the request to advise whether there were any NCAA-related concerns, Mr. Hoffman included an appendix of potential NCAA violations which had been reported during the course of his interviews. (Def.'s SMF BOR ¶ 78; Pl.'s RSMF BOR ¶ 78).[20]

On March 20, 2019, Ms. Joseph was given a copy of the report and an opportunity to respond. (Def.'s SMF BOR ¶ 90; Pl.'s RSMF BOR ¶ 90). Ms. Joseph provided a written response on March 25, 2019. (Def.'s SMF BOR ¶ 91; Pl.'s RSMF BOR ¶ 91). Ms. Joseph's employment was terminated on March 26, 2019. (Def.'s SMF BOR ¶ 92; Pl.'s RSMF BOR ¶ 92).

### 4.      Plaintiff's Allegations of Discrimination and Retaliation

#### a.      Disparities in Facilities and Resources

During her tenure as head coach of the GT WBB team, the locker room that GT provided to Ms. Joseph and the WBB team was inferior in both quality and accessibility to the practice facility, weight room, and video room than the locker room that GT provided to the male coaches of the MBB team and the MBB team.

---

[20] The NCAA Committee on Infractions issued its final decision on the 2019 allegations on September 21, 2021, substantiating Level II violations against both GT and Joseph.  (SMF BOR ¶ 80; RSMF BOR ¶ 80). As Ms. Joseph was not terminated as a result of the NCAA findings, the Court need not address her objections under Federal Rule of Evidence 402.

(Pl.'s SAMF BOR ¶ 28; Def.'s RSAMF BOR ¶ 28). The locker rooms for the WBB and MBB teams were located between McCamish Pavilion ("McCamish"), where the basketball teams compete, and Zelnak Basketball Center ("Zelnak"), where the basketball teams practice. (Pl.'s SAMF BOR ¶ 29; Def.'s RSAMF BOR ¶ 29). From 2003 to 2019, GT did not make any upgrades to the WBB locker rooms with the exception of converting a small storage space to an academic room, laying new carpet, painting, purchasing a used cold tub from the volleyball team, and updating the furniture in the locker room area. (Pl.'s SAMF BOR ¶ 36; Def.'s RSAMF BOR ¶ 36). Apart from the new carpet and paint, Ms. Joseph had to fundraise for these improvements. (Pl.'s SAMF BOR ¶ 37; Def.'s RSAMF BOR ¶ 37).

Mark Rountree, who supervised the GT WBB program from 2017 to 2019, believed that the GT WBB locker room was inferior to the GT MBB locker room and desperately needed an upgrade. (Pl.'s SAMF BOR ¶ 37; Def.'s RSAMF BOR ¶ 37).[21] Mr. Stansbury, who served as GT Athletic Director from approximately November 2016 through Ms. Joseph's termination, agreed that the WBB locker room was worse than the MBB locker room and acknowledged that the WBB

---

[21] BOR does not dispute the accuracy of most of the following assertions drawn from Ms. Joseph's SAMF BOR, but argues that the facts are not material. The Court addresses these arguments in the discussion section, below.

locker room needed to be upgraded. (Pl.'s SAMF BOR ¶ 43; Def.'s RSAMF BOR ¶ 43).

In addition to the difference in quality between the GT WBB and MBB locker rooms, the GT MBB locker rooms were also more accessible to the Zelnak practice facilities than the GT WBB locker room. (Pl.'s SAMF BOR ¶ 44; Def.'s RSAMF BOR ¶ 44). The GT MBB team had direct access to the interior doors of Zelnak from the GT MBB locker room. (Pl.'s SAMF BOR ¶ 46; Def.'s RSAMF BOR ¶ 46). The GT WBB team did not have direct access to the practice gym in Zelnak from the GT WBB locker room. (Pl.'s SAMF BOR ¶ 47; Def.'s RSAMF BOR ¶ 47).

During Ms. Joseph's tenure as head coach of the GT WBB team, there was also disparity between the office space provided to the coaches of the WBB and MBB teams. (Pl.'s SAMF BOR ¶ 51; Def.'s RSAMF BOR ¶ 51). GT provided Ms. Joseph and the WBB team less money and resources for marketing than it provided the head coaches of the MBB team and the MBB team. (Pl.'s SAMF BOR ¶ 59; Def.'s RSAMF BOR ¶ 59). During Ms. Joseph's employment at GT, GT limited the WBB's team in-game marketing budget to between $20,000 and $22,000. (Pl.'s SAMF BOR ¶ 60; Def.'s RSAMF BOR ¶ 60).

During Ms. Joseph's employment at GT, GT provided Ms. Joseph no money for external advertisements for WBB such as articles, billboards, radio, or digital marketing. (Pl.'s SAMF BOR ¶ 61; Def.'s RSAMF BOR ¶ 61). In addition, GTAA

paid to produce television and radio shows for Coach Pastner to participate in during the GT MBB season. (Pl.'s SAMF BOR ¶ 62; Def.'s RSAMF BOR ¶ 62). In consideration for Coach Pastner's participation in television and radio shows, GTAA paid him $600,000 in 2016-17, $700,000 in 2017-18, and $800,000 in 2018-19. (Pl.'s SAMF BOR ¶ 64; Def.'s RSAMF BOR ¶ 64).

Neither GT nor GTAA ever produced television or radio shows for Ms. Joseph to participate in during the GT WBB season. (Pl.'s SAMF BOR ¶ 65; Def.'s RSAMF BOR ¶ 65). Neither GT nor GTAA ever paid Ms. Joseph to participate in television or radio shows during the GT WBB season. (Pl.'s SAMF BOR ¶ 66; Def.'s RSAMF BOR ¶ 66).

During Ms. Joseph's entire tenure as head coach, GT WBB did not have a full-time marketing position or coordinator. (Pl.'s SAMF BOR ¶ 67; Def.'s RSAMF BOR ¶ 67). A graduate assistant or intern on the marketing team assisted with GT WBB marketing. (Pl.'s SAMF BOR ¶ 68; Def.'s RSAMF BOR ¶ 68). This graduate assistant or intern was not exclusive to WBB, but also provided marketing support for other programs. (Pl.'s SAMF BOR ¶ 68; Def.'s RSAMF BOR ¶ 68). WBB was sometimes required to pay for the marketing intern or graduate assistant, even though the marketing intern or graduate assistant did marketing for other teams as well. (Pl.'s SAMF BOR ¶ 69; Def.'s RSAMF BOR ¶ 69). As of 2018, Ms. Joseph was the only WBB head coach in the ACC without a full-time employee

responsible for marketing. (Pl.'s SAMF BOR ¶ 70; Def.'s RSAMF BOR ¶ 70). Without the support of a dedicated marketing team, Ms. Joseph had to dedicate other resources to GT WBB marketing efforts, either by spending time to market the team herself or by allocating a portion of her fundraising or assistant coach salary budget to hire part-time help. (Pl.'s SAMF BOR ¶ 71; Def.'s RSAMF BOR ¶ 71).

GT used an outside sales group, Aspire Group, to sell GT MBB home game tickets but not GT WBB home game tickets. (Pl.'s SAMF BOR ¶ 74; Def.'s RSAMF BOR ¶ 74). There is a large suite in McCamish where GT MBB and GT WBB play games called the Callaway Club that could be used to entertain fans and donors. (Pl.'s SAMF BOR ¶ 75; Def.'s RSAMF BOR ¶ 75). GT made the Callaway Club available to premium ticket holders of the GT MBB team but not the GT WBB team. (Pl.'s SAMF BOR ¶ 76; Def.'s RSAMF BOR ¶ 76).

From at least 2014 through her termination, GT provided Ms. Joseph less money to hire assistant coaches for the WBB team than it provided to the head coaches to hire assistant coaches for the MBB team. (Pl.'s SAMF BOR ¶ 83; Def.'s RSAMF BOR ¶ 83).

### b.  Joseph's Initial Complaints

Joseph first learned that differences existed between the funding and resources being allocated to GT WBB relative to GT MBB in the 2006-07 school year

through her participation in GT's 10-year NCAA certification review. (Pl.'s SAMF BOR ¶ 95; Def.'s RSAMF BOR ¶ 95). GT conducted the NCAA certification review pursuant to the NCAA's certification program, which required Division I schools to conduct a campus-wide self-study of gender equity issues in their athletic programs every ten years. (Pl.'s SAMF BOR ¶ 76; Def.'s RSAMF BOR ¶ 76). During GT's 2006-07 NCAA certification review, Ms. Joseph sat on the Subcommittee for Equity & Student Athlete Well-Being, which met between four and six times in the 2006-07 year. (Pl.'s SAMF BOR ¶ 97; Def.'s RSAMF BOR ¶ 97).

While on the Subcommittee for Equity & Student Athlete Well-Being, Ms. Joseph learned of discrepancies between WBB and MBB resources for travel, assistant coach salaries, staffing, and locker room facilities. (Pl.'s SAMF BOR ¶ 98; Def.'s RSAMF BOR ¶ 98). Specifically, Ms. Joseph learned that MBB flew charter while WBB did not, MBB had an assistant director of operations while WBB did not, MBB had student managers on scholarship while WBB's student managers were all volunteers and thus less dedicated to the work, and MBB had a much larger salary pool for both head and assistant coaches. (Pl.'s SAMF BOR ¶ 99; Def.'s RSAMF BOR ¶ 99).

GT adopted Gender Equity and Minority Plans to monitor and address the gender inequities in its intercollegiate athletic programs identified during the 2006-07 NCAA certification review. (Pl.'s SAMF BOR ¶ 101; Def.'s RSAMF BOR

¶ 101). The purpose of the Gender Equity and Minority Plans was to ensure that Division I schools were self-studying matters of gender and racial equity and adopting plans that were designed to ensure equitable practices. (Pl.'s SAMF BOR ¶ 102; Def.'s RSAMF BOR ¶ 102).

From approximately May 2006 to January 2016, Theresa Wenzel served as the GT senior woman administrator, WBB sport administrator, and Title IX Coordinator for Athletics. (Pl.'s SAMF BOR ¶ 104; Def.'s RSAMF BOR ¶ 104). Ms. Wenzel also sat on the GTAA Compliance and Equity Subcommittee. (Pl.'s SAMF BOR ¶ 105; Def.'s RSAMF BOR ¶ 105). As Title IX Coordinator for the Athletics Department and a member of the GTAA Compliance and Equity Subcommittee, Ms. Wenzel monitored the Gender Equity and Minority Plans and received complaints regarding potential Title IX violations in the Athletics Department. (Pl.'s SAMF BOR ¶ 106; Def.'s RSAMF BOR ¶ 106). One way Ms. Wenzel monitored GT's compliance with the Gender Equity and Minority Plans was by reviewing GT's resource allocation to its sports teams and ensuring that funds were being allocated equitably. (Pl.'s SAMF BOR ¶ 107; Def.'s RSAMF BOR ¶ 107). While Ms. Wenzel was a member of the GTAA Compliance and Equity Subcommittee, the subcommittee identified Title IX issues that related to the GT WBB program, including staff salaries and team travel. (Pl.'s SAMF BOR ¶ 108; Def.'s RSAMF BOR ¶ 108).

While Ms. Wenzel was GT's Title IX Coordinator, Ms. Joseph raised repeated concerns with Ms. Wenzel regarding her belief that GT was allocating WBB less money and resources than MBB, particularly as it related to facilities, marketing, assistant coach salaries, and travel. (Pl.'s SAMF BOR ¶ 109; Def.'s RSAMF BOR ¶ 109). When Ms. Joseph reported her concerns regarding her belief that GT was allocating WBB less money and resources than MBB to Ms. Wenzel, she was given assurance that Ms. Wenzel was working with senior staff to address the issues. (Pl.'s SAMF BOR ¶ 110; Def.'s RSAMF BOR ¶ 110). Ms. Joseph perceived Ms. Wenzel to be supportive of her raising concerns regarding GT's allocation of resources to WBB to discuss and address. (Pl.'s SAMF BOR ¶ 111; Def.'s RSAMF BOR ¶ 111).

### c.    Ms. Joseph's Disputes with Mr. Bobinski

In 2013, GT hired Mike Bobinski as the GT Athletic Director. (Pl.'s SAMF BOR ¶ 112; Def.'s RSAMF BOR ¶ 112). In September 2014, GT hired Marvin Lewis as Associate Athletic Director of Administration and Finance. (Pl.'s SAMF BOR ¶ 113; Def.'s RSAMF BOR ¶ 113).

On March 12, 2015, Mr. Bobinski met with Ms. Joseph and accused her and Ms. Wenzel of "pitting" people against each other and stated that he did not have these "fucking problems" with any program besides WBB. (Pl.'s SAMF BOR ¶ 120; Def.'s RSAMF BOR ¶ 120). Ms. Joseph left the March 12, 2015 meeting feeling as if

Mr. Bobinski wanted to fire her and Ms. Wenzel. (Pl.'s SAMF BOR ¶ 121; Def.'s RSAMF BOR ¶ 121). In late March 2015, Ms. Joseph spoke with Ms. Wenzel, during which Ms. Wenzel described a recent conversation with Mr. Lewis. (Pl.'s SAMF BOR ¶ 122; Def.'s RSAMF BOR ¶ 122). Ms. Wenzel told Ms. Joseph that Mr. Lewis had raised concerns about turnover in WBB's staff, and that he was reluctant to pay out the contract value of one of her departing assistant coaches. (Pl.'s SAMF BOR ¶ 123; Def.'s RSAMF BOR ¶ 123). The assistant coach Mr. Lewis did not want to pay out was a woman. (Pl.'s SAMF BOR ¶ 124; Def.'s RSAMF BOR ¶ 124). He had recently agreed to pay out the contract of a male assistant coach. (Pl.'s SAMF BOR ¶ 124; Def.'s RSAMF BOR ¶ 124).

At some point, Ms. Joseph complained to Ms. Wenzel about Mr. Lewis. After she complained, Ms. Wenzel told Ms. Joseph that she had relayed those complaints to Mr. Lewis, noting that he was treating male and female assistant coaches differently. (Pl.'s SAMF BOR ¶ 127; Def.'s RSAMF BOR ¶ 127). In response, Mr. Lewis said Ms. Joseph needed to create a long-term plan to retain her staff. (Pl.'s SAMF BOR ¶ 127; Def.'s RSAMF BOR ¶ 127). Mr. Lewis's tone toward Ms. Wenzel was adversarial. (Pl.'s SAMF BOR ¶ 127; Def.'s RSAMF BOR ¶ 127). In March or April 2015, about a week after Ms. Wenzel's adversarial interaction with Mr. Lewis, Ms. Joseph and Ms. Wenzel participated in a budget meeting with Mr. Lewis in which Ms. Joseph asked Mr. Lewis to honor a prior

agreement she had with Mr. Lewis's predecessor to use approximately $48,000 from her prior budget savings for assistant coach salaries to hire a more qualified assistant coach in the 2015-16 year when the ACC expanded to a more competitive league. (Pl.'s SAMF BOR ¶ 128; Def.'s RSAMF BOR ¶ 128). Mr. Lewis would not agree to provide the $48,000 back to Ms. Joseph's assistant coach salary pool. (Pl.'s SAMF BOR ¶ 129; Def.'s RSAMF BOR ¶ 129).

After the budget meeting between Ms. Joseph, Ms. Wenzel, and Mr. Lewis, Ms. Joseph talked with Ms. Wenzel about their shared concern about Mr. Lewis's resistance to increasing the WBB assistant coach salary pool. (Pl.'s SAMF BOR ¶ 133; Def.'s RSAMF BOR ¶ 133). Ms. Wenzel shared with Ms. Joseph at some point in this budget cycle that she had seen financial statements relating to how money was being allocated to WBB and MBB and she had observed that the salary pool had gone up on the men's side and it had not increased as much on the women's side. (Pl.'s SAMF BOR ¶ 134; Def.'s RSAMF BOR ¶ 134). Ms. Wenzel made Mr. Lewis aware that Ms. Joseph was complaining about disparities between the resources allocated to WBB as compared to MBB. (Pl.'s SAMF BOR ¶ 136; Def.'s RSAMF BOR ¶ 136).

After the spring 2015 budget meetings with Mr. Lewis, Ms. Wenzel continued to speak to Mr. Bobinski about Mr. Lewis's hostility toward Ms. Joseph and his decisions concerning the WBB staff salary pool. (Pl.'s SAMF BOR ¶ 138;

Def.'s RSAMF BOR ¶ 138). Ms. Wenzel believed that Mr. Bobinski and Mr. Lewis became frustrated with her and Ms. Joseph for her advocacy for gender equity within the GT Athletic Department. (Pl.'s SAMF BOR ¶ 140; Def.'s RSAMF BOR ¶ 140).

As mentioned above, on September 14, 2015, Mr. Bobinski issued Ms. Joseph a reprimand for allegedly being drunk at a GT football game. (Pl.'s SAMF BOR ¶ 141; Def.'s RSAMF BOR ¶ 141). Prior to this reprimand, Ms. Joseph faced no reprimands for any alleged misconduct other than occasional routine counseling for minor NCAA infractions. (Pl.'s SAMF BOR ¶ 142; Def.'s RSAMF BOR ¶ 142). At or around the same time Mr. Bobinski issued Ms. Joseph a reprimand for allegedly being drunk at a football game, Mr. Bobinski also issued Ms. Wenzel a reprimand for her alleged unprofessional conduct at the same football game. (Pl.'s SAMF BOR ¶ 143; Def.'s RSAMF BOR ¶ 143). He also notified her that he did not intend to renew her contract the following year. (Pl.'s SAMF BOR ¶ 143; Def.'s RSAMF BOR ¶ 143).

In or around October 2015, Ms. Engel recommended to the GTAA Committee on Compliance and Equity that reference to the Gender Equity and Minority Plans be removed from the GTAA bylaws. (Pl.'s SAMF BOR ¶ 152; Def.'s

RSAMF BOR ¶ 152).[22] Approximately four months after Ms. Wenzel left, Ms. Joseph also learned that Mr. Lewis was proposing to decrease the WBB assistant coach salary pool for the 2016-17 season by approximately $13,000. (Pl.'s SAMF BOR ¶ 57).[23]

On April 21, 2016, Ms. Joseph told Mr. Lewis and Mr. Bobinski that she did not think it was right that her assistant coach salary pool had been decreased, and she stated that Ms. Wenzel would not have agreed with the decision because of her position on Title IX. (Pl.'s SAMF BOR ¶ 158; Def.'s RSAMF BOR ¶ 158). On May 6, 2016, Ms. Joseph sent an email to Mr. Bobinski, copying Mr. Lewis, seeking a salary pool increase of $17,881.26. (Resp. to BOR MSJ Ex. 19, Doc. 220-22). At his deposition, Mr. Lewis did not recall whether she received the additional funding. (Lewis Dep. at 153:18–23).

---

[22] As BOR notes, the NCAA stopped requiring Division I schools to conduct these campus-wide studies before the timeframe relevant for this case. (*See* RSAMF BOR ¶ 96).

[23] BOR's objection to paragraph 57 of Plaintiff's SAMF is overruled. As the Court noted in its MTD Order, "Although Joseph may not recover for the earlier allegations (which she states she will not attempt to do), she may use them as background evidence." (MTD Order at 17) (citing *Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1179 (11th Cir. 2005)).

Meanwhile, GT increased Coach Pastner's assistant coach salary budget for the 2016-17 school year by $190,000. (GTAA's Answer ¶117, Doc. 7).[24] On May 17, 2016, the Atlanta Journal Constitution published an article titled "Big assistant coach salary pool bump for Josh Pastner" that reported that GT had provided Coach Pastner 35 percent more than the previous GT MBB coach to put toward the salaries of his assistant coaches. (Pl.'s SAMF BOR ¶ 162; Def.'s RSAMF BOR ¶ 162). Ms. Joseph reviewed the article on or around the day it was published. (Pl.'s SAMF BOR ¶ 163; Def.'s RSAMF BOR ¶ 163). The information contained in the article, combined with her personal knowledge of what Mr. Bobinski and Mr. Lewis had agreed to provide to her for the 2016-17 season for her assistant salary pool, deepened Ms. Joseph's concern that GT was providing her and the WBB team less than MBB for assistant coach salaries. (Pl.'s SAMF BOR ¶ 164; Def.'s RSAMF BOR ¶ 164).

### d.   Ms. Joseph's Disputes with Ms. Akin

In or around August 2016, Joeleen Akin became the GT WBB sport administrator. (Pl.'s SAMF BOR ¶ 167; Def.'s RSAMF BOR ¶ 167). Around the same time that Ms. Akin assumed the role of GT WBB sport administrator, Mr. Bobinski left GT and Paul Griffin was appointed interim Athletic Director. (Pl.'s

---

[24] BOR's objection to paragraph 161 of Plaintiff's SAMF BOR is overruled. Under Federal Rule of Civil Procedure 56(c)(1)(A), a party may support a factual assertion by citing to admissions, which would include an admission in an answer.

SAMF BOR ¶ 168; Def.'s RSAMF BOR ¶ 168). On August 26, 2016, Ms. Joseph disclosed to Ms. Akin her concerns regarding the inferior state of the WBB locker room relative to the MBB locker room. (Pl.'s SAMF BOR ¶ 170; Def.'s RSAMF BOR ¶ 170). Then, on or around September 9, 2016, Ms. Akin requested the aforementioned meeting with Ms. Joseph regarding the Sanford investigation. (Pl.'s SAMF BOR ¶ 171; Def.'s RSAMF BOR ¶ 171).

GT opened an investigation into the allegation that Ms. Joseph made during the Sanford investigation that she was being treated differently than male employees in the Athletic Department. (Pl.'s SAMF BOR ¶ 180; Def.'s RSAMF BOR ¶ 180). As noted above, in Ms. McRae's supplement to her report, she noted that "[t]he information gathered [did] not support that the USG Ethics Policy ha[d] been violated." (BOR MSJ Ex. 9, Doc. 212-12).

During the fall of 2016, Ms. Joseph complained to Ms. Akin about Ms. Akin asking her not to cuss so much and said that she felt she was being held to a different standard than the football and MBB coach, who she believed also cussed. (Pl.'s SAMF BOR ¶ 198; Def.'s RSAMF BOR ¶ 198). Ms. Akin reported Ms. Joseph's complaint of a double standard to Mr. Stansbury. (Pl.'s SAMF BOR ¶ 199; Def.'s RSAMF BOR ¶ 199).

In 2016 or 2017, when Ms. Akin was WBB sport administrator, Ms. Joseph expressed concerns to Ms. Akin that WBB was being treated less favorably than

MBB with respect to the WBB locker room, office space, and marketing. (Pl.'s SAMF BOR ¶ 200; Def.'s RSAMF BOR ¶ 200). Ms. Akin talked to Mr. Stansbury about the issues that Ms. Joseph had raised regarding the funding and resources provided to the WBB program and that Ms. Joseph had concerns about the WBB locker room. (Pl.'s SAMF BOR ¶ 201; Def.'s RSAMF BOR ¶ 201). Mr. Stansbury conveyed to Ms. Akin the general sentiment that GT needed to review the issues Ms. Joseph was raising. (Pl.'s SAMF BOR ¶ 202; Def.'s RSAMF BOR ¶ 202).

In or around December 2016, Mr. Lewis became the MBB sport administrator. (Pl.'s SAMF BOR ¶ 203; Def.'s RSAMF BOR ¶ 203). As a sport administrator, Mr. Lewis acted as a liaison between the head coach and the athletics director and helped monitor the resources of the program. (Pl.'s SAMF BOR ¶ 204; Def.'s RSAMF BOR ¶ 204). At the time Mr. Lewis became the MBB sport administrator, Ms. Engel was still working as GT Associate Athletic Director of Compliance and had assumed the role of Deputy Title IX Coordinator. (Pl.'s SAMF BOR ¶ 205; Def.'s RSAMF BOR ¶ 205). In her role, Ms. Engel had oversight over NCAA and Title IX compliance in the Athletic Department. (Pl.'s SAMF BOR ¶ 206; Def.'s RSAMF BOR ¶ 206). In 2016, Mr. Lewis started dating Ms. Engel. (Pl.'s SAMF BOR ¶ 207; Def.'s RSAMF BOR ¶ 207). Mr. Lewis's and Ms. Engel's romantic relationship concerned Ms. Joseph since she believed Mr. Lewis played a role in allocating resources to her and the WBB program in a discriminatory

manner, and the person who was ostensibly in charge of ensuring that resources were allocated in an equitable manner was Ms. Engel, his girlfriend. (Pl.'s SAMF BOR ¶ 209; Def.'s RSAMF BOR ¶ 209). Ms. Engel was aware that Ms. Joseph claimed WBB and MBB were treated differently in terms of funding. (Pl.'s SAMF BOR ¶ 211; Def.'s RSAMF BOR ¶ 211). After Ms. Joseph learned that Mr. Lewis and Ms. Engel were in a romantic relationship, Ms. Joseph expressed concern to Ms. Akin about their relationship. (Pl.'s SAMF BOR ¶ 212; Def.'s RSAMF BOR ¶ 212). Ms. Akin told Ms. Joseph that their relationship had been approved by President Peterson, and nothing could be done. (Pl.'s SAMF BOR ¶ 214; Def.'s RSAMF BOR ¶ 214).

Mr. Stansbury was aware that Ms. Joseph did not feel supported by other units within the Athletic Department, and that there was tension between Ms. Joseph, Mr. Lewis, Ms. Engel, and Ms. Akin. (Pl.'s SAMF BOR ¶ 223; Def.'s RSAMF BOR ¶ 223). In or around April 2017, Mr. Stansbury decided to replace Ms. Akin as WBB sport administrator with newly hired Deputy Athletic Director Mark Rountree to help alleviate some of the tension that existed between Ms. Joseph and other units within the Athletic Department. (Pl.'s SAMF BOR ¶ 224; Def.'s RSAMF BOR ¶ 224).

###### e.      Ms. Joseph's Later Complaints

In or around April 2017, after Mr. Rountree took over as WBB sport administrator, Ms. Joseph raised concerns with him about the state of the WBB locker room, including that it did not have as many amenities as the MBB locker room, was smaller, and was not as accessible to the practice facility as the MBB locker room. (Pl.'s SAMF BOR ¶ 225; Def.'s RSAMF BOR ¶ 225). Mr. Stansbury was also aware that Ms. Joseph had expressed concerns about Title IX, including regarding the money allocated to MBB for travel and salaries. (Pl.'s SAMF BOR ¶ 231; Def.'s RSAMF BOR ¶ 231). Ms. Akin also spoke to Mr. Rountree about Ms. Joseph's complaints. (Pl.'s SAMF BOR ¶ 232; Def.'s RSAMF BOR ¶ 232).

In or around October 2017, Ms. Joseph asked Mr. Stansbury and Mr. Rountree to raise funds to upgrade the WBB locker room. (Pl.'s SAMF BOR ¶ 241; Def.'s RSAMF BOR ¶ 241). In framing this request, Ms. Joseph told Mr. Stansbury and Mr. Rountree that she believed the difference between the men's and women's locker room created Title IX concerns. (Pl.'s SAMF BOR ¶ 244; Def.'s RSAMF BOR ¶ 244). From approximately October 2017 to June 2018, Ms. Joseph spent time fundraising money for the WBB locker room upgrades that she had discussed with Mr. Stansbury and Mr. Rountree. (Pl.'s SAMF BOR ¶ 252; Def.'s RSAMF BOR ¶ 252). By April 2018, Ms. Joseph had helped fundraise approximately $2.1 million for the WBB locker room project. (Pl.'s SAMF BOR ¶ 253; Def.'s RSAMF BOR

¶ 253). By April 2018, Coach Pastner had not raised any money for upgrades to the MBB locker room and told Mr. Rountree that GT should move forward with the WBB locker room upgrades if they had the money. (Pl.'s SAMF BOR ¶ 254; Def.'s RSAMF BOR ¶ 254). After Coach Pastner stated that he did not have time to fundraise for the MBB locker room project, Mr. Stansbury solicited money to support the MBB locker room portion. (Pl.'s SAMF BOR ¶ 255; Def.'s RSAMF BOR ¶ 255).

In or around May 2018, Mr. Stansbury asked all head coaches to prepare a strength-weakness-opportunities-threat ("SWOT") analysis for their program. (Pl.'s SAMF BOR ¶ 282; Def.'s RSAMF BOR ¶ 282). On May 30, 2018, Ms. Joseph sent her SWOT analysis to Mr. Stansbury and Mr. Rountree, among other people, for a Staff Audit meeting scheduled for the next day. (Pl.'s SAMF BOR ¶ 283; Def.'s RSAMF BOR ¶ 283). In her SWOT analysis, Ms. Joseph identified as weaknesses some of the issues she had raised with GT administrators in the past: she stated that WBB marketing was a weakness, noting that the WBB marketing budget was $20,000; they had no full-time marketing position/coordinator; and they had no access to Aspire for ticket sales. (Pl.'s SAMF BOR ¶ 284; Def.'s RSAMF BOR ¶ 284). In her SWOT analysis, Ms. Joseph also stated that the WBB locker room was so old it "affects recruiting/student-athlete experience," and that its location created access issues to the practice facility. (Pl.'s SAMF BOR ¶ 285; Def.'s RSAMF BOR

¶ 285). On May 31, 2018, Ms. Joseph orally presented the SWOT analysis in a meeting with Mr. Rountree, Mr. Lewis, Ms. Engel, and Senior Associate Athletic Director for Academics Phyllis LaBaw, among other people. (Pl.'s SAMF BOR ¶ 286; Def.'s RSAMF BOR ¶ 286). After the May 31, 2018, meeting Ms. Joseph told Ms. Akin that she felt like Mr. Lewis and Ms. Akin had acted in a disrespectful way toward her in the meeting. (Pl.'s SAMF BOR ¶ 291; Def.'s RSAMF BOR ¶ 291).

By June 13, 2018, Ms. Joseph and GT Director of Development Mindy Hyde had raised $2.64 million toward the $2.75 million needed for the WBB locker room upgrades. (Pl.'s SAMF BOR ¶ 292; Def.'s RSAMF BOR ¶ 292). On June 21, 2018, Mr. Rountree asked Mr. Hall and Mr. Stansbury whether they were at a point to decide whether to do a combined WBB/MBB project or just have WBB move forward alone. (Pl.'s SAMF BOR ¶ 296; Def.'s RSAMF BOR ¶ 296). Mr. Hall just responded: "Not sure we are quite there on the men's side." (Pl.'s SAMF BOR ¶ 296; Def.'s RSAMF BOR ¶ 296). It was Mr. Stansbury's decision whether to go forward with the WBB portion of the locker room project only or to wait to try to get money for both WBB and MBB. (Pl.'s SAMF BOR ¶ 297; Def.'s RSAMF BOR ¶ 297). Ultimately, the WBB locker room was not upgraded during Ms. Joseph's employment at GT. (Pl.'s SAMF BOR ¶ 298; Def.'s RSAMF BOR ¶ 298).

### f.    Ms. Joseph's Contract Negotiations

As Athletic Director, it was Mr. Stansbury's responsibility to negotiate and execute contracts. (Pl.'s SAMF BOR ¶ 234; Def.'s RSAMF BOR ¶ 234). Ms. Joseph's employment contract stated that Ms. Joseph and GTAA agreed "to a good faith reconsideration of the terms and conditions of the Contract after the completion of the 2016-2017 season." (Pl.'s SAMF BOR ¶ 235; Def.'s RSAMF BOR ¶ 235). In the 2016-17 season, both GT WBB and MBB made it to the National Invitational Tournament championship. (Pl.'s SAMF BOR ¶ 236; Def.'s RSAMF BOR ¶ 236). After the 2016-17 season, Mr. Stansbury chose not to extend Ms. Joseph's contract that year, purportedly because she had not led the WBB team to the NCAA tournament. (Stansbury Dep. 85:23-86:10, 87:16-88:16, Doc. 182).

As of the end of the 2016-2017 season, the last time Ms. Joseph led the GT WBB team to the NCAA tournament was in 2014, or three years prior. (Pl.'s SAMF BOR ¶ 238; Def.'s RSAMF BOR ¶ 238). When GT hired Coach Pastner, he was told he had five years to make it to the NCAA tournament. (Pl.'s SAMF BOR ¶ 239; Def.'s RSAMF BOR ¶ 239). Mr. Stansbury negotiated the extension of Coach Pastner's contract in or around June 2017, and the deal remained that Coach Pastner had five years to get the MBB to the NCAA tournament. (Pl.'s SAMF BOR ¶ 240; Def.'s RSAMF BOR ¶ 240). On October 4, 2017, GT announced that it had given Coach Pastner a one-year extension of his employment contract, offering

him a $500,000 retention bonus if he remained through 2021-22. (BOR's Answer ¶ 145, Doc. 2).[25] As of October 4, 2017, the GT MBB team had not made it to the NCAA tournament in seven years. (Pl.'s SAMF BOR ¶ 247; Def.'s RSAMF BOR ¶ 247).

In or around April or May 2018, Ms. Joseph's agent, Garry Rosenfield, spoke to Mr. Rountree about extending Ms. Joseph's contract. Mr. Rountree stated GT wanted to see Ms. Joseph lead the WBB to the NCAA tournament. (Pl.'s SAMF BOR ¶ 256; Def.'s RSAMF BOR ¶ 256).[26]

### g.   Events Leading to Ms. Joseph's termination

On or around June 20, 2018, Ms. Joseph's Assistant Coach Rob Norris resigned his employment. (Pl.'s SAMF BOR ¶ 293; Def.'s RSAMF BOR ¶ 293). In his resignation email, Mr. Norris stated that it seemed to him that during his tenure as an assistant coach on the GT WBB team, the WBB program was "targeted by various departments" and "did not get the attention it deserved, which made the job more difficult and less full-fill [sic]." (Pl.'s SAMF BOR ¶ 294).[27]

---

[25] BOR's objection to paragraph 245 of Plaintiff's SAMF BOR is overruled. *See* note 24, *supra*.

[26] BOR's objection to paragraph 257 of Plaintiff's SAMF BOR is sustained.

[27] BOR's objection to paragraph 294 of Plaintiff's SAMF BOR is overruled. The Court "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).

At the time Mr. Norris resigned, assistant coach hiring season was over and there was not a big pool of coaches to choose from so Ms. Joseph hired who was available. (Pl.'s SAMF BOR ¶ 299; Def.'s RSAMF BOR ¶ 299). Because Mr. Norris's replacement had less experience than he did, her salary was lower than Mr. Norris's and Ms. Joseph had some money left over in her staff salary pool for 2018-2019. (Pl.'s SAMF BOR ¶ 300; Def.'s RSAMF BOR ¶ 300). With the money left over in her salary pool, Ms. Joseph asked if she could raise the salary of her assistant coach Mark Simons. (Pl.'s SAMF BOR ¶ 302).[28]

On July 5, 2018, Ms. Joseph learned from Mr. Rountree that he, Mr. Stansbury, and Mr. Lewis had denied Ms. Joseph's request to use $16,700 from her staff salary pool to increase Mr. Simon's salary. (Pl.'s SAMF BOR ¶ 302; Def.'s RSAMF BOR ¶ 302). In or around May of 2018, Ms. Joseph spoke with Pearl Alexander, GT's Executive Director of Staff Diversity, Inclusion, and Engagement and former GT Title IX Coordinator, to relay hers and the other female coaches' concerns about how resources were being allocated to their programs. Ms. Joseph spoke with Ms. Alexander about ways to communicate the needs for her program. (Pl.'s SAMF BOR ¶ 306; Def.'s RSAMF BOR ¶ 306).

---

[28] BOR objects to paragraph 301 of Plaintiff's SAMF BOR, but in light of its admission of paragraph 302, which acknowledges that Ms. Joseph made the referenced request, this objection is moot.

On or around July 25, 2018, Ms. Joseph met with Mr. Stansbury and Mr. Rountree and brought up her concern again about Mr. Lewis's and Ms. Engel's relationship and how it affected her team. (Pl.'s SAMF BOR ¶ 308; Def.'s RSAMF BOR ¶ 308). During the meeting, Ms. Joseph told Mr. Stansbury and Mr. Rountree that Mr. Lewis and Ms. Engel ran their departments in a manner that clearly benefited MBB to the detriment of WBB, and she felt like she had no one with whom to raise her concerns about this disparate treatment because of their romantic relationship. (Pl.'s SAMF BOR ¶ 309; Def.'s RSAMF BOR ¶ 309). Ms. Joseph testified at her deposition that she also "explain[ed] to him about how the other female coaches felt." (Deposition of MaChelle Joseph dated June 18, 2021 ("Joseph Dep. II") at 353:20–21; Doc. 177).

Ms. Joseph testified at her deposition that she "recall[ed] that Todd [Stansbury] said that his hands were tied, that Bud [Peterson] had approved the relationship. And he also became irate when I was explaining to him about how the other female coaches felt about some equity issues and Shoshanna [Engel] and Marvin[ Lewis]'s relationship." (*Id.* at 353:19–23). Mr. Rountree testified that Mr. Stansbury's "tone changed," and became "emotional, because he looked at that as, hey, coaches can come directly to me" but that "[t]here wasn't any anger/emotion directed at Coach Joseph, but it was more of, hey, they -- I mean, I meet with them individually, they can come to me, you shouldn't have to be

involved with that." (Rountree Dep. at 149:19, 150:6–12). Mr. Stansbury testified that he "did get annoyed . . . Because [he] had not heard these issues brought up before, and [he] meet[s] with every head coach individually . . . and so [he] was annoyed because . . . if there were issues that they had, they should bring them up to [him] directly. (Dep. Stansbury at 118:9–16).

On August 9, 2018, Ms. Joseph sent Mr. Stansbury, Mr. Rountree, and Ms. Akin an email titled "Support staff evaluation 2018." (Pl.'s SAMF BOR ¶ 315; Def.'s RSAMF BOR ¶ 315). In her email, Ms. Joseph reiterated her concerns about the WBB locker room and lack of support and resources for WBB marketing and ideation, noting that she and her staff have had to spend extra time and money to make up for these deficiencies. (Pl.'s SAMF BOR ¶ 316; Def.'s RSAMF BOR ¶ 316). In that same email, Ms. Joseph also stated that Mr. Lewis oversaw the budget and Ms. Engel oversaw Title IX, and that their relationship made it difficult for them to be impartial with their professional responsibilities. (Pl.'s SAMF BOR ¶ 318; Def.'s RSAMF BOR ¶ 318). Mr. Stansbury understood that Ms. Joseph was complaining that her concern was that Ms. Engel oversaw Title IX and gender equity and she felt like she could not bring concerns about the budget to Ms. Engel because she was in a romantic relationship with Mr. Lewis who oversaw the budget. (Pl.'s SAMF BOR ¶ 315; Def.'s RSAMF BOR ¶ 315).

On October 30, 2018, Ms. Joseph participated in an interview with NCAA enforcement staff in connection with a then on-going investigation into the WBB program. (Pl.'s SAMF BOR ¶ 330; Def.'s RSAMF BOR ¶ 330). During the interview, GT's outside counsel questioned Ms. Joseph about whether she had tried to impede Ms. Engel's ability to monitor the WBB program and whether she had blocked Ms. Engel on social media. (Pl.'s SAMF BOR ¶ 331; Def.'s RSAMF BOR ¶ 331).

On November 7, 2018, at 7:25 a.m., Ms. Joseph's agent, Garry Rosenfield, sent an email to Mr. Stansbury and Mr. Rountree, copying Ms. Joseph's attorney concerning NCAA matters at the time, Matt Johns, with the subject line "Call request re: MaChelle Joseph/Shoshanna Engel," in which Mr. Rosenfield notified Mr. Stansbury and Mr. Rountree of growing concerns over Ms. Engel and her repeated attempts to undermine Ms. Joseph. (Pl.'s SAMF BOR ¶ 335).[29] On November 19, 2018, when neither Mr. Rountree nor Mr. Stansbury responded to Mr. Rosenfield's email, Mr. Johns sent a follow up email to Mr. Rountree and Mr. Stansbury reiterating the request for a meeting to discuss Ms. Engel's conduct toward Ms. Joseph. (Pl.'s SAMF BOR ¶ 337; Def.'s RSAMF BOR ¶ 337).

---

[29] BOR's objection to paragraph 335 of Plaintiff's SAMF BOR ¶ 335 is overruled for the reasons the Court gave in note 27, *supra.*

On November 21, 2018, Ms. Joseph through her attorney, sent a letter to Dr. Peterson copying Mr. Stansbury and Mr. Rountree, in which she stated that she had raised concerns regarding the resources GT allocated to WBB relative to MBB for years, and that she feared she may be facing retaliation from members of the Athletic Department as a result of these complaints (the "November 2018 Letter"). (Pl.'s SAMF BOR ¶ 350; Def.'s RSAMF BOR ¶ 350). After reading the November 2018 Letter, Dr. Peterson understood that Ms. Joseph was expressing concerns about retaliation against her for raising Title IX concerns. (Pl.'s SAMF BOR ¶ 352; Def.'s RSAMF BOR ¶ 352). Mr. Stansbury and Dr. Peterson discussed the concerns outlined in the November 21, 2018, letter shortly after it was received. (Pl.'s SAMF BOR ¶ 353; Def.'s RSAMF BOR ¶ 353). Dr. Peterson spoke with Mr. Stansbury and Ms. Oliver-Staley about whether GT had issues with Title IX. (Pl.'s SAMF BOR ¶ 354; Def.'s RSAMF BOR ¶ 354)

Mr. Rountree asked to meet with Ms. Joseph to talk about the November 2018 Letter. (Pl.'s SAMF BOR ¶ 360; Def.'s RSAMF BOR ¶ 360). Ms. Joseph and Mr. Rountree thereafter met on December 12, 2018 (the "December 12 meeting"). (Pl.'s SAMF BOR ¶ 361; Def.'s RSAMF BOR ¶ 361). During the December 12 meeting, Ms. Joseph reiterated to Mr. Rountree her concerns about Mr. Lewis's and Ms. Engel's romantic relationship, and her belief that it created a conflict of interest that impacted her ability to do her job. (Pl.'s SAMF BOR ¶ 362; Def.'s

RSAMF BOR ¶ 362). During the meeting, Ms. Joseph also told Mr. Rountree that she felt harassed by Mr. Lewis and Ms. Engel, who she believed were angry about her complaints about Mr. Lewis's budget decisions and her complaints that his relationship with Ms. Engel created a conflict of interest. (Pl.'s SAMF BOR ¶ 360; Def.'s RSAMF BOR ¶ 360). Mr. Rountree replied that GT did not have Title IX issues, and even if it did, it is not like anyone would "die" — GT would just be told to get in compliance. (Pl.'s SAMF BOR ¶ 365; Def.'s RSAMF BOR ¶ 365). During the December 12 meeting, Mr. Rountree asked Ms. Joseph to write up the concerns she had expressed to him in that meeting and send them to him. (Ex. 1, Pl. Decl. ¶ 287; Pl.'s SAMF BOR ¶ 366; Def.'s RSAMF BOR ¶ 366).[30]

On Friday, February 8, 2019, Ms. Joseph sent an email to Mr. Rountree to follow up on their December 12, 2018, meeting during which he asked her to send in a write up of the concerns she had articulated on December 12. (Pl.'s SAMF BOR

---

[30] Around this point, the incidents investigated in the Littler Report occurred. Ms. Joseph spends much of her Statement of Additional Material Facts laying out her side of the story behind the Littler Report. The Court agrees with BOR however, that for purposes of the BOR's MSJ, the only relevant inquiry is what the decision maker knew when he made the decision to terminate Ms. Joseph's employment. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decision maker's head.").

¶ 401; Def.'s RSAMF BOR ¶ 401).[31] Ms. Joseph copied Mr. Stansbury, Ms. Akin, Ms. Oliver-Staley, and Mr. Newsome on the email and attached a formal complaint of discrimination, retaliation, and conflict of interest. (the "February 2019 Internal Complaint") (Pl.'s SAMF BOR ¶ 401; Def.'s RSAMF BOR ¶ 401). Ms. Joseph further alleged in her February 2019 Internal Complaint that she had faced retaliation for raising concerns about these inequities, and that Mr. Stansbury, Mr. Rountree, and Ms. Akin had been complicit in or carried out the retaliation against her. (Pl.'s SAMF BOR ¶ 404; Def.'s RSAMF BOR ¶ 404).

On Saturday, February 9, 2019, Ms. Durham forwarded Dr. Peterson a copy of the February 2019 Internal Complaint. (Pl.'s SAMF BOR ¶ 409; Def.'s RSAMF BOR ¶ 409). As noted above, on February 11, 2019, Ms. Durham left Mr. Stansbury an envelope that contained the letter regarding Ms. Pan. (Pl.'s SAMF BOR ¶ 412; Def.'s RSAMF BOR ¶ 412). On February 18, 2019, Mr. Stansbury, Ms. Oliver-Staley, Kate Wasch, Ms. Durham, and Marcia Bull-Stadeker met to discuss Ms. Joseph's February 2019 Internal Complaint. (Pl.'s SAMF BOR ¶ 440; Def.'s RSAMF BOR ¶ 440). GT hired outside counsel from Lightfoot, Franklin & White to investigate the claims made by Ms. Joseph in her February 2019 Internal Complaint. (SMF ¶ 86; RSMF ¶ 86). That investigation was not completed until May 14, 2019, after Ms.

---

[31] That same day, Ms. Engel and Ms. Oliver-Staley were informed that the NCAA would not be moving forward with charges against the WBB team. (SAMF ¶ 406; RSAMF ¶ 406).

Joseph's employment was terminated on March 26, 2019. (Pl.'s SAMF BOR ¶ 503; Def.'s RSAMF BOR ¶ 503; SMF BOR ¶ 92; Pl.'s RSMF BOR ¶ 92).

### D.    Discussion of Motion for Summary Judgment

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). When a party relies on circumstantial evidence to prove her case of discrimination, as Ms. Joseph does in the instant case, courts typically employ the familiar burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *accord Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). To establish a prima facie case of racial discrimination under Title VII, a plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of the protected class more favorably; and (4) she was qualified for the job. *McDonnell Douglas*, 411 U.S. at 802.

If a plaintiff establishes a prima facie case, she has created an inference of discrimination, and the defendant has the burden of articulating a legitimate, non-discriminatory reason for its employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). This burden is "exceedingly light." *Meeks v. Comput. Assocs. Int'l.*, 15 F.3d 1013, 1019 (11th Cir. 1994). "[T]he defendant must merely proffer non-[discriminatory] based reasons, not prove them." *Id.* That is, the employer must only introduce admissible evidence to support the challenged employment actions. *Tx. Dept. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). If the defendant meets this light burden, then the inference of discrimination is erased, and the burden shifts back to the plaintiff "to demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* at 256. To survive summary judgment, the plaintiff must prove both that the employer's proffered reason is not worthy of credence and that the employer was motivated by intentional discrimination. *See Meeks*, 15 F.3d at 1019 n.1 (citing *Hicks*, 509 U.S. at 511). To this end, the plaintiff "must meet [the] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Furthermore, pretext cannot be shown simply by demonstrating that the employer's reasoning was mistaken. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171,

1176 (11th Cir. 2000) (citing *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995)).

In addition to the *McDonnell-Douglas* burden-shifting framework, a plaintiff can survive summary judgment by presenting circumstantial evidence creating a triable issue as to the employer's discriminatory intent. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Under *Smith*, a plaintiff may create such an issue by presenting a "convincing mosaic of circumstantial evidence" that "raises a reasonable inference that the employer discriminated against her." *Boone v. City of McDonough*, 571 F. App'x 746, 752 (11th Cir. 2014) (quoting *Smith*, 644 F.3d at 1328) (internal quotations omitted). Regardless of the framework utilized, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Similarly, "[r]etaliation against a person because that person has complained of sex discrimination is [a] form of intentional sex discrimination encompassed by Title IX's private cause of action." *Saphir by & through Saphir v. Broward Cnty. Pub. Sch.*, 744 F. App'x 634, 639 (11th Cir. 2018) (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005)). "To prevail on a retaliation claim, [Plaintiff] must prove that" the Board of Regents "retaliated against [her] because [she] complained of sex discrimination." *Id.* (quoting *Jackson*, 544 U.S. at 184).

"Retaliation claims under Title IX are analyzed under the framework for claims under Title VII of the Civil Rights Act of 1964 ("Title VII")." *Kocsis v. Fla. State Univ. Bd. of Trustees*, 788 F. App'x 680, 686 (11th Cir. 2019).[32]

### 1.   Ms. Joseph's Claims Arising from Her Termination

The Court first addresses Ms. Joseph's claims arising from her March 26, 2019 termination.[33] (Def.'s SMF BOR ¶ 92; Pl.'s RSMF BOR ¶ 92). Ms. Joseph contends that this termination violated Title IX, Title VII, and the Georgia Whistleblower Act as discriminatory on the basis of sex and as retaliation for protected conduct. (Resp. to BOR MSJ at 48, Doc. 220).

The Court begins with claims for sex discrimination under Title VII. The parties agree that the *McDonnell Douglas* framework applies. (Br. Supp. BOR MSJ at 8; Resp. to BOR MSJ at 48). To make out a prima facie case of sex discrimination, Ms. Joseph must show that "(1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and

---

[32] GTAA incorporated into the GTAA MSJ "all arguments made in Sections III. a-c," regarding discrimination and retaliation, of the BOR MSJ. (GTAA MSJ at 15).

[33] The Court agrees with BOR that Ms. Joseph's placement on investigation suspension with pay on February 27, 2019 was not an adverse employment action. (Resp. to BOR MSJ Ex. 9, BOR Responses and Objections to Plaintiff's First Requests for Admission, No. 10 at 6, Doc. 220-12). *See Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1267 (11th Cir. 2021), *petition for cert. docketed,* No. 22-231 (U.S. June 23, 2022) (finding that "a simple paid suspension is not an adverse employment action" within the meaning of Title VII discrimination claims).

(4) her employer treated similarly situated employees outside her class more favorably." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citing *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) and *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985)).

Defendants concede that Ms. Joseph is a member of a protected class, that she possessed the necessary qualifications for the job, and that her termination was an adverse action. (Br. Supp. BOR MSJ at 10). However, they assert that Ms. Joseph cannot establish that any similarly situated male comparators were treated more favorably than her. The Court agrees. As BOR notes,

> There is no evidence that: a) any other male coach at GT has been the subject of multiple student-athlete complaints regarding abusive behavior; b) multiple student-athletes quit their sport because of behavior they attributed to a male coach; or, most importantly, c) any other male coach at GT has, following a thorough and independent investigation, been found to have engaged in the depth and breadth of corrosive behavior that was revealed by the Littler investigation.

(Br. Supp. BOR MSJ at 11). Even crediting Ms. Joseph's explanations for the foregoing, she fails to point to a comparator for the purpose of a sex discrimination analysis. As BOR notes, the only possible comparator is GT's former head football coach Paul Johnson, who received a complaint from a single student who failed to follow up on the complaint after being reached out to by HR. (*Id.* at 11–12). Ms.

Joseph fails to substantively respond to this portion of BOR's argument.[34] The Court agrees that Ms. Joseph has failed to make out a prima facie case of sex discrimination arising from her termination.[35]

The Court turns next to Ms. Joseph's claims that her termination was retaliation for protected activity. Defendants contend that even assuming she engaged in protected activity, Ms. Joseph cannot rebut BOR's proffered legitimate reasons for terminating her. Here, too, the Court agrees. Defendants point to the Littler Report, upon which Mr. Stansbury and Dr. Peterson based their termination decisions.

Ms. Joseph first asserts that opening the Littler Investigation was a pretext for terminating her in retaliation for her protected conduct for a number of reasons. First, because Mr. Stansbury testified that he based the decision to open the investigation in part on HR complaints which Ms. Joseph argues he had not actually received at the time. (*See supra* note 19). Second, because Mr. Stansbury decided to open the investigation within three days after she submitted her

_____

[34] While the Eleventh Circuit has held that "[e]ven without similarly situated comparators, 'the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent,'" the Court finds that Ms. Joseph has failed to put forward such evidence. *Lewis*, 934 F.3d at 1185 (quoting *Smith*, 644 F.3d at 1328).

[35] Even assuming Ms. Joseph could make out such a claim, as set forth in the following paragraphs, she fails to show the reason for her termination was pretext.

February 2019 Internal Complaint. And third, because Ms. Joseph argues that Coach Pastner was treated more favorably when an investigation was launched into allegations of misconduct against him.

While Ms. Joseph does not squarely make this argument, the Court begins with the observation that the commencement of the Littler Investigation was not in and of itself an adverse employment action. While the Eleventh Circuit has noted in an unpublished decision that commencing an internal investigation can be an adverse employment action "because it is likely that the initiation of an internal investigation against an employee would dissuade a reasonable worker from making or supporting a charge of discrimination," *Entrekin v. City of Panama City Fla.*, 376 F. App'x 987, 995 (11th Cir. 2010), it also noted in another case that "certainly internal investigations alone do not constitute discriminatory practices." *Brush v. Sears Holdings Corp.*, 466 F. App'x 781, 786 (11th Cir. 2012) (citing *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1304 (11th Cir. 2007)).[36] The concept that the opening an investigation into conduct is itself retaliation seems belied by the wealth of case law holding that the placement of an employee on administrative leave pending an internal investigation is not an adverse employment action. *See Davis v. Legal Servs. Ala., Inc.*, 472 F. Supp. 3d 1123,

---

[36] Of course, the Supreme Court has noted that a broader range of actions can be considered "adverse actions" in the retaliation context versus the discrimination context. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

1130–31 (M.D. Ala. 2020), *aff'd*, 19 F.4th 1261 (11th Cir. 2021), *petition for cert. docketed*, No. 22-231 (U.S. June 23, 2022) (collecting cases and observing that "to rule otherwise is to make every inquiry by any employer as to any conduct by a suspended employee, regardless of the cause or circumstances, into an adverse action sufficient to trigger application of federal anti-discrimination law."). If placing an employee on leave pending investigation is not necessarily an adverse employment action, then by extension, the simple act of investigating the employee cannot be either.

Here, where all parties agree that the WBB environment at the time of the commencement of the investigation was characterized by tension, and in light of Ms. Joseph's February 2019 Internal Complaint, the only plausible step that Defendants could take in light of the serious concerns raised by the students was to bring in an independent investigator. (Pl.'s Resp. to BOR MSJ at 11-12 ("Stansbury talked to Durham about Joseph's discriminatory resource allocation complaints and he seemed annoyed and "worn down" by Joseph. . . . Rountree also spoke to Durham about Joseph's complaints regarding resource disparities, and he too seemed annoyed. . . . Tensions between Joseph, Lewis, and Engel were also palpable."); Def.'s Reply BOR MSJ at 23 ("Stansbury had known almost from the very beginning of his employment with Georgia Tech that Joseph had tense and often strained relationships with other members of the Athletic

Department.")). As such, the Court rejects Ms. Joseph's proffered assertions that the circumstances leading to the commencement of the Littler Investigation provide evidence of pretext for Defendants' decision to terminate Ms. Joseph upon receiving the completed Report.

Next, Ms. Joseph attacks the Littler Report itself. First, she asserts that Mr. Stansbury "hand-selected Akin, Joseph's former supervisor who Joseph had just accused of retaliating against her in her [February 2019 Internal Complaint], to be the point person in the Littler Investigation" and that in turn, "Akin handpicked for Hoffman only witnesses with negative things to say about Joseph, intentionally avoided witnesses who might have said positive things about Joseph." (Resp. to BOR MSJ at 53). These complaints fall short. "An investigation does not have to be perfect, and just because the accused proclaims his innocen[c]e does not obligate the employer to expand or extend the investigation indefinitely in hopes of finding at least one person who can support the accused." *Johnson v. Reed Contracting Servs., Inc.*, No. 5:14-CV-2131-AKK, 2016 WL 5407999, at *8 (N.D. Ala. Sept. 28, 2016); *see also Gray v. Deloitte LLP*, No. 117CV04731CAPAJB, 2020 WL 10459805, at *12 (N.D. Ga. Jan. 16, 2020), *report and recommendation adopted*, No. 1:17-CV-04731-CAP, 2020 WL 10459740 (N.D. Ga. Feb. 11, 2020), *aff'd in part, appeal dismissed in part*, 849 F. App'x 843 (11th Cir. 2021) ("[T]he Court is not empowered to second-guess Defendants' review process unless the process itself was unlawfully

discriminatory, and the record contains no evidence of that fact.") *(citing Flowers*

*v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015)).  Moreover, Ms.

Joseph fails to rebut Mr. Hoffman's testimony that he identified the witnesses he

interviewed "based on [his] experience in the higher education setting as well as

[his] general knowledge of collegiate sports." (Deposition of Eric A. Hoffman

dated December 2, 2020 at 56:14-58:14, Doc. 186). Moreover, Mr. Hoffman testified

that

> Joeleen Akin wasn't selecting the interviewees, she was
> helping me schedule them and serving as a liaison
> between the folks in the athletic department and
> everyone else and myself. So, she was coordinating
> interviews.  But I wouldn't agree with your
> characterization that she selected the interviewees.

(*Id.* at 58:3–14). Ms. Joseph presents no evidence that Mr. Hoffman's independence

was compromised by the involvement of Ms. Akin to such a degree that the entire

Littler Report was pretextual.

Second, she attacks the way Mr. Hoffman conducted the Littler

Investigation, complaining that he failed to vet allegations and did not tell Ms.

Joseph what allegations had been made. (Resp. to BOR MSJ at 53). But "[n]one of

[her] criticisms of the investigation considered separately or together show that

the investigation was unfairly conducted, or at a minimum so unfairly conducted

that it should be considered evidence of pretext." *Ellison v. St. Joseph's/Candler Health Sys., Inc.*, 775 F. App'x 634, 648 (11th Cir. 2019).[37]

Finally, Ms. Joseph alleges that Mr. Stansbury did not actually believe the Littler Report. To support this charge, she cites testimony from his deposition in which he acknowledged perceived shortcomings of the report. (Resp. to BOR MSJ at 55–56). This argument fails for the same reason that Ms. Joseph's attacks on the report itself failed. Ms. Joseph was given an opportunity to respond, Mr. Stansbury testified that he reviewed the response, and that nothing in the response caused him to reconsider his decision to recommend her termination. (Stansbury Dep. at 238:5–7). The limitations on the report elicited at Mr. Stansbury's deposition, standing alone, do not raise a reasonable inference that he did not subjectively believe the report.[38]

Defendants are thus entitled to summary judgment on Ms. Joseph's claims arising from her termination.

---

[37] Likewise, her assertions that the Littler Report was factually inaccurate do not give rise to any credible evidence of pretext where the relevant inquiry is on the employer's beliefs. *See Alvarez*, 610 F.3d at 1266.

[38] Ms. Joseph makes a "cat's paw" argument in passing, but provides no evidence that Ms. Durham acted with discriminatory or retaliatory intent or that Mr. Stansbury's opinion was influenced by Ms. Durham in any way.

### 2.    Ms. Joseph's Claims Arising from Disparate Resources

Ms. Joseph contends that Defendants' disparate allocation of resources to the WBB program as opposed to the MBB program was sex discrimination in violation of Title VII. Specifically, she argues that "Defendants doled out vastly superior resources for locker rooms, marketing, assistant coach salaries, and travel to Pastner." (Resp. to BOR MSJ at 26). In response, Defendants argue that this is a Title IX argument packed into a Title VII claim, and under Title IX regulations, "[u]nequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance," though "the failure to provide necessary funds for teams for one sex" may be considered "in assessing equality of opportunity for members of each sex." 34 C.F.R. § 106.41(c).

In the Court's MTD Order, the Court recognized that "[a]lthough Title IX regulations provide that a mere difference in funding is not enough to constitute discrimination, the Court finds that at this stage Joseph has pleaded sufficient facts to state a claim that the alleged underfunding was sufficiently severe as to constitute discrimination." (MTD Order at 24, Doc. 64). However, the Court recognized that "[t]he claim here is, of course, under Title VII." (*Id.* at 24 n.5). The Court did not squarely decide whether a funding discrepancy which does not

violate Title IX could still constitute an adverse employment action under Title VII. (*Id.*).

In the Court's view, the relevant question for determining whether a funding disparity constitutes a Title VII violation is: What is the injury about which the plaintiff is complaining? As one commenter noted,

> [b]oth Title VII and Title IX are theoretically available to a coach-employee to address workplace discrimination concerning the coach's employment conditions, as well as female players' experiences--insofar as these conditions relate to and affect the coach's employment. However, employees deciding whether to proceed under Title VII and/or Title IX must analyze multiple factors, including the varying approaches courts take throughout the United States in resolving these claims. First, **one must consider whether the alleged unlawful acts were directed solely at the coach or against the coach and female athletes in the school--female athletes being the historically underrepresented sex**.

Kim Turner, *The Rights of School Employee-Coaches Under Title VII and Title IX in Educational Athletic Programs*, 32 ABA J. Lab. & Emp. L. 229, 230 (2017) (emphasis added) (notes omitted).

Courts have "noted that the facilities and supplies with which a coach is provided are a part of the coach's conditions of employment even though the same factors might be asserted by the students in a Title IX action." *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 798 (S.D. Ohio 1998), *aff'd*, 194 F.3d 1315 (6th Cir. 1999) (citing *O'Connor v. Peru State College*, 781 F.2d 632, 642 n. 8 (8th Cir. 1986)). So,

88

where a Title VII plaintiff challenges a disparity in resources provided to student-athletes, a court must carefully scrutinize whether there is evidence of intentional discrimination against the plaintiff above and beyond disparate resources provided to students. That is to say, while a Title VII plaintiff may meet her prima facie burden by showing that "her employer treated similarly situated employees outside of the protected class more favorably," a plaintiff-coach cannot meet her burden solely by pointing to more favorable treatment of non-employee *players*, if this disparate treatment only incidentally impacts her working conditions. *McDonnell Douglas*, 411 U.S. at 802.[39]  Instead, this disparity must be remedied by a Title IX claim. To hold otherwise would permit plaintiffs to skirt Title IX regulations permitting different funding for women's and men's teams.

For example, in *Weaver*, though the coach "contend[ed] that the lack of an adequate budget and the poor condition of the artificial turf hampered her coaching performance and her ability to recruit players, there [was] no evidence that the players' complaints which led to plaintiff's termination were related in any way to plaintiff's inability to recruit talented players or the condition of the

---

[39] And, even assuming a plaintiff-coach makes her prima facie case, she ultimately must establish that the disparate treatment was due to her membership in a protected category. Said another way, just as a male coach of a budget-neglected women's sports team could not bring a Title VII claim for sex discrimination, neither can a female coach absent proof of intentional discrimination on the basis of *her* sex. *See Burdine*, 450 U.S. at 253.

turf." 71 F. Supp. 2d at 798. Moreover, in that case, the "defendants [] presented evidence that the delay in replacing the artificial turf was due to a lack of available funds, not to gender discrimination." *Id.* "The practice field in question was also used by the men's lacrosse team, and thus the failure to promptly replace the turf also impacted equally upon a men's team" and "[n]o evidence has been submitted concerning the circumstances of the Athletic Department's failure to timely process the application for hosting the play-off games in 1994 which would suggest that this failure was the result of intentional gender discrimination as opposed to mere administrative error." *Id.* at 798–99.

Here, aside from eleventh-hour evidence excluded pursuant to BOR's Notice of Objections, Ms. Joseph only points to disparities in treatment of her team. (Resp. to BOR MSJ at 27) ("Joseph's team was also required to travel by commercial flights far more often than MBB, who primarily traveled by charter planes. This resulted in WBB players experiencing fatigue and missing classes due to game-day travel. All of these disparities in resources sent a signal to Joseph and her team that they less valued and less prestigious than MBB."). Ms. Joseph also asserts that she spent more time fundraising than MBB Coach Pastner, but as she acknowledges, their contracts required each of them to assist in fundraising efforts when reasonably requested. *Id.* Moreover, she points to absolutely no evidence that this disparity in necessary funding (as well as the asserted disparities in

recruiting and staffing excluded by the Court) was due to the fact that *she* was a member of a protected class, as opposed to her players. The Court therefore will grant BOR's motion for summary judgment as to these claims.[40]

### 3.   Ms. Joseph's Claims Arising from a Retaliatory Hostile Work Environment

Finally, the Court turns to Ms. Joseph's claims arising from a retaliatory hostile work environment. As the Court observed in its MTD Order, such a claim requires Ms. Joseph to come forward with evidence that (1) she engaged in a protected activity; (2) after doing so, she faced unwelcome harassment; (3) the protected activity was a "but for" cause of the harassment; (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment; and (5) her employer is responsible for the environment under either vicarious or direct liability. *See Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1248–49 (11th Cir. 2014). In that Order, the Court noted that

> Joseph does not allege threats, yelling, humiliation or physical intimidation, foul language, or the various other hallmarks of a hostile work environment. *See, e.g., Harris v. Fla. Agency for Health Care Admin.*, 611 F. App'x 949, 953 (11th Cir. 2015). Rather, she alleges "a series of unwarranted reprimands, disciplinary actions, and investigations on baseless and frequently discriminatory grounds"; "constant unwarranted compliance investigations"; being consistently treated "in an

---

[40] The Court does not need to reach the issues of statute of limitations or exhaustion and thus Plaintiff's proposed supplemental brief would not be dispositive of this issue. (Doc. 269).

adversarial manner" and being mocked for her complaints of discrimination; that the Board and GTAA engaged in "internal discussions about how to 'get rid' of her"; and "unreasonably refusing to engage in discussions about extending her contract on reasonable terms." [16] at 17.

She contends that following her February 3, 2019 complaint to human resources and February 8 complaint of discrimination and retaliation, the harassment became more acute. Specifically, she alleges that she was transferred to report to Joeleen Akin (who Joseph contends had previously "targeted" her) and that GTAA and the Board failed to inform her that she had been cleared of NCAA violations and that GTAA and the Board failed to inform her that she had been cleared of NCAA violations and did not honor their promise to renew her contract after the end of the NCAA investigation.

(MTD Order at 22–23). The Court also observed that "Joseph's allegations are weaker than those in most successful retaliatory harassment claims," but that "the Court nonetheless finds that she has stated a claim." (*Id*. at 23). Now, on summary judgment, Defendants argue that, even viewing the facts in the light most favorable to Ms. Joseph, she fails to establish an objectively hostile work environment. (Def.'s Br. Supp. MSJ at 44–45).

Starting chronologically, Ms. Joseph first argues that "[f]ollowing complaints to Lewis and Bobinski about their failure to adhere to the Plans and allocate money in an equitable manner, Bobinski accused Joseph of 'pitting' people against each other and then reprimanded her for appearing drunk at a football

game." (Pl.'s Resp. to BOR MSJ at 45). But as BOR points out, Ms. Joseph cannot show any temporal proximity between her alleged protected conduct and the reprimand. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough").

Next, she asserts that after she "complained to Akin about the disparate state of the WBB and MBB locker rooms, Akin made Joseph submit to an investigation for conduct male employees engaged in with impunity" and that "[a]fter Joseph complained of disparate discipline, the new AD, Griffin, accused her of 'attacking' GT through her complaints of sex discrimination before issuing her a final written warning for having her assistant perform personal tasks while a male employee engaged in the same misconduct without such severe discipline." (Pl.'s Resp. to BOR MSJ at 45). But the undisputed evidence shows that there was sufficient cause for the investigation, that the investigator found no evidence of such a disparity in enforcement, and that Ms. Joseph failed to provide examples of such disparities when requested. (McRae Report at 9 n.7, Doc. 212-10; BOR MSJ Ex. 9, Doc. 212-12).

Ms. Joseph next complains that after she learned that Mr. Lewis and Ms. Engel were dating, she told Ms. Akin "that she believed their relationship compromised Engel's ability to effectively police Lewis's budget decisions,

undermining Joseph's ability to do her job [and] . . . [t]hereafter, Joseph and her staff became the target of overbearing compliance inquiries by Engel's office." (Pl.'s Resp. to BOR MSJ at 45). As an initial matter, it is unclear that Ms. Joseph's complaints about Mr. Lewis and Ms. Engel's relationship constituted protected activity. The purported complaints about their relationship are barely referenced in the sections of Ms. Joseph's brief devoted to her protected activity. (Pl.'s Resp. to BOR MSJ at 35–44). But even if such complaints did constitute protected activity, increased scrutiny does not constitute an adverse employment action. *Harbuck v. Teets*, 152 F. App'x 846, 848 (11th Cir. 2005).

Next, Ms. Joseph points to the initial refusal of Mr. Stansbury and Mr. Rountree to extend Ms. Joseph's contract, but she points to no evidence at all that this was provoked by any protected activity. (Resp. to BOR MSJ at 46). As Defendants point out (and to which Ms. Joseph fails to respond), there was no evidence that Mr. Stansbury was aware of Ms. Joseph's complaints at the time. (Br. Supp. BOR MSJ at 55; Reply BOR MSJ at 19 n.19).[41]

Finally, Ms. Joseph points to the fact that the Littler Investigation was commenced shortly after her February 2019 Complaint, but the Court has already

---

[41] Moreover, as Defendants correctly point out, Ms. Joseph fails to present any evidence that the failure to initially extend her contract was pretext for discrimination or retaliation, rather than a desire to see better results by the WBB.

ruled that the commencement of the investigation alone was not an adverse employment action under the facts of this case.[42]

In sum, the Court finds that Ms. Joseph has failed to make out a prima facie case of a retaliatory hostile work environment. As such, the Court need not consider whether Ms. Joseph had a good-faith, subjective belief that she was engaging in protected activity.[43]

### 4.    Other Claims

As BOR notes in its Reply, Ms. Joseph has failed to respond to the BOR's argument regarding Count Fifteen, her claim under the Georgia Open Records Act and has therefore abandoned the claim. (Reply BOR MSJ at 29 n.23) (citing *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009)). As the Court has denied Ms. Joseph all relief against BOR, Count Sixteen for litigation expenses must also be dismissed.

As to her breach of contract claim against GTAA, Ms. Joseph asserts GTAA lacked good cause to terminate her Contract by incorporating by reference her arguments that her termination violated Titles VII and IX. (Resp. to GTAA MSJ at 14–15). As the Court has dispensed with those arguments, the Court likewise

---

[42] Ms. Joseph's remaining "bits and pieces" either do not rise to the level of adverse employment action or concern disparate treatment of her students, not her.

[43] For this reason, the Court does not need to consider the BOR Sanctions Order in ruling on the BOR MSJ.

dismisses this claim. Moreover, because the Court's ruling on the BOR MSJ is dispositive of all issues against Defendant GTAA, the Court does not reach GTAA's arguments that Title VII and/or Title IX is inapplicable to it.

## Conclusion

For the above reasons, it is

**ORDERED** that Plaintiff's Motion for Leave to Amend (Doc. 241) is **GRANTED**. It is

**FURTHER ORDERED** that Plaintiff's Motion for Reconsideration (Doc. 265) is **DENIED**.

It is **FURTHER ORDERED** that Defendant BOR's Motion for Summary Judgment (Doc. 212) is **GRANTED.**

It is **FURTHER ORDERED** that Defendant GTAA's Motion  for Summary Judgment (Doc. 214) is **GRANTED**.

The Clerk is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff and to close the case.

**SO ORDERED** this 3rd day of February, 2023.

_____
Victoria Marie Calvert
United States District Judge